UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RAYMOND FLANKS,

                                        Plaintiff,

        – against –

THE CITY OF NEW ORLEANS; JASON WILLIAMS, in his official
capacity as Orleans Parish District Attorney; ANNE KIRKPATRICK,
in her official capacity as Superintendent of the New Orleans Police
Department; JOHN DILLMANN, in his individual capacity; and
JOHN/JANE DOES #1-20, in their individual capacities,

                                        Defendants.

Case No. 23-CV-6897

**COMPLAINT**

JURY TRIAL
DEMANDED

**MURELL LAW FIRM**

Christopher J. Murell, La. Bar No. 32075
Meghan K. Matt, La. Bar No. 39975
2831 Saint Claude Avenue
New Orleans, LA 70117
(504) 717-1297 (Tel)
chris@murell.law
meghan@murell.law

**SHANIES LAW OFFICE PLLC**

David B. Shanies* (T.A.)
Deborah I. Francois*
Eleanor C. Davis*
110 West 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com
deborah@shanieslaw.com
eleanor@shanieslaw.com

* Applications for admission
  *pro hac vice* forthcoming

*Attorneys for Plaintiff Raymond Flanks*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

NATURE OF THE ACTION ............................................................................................. 3

JURISDICTION AND VENUE ......................................................................................... 4

PARTIES ........................................................................................................................... 4

JURY DEMAND ............................................................................................................... 6

FACTS ............................................................................................................................... 6

    A.  The Crime ....................................................................................................... 6

    B.  The Investigation and Raymond Flanks' Arrest ........................................... 7

    C.  The Trials and Conviction ............................................................................ 9

    D.  Raymond Flanks' Exoneration ................................................................... 11

    E.  The City of New Orleans's, NOPD's, and OPDA's Deliberate Indifference to
        Official Misconduct, Including *Brady* Violations, Fabrication of Evidence,
        Malicious Prosecution, and Their Failures to Train, Supervise, and Discipline
        Their Employees ......................................................................................... 12

        1.  The City's, NOPD's, and OPDA's Policies, Customs, and Practices of
            Condoning and Encouraging Misconduct ............................................... 13

        2.  The City's, NOPD's, and OPDA's Policies, Customs, and Practices of
            Suppressing *Brady* Information ............................................................. 18

        3.  The City's and NOPD's Unlawful Policies, Customs, and Practices
            Concerning the Fabrication of Evidence .................................................. 30

DAMAGES ...................................................................................................................... 33

CAUSES OF ACTION .................................................................................................... 35

REQUEST FOR RELIEF ................................................................................................ 47

Plaintiff Raymond Flanks, by his undersigned counsel, the Murell Law Firm and the Shanies Law Office PLLC, as and for his Complaint against the above-named Defendants, alleges as follows:

## **INTRODUCTION**

1.     In May of 1985, Mr. Flanks was wrongfully convicted for a 1983 murder he did not commit.  He was just 20 years old when he was falsely accused.  By the time he was exonerated in 2022, he had spent almost thirty-nine years in prison.  The true perpetrator of the crime was never arrested or prosecuted for it.

2.     Mr. Flanks' wrongful prosecution, conviction, and incarceration did not result from an inadvertent mistake.  They were caused by Defendants' unconstitutional and tortious acts and omissions, which included fabricating evidence; suppressing exculpatory evidence; providing false testimony and failing to correct false testimony; and creating and maintaining unlawful policies, customs, and practices that caused the wrongful and unconstitutional acts and omissions described in this Complaint.

3.     Mr. Flanks was convicted at his second trial, after a jury was unable to reach a verdict in his first trial.  At this second trial, the government relied exclusively on the victim's wife's identification testimony, which Defendant John Dillmann, at the time a Detective with the New Orleans Police Department ("NOPD"), intentionally fabricated by using manipulative, grossly improper, and unlawful identification procedures designed to obtain an unreliable identification.

4.     Among other misconduct, Defendant Dillmann responded to the victim's wife's expression of uncertainty about making an identification by shaking his head, directing her attention to Mr. Flanks' photograph, and saying, "that's him."

1

5.    No reasonable police officer—either today or in 1983—would believe it is proper to make such a remark to an eyewitness during an identification procedure.

6.    Any reasonable police officer in Defendant Dillman's position would have known that his actions were highly likely to cause a false identification.

7.    Defendant Dillman acted knowingly or with reckless disregard for the consequences of his misconduct.

8.    This fabricated identification was the only evidence offered against Mr. Flanks.

9.    To make matters worse, before, during, and after the trial, the NOPD, the Orleans Parish District Attorney's Office ("OPDA"), and Defendant Dillmann concealed and lied about critical exculpatory information, including evidence undermining the reliability of Defendant Dillmann's testimony and the reliability of the sole eyewitness's identification of Mr. Flanks as the perpetrator.[1]

10.    Decades later, the OPDA's Civil Rights Division worked with the Innocence Project of New Orleans ("IPNO") to conduct a comprehensive and cooperative reinvestigation of the case.  At the conclusion of that investigation, the adversaries adamantly agreed that Mr. Flanks had been wrongfully convicted and his rights egregiously violated.

11.    At Mr. Flanks' exoneration hearing last year, the OPDA stated, "the State agrees that Mr. Flank's [sic] conviction was obtained in violation of *Brady v. Maryland*" because "the

---

1.    All references in this Complaint to *Brady* and/or exculpatory information refer to the government's obligation under the Due Process Clauses of the Fifth and Fourteenth Amendments to disclose favorable information to a criminal defendant and corresponding protections under Louisiana law.  *See, e.g.*, *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006); *Kyles v. Whitley*, 514 U.S. 419, 438 (1995), *United States v. Agurs*, 427 U.S. 97, 103-07 (1976); *Giglio v. United States*, 405 U.S. 150, 155 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Wilde v. Wyoming*, 80 S. Ct. 900, 901 (1960); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Alcorta v. Texas*, 335 U.S. 28, 31 (1957); *Berger v. United States*, 295 U.S. 78, 88 (1935); La.C.Cr.P. art. 718 (A); La.C.Cr.P. art. 719 (A); La.C.Cr.P. art. 722; La. R. Prof'l Cond. 3.8; *In re Seastrunk*, 236 So. 3d 509, 510 (La. 2017) (duty to disclose under Louisiana Rules of Professional conduct is "coextensive" with *Brady* obligation).

State failed to disclose … materials [that] are favorable, and under the circumstances of the State's case against Mr. Flank[s], material."

12.    The State court judge who vacated Mr. Flanks' conviction acknowledged "that Mr. Flank[s] did not receive the justice that he deserved" at trial.

13.    Because the injustice done to Mr. Flanks was committed by Defendant Dillmann, an employee of the NOPD, and made possible by the NOPD and OPDA's unconstitutional policies and practices, Mr. Flanks has legal claims under state and federal law to remedy the massive damage he suffered due to his wrongful conviction and decades of imprisonment.

14.    Defendants' conduct caused Mr. Flanks injuries and damages including bodily and personal injuries; pain and suffering; mental anguish; emotional distress; loss of liberty; loss of income and earning capacity; reputational harm; infliction of physical illness; inadequate medical care; humiliation of himself and his family; degradation; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, and family relations.  These injuries began in 1983 and are ongoing in nature.

## NATURE OF THE ACTION

15.    This is an action to recover compensatory and punitive damages and other legal remedies for violations of Mr. Flanks' rights secured by 42 U.S.C. §§ 1983 and 1988 and by the United States Constitution, including its Fourth, Fifth, and Fourteenth Amendments, as well as the Louisiana Constitution and State law, arising from Defendants' suppression of *Brady* information, fabrication of evidence, and presentation of false testimony to maliciously prosecute, convict, and incarcerate Mr. Flanks for a crime he did not commit.

16.    The lawsuit also seeks to hold Defendants the OPDA and the City of New Orleans (the "City") liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Both the NOPD and the OPDA maintained unlawful policies, customs, and practices during Mr. Flanks'

investigation, arrest, and trial.  In executing those unlawful policies, customs, and practices, the NOPD and OPDA violated the constitutional rights of criminal suspects and defendants, including Mr. Flanks.  In Mr. Flanks' case, the unlawful policies, customs, and practices enabled Defendants Dillmann, and other members, servants, employees, and agents of the City, to violate Mr. Flanks' constitutional rights.  The policymaking officials acting on behalf of the City were deliberately indifferent to the likelihood that their agencies' unlawful policies, customs, and practices would cause constitutional violations like Mr. Flanks'.  As a result, the OPDA and City caused and are liable for Mr. Flanks' injuries.

17.     The City is likewise liable under the doctrine of *respondeat superior* for the tortious conduct of its agents and violations of the Louisiana Constitution and State law.

## JURISDICTION AND VENUE

18.     Mr. Flanks brings this action under 42 U.S.C. §§ 1983 and 1988 because he alleges Defendants, acting under color of law, deprived Mr. Flanks of his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

19.     This Court has original subject matter jurisdiction over Mr. Flanks' federal law claims under 28 U.S.C. §§ 1331 and 1343, this being an action seeking redress for the violation of Mr. Flanks' constitutional and civil rights; and supplemental jurisdiction over Mr. Flanks' state law claims under 28 U.S.C. § 1367.

20.     Venue is proper in the United States District Court for the Eastern District of Louisiana under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Mr. Flanks' claims occurred in this District.

