UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RAYMOND FLANKS,

Plaintiff,

– against –

THE CITY OF NEW ORLEANS; JASON WILLIAMS, in his official
capacity as Orleans Parish District Attorney; ANNE KIRKPATRICK,
in her official capacity as Superintendent of the New Orleans Police
Department; JOHN DILLMANN, in his individual capacity; and
JOHN/JANE DOES #1-20, in their individual capacities,

Defendants.

Case No. 23-CV-6897

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT JASON WILLIAMS'S MOTION TO DISMISS

**MURELL LAW FIRM**

Christopher J. Murell
La. Bar No. 32075
Meghan K. Matt
La. Bar No. 39975
2831 Saint Claude Avenue
New Orleans, Louisiana 70117
(504) 717-1297 (Tel)
chris@murell.law
meghan@murell.law

**SHANIES LAW OFFICE PLLC**

David B. Shanies (T.A.) (admitted *PHV*)
Deborah I. Francois (admitted *PHV*)
Eleanor C. Davis (admitted *PHV*)
110 West 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com
deborah@shanieslaw.com
eleanor@shanieslaw.com

*Attorneys for Plaintiff Raymond Flanks*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

LEGAL STANDARD................................................................................................................. 8

ARGUMENT ............................................................................................................................ 8

    I.   Defendants' Failure to Disclose Exculpatory Evidence Was a *Brady* Violation............... 9

    II.  Former District Attorney Harry Connick Was a Final Policymaker ............................... 12

    III. The Orleans Parish District Attorney's Office Had Official Policies, Customs, and Practices That Were the Moving Force Behind Raymond Flanks's Injuries............ 13

CONCLUSION....................................................................................................................... 18

## TABLE OF AUTHORITIES

**Cases**

*Adams v. City of New Orleans*, 2016 WL 4275246, 2016 U.S. Dist. LEXIS 107534
    (E.D. La. Aug. 12, 2016) .................................................................................... 10

*Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023) ............................................................. 8

*Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020) .................................................. 8

*Arnone v. Dallas County*, 29 F.4th 262 (5th Cir. 2022) ................................................ 12

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ................................................................... 8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) .................................................. 8

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................................. 9, 17

*Burge v. Parish of St. Tammany*, 187 F.3d 452 (5th Cir. 1999) ............................. 12, 13

*Cadena v. El Paso County*, 946 F.3d 717 (5th Cir. 2020) ............................................ 17

*City of Canton v. Harris*, 489 U.S. 378 (1989) ............................................................ 14

*Durant v. Gretna City*, 2020 WL 263669, 2020 U.S. Dist. LEXIS 8422
    (E.D. La. Jan. 17, 2020) .................................................................................... 18

*Evans v. Lopinto*, 2022 WL 2304512, 2022 U.S. Dist. LEXIS 112705
    (E.D. La. June 27, 2022) ................................................................................ 8, 9

*Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018) ..................................................... 10, 11

*Grace v. Cain*, 2021 WL 5711942, 2021 U.S. Dist. LEXIS 230654 (E.D. La. Dec. 2, 2021) ..... 11

*Grace v. Hooper*, 2023 WL 2810059, 2023 U.S. App. LEXIS 8261 (5th Cir. Apr. 6, 2023) ...... 11

*Guillot v. Lopinto*, 2022 WL 684159, 2022 U.S. Dist. LEXIS 40383 (E.D. La. Mar. 8, 2022) ... 15

*Jason v. Tanner*, 938 F.3d 191 (5th Cir. 2019) ............................................................ 15

*Jauch v. Choctaw County*, 874 F.3d 425 (5th Cir. 2017) ....................................... 17, 18

*Kyles v. Whitley*, 514 U.S. 419 (1995) .......................................................................... 10

*LaCaze v. Warden La. Corr. Inst. for Women*, 645 F.3d 728 (5th Cir. 2011) .............. 12

*Luebano v. Office Depot, L.L.C.*, 2023 WL 4249268, 2023 U.S. App. LEXIS 16524
    (5th Cir. 2023) .................................................................................................... 8

*Marshall v. Webre*, 2023 WL 5952645, 2023 U.S. Dist. LEXIS 162031
  (E.D. La. Sept. 13, 2023) ................................................................... 13, 14, 17

*Mays v. Dir., Office of Workers' Comp. Programs*, 938 F.3d 637 (5th Cir. 2019) ..................... 10

*McMillian v. Monroe County*, 520 U.S. 781 (1997) .................................................... 12

*McWilliams v. City of Houston*, 2022 WL 17337820, 2022 U.S. App. LEXIS 33076
  (5th Cir. Nov. 30, 2022) ................................................................... 14, 15

*Mitchell v. City of New Orleans*, 184 F. Supp. 3d 360 (E.D. La. May 2, 2016) .......................... 16

*Mixon v. Pohlmann*, 2022 WL 2921733, 2022 U.S. Dist. LEXIS 131160
  (E.D. La. July 25, 2022) ................................................................... 14, 17

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) .................................... 2, 8

*Neal v. Vannoy*, 2021 WL 1212663, 2021 U.S. Dist. LEXIS 62132
  (E.D. La. Mar. 30, 2021) ................................................................... 11

*O'Quinn v. Manuel*, 773 F.2d 605 (5th Cir. 1985) ...................................................... 9

*Reed v. City of Arlington*, 650 F.3d 571 (5th Cir. 2011) ............................................. 10

