## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**RAYMOND FLANKS**                                    **CIVIL ACTION**

**VERSUS**                                                       **NO. 23-6897**

**THE CITY OF NEW ORLEANS et al.**          **SECTION: "G"(4)**

## ORDER AND REASONS

This litigation arises from Plaintiff Raymond Flanks' ("Plaintiff") wrongful conviction for first-degree murder in 1985. Plaintiff names as Defendants the City of New Orleans; Jason Williams, in his official capacity as Orleans Parish District Attorney; Anne Kirkpatrick, in her official capacity as Superintendent of the New Orleans Police Department; John Dillmann, in his individual capacity; and John/Jane Does #1-20 in their individual capacities.[1] Plaintiff brings a *Monell* claim against Jason Williams, in his official capacity as the District Attorney for Orleans Parish ("Defendant Williams").[2] Plaintiff alleges that the Orleans Parish District Attorney's Office ("OPDA") secured his wrongful conviction in violation of his constitutional rights by withholding material exculpatory evidence in violation of OPDA's obligations under *Brady v. Maryland*.[3] Before the Court is Defendant Williams' Motion to Dismiss.[4] Defendant Williams argues that OPDA cannot be held liable under 42 U.S.C. § 1983 because Plaintiff has not identified any OPDA policymaker, any official policy, custom, or practice, or established a causal link between the

---

[1] *See* Rec. Doc. 1

[2] *Id.* at 7.

[3] *Id.* at 4–5. *See Brady v. Maryland*, 373 U.S. 83 (1963).

[4] Rec. Doc. 15. Other defendants in this matter did not join Defendant Williams' motion.

1

alleged OPDA policies and the alleged constitutional violations in his case.[5] Plaintiff opposes the motion, arguing that he has adequately alleged that he was prosecuted, convicted, and imprisoned as a direct result of intentional suppression of exculpatory information by OPDA employees and that then District Attorney Harry Connick was the official policymaker of these policies.[6] Having considered the motion, the memoranda in support and opposition, the record, and the applicable law, the Court denies Defendant Williams' motion and grants Plaintiff leave to file an Amended Complaint.

## I. Background

In December 1985, a jury found Plaintiff guilty of first-degree murder in the death of Martin Carnesi ("Mr. Carnesi").[7] This was Plaintiff's second trial after the first trial in August 1984 resulted in a mistrial when the jury was unable to reach a verdict.[8] At both trials, Mr. Carnesi's wife, Faye Carnesi ("Mrs. Carnesi"), testified to the circumstances of her husband's death, including identifying Plaintiff as the person who shot her husband.[9]

According to the Complaint, Mr. Carnesi was shot by the Actual Perpetrator ("Actual Perpetrator") on December 17, 1983 in a robbery gone wrong.[10] At the time, Mr. Carnesi was walking Mrs. Carnesi to her car that was parked in front of their home.[11] After Mr. Carnesi was

---

[5] *Id.* at 1.

[6] Rec. Doc. 21 at 7.

[7] Rec. Doc. 1 at 13.

[8] *Id.* at 11.

[9] *Id.* at 12–13.

[10] *Id.* at 8.

[11] *Id.*

shot, Mrs. Carnesi threw her purse at the Actual Perpetrator and ran away.[12] Initially, Mrs. Carnesi represented that the Actual Perpetrator was a Black man in his late twenties, about 5'10" and 150 pounds, with a medium build, brown skin, and a light mustache.[13] Mrs. Carnesi also reported that the Actual Perpetrator was wearing a shower cap and he sped off in an aged, light blue car.[14] Approximately a week after the crime, NOPD detectives, including Dillman, visited Mrs. Carnesi at her home and showed her a photo lineup for identification.[15] Mrs. Carnesi narrowed it down to two photos, Plaintiff and one other individual.[16] Dillman then suggested to Mrs. Carnesi that Plaintiff was the perpetrator.[17]

Mrs. Carnesi testified before the grand jury and identified Plaintiff as the perpetrator, based on her identification of him when Dillman suggested that Plaintiff was the perpetrator.[18] Mrs. Carnesi testified that the Actual Perpetrator had a "little white blotch on the side of his cheek, a little white mark, like discolored looking" but rationalized her selection of Plaintiff from the photo lineup because she "didn't think they showed the side of his face with that mark in the photo."[19]

Plaintiff's first trial began on August 28, 1984.[20] Mrs. Carnesi identified Plaintiff and testified that the car he was arrested in resembled the car she saw fleeing the scene.[21] OPDA

---

[12] *Id.* at 9.

[13] *Id.*

[14] *Id.*

[15] *Id.* at 11.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

prosecutors also presented testimony from an NOPD technician who testified that Mr. Carnesi was shot with the same gun as the gun in Plaintiff's possession.[22] This first trial resulted in a hung jury.[23] After the first trial, the Bureau of Alcohol, Tobacco, and Firearms conducted independent ballistics testing and determined that neither the bullets used to kill Mr. Carnesi nor the casing found at the scene matched Plaintiff's gun.[24] At the second trial, Mrs. Carnesi testified that she "knew 'it was him'" and also testified that Dillman did not suggest to her who to identify during the photo lineup.[25] The jury returned a guilty verdict for first-degree murder at this second trial.[26]

Nearly 37 years later, on November 17, 2022, Plaintiff's first-degree murder conviction was vacated.[27] At the November 17, 2022 exoneration hearing, "OPDA stated that 'the State agrees that Mr. Flank's [sic] conviction was obtained in violation of *Brady v. Maryland*' because 'the State failed to disclose … materials [that] are favorable, and under circumstances of the State's case against Mr. Flank[s], material.'"[28] Plaintiff notes that OPDA specifically "acknowledged that 'there is a reasonable likelihood that had [Mrs. Carnesi's] prior testimony been disclosed, it could have affected the judgment of the jury' and 'defense counsel would have been able to present a compelling case that Mrs. Carnesi was innocently mistaken when presented with the wrong

---

[22] *Id.*

[23] *Id.* at 12.

