UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RAYMOND FLANKS,<br><br>　　*Plaintiff*,<br><br>v.<br><br>THE CITY OF NEW ORLEANS, *et al.*,<br><br>　　*Defendants*. | Civil Action No. 23-06897<br><br>Section G<br>Chief Judge Nannette Jolivette Brown<br><br>Division 4<br>Magistrate Judge Karen Wells Roby |

## MEMORANDUM IN SUPPORT OF SECOND MOTION TO DISMISS

Defendant Jason R. Williams, in his official capacity as Orleans Parish District Attorney ("OPDA"), through undersigned counsel, respectfully submits this memorandum in support of his motion to dismiss the claims against him in Plaintiff Raymond Flanks's Amended Complaint, Doc. No. 27, pursuant to Federal Rule of Civil Procedure 12(b)(6). Even if accepted as true for purposes of this motion, Mr. Flanks's factual allegations do not plausibly demonstrate that the alleged violation of his constitutional rights was caused by OPDA's official policies. Accordingly, Mr. Flanks's claims against OPDA must be dismissed.

### INTRODUCTION

In 1985, an Orleans Parish jury convicted Mr. Flanks of the 1983 murder of Martin Carnesi. Mr. Carnesi's widow, Faye Carnesi, identified Mr. Flanks as the man who shot her husband while robbing the two of them. Over the years, Mr. Flanks advanced various challenges to his conviction in state and federal court, all of which were denied. Notwithstanding these denials, in 2022, the OPDA Civil Rights Division agreed to review Mr. Flanks's conviction. After an investigation, the Civil Rights Division and Mr. Flanks filed a "Joint Agreement and Motion to Vacate Conviction." The motion was granted; Mr. Flanks was released from prison; and the charges against him were

1

dismissed. Now, after obtaining his freedom with the assistance of OPDA's Civil Rights Division, Mr. Flanks has chosen to sue OPDA and blame OPDA and its prosecutors for his allegedly wrongful conviction.

Mr. Flanks's claims against OPDA are vague and non-specific. Although the Amended Complaint includes twelve enumerated claims, only one—Count Six—is asserted against OPDA. Mr. Flanks alleges that "[t]he actions of each of the individual Defendants were undertaken pursuant to a policy, custom, and/or practice of the NOPD and/or the OPDA." Doc. No. 27 at ¶ 172. However, only one "individual Defendant" is named in the Complaint—former NOPD Detective John Dillmann, who, according to Mr. Flanks, "intentionally fabricated" Mrs. Carnesi's identification "by using manipulative, grossly improper, and unlawful identification procedures designed to obtain an unreliable identification." *Id.* at ¶ 3. Yet Det. Dillmann was never employed by OPDA,[1] and Mr. Flanks does not contend that he was subject to supervision or control by OPDA. The only other "individual Defendants" listed in the Amended Complaint are unnamed "John/Jane Doe" defendants. *See* Doc. No. 27 at ¶ 28. Thus, it is not clear which "individual Defendants" OPDA is purportedly liable for, or what they are alleged to have done.

Notwithstanding this lack of clarity, Mr. Flanks appears to allege that OPDA violated his constitutional rights by "failing to disclose information and records in NOPD's possession" that were "exculpatory to him." Doc. No. 27 at ¶ 143. Although he does not specify which purported documents in NOPD's possession should have been disclosed, he contends that they would have shown "inconsistencies between Mrs. Carnesi's description of the Actual Perpetrator and [his] appearance," a "string of similar crimes with a consistently described perpetrator," "the

---

[1] *See* Doc. No. 27 at ¶ 27 (alleging that "[a]t all relevant times, [Det. Dillmann] was a duly appointed and acting officer of the NOPD employed by Defendant the City of New Orleans").

circumstances of the photo array and Mrs. Carnesi's identification of [him]," and "Mrs. Carnesi's grand jury testimony regarding the same." *Id.* at ¶ 156.

Even assuming, solely for the sake of this Rule 12(b)(6) motion, that Mr. Flanks has alleged a violation of his constitutional rights, his claims against OPDA still must be dismissed because he has not adequately alleged that OPDA was responsible. A municipality such as OPDA cannot be held liable under § 1983 unless an official policy adopted by a municipal policymaker is the "moving force" causing a violation of the plaintiff's constitutional rights. But Mr. Flanks has not adequately alleged that OPDA had any unconstitutional policies, either written or unwritten. Nor has he adequately alleged that OPDA's alleged policymaker, Harry Connick, was aware of serious problems with OPDA's policies yet acted with deliberate indifference. Mr. Flanks has also failed to establish a causal link between the alleged OPDA policies and the alleged constitutional violations in his case. For all these reasons, his claims against OPDA must be dismissed.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "To be plausible, the complaint's 'factual allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555). The Court must "accept all well-pleaded facts as true," but it should not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Id.* (quotation omitted).

## LAW AND ARGUMENT

Even assuming for the sake of argument that Mr. Flanks has adequately alleged a constitutional violation in connection with his criminal proceedings, he has not adequately alleged

3

the elements necessary to hold OPDA liable. "Three essential elements must be established for a municipality to face § 1983 liability." *Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018) (en banc). "There must be (1) a policymaker; (2) an official policy; and (3) a violation of a constitutional right whose 'moving force' is the policy or custom." *Id.* "An official policy usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.* at 389–90 (quotation omitted). The plaintiff "must demonstrate that the policy was implemented with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Id.* at 390 (quotations omitted). "The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts." *Guillot on behalf of T.A.G. v. Russell*, 59 F.4th 743, 752 (5th Cir. 2023). Mr. Flanks has not adequately pleaded any of these elements.

I. **Any alleged suppression of exculpatory evidence was not caused by OPDA's official policies.**

  A. **Mr. Flanks has not alleged that OPDA had a facially unconstitutional official *Brady* policy; rather, he must show that OPDA's alleged policymaker, Harry Connick, acted (or failed to act) with deliberate indifference.**

Mr. Flanks does not allege that, at the time of his prosecution, OPDA had a formal, written policy instructing prosecutors to suppress *Brady* evidence. In fact, he alleges that, at the time, OPDA had no "written, *Brady*-specific policy" at all. Doc. No. 27 at ¶ 97. Mr. Flanks also does not allege that OPDA prosecutors were ever trained or otherwise instructed that they should avoid disclosure of exculpatory evidence in violation of the Constitution.[2]

---

[2] Mr. Flanks vaguely alleges that the City of New Orleans, NOPD, and OPDA "encouraged" suppression of *Brady* material "as a matter of policy, custom, and practice." *See* Doc. No. 27 at ¶¶ 95, 98, 101, 125. Whatever Mr. Flanks may be trying to convey by the use of the word

For the most part, Mr. Flanks's claims are based on things that OPDA allegedly did *not* do. He alleges that OPDA should have "create[d] a written, *Brady*-specific policy to instruct its prosecutors about their *Brady* obligations," instituted "procedures for the proper handling, tracking, and disclosure of *Brady* information in related cases and cases handled by multiple prosecutors," and created a policy "requir[ing] prosecutors to report . . . *Brady* violations." Doc. No. 27 at ¶¶ 97, 110. He alleges that OPDA's training, monitoring, supervision, and discipline with respect to *Brady* issues were "insufficient." *Id.* at ¶¶ 97, 113–116. As this Court previously recognized, a failure to "act affirmatively" may give rise to municipal liability only where "the need to take some action to control the agents of the local government entity is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." Doc. No. 26 at 19 (quotation omitted, alterations removed).

Mr. Flanks alleges that, under Mr. Connick, prosecutors were instructed to "withhold all documents that were not required by law to be disclosed." Doc. No. 27 at ¶ 108.[3] Mr. Flanks contends that Mr. Connick's "conservative discovery policies" and refusal to engage in "open file discovery" "increase[d] the chance that prosecutors will . . . err on the side of not disclosing material to the defense." Doc. No. 27 at ¶¶ 108–109. Clearly an alleged policy of disclosing evidence required by law, but no more, is not unconstitutional on its face.

---

"encouraged," his Amended Complaint includes no factual allegations whatsoever suggesting that OPDA prosecutors were ever instructed that they should suppress *Brady* evidence.

[3] The allegation that Mr. Connick "promulgated policy manuals instructing his prosecutors to withhold all documents that were not required by law to be disclosed" conflicts with the allegation that, at the time of Mr. Flanks's prosecution, OPDA had no "written, *Brady*-specific policy." *See* Doc. No. 27 at ¶¶ 97, 108. To the extent that Mr. Flanks is referring to policy manuals issued in 1987 or later, *see id.* at ¶ 105, the allegation is irrelevant to Mr. Flanks's claims.

5

Some of Mr. Flanks's policy allegations are not stated with sufficient factual specificity. For example, he alleges that "OPDA defined the scope of prosecutors' disclosure obligations as including only evidence that was affirmatively exculpatory, as opposed to evidence that was impeaching or otherwise favorable to the defense." Doc. No. 27 at ¶ 97. However, he does not explain how this alleged "definition" was purportedly memorialized, promulgated, or conveyed to ODPA prosecutors before the time of his conviction in 1985. To the extent this allegation is based on alleged deficiencies in the OPDA written policy manual created in 1987, *see* Doc. No. 27 at ¶ 105, it is irrelevant to Mr. Flanks's claims because that manual did not exist at the time of his prosecution.

Mr. Flanks also alleges that Mr. Connick "repeatedly and publicly expressed disdain for the *Brady* doctrine." Doc. No. 27 at ¶ 99. This allegation is hopelessly vague because it lacks any factual detail as to what Mr. Connick purportedly said, when he said it, and to whom he said it. Such an allegation cannot establish that, before Mr. Flanks's conviction in 1985, Mr. Connick expressed "disdainful" sentiments to OPDA prosecutors that might have plausibly caused them to suppress exculpatory evidence.

Mr. Flanks also alleges that Mr. Connick "rebuffed suggestions—including, in one notable instance, a plea from a sitting Orleans Parish Criminal District Court Judge—that prosecutors be instructed on their *Brady* obligations and that OPDA take steps to ensure compliance with the law and Constitution." Doc. No. 27 at ¶ 99. Here again, the failure to include necessary factual details renders this allegation irrelevant. Mr. Flanks has not shown that any such "suggestions" were made, or "rebuffed," before his conviction in 1985.[4]

---

[4] The "notable instance" mentioned to in Paragraph 99 clearly refers to an exchange of correspondence between Mr. Connick and Orleans Parish Criminal District Court Judge Calvin Johnson that occurred in 1998, more than 12 years after Mr. Flanks's conviction.

6

In conclusion, because Mr. Flanks has not adequately alleged that OPDA promulgated official policies that are facially unconstitutional and that caused his alleged injuries, he must demonstrate deliberate indifference on the part of OPDA's alleged policymaker, Harry Connick. *See, e.g.*, *Edwards v. City of Balch Springs*, 70 F.4th 302, 309 (5th Cir. 2023). As explained further below, he has failed to do so.

> **B.     Mr. Flanks has not adequately alleged that Mr. Connick acted with deliberate indifference because there was nothing to put him on notice, before Mr. Flanks's conviction in 1985, that his office's policies were likely to cause *Brady* violations.**

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quotation omitted). "Knowledge on the part of the policymaker that a constitutional violation ***will most likely result*** from a given official custom or policy is a *sine qua non* of municipal liability under section 1983." *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) (emphasis added). "Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally negligent oversight." *Alvarez*, 904 F.3d at at 391 (quotation omitted).

"Because the standard for municipal fault is a stringent one, a pattern of similar constitutional violations by untrained employees is ordinarily required to show deliberate indifference." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quotations omitted); *see also Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017) ("A pattern requires similarly, specificity, and sufficiently numerous prior incidents."). The Fifth Circuit has explained that only "very similar violations" can provide the "notice" to policymakers that would give rise to deliberate indifference. *See Jason v. Tanner*, 938 F.3d 191, 198 (5th Cir. 2019); *see also Robinson v. Midland County*, 80 F.4th 704, 710 n.3 (5th Cir. 2023) ("The deaths of other

7

inmates are not sufficiently similar to put the county on notice of a failure to provide adequate medical care because only one of them is alleged to have involved a failure to follow proper procedures, and none of the allegations involve fabrication of medical reports."); *Johnson v. Harris County*, 83 F.4th 941, 946–47 (5th Cir. 2023) (The "specific facts" of the alleged practice "must be similar to the case at hand: Prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question.") (quotation omitted).

Mr. Flanks alleges that there were "numerous cases and investigations" before his prosecution in 1984–1985 in which "OPDA employees, including prosecutors involved in the case against [him]," committed "repeated *Brady* violations." *See* Doc. No. 27 at ¶¶ 92–93. Mr. Flanks further alleges that this "misconduct . . . was actually or constructively known to OPDA supervisors and policymakers prior to [his] wrongful conviction," yet they "failed to train, supervise, discipline, or otherwise reprimand OPDA employees in response to such actual and constructive notice." *Id.* However, Mr. Flanks has failed to allege *facts* that would have put Mr. Connick on notice, before his conviction in 1985, of an urgent need to change OPDA's policies, training, or supervision with respect to *Brady* disclosures—particularly with respect to the alleged *Brady* issues in his own case.

Mr. Flanks lists 39 other Orleans Parish criminal defendants whose cases allegedly involved suppression of *Brady* evidence. *See* Doc. No. 27 at ¶¶ 122–124. However, most of these cases are irrelevant. Eleven of these defendants[5] were not even prosecuted until after Mr. Flanks's

---

[5] Jerome Morgan, Kuantau Reeder, Larry Moses, Shareef Cousin, Bernell Juluke, Kunta Gable, Leroy Nelson, Dan Bright, Robert Jones, Eddie Triplett, and Cedric Dent.

8

conviction. *See* Doc. No. 27 at ¶ 123.[6] And of the remaining 28 defendants, the convictions of 18[7] were not vacated until after Mr. Flanks's conviction. Indeed, some of these convictions were not vacated until decades after Mr. Flanks's conviction.[8]

In its earlier ruling on OPDA's motion to dismiss, the Court suggested that "cases where convictions were obtained prior to December 1985 and where a court later found that a *Brady* violation occurred" would be relevant in establishing Mr. Flanks's *Monell* claim. *See* Doc. No. 26 at 23. However, OPDA respectfully submits that the only relevant cases would be those in which the court decision finding a *Brady* violation occurred before Mr. Flanks's conviction in December 1985. Absent such a court finding, there is no reason to believe or infer that Mr. Connick would have been aware that exculpatory evidence had not been disclosed or that the defendant's constitutional rights were violated as a result. In other words, there would be nothing to put Mr. Connick on notice of any deficiencies in his office's policies. Critically, in *Connick v. Thompson*, the Supreme Court looked to the number of *Brady* **reversals** during the ten years preceding Mr. Thompson's armed robbery trial—not the number of cases in which courts *later* found a *Brady* violation. *See Connick*, 563 U.S. at 62. Likewise, in *Armstrong v. Ashley*, 60 F.4th 262, 278 &

---

[6] *See, e.g.*, *Truvia v. Connick*, 577 F. App'x 317, 324 (5th Cir. 2014) ("Appellants' citations to over a dozen federal and state to show a 'continuum' of *Brady* violations are not probative because the vast majority of them occurred after Appellants were convicted in July 1976. The two cases that predated July 1976 . . . surely did not convey the requisite notice under a failure-to-train theory.").

[7] John Thompson, Curtis Kyles, John Floyd, Larry Hudson, Hayes Williams, Roland Gibson, Michael Williams, Errol Bernard, Gregory Bright, Earl Truvia, Norris Henderson, Calvin Williams, Isaac Knapper, Reginald Adams, Stephen Rosiere, Calvin Duncan, George Toca, and Bobbie Jean Johnson.

[8] For example, John Floyd (conviction vacated in 2017), Reginald Adams (conviction vacated in 2014), Calvin Duncan (conviction vacated in 2021), and George Toca (conviction vacated in 2022). *See* Doc. No. 27 at ¶¶ 122–123.

n.13 (5th Cir. 2023), the Fifth Circuit considered whether court rulings in other alleged *Brady* cases would have "put the District Attorney on notice."

Mr. Flanks alleges that there were court rulings finding *Brady* violations in the cases of nine Orleans Parish defendants before his own conviction in 1985. *See* Doc. No. 27 at ¶¶ 123. He further alleges that "OPDA's conduct amounted to an admission of a *Brady* violation" in another case (Johnny Ross) in 1981. *See id.* at ¶ 124. However, many of these cases are unhelpful to him:

- In the case of Ronald Monroe, the alleged *Brady* material consisted of statements made to a policeman six months *after* the defendant's conviction. *See Monroe v. Blackburn*, 748 F.2d 958, 960 (5th Cir. 1984). The unusual post-conviction context of Mr. Monroe's claim makes it factually dissimilar to Mr. Flanks's claims and the other alleged *Brady* cases listed in the Amended Complaint.[9] Moreover, the defendant's conviction was never vacated; the Fifth Circuit explained that he had "failed to show that his right to a fair trial was prejudiced by the post-conviction suppression of evidence." *Id.*

- In the case of Johnny Ross, the alleged *Brady* material was, according to Mr. Flanks, "information regarding the perpetrator's blood type." Doc. No. 27 at ¶ 124a. In *Connick v. Thompson*, the Supreme Court held that alleged

---

[9] Indeed, the Supreme Court has held that *Brady* "does not apply in the post-conviction context." *In re Bolin*, 811 F.3d 403, 408–09 (11th Cir. 2016) (citing *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52 (2009)); *see also, e.g.*, *Gavitt v. Born*, 835 F.3d 623, 648 (6th Cir. 2016) ("In *Osborne*, the Supreme Court noted that 'nothing in our precedents' suggests that the prosecutor's obligation to disclose *Brady* material to the defendant before trial continued after the defendant is convicted and the case is closed."); *Jones v. Ryan*, 733 F.3d 825, 837 (9th Cir. 2013) ("[T]he *Brady* right of pretrial disclosure available to defendants at trial does not extend to habeas corpus petitioners seeking post-conviction relief."); *Tevlin v. Spencer*, 621 F.3d 59, 70 (1st Cir. 2010) ("[T]he Supreme Court has explicitly rejected *Brady's* applicability to postconviction proceedings.").

10

*Brady* violation in that case, an alleged "failure to disclose blood evidence," was "not similar" to four earlier cases reversed on *Brady* grounds. *Id.* at 62–63. Thus, the Supreme Court held that the four prior reversals "could not have put Connick on notice that specific training was necessary to avoid this constitutional violation." *Id.* For the same reasons, the alleged *Brady* violation in Mr. Ross's case is not similar to the alleged violations in Mr. Flanks's case, which do not involve blood evidence (or indeed any physical evidence).

- In the case of Norman Clark and Raymond Lockett, the convictions were vacated by the Fifth Circuit because an NOPD officer paid to send witnesses out of state at the time of trial so that they could not be called to testify for the defense. *See* Doc. No. 27 at ¶ 123h–i. The case had nothing to do with failure to disclose evidence.

- In the case of James Carney, the alleged *Brady* evidence was a cooperation agreement between a witness and the District Attorney's Office that was not disclosed because it was not known to the trial prosecutor. *See State v. Carney*, 334 So. 2d 415, 416–17 (La. 1976). It did not involve a failure to disclose transcripts of grand jury testimony, police reports or notes, or any other documents in NOPD's possession. Because this case did not involve a "very similar violation[ ]," *see Jason*, 938 F.3d at 198, the opinion vacating the conviction in 1976 would not have put Mr. Connick on notice that OPDA's policies were likely to cause constitutional violations of the type alleged in Mr. Flanks's case.

- In the case of Linroy Davis, the conviction was vacated in 1973, before Mr. Connick (the alleged policymaker) had even taken office. *See* Doc. No.

11

27 at ¶ 25 (alleging that James Garrison "served as OPDA's final policymaker from in or around 1962 to in or around 1973," and that Mr. Connick was the "final policymaker" starting in 1974). Thus, absent some allegation explaining how Mr. Connick would have been made aware of this ruling (and there is none), it would have provided no notice to Mr. Connick of any deficiency in his office's policies.

The cases of Floyd Falkins, Arthur Monroe, Larry Curtis, and William Perkins all involved pre-trial statements of witnesses that could have been used to impeach the witnesses' trial testimony or otherwise support the defense. *See State v. Falkins*, 356 So. 2d 415 (La. 1978); *Monroe v. Blackburn*, 607 F.2d 148 (5th Cir. 1980); *State v. Curtis*, 384 So. 2d 396 (La. 1980); *State v. Perkins*, 423 So. 2d 1103 (La. 1982). Critically, however, none of these cases involved grand jury testimony, which is unlike other evidence that may be in the State's possession because its treatment is regulated by special provisions under state law that are intended to ensure its confidentiality.[10] Nor did any of these cases involve evidence concerning *other crimes* that the defendant was not charged with, which could have allegedly been used to prove that the crime he *was* charged with was part of a series of crimes committed by someone else.

But even if these four cases are considered "very similar" for *Monell* purposes, these few reversals—out of many hundreds of cases tried—would not have reasonably put Mr. Connick on notice that his office's policies were constitutionally deficient. It must be noted once again that the Supreme Court previously reversed a jury verdict against OPDA after finding the evidence insufficient as a matter of law to prove that, in 1985—the same year Mr. Flanks was convicted—

---

[10] *See, e.g.*, LA. CODE CRIM. PROC. art. 434 ("Members of the grand jury, all other persons present at a grand jury meeting, and all persons having confidential access to information concerning grand jury proceedings, shall keep secret the testimony of witnesses and all other matters occurring at, or directly connected with, a meeting of the grand jury.").

OPDA's policymaker was deliberately indifferent to a need for better training with respect to *Brady* disclosures. *See Connick v. Thompson*, 563 U.S. 51 (2011). The Supreme Court explained that "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 62. The Supreme Court specifically rejected the argument that "four convictions" overturned "during the 10 years preceding [Mr. Thompson's] armed robbery trial . . . because of *Brady* violations by prosecutors in Connick's office" was sufficient to "put Connick on notice that specific training was necessary to avoid this constitutional violation." *Id.* at 62–63; *see also Armstrong v. Ashley*, 60 F.4th 262, 277–78 ("Armstrong lists nine cases over a 24-year period as examples where exculpatory evidence was suppressed by the District Attorney's practices. But nine constitutional violations over a 24-year period and thousands of prosecutions are hardly sufficient to show a municipal custom.").[11] Mr. Flanks's Amended Complaint includes no substantial new factual allegations that would alter the Supreme Court's analysis and conclusion in *Thompson*.

### C. Mr. Flanks has not adequately alleged that OPDA's policies were the "moving force" causing the alleged suppression of evidence in his case.

Finally, even if Mr. Walter could establish a constitutionally defective policy concerning *Brady* disclosures, his allegations do not establish that it was the "moving force" of the alleged *Brady* violation in his case—*i.e.*, that the prosecutor or prosecutors responsible for the disclosures in his criminal case (who are not even identified) were acting pursuant to such a policy when they

---

[11] Mr. Flanks also alleges that two of the prosecutors who were involved with the John Thompson case also prosecuted his case. *See* Doc. No. 27 at ¶ 122a. But his allegations do not establish that these prosecutors were responsible for a *Brady* violation in Mr. Thompson's case. More importantly, the Amended Complaint provides no basis to conclude that, at the time of Mr. Flanks's prosecution, Mr. Connick was aware of misconduct by those prosecutors or any other prosecutors in connection with Mr. Thompson's case.

13

allegedly failed to disclose information and records in NOPD's possession. The Amended Complaint merely alleges that "Mr. Flanks and his counsel were not aware of the NOPD records" that he contends were exculpatory. *See* Doc. No. 27 at ¶ 67. It includes no allegations as to who did what, and when, concerning the alleged nondisclosure. It does not even explain whether any OPDA prosecutor was allegedly aware of the undisclosed evidence, or, if so, why that prosecutor or those prosecutors failed to disclose it. Without such basic information, Mr. Flanks has not plausibly alleged that the prosecutors purportedly responsible for the nondisclosure in his case were acting pursuant to an unconstitutional policy.

In its prior ruling on OPDA's motion to dismiss, the Court concluded that Mr. Flanks had adequately alleged the "moving force" element by alleging that Mr. Connick engaged in the "affirmative conduct" of "publicly expressing disdain and rebuffing suggestions to ensure compliance with *Brady*." Doc. No 26 at 25. As explained above, these allegations are not stated with sufficient factual specificity. OPDA respectfully submits that Mr. Flanks cannot show that Mr. Connick's alleged words and actions caused an alleged *Brady* violation in his case without providing some plausible explanation as to how those alleged words and actions affected the actions of the prosecutors who handled Mr. Flanks's case. Yet he has not provided even an approximate description of what Mr. Connick allegedly said, when he said it, or to whom he said it.

II. **Mr. Flanks has not corrected the deficiencies noted by the Court with respect to his claims against OPDA based on alleged fabrication of evidence or concealment of misconduct.**

The Court previously ruled that Mr. Flanks had failed to adequately claims against OPDA based on theories of "fabrication of evidence" or "affirmative concealment of misconduct." Doc. No. 26 at 26–27. Although the Court granted leave to amend, Mr. Flanks has not included any new factual allegations to support these theories. In fact, Mr. Flanks removed the prior allegations in

one paragraph alleging that "the NOPD and/or the OPDA" had a "policy, custom, and/or practice" of "[f]abricating evidence" and "[e]ngaging in the affirmative concealment of such misconduct." *Compare* Doc. No. 1 at ¶ 157 *with* Doc. No. 27 at ¶ 174. However, the Amended Complaint still includes other allegations that OPDA and its policies are responsible for "fabricating evidence" and "creating and presenting false testimony." *See* Doc. No. 27 at ¶¶ 133, 175–181. For the reasons explained in OPDA's original motion to dismiss, Doc. No. 15 at 13–14, and in this Court's ruling on that motion, Doc. No. 26 at 25–27, any remaining claims or allegations against OPDA based on alleged fabrication of evidence or concealment of misconduct should be dismissed.

## CONCLUSION

For the reasons explained above, the claims against Jason Williams, in his official capacity as Orleans Parish District Attorney, should be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

Respectfully submitted,

 /s/ Matthew J. Paul
W. Raley Alford, III, 27354
Matthew J. Paul, 37004
STANLEY REUTER THORNTON ALFORD LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: (504) 523-1580
Facsimile:  (504) 524-0069
wra@stanleyreuter.com
mjp@stanleyreuter.com

*Counsel for Jason R. Williams (in his official capacity as Orleans Parish District Attorney)*