UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RAYMOND FLANKS,

                         Plaintiff,

    – against –

THE CITY OF NEW ORLEANS; JASON WILLIAMS, in his official
capacity as Orleans Parish District Attorney; ANNE KIRKPATRICK,
in her official capacity as Superintendent of the New Orleans Police
Department; JOHN DILLMANN, in his individual capacity; and
JOHN/JANE DOES #1-20, in their individual capacities,

                         Defendants.

Case No. 23-CV-6897

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT JASON WILLIAMS'S SECOND MOTION TO DISMISS

**MURELL LAW FIRM**

Christopher J. Murell, La. Bar No. 32075
Meghan K. Matt, La. Bar No. 39975
2831 Saint Claude Avenue
New Orleans, Louisiana 70117
(504) 717-1297 (Tel)
chris@murell.law
meghan@murell.law

**SHANIES LAW OFFICE LLC**

David B. Shanies (T.A.) (admitted *PHV*)
Deborah I. Francois (admitted *PHV*)
Eleanor C. Davis (admitted *PHV*)
110 West 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com
deborah@shanieslaw.com
eleanor@shanieslaw.com

*Attorneys for Plaintiff Raymond Flanks*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................... 3

  I. Factual Background ..................................................................................... 3

  II. Procedural Background ................................................................................ 8

LEGAL STANDARD ........................................................................................... 8

ARGUMENT ....................................................................................................... 8

  I. Mr. Flanks Has Alleged That The Custom Of Withholding *Brady* Evidence
     Reflected A Facially Unconstitutional Official Policy Of The ODPA. ........................... 11

    A. Mr. Flanks Has Alleged That OPDA Maintained A Custom Or Practice
       Permitting The Nondisclosure Of Exculpatory Evidence In Violation
       Of *Brady*. ......................................................................................... 11

    B. Mr. Flanks Alleges That Nondisclosure Of *Brady* Evidence Was
       Adopted As Official OPDA Policy Through Mr. Connick's Awareness
       Of And Acquiescence In The Practice. .......................................................... 14

    C. Mr. Flanks's Allegations Are Stated In Sufficient Factual Detail To
       Support The Inference That Mr. Connick Adopted An Official Policy
       Of Nondisclosure. ................................................................................ 15

  II. Mr. Flanks Also Alleges That Mr. Connick's Deliberate Indifference Was
     The "Moving Force" Behind The Alleged Constitutional Violations. ........................... 17

    A. Mr. Flanks Pleads Facts Sufficient To Infer That Mr. Connick
       Had Actual Or Constructive Knowledge Of Widespread And Frequent
       *Brady* Violations. ............................................................................... 19

    B. Numerous Prior Violations Were Sufficient To Put Mr. Connick On
       Notice In 1985 Of The Need To Train, Supervise, And/Or Discipline
       Prosecutors With Respect To *Brady*'s Disclosure Requirements. ............................ 22

  III. Finally, Mr. Flanks Also Sufficiently Alleges That The OPDA Had An
     Affirmative Policy That Each Individual Prosecutor Should "Figure It
     Out Themselves." ................................................................................... 24

Conclusion ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970) ...................................................... 14

*Allen v. Hays*, 65 F.4th 736 (5th Cir. 2023) ................................................................ 8

*Alvarez v. City of Brownsville*, 904 F.3d 382 (5th Cir. 2018) ...................................... 19

*Armstrong v. Ashley*, 60 F.4th 262 (5th Cir. 2023) ...................................................... 23

*Arnold v. Williams*, 979 F.3d 262 (5th Cir. 2020) ........................................................ 8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................ 8, 15, 23

*Avery v. County Of Burke*, 660 F.2d 111 (4th Cir. 1981) ............................................ 25

*Barr v. City of San Antonio*, 2006 WL 2322861, 2006 U.S. Dist. LEXIS 59402
 (W.D. Tex. 2006) .................................................................................................... 14

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................ 8, 16, 17, 23

*Bennett v. City of Slidell*, 728 F.2d 762 (5th Cir. 1984) ........................................ 14, 22

*Berry v. McLemore*, 670 F.2d 30 (5th Cir. 1982) ........................................................ 15

*Butler v. City of Dallas*, 2015 WL 8467029, 2015 U.S. Dist. LEXIS 165579
 (W.D. Tex. Nov. 4, 2015) .................................................................................. 13, 17

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989) ................................................. 18

*Connick v. Thompson*, 563 U.S. 51 (2011) .................................................... 18, 23, 24

*Davidson v. City of Stafford*, 848 F.3d 384 (5th Cir 2017) ............................ 11, 19, 20

*Evans v. Lopinto*, 2022 WL 2304512, 2022 U.S. Dist. LEXIS 112705
 (E.D. La. June 27, 2022) ...................................................................................... 9, 10

*Flagg v. Stryker Corp.*, 647 F. App'x 314 (5th Cir. 2016) .......................................... 17

*Flanks v. City of New Orleans*, 2024 WL 2295543, 2024 U.S. Dist. LEXIS 90689
 (E.D. La. May 21, 2024) .................................................................................... passim

*Gonzalez v. Ysleta Independent School District*, 996 F.2d 745 (5th Cir. 1993) .......... 15

*Gschwind v. Heiden*, 692 F.3d 844 (7th Cir. 2012) ..................................................... 25

*International Woodworkers of America v. Champion International Corp.*,
    790 F.2d 1174 (5th Cir. 1986) ............................................................ 15

*Jason v. Tanner*, 938 F.3d 191 (5th Cir. 2019 ........................................... 20

*Jett v. Dallas Independent. School District*, 491 U.S. 701 (1989)................ 14

*Luebano v. Office Depot, L.L.C.*, 2023 WL 4249268, 2023 U.S. App. LEXIS 16524
    (5th Cir. 2023) (per curiam)................................................................. 8

*Medical Center Pharmacy v. Holder*, 634 F.3d 830 (5th Cir. 2011) ............ 9

*Mitchell v. City of New Orleans*, 184 F. Supp. 3d 360 (E.D. La. May 2, 2016)................... passim

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) ................... 2

*Mortimer v. Baca*, 594 F3d 714 (9th Cir. 2010) ....................................... 25

*O'Quinn v. Manuel*, 773 F.2d 605 (5th Cir. 1985) .................................... 10

*Oporto v. City of El Paso*, 2010 WL 3503457, 2010 U.S. Dist. LEXIS 91241
    (W.D. Tex. Sept. 2, 2010)...................................................................... 13

*Peña v. City of Rio Grande City*, 879 F.3d 613 (5th Cir. 2018) ................. 11

*Peterson v. City of Fort Worth*, 588 F.3d 838 (5th Cir. 2009)............... 19, 20

*Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001) ............. 9, 18, 19

*Ramirez v. Escajeda*, 298 F. Supp. 3d 933 (W.D. Tex. 2018)...................... 13

*Robinson v. Midland County*, 80 F.4th 704 (5th Cir. 2023) ....................... 21

*Sanchez v. Young County*, 956 F.3d 785 (5th Cir.) (2020) ........................... 9

*Scanlon v. County of Los Angeles*, 92 F.4th 781 (9th Cir. 2024)................. 25

*Senegal v. Sheriffs Department of Beauregard Parish*, 2022 WL 352711,
    2022 U.S. Dist. LEXIS 21303 (W.D. La. Feb. 4, 2022) ........................ 16

*Spiller v. City of Texas City, Police Department*, 130 F.3d 162 (5th Cir. 1997)........... 9

*Webster v. City of Houston*, 689 F.2d 1220 (5th Cir. 1982) ....................... 15

*Webster v. City of Houston*, 735 F.2d 838 (5th Cir. 1984) ......................... 20

**Statutes**

42 U.S.C. § 1983 ................................................................................................................... 1

La. C.Cr.P. § 723 ................................................................................................................... 11

**Rules**

La. R. Prof'l Cond. 3.3 ......................................................................................................... 11

# PRELIMINARY STATEMENT

In May of 1985, Mr. Flanks was wrongfully convicted of a 1983 murder he did not commit.  He was only 20 years old when he was falsely accused, and by the time he was exonerated in 2022, he had been incarcerated for almost 39 years.  Mr. Flanks was tried twice; the jury was unable to reach a verdict at first trial, and Mr. Flanks was convicted after a second trial.  At the time of both trials, powerful evidence of Mr. Flanks's innocence existed, including: (a) evidence that Defendant John Dillmann, then a Detective with the New Orleans Police Department (the "NOPD"), fabricated the sole eyewitness's identification of Mr. Flanks by pointing to his photograph in a photo array and saying, "that's him"; (b) evidence that the eyewitness's initial description of the perpetrator mismatched both Mr. Flanks and her own testimony at trial; (c) evidence that the eyewitness's description of the car the perpetrator used did not match Mr. Flanks's car; and (d) evidence of a string of similar crimes identified by the NOPD that involved descriptions of a perpetrator who, again, did not match Mr. Flanks.  Neither Mr. Flanks nor his counsel had access to this evidence at trial.

At Mr. Flanks's exoneration hearing, the Orleans Parish District Attorney's Office (the "OPDA") admitted that "Mr. Flank's [sic] conviction was obtained in violation of *Brady*" because "the State failed to disclose . . . materials [that] are favorable, and under the circumstances of the State's case against Mr. Flank[s], material."  The OPDA agreed that the State's conduct violated Mr. Flanks's constitutional right to due process and stated that Mr. Flanks "didn't receive a fair trial."  At that hearing, Judge Rhonda Goode-Douglas of the Orleans Parish Criminal Court also acknowledged "that Mr. Flank[s] did not receive the justice that he deserved" and vacated his conviction.  Mr. Flanks brought this action under under 42 U.S.C. § 1983 and state law to obtain relief for the NOPD and OPDA's misconduct.

In his second motion to dismiss the claims brought against him in his official capacity, Defendant Jason Williams contends Mr. Flanks has failed to state a claim against him under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  To the contrary, Mr. Flanks has alleged that he was deprived of his constitutional rights under the Fifth and Fourteenth Amendments, including because he was prosecuted, convicted, and imprisoned as a direct result of the suppression of exculpatory information by OPDA employees *and* that the proximate causes of those violations included, *inter alia*, both an official OPDA policy—created by then-District Attorney Harry Connick—*and* a custom of suppressing and failing to disclose material exculpatory evidence with deliberate indifference to the rights of individuals prosecuted by the OPDA.

Indeed, this Court has already rejected many of the arguments Mr. Williams raises in its opinion denying his first motion to dismiss.  *See Flanks v. City of New Orleans*, 2024 WL 2295543, 2024 U.S. Dist. LEXIS 90689 (E.D. La. May 21, 2024).  In that opinion, the Court explicitly found that Mr. Flanks alleged that OPDA policies were the "moving force" behind the deprivation of his constitutional rights.  *Id.* at *29-*30.  The Court also found that its *Monell* analysis would "include . . . cases where convictions were obtained prior to [Mr. Flanks's conviction] and where a court later found that a *Brady* violation occurred."  *Id.* at *28.  Mr. Williams disregards the law of the case by arguing to the contrary.  Moreover, the Court granted Mr. Flanks leave to amend his complaint to add allegations clarifying that Mr. Connick was an official policymaker and regarding additional cases of *Brady* violations prior to 1985.  *Id.* at *22, *28-*29.  Mr. Flanks has done so in his Amended Complaint.  *See* R. Doc. 27 ("Am. Compl.").

Accordingly, Mr. Flanks has stated an actionable *Monell* claim and Mr. Williams's second motion to dismiss should be denied.

# BACKGROUND

## I.      Factual Background

On December 17, 1983, Faye Carnesi, a white woman, was walking to her car, which was parked in front of her house. Am. Compl. (Dkt. 27) ¶ 30. Mrs. Carnesi saw a Black man wearing a shower cap (the "Actual Perpetrator") walk past her. *Id.* ¶ 31. Mrs. Carnesi's husband, Martin Carnesi, walked with Mrs. Carnesi to see her off. *Id.* ¶ 32. The Actual Perpetrator demanded money from Mr. Carnesi. *Id.* ¶ 33. When Mr. Carnesi reached into his pocket, the Actual Perpetrator pulled out a gun and shot Mr. Carnesi. *Id.* The Actual Perpetrator then pointed the gun at Mrs. Carnesi and demanded her purse. *Id.* ¶ 34. She threw her purse at him and ran away. *Id.* Mrs. Carnesi saw an old, light blue car speed off. *Id.* ¶ 35. At the time of the murder, Mr. Flanks—then just 20 years old—was at home with his brother, Ralph Flanks. *Id.* ¶¶ 1, 37. He had nothing to do with the murder. *Id.* ¶ 36.

Mrs. Carnesi initially described the Actual Perpetrator as a Black man in his late twenties, about 5'10" and 150 pounds, with a medium build, brown skin, and a light mustache. *Id.* ¶ 38. She also noted that he was wearing "a white plastic shower cap on his head." *Id.* When Mrs. Carnesi appeared before the grand jury four weeks later, she testified that the "one thing" she remembered about the Actual Perpetrator was that he "had a little white blotch on the side of his cheek, a little white mark, like discolored looking." *Id.* This description does not match Mr. Flanks. *Id.* ¶ 39. Mr. Flanks is over six feet tall and has never had a white mark on the side of his cheek. *Id.* Mrs. Carnesi also reported that the perpetrator was driving a light blue car. *Id.* ¶ 40. The daily report produced by the NOPD on the day of the crime says that the make and model of the vehicle were unknown, but when Mrs. Carnesi testified to the grand jury just four weeks later she described the car as "pale blue" and "not a shiny car[,] [i]t was an old car." *Id.*

The NOPD quickly associated this crime with a series of similar armed robberies that had occurred in the same area, all perpetrated against elderly people. *Id.* ¶ 41. The assailant described by the victims of those crimes was consistent with Mrs. Carnesi's initial description of the Actual Perpetrator: a Black man in his twenties, 5'8" to 5'11" tall, with a medium build and brown skin, with a mustache, and wearing a shower or "hospital type" cap. *Id.* He was also described as being armed with a "small caliber nickel plated automatic" gun and as driving an "old, light blue or gray vehicle." *Id.* As of December 19, 1983, two days after Mr. Carnesi's murder, the police had identified similar robberies on November 29, 1983; December 3, 1983; December 8, 1983; December 12, 1983; and December 18, 1983. *Id.* One victim also described the perpetrator as being in his thirties, and others described him as clean shaven and having a "small" "pug" nose. *Id.* ¶ 42. Again, these descriptions do not match Mr. Flanks. *Id.* ¶ 43.

Mr. Flanks became a suspect in Mr. Carnesi's murder after he was arrested in connection with an unrelated robbery.[1] *Id.* ¶ 44. Notably, the crime for which Mr. Flanks was arrested did not match the pattern of robberies into which Mr. Carnesi's murder clearly fit: the robbery was of a store, not of an elderly person outside on the street. *Id.* ¶ 45. Nor was Mr. Flanks wearing a shower cap, as the perpetrator had been in the other robberies that the NOPD had already linked to Mr. Carnesi's murder. *Id.* Moreover, the arresting officer described Mr. Flanks as having a "dark" complexion and a tattoo on his right hand. *Id.* ¶ 46. Again, this description does not match the one initially provided by Mrs. Carnesi or those provided by the victims of the other similar crimes. *Id.* In addition, Mr. Flanks was arrested with a gun registered to his brother, Ralph Flanks. *Id.* ¶ 47. The NOPD initially claimed that it matched this gun to Mr. Carnesi's murder, but later ballistics testing by federal officials demonstrated that it was not involved. *Id.* On the

---

1. Mr. Flanks's conviction for that robbery is not at issue in this lawsuit.

day of the robbery, Mr. Flanks drove a 1982 light blue Chevrolet Citation—virtually brand new at the time of the murder in 1983. *Id.* ¶ 48. This was inconsistent with Mrs. Carnesi's description that the Actual Perpetrator drove an old car. *Id.* It is also inconsistent with the reports of the victims of some of the other similar crimes, who also described the perpetrator's car as old. *Id.*

About a week after Mr. Carnesi's murder, NOPD detectives visited Mrs. Carnesi at her home and showed her a photo array with photos of six individuals, including Mr. Flanks. *Id.* ¶ 49. Mrs. Carnesi testified to the grand jury that she narrowed it down to two photos—Mr. Flanks and one other—and then told the detectives that the "one thing" she remembered about the Actual Perpetrator was the "little white blotch on the side of his cheek, a little white mark, like discolored looking." *Id.* ¶ 50. In response, Defendant Dillmann "shook his head and said, 'that's him,'" indicating the Mr. Flanks's photo. *Id.* ¶ 51. Mrs. Carnesi then acquiesced and mistakenly identified Mr. Flanks. *Id.* To the grand jury, Mrs. Carnesi rationalized this choice by saying that she "d[id]n't think they showed the side of his face with that mark" in the photo. *Id.* ¶ 52.

Mr. Flanks first went to trial on August 28, 1984. *Id.* ¶ 53. At this trial, the State presented testimony from NOPD Technician Stubbs. *Id.* ¶ 54. Stubbs testified—falsely—that the gun found with Mr. Flanks when he was arrested was the same gun that fired the bullets that killed Mr. Carnesi. *Id.* Mrs. Carnesi then identified Mr. Flanks and testified that the car he was arrested in resembled the one she saw fleeing the scene. *Id.* ¶ 55. The defense presented testimony from Mr. Flanks's brother Ralph Flanks, who testified that Mr. Flanks was home with him at the time of the murder. *Id.* ¶ 56. After two and a half hours of deliberations, the jury could not reach a verdict. *Id.* ¶ 57. As a result, the court declared a mistrial and set the case for a new trial. *Id.* After this first trial, and at defense counsel's request, the State sent the firearm recovered from Mr. Flanks for an independent examination by the Bureau of Alcohol, Tobacco, and Firearms (the

"ATF") Forensic Laboratory. *Id.* ¶ 58. The ATF reported that neither the bullet used to kill Mr. Carnesi nor the casing found at the scene was fired by this gun. *Id.*

Mr. Flanks's second trial began on May 14, 1985. *Id.* ¶ 59. Without the murder weapon, the State relied solely on Mrs. Carnesi's identification of Mr. Flanks. *Id.* At this trial, Mrs. Carnesi offered a description of her initial identification that differed drastically from her grand jury testimony, saying that, when examining the photo, she knew "it was him. This is the man that killed my husband. This man. I can't forget his face never, ever. If I live to be a thousand years old. Every night when I go to bed I see this man shoot my husband." *Id.* ¶ 60. She also testified that Defendant Dillmann "didn't tell me anything" indicating whom to identify during the photo array. *Id.* This testimony directly contradicted her testimony to the grand jury just three weeks after her initial identification and four weeks after the crime. *Id.* ¶ 61. Defendant Dillmann also testified about the identification, claiming that Mrs. Carnesi "picked up the photograph of Mr. Flank[s] and handed it to me and begin [*sic*] crying. Once she stopped crying she told me that this was positively the man who had shot and killed Mr. Carnesi." *Id.* ¶ 62. He further testified that neither he nor anyone else "indicate[d] in anyway [*sic*] that [he] wanted her to pick out a particular photograph." *Id.* Again, these claims contradicted Mrs. Carnesi's grand jury testimony. *Id.* ¶ 63. Ralph Flanks also testified at the second trial, reaffirming that his brother was at home with him at the time of the murder. *Id.* ¶ 64. The jury found Mr. Flanks guilty, and he was sentenced to life in prison without the possibility of parole. *Id.* ¶¶ 65-66.

While preparing for trial, Mr. Flanks and his counsel were not given or made aware of the NOPD records showing inconsistencies between Mrs. Carnesi's initial description of the Actual Perpetrator and Mr. Flanks's appearance, the NOPD records showing a string of similar crimes with a consistently described perpetrator, or Mrs. Carnesi's grand jury testimony regarding

the photo array and her initial identification of Mr. Flanks. *Id.* ¶ 67. As a result, that exculpatory information was unusable at trial and Mr. Flanks was deprived of an opportunity to rebut the reliability of Mrs. Carnesi's identification, to rebut the reliability of Defendant Dillmann's testimony, and to call into question the integrity of the investigation into the murder. *Id.* ¶ 68.

In May of 2022—after Mr. Flanks had spent almost 39 years in prison—the Innocence Project of New Orleans ("IPNO") contacted the Civil Rights Division ("CRD") of the OPDA about Mr. Flanks's case, and CRD began its own review and investigation. *Id.* ¶¶ 1, 69. At the conclusion of those investigations, on November 14, 2022, the OPDA and Mr. Flanks filed a Joint Agreement and Motion to Vacate his conviction. *Id.* ¶ 70. A hearing on the motion was held on November 17, 2022. *Id.* ¶ 71. At this hearing, the OPDA stated that "Mr. Flank's [*sic*] conviction was obtained in violation of *Brady v. Maryland*" because "the State failed to disclose . . . materials [that] are favorable, and under the circumstances of the State's case against Mr. Flank[s], material." *Id.* ¶ 72. The OPDA acknowledged that "there is a reasonable likelihood that had [Mrs. Carnesi's] prior testimony been disclosed, it could have affected the judgment of the jury" and "defense counsel would have been able to present a compelling case that Mrs. Carnesi was innocently mistaken when presented with the wrong suspect, that Mr. Flank[s] did not resemble the perpetrator, and that the car he was arrested in did not fit the one at the crime scene." *Id.* ¶ 73. The OPDA explicitly agreed that the State's conduct violated Mr. Flanks's constitutional right to due process and that Mr. Flanks "didn't receive a fair trial." *Id.* ¶ 74. At that hearing, Judge Rhonda Goode-Douglas of the Orleans Parish Criminal Court also acknowledged "that Mr. Flank[s] did not receive the justice that he deserved" at trial and vacated his conviction. *Id.* ¶ 75.

Mr. Williams, as the current Orleans Parish District Attorney, is responsible for the management and supervision of the OPDA and its employees. *Id.* ¶ 25.

## II.     Procedural Background

Mr. Flanks initiated this lawsuit by filing his Complaint on November 16, 2023. R. Doc. 1.  Mr. Williams moved to dismiss the Complaint on January 18, 2024.  R. Doc. 15.  The Court denied that motion and granted Mr. Flanks leave to amend his Complaint on May 21, 2024.  *See Flanks v. City of New Orleans*, 2024 WL 2295543, 2024 U.S. Dist. LEXIS 90689, at *34 (E.D. La. May 21, 2024).  Mr. Flanks filed his Amended Complaint on June 6, 2024, elaborating on the bases for his *Monell* claim.  *See* R. Doc. 27.  Mr. Williams filed a second motion to dismiss on June 18, 2024.  *See* R. Doc. 28.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "if the plaintiff alleges facts that . . . allow a court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678).  The court should "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff[]."  *Luebano v. Office Depot, L.L.C.*, 2023 WL 4249268, 2023 U.S. App. LEXIS 16524, at *7 (5th Cir. 2023) (per curiam) (citation omitted).  All reasonable inferences should be drawn in the plaintiff's favor.  *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023).

## ARGUMENT

Mr. Flanks states a claim against Mr. Williams in his official capacity under 42 U.S.C § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  "To assert a § 1983 claim against a municipality . . . , a plaintiff must establish both (1) 'that a constitutional violation occurred' and (2) 'that a municipal policy was the moving force behind the violation.'"

*Evans v. Lopinto*, 2022 WL 2304512, 2022 U.S. Dist. LEXIS 112705, at *20 (E.D. La. June 27, 2022) (Brown, C.J.) (citation omitted). "Under the latter, a plaintiff must show three things: (1) an 'official policy or custom 'was a cause in fact of the deprivation of rights inflicted,' (2) the policy 'served as a moving force' behind the constitutional violation, and (3) the policy was decided on by a policymaker with 'either actual or constructive knowledge of the alleged policy.'" *Id.* (citations omitted). Mr. Flanks may allege either "(1) an official policy [that] is unconstitutional or (2) a facially innocuous policy [that] was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Mitchell v. City of New Orleans*, 184 F. Supp. 3d 360, 372 (E.D. La. May 2, 2016) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

This Court has already found that Mr. Flanks "sufficiently alleged that the OPDA's custom of suppressing exculpatory evidence in violation of *Brady* was the moving force behind the constitutional violations he suffered." *Flanks v. City of New Orleans*, 2024 WL 2295543, 2024 U.S. Dist. LEXIS 90689, at *30 (E.D. La. May 21, 2024). The allegations that supported this conclusion—that "51 cases exist" where a court found or the prosecution acknowledged "*Brady* violations during Harry Connick's tenure" and that "Connick 'repeatedly and publicly expressed disdain for the *Brady* doctrine and rebuffed suggestions . . . that prosecutors be instructed on their *Brady* obligations and that the OPDA take steps to ensure compliance with the law and the Constitution"—are included verbatim in the Amended Complaint. *See id.* at *29-*30; Am. Compl. ¶¶ 99, 121. Accordingly, Mr. Williams cannot now dispute that Mr. Flanks has sufficiently alleged a causal relationship between the OPDA's unconstitutional policies and customs and the constitutional violations he suffered. *See Medical Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) ("[W]hen a court decides upon a

rule of law, that decision should continue to govern the same issue in subsequent stages in the same case." (citation omitted)).  In addition, Mr. Flanks has alleged violations of his constitutional rights under the Fifth and Fourteenth Amendments by alleging, *inter alia*, that the OPDA violated *Brady* and denied Mr. Flanks due process.  Mr. Flanks has further alleged that the "moving force" behind these violations were OPDA policies and customs promulgated and enforced by then-District Attorney Harry Connick in his role as an official policymaker.[2]

Mr. Flanks has alleged facts sufficient to support *Monell* liability under three distinct theories:  (1) that OPDA maintained a customary policy of withholding exculpatory evidence; (2) that Mr. Connick, having knowledge of multiple instances in which OPDA prosecutors suppressed material exculpatory evidence, exhibited deliberate indifference in failing to act to prevent further *Brady* violations; and (3) that OPDA expressly adopted a policy of having no policy, *i.e.*, a policy that individual prosecutors "were supposed to figure it out themselves" with regard to *Brady* compliance.[3]  Indeed, this Court offered Mr. Flanks a chance to amend his complaint to provide additional allegations regarding specific pre-existing cases of *Brady* violations.  *See Flanks*, 2024 U.S. Dist. LEXIS 90689, at *27-*28.  Mr. Flanks has done so, and now specifically alleges 26 instances in which the OPDA withheld *Brady* material prior to Mr. Flanks's conviction and a court subsequently found a *Brady* violation.  Am. Compl. ¶¶ 122-23.  Accordingly, Mr. Flanks has stated a claim against Mr. Williams in his official capacity and Mr. Williams's motion to dismiss the Amended Complaint should be denied.[4]

---

2. Mr. Williams does not dispute that Mr. Flanks has alleged a constitutional violation, nor that Mr. Connick is the official policymaker responsible for the OPDA's unconstitutional policies and customs.

3. The Amended Complaint does not state a claim against Mr. Williams based on fabrication of evidence or affirmative concealment of misconduct (to the extent the latter is distinct from the *Brady* claim).

4. Mr. Flanks has also stated a claim against Mr. Williams because "municipalities may face liability under section 1983 where they breach duties imposed by state or local law." *Evans*, 2022 U.S. Dist. LEXIS 112705, at *21 (Brown, C.J.) (alteration adopted) (quoting *O'Quinn v. Manuel*, 773 F.2d 605, 609 (5th Cir. 1985)).

I.     **Mr. Flanks Has Alleged That The Custom Of Withholding *Brady* Evidence Reflected A Facially Unconstitutional Official Policy Of The ODPA.**

Mr. Flanks has identified an unconstitutional policy by alleging that Mr. Connick permitted and encouraged his subordinates to engage in a custom or practice of violating *Brady*.

A.     Mr. Flanks Has Alleged That OPDA Maintained A Custom Or Practice Permitting The Nondisclosure Of Exculpatory Evidence In Violation Of *Brady.*

Mr. Flanks alleges that OPDA had a persistent, widespread practice of withholding exculpatory evidence in violation of the Fifth and Fourteenth Amendment. This claim is supported by specific facts showing a pattern of *Brady* violations similar those in Mr. Flanks's case. *See Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (an official custom or practice may be demonstrated by a "pattern of similar constitutional violations" by municipal employees); *Mitchell*, 184 F. Supp. 3d at 371 ("[To] show[] that the municipality maintained such a practice [of excessive force], plaintiffs may attempt to prove other similar incidents of the use and toleration of excessive force."). "[T]o find a municipality liable for a policy based on a pattern, that pattern must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir 2017).

Mr. Flanks identifies 37 cases over a period of 32 years in which a court found that OPDA's nondisclosure of material exculpatory evidence violated the defendant's constitutional rights, 26 of which occurred in the 18 years prior to Mr. Flanks's conviction. Am.

---

Louisiana law mandates that prosecutors comply with *Brady*, *see* La. C.Cr.P. § 723.B, and that attorneys do not knowingly offer false evidence, *see* La. R. Prof"l Cond. 3.3(a)(3). Because Mr. Flanks has alleged that OPDA employees violated these duties, *see, e.g.*, Am. Compl. ¶¶ 61, 67-68, he has stated a claim against Mr. Williams in his official capacity.

Compl. ¶¶ 122-23. In each of these cases, the court found that OPDA withheld evidence similar to that withheld in Mr. Flanks's case, namely, evidence casting doubt on the veracity of witness testimony and suggesting that the perpetrator was someone other than the defendant.[5] *Id.* Mr. Flanks also alleges "at least" 51 criminal cases in which the court found, or OPDA admitted, that prosecutors violated *Brady*, *id.* ¶ 121, and describes three specific cases in which OPDA's conduct amounted to an admission of a *Brady* violation (all three of which predate Mr. Flanks's conviction), *id.* ¶ 124. In addition to identifying dozens of instances in which prosecutors engaged in the same unconstitutional conduct, the Amended Complaint cites empirical evidence indicating that such misconduct was a pervasive practice of OPDA prosecutors, including that "Orleans Parish Orleans Parish has the highest per capita exoneration rate of any county or parish in the country," and that, "[a]s of 2020, in 78% of exonerations from New Orleans, exculpatory evidence was concealed . . . [and] prosecutors committed misconduct in nearly 90% of those cases." *Id.* ¶ 120.

These allegations support the inference that Mr. Connick was constructively aware of a persistent and widespread practice of withholding exculpatory evidence. Indeed,

---

5. Mr. Williams's attempts to distinguish some of these cases are unavailing. *See* R. Doc. 28-1 ("MTD") at 11-12. In the cases of Lockett and Clark, far from "ha[ving] nothing to do with failure to disclose evidence," MTD at 11, the Fifth Circuit found that the impermissible violation by the State was its decision to conceal the potentially exculpatory witness testimony. In other words, the fact that "an NOPD officer paid to send witnesses out of state" mattered because "[n]either Lockett nor the state trial judge knew that the State had deliberately made key witnesses unavailable for defendant's trial." *Lockett v. Blackburn*, 571 F.2d 309, 313 (5th Cir. 1978); *see also Clark v. Blackburn*, 632 F.2d 531, 535 (5th Cir. 1980). As for James Carney, Mr. Williams attempts to distinguish between the cooperation agreement concealed there and the grand jury testimony and police records concealed here. *See* MTD at 11. But, of course, both cases involved impeachment evidence of key eyewitnesses, and the concealment of such evidence indicates a practice or custom of *Brady* violations, which is the key issue here. As for Linroy Davis, it strains credulity to suggest that Mr. Connick would not have been aware of the vacatur of his conviction just because it occurred one year before he took office. *See* MTD at 11-12. In any event, this conviction serves as evidence of the widespread practice of violations with the OPDA. And, of course, Mr. Williams admits that the cases of Floyd Falkins, Arthur Monroe, Larry Curtis, and William Perkins "all involved pre-trial statements of witnesses that could have been used to impeach the witnesses' trial testimony or otherwise support the defense." MTD at 12. They are similar to the violations at issue here, which involved precisely the same kind of evidence.

courts in this Circuit regularly find similar allegations sufficient to infer the existence of a

municipal custom or practice. *See, e.g.*, *Ramirez v. Escajeda*, 298 F. Supp. 3d 933, 943 (W.D.

Tex. 2018) (plaintiffs alleged custom by "offer[ing] detailed accounts of eight other instances of

the alleged use of excessive force against mentally ill persons from 2013 to 2016 and various

statistics indicating that the use of force against the mentally ill is an issue for the City");

*Mitchell*, 184 F. Supp. 3d at 371-72 (finding sufficient plaintiff's allegations regarding 1) the

custom for NOPD officers to "'interfere, stop, intimidate and harass civilians,' predominantly in

African American neighborhoods"; (2) the existence of "a persistent, widespread practice of

failing to train, supervise, and discipline NOPD officers, especially those assigned to street

patrol"; and (3) "a culture . . . in which [officers] had the reasonable belief . . . that their

misconduct would not be thoroughly investigated or sanctioned, but instead would be tolerated

and approved"); *Butler v. City of Dallas*, 2015 WL 8467029, 2015 U.S. Dist. LEXIS 165579, at

*15-*17 (W.D. Tex. Nov. 4, 2015) (plaintiff established custom of excessive force by alleging

"that (1) Dallas ranks near the top of the nation in police misconduct; (2) since 2001, over 60

unarmed black men have been killed by DPD offers; and (3) numerous individuals have been

harassed and/or arrested for no lawful reason through the use of excessive force by DPD

officers," and by "describ[ing] two excessive force incidents in sufficient detail . . . to denote the

similarities to Plaintiff's incident."); *Oporto v. City of El Paso*, 2010 WL 3503457, 2010 U.S.

Dist. LEXIS 91241, at *7, *17-*18 (W.D. Tex. Sept. 2, 2010) ("[T]he recitation of a list of

similar prior incidents" is generally sufficient, and, "[a]lthough the detail with which Plaintiffs

describe the incidents used to establish a pattern . . . varies—three are described with significant

detail, fifteen are described with some detail and fourteen are listed with virtually no detail—the

similarities revealed . . . are sufficient"); *Barr v. City of San Antonio*, 2006 WL 2322861, 2006

U.S. Dist. LEXIS 59402, at *12-*13 (W.D. Tex. 2006) (pattern alleged where plaintiff (1) alleged that police officers believed they were entitled to stop and arrest any person without probable cause and (2) cited four similar prior lawsuits against the city).

So too here. Mr. Flanks's assertion that OPDA maintained a custom or practice of violating *Brady* is supported by specific facts demonstrating a "pattern of conduct in actual practice that may be called 'custom.'" *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984). Dismissal is therefore innapropriate.

> B.  Mr. Flanks Alleges That Nondisclosure Of *Brady* Evidence Was Adopted As Official OPDA Policy Through Mr. Connick's Awareness Of And Acquiescence <u>In The Practice.</u>

Mr. Williams avers that Mr. Flanks failed to allege that OPDA's custom of suppressing evidence reflected a facially unconstitutional official policy because the Amended Complaint "does not allege that OPDA prosecutors were ever trained or otherwise instructed" to violate *Brady*. MTD at 4. This argument fails because the Amended Complaint includes factual allegations indicating that OPDA prosecutors were openly permitted and even encouraged to suppress *Brady* evidence. Am. Compl. ¶¶ 95-112.

The claim that a municipality permitted or encouraged misconduct in violation of the Constitution is a well-established ground for *Monell* liability. *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 737 (1989) (municipal liability attaches where policymaking officials cause a constitutional deprivation "by acquiescence in a longstanding practice or custom" (citations omitted)). Contrary to Mr. Williams's implications, MTD at 4 n.2, courts have repeatedly established that where officials with policymaking authority encourage unconstitutional conduct, whether explicitly or tacitly, that conduct can be fairly said to represent the "official policy" of the municipality. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970) (acknowledging

municipal liability under § 1983 where policymaking officials "in any way act[ed] to compel or encourage" an unconstitutional custom or practice).[6]  Policymaking officials need not explicitly instruct, direct, or otherwise affirmatively implement a "custom" for that custom to be attributable to the municipality under *Monell*; to the contrary, a custom is attributable to the municipality where a municipal policymaker tacitly condones the practice.  *See Gonzalez v. Ysleta Ind. Sch. Dist.*, 996 F.2d 745, 761 (5th Cir. 1993) (collecting cases).  Because Mr. Connick tolerated, permitted, and encouraged an unconstitutional practice of withholding exculpatory evidence, that practice reflects the "official policy" of the ODPA.

C.  Mr. Flanks's Allegations Are Stated In Sufficient Factual Detail To Support The Inference That Mr. Connick Adopted An Official Policy Of Nondisclosure.

Mr. Williams also argues, contrary to this Court's earlier ruling, that the Amended Complaint lacks factual specificity to support the claim that OPDA's policies caused the *Brady* violation in Mr. Flanks's case, rendering it "hopelessly vague" and conclusory.  MTD at 14.  But Mr. Flanks does not ask the Court to simply "credit[] the allegation" that Mr. Connick tacitly condoned the OPDA's custom of violating Brady.  *See Iqbal*, 556 U.S. at 680.  Instead, the Amended Complaint sets forth specific facts that are sufficient for the Court to draw the reasonable inference that Mr. Connick acquiesced in the alleged misconduct.  *See id.* at 678.

The Amended Complaint alleges that Mr. Connick "repeatedly and publicly expressed disdain for the *Brady* doctrine and rebuffed suggestions . . . that prosecutors be instructed on their Brady obligations and that the OPDA take steps to ensure compliance."  Am. Compl. ¶ 99.  It cites the statement of Mr. Connick's successor that, under Mr. Connick, "bad

---

6.  *See also, e.g.*, *Berry v. McLemore*, 670 F.2d 30, 32 (5th Cir. 1982) (considering whether plaintiff had shown "a municipal policy of authorizing or encouraging police misconduct" giving rise to municipal liability), *overruled on other grounds by Int'l Woodworkers of Am. v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986); *Webster v. City of Houston*, 689 F.2d 1220, 1227 (5th Cir. 1982) ("*Monell* sets § 1983 liability 'if high local officials overtly or covertly authorize or encourage constitutional violations by subordinate officials.'" (citations omitted)).

policy decisions took root and became institutional," and that *Connick v. Thompson* (which involved rampant *Brady* violations) was a "collateral consequence[]" of "some of those policy decisions." *Id.* ¶ 98. The Amended Complaint also describes *how* Mr. Connick encouraged *Brady* violations—"by creating a culture focused on 'winning' at all costs," that pressured prosecutors "to win by any means necessary (up to, and includ[ing], by ignoring Brady obligations);" by communicating to prosecutors that they would face negative consequences for failures to obtain convictions; by tracking prosecutors' wins and losses; by promulgating a "specific policy against 'open file discovery'"; by instructing prosecutors to err on the side of nondisclosure; and by "demonstrating to employees that they would face no negative consequences for their failures to comply with *Brady*." *Id.* ¶¶ 108-09, 125-26.

Mr. Williams objects that Mr. Flanks does not explain how Mr. Connick's communications were "memorialized, promulgated, or conveyed" to prosecutors, and does not include "factual details as to what Mr. Connick purportedly said." MTD at 6. As described above, the Amended Complaint *does* include many specific factual allegations, but, in any event, dismissal is not merited because such detail is not required at the pleading stage. *Senegal v. Sheriffs Dep't Beauregard Par.*, 2022 WL 352711, 2022 U.S. Dist. LEXIS 21303, at *6 (W.D. La. Feb. 4, 2022) ("[T]he pleading standard does not require a complaint to contain 'detailed factual allegations.'" (quoting *Twombly*, 550 U.S. at 555)); *see also Twombly*, 550 U.S. at 570 ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."); *Mitchell*, 184 F. Supp. 3d at 373 (finding allegations that policymaker was aware of "long history of prior incidents," and "'set the tone and direction'" for these incidents of police harassment and deprivation of rights by approving, ratifying, and condoning these actions and by communicating . . . that [officers] would be

protected from discipline or accountability" sufficient to withstand a motion to dismiss); *Butler*, 2015 U.S. Dist. LEXIS 165579, at *19 (allegations stating general pattern of excessive force and two identifying specific similar instances "a close call" but "sufficient . . . [to] reasonably infer the existence of a persistent, widespread practice . . . of using excessive force rising to the level of a custom that has the effect of official City policy" and survive a motion to dismiss because "[t]here is no evidence before the Court at this stage of proceedings" and, "at this juncture, the Court must only evaluate whether Plaintiff pled sufficient facts that would 'allow the court to draw the reasonable inference that the defendant is liable.'" (citation omitted)).

At minimum, Mr. Flanks has alleged "enough fact to raise a reasonable expectation that discovery will reveal evidence" of Mr. Connick's tacit encouragement of unconstitutional conduct sufficient to prove municipal liability. *Twombly*, 550 U.S. at 556; *see also Flagg v. Stryker Corp.*, 647 F. App'x 314, 319 (5th Cir. 2016) ("[W]e must remember that the question at the motion to dismiss stage is not whether [Plaintiff] has proven the elements to succeed . . . or even whether he has made 'detailed factual allegations.' . . . The question is whether [Plaintiff] has plausibly alleged enough information that, with discovery, he could prove the [Defendants] are liable." (emphases and citation omitted)). While necessarily limited to the facts available pre-discovery, the facts set forth in the Amended Complaint, taken as true, make it more than plausible that OPDA prosecutors were encouraged by Mr. Connick to withhold exculpatory evidence in violation of *Brady*. Accordingly, Mr. Williams's argument that the claim lacks sufficient factual specificity necessary to survive a motion to dismiss must fail.

## II.    Mr. Flanks Also Alleges That Mr. Connick's Deliberate Indifference Was The "Moving Force" Behind The Alleged Constitutional Violations.

The Amended Complaint also alleges that OPDA's disclosure policies were maintained with deliberate indifference to the "known or obvious" risk that defendants' *Brady*

rights would be violated. *See Mitchell*, 184 F. Supp. 3d at 372 (quoting *Piotrowski*, 237 F.3d at 579). A failure to act reflects official municipal policy where it "amounts to deliberate indifference to the rights of persons with whom [officials] come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). Deliberate indifference exists when "policymakers are on actual or constructive notice that a particular omission in their [policies] causes city employees to violate citizens' constitutional rights, [and] . . . the policymakers choose to retain that program." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Deliberate indifference thus requires proof that the policymaker was on notice of the need to act affirmatively to prevent further constitutional violations. *See id.* at 61-62.

Mr. Williams argues that Mr. Flanks has failed to state a claim for deliberate indifference because there was nothing to put Mr. Connick on notice of the need to prevent reasonably foreseeable future *Brady* violations. *See* MTD at 13-14. Contrary to Mr. Williams's assertion, however, the Amended Complaint alleges that despite having actual or constructive knowledge of frequent *Brady* violations, Mr. Connick failed to promulgate any policy requiring timely disclosure of *Brady* information, failed to provide prosecutors with any training on *Brady* compliance, failed to supervise prosecutors' handling of discovery, failed to investigate any of the of *Brady* violations discovered prior to Mr. Flanks's conviction, and failed to discipline prosecutors who were found to have suppressed evidence—all despite the reasonable likelihood that absent remedial action, OPDA prosecutors would continue to withhold *Brady* evidence and deprive those they prosecuted of their constitutional rights. *See* Am. Compl. ¶¶ 103-04, 106, 110-11, 113-17. Mr. Flanks thus pleads facts sufficient to conclude that Mr. Connick had actual or constructive knowledge of a pattern of constitutional violations caused by prosecutors' nondisclosure of *Brady* evidence such that his failure to institute policies to ensure *Brady*

compliance reflected a deliberate choice to permit such violations and rises above the level of mere "unintentionally negligent oversight." *See Alvarez v. City of Brownsville*, 904 F.3d 382, 391 (5th Cir. 2018) (citation omitted). Dismissal is inappropriate.

A. Mr. Flanks Pleads Facts Sufficient To Infer That Mr. Connick Had Actual Or Constructive Knowledge Of Widespread And Frequent *Brady* Violations.

Mr. Flanks alleges a pervasive pattern of *Brady* violations sufficient to put Mr. Connick on notice that ODPA's policies were constitutionally deficient. *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir 2017) ("[T]o find a municipality liable . . . based on a pattern, that pattern 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice.'" (citation omitted)); *Piotrowski*, 237 F.3d at 582 ("A pattern could evidence not only the existence of a policy but also official deliberate indifference.").

The Amended Complaint identifies 29 specific cases that occurred in the 18 years leading up to Mr. Flanks's conviction in which OPDA prosecutors unconstitutionally withheld evidence. Am. Compl. ¶¶ 122-24. These occurrences are not isolated incidents—rather, they demonstrate that, on average, OPDA prosecutors suppressed evidence to obtain a wrongful conviction more than once every year. *See Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) (a pattern "requires 'sufficiently numerous prior incidents'") (citation omitted). The frequency with which these violations occurred, and the fact that they had been regularly occurring for eighteen years leading up to Mr. Flanks's conviction, supports the inference that Mr. Connick knew or should have known of the need to prevent further misconduct. Moreover, in nine of these cases, courts found that prosecutors had withheld evidence and deprived the defendant of due process prior to Mr. Flanks's 1985 conviction. *See* Am. Compl. ¶¶ 123.c, 123.e, 123.g, 123.h, 123.i, 123.j, 123.p, 123.r, 123.s. Mr. Connick thus had demonstrative, actual

notice of nine instances in which, a court determined, OPDA suppressed exculpatory evidence in violation of the defendant's constitutional rights. The remaining cases that occurred prior to Mr. Flanks's conviction further evince the pervasiveness and regularity with which OPDA prosecutors withheld evidence in violation of *Brady*, from which Mr. Connick's constructive knowledge can be inferred. *See Webster v. City of Houston*, 735 F.2d 838, 854 (5th Cir. 1984) ("[Where] a practice [is] widely known and followed with relative impunity . . . the frequency and pattern of the practice is sufficient to support a reasonable inference that the city, through its top officials, is aware or has the responsibility to be aware that city employees engage in the practice."). These prior instances, involving similar misconduct and resulting in the same constitutional violation, "demonstrate 'a pattern of abuses that transcends the error made in a single case.'" *Peterson*, 558 F.3d at 850-51 (citation omitted).

Indeed, the violations cited in the Amended Complaint are "very similar" to those in Mr. Flanks's case—in each, the court found that the OPDA had failed to disclose material exculpatory evidence in violation of defendants' Fifth and Fourteenth Amendment rights. *See Davidson*, 848 F.3d at 396 ("a pattern requires similarity"). The cases Mr. Williams cites, on the other hand, are cases in which the court could *not* conclude, based on the circumstances of the instances alleged, that the same violation of individual rights occurred in each. *See* MTD at 7-8. In *Jason v. Tanner*, for instance, the court found that allegations of four previous instances of inmate fights involving brooms and mops "just aren't enough to constitute a pattern" to put the prison on notice for a subsequent fight involving a "sling-blade." 938 F.3d 191, 198 (5th Cir. 2019). And in *Robinson v. Midland County*, the court found that that prior instances of inmate deaths were "not sufficiently similar to put the county on notice of a failure to provide adequate medical care because only one of them is alleged to have involved a failure to follow proper

procedures." 80 F.4th 704, 710 n.3 (5th Cir. 2023). Here, by contrast, Mr. Flanks alleges dozens

of analogous allegations over the course of multiple years, 26 of which predate Mr. Flanks's

conviction and in which a court has found that OPDA impermissibly withheld material

exculpatory evidence. Am. Compl. ¶¶ 122-23; *see also id.* ¶ 124. Moreover, many of these

allegations include very similar violations to those alleged here, including, for example,

instances of withholding material evidence regarding inconsistent statements by key witnesses,

*e.g.*, *id.* ¶¶ 122.b, 123.a, 123.b, 123.c, 123.d, 123.f, 123.g, 123.n, 123.o, 123.p, 123.u, 123.w,

124.c; regarding descriptions of the perpetrator that did not match the defendant, *e.g.*, *id.*

¶¶ 122.b, 123.q, 123.v, 123.w; regarding descriptions of cars that indicated the defendant was

likely innocent, *e.g.*, *id.* ¶¶ 122.b, 123.bb; regarding improperly indicating the suspect to

influence identification during a photograph array, ¶ 123.a; and regarding misconduct by

Defendant Dillmann, *e.g.*, *id.* ¶¶ 122.b, 122.c, 123.q. The instances alleged in the Amended

Complaint demonstrate a persistent failure of OPDA prosecutors to identify evidence requiring

disclosure under *Brady*, indicating a need for additional policies and training regarding *Brady*

obligations.

      Mr. Williams does not meaningfully contest that these prior instances are

insufficient to establish a pattern. Rather, he reiterates his previous claim that "the only relevant

cases would be those in which the court decision finding a *Brady* violation occurred before Mr.

Flanks's conviction." MTD at 9. As an initial matter, this Court rejected this exact argument the

first time Mr. Williams made it, specifically identifying as relevant cases "where a court later

found that a *Brady* violation occurred" and giving Plaintiff leave to amend the Complaint to

include additional such cases. *Flanks*, 2024 U.S. Dist. LEXIS 90689, at *28. In complete

disregard of this Court's opinion, Mr. Williams nonetheless argues that "[a]bsent such a court

finding [that a *Brady* violation had occurred], there is no reason to believe or infer that Mr. Connick would have been aware that exculpatory evidence had not been disclosed or that the defendant's constitutional rights were violated as a result." MTD at 9. But "[c]onstructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity." *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984). Violations prior to 1985 demonstrate a "persistent and widespread" pattern, regardless of when confirmed by a court. Moreover, OPDA's failure to comply with *Brady* was the subject of "public discussion," arguably to a "high degree of publicity," in part because of the nine cases in which a court *did* find a violation prior to 1985. A District Attorney "properly exercis[ing] [his] responsibilities" should have been aware of multiple cases overturning convictions obtained by the OPDA—especially where, as here, the reversals were made the ground that OPDA prosecutors engaged in misconduct. The fact that OPDA tracked the win and loss records of its prosecutors, Am. Compl. ¶ 126, makes it even more probable that Mr. Connick was aware of these cases and the circumstances under which multiple "wins" became "losses" for the OPDA.

Accordingly, Mr. Flanks has sufficiently alleged the existence of a pattern of widespread and requent *Brady* Violations such that Mr. Connick can be imputed constructive—if not actual—knowledge of the widespread custom of violating *Brady.*

B.     Numerous Prior Violations Were Sufficient To Put Mr. Connick On Notice In 1985 Of The Need To Train, Supervise, And/Or Discipline Prosecutors With Respect To *Brady*'s Disclosure Requirements.

Mr. Williams argues that even if the cases identified in the Amended Complaint constitute a pattern, they are insufficient to show deliberate indifference because they did not

indicate an "obvious need" to promulgate new or additional *Brady* policies. MTD at 12. In support of this argument, Mr. Williams relies on cases in which the court found that the plaintiff had not shown a sufficient number of prior instances to support the conclusion that policymakers were deliberately indifferent to an unconstitutional pattern or practice. MTD at 13 (citing *Connick v. Thompson*, 563 U.S. 51 (2011)); *Armstrong v. Ashley*, 60 F.4th 262, 277-78 (5th Cir. 2023)). But Mr. Williams's reliance on these cases is misplaced. The plaintiff in *Thompson* alleged only four convictions reversed due to *Brady* violations, while the plaintiff in *Armstrong* identified nine reversals, "none of which found a *Brady* violation." *Thompson*, 563 U.S. at 62; *Armstrong*, 60 F.4th at 278. By contrast, Mr. Flanks has identified 26 prior instances in which a court subsequently found a *Brady* violation on the ground that material exculpatory evidence was withheld by prosecutors. Both cases are easily distinguishable on that ground alone. Moreover, *Thompson* was also an appeal from a jury verdict, requiring the court to determine whether the evidence was sufficient to support a verdict against the city. *Thompson*, 563 U.S. at 54, 57-58. At the motion to dismiss stage, however, Mr. Flanks must merely allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). For the reasons explained above, including at pp.19-22, Mr. Flanks has met that burden.

Perhaps even more crucially, Mr. Williams mischaracterizes the Supreme Court's conclusion in *Thompson*. MTD at 13. In *Thompson*, the plaintiff "relie[d] on the 'single-incident' liability" theory, in which the need for training is "so obvious" that deliberate indifference can be inferred from a single violation. *Thompson*, 563 U.S. at 63. The Court, having granted *certiorari* "to decide whether a district attorney's office may be held liable under § 1983 for failure to train based on a single *Brady* violation," reasoned that because "[a]ttorneys

are trained in the law and equipped with the tools to interpret and apply legal principles," the unconstitutional consequences of failing to provide *Brady*-specific training were not "so patently obvious that a city could be liable . . . without proof of a pre-existing pattern." *Id.* at 54, 64.

Mr. Flanks, by contrast, does not rely on a theory of single-incident liability. Rather, he alleges that there *was* a pre-existing pattern of violations that should have alerted Mr. Connick to the need for additional training and oversight to ensure that prosecutors understood and complied with *Brady*'s disclosure requirements. In other words, even if the need for training and oversight were not facially obvious, by May of 1985 it was clear that OPDA prosecutors were frequently violating *Brady*. Because Mr. Flanks has alleged a pattern of similar constitutional violations sufficient to put Mr. Connick on notice that ODPA's existing *Brady* policies—or lack thereof—were insufficient to prevent foreseeable constitutional violations, and because Mr. Connick failed to take any steps to prevent the violation of Mr. Flanks's constitutional rights, Mr. Flanks has stated a claim based on deliberate indifference.

## III. Finally, Mr. Flanks Also Sufficiently Alleges That The OPDA Had An Affirmative Policy That Each Individual Prosecutor Should "Figure It Out Themselves."

Mr. Flanks also states a claim for *Monell* liability against the OPDA on the basis of an official policy expressly adopted by Mr. Connick: that, in Mr. Connick's own words, individual prosecutors "were supposed to figure it out themselves." Am. Compl. ¶ 106. In other words, the official policy of the OPDA in 1985—adopted and confirmed by Mr. Connick himself—was to *not* provide guidance, training, or supervision to individual prosecutors deciding whether to turn over evidence to the defense under *Brady*. And this, of course, can provide a basis for a *Monell* claim because, as courts around the country have found, "[o]fficial nonfeasance can constitute a *Monell* violation when the municipality in effect 'has a policy of inaction and such inaction amounts to a failure to protect constitutional rights.'" *Scanlon v.*

*County of Los Angeles*, 92 F.4th 781, 812 (9th Cir. 2024) (quoting *Mortimer v. Baca*, 594 F3d

714, 722 (9th Cir. 2010)); *see also Avery v. Cnty. Of Burke*, 660 F.2d 111, 112 (4th Cir. 1981)

(*Monell* liability may attach where no relevant written policies existed because "activities were

by custom left solely to the standardless discretion of individual employees").

        In a decision regarding a superintendant's statement that it was the school district's

"policy to allow principals and assistant principals to make evaluation and employment decisions

as they see fit," for example, the Seventh Circuit held that this statement "was evidence of a

policy of the school district of condoning unconstitutional terminations, since principals and

assistant principals might 'see fit' to fire teachers on unconstitutional grounds." *Gschwind v.

Heiden*, 692 F.3d 844, 848 (7th Cir. 2012). The same logic applies with equal force here, where

Mr. Connick's decision to leave *Brady* decisions up to individual prosecutors is "evidence of a

policy of the [OPDA] of condoning" *Brady* violations, "since [prosecutors] might" "figure" that

they need not produce exculpatory evidence. And, as the Amended Complaint alleges, that is

precisely what happened to dozens of defendants during Mr. Connick's tenure. Mr. Flanks has

thus also stated a *Monell* claim based on the adoption of a facially insufficient official policy that

prosecutors be left without guidance or oversight to determine whether to produce material

exculpatory evidence to the defense.

## CONCLUSION

        For the foregoing reasons, Plaintiff Raymond Flanks respectfully submits that the

Court should deny Defendant Jason Williams's Motion to Dismiss.

Dated: July 30, 2024
      New Orleans, Louisiana

MURELL LAW FIRM

By: */s/ Christopher J. Murell*
    Christopher J. Murell
    La. Bar No. 32075
    Meghan K. Matt
    La. Bar No. 39975
    2831 Saint Claude Avenue
    New Orleans, Louisiana 70117
    (504) 717-1297 (Tel)
    chris@murell.law
    meghan@murell.law

SHANIES LAW OFFICE LLC

By: */s/ David B. Shanies*
    David B. Shanies* (T.A.)
    Deborah I. Francois*
    Eleanor C. Davis*
    110 West 40th Street, Tenth Floor
    New York, New York 10018
    (212) 951-1710 (Tel)
    (212) 951-1350 (Fax)
    david@shanieslaw.com
    deborah@shanieslaw.com
    eleanor@shanieslaw.com

    *Admitted *Pro Hac Vice*

*Attorneys for Plaintiff Raymond Flanks*