## PARTIES

21.     Plaintiff Raymond Flanks is a citizen of the United States and was at all relevant times a resident of the State of Louisiana.

22.     Defendant the City of New Orleans is and was at all relevant times a municipal corporation existing under and by virtue of the laws of the City of New Orleans and the State of Louisiana, and having the powers and duties imposed by law thereon.

23.     Defendant the City of New Orleans was at all relevant times relevant the public employer of the individual Defendants Dillmann and John/Jane Does #1-20 and was legally responsible for torts they committed within the scope of their employment or under the color of state law.  Defendant the City of New Orleans is also obligated under law and by contract to indemnify and defend the individual Defendants named herein.

24.     The NOPD and the OPDA are and were at all relevant times agencies of Defendant the City of New Orleans and/or Orleans Parish.  At all times relevant to this action, Defendants the City of New Orleans and Defendants Williams and Kirkpatrick and their predecessors in office, in their official capacities, by their officers, agents, servants, and employees, were responsible for the operation, maintenance, and control of the NOPD and the OPDA and for the selection, training, supervision, and discipline of police officers and prosecutors.

25.     Defendant Jason Williams is currently the Orleans Parish District Attorney, and currently responsible for the operation, maintenance, and control of the OPDA and for the selection, training, supervision, and discipline of prosecutors and other OPDA employees. Defendant Williams is sued in his official capacity.

26.     Defendant Anne Kirkpatrick is currently the Superintendent of the NOPD, and currently responsible for the operation, maintenance, and control of the NOPD and for the selection, training, supervision, and discipline of police officers and other NOPD employees. Defendant Kirkpatrick is sued in her official capacity.

27.     Defendant John Dillmann is a former officer of the NOPD.  At all relevant times, he was a duly appointed and acting officer of the NOPD employed by Defendant the City of New Orleans.  At all relevant times, Defendant Dillmann acted toward Mr. Flanks under the color of state law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of Louisiana and the City of New Orleans.  This lawsuit seeks to hold Defendant Dillmann liable in his individual capacity.

28.     Defendants John/Jane Does #1-20 are employees of the NOPD or the OPDA who acted toward Mr. Flanks under the color of state law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of Louisiana and the City of New Orleans and/or Orleans Parish; and who participated in the misconduct alleged herein; but whose actual names Mr. Flanks has been unable to ascertain notwithstanding reasonable efforts to do so.  This lawsuit seeks to hold Defendants John/Jane Does #1-20 liable in their individual capacities.

### JURY DEMAND

29.     Mr. Flanks hereby demands trial by jury of all issues raised in this Complaint.

### FACTS

**A.     The Crime**

30.     On December 17, 1983, Faye Carnesi, a white woman, was walking to her car, which was parked in front of her house.

31.     Mrs. Carnesi saw a Black man wearing a shower cap (the "Actual Perpetrator") walk past her.

32.     Mrs. Carnesi's husband, Martin Carnesi, walked with Mrs. Carnesi to see her off.

33.     The Actual Perpetrator demanded money from Mr. Carnesi.  When Mr. Carnesi reached into his pocket, the Actual Perpetrator pulled out a gun and shot Mr. Carnesi.

34.     The Actual Perpetrator then pointed the gun at Mrs. Carnesi and demanded her purse.  She threw her purse at him and ran away.

35.     Mrs. Carnesi saw an aged, light blue car speed off.

36.     Mr. Flanks had nothing to do with the crime.

37.     At the time of the murder, Mr. Flanks was at home with his brother, Ralph Flanks.

**B.     The Investigation and Raymond Flanks' Arrest**

38.     Initially, Mrs. Carnesi described the Actual Perpetrator as a Black man in his late twenties, about 5'10" and 150 pounds, with a medium build, brown skin, and a light mustache. She also noted that he was wearing "a white plastic shower cap on his head."  When Mrs. Carnesi appeared before the grand jury four weeks later, she testified that the "one thing" she remembered about the Actual Perpetrator was that he "had a little white blotch on the side of his cheek, a little white mark, like discolored looking."

39.     This description did not match Mr. Flanks, who at the time was just 20 years old. Mr. Flanks is also over six feet tall and has never had a white mark on the side of his cheek.

40.     Mrs. Carnesi also reported that the perpetrator was driving a light blue car.  The daily report produced by the NOPD on the day of the crime says that the make and model of the vehicle were unknown, but, when Mrs. Carnesi testified to the grand jury just four weeks later, she described the car as "pale blue" and "not a shiny car[,] [i]t was an old car."

41.     The NOPD immediately associated this crime with a series of similar armed robberies that had occurred in the same area, all also perpetrated against elderly people.  The assailant described by the victims of those crimes was consistent with Mrs. Carnesi's initial description of the Actual Perpetrator: a Black man in his twenties, 5'8" to 5'11" tall, with a medium build and brown skin, with a mustache, and wearing a shower or "hospital type" cap.  He was also described as armed with a "small caliber nickel plated automatic" gun and as driving an "old, light

blue or gray vehicle." As of December 19, 1983, two days after Mr. Carnesi was murdered, the police had identified similar robberies on November 29, 1983; December 3, 1983; December 8, 1983; December 12, 1983; and December 18, 1983.

42.     One victim also described the perpetrator as being in his thirties, and the victims of another crime described him as being clean shaven and having a "small" "pug" nose.

43.     Again, these descriptions do not match Mr. Flanks.

44.     Mr. Flanks became a suspect in Mr. Carnesi's murder after he was arrested while fleeing from an armed robbery of an A&P Food Store on December 23, 1983.[2]

45.     Notably, the crime for which Mr. Flanks was arrested did not match the pattern of robberies into which Mr. Carnesi's murder clearly fit: the robbery was of a store, not of an elderly person outside on the street, and Mr. Flanks was not wearing a shower cap, as the perpetrator had been in the other robberies that the NOPD had already linked to Mr. Carnesi's murder.

46.     The arresting officer described Mr. Flanks as having a "dark" complexion and a tattoo on his right hand. Again, this description does not match the one initially provided by Mrs. Carnesi or those descriptions provided by victims of the other similar crimes.

47.     Mr. Flanks was arrested with a gun registered to his brother, Ralph Flanks. The NOPD falsely claimed that it forensically matched Ralph Flanks' gun to Mr. Carnesi's murder, but later ballistics testing by federal officials demonstrated that Ralph Flanks' gun was not connected to Mr. Carnesi's murder.

48.     On the day of the robbery, Mr. Flanks drove a 1982 light blue Chevrolet Citation—a very new car at the time of Mr. Carnesi's murder in 1983. This was inconsistent with Mrs. Carnesi's description of the Actual Perpetrator, who drove an old car. It is also inconsistent with

---

2.      Mr. Flanks' conviction for that robbery is not at issue in this lawsuit.

the reports from the victims of some of the other similar crimes, who similarly described the perpetrator's car as old.

49.     About a week after the crime, NOPD detectives visited Mrs. Carnesi at her home and showed her a photo array with photos of six individuals, including Mr. Flanks.

50.     Mrs. Carnesi testified to the grand jury that she narrowed it down to two photos—Mr. Flanks and one other—and then told the detectives that the "one thing" she remembered about the Actual Perpetrator was the "little white blotch on the side of his cheek, a little white mark, like discolored looking."

51.     In response, Defendant Dillmann "shook his head and said, 'that's him,'" indicating the photo of Mr. Flanks.  Mrs. Carnesi then acquiesced and mistakenly identified Mr. Flanks as the perpetrator.

52.     In her grand jury testimony, Mrs. Carnesi rationalized this selection by saying that she "d[id]n't think they showed the side of his face with that mark" in the photo.

**C.     The Trials and Conviction**

53.     Mr. Flanks initially went to trial on August 28, 1984.

54.     At this trial, the State presented testimony from NOPD Technician Stubbs.  Stubbs testified—falsely—that the gun found with Mr. Flanks when he was arrested was the same gun that fired the bullets that killed Mr. Carnesi.

55.     In addition, Mrs. Carnesi identified Mr. Flanks and testified that the car he was arrested in resembled the one she saw fleeing the scene.

56.     The defense presented testimony from Mr. Flanks' brother Ralph Flanks, who testified that Mr. Flanks was home with him at the time of the murder.

57.     After two and a half hours of deliberations, the jury could not reach a verdict.  As a result, the court declared a mistrial and set the case for a new trial.

58.    After this first trial, and at defense counsel's request, the State sent the firearm recovered from Mr. Flanks for an independent examination by the Bureau of Alcohol, Tobacco, and Firearms ("ATF") Forensic Laboratory.  On February 13, 1985, the ATF reported that neither the bullet used to kill Mr. Carnesi nor the casing found at the scene was fired by the gun with which Mr. Flanks was arrested.

59.    Mr. Flanks' second trial began on May 14, 1985.  Without the murder weapon, the State relied solely on Mrs. Carnesi's identification of Mr. Flanks as the perpetrator.

60.    At this trial, Mrs. Carnesi offered a description of her initial identification that differed drastically from her grand jury testimony, saying that, when examining the photo, she knew "… it was him.  This is the man that killed my husband.  This man.  I can't forget his face never, ever.  If I live to be a thousand years old.  Every night when I go to bed I see this man shoot my husband."  She also testified that Defendant Dillmann "didn't tell me anything" indicating whom to identify during the photo array.

61.    This testimony directly contradicted her testimony to the grand jury just three weeks after her initial identification and four weeks after the crime.  These facts were concealed from the defense.

62.    Defendant Dillmann also testified about the identification, claiming that Mrs. Carnesi "picked up the photograph of Mr. Flank[s] and handed it to me and begin [sic] crying. Once she stopped crying she told me that this was positively the man who had shot and killed Mr. Carnesi."  He further testified that neither he nor anyone else "indicate[d] in anyway [sic] that [he] wanted her to pick out a particular photograph."

63.    Those claims also contradicted Mrs. Carnesi's undisclosed grand jury testimony.

64.     Ralph Flanks also testified at the second trial, reaffirming that his brother was at home with him at the time of the murder.

65.     At the conclusion of the second trial, the jury found Mr. Flanks guilty of first-degree murder.

66.     At the penalty phase, the jury voted against capital punishment and Mr. Flanks was sentenced to life without parole.

67.     While preparing for the criminal trial, Mr. Flanks and his counsel were not aware of the NOPD records showing inconsistencies between Mrs. Carnesi's initial description of the Actual Perpetrator and Mr. Flanks' appearance, the NOPD records showing a string of similar crimes with a consistently prescribed perpetrator, or Mrs. Carnesi's grand jury testimony regarding the photo array and her initial identification of Mr. Flanks.

68.     As a result, that exculpatory information was unusable at trial, and Mr. Flanks was deprived of an opportunity to rebut the reliability of Mrs. Carnesi's identification of him as the perpetrator, to rebut the reliability of Defendant Dillmann's testimony at trial, and to call into question the integrity of the investigation conducted by the NOPD and OPDA.

**D.     Raymond Flanks' Exoneration**

69.     In May of 2022, IPNO contacted the Civil Rights Division ("CRD") of the OPDA about Mr. Flanks' case, and CRD began its own review and investigation.

70.     At the conclusion of those investigations, on November 14, 2022, the OPDA and Mr. Flanks' IPNO attorneys filed a Joint Agreement and Motion to Vacate his conviction.

71.     A hearing on the motion was held on November 17, 2022.

72.     At Mr. Flanks' exoneration hearing, the OPDA stated that "the State agrees that Mr. Flank's [sic] conviction was obtained in violation of *Brady v. Maryland*" because "the State

failed to disclose … materials [that] are favorable, and under the circumstances of the State's case against Mr. Flank[s], material."

73.     In particular, the OPDA acknowledged that "there is a reasonable likelihood that had [Mrs. Carnesi's] prior testimony been disclosed, it could have affected the judgment of the jury" and "defense counsel would have been able to present a compelling case that Mrs. Carnesi was innocently mistaken when presented with the wrong suspect, that Mr. Flank[s] did not resemble the perpetrator, and that the car he was arrested in did not fit the one at the crime scene."

74.     The OPDA also explicitly agreed that the State's conduct violated Mr. Flanks' constitutional right to due process and that Mr. Flanks "didn't receive a fair trial."

75.     At that hearing, Judge Goode-Douglas also acknowledged "that Mr. Flank[s] did not receive the justice that he deserved" at trial and vacated his conviction.

**E.     The City of New Orleans's, NOPD's, and OPDA's Deliberate Indifference to Official Misconduct, Including *Brady* Violations, Fabrication of Evidence, Malicious Prosecution, and Their Failures to Train, Supervise, and Discipline Their Employees**

76.     Mr. Flanks' wrongful conviction and imprisonment were not a random miscarriage of justice in an otherwise well-functioning law enforcement regime.  Rather, during the relevant period, the NOPD; the OPDA; policymakers acting on behalf of those agencies; Defendant the City of New Orleans; and/or Orleans Parish engaged in the following misconduct, which was reflected in, and led to, Mr. Flanks' false conviction: officials acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity; and implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the constitutional duties of OPDA, NOPD, and other City and/or Parish officials—including, but not limited to, properly documenting and disclosing exculpatory information,  avoiding the use of improper and suggestive identification

procedures, fabricating evidence, and maliciously prosecuting innocent individuals without probable cause.

**1.  *The City's, NOPD's, and OPDA's Policies, Customs, and Practices of Condoning and Encouraging Misconduct***

77.    Prior to, and at the time of, the unlawful investigation, prosecution, and incarceration of Mr. Flanks, the NOPD and OPDA—both agencies of the City of New Orleans and/or Orleans Parish—by and through their policymakers, maintained a policy, custom, or pattern and practice of condoning official misconduct, including by failing to train, supervise, and discipline police officers and prosecutors.

78.    Among other things, the NOPD failed to maintain individual training records; failed to conduct any in-service or advanced training for supervisors; failed to ensure that its supervisors had the training and resources to supervise serious investigations, including of murders; and failed to adequately document and enforce disciplinary investigations and findings against individual officers.

79.    In 1991, less than a decade after the murder investigation in this case, the International Association of Chiefs of Police published a report citing a "stunning lack of training" at the NOPD and finding that the NOPD's training record was "not nearly in compliance with professional expectations."  The report concluded that the NOPD's failure to keep training records "leaves the department dangerously defenseless against failure-to-train based allegations and lawsuits."  With respect to criminal investigations, the report concluded, "[T]he CIB [the Criminal Investigation Bureau] is failing in almost every crime category.  While the entire department must share responsibility for this poor performance, the CIB is simply not getting its portion of the job done. . . .  [P]rimitive case management practices, absence of performance goals, measurement

accountability, flawed selection process, and a stunning lack of training inhibits investigative effectiveness."

80.     Throughout the 1970s, 1980s, and 1990s, the NOPD maintained a widespread practice of promoting, facilitating, and/or condoning improper, illegal, and unconstitutional investigative techniques, including, but not limited to: (a) creation and presentation of false or materially misleading evidence; and (b) failure to document and disclose exculpatory and impeachment evidence to prosecutors, defense counsel, and courts; as well as engaging in the affirmative and/or passive concealment of those types of misconduct.

81.     Despite having actual or constructive notice that the NOPD's custom, pattern, and practice of promoting, facilitating, and/or condoning improper, illegal, and unconstitutional investigative techniques, and failing to adequately supervise, discipline, and train its officers, was reasonably likely to lead to constitutional violations similar to those perpetuated against Mr. Flanks, the NOPD leadership continued to maintain those customs, patterns, and practices of deliberate indifference to the rights of the suspects.

82.     With respect to training in particular, in 1994, the Louisiana National Guard, in partnership with the City, found that "[a] great deal has been written about the state of training within the NOPD.  Year after year it does not seem to improve.  It is clearly apparent that the city and department leaders do not understand, or simply choose to ignore, the importance of training for police officers and police civilians engaged in supporting police officers. . . .  Unfortunately, even after three previous reports criticizing training within the NOPD, very little action has been taken to improve the situation."

83.     NOPD supervisors and policymakers had actual and constructive notice of the NOPD's policy, custom, pattern, or practice of investigative misconduct and failures to supervise

and train through numerous cases and investigations that took place prior to the investigation in this case. The misconduct committed in those cases by NOPD officers, including Defendant Dillmann, was actually or constructively known to NOPD supervisors and policymakers prior to Mr. Flanks' wrongful conviction, and NOPD supervisors and policymakers failed to train, supervise, discipline, or otherwise reprimand Defendant Dillmann and other NOPD employees in response to such actual and constructive notice.

84.     The NOPD's policy, custom, pattern, and practice of investigative misconduct and failures to supervise and train is illustrated through numerous cases and investigations preceding this case. The misconduct committed in those cases by NOPD officers, including Defendant Dillmann, was actually or constructively known to NOPD supervisors and policymakers prior to Mr. Flanks' wrongful conviction and, upon information and belief, NOPD supervisors and policymakers failed to train, supervise, discipline, or otherwise reprimand Defendant Dillmann and other NOPD employees in response to such actual and constructive notice.

85.     In addition, prior to and at the time of Mr. Flanks' conviction, the NOPD, by and through its final policymakers, maintained a custom or practice of a "blue curtain," or code of silence, pursuant to which police misconduct—including, but not limited to, the manufacture of false evidence, the suppression of exculpatory evidence, and the malicious prosecution of innocent individuals without probable cause—was routinely not reported by fellow officers or disciplined or otherwise addressed by the department. To the contrary, officers customarily engaged in misconduct themselves to cover up any misconduct they witnessed by a fellow officer.

86.     Senior policymakers at NOPD at the time of Mr. Flanks' arrest and conviction were aware of the existence of the code of silence, and of rampant police misconduct and the culture of

unaccountability that resulted from this custom, and were deliberately indifferent to its consequences, including that it caused constitutional violations.

87.     By way of example, in 1979, then-Superintendent James C. Parsons testified at a jury trial that a code of silence existed at the NOPD.  *Thomas v. City of New Orleans*, 687 F.2d 80, 82 (5th Cir. 1982).  In that case, Officer Thomas was retaliated against and discharged because of this complaint against a fellow officer.  Superintendent Parsons testified that he had considered taking steps to protect officers who broke the code of silence, but he did not do so.

88.     As another example, in 1981, NOPD paramedic Christopher Hero was wrongfully dismissed in retaliation for reporting to the Internal Affairs Division unlawful conduct of a police officer.  The City of New Orleans Civil Service Commission reinstated Mr. Hero and found that he had "established beyond doubt that a 'code of silence' does operate within the New Orleans Police Department …".   *See Christopher Hero v. Dep't of Police*, No. 1775 (Civil Service Commission, City of New Orleans, Mar. 17, 1983).

89.     Even prior to the *Thomas* and *Hero* cases, the NOPD had been put on notice that its disciplinary procedures were inadequate and fostered a culture of police protectionism.  A 1975 report on citizen complaints at the NOPD by McManis Associates, Inc., warned that the NOPD "suffers from the absence of clearly defined and enforced ground rules of behavior," and observed that "police personnel feel free to behave as they wish in most instances."

90.     Notwithstanding these and other warnings, the NOPD failed to institute meaningful reforms that would have constrained police misconduct and addressed the code of silence at the NOPD.

91.     Similarly, throughout the 1970s, 1980s, and 1990s, the OPDA maintained policies, customs, and practices that promoted, facilitated, and condoned misconduct by prosecutors and

other OPDA employees and agents, including concerning the suppression of exculpatory and favorable evidence to criminal defendants and their counsel.

92.     Prior to, during, and after Mr. Flanks' wrongful prosecution and conviction, OPDA supervisors and policymakers had actual and constructive notice of a pattern and practice of prosecutors' *Brady* violations.   Repeatedly, when confronted with instances of misconduct, including in particular *Brady* violations, OPDA's supervisors and policymakers, as a matter of policy and custom, failed to impose reasonable discipline on the employee(s) involved and failed to take other reasonable, remedial measures to deter and prevent such misconduct.   OPDA supervisors and policymakers likewise failed to train and supervise OPDA employees regarding repeated *Brady* violations, despite their actual and constructive notice of a pattern and practice of such behavior, and despite the knowledge that their failure to train and supervise OPDA employees would likely result in wrongful prosecutions, convictions, and imprisonment of criminal defendants, including Mr. Flanks.

93.     The OPDA's policy, custom, pattern, and practice of investigative misconduct and failure to supervise, train, and discipline is illustrated through numerous cases and investigations that took place prior to the investigation and prosecution in this case.   The misconduct committed in those cases by OPDA employees, including prosecutors involved in the case against Mr. Flanks, was actually or constructively known to OPDA supervisors and policymakers prior to Mr. Flanks' wrongful conviction and, upon information and belief, OPDA supervisors and policymakers failed to train, supervise, discipline, or otherwise reprimand OPDA employees in response to such actual and constructive notice.

94.     The existence and ongoing nature of OPDA's policy, custom, pattern, and practice of investigative misconduct and failure to supervise, train, and discipline is illustrated through

numerous cases and investigations that took place during or after the investigation and prosecution in this case.

### 2. The City's, NOPD's, and OPDA's Policies, Customs, and Practices of Suppressing Brady Information

95.     At all relevant times, the City of New Orleans, NOPD, and OPDA, as a matter of policy, custom, and practice, permitted, encouraged, and acquiesced to the suppression of *Brady* information.

96.     At all relevant times, the City's, NOPD's, and OPDA's policies, rules, and procedures governing documentation and disclosure of information collected during criminal investigations was not designed to, and did not, adequately ensure that the NOPD, the OPDA, and their employees documented or disclosed *Brady* information to suspects or defendants, courts, and, in some cases, prosecutors.

97.     The City of New Orleans and both the NOPD and the OPDA (sued through their then-current final policymakers) have revealed, through discovery in other wrongful conviction lawsuits and otherwise, that the OPDA's formal policies permitted prosecutors to suppress *Brady* information by embracing an improperly circumscribed definition of "exculpatory" information that was at odds with governing jurisprudence and the United States Constitution.  Moreover, at the time of Mr. Flanks' prosecution and conviction, the OPDA's formal policies did not require prosecutors to disclose *Brady* information to criminal defendants, their attorneys, or the courts, at all.

98.     By declining to promulgate, much less enforce, any policy requiring timely disclosure of *Brady* information at the time of Mr. Flanks' prosecution and conviction, the OPDA effectively delegated policymaking authority on such matters to individual prosecutors, including the prosecutors involved in Mr. Flanks' prosecution and conviction.

99.    Even when the OPDA did adopt a formal policy requiring disclosure of some—but not all—*Brady* information to the defense, the policy was extremely deficient.  Among other things, the policy failed to instruct prosecutors: (a) on how to determine whether evidence is favorable, (b) to what extent (if any) impeachment information should be considered *Brady*, (c) to what extent the facts of an investigation focused on another suspect constitutes *Brady*, (d) how to address recanted testimony, (e) whether and to what extent prosecutors should be considering the materiality of exculpatory information when making disclosure decisions, (f) the timing of *Brady* disclosures, (g) prosecutors' responsibility to determine whether other prosecutors or law enforcement personnel have *Brady* information, (h) how to obtain advice regarding *Brady* disclosures, (i) specific examples from prior cases demonstrating OPDA's failures to meet its *Brady* obligations and summaries of relevant case law, and (j) to what extent (if any) prosecutors should disclose undocumented *Brady* information.

100.    On the materiality question, for example, former District Attorney Harry Connick has testified that while "[m]ateriality was very important" under his office's *Brady* policy, there was no instruction on how to define materiality or guidance for prosecutors to make such determinations.  Instead, Mr. Connick testified, prosecutors "were supposed to figure it out themselves."

101.    The City's, NOPD's, and OPDA's policy and practice was to tolerate, fail to discipline, and encourage violations of officials' constitutional obligations to make timely disclosure to the defense of *Brady* information.  The City's, NOPD's, and OPDA's deliberate indifference to such violations created a laissez-faire atmosphere that caused such violations to persist, including in Mr. Flanks' case.

102.    The City of New Orleans and both the NOPD and the OPDA (sued through their then-current final policymakers) have revealed, through discovery in other wrongful conviction lawsuits and otherwise, that their policymakers created and furthered policies and practices that encouraged and tolerated *Brady* violations.  For example, former Orleans Parish District Attorney Leon Cannizzaro, Jr., described the tenure of his predecessor, Mr. Connick, as follows: "In the decades preceding my administration, the District Attorney's office [*i.e.*, under Mr. Connick, from 1974 to 2003] had been in a steady state of decline.  Over the course of that time period, bad policy decisions took root and became institutional."  Mr. Cannizzaro observed that, as a result of the *Brady* claims in the case *Thompson v. Connick*, "some of those policy decisions had collateral consequences in the form of civil liability against the office."

103.    Indeed, during his tenure as District Attorney, Mr. Connick repeatedly and publicly expressed disdain for the *Brady* doctrine and rebuffed suggestions—including, in one notable instance, a plea from a sitting Orleans Parish Criminal District Court Judge—that prosecutors be instructed on their *Brady* obligations and that the OPDA take steps to ensure compliance with the law and Constitution.

104.    The deficiencies of the OPDA's policies, customs, and practices regarding disclosure of *Brady* information are both legion and well-documented.  For example, Mr. Flanks attaches as Exhibit 1 and incorporates by reference the expert report of Professor Laurie Levenson, filed in the case of *Jones v. Cannizzaro* et al., E.D. La. Civil Action No. 18-503, which methodically documents and discusses many of the deficiencies.

105.    These policies, customs, and practices directly and proximately caused the violations of Mr. Flanks' constitutional rights described herein and his wrongful conviction, imprisonment, and other damages.

106.    As the National Registry of Exonerations has reported, in the 1980s, concealing exculpatory evidence in New Orleans was routine.  Justice John Paul Stevens observed in 1995 that the OPDA's *Brady* violations were "blatant and repeated."  Justice Ruth Bader Ginsberg later observed in 2012 that the OPDA during the 1980s was "a tinderbox . . . in which *Brady* violations were nigh inevitable."  For example, John Thompson was sentenced to death in 1985 because a New Orleans prosecutor hid (and eventually lost or destroyed) a critical item of physical evidence: a piece of cloth with a stain of the criminal's blood that tests had proven could not have come from Mr. Thompson.

107.    Empirical data support this conclusion.  Orleans Parish has the highest per capita exoneration rate of any county or parish in the country.  As of 2020, in 78% of exonerations from New Orleans, exculpatory evidence was concealed (*i.e.*, in 18 of the 23 exonerations); prosecutors committed misconduct in nearly 90% of those cases (*i.e.*, in 16 of the 18 cases in which exculpatory evidence was concealed).

108.    In addition to post-conviction exonerations, there are at least 51 criminal cases from New Orleans in which courts have found and/or the prosecution has acknowledged that the OPDA violated *Brady*, as well as several others in which strong claims of *Brady* violations existed but the convictions were reversed on other grounds.  As such, the actual total of cases with concealed exculpatory evidence is much higher.

109.    The following cases provide three illustrative and notable instances of the City's and/or Parish's policies, customs, and practices of tolerating, failing to discipline, and encouraging violations of officials' constitutional obligations to make timely *Brady* disclosures:

    a.  *Connick v. Thompson*, 563 U.S. 51 (2011):  John Thompson was wrongfully convicted of murder.  Roughly one week before Thompson's trial, a blood sample

collected from the crime scene was sent to the crime laboratory; two days before

trial, an Assistant District Attorney ("ADA")—who also worked on Mr. Flanks'

case—received the report, stating that the perpetrator had blood type B.  He later

claimed to have put the report on another ADA's desk, one who was also assigned

to Mr. Flanks' case.  On the first day of trial, a third Assistant District Attorney

(ADA) checked out all the physical evidence in the case from the police property

room, including the bloodstained swatch.  This third ADA then checked all the

evidence, except the swatch, into the courthouse property room.  Neither the lab

report nor any mention of the swatch was ever disclosed to Thompson's counsel.

When a private investigator discovered the crime lab report in New Orleans Police

Crime Laboratory files, Thompson's blood was tested.  He was determined to be

type O, and therefore not a match for the undisclosed blood samples.

b.  *Kyles v. Whitley*, 514 U.S. 419 (1995):  The U.S. Supreme Court granted habeas

relief to Curtis Lee Kyles for his 1984 conviction and held that the prosecution had

withheld evidence favorable to the defense—significantly, that a key, non-

testifying witness had made inconsistent and self-incriminating statements to the

police.  The defense was also never told that an eyewitness, who testified that Mr.

Kyles was the perpetrator, had described the perpetrator as having features

significantly different from Mr. Kyles's.  Moreover, the prosecution also

suppressed a list of cars present at the crime scene after the murder—a list that

would have exculpated Mr. Kyles.  Notably, Defendant Dillmann was the lead

detective on this case.

    c. *Floyd v. Vannoy*, No. 11-2819, 2017 WL 1837676, 2017 U.S. Dist. LEXIS 69705, (E.D. La. May 8, 2017), *aff'd* 894 F.3d 143 (5th Cir. 2018):  This Court granted federal habeas corpus relief to John Floyd after suppression of forensic and other evidence led to his 1982 murder conviction.  The suppressed evidence included fingerprint results that the NOPD had analyzed and an affidavit that misrepresented information a witness gave to police.  Again, Defendant Dillmann was a detective on this case.

110.    These three cases are not isolated incidents.    Other individuals who were documented victims of the *Brady* violations rampant in New Orleans in the 1970, 1980s, and 1990s (including by Defendant Dillmann) include, but are not limited to, the following:

    a. *Norman Clark*:  In 1974, Norman Clark was convicted of heroin distribution.  Clark's defense secured subpoenas compelling testimony of material eyewitnesses to the charged drug transactions.  However, these eyewitnesses—police informants—"were made unavailable" because they "had been sent to Florida with spending money and at government expense through the combined efforts of state and federal officials."  An NOPD officer testified at Mr. Clark's trial "that it had been his suggestion to send [the eyewitnesses] out of Louisiana."  Indeed, it was the NOPD officer who provided the eyewitnesses with spending money for their trip.  After Mr. Clark was convicted, one of those eyewitnesses came forth with exculpatory testimony.  In subsequent federal habeas proceedings, the United States Court of Appeals for the Fifth Circuit concluded the NOPD had "flagrantly violated" Mr. Clark's constitutional right to due process and his "conviction [could not] be allowed to stand."  *Clark v. Blackburn*, 632 F.2d 531, 535 (5th Cir. 1980).

b. *Raymond Lockett*: In 1974, Raymond Lockett was also convicted of heroin distribution.  "The State's evidence at trial tended to show that Lockett sold heroin to an undercover agent in the presence of two confidential informants," but when Mr. Lockett's lawyer "attempted to locate and subpoena" those informants, "[h]e was unable to do so," because the government had "willfully concealed [them] from the trial court."  In other words, "the State had deliberately made key witnesses unavailable for [Mr. Lockett's] trial." The two informants who would have testified at Mr. Lockett's trial were the same two informants who would have testified at Mr. Clark's, and the same NOPD officer orchestrated their unavailability. The Fifth Circuit later concluded that the NOPD's "deliberate concealment of a named eyewitness whose testimony would admittedly be material constitute[d] a prima facie deprivation of due process."  *Lockett v. Blackburn*, 571 F.2d 309 (5th Cir. 1978).

c. *Issac Knapper*: In 1979, Issac Knapper was convicted of the armed robbery and first-degree murder of Dr. Ronald Banks. On appeal it was discovered that Defendant Dillmann, the lead investigator there, had failed to turn over a report containing exculpatory evidence before Knapper was convicted.  The undisclosed report contradicted evidence put on by the State and Defendant Dillmann at trial, including differing witness descriptions of the perpetrator, and confirmation that the gun used to kill Banks was the same gun used in a similar armed robbery in the area just a month earlier for which the gunman was identified.  The court found that Dillmann's report was not only withheld from defense counsel but that it contained

extremely favorable and exonerating evidence in violation of *Brady*, leading the court to overturn Knapper's conviction.

d. *Reginald Adams*:  Mr. Adams was convicted of murder in 1983.  The only evidence used in Mr. Adams's trial was a coerced confession that got nearly every fact about the crime wrong.   The prosecution suppressed a police report showing that detectives had discovered the murder weapon, traced it to the people who had access to the gun shortly before the murder, and subsequently arrested one of them—on whom they found a bracelet stolen from the victim's home—for accessory to first-degree murder.  Nevertheless, detectives testified that their only real lead developed once Mr. Adams confessed and that they never located the murder weapon or any of the victim's stolen property.  The prosecution also falsely represented to Mr. Adams's defense team that no evidence was ever recovered and that no forensic examination, including ballistics testing, had ever been conducted, when the opposite was true.  Mr. Adams was exonerated in 2014.

e. *Curtis Lee Kyles*: In 1984, Curtis Lee Kyles was convicted of first-degree murder and sentenced to death. Although his defense requested any exculpatory or impeachment evidence before trial, the State responded that there was "no exculpatory evidence of any nature."  However, following Mr. Kyles's conviction, it emerged that the State had evidence that "would have entitled a jury to find that the eyewitnesses were not consistent in describing the killer, that two out of the four eyewitnesses testifying were unreliable, that the most damning physical evidence was subject to suspicion, that the investigation that produced it was insufficiently probing, and that the principal police witness was insufficiently

informed or candid." Before the United States Supreme Court, the State of Louisiana conceded that "some of the favorable evidence in issue . . . was not disclosed . . . to the prosecutor until after trial," even though it had been "known . . . to [NOPD] police investigators." In other words, the NOPD's failure to turn over material, exculpatory evidence caused the *Brady* violations at Mr. Kyles's trial. The Court specifically admonished Defendant Dillmann, who was the lead investigator, for preventing the defense from using a witness's inculpatory statements "to throw the reliability of the investigation into doubt and to sully the credibility of Detective Dillman[n]." Additionally, Darlene Kersh, the witness who identified Kyles at trial, later recanted her testimony, disclosing that the State coerced her to lie on the stand. The Supreme Court ultimately held that Mr. Kyles was entitled to a new trial. *Kyles v. Whitley*, 514 U.S. 419 (1995).

f.  *Calvin Duncan*:  In 1985, Mr. Duncan was convicted of first-degree murder after the prosecution withheld evidence that showed he had no knowledge of the crime, the perpetrator did not match Mr. Duncan's physical characteristics, and the identification process was completely unreliable.  In response to an explicit request from the defense for any exculpatory evidence in the case, the prosecution told the defense, "The state has no exculpatory evidence."  The prosecution also suppressed evidence that an officer on the case had a felony conviction.  Mr. Duncan was exonerated in 2021.

g.  *George Toca, Jr.*:  In 1985, Mr. Toca was convicted of second-degree murder after the prosecution withheld exculpatory evidence, including witnesses' initial descriptions of the perpetrator that did not match Mr. Toca.  One witness also stated

that he probably would not be able to make an identification but subsequently identified Mr. Toca at trial.  Moreover, the defense was not given a police report that supported Mr. Toca's alibi.  Specifically, the report detailed his alibi witness's call to the police after Mr. Toca's arrest, during which she reported that Mr. Toca was innocent and provided a tip pointing to someone else.  Mr. Toca was exonerated in 2022.

h. *Jerome Morgan*:  In 1994, Mr. Morgan was wrongfully convicted of second-degree murder after the prosecution withheld a 911 call log revealing that the police had arrived at the scene and sealed it up within a few minutes after the shooting, which undermined the prosecution's theory that Mr. Morgan fled the scene after the shooting and then returned before police arrived.  Two witnesses also later recanted their testimonies and said that police pressured them into falsely identifying Mr. Morgan; in fact, during a photographic lineup, one detective pointed to Mr. Morgan's photo.  Both witnesses also later testified that police told them Mr. Morgan was the shooter.  Mr. Morgan was exonerated in 2016.

i. *Kuantau Reeder*:  In 1995, Mr. Reeder was wrongfully convicted of second-degree murder after the prosecution failed to disclose that a key witness had a federal conviction for lying on a gun application (which the witness then lied about during testimony, a lie the prosecution did not correct).  Although police recovered the jacket the shooter had been wearing and lifted a fingerprint from a stamp in the pocket, the print was not compared to Mr. Reeder's prints; in 2021, the NOPD examined the print and concluded that it excluded Mr. Reeder.  Additionally, as the practice of the OPDA was to not turn over prosecutors' notes to the defense, the

prosecution did not disclose that the key witness said twice that he had identified another suspect as the shooter during a photographic lineup.  Mr. Reeder was exonerated in 2021.

j.   *Larry Moses*:  In 1995, Mr. Moses was convicted after prosecutors withheld the fact that one of their key witnesses had pinned crimes on romantic rivals in the past.  The witness would later go on to share inconsistent accounts of the crime and admit to others that he set up Mr. Moses in an act of revenge.  Additionally, the prosecutor relied on the testimony from a woman who was only 70 or 75% sure of the robber's voice that she heard on the night of the murders.  Mr. Moses was exonerated in 2023.

k.   *Shareef Cousin*:  In 1996, Mr. Cousin was wrongfully convicted of murder and sentenced to death after police coerced Mr. Cousin's former friend into implicating him.  Mr. Cousin's conviction was reversed after it was determined that the prosecution had improperly questioned witnesses and improperly withheld a statement by the key witness that she was unable to see the perpetrator clearly and likely could not identify him.  Mr. Cousin was exonerated in 1999.

l.   *Bernell Juluke, Jr.; Kunta Gable; and Leroy Nelson*:  Messrs. Juluke, Gable, and Nelson were each convicted of murder after the prosecution withheld exculpatory evidence, including police communication logs and information that undermined a witness's testimony.  The prosecution also withheld that a witness initially testified that the getaway car was green, contradicting his trial testimony that the car was blue.  Meanwhile, Mr. Juluke, who was pegged as the driver, had a gray car.  Moreover, two NOPD officers on the case who broadcast the information that

implicated the three men were indicted in 1994 for drug dealing and conspiracy in a woman's death.  All three men were exonerated in 2022.

m. *Dan L. Bright*:  In 1996, Mr. Bright was wrongfully convicted of murder after the prosecution withheld FBI documents stating that a confidential informant had identified another man as the killer, as well as evidence that undermined the credibility of the prosecution's key witness.  Mr. Bright was exonerated in 2004.

n. *Robert Jones*:  In 2017, Mr. Jones was exonerated of four separate crimes, including rape, robbery, kidnapping, and manslaughter, after it was revealed in the years following his 1996 conviction that the prosecution and police had withheld numerous key facts.  Among other things, they failed to disclose: (1) the rape victim's descriptions of the perpetrator, which matched Lester Jones (the actual perpetrator) and not Robert Jones; (2) the rape victim's statement that the perpetrator told her that the location where he raped her was his "neck of the woods," a critical fact given that the location was a block from where Lester Jones lived; (3) the fact that the investigating detectives concluded that Robert Jones and Lester Jones did not know each other, and that Lester Jones was responsible for all the crimes of which Robert Jones was convicted; (4) Lester Jones's possession of items stolen in each robbery; and (5) a memorandum by the trial prosecutor corroborating that Lester Jones and Robert Jones did not know each other.

o. *Eddie Triplett*:  In 1998, Mr. Triplett was convicted of drug charges after the prosecution withheld from the defense a police report describing how officers stopped both Mr. Triplett and another person before arresting Mr. Triplett and releasing the other man.  This police report named the other man, not Mr. Triplett,

29

as the person detained.  The police report refuted the police's testimony at trial that no other person besides Mr. Triplett was present at the scene.  Mr. Triplett was exonerated in 2011.

p. *Cedric Dent*:  In 1999, Mr. Dent was convicted of second-degree murder after the prosecution withheld evidence, including the lead detective's notes revealing that there was a second eyewitness, and that this eyewitness's description of the shooter was not a match to Mr. Dent.  The notes also contradicted the detective's account in his police report about how Mr. Dent came to be a suspect in the case.  Finally, prosecutors failed to disclose four out of the six accounts provided by the original eyewitness, each of which differed.  Mr. Dent was exonerated in 2022.

111.    Under the City's, the NOPD's, and the OPDA's policies, customs, and practices, officials were permitted and encouraged to refrain from making any record of *Brady* information, despite the fact that disclosure of such information was and remains constitutionally required.

112.    Through a policy, custom, and practice of not disciplining employees for *Brady* or other constitutional violations and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings, or otherwise), the City, the NOPD, and the OPDA encouraged such violations by demonstrating to employees that they would face no negative consequences for their failures to comply with *Brady* and other constitutional requirements.

### 3.    *The City's and NOPD's Unlawful Policies, Customs, and Practices Concerning the Fabrication of Evidence*

113.    At the time of Mr. Flanks' arrest, prosecution, and conviction, the City and NOPD also created and/or maintained policies, customs, and practices that permitted and encouraged officials to fabricate evidence.

114.    Moreover, during the 1970s and 1980s, there was a pattern of fabrication of evidence within the NOPD, including by Defendant Dillmann.

115.    Individuals who were documented victims of the fabrication of evidence by Defendant Dillmann prior to Mr. Flanks include Issac Knapper and Curtis Lee Kyles, as described above, in addition to the following:

a.    *Kevin Seward*:  In 1979, Kevin Seward was convicted of first-degree murder.  Mr. Seward's confession was allegedly given to Defendant Dillmann, the lead investigator, and was introduced at trial over the objection of defense counsel.  Mr. Seward later challenged his conviction because his confession had been coerced by NOPD officers and detectives, including Defendant Dillmann, and should have been excluded at trial.  The Louisiana Supreme Court agreed and reversed Mr. Seward's conviction.  *State v. Seward*, 509 So. 2d 413 (La. 1987).

b.    *John Floyd*:  In 1982, John Floyd was convicted of the 1980 murder of William Hines, who had apparently been murdered by a sexual partner.  Mr. Floyd's conviction was largely based on a confession entirely fabricated by NOPD officers and detectives, including Defendant Dillmann, which he signed while intoxicated and as a result of physical coercion and threats.  NOPD officers and detectives, including Defendant Dillmann, coerced two other witnesses into making statements implicating Mr. Floyd in the murder.  Defendant Dillmann also fabricated evidence regarding Mr. Hines' sexual preferences, falsely reporting that one of Mr. Hines' close friends related that Mr. Hines frequently had sexual relations with both white and Black partners when, in reality, that friend reported that he had only ever seen Mr. Hines with Black partners.  Mr. Floyd is white, and forensic evidence,

including fingerprints and analysis of blood found at the scene, confirm that he was not the perpetrator.  Mr. Floyd petition for habeas corpus was granted in 2017 and he was released.

116.    Defendant Dillmann's supervisors at the NOPD were aware, or should have been aware, of his repeated fabrication of evidence and presentation of false evidence.  They nonetheless failed to discipline Defendant Dillmann, to provide him additional training, or to otherwise ensure that he would not continue to fabricate and present false evidence.

117.    These policies, customs, and practices of condoning the fabrication of evidence in the NOPD in the 1970s, 1980s, and 1990s were not limited to Defendant Dillmann.  Two other specific, documented instances are reflected in the following cases:

a.    *United States v. Duzac*, 622 F.2d 911 (5th Cir. 1980):  After subjecting Darrell Land to physical and verbal abuse during his wrongful arrest, NOPD Officers Reynolds and Duzac were indicted for lying to a grand jury.  Duzac was also indicted for willfully depriving Land of his civil rights and was found guilty on both counts. Reynolds was acquitted.

b.    *State v. Greco*, 862 So.2d 1152 (La. Ct. App. 4th Cir. 2003):  The Louisiana Fourth Circuit Court of Appeal found that an NOPD detective and an OPDA investigator forced witnesses "to lie both in their pretrial statements and at trial," finding evidence the officers manufactured false testimony and coerced witnesses to present that false testimony at trial.

118.    In addition to these two cases, numerous other documented instances illustrate the City's, NOPD's, and OPDA's policies, customs, and practices of fabricating evidence and

presenting false evidence at trial, including, but not limited to, in the above-described prosecutions of Jerome Morgan, Kuantau Reeder, Shareef Cousin and Eddie Triplett.

**DAMAGES**

119.    This action seeks damages for the period from December 23, 1983 (the date of Mr. Flanks' arrest) through the present.   Defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith, and/or malicious acts, misdeeds, and omissions caused Mr. Flanks to be unfairly tried and wrongfully convicted; to endure almost 39 years of wrongful imprisonment (including serving hard labor), including the physical and mental damage arising therefrom; and to spend his entire young adulthood bearing the burden and stigma of being falsely branded as a convicted murderer.

120.    Mr. Flanks has spent most of his life wrongfully imprisoned.  He was arrested at the age of 20 for a heinous crime he did not commit, and he was sentenced to life imprisonment without the possibility of parole—a term he served until he was exonerated and released in 2022. Mr. Flanks' wrongful conviction and incarceration deprived him of the most vital years of his life, forcing him to spend those years in oppressive conditions, including performing forced prison labor.  His wrongful conviction denied Mr. Flanks nearly every joy in life.

121.    Starting from the time he was only 20 years old, Mr. Flanks served his sentence in harsh and oppressive conditions—including over 30 years he spent at the Louisiana State Penitentiary, also known as Angola, a notoriously dangerous and abusive prison, particularly in the 1980s and 1990s when Mr. Flanks was first wrongfully incarcerated there.

122.    Due to his wrongful conviction and imprisonment, Mr. Flanks lost his chance to have meaningful relationships with his family members and friends.  He also lost all the social benefits that come from freedom, including the opportunities to create community ties and participate in normal civilian life.

123.    The torment his family suffered exacerbated Mr. Flanks own torment and the psychological burden he had to bear.

124.    As a direct and proximate result of the acts, misdeeds, and omissions of Defendants, the injuries and damages sustained by Mr. Flanks, arising from the deprivation of his civil rights, include: the violations of his clearly established rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; personal injuries; past and future pain and suffering; past and future severe mental anguish; past and future emotional distress; extreme fear; economic damages including loss of income and diminution in future earning potential and the inability to obtain certain professional licenses; infliction of physical illness and injury resulting from his confinement; humiliation, indignities, embarrassment, degradation, and egregious injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal care, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

125.    All the alleged acts, misdeeds, and omissions committed by the individual Defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of the individual Defendants meets all the standards for imposition of punitive damages.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983

*Deprivation of Liberty Without Due Process of Law*
*(United States Constitution Amendments V and XIV)*

**Against the Individual Defendants**

126.    Mr. Flanks repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

127.    The individual Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, improperly suppressed and failed to timely disclose material exculpatory evidence, fabricated evidence, and engaged in the affirmative concealment of such misconduct, thereby depriving Mr. Flanks of his right not to be deprived of liberty without due process of law.

128.    Specifically, the individual Defendants failed to timely disclose material exculpatory evidence by failing to disclose information and records in NOPD's possession: (a) showing inconsistencies between Mrs. Carnesi's descriptions of the Actual Perpetrator and Mr. Flanks' appearance; (b) regarding the string of similar crimes with a consistently described perpetrator; and (c) regarding Mrs. Carnesi's grand jury testimony, the circumstances of the photo array, and her initial identification of Mr. Flanks.

129.    The individual Defendants also fabricated evidence against Mr. Flanks, including by improperly encouraging an uncertain Mrs. Carnesi to identify Mr. Flanks as the perpetrator in a photo array, and by falsely denying that misconduct when testifying at Mr. Flanks' trial.

130.    Had the individual Defendants' fabrications and/or the material exculpatory evidence known to them been disclosed, this evidence would have tended to prove Mr. Flanks'

innocence, cast doubt on the entire police investigation and prosecution, impeached Mrs. Carnesi's identification of Mr. Flanks, and likely led to a more favorable outcome.

131.   The individual Defendants' misconduct did not cease with Mr. Flanks' conviction, but continued up to the date of his exoneration, thereby prolonging his wrongful incarceration.

132.   The individual Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer or prosecutor at the time would have believed that the individual Defendants' actions were lawful.

133.   As a direct and proximate result of the individual Defendants' actions and omissions, Mr. Flanks was wrongly prosecuted, detained, and incarcerated for almost thirty-nine years and suffered the other grievous injuries and damages set forth herein.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983

*Engaging in Violations of Due Process that Shock the Conscience*
*(United States Constitution Amendment XIV)*

**Against the Individual Defendants**

134.   Mr. Flanks repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

135.   In their determination to obtain Mr. Flanks' conviction and incarceration irrespective of his innocence or guilt, the individual Defendants deliberately engaged in arbitrary and conscience-shocking conduct that contravened fundamental canons of decency and fairness and violated Mr. Flanks' substantive due process rights under the Fourteenth Amendment.

136.   Specifically, the individual Defendants suppressed and failed to timely disclose material exculpatory evidence, fabricated evidence against Mr. Flanks, engaged in the affirmative

concealment of such misconduct, and engaged in additional, conscience-shocking misconduct that led to the wrongful incarceration of an innocent man.

137.    The individual Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer at the time would have believed that the individual Defendants' actions were lawful.

138.    As a direct and proximate result of the individual Defendants' actions, Mr. Flanks was wrongly prosecuted, detained, and incarcerated for almost thirty-nine years and suffered the other grievous injuries and damages set forth herein.

## **THIRD CAUSE OF ACTION**

### **42 U.S.C. § 1983**

*Malicious Prosecution and Denial of Fourth Amendment Rights*
*(United States Constitution Amendments IV and XIV)*

**Against the Individual Defendants**

139.    Mr. Flanks repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

140.    The individual Defendants, acting individually and in concert, with malice, under color of law, and knowing that probable cause did not exist to arrest Mr. Flanks and prosecute him for the murder of Mr. Carnesi, caused Mr. Flanks to be arrested, charged, and prosecuted for that crime, thereby violating Mr. Flanks' clearly established right under the Fourth and Fourteenth Amendments to the United States Constitution to be free of unreasonable searches and seizures.

141.    Specifically, the individual Defendants: (a) failed to timely disclose exculpatory evidence, including but not limited to: (i) inconsistencies between Mrs. Carnesi's description of the Actual Perpetrator and Mr. Flanks' appearance, (ii) the string of similar crimes with a consistently described perpetrator, (iii) the circumstances of the photo array and Mrs. Carnesi's

identification of Mr. Flanks, and (iv) Mrs. Carnesi's grand jury testimony regarding the same; (b) fabricated evidence by improperly influencing Mrs. Carnesi's identification of Mr. Flanks as the perpetrator, and, in Defendant Dillmann's case, providing false testimony; and (c) failed to correct witness statements they knew to be false or misleading.

142.    The individual Defendants engaged in this conduct without concern for or consideration of the perceived guilt or innocence of Mr. Flanks, and for no purpose related to any legitimate law enforcement or prosecutorial concern.

143.    The individual Defendants' actions were in violation of clearly established constitutional law, and no reasonable officer at the time of Mr. Flanks' prosecution or thereafter would have believed this conduct was lawful.

144.    Mr. Flanks is, and has consistently maintained that he is, innocent of the murder of Mr. Carnesi.  The criminal proceedings terminated in Mr. Flanks' favor when the Criminal District Court for the Parish of Orleans vacated his conviction and dismissed all charges.

145.    As a direct and proximate result of the individual Defendants' malicious prosecution of Mr. Flanks, Mr. Flanks was wrongfully detained and incarcerated for almost thirty-nine years for crimes he did not commit, and suffered the additional physical, emotional, and pecuniary damages as described herein.

## FOURTH CAUSE OF ACTION

### 42 U.S.C. § 1983

*Failure to Intervene*

### Against the Individual Defendants

146.    Mr. Flanks repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

147.    By their conduct and under color of law, during the constitutional violations described herein, the individual Defendants stood by without intervening to prevent other Defendants and others yet unknown from violating Mr. Flanks' constitutional rights, even though those individual Defendants had the opportunity to so intervene.

148.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Mr. Flanks' clearly established constitutional rights.

149.    The individual Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer or prosecutor at the time would have believed the individual Defendants' actions were lawful.

150.    As a direct and proximate result of the individual Defendants' actions, Mr. Flanks was wrongly prosecuted, detained, convicted, and incarcerated for almost thirty-nine years and suffered the other grievous injuries and damages set forth herein.

## FIFTH CAUSE OF ACTION

### 42 U.S.C. § 1983

*Civil Rights Conspiracy*

**Against the Individual Defendants**

151.    Mr. Flanks repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

152.    The individual Defendants and others yet unknown agreed among themselves and other individuals to act in concert to deprive Mr. Flanks of his clearly established rights not to be deprived of liberty without due process of law, and not to be illegally seized and detained.

153.    In furtherance of the conspiracy, the individual Defendants engaged in and facilitated numerous overt acts, including but not limited to the following:

a. acting in concert to conceal material exculpatory evidence and information, including but not limited to inconsistencies between Mrs. Carnesi's description of the Actual Perpetrator and Mr. Flanks' appearance, knowledge and records regarding a string of similar crimes with a consistently described perpetrator, and Mrs. Carnesi's grand jury testimony regarding the photo array and her initial identification of Mr. Flanks;

b. engaging in misconduct during identification procedures, including by improperly encouraging Mrs. Carnesi to identify Mr. Flanks and reinforcing her wrongful identification;

c. acting in concert to fabricate evidence, including but not limited to false witness statements and testimony; and

a. acting in concert to affirmatively conceal such misconduct.

154.   As a direct and proximate result of the individual Defendants' conspiracy and actions in furtherance of that conspiracy, Mr. Flanks was wrongly prosecuted, detained, convicted, and incarcerated for almost thirty-nine years and suffered the other grievous injuries and damages set forth herein.

**<u>SIXTH CAUSE OF ACTION</u>**

**42 U.S.C. § 1983**

*Monell v. Department of Social Services*, 436 U.S. 658 (1978)

**Against Defendants the City of New Orleans; Jason Williams, *in his official capacity as Orleans Parish District Attorney*; and Anne Kirkpatrick, *in her official capacity as Superintendent of the New Orleans Police Department***

155.   Mr. Flanks repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

156.     At all times relevant, Defendant the City of New Orleans and Defendants Williams and Kirkpatrick, in their official capacities, were responsible for the policies, customs, and practices of the NOPD and the OPDA.

157.     The actions of each of the individual Defendants were undertaken pursuant to a policy, custom, and/or practice of the NOPD and/or the OPDA that included but was not limited to:

     a.   Suppressing and failing to timely disclose material exculpatory evidence;

     b.   Fabricating evidence, including but not limited to false witness statements; and

     c.   Engaging in the affirmative concealment of such misconduct.

158.     Before and during the unlawful investigation, prosecution, and incarceration of Mr. Flanks, the City, and Defendants Williams and Kirkpatrick, by and through their final policymakers, maintained policies, customs, and/or practices of failing to adequately train, monitor, and supervise their employees regarding their constitutional duties to disclose exculpatory evidence and not to fabricate evidence, despite the obviousness that such training, monitoring, or supervision was required in order to prevent constitutional violations, and their awareness of prior incidents in which employees had failed to comply with these constitutional duties.

159.     The general practices of withholding exculpatory evidence, fabricating evidence, and failing to appropriately train, monitor, and supervise were so common and well established as to constitute official policies that fairly represented the City's and Defendants Williams' and Kirkpatrick's official policies, customs, and/or practices.

160.     Before and during the unlawful investigation, prosecution, and incarceration of Mr. Flanks, the City, by and through its final policymakers, and Defendants Williams and Kirkpatrick also maintained a policy, custom, and/or practice of failing to supervise and discipline misconduct.

161.     The City's and Defendants Williams' and Kirkpatrick's final policymakers knew of these policies, customs, and practices, and implemented them with deliberate indifference to the likelihood that they would result in wrongful incarceration.

162.     The City's and Defendants Williams' and Kirkpatrick's policies, customs, and practices were a moving force behind the denial of due process to Mr. Flanks in that they directly caused police and prosecutorial improprieties and errors, including suppressing and failing to timely disclose exculpatory material to the defense, and creating and presenting false testimony.

163.     As a result of these improprieties caused by the City's and Defendants Williams' and Kirkpatrick's policies, customs, and practices, Mr. Flanks was subject to criminal proceedings that offend fundamental principles of justice and transgress any principle of fundamental fairness, including because he was prosecuted, convicted, and imprisoned as a direct result of intentional suppression of exculpatory information and the presentation of false testimony by NOPD and OPDA employees.

164.     The misconduct and constitutional violations committed by the individual Defendants in the course of the investigation and prosecution of Mr. Flanks were carried out pursuant to these policies, customs, and/or practices of investigative misconduct, and were directly and proximately caused by the City's and Defendants Williams' and Kirkpatrick's failure to train, supervise, and discipline investigators.

165.     As a direct and proximate result of the City's and Defendants Williams' and Kirkpatrick's policies, customs, and/or practices, Mr. Flanks was wrongly prosecuted, and

continually detained for almost thirty-nine years and suffered the other grievous and continuing injuries and damages as set forth herein.

## SEVENTH CAUSE OF ACTION

### Malicious Prosecution

*Louisiana State Law*

### Against the Individual Defendants

166.    Mr. Flanks repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

167.    The individual Defendants, acting separately and in concert, did willfully, unlawfully, maliciously, and without probable cause or legal justification, cause Mr. Flanks to be prosecuted, detained, and incarcerated for the murder of Mr. Carnesi.

168.    Specifically, the individual Defendants: (a) failed to timely disclose exculpatory evidence, including but not limited to: (i) inconsistencies between Mrs. Carnesi's description of the Actual Perpetrator and Mr. Flanks' appearance, (ii) the string of similar crimes with a consistently described perpetrator, (iii) the circumstances of the photo array and Mrs. Carnesi's identification of Mr. Flanks, and (iv) Mrs. Carnesi's grand jury testimony regarding the same; (b) fabricated evidence by improperly influencing Mrs. Carnesi's identification of Mr. Flanks as the perpetrator, and, in Defendant Dillmann's case, providing false testimony; and (c) failed to correct witness statements they knew to be false or misleading.

169.    The individual Defendants engaged in this conduct without concern for or consideration of the perceived guilt or innocence of Mr. Flanks, and for no purpose related to any legitimate law enforcement or prosecutorial concern.

170.    Mr. Flanks is, and has consistently maintained that he is, innocent of the murder of Mr. Carnesi.  The Criminal District Court for the Parish of Orleans vacated his conviction and dismissed the charges against him in their entirety.

171.    As a direct and proximate result of the individual Defendants' malicious prosecution of Mr. Flanks, Mr. Flanks was wrongfully detained and incarcerated and served almost thirty-nine years for crimes he did not commit, and suffered the additional physical, emotional, and pecuniary damages as described herein.

**EIGHTH CAUSE OF ACTION**

**Wrongful Conviction and Wrongful Imprisonment**

*Louisiana State Law*

**Against the Individual Defendants**

172.    Mr. Flanks repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

173.    The individual Defendants acting separately and in concert, individually and in their official capacities did willfully, unlawfully, maliciously, and without probable cause or legal justification, cause Mr. Flanks to be prosecuted, convicted, and incarcerated for an ongoing and continuing basis lasting almost thirty-nine years for a crime he did not commit.

174.    The individual Defendants intentionally, maliciously, and with reckless disregard for and deliberate indifference to his rights, suppressed and failed to timely disclose material exculpatory evidence, fabricated false evidence, and presented false argument and false facts to the court for the purpose of ensuring that Mr. Flanks was detained, prosecuted, convicted, and incarcerated and to preclude judicial authorities from discovering the lack of probable cause for the prosecution and ongoing detention of Mr. Flanks.

175.    As a direct and proximate result of the individual Defendants' wrongful imprisonment of Mr. Flanks, Mr. Flanks suffered the physical, emotional, and pecuniary damages as described herein.

## NINTH CAUSE OF ACTION

### Negligence and/or Gross Negligence

*Louisiana State Law*

### Against the Individual Defendants and Defendant City of New Orleans

176.    Mr. Flanks repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

177.    The individual Defendants and City of New Orleans failed to take due care, and instead were negligent and/or grossly negligent in suppressing and failing to timely disclose material exculpatory evidence to Mr. Flanks and in fabricating evidence against Mr. Flanks.

178.    It was foreseeable that, as a result of such negligence by the individual Defendants and City of New Orleans, Mr. Flanks would be wrongfully detained and incarcerated, and in fact, Mr. Flanks was wrongfully detained and incarcerated and served almost thirty-nine years for a crime he did not commit, and suffered the additional physical, emotional, and pecuniary damages as described herein.

## TENTH CAUSE OF ACTION

### Intentional and/or Reckless Infliction of Emotional Distress

*Louisiana State Law*

### Against the Individual Defendants

179.    Mr. Flanks repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

180.     The individual Defendants, acting separately and in concert, individually and in their official capacities, did intentionally, maliciously, and with reckless disregard and deliberate indifference to Mr. Flanks' rights engage in extreme and outrageous conduct in connection with the detention, prosecution, conviction, and incarceration of Mr. Flanks, including, without limitation, prosecuting Mr. Flanks without probable cause; suppressing and/or failing to timely disclose material exculpatory evidence, including without limitation serological testing results showing that the perpetrator was a non-secretor; fabricating false evidence, including without limitation about the serological testing results; and presenting false argument and false facts to the court for the purpose of ensuring that Mr. Flanks was indicted, detained, and incarcerated.

181.     The individual Defendants desired to inflict severe emotional distress on Mr. Flanks or knew that severe emotional distress would be certain or substantially certain to result from their joint and several conduct.

182.     As a direct and proximate result of the individual Defendants' joint and several extreme and outrageous behavior, Mr. Flanks suffered severe emotional distress for which he is entitled to damages.

## ELEVENTH CAUSE OF ACTION

### Vicarious Liability

*Louisiana State Law*

### Against Defendant the City of New Orleans

183.     Mr. Flanks repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

184.     At all times, the individual Defendants were acting within the scope of their employment and as agents for the City of New Orleans.

185.     Consequently, the City of New Orleans is liable under the doctrine of *respondeat superior* for any and all tortious actions of its employees and agents.

## TWELFTH CAUSE OF ACTION

### Violations of the Louisiana State Constitution

*Louisiana State Law*

### Against the Individual Defendants and Defendant City of New Orleans

186.     Mr. Flanks repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

187.     The Louisiana State Constitution, like the United States Constitution, guarantees a person's right to be secure in his person and effect from unreasonable seizure, to equal protection of the law, to due process of law, to be free from discrimination, to be free from cruel, excessive, or unusual punishment, and to additional unenumerated rights.  *See* La. Cost. Art. I, §§ 2, 3, 5, 12, 13, 15, 16, 20, 22, & 24.

188.     By reason of the same intentional, malicious, reckless, and deliberate conduct that violated Mr. Flanks' rights under the United States Constitution, the individual Defendants and the City of New Orleans's conduct violated the rights guaranteed to Mr. Flanks under Article I, §§ 2, 3, 5, 12, 13, 15, 16, 20, 22, and 24 of the Louisiana State Constitution.

189.     These violations of the Louisiana State Constitution proximately and directly caused Mr. Flanks to be wrongfully detained and incarcerated for a crime he did not commit, and suffer the additional physical, emotional, and pecuniary damages as described herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Raymond Flanks demands judgment against the above-captioned Defendants as follows:

a.  for compensatory damages to be determined at trial, but in all events no less than $50 million;

b.  for punitive damages against the individual Defendants in an amount to be determined at trial;

c.  for reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988 and other applicable laws;

d.  for pre- and post-judgment interest as allowed by law; and

e.  for such other relief as this Court deems just and proper.

Dated:  November 16, 2023
        New Orleans, Louisiana

MURELL LAW FIRM

By: /s/ Christopher J. Murell

    Christopher J. Murell, La. Bar No. 32075
    Meghan K. Matt, La. Bar No. 39975
    2831 Saint Claude Avenue
    New Orleans, Louisiana 70117
    (504) 717-1297 (Tel)
    chris@murell.law
    meghan@murell.law

SHANIES LAW OFFICE PLLC

By: _____

    David B. Shanies* (T.A.)
    Deborah I. Francois*
    Eleanor C. Davis*
    110 West 40th Street, Tenth Floor
    New York, New York 10018
    (212) 951-1710 (Tel)
    (212) 951-1350 (Fax)
    david@shanieslaw.com
    deborah@shanieslaw.com
    eleanor@shanieslaw.com

    * Applications for admission *pro hac vice* forthcoming

*Attorneys for Plaintiff Raymond Flanks*

48