*Sanchez v. Young Cnty., Texas*, 956 F.3d 785 (5th Cir.) (2020) ...................................... 8

*Smith v. Black*, 503 U.S. 930 (1992) ................................................................. 11

*Smith v. Black*, 904 F.2d 950 (5th Cir. 1990) ....................................................... 11

*Smith v. Williams*, 2023 WL 2263841, 2023 U.S. Dist. LEXIS 32662
  (E.D. La. Feb. 28, 2023) ................................................................... 12

*Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162 (5th Cir. 1997) ........................... 8

*Thomas v. City of Galveston*, 800 F. Supp. 2d 826 (S.D. Tex. 2011) ................................. 16

*Truvia v. Connick*, 577 F. App'x 317 (5th Cir. 2014) ................................................ 10

*United States v. Bagley*, 473 U.S. 667, 682 (1985) .................................................. 11

*Webster v. City of Houston*, 735 F.2d 838 (5th Cir. 1984) ........................................ 14, 15

*Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) .............................................. 11

**Statutes**

42 U.S.C § 1983 ................................................................................................................. 2, 8

La. C.Cr.P. § 723 ................................................................................................................. 9

**Rules**

La. R. Prof'l Cond. 3.3 ....................................................................................................... 9

## PRELIMINARY STATEMENT

In May of 1985, Plaintiff Raymond Flanks was wrongfully convicted of a 1983 murder he did not commit.  He was just 20 years old when he was falsely accused and, by the time he was exonerated in 2022, had spent almost 39 years in prison.  Mr. Flanks was convicted in his second trial, after a jury was unable to reach a verdict in his first trial.  At both trials, neither Mr. Flanks nor his counsel had access to key evidence demonstrating his innocence, including: (a) evidence that Defendant John Dillmann, then a Detective with the New Orleans Police Department (the "NOPD"), fabricated the key eyewitness's identification of Mr. Flanks by pointing to his photograph in a photo array and saying "that's him"; (b) evidence that the key eyewitness's initial description of the perpetrator mismatched both Mr. Flanks and her own testimony at trial; (c) evidence that the key eyewitness's description of the car the perpetrator used did not match Mr. Flanks's car; and (d) evidence of a string of similar crimes identified by the NOPD that involved descriptions of a perpetrator who, again, did not match Mr. Flanks.  Because of Defendants' actions, the true perpetrator of the murder was never arrested or prosecuted for it.

At Mr. Flanks's exoneration hearing, the Orleans Parish District Attorney's Office (the "OPDA") stated that "Mr. Flank's [sic] conviction was obtained in violation of *Brady v. Maryland*" because "the State failed to disclose . . . materials [that] are favorable, and under the circumstances of the State's case against Mr. Flank[s], material."  The OPDA explicitly agreed that the State's conduct violated Mr. Flanks's constitutional right to due process and that Mr. Flanks "didn't receive a fair trial."  At that hearing, Judge Rhonda Goode-Douglas of the Orleans Parish Criminal Court also acknowledged "that Mr. Flank[s] did not receive the justice that he deserved" at trial and vacated his conviction.  Mr. Flanks now seeks compensation from

Defendants for violations of his rights, including his rights under the Fifth and Fourteenth Amendments to the U.S. Constitution.

In arguing for dismissal of the claims brought against him in his official capacity, Defendant Jason Williams contends Mr. Flanks has failed to state a claim against him under 42 U.S.C § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978). To the contrary, Mr. Flanks has alleged violations of his rights under the Fifth and Fourteenth Amendments by alleging that Mr. Flanks was subject to criminal proceedings that offend fundamental principles of justice and transgress any principle of fundamental fairness, including because he was prosecuted, convicted, and imprisoned as a direct result of intentional suppression of exculpatory information by OPDA employees. Mr. Flanks has alleged that the "moving force" behind these violations was an OPDA policy and custom—created by then-District Attorney Harry Connick—of suppressing and failing to disclose material exculpatory evidence, fabricating and knowingly allowing the presentation of false evidence, and engaging in the affirmative concealment of such misconduct. Accordingly, Mr. Flanks has stated a claim against Defendant Williams, and Williams's motion to dismiss should be denied.

## BACKGROUND

On December 17, 1983, Faye Carnesi, a white woman, was walking to her car, which was parked in front of her house. Compl. (Dkt. 1) ¶ 30. Mrs. Carnesi saw a Black man wearing a shower cap (the "Actual Perpetrator") walk past her. *Id.* ¶ 31. Mrs. Carnesi's husband, Martin Carnesi, walked with Mrs. Carnesi to see her off. *Id.* ¶ 32. The Actual Perpetrator demanded money from Mr. Carnesi. *Id.* ¶ 33. When Mr. Carnesi reached into his pocket, the Actual Perpetrator pulled out a gun and shot Mr. Carnesi. *Id.* The Actual Perpetrator then pointed the gun at Mrs. Carnesi and demanded her purse. *Id.* ¶ 34. She threw her purse at him and ran

away.  *Id.*  Mrs. Carnesi saw an aged, light blue car speed off.  *Id.* ¶ 35.  At the time of the murder, Mr. Flanks—then just 20 years old—was at home with his brother, Ralph Flanks.  *Id.* ¶¶ 1, 37.  He had nothing to do with the murder.  *Id.* ¶ 36.

Mrs. Carnesi initially described the Actual Perpetrator as a Black man in his late twenties, about 5'10" and 150 pounds, with a medium build, brown skin, and a light mustache.  *Id.* ¶ 38.  She also noted that he was wearing "a white plastic shower cap on his head."  *Id.*  When Mrs. Carnesi appeared before the grand jury four weeks later, she testified that the "one thing" she remembered about the Actual Perpetrator was that he "had a little white blotch on the side of his cheek, a little white mark, like discolored looking."  *Id.*  This description does not match Mr. Flanks.  *Id.* ¶ 39.  Mr. Flanks is over six feet tall and has never had a white mark on the side of his cheek.  *Id.*  Mrs. Carnesi also reported that the perpetrator was driving a light blue car.  *Id.* ¶ 40.  The daily report produced by the NOPD on the day of the crime says that the make and model of the vehicle were unknown, but, when Mrs. Carnesi testified to the grand jury just four weeks later, she described the car as "pale blue" and "not a shiny car[,] [i]t was an old car."  *Id.*

The NOPD immediately associated this crime with a series of similar armed robberies that had occurred in the same area, all also perpetrated against elderly people.  *Id.* ¶ 41.  The assailant described by the victims of those crimes was consistent with Mrs. Carnesi's initial description of the Actual Perpetrator: a Black man in his twenties, 5'8" to 5'11" tall, with a medium build and brown skin, with a mustache, and wearing a shower or "hospital type" cap.  *Id.*  He was also described as being armed with a "small caliber nickel plated automatic" gun and as driving an "old, light blue or gray vehicle."  *Id.*  As of December 19, 1983, two days after Mr. Carnesi's murder, the police had identified similar robberies on November 29, 1983; December 3, 1983; December 8, 1983; December 12, 1983; and December 18, 1983.  *Id.*  One victim also described

3

the perpetrator as being in his thirties, and the victims of another crime described him as being clean shaven and having a "small" "pug" nose.  *Id.* ¶ 42.  Again, these descriptions do not match Mr. Flanks.  *Id.* ¶ 43.

Mr. Flanks became a suspect in Mr. Carnesi's murder after he was arrested while fleeing from an armed robbery of an A&P Food Store on December 23, 1983.[1]  *Id.* ¶ 44.  Notably, the crime for which Mr. Flanks was arrested did not match the pattern of robberies into which Mr. Carnesi's murder clearly fit: the robbery was of a store, not of an elderly person outside on the street. *Id.* ¶ 45.  Nor was Mr. Flanks wearing a shower cap, as the perpetrator had been in the other robberies that the NOPD had already linked to Mr. Carnesi's murder.  *Id.*  Moreover, the arresting officer described Mr. Flanks as having a "dark" complexion and a tattoo on his right hand.  *Id.* ¶ 46.  Again, this description does not match the one initially provided by Mrs. Carnesi or the descriptions provided by the victims of the other similar crimes.  *Id.*  In addition, Mr. Flanks was arrested with a gun registered to his brother, Ralph Flanks.  *Id.* ¶ 47.  The NOPD falsely claimed that it forensically matched Ralph Flanks's gun to Mr. Carnesi's murder, but later ballistics testing by federal officials demonstrated that Ralph Flanks's gun was not involved.  *Id.*  On the day of the robbery, Mr. Flanks drove a 1982 light blue Chevrolet Citation—virtually brand new at the time of Mr. Carnesi's murder in 1983.  *Id.* ¶ 48.  This was inconsistent with Mrs. Carnesi's description of the Actual Perpetrator, who drove an old car.  *Id.*  It is also inconsistent with the reports from the victims of some of the other similar crimes, who likewise described the perpetrator's car as old.  *Id.*

About a week after Mr. Carnesi's murder, NOPD detectives visited Mrs. Carnesi at her home and showed her a photo array with photos of six individuals, including Mr. Flanks.  *Id.*

---

1.  Mr. Flanks's conviction for that robbery is not at issue in this lawsuit.

4

¶ 49.  Mrs. Carnesi testified to the grand jury that she narrowed it down to two photos—Mr. Flanks and one other—and then told the detectives that the "one thing" she remembered about the Actual Perpetrator was the "little white blotch on the side of his cheek, a little white mark, like discolored looking."  *Id.* ¶ 50.  In response, Defendant Dillmann "shook his head and said, 'that's him,'" indicating the photo of Mr. Flanks.  *Id.* ¶ 51.  Mrs. Carnesi then acquiesced and mistakenly identified Mr. Flanks as the perpetrator.  *Id.*  In her grand jury testimony, Mrs. Carnesi rationalized this selection by saying that she "d[id]n't think they showed the side of his face with that mark" in the photo. *Id.* ¶ 52.

Mr. Flanks first went to trial on August 28, 1984.  *Id.* ¶ 53.  At this trial, the State presented testimony from NOPD Technician Stubbs.  *Id.* ¶ 54.  Stubbs testified—falsely—that the gun found with Mr. Flanks when he was arrested was the same gun that fired the bullets that killed Mr. Carnesi.  *Id.*  In addition, Mrs. Carnesi identified Mr. Flanks and testified that the car he was arrested in resembled the one she saw fleeing the scene. *Id.* ¶ 55.  The defense presented testimony from Mr. Flanks's brother Ralph Flanks, who testified that Mr. Flanks was home with him at the time of the murder.  *Id.* ¶ 56.  After two and a half hours of deliberations, the jury could not reach a verdict.  *Id.* ¶ 57.  As a result, the court declared a mistrial and set the case for a new trial.  *Id.* After this first trial, and at defense counsel's request, the State sent the firearm recovered from Mr. Flanks for an independent examination by the Bureau of Alcohol, Tobacco, and Firearms (the "ATF") Forensic Laboratory.  *Id.* ¶ 58.  On February 13, 1985, the ATF reported that neither the bullet used to kill Mr. Carnesi nor the casing found at the scene was fired by the gun with which Mr. Flanks was arrested.  *Id.*

Mr. Flanks's second trial began on May 14, 1985.  *Id.* ¶ 59.  Without the murder weapon, the State relied solely on Mrs. Carnesi's identification of Mr. Flanks.  *Id.*  At this trial,

Mrs. Carnesi offered a description of her initial identification that differed drastically from her grand jury testimony, saying that, when examining the photo, she knew "it was him. This is the man that killed my husband. This man. I can't forget his face never, ever. If I live to be a thousand years old. Every night when I go to bed I see this man shoot my husband." *Id.* ¶ 60. She also testified that Defendant Dillmann "didn't tell me anything" indicating whom to identify during the photo array. *Id.* This testimony directly contradicted her testimony to the grand jury just three weeks after her initial identification and four weeks after the crime. *Id.* ¶ 61. Defendant Dillmann also testified about the identification, claiming that Mrs. Carnesi "picked up the photograph of Mr. Flank[s] and handed it to me and begin [*sic*] crying. Once she stopped crying she told me that this was positively the man who had shot and killed Mr. Carnesi." *Id.* ¶ 62. He further testified that neither he nor anyone else "indicate[d] in anyway [*sic*] that [he] wanted her to pick out a particular photograph." *Id.* Again, these claims contradicted Mrs. Carnesi's grand jury testimony. *Id.* ¶ 61. Ralph Flanks also testified at the second trial, reaffirming that his brother was at home with him at the time of the murder. *Id.* ¶ 64. The jury found Mr. Flanks guilty, and he was sentenced to life in prison without the possibility of parole. *Id.* ¶¶ 65-66.

While preparing for trial, Mr. Flanks and his counsel were not given or made aware of the NOPD records showing inconsistencies between Mrs. Carnesi's initial description of the Actual Perpetrator and Mr. Flanks's appearance, the NOPD records showing a string of similar crimes with a consistently described perpetrator, or Mrs. Carnesi's grand jury testimony regarding the photo array and her initial identification of Mr. Flanks. *Id.* ¶ 67. As a result, that exculpatory information was unusable at trial and Mr. Flanks was deprived of an opportunity to rebut the reliability of Mrs. Carnesi's identification of him as the perpetrator, to rebut the reliability of

Defendant Dillmann's testimony at trial, and to call into question the integrity of the investigation conducted by the NOPD and OPDA. *Id.* ¶ 68.

In May of 2022—after Mr. Flanks had spent almost 39 years in prison—the Innocence Project of New Orleans ("IPNO") contacted the Civil Rights Division ("CRD") of the OPDA about Mr. Flanks's case, and CRD began its own review and investigation. *Id.* ¶¶ 1, 69. At the conclusion of those investigations, on November 14, 2022, the OPDA and Mr. Flanks's IPNO attorneys filed a Joint Agreement and Motion to Vacate his conviction. *Id.* ¶ 70. A hearing on the motion was held on November 17, 2022. *Id.* ¶ 71. At Mr. Flanks's exoneration hearing, the OPDA stated that "Mr. Flank's [*sic*] conviction was obtained in violation of *Brady v. Maryland*" because "the State failed to disclose . . . materials [that] are favorable, and under the circumstances of the State's case against Mr. Flank[s], material." *Id.* ¶ 72. In particular, the OPDA acknowledged that "there is a reasonable likelihood that had [Mrs. Carnesi's] prior testimony been disclosed, it could have affected the judgment of the jury" and "defense counsel would have been able to present a compelling case that Mrs. Carnesi was innocently mistaken when presented with the wrong suspect, that Mr. Flank[s] did not resemble the perpetrator, and that the car he was arrested in did not fit the one at the crime scene." *Id.* ¶ 73. The OPDA explicitly agreed that the State's conduct violated Mr. Flanks's constitutional right to due process and that Mr. Flanks "didn't receive a fair trial." *Id.* ¶ 74. At that hearing, Judge Rhonda Goode-Douglas of the Orleans Parish Criminal Court also acknowledged "that Mr. Flank[s] did not receive the justice that he deserved" at trial and vacated his conviction. *Id.* ¶ 75.

Defendant Williams, as the current Orleans Parish District Attorney, is responsible for the management and supervision of the OPDA and its employees. *Id.* ¶ 21.

**LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "if the plaintiff alleges facts that . . . allow a court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678).  The court should "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff[]."  *Luebano v. Office Depot, L.L.C.*, 2023 WL 4249268, 2023 U.S. App. LEXIS 16524, at *7 (5th Cir. 2023) (per curiam) (citation omitted).  All reasonable inferences should be drawn in the plaintiff's favor.  *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023).

**ARGUMENT**

Mr. Flanks states a claim against Defendant Williams in his official capacity under 42 U.S.C § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  "To assert a § 1983 claim against a municipality rather than an individual, a plaintiff must establish both (1) 'that a constitutional violation occurred' and (2) 'that a municipal policy was the moving force behind the violation.'"  *Evans v. Lopinto*, 2022 WL 2304512, 2022 U.S. Dist. LEXIS 112705, at *21 (E.D. La. June 27, 2022) (Brown, C.J.) (quoting *Sanchez v. Young Cnty., Texas*, 956 F.3d 785, 791 (5th Cir.) (2020)).  "Under the latter, a plaintiff must show three things: (1) an 'official policy or custom 'was a cause in fact of the deprivation of rights inflicted,' (2) the policy 'served as a moving force' behind the constitutional violation, and (3) the policy was decided on by a policymaker with 'either actual or constructive knowledge of the alleged policy.'"  *Id.* (quoting *Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997)).

Mr. Flanks has alleged violations of his constitutional rights under the Fifth and Fourteenth Amendments by alleging, *inter alia*, that the OPDA violated *Brady* and denied Mr. Flanks due process.  Mr. Flanks has further alleged that the "moving force" behind these violations were OPDA policies and customs—created by then-District Attorney Harry Connick—of suppressing and failing to timely disclose material exculpatory evidence, knowingly allowing the presentation of false evidence, and engaging in the affirmative concealment of such misconduct. Accordingly, Mr. Flanks has stated a claim against Defendant Williams in Williams's official capacity and the Court should deny Williams's motion to dismiss.[2]

## I.    Defendants' Failure to Disclose Exculpatory Evidence Was a *Brady* Violation

Defendant Williams does not even attempt to argue that Mr. Flanks has failed to state a *Brady* violation.  This is for good reason, as Mr. Flanks has clearly alleged a violation of his constitutional rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and the Fifth and Fourteenth Amendments based on the State's failure to disclose: (a) evidence that Defendant Dillmann fabricated Mrs. Carnesi's identification of Mr. Flanks by pointing to his photograph in a photo array and saying "that's him"; (b) evidence that Mrs. Carnesi's initial description of the perpetrator did not match Mr. Flanks or her testimony at trial; (c) evidence that Mrs. Carnesi's description of the car the perpetrator used did not match Mr. Flanks's car; and (d) evidence of a string of similar crimes identified by the NOPD that involved descriptions of a perpetrator that, again, did not match Mr. Flanks.  Indeed, at Mr. Flanks's exoneration hearing, the OPDA acknowledged that Mr.

---

2.  Mr. Flanks has also stated a claim against Defendant Williams because "municipalities may face liability under section 1983 where they breach duties imposed by state or local law."  *Evans*, 2022 U.S. Dist. LEXIS 112705, at *21 (Brown, C.J.) (alteration adopted) (quoting *O'Quinn v. Manuel*, 773 F.2d 605, 609 (5th Cir. 1985)).  Louisiana law mandates that prosecutors comply with *Brady*, *see* La. C.Cr.P. § 723.B, and that attorneys do not knowingly offer false evidence, *see* La. R. Prof'l Cond. 3.3(a)(3).  Because Mr. Flanks has alleged that OPDA employees violated these duties, *see infra* at 9-13, he has stated a claim against Defendant Williams in his official capacity.

Flanks's "conviction was obtained in violation of *Brady v. Maryland*" and that Mr. Flanks "didn't receive a fair trial."[3]  Compl. ¶¶ 72, 74.

"Under *Brady*, a state actor 'deprives a criminal defendant of his right to due process when the state actor suppresses or withholds evidence that is both favorable to the defendant and material to his defense.'"  *Adams v. City of New Orleans*, 2016 WL 4275246, 2016 U.S. Dist. LEXIS 107534, at *12 (E.D. La. Aug. 12, 2016) (alteration adopted) (quoting *Truvia v. Connick*, 577 F. App'x 317, 321-22 (5th Cir. 2014)).  As an initial matter, all three categories of evidence were clearly withheld, as neither Mr. Flanks nor his counsel was made aware of any of the evidence prior to or during trial.  *See, e.g.*, Compl. ¶¶ 61, 63, 67, 72.

Second, the withheld evidence was favorable to Mr. Flanks.  To be favorable under *Brady*, evidence must just have "some value in countering" the prosecution's case.  *See Floyd v. Vannoy*, 894 F.3d 143, 163 (5th Cir. 2018) (quoting *Kyles v. Whitley*, 514 U.S. 419, 450 (1995)).  As the OPDA acknowledged at Mr. Flanks's exoneration hearing, the evidence that the State "failed to disclose [included] materials [that] [we]re favorable" to his case because they could have undermined the reliability of Mrs. Carnesi's identification of Mr. Flanks and the integrity of the investigation into the crime, thereby countering the prosecution's case, which relied wholly on

---

3.  Defendant Williams is now judicially estopped from arguing to the contrary.  Judicial estoppel "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Reed v. City of Arlington*, 650 F.3d 571, 573-74 (5th Cir. 2011).  Because Defendant Williams is sued as the representative of the OPDA, the court at Mr. Flanks's exoneration hearing accepted the OPDA's position that Mr. Flanks's conviction was obtained in violation of *Brady v. Maryland*, and the OPDA did not act inadvertently, Defendant Williams cannot now claim that there was no *Brady* violation. *Id.* at 574 ("In assessing whether judicial estoppel should apply, we look to see whether the following elements are present: (1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently.").

In the alternative, the facts conceded by Defendant Williams's counsel at Mr. Flanks's exoneration hearing are, at a minimum, evidentiary admissions entitled to the presumption of truth at the pleading stage in this case. *Cf. Mays v. Dir., Office of Workers' Comp. Programs*, 938 F.3d 637, 647-48 (5th Cir. 2019) (discussing differences between judicial and evidentiary admissions).

Mrs. Carnesi's identification of Mr. Flanks.  *See* Compl. ¶¶ 59-63, 72-73.  This evidence is obviously favorable.

        Third, the withheld evidence was material to Mr. Flanks's case.  Under *Brady*, evidence is material if it "demonstrates 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *Floyd*, 894 F.3d at 166 (quoting *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006)).  "A reasonable probability is a likelihood sufficient to 'undermine confidence in the outcome.'"  *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  Here, the failure to disclose evidence prejudiced the defense.  As the OPDA put it at Mr. Flanks's exoneration hearing, "there is a reasonable likelihood that had [Mrs. Carnesi's] prior testimony been disclosed, it could have affected the judgment of the jury" and that "defense counsel would have been able to present a compelling case that Mrs. Carnesi was innocently mistaken when presented with the wrong suspect, that Mr. Flank[s] did not resemble the perpetrator, and that the car he was arrested in did not fit the one at the crime scene."  Compl. ¶ 73.  This materiality finding is particularly strong given the weakness of the case against Mr. Flanks, which relied entirely on an unreliable eyewitness identification made by an undoubtedly traumatized victim.  *Id.* ¶ 59.  *See Smith v. Black*, 904 F.2d 950, 967 (5th Cir. 1990) ("[M]ateriality . . . depends almost entirely on the value of the evidence relative to the other evidence."), *vacated on other grounds*, *Smith v. Black*, 503 U.S. 930 (1992); *Grace v. Cain*, 2021 WL 5711942, 2021 U.S. Dist. LEXIS 230654, at *36 (E.D. La. Dec. 2, 2021) ("[W]ithheld evidence is more likely material when the State presents a weaker case." (quoting *Floyd*, 894 F.3d at 166)), *vacated in part on other grounds*, *Grace v. Hooper*, 2023 WL 2810059, 2023 U.S. App. LEXIS 8261 (5th Cir. Apr. 6, 2023); *Neal v. Vannoy*, 2021 WL 1212663, 2021 U.S. Dist. LEXIS 62132, at *65-66 (E.D. La. Mar. 30, 2021) (Brown, C.J.) ("[A]

*Brady* violation is more likely . . . when the impeaching evidence 'would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration.'" (quoting *LaCaze v. Warden La. Corr. Inst. for Women*, 645 F.3d 728, 736 (5th Cir. 2011))).

## II.    Former District Attorney Harry Connick Was a Final Policymaker

Mr. Flanks has alleged that former District Attorney Harry Connick was the final policymaker for the OPDA.  Under *Monell*, a "policymaker is an official whose decisions represent the official policy of the local governmental unit.'"  *Smith v. Williams*, 2023 WL 2263841, 2023 U.S. Dist. LEXIS 32662, at *15 (E.D. La. Feb. 28, 2023) (Brown, C.J.) (cleaned up) (quoting *Arnone v. Dallas County*, 29 F.4th 262, 266 (5th Cir. 2022)).  Under Louisiana law,[4] "a district attorney is the independent and final official policymaker for all of the administrative and prosecutorial functions of his office."  *Burge v. Parish of St. Tammany*, 187 F.3d 452, 469 (5th Cir. 1999).  In particular, "a suit against a district attorney in his official capacity under § 1983 for constitutional torts caused by the district attorney's policies regarding the acquisition, security, and disclosure of *Brady* material" will, if successful, "impose[] liability on the district attorney's office as an independent local entity."  *Id.* at 470.  Louisiana district attorneys are therefore policymakers because they "act as an independent local entity . . . in creating policies for disclosure of evidence to criminal defendants under *Brady*."  *Smith*, 2023 U.S. Dist. LEXIS 32662, at *19.

Mr. Flanks alleges that Harry Connick, who was District Attorney at the time of Mr. Flanks's wrongful prosecution and conviction, was the final policymaker who created the policy, custom, or practice that caused the deprivation of his constitutional rights.  Mr. Connick has testified that there was no instruction or guidance provided to prosecutors on how to define

---

4.  Under *Monell*, the question of whether an individual is a final policymaker is determined by state law.  *McMillian v. Monroe County*, 520 U.S. 781, 786 (1997).

materiality for *Brady* during the relevant time and that prosecutors "were supposed to figure it out themselves." Compl. ¶ 100. Mr. Connick also "repeatedly and publicly expressed disdain for the *Brady* doctrine and rebuffed suggestions . . . that prosecutors be instructed on their *Brady* obligations and that the OPDA take steps to ensure compliance." *Id.* ¶ 103. Finally, Mr. Connick's successor, Leon Cannizzaro, Jr., has publicly described Mr. Connick's tenure as a period in which "bad policy decisions"—including those like the *Brady* claims raised in *Thompson v. Connick*— "took root and became institutional." *Id.* ¶ 102. Defendant Williams ignores these allegations regarding Mr. Connick, claiming incorrectly that Mr. Flanks only "refers generally to 'policymakers' acting on behalf of OPDA, without ever identifying who these 'policymakers' were or providing any factual basis that they had the power to make policy." Mot. to Dismiss (Dkt. 15.1) at 6. Because Mr. Flanks made several specific allegations that Mr. Connick created and endorsed the policies that caused the constitutional violations against him, *see* Compl. ¶¶ 100, 102-03, and because Louisiana law dictates that "a district attorney is the independent and final official policymaker for all of the administrative and prosecutorial functions of his office," this argument must fail. *See Burge*, 187 F.3d at 469.

## III.   The Orleans Parish District Attorney's Office Had Official Policies, Customs, and Practices That Were the Moving Force Behind Raymond Flanks's Injuries

Mr. Flanks alleges that the OPDA had official policies, customs, and practices that led to the violation of his rights. "For purposes of *Monell* liability, an official policy may be either 1) 'policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers' or 2) 'A persistent, widespread practice which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'" *Marshall v. Webre*, 2023 WL 5952645, 2023 U.S. Dist. LEXIS 162031, at *11 (E.D. La. Sept. 13, 2023) (alteration adopted)

(quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)).  Such a custom or practice "can yield a *de facto* policy of the [policymaker] provided he had actual or constructive knowledge of the custom or practice and he acquiesced in it."  *Mixon v. Pohlmann*, 2022 WL 2921733, 2022 U.S. Dist. LEXIS 131160, at *21 (E.D. La. July 25, 2022).  Moreover, "failure to provide proper training may fairly be said to represent a policy for which the Defendants are responsible, and for which they may be held liable if it actually causes injury."  *Marshall*, 2023 U.S. Dist. LEXIS 162031, at *16 (alterations adopted) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).  A failure to properly discipline employees may also give rise to a claim where the plaintiff alleges that a "legally authorized policymaker" effectively "ratified a policy that violate a constitutional right."  *McWilliams v. City of Houston*, 2022 WL 17337820, 2022 U.S. App. LEXIS 33076, at *19 (5th Cir. Nov. 30, 2022) (citation omitted).

Mr. Flanks has alleged a "persistent, widespread practice [which] is so common and well settled as to constitute a custom that fairly represents municipal policy."  *Marshall*, 2023 U.S. Dist. LEXIS 162031, at *11 (quoting *Webster*, 735 F.2d at 841).  Mr. Flanks alleges that the official policy of the OPDA—confirmed in testimony by then-District Attorney Connick—was that prosecutors should "figure it out themselves" with respect to determining materiality under *Brady*.  Compl. ¶ 100.  Mr. Flanks also alleges that Mr. Connick had *actual knowledge* of repeated constitutional violations—including *Brady* violations—and publicly declined to take action to prevent such violations.  *Id*. ¶ 103 ("Mr. Connick repeatedly and publicly expressed disdain for the *Brady* doctrine and rebuffed suggestions—including, in one notable instance, a plea from a sitting Orleans Parish Criminal District Judge—that prosecutors be instructed on their *Brady* obligations and that the OPDA take steps to ensure compliance.").  This failure to discipline effectively amounts to ratification of the illegal conduct because plaintiff has alleged "specific

facts that support an inference that any pertinent policymaker knew of unlawful actions and approved them." *McWilliams*, 2022 U.S. App. LEXIS 33076, at \*19.

Mr. Flanks also alleges that Mr. Connick had constructive knowledge of repeated *Brady* violations because such violations "occurred for so long [and] so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice.'" *Guillot v. Lopinto*, 2022 WL 684159, 2022 U.S. Dist. LEXIS 40383, at \*17 (E.D. La. Mar. 8, 2022) (quoting *Webster*, 735 F.2d at 841-42).  Mr. Flanks's allegations include that:

- In the 1980s, concealing exculpatory evidence in New Orleans was routine (as observed by the National Registry of Exonerations and Supreme Court Justices John Paul Stevens and Ruth Bader Ginsberg), Compl. ¶ 106;

- Orleans Parish has the highest per capita exoneration rate of any county or parish in the county (and prosecutorial misconduct, including the suppression of exculpatory evidence, occurred in the majority of those exonerations), *id.* ¶ 107;

- There are at least 51 criminal cases from New Orleans in which courts have found or the prosecution has acknowledged that the OPDA violated *Brady*, as well as several others in which strong claims of *Brady* violations existed but the convictions were reversed on other grounds, *id.* ¶ 108; and

- Eighteen specific cases provide illustrative examples of those repeated *Brady* violations, *id.* ¶¶ 109-10.

These allegations illustrate persistent, widespread practices.  Indeed, Mr. Flanks has alleged instances of "very similar violations," *Jason v. Tanner*, 938 F.3d 191, 198 (5th Cir. 2019), to those that he endured, including, for example, instances of withholding material evidence: regarding inconsistent statements by key witnesses, *e.g.*, Compl. ¶¶ 109.b, 110.e, 110.g, 110.i, 110.l, 110.p; regarding descriptions of the perpetrator that did not match the defendant, *e.g.*, *id.* ¶¶ 109.b, 110.c, 110.e, 110.f, 110.n, 110.p; regarding descriptions of cars that indicated the defendant was likely innocent, *e.g.*, ¶¶ 109.b, 110.l; regarding improperly indicating the suspect to influence identification during a photograph array, ¶ 110.h; and regarding misconduct by Defendant

15

Dillmann, including other instances of fabrication of evidence, *e.g.*, ¶¶ 109.b, 109.c, 110.c, 110.e, 115.

*Mitchell v. City of New Orleans*, 184 F. Supp. 3d 360 (E.D. La. May 2, 2016), is instructive. There, plaintiffs stated "a plausible claim for relief by identifying in the complaint, among other things, 'past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy.'" *Id.* at 373 (quoting *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 843-44 (S.D. Tex. 2011)). Plaintiffs met that standard by alleging "a persistent, widespread practice of failing to train, supervise, and discipline NOPD officers" and "a custom of condoning a culture within the NOPD in which NOPD personnel had the reasonable belief that their actions would not be properly monitored and that their misconduct would not be thoroughly investigated or sanctioned, but instead would be tolerated and approved." *Id.* at 372. Accordingly, plaintiffs "provide[d] more than a boilerplate recitation of the grounds for municipal liability" by "mak[ing] some additional allegation to put the municipality on fair notice of the grounds for which it is being sued," and the allegations "survive[d] dismissal." *Id.* at 373-74. So too here, where Mr. Flanks alleges "a persistent, widespread practice of failing to train, supervise, and discipline" OPDA employees and "a custom of condoning a culture within the [OPDA] in which [OPDA] personnel had the reasonable belief that their actions would not be properly monitored and that their misconduct would not be thoroughly investigated or sanctioned, but instead would be tolerated and approved." *Id.* Those allegations state a claim, which is all that is required at the pleading stage.

Mr. Flanks has also alleged that the OPDA adopted "an unconstitutional official policy" or, at the least, a policy "promulgated with deliberate indifference to the known or obvious

consequences that constitutional violations would result." *Mixon*, 2022 U.S. Dist. LEXIS 131160, at *13 (cleaned up and citation omitted). *First*, Mr. Flanks has alleged that the OPDA effectively adopted an official policy of allowing the suppression of material exculpatory evidence and engaging in the affirmative concealment of such misconduct. *See supra* at 13-16. Of course, such policies are facially unconstitutional. *See Brady*, 373 U.S. at 87. *Second*, Mr. Flanks has, at minimum, alleged that the OPDA promulgated its *Brady* policies with deliberate indifference to the obvious consequences that constitutional violations would result. "Deliberate indifference 'requires that the defendant act with 'something more than mere negligence' but 'less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Marshall*, 2023 U.S. Dist. LEXIS 162031, at *20 (quoting *Cadena v. El Paso County.*, 946 F.3d 717, 727 (5th Cir. 2020)). As explained above, Mr. Flanks has alleged that Mr. Connick had both actual and constructive knowledge of ongoing *Brady* violations but repeatedly and publicly refused to take any steps to prevent such violations or discipline his employees for their conduct. *See supra* at 13-16. He thus acted "with knowledge that harm w[ould] result" from his policies, exhibiting deliberate indifference to the obvious consequence of constitutional violations like those at issue here.

Finally, the OPDA's policy was the moving force behind Mr. Flanks's injuries. Under *Monell*, "proof that the municipality's decision was unconstitutional' [may] establish[] that 'the municipality itself was liable for the plaintiff's constitutional injury.'" *Jauch v. Choctaw County.*, 874 F.3d 425, 436 (5th Cir. 2017) (citation omitted). "'Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so,' the causation determination 'is straightforward.'" *Id.* at 435 (citation omitted). As explained above, Mr. Flanks has alleged that the OPDA had a policy of promoting, facilitating, and condoning

misconduct by its employees concerning the suppression of *Brady* material. *See supra* at 13-16. Because such behavior violates the Fifth and Fourteenth Amendments, Mr. Flanks has alleged that the OPDA's unconstitutional policies caused his constitutional injury. *See Jauch*, 874 F.3d at 435-46 (finding it "obvious" that "policy whereby certain arrestees were indefinitely detained" was the moving force behind "due process violation [of] indefinite detention"); *Durant v. Gretna City*, 2020 WL 263669, 2020 U.S. Dist. LEXIS 8422, at *75-76 (E.D. La. Jan. 17, 2020) (Brown, C.J.) (arrest pursuant to unconstitutional ordinance established that unconstitutional ordinance itself "obvious[ly]" caused plaintiff's injury). Defendant Williams cites no cases to the contrary.

## CONCLUSION

For the foregoing reasons, Plaintiff Raymond Flanks respectfully submits that the Court should deny Defendant Jason Williams's Motion to Dismiss.

Dated: February 20, 2024
        New Orleans, Louisiana


MURELL LAW FIRM                              SHANIES LAW OFFICE PLLC

By: */s/ Christopher J. Murell*             By: */s/ David B. Shanies*
    Christopher J. Murell                        David B. Shanies* (T.A.)
    La. Bar No. 32075                            Deborah I. Francois*
    Meghan K. Matt                               Eleanor C. Davis*
    La. Bar No. 39975                            110 West 40th Street, Tenth Floor
    2831 Saint Claude Avenue                     New York, New York 10018
    New Orleans, Louisiana 70117                 (212) 951-1710 (Tel)
    (504) 717-1297 (Tel)                         (212) 951-1350 (Fax)
    chris@murell.law                             david@shanieslaw.com
    meghan@murell.law                            deborah@shanieslaw.com
                                                 eleanor@shanieslaw.com

                                                 *Admitted *Pro Hac Vice*


*Attorneys for Plaintiff Raymond Flanks*