[24] *Id.*

[25] *Id.*

[26] *Id.* at 13.

[27] *Id.*

[28] *Id.* at 13–14.

suspect, that Mr. Flank[s] did not resembled the perpetrator, and that the car he was arrested in did not fit the one at the crime scene.'"[29]

Plaintiff brings a *Monell* claim against Defendant Williams in his official capacity as the District Attorney for Orleans Parish.[30] Plaintiff alleges that "throughout the 1970s, 1980s, and 1990s, the OPDA maintained policies and customs that promoted, facilitated, and condoned misconduct by prosecutors and other OPDA employees and agents, including concerning the suppression of exculpatory and favorable evidence to criminal defendants and their counsel."[31] Plaintiff further alleges that OPDA's policymakers maintained a policy, custom, or pattern and practice of condoning official misconduct, including by failing to train, supervise, and discipline … prosecutors."[32] According to Plaintiff, because he and his counsel "were not aware of the NOPD records showing inconsistencies between Mrs. Carnesi's initial description of the Actual Perpetrator and Mr. Flanks' appearance, the NOPD records showing a string of similar crimes with a consistently described perpetrator, or Mrs. Carnesi's grand jury testimony regarding the photo array and her initial identification of Mr. Flanks," this exculpatory material was unusable at trial.[33]

Plaintiff attached to the Complaint an expert report prepared by Professor Laurie Levenson.[34] Professor Levenson's expert report discusses the extent to which the policies, customs, and practices of OPDA complied with *Brady*.[35]

---

[29] *Id.* at 14.

[30] *Id.* at 42.

[31] *Id.* at 18–19.

[32] *Id.* at 15.

[33] *Id.*

[34] Rec. Doc. 1-1. Professor Levenson prepared the report for the plaintiff in *Robert Jones v. Leon Cannizzaro, Jr.*, No. 18-503 (ED. La.)

[35] *Id.* at 3.

On January 18, 2024, Defendant Williams filed the instant motion to dismiss.[36] On January 26, 2024, the Court granted Plaintiff's motion to continue the submission date on the instant motion from February 7, 2024 to February 28, 2024.[37] On February 20, 2024, Plaintiff opposed the motion.[38] On February 26, 2024, Defendant Williams filed a reply.[39]

## II. Parties' Arguments

### A.   *Defendant Williams' Arguments in Support of Motion to Dismiss*

Defendant Williams argues that Plaintiff has failed to state a *Monell* claim to hold Defendant Williams liable under § 1983.[40] Defendant Williams notes that there are three elements to establish a § 1983 claim against a municipality: "'[t]here must be (a) a policymaker; (2) an official policy; and (3) a violation of a constitutional right whose 'moving force' is the policy or custom.'"[41]

Defendant Williams contends that Plaintiff has not alleged the involvement of any OPDA policymaker in establishing a policy of suppressing exculpatory evidence, as Plaintiff did not identify who these policymakers were or provide any factual basis to conclude that they had power to make policy on the matters in question.[42]   Defendant Williams notes that "Supreme Court

---

[36] Rec. Doc. 15.

[37] Rec. Doc. 19.

[38] Rec. Doc. 21.

[39] Rec. Doc. 22.

[40] Rec. Doc. 15-1 at 4.

[41] *Id.* (citing *Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018)).

[42] *Id.* at 5–6.

jurisprudence 'distingushe[s] between decisionmakers and final decisionmakers.'"[43] Defendant Williams also notes that Plaintiff alleges in the Complaint that "'OPDA effectively delegated policymaking authority' on the issue of *Brady* disclosures to 'individual prosecutors, including the prosecutors involved in [his] prosecution and conviction.'"[44] Defendant Williams contends, however, that this is insufficient for identifying them as policymakers for OPDA or that they had final authority to "'decide goals for a particular [OPDA] function and devise the means of achieving those goals.'"[45]

Defendant Williams next contends that Plaintiff has not adequately alleged that OPDA maintained any unconstitutional policies concerning disclosure of evidence as Plaintiff did not allege that at the time he was prosecuted and convicted in 1985, OPDA has any written policy statements, ordinances, or regulations instructing prosecutors to suppress exculpatory evidence under *Brady*.[46] Defendant Williams avers that to the contrary, Plaintiff appears to allege that at that time, OPDA did not have a written policy concerning *Brady* disclosures.[47]

Defendant Williams next argues that Plaintiff's allegation that "'there are at least 51 criminal cases from New Orleans in which courts have found and/or the prosecution has acknowledged that the OPDA violated *Brady*, as well as several others in which strong claims of *Brady* violations existed but the convictions were reversed on other grounds'" is insufficient

---

[43] *Id.* at 5 (citing *Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1247 (5th Cir. 1993); *Webb v. Town of St. Joseph*, 925 F.3d 209, 216–17 (5th Cir. 2019); *Bolton v. City of Dallas*, 541 F.3d 545, 549 (5th Cir. 2008); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988)).

[44] *Id.* at 6.

[45] *Id.* (citing *Webb*, 925 F.3d at 217).

[46] *Id.*

[47] *Id.* at 6–7.

because these 51 criminal cases occurred over a period of decades.[48] Further, Plaintiff has only identified 18 cases involving alleged *Brady* violations that proceeded in Orleans Parish.[49] Defendant Williams notes that none of these cases Plaintiff has identified involved allegedly exculpatory grand jury testimony.[50] Defendant Williams also notes that Plaintiff has not alleged which specific documents OPDA should have disclosed.[51] Defendant Williams further notes that Plaintiff has alleged that these exculpatory documents are "'in NOPD's possession'" rather than OPDA's possession.[52] Defendant Williams cites *Armstrong v. Ashley*, where the Fifth Circuit held that listing nine cases over a 24-year period as examples where exculpatory evidence was suppressed by prosecutors was insufficient to show a municipal custom.[53]

Defendant Williams also argues that Plaintiff has not alleged that any OPDA policymaker acted with deliberate indifference because "[h]alf" of the 18 cases that Plaintiff cites to demonstrate a pattern of the OPDA's suppression of exculpatory evidence occurred after Plaintiff's conviction, so OPDA prosecutors could not have known about them.[54] Defendant Williams notes that Plaintiff has alleged that "there were 'numerous cases and investigations' before his prosecution in 1984–1985 in which 'OPDA employees, including prosecutors involved in the case against [him]'

---

[48] *Id.* at 7.

[49] *Id.* at 8.

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.* (citing *Armstrong v. Ashley*, 60 F.4th 262, 277–78 (5th Cir. 2023)). Defendant also cites *Johnson v. Harris County*, 83 F.4th 941, 946–47 (5th Cir. 2023) (holding that 23 instances of arrests was insufficient to show a pattern); *Martinez v. Nueces County*, 71 F.4th 385, 389 (5th Cir. 2023) (finding that the example cases the plaintiff provided were not similar and specific)). Rec. Doc. 15-1 at 9.

[54] *Id.* at 9–11.

committed 'repeated *Brady* violations.'"[55] However, Defendant Williams contend that the Fifth Circuit requires "that only 'very similar violations' can provide the 'notice' to policymakers that would give rise to deliberate indifference" and Plaintiff has not alleged in the Complaint how these 18 cases are similar to his own case.[56] According to Defendant Williams, the Supreme Court in *Connick v. Thompson* reversed a jury verdict against OPDA after finding that the evidence was insufficient to prove that in 1985 OPDA's policymaker was deliberately indifferent to a need for better training with respect to *Brady* disclosures.[57]

Defendant Williams also argues that Plaintiff has not adequately alleged that OPDA's policies were the "moving force" that caused the alleged suppression of evidence in his case, as the Complaint makes no mention of any OPDA prosecutor being aware of the undisclosed evidence or why that prosecutor failed to disclose it.[58]

Finally, Defendant Williams contends that NOPD Detective Dillmann's alleged fabrication of evidence was not caused by OPDA's official policies as OPDA did not employ Dillmann, did not supervise or control him, or subject him to OPDA's official policies in any way.[59] Defendant Williams further contends that Plaintiff has not alleged the existence of any OPDA policymaker, any official OPDA policy directing police officers to fabricate evidence, or any widespread practice of improperly suggestive identification techniques.[60]

---

[55] *Id.* at 10.

[56] *Id.* at 10–11 (citing *Jason v. Tanner*, 938 F.3d 191, 198 (5h Cir. 2019); *Robinson v. Midland County*, 80 F.4th 704, 710 n.3 (5th Cir. 2023)).

[57] *Id.* at 12 (citing *Connick v. Thompson*, 563 U.S. 51 (2011)).

[58] *Id.* at 13.

[59] *Id.* at 13–14.

[60] *Id.* at 14.

**B.** *Plaintiff's Arguments in Opposition to Motion to Dismiss*

In opposition, Plaintiff argues that he has adequately stated a *Monell* claim against Defendant Williams because he has alleged that OPDA violated *Brady* and the "moving force" behind these *Brady* violations were OPDA policies and customs of concealing and suppressing exculpatory evidence created by then District Attorney Harry Connick.[61] Plaintiff notes that he has alleged that Harry Connick was the final policymaker who created the policy, custom, or practice that caused the *Brady* violation and the deprivation of the constitutional rights that he suffered.[62] Plaintiff further notes that Harry Connick has testified that there was no instruction or guidance provided to prosecutors on how to define materiality for *Brady* and that prosecutors "'were supposed to figure it out themselves.'"[63] Plaintiff also notes that he has alleged that Harry Connick "'repeatedly and publicly expressed disdain for the *Brady* doctrine and rebuffed suggestions … that prosecutors be instructed on their *Brady* obligations and that the OPDA take steps to ensure compliance.'"[64] Plaintiff also notes that Harry Connick's successor, Leon Cannizzaro, Jr., "has publicly described Mr. Connick's tenure as a period in which 'bad policy decisions'—including those like the *Brady* claims raised in *Thompson v. Connick*—'took root and became institutional.'"[65]

Plaintiff next argues that he has alleged that OPDA had official policies, customs, and practices that were the moving force behind Plaintiff's injuries because he has specifically alleged

---

[61] Rec. Doc. 21 at 13–14.

[62] *Id.* at 17.

[63] *Id.* at 17–18.

[64] *Id.* at 18.

[65] *Id.*

that OPDA's official policy with regard to *Brady* was that "prosecutors should 'figure it out themselves'" and that Harry Connick had actual knowledge of *Brady* violations and publicly declined to take action to prevent these violations.[66] Plaintiff contends that Harry Connick's failure to discipline prosecutors for *Brady* violations amounts to approval of this illegal conduct.[67] Plaintiff further contends that he has alleged that Harry Connick had constructive knowledge of repeated *Brady* violations because they "'occurred for so long [and] so frequently.'"[68] Plaintiff notes that he has alleged that the National Registry of Exonerations and former Supreme Court Justices John Paul Stevens and Ruth Bader Ginsberg have observed that concealing exculpatory evidence in New Orleans was routine in the 1980s.[69] Plaintiff also notes that he has alleged that Orleans Parish had the highest per capita exoneration rate of any county or parish in the country, there are at least 51 criminal cases from New Orleans in which courts have found or the prosecution has acknowledged that OPDA violated *Brady*, and 18 specific cases that illustrate examples of repeated *Brady* violations.[70]

Plaintiff cites *Mitchell v. City of New Orleans*, where the plaintiffs there "stated 'a plausible claim for relief by identifying in the Complaint, among other things, past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, involvement of multiple officials in the misconduct, or the specific topic of the challenged

---

[66] *Id.* at 18–19.

[67] *Id.* at 19–20.

[68] *Id.* at 20.

[69] *Id.*

[70] *Id.*

policy or training inadequacy.'"[71] Plaintiff avers that his allegation that "'a persistent, widespread practice of failing to train, supervise, and discipline' OPDA employees and 'a custom of condoning culture within the [OPDA] in which [OPDA] personnel had the reasonable belief that their actions would not be properly monitored and that their misconduct would not be thoroughly investigated or sanctioned, but instead would be tolerated and approved'" is sufficient to state a *Monell* claim.[72] Plaintiff also contends that because he alleges that OPDA's policy of promoting, facilitating, and condoning misconduct by its employees concerning the suppression of *Brady* material violated his constitutional rights under the Fifth and Fourteenth Amendments, he has adequately alleged causation.[73]

## C.   *Defendant Williams' Further Arguments in Support of the Motion to Dismiss*

In the reply, Defendant Williams contends that Plaintiff did not allege in the Complaint that Harry Connick was the final policymaker for OPDA and the Complaint only references "policymakers" for OPDA.[74] Defendant Williams also argues that Plaintiff's *Brady* claims still fail because they all depend on Harry Connick having notice of serious problems with OPDA's *Brady* policies or training before Plaintiff's prosecution in 1985.[75] According to Defendant Williams, the factual allegations Plaintiff states are "vague" and "generalized," as they "do not identify or

---

[71] *Id.* at 21 (citing *Mitchell v. City of New Orleans*, 184 F. Supp. 3d 360 (E.D. La. May 2, 2016) (Barbier, J.) (internal citation and quotation marks omitted)).

[72] *Id.*

[73] *Id.* at 22–23.

[74] Rec. Doc. 22 at 1.

[75] *Id.* at 1–2.

establish any specific incidents" before Plaintiff's prosecution that would have put Harry Connick on notice of problems with OPDA's *Brady* policies.[76]

Defendant Williams argues that the 51 criminal cases Plaintiff references as demonstrating a pattern of OPDA's violations of *Brady* is vague because Plaintiff has not provided the names of these cases, the relevant facts in those cases that resulted in *Brady* violations, and the dates for when these *Brady* violations occurred.[77] Similarly, Defendant Williams contends that the 11 cases of "very similar violations" that Plaintiff cited in the Complaint did not occur prior to Plaintiff's prosecution and conviction in 1985 and therefore would not have put Harry Connick on notice of these *Brady* violations.[78] Defendant Williams reiterates that none of these cases involve exculpatory grand jury testimony or evidence of a series of other similar crimes that the defendant was not charged with.[79]

Defendant Williams contends that *Mitchell v. City of New Orleans*, which Plaintiff cites, is distinguishable because the plaintiffs there alleged that NOPD officer Melvin Williams had an extensive record of incidents and civilian complaints for abuse of citizens' rights that the supervisor was aware of but did not take any action to intervene and prevent this conduct.[80] Defendant Williams also notes that Plaintiff did not respond to the argument that former NOPD Detective Dillmann is not supervised or controlled by OPDA.[81]

---

[76] *Id.* at 2.

[77] *Id.* at 3.

[78] *Id.* at 3–4.

[79] *Id.* at 4.

[80] *Id.*

[81] *Id.* at 5.

### III. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides that an action may be dismissed for "failure to state a claim upon which relief can be granted."[82] A motion to dismiss for failure to state a claim is "viewed with disfavor and is rarely granted."[83] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[84] "Factual allegations must be enough to raise a right to relief above the speculative level."[85] A claim is facially plausible when the plaintiff has pleaded facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."[86]

On a motion to dismiss, asserted claims are liberally construed in favor of the claimant, and all facts pleaded are taken as true.[87] However, although required to accept all "well-pleaded facts" as true, a court is not required to accept legal conclusions as true.[88] "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."[89] Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

---

[82] Fed. R. Civ. P. 12(b)(6).

[83] *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982).

[84] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[85] *Twombly*, 550 U.S. at 555.

[86] *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556).

[87] *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007).

[88] *Iqbal*, 556 U.S. at 678–79.

[89] *Id.* at 679.

statements" will not suffice.[90] The complaint need not contain detailed factual allegations, but it must offer more than mere labels, legal conclusions, or formulaic recitations of the elements of a cause of action.[91] That is, the complaint must offer more than an "unadorned, the-defendant-unlawfully-harmed-me accusation."[92] From the face of the complaint, there must be enough factual matter to raise a reasonable expectation that discovery will reveal evidence as to each element of the asserted claims.[93] If factual allegations are insufficient to raise a right to relief above the speculative level, or if it is apparent from the face of the complaint that there is an "insuperable" bar to relief, the claim must be dismissed.[94]

## IV. Analysis

Defendant Williams argues that Plaintiff did not adequately state a *Monell* claim against Defendant Williams in his official capacity as the head of OPDA because Plaintiff has failed to allege an official policymaker for OPDA, an official policy, custom or practice of suppressing or fabricating evidence, or that the official policy is the moving force behind Plaintiff's constitutional injuries.[95] Plaintiff counters that he has stated a *Monell* claim because he has identified Harry Connick as the official policymaker for OPDA when an official policy of suppressing exculpatory evidence was in place, has referenced other cases that establish a custom of OPDA's violations of

---

[90] *Id.* at 678.

[91] *Id.*

[92] *Id.*

[93] *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009).

[94] *Carbe v. Lappin*, 492 F.3d 325, 328 n.9 (5th Cir. 2007); *Moore v. Metro. Hum. Serv. Dist.*, No. 09-6470, 2010 WL 1462224, at * 2 (E.D. La. Apr. 8, 2010) (Vance, J.) (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)).

[95] Rec. Docs. 15, 15-1, 22.

*Brady*, and that this custom was the moving force responsible for the constitutional harms he suffered.[96]

### A.      The Monell Claim

In *Monell v. Department of Social Services of the City of New York*, the Supreme Court held that plaintiffs may bring § 1983 claims against local government entities or officials for policies they promulgate.[97] A valid *Monell* claim requires "(1) a policymaker; (2) an official policy; and (3) a violation of a constitutional right whose 'moving force' is the policy or custom."[98]

From Plaintiff's Complaint and his opposition to Defendant Williams' Motion to Dismiss, it is clear that Plaintiff is attempting to hold the OPDA liable through its agents by alleging several theories of *Monell* liability. Plaintiff alleges that OPDA's final policymakers violated Plaintiff's constitutional rights under the Fifth and Fourteenth Amendments.[99] He further alleges that the OPDA had a widespread custom or practice of suppressing exculpatory evidence in violation of *Brady* and that OPDA policymakers were deliberately indifferent to these customs and practices when they failed to supervise, discipline and train prosecutors.[100] Similarly, Plaintiff alleges that OPDA had a widespread custom or practice of fabricating evidence and that OPDA policymakers were deliberately indifferent to these customs and practices when they failed to supervise, discipline and train prosecutors.[101] Plaintiff also asserts that OPDA had a policy, custom, or

---

[96] Rec. Doc. 21.

[97] *Monell v. Dep't of Soc. Servs. Of City of N.Y.*, 436 U.S. 658, 690 (1978).

[98] *Alvarez*, 904 F.3d at 389 (citation omitted).

[99] Rec. Doc. 1 at 5.

[100] *Id.* at 42–45.

[101] *Id.*

practice of engaging in the affirmative concealment of misconduct.[102] Each of these theories is addressed in turn.

### 1.     Suppression of Exculpatory Evidence

#### i.     *Whether Plaintiff has Alleged an Official Policymaker*

To state a *Monell* claim, a plaintiff must "identify a policymaker with final policymaking authority and a policy that is the 'moving force' behind the alleged unconstitutional violation."[103] The Supreme Court has held that "the identification of policymaking officials is a question of state law."[104] Under Louisiana law, a district attorney "shall have charge of every criminal prosecution by the state in his district, be the representative of the state before the grand jury in his district, and be the legal advisor to the grand jury."[105]

In the Complaint, Plaintiff alleges that "policymakers" acting on behalf of OPDA engaged in misconduct, including the improper documentation and non-disclosure of exculpatory information, that led to Plaintiff's false conviction.[106] Plaintiff frequently uses "policymakers" when referring to both NOPD and OPDA policymakers in the same sentence.[107] However, Plaintiff later identifies Harry Connick, then the head of OPDA, as the OPDA policymaker responsible for policies that led to *Brady* violations.[108] For instance, Plaintiff alleges that Harry Connick testified that his OPDA prosecutors "'were supposed to figure it out themselves'" in regards to OPDA's

---

[102] *Id.*

[103] *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003).

[104] *Praprotnik,* 485 U.S. at 124.

[105] La. Const. Art. V, § 26.

[106] Rec. Doc. 1 at 14.

[107] *Id.* at 14, 15, 42.

[108] *Id.* at 21–22.

*Brady* policy.[109] Plaintiff also referenced the statements of former OPDA Leon Cannizzaro, Jr., who succeeded Harry Connick, that the OPDA, under Harry Connick, "'had been in a steady state of decline'" and that "'bad policy decisions took root and became institutional,'" which had "'collateral consequences in the form of civil liability against the office.'"[110] Plaintiff also alleged that "during his tenure as District Attorney, Mr. Connick repeatedly and publicly expressed disdain for the *Brady* doctrine and rebuffed suggestions … that prosecutors be instructed on their *Brady* obligations and that the OPDA take steps to ensure compliance with the law and Constitution."[111] Although Plaintiff did not directly state that Harry Connick is the policymaker with final policymaking authority for OPDA, it can be inferred from the Complaint that Harry Connick was the policymaker with final policymaking authority for OPDA when Plaintiff was prosecuted for the killing of Mr. Carnesi. Plaintiff also makes clear in his opposition to the instant motion that Harry Connick was the official policymaker for OPDA.[112] Therefore, the Court will grant Plaintiff leave to amend the Complaint to more specifically allege that Harry Connick was the official policymaker for OPDA.

### ii.    Whether There was an Official Policy or a Custom

Because Harry Connick has been identified at the relevant time as the final policymaker of the OPDA, Plaintiff must plead sufficient facts to establish the existence of an official policy, practice, or custom. This requirement may be established in one of three ways. First, there may be a policy that is "officially adopted and promulgated" by the municipality or by an official with

---

[109] *Id.* at 21.

[110] *Id.* at 22.

[111] *Id.*

[112] Rec. Doc. 21 at 17.

policymaking authority.[113] Second, there may be a "persistent, widespread practice of city officials or employees, which, although not authorized by officially promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy."[114] A persistent, widespread practice may include allegations that a policymaker failed to act affirmatively, "if the need to take some action to control the agents of the local government entity 'is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r] … can reasonably be said to have been deliberately indifferent to the need.'"[115] A policymaker with policy-making authority must have actual or constructive knowledge of the custom.[116] Third, "a single decision by a policy maker may, under certain circumstances, constitute a policy for which a municipality may be liable."[117]

In *Connick v. Thompson*, the Supreme Court considered whether a single *Brady* violation was sufficient to hold Connick, as the official policymaker for OPDA, liable under *Monell* for the wrongful conviction of John Thompson.[118] The Supreme Court, applying dicta from a prior Supreme Court case, *Canton v. Harris,* found that the theory of "single-incident liability" did not apply to prosecutors.[119] The Supreme Court also noted that four overturned convictions in

---

[113] *Burge v. St. Tammany Parish (Burge II),* 336 F.3d 363, 369 (5th Cir. 2003).

[114] *Id.*

[115] *Burge v. Parish of St. Tammany (Burge I)*, 187 F.3d 452, 471 (5th Cir. 1999) (quoting *City of Canton v. Harris*, 489 U.S. 378, 380 (1989)).

[116] *Webster*, 735 F.2d at 842.

[117] *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (quoting *Brown v. Bryan County*, 219 F.3d 450, 462 (5th Cir. 2000)).

[118] *Connick,* 563 U.S. at 63–64.

[119] *Id.* at 63–68 (discussing *Canton v. Harris*, 489 U.S. at 390). *See Lester v. Parish*, No. 15-2008, 2016 WL 5723994, at *8 (W.D. La. Sept. 29, 2016) (Hicks, J.) ("In *Connick v. Thompson*, the Supreme Court addressed dicta from a prior Supreme Court case, *Canton v. Harris*, that had opened the door to potential 'single-incident' liability for local governments in *Monell* claims.").

Louisiana courts because of *Brady* violations by OPDA prosecutors under Connick in the 10 years before Thompson's armed robbery trial "could not have put Connick on notice that the [OPDA's] *Brady* training was inadequate with respect to the sort of *Brady* violation at issue here."[120] Thompson contended that OPDA failed to disclose an exculpatory blood swatch as the *Brady* violation, but the Supreme Court noted that none of the cases Thompson cited involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind.[121]

In *Armstrong v. Ashley,* the Fifth Circuit affirmed the district court's dismissal of Andrea Armstrong's ("Armstrong") *Monell* claim against James Stewart, in his official capacity as the District Attorney for Caddo Parish ("Stewart"), on a Rule 12(b)(6) motion.[122] The Fifth Circuit held that Armstrong's *Monell* claim against Stewart was conclusory because Armstrong alleged, in part, that "the District Attorney, through its final policymakers, maintained a policy, custom, or pattern and practice of condoning corruption, that included widespread prosecutorial misconduct, including by failing to supervise, discipline, and train its prosecutors …"[123] Armstrong also listed nine cases over a 24-year period where exculpatory evidence was suppressed by the District Attorney as demonstrating a custom of suppressing exculpatory evidence.[124] However, the Fifth Circuit held that "nine constitutional violations over a 24-year period and thousands of prosecutions are hardly sufficient to show a municipal custom."[125] Further, the Fifth Circuit noted

---

[120] *Connick,* 563 U.S. at 59, 62.

[121] *Id.* at 62–63.

[122] *Armstrong,* 60 F.4th at 277. Glenn Ford, the real party in interest, passed away a few months after he filed suit and the executrix of his estate, Andrea Armstrong, was substituted as the plaintiff. *Id.* at 268.

[123] *Id.* at 277.

[124] *Id.* at 277–78.

[125] *Id.* at 278 (citing *Connick*, 563 U.S. at 62).

that "[a] more fundamental problem … is the mischaracterization of these nine cases, none of which found a *Brady* violation."[126] The Fifth Circuit concluded that "[t]his proffered litany cannot establish a plausible allegation that the Caddo Parish DA's office had a custom of suppressing exculpatory evidence."[127]

Here, Plaintiff's allegations center on a widespread practice of OPDA prosecutors withholding exculpatory evidence in violation of *Brady*.[128] Plaintiff further alleges that Harry Connick had knowledge of this widespread practice of withholding exculpatory evidence but "failed to impose reasonable discipline on the employee(s) involved and failed to take other reasonable, remedial measures to deter and prevent such misconduct," including training and supervising OPDA employees with regard to repeated *Brady* violations.[129] In support of these allegations, Plaintiff states that "Orleans Parish has the highest per capita exoneration rate of any county or parish in the country."[130] Plaintiff also references "51 criminal cases from New Orleans in which courts have found and/or the prosecution has acknowledged that the OPDA violated *Brady*, as well as several others in which strong claims of *Brady* violations existed but the convictions were reversed on other grounds."[131] Plaintiff reasons that, "the actual total of cases with concealed exculpatory evidence is much higher."[132] Of these 51 criminal cases, Plaintiff

---

[126] *Id.* (citation omitted).

[127] *Id.* (citing *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017)).

[128] *See* Rec. Doc. 1 at 14–23.

[129] *Id.* at 19.

[130] *Id.* at 23.

[131] *Id.*

[132] *Id.*

identifies and describes 18 of these cases..[133] Of these 18 cases, nine appear to predate Plaintiff's conviction in 1985.[134] Therefore, the Court only considers the nine cases that predate Plaintiff's conviction. Seven of these nine cases involve the suppression of witness testimony or evidence that the preparator did not match the defendant's characteristics.[135] The *Brady* evidentiary violations in these seven cases are similar to Plaintiff's allegations that OPDA suppressed evidence of inconsistent descriptions of the perpetrator and Mrs. Carnesi's inconsistent testimony in identifying Plaintiff.

Professor Levenson's expert report, which Plaintiff attached to the Complaint, includes a list of cases where courts have found that OPDA violated *Brady*.[136] Professor Levenson notes 23 cases where a defendant was convicted of a crime prior to December 1985.[137] Plaintiff has already

---

[133] *Id.* at 23–32.

[134] John Thompson (1985 charge); John Floyd (1982 conviction); Norman Clark (1974 conviction); Raymond Lockett (1974 conviction); Isaac Knapper (1979 conviction); Reginald Adams (1983 conviction); Curtis Lee Kyles (1984 conviction); Calvin Duncan (1985 conviction); George Toca Jr. (1985 conviction). Because Plaintiff's conviction occurred in December 1985, the Court will include cases where convictions occurred in 1985.

[135] Rec. Doc. 1 at 24–28. John Thompson (suppression of crime lab report of blood tests); John Floyd (affidavit misrepresented information a witness gave to police); Norman Clark (NOPD officer made witness unavailable to testify); Raymond Lockett (willful concealment of a witness from testifying); Reginald Adams (suppression of a police report showing that detectives discovered the murder weapon and traced it to individuals who were not the defendant); Isaac Knapper (detective's failure to disclose a police report that contradicted evidence put on by OPDA at trial, including different witness descriptions of the perpetrator); Curtis Lee Kyles (suppression of inconsistent testimony of witnesses in describing the killer); Calvin Duncan (withheld evidence that the perpetrator did not match the defendant's physical characteristics); George Toca, Jr (withheld evidence of some witness's initial descriptions of the perpetrator not matching the defendant and one defendant who said he would not be able to make an identification but nevertheless identified the defendant at trial).

[136] Rec. Doc. 1-1 at 54–63.

[137] *Id.* at 54–59. Larry Hudson (December 1967 conviction); Hayes Williams (February 1968 conviction); Linroy Davis (September 1968 conviction); Roland Gibson (November 1968 conviction); James Carney (September 1974 conviction); Michael Williams (April 1974 conviction); Arthur Monroe (April 1974 conviction); Norman Clark (December 1974 conviction); Floyd Falkins (September 1976 conviction); Errol Bernard (January 1976 conviction); Gregory Bright (July 1976 conviction); Earl Truvia (July 1976 conviction); Norris Henderson (March 1977 conviction); Calvin Williams (June 1977 conviction); Larry Curtis (June 1979 conviction); Isaac Knapper (October 1979 conviction); William Perkins (January 1980 conviction); Ronald Monroe (January 1980 conviction); John Floyd (January 1982 conviction); Reginald Adams (August 1983 conviction); Stephen Rosiere (February 1984 conviction); Curtis Lee Kyles (December 1984 conviction); John Thompson (May 1985 conviction).

identified and described six of these 23 cases in the Complaint.[138] Of these 23 cases Professor Levenson identifies, there are eight cases where courts have found that OPDA violated *Brady* prior to December 1985.[139] Professor Levenson also identifies three cases where "OPDA's conduct amounted to admission of *Brady* violations."[140] She explains that in these cases, OPDA either offered the defendant a plea agreement for immediate release or filed a joint motion with the defendant for relief when the defendant raised a *Brady* violation.[141]

Because Plaintiff alleges that there are 51 cases where OPDA prosecutors committed *Brady* violations that led to convictions being overturned but only provided specific allegations for 18 "representative cases," Plaintiff is granted leave to amend the Complaint to clarify if any other of those 51 cases predate Plaintiff's conviction in 1985 and Plaintiff may include cases Professor Levenson has identified. Plaintiff may include these cases in the Complaint to clarify the number of cases where convictions were obtained prior to December 1985 and where a court later found that a *Brady* violation occurred. The Supreme Court's decision in *Connick* and the Fifth Circuit's decision in *Armstrong* did not create a bright line rule as to how many similar cases predating a defendant's conviction where courts have found *Brady* violations would be sufficient to

---

[138] Rec. Doc. 1-1 at 54–59. Plaintiff's Complaint already references Norman Clark, Isaac Knapper, John Floyd, Reginald Adams, Curtis Lee Kyles, and John Thompson's convictions and subsequent findings that OPDA violated *Brady*.

[139] Rec. Doc. 1-1 at 54–59. Linroy Davis (date of *Brady* violation finding was May 29, 1973); James Carney (date of *Brady* violation finding was June 21, 1976); Arthur Monroe (date of *Brady* violation finding was November 21, 1979); Norman Clark (date of *Brady* violation finding was December 10, 1980); Floyd Falkins (date of *Brady* violation finding was March 6, 1978); Larry Curtis (date of *Brady* violation finding was May 19, 1980); William Perkins (date of *Brady* violation finding was November 29, 1982); Ronald Monroe (date of *Brady* violation finding was February 28, 1984).

[140] Rec. Doc. 1-1 at 64–65. Johnny Ross (February 1975 conviction); Bobbie Jean Johnson (October 1978 conviction); Calvin Duncan (January 1985 conviction).

[141] *Id.*

23

demonstrate a custom of OPDA violating *Brady*.[142] Granting Plaintiff leave to amend the Complaint will clarify the number of similar cases the Court can consider in its analysis.

Plaintiff also asserts theories of *Monell* liability against Defendant Williams based on OPDA's failure to train, supervise, and discipline its prosecutors based on the same allegation that 51 cases of overturned convictions because of *Brady* violations in Orleans Parish demonstrates a custom of OPDA's failure to train, supervise, and discipline its prosecutors. For the same reasons already discussed above, Plaintiff may amend the Complaint to clarify the number of similar cases that demonstrate a pattern of OPDA violating *Brady* and failing to train, supervise, and discipline its prosecutors with regard to *Brady*.

       *iii.*     *A Constitutional Violation Whose Moving Force is that Policy or Custom*

To establish "moving force" causation, a "plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."[143] Specifically, a plaintiff must "demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision."[144] "Deliberate indifference … is a stringent test and a showing of simple or even heightened negligence will not suffice."[145]

Causation has been discussed to an extent in the discussion above on whether there was a custom of suppressing exculpatory evidence within OPDA. Plaintiff has alleged that 51 cases exist where defendants eventually had their convictions vacated because of *Brady* violations during

---

[142] *Connick*, 563 U.S. at 59, 62; *Armstrong*, 60 F.4th at 278. *See also Truvia*, 577 Fed. App'x. at 324 (appellant only cited two cases that predated his conviction in July 1976).

[143] *Bd. Of the County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

[144] *Id.* at 411.

[145] *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)

Harry Connick's tenure as the District Attorney for Orleans Parish. Plaintiff additionally alleges that Harry Connick "repeatedly and publicly expressed disdain for the *Brady* doctrine and rebuffed suggestions … that prosecutors be instructed on their *Brady* obligations and that the OPDA take steps to ensure compliance with the law and the Constitution."[146] Plaintiff's allegations here center on Connick's affirmative conduct in publicly expressing disdain and rebuffing suggestions to ensure compliance with *Brady*, as a cause of those *Brady* violations during his tenure as the head of OPDA. This alleged affirmative conduct is more than heightened negligence. Therefore, Plaintiff has sufficiently alleged that the OPDA's custom of suppressing exculpatory evidence in violation of *Brady* was the moving force behind the constitutional violations he suffered.

### 2.    Fabrication of Evidence

Plaintiff also asserts that "the NOPD and/or the OPDA" had "a policy, custom, and/or practice of … [f]abricating evidence, including but not limited to false witness statements."[147] In the motion, Defendant Williams argues that "[a]ny 'fabrication' of evidence was not caused by OPDA's official policies," as Plaintiff alleges in the Complaint that Detective Dillman "'fabricated'" evidence.[148] Because Plaintiff includes both the NOPD and OPDA in this allegation of fabricating evidence, the Complaint's allegations are vague as to whether NOPD or OPDA fabricated evidence. The facts alleged in the Complaint suggest that any fabricated evidence was within the control of NOPD. For instance, Plaintiff alleges that Defendant "presented testimony from NOPD Technician Stubbs", who "testified—falsely—that the gun found with [Plaintiff] when he was arrested was the same gun that fired the bullets that killed Mr. Carnesi."[149] There is

---

[146] Rec. Doc. 1 at 22.

[147] *Id.* at 43.

[148] Rec. Doc. 15-1 at 13.

[149] Rec. Doc. 1 at 11.

no allegation that OPDA caused NOPD Technician Stubbs to give that testimony so that this evidence could be considered fabricated. Plaintiff also points to then NOPD Detective Dillmann's suggestion to Mrs. Carnesi to identify Plaintiff from a lineup and his trial testimony that denies his culpability in directing Mrs. Carnesi to identify Plaintiff.[150] Similarly, there is no allegation that OPDA directed Dillmann to engage in this conduct. Further, there is no allegation that OPDA directed witnesses to provide the testimony they did. To the extent that police reports or other documents that constitute "material exculpatory evidence" or fabricated evidence existed, Plaintiff alleges that these materials were "in NOPD's possession."[151]

Plaintiff has failed to state a fabrication of evidence theory of liability against Defendant Williams under *Monell*. However, Plaintiff is granted leave to amend the Complaint to state factual allegations that could plausibly give rise to a fabrication of evidence claim. Further, because other defendants, such as the City of New Orleans and NOPD, did not join Defendant Williams' motion, the Court does not reach any conclusions as to Plaintiff's sufficiency of pleading of this theory of *Monell* liability against Defendants NOPD or the City of New Orleans.

### 3. Affirmative Concealment of Misconduct

In Plaintiff's pleading of the *Monell* claim against Defendant Williams in his official capacity as the policymaker for OPDA, Plaintiff asserts that OPDA had a policy, custom, or practice of "[e]ngaging in the affirmative concealment of such misconduct."[152] This misconduct appears to rely on the suppression of exculpatory evidence and fabrication of evidence theories of liability under *Monell* that were discussed in the sections above. Further, the Complaint is vague as to

---

[150] *Id.* at 12.

[151] *Id.* at 37.

[152] *Id.* at 43.

what facts show OPDA's affirmative concealment of misconduct. Therefore, Plaintiff inadequately alleges a theory of OPDA's affirmative concealment of misconduct. However, he is granted leave to amend the Complaint to state factual allegations that could plausibly give rise to a concealment of misconduct claim against Defendant Williams. As discussed above, because the motion was only brought by Defendant Williams and Defendants NOPD and the City of New Orleans did not join the motion, the Court does not reach any conclusions pertaining to the sufficiency of Plaintiff's pleading of this *Monell* theory of liability against those defendants.

## V. Conclusion

Plaintiff is granted leave to amend the Complaint to clarify certain issues so that the Court has the information it needs to analyze whether Plaintiff has sufficiently plead a *Monell* claim against Defendant Williams. Although the Court can infer from Plaintiff's allegations that Harry Connick is the official policymaker for OPDA when custom of suppressing exculpatory evidence was allegedly in place when he was prosecuted for first degree murder in 1985, Plaintiff may amend the Complaint to specifically state that he is the official policymaker for OPDA. Further, Plaintiff may amend the Complaint to include additional cases where OPDA obtained a defendant's conviction prior to December 1985 and a court later found a *Brady* violation. Given that four cases in 10 years, as the Supreme Court held in *Connick*, and nine cases in 24 years, as the Fifth Circuit held in *Armstrong*, were insufficient to demonstrate a custom of prosecutors violating *Brady*, additional similar cases that Plaintiff can allege in the Complaint may distinguish the allegations made here from those cases. Plaintiff may also amend the Complaint with respect to his claims of OPDA's fabrication of evidence and affirmative concealment of misconduct, as these claims are vague and not supported by adequate factual allegations.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Jason Williams's Motion to Dismiss for Failure to State a Claim[153] is **DENIED WITHOUT PREJUDICE.** Plaintiff is granted leave to amend the Complaint within 14 days of this Order to cure the deficiencies noted, if possible. If upon amendment, Plaintiff fails to provide sufficient factual support for each element of each claim, upon motion by a party, the Court will dismiss the claims.

**NEW ORLEANS, LOUISIANA**, this ⎯21st⎯ day of May, 2024.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[153] Rec. Doc. 15.