# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RAYMOND FLANKS,<br><br>*Plaintiff*,<br><br>v.<br><br>THE CITY OF NEW ORLEANS, *et al.*,<br><br>*Defendants*. | Civil Action No. 23-06897<br><br>Section G<br>Chief Judge Nannette Jolivette Brown<br><br>Division 4<br>Magistrate Judge Karen Wells Roby |

**REPLY MEMORANDUM IN SUPPORT OF JASON WILLIAMS'S**
**SECOND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

Defendant Jason R. Williams, in his official capacity as Orleans Parish District Attorney ("OPDA"), through undersigned counsel, respectfully submits this reply to the opposition memorandum filed by Plaintiff Raymond Flanks, Doc. No. 33, and in further support of his motion seeking dismissal of the claims against OPDA pursuant to Federal Rule of Civil Procedure 12(b)(6), Doc. No. 28.

**A.      Mr. Flanks has not alleged a facially unconstitutional official policy of suppressing *Brady* evidence.**

Mr. Flanks alleges that "OPDA maintained a custom or practice of violating *Brady*," Doc. No. 33 at 19, but it is not even clear what this is supposed to mean. In the criminal-law context, a *Brady* violation may occur "irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Accordingly, failure to disclose exculpatory evidence resulting in a *Brady* violation can occur in many different ways for many different reasons.

For example, it may occur because a prosecutor deliberately seeks to hide favorable evidence from the defense to ensure a conviction. It may occur because a prosecutor, due to time and workload pressures, fails to thoroughly seek out and review evidence in the State's possession

1

that may be exculpatory. It may occur if a prosecutor is aware of the evidence but does not appreciate its exculpatory nature. It may occur due to simple misunderstandings or miscommunications between prosecutors as to what has already been disclosed to the defense. It may be attributable to the prosecutor's incorrect or incomplete knowledge of the governing law, or it may not. And it even may occur without any fault whatsoever on the part of the prosecutor, such as when a police officer conceals or deliberately misrepresents information.

Mr. Flanks does not explain the specific alleged custom or practice among OPDA prosecutors that purportedly caused repeated *Brady* violations. Some of his allegations imply deliberate suppression of evidence, such as the claim that prosecutors faced pressure to "win by any means necessary (up to, and including, by ignoring Brady obligations)." Doc. No. 27 at ¶ 126. Other allegations suggest a more inadvertent "failure to identify evidence requiring disclosure under *Brady*" that could be remedied by "additional policies and training regarding *Brady* obligations." Doc. No. 33 at 26.

This failure to describe the alleged custom or practice with specificity is fatal to Mr. Flanks's claim. Unofficial, unwritten customs or practices cannot be attributed to a municipality as its official policy unless the policymaker is aware of the specific custom or practice and aware that it is so common as to be "the expected, accepted practice" within his office. *See Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017) (explaining that the pattern "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of **knowledge that the objectionable conduct is the expected, accepted practice**.") (emphasis added). If Mr. Flanks cannot even explain what the purported custom was, he certainly cannot show that Mr. Connick was aware of it in 1985. Nor can he show that it was the "moving force"

that caused specific prosecutors to withhold *Brady* evidence in his specific case.[1] And simply alleging that the custom was "withholding *Brady* evidence" is insufficient because it provides no explanation of the alleged actions or inactions by prosecutors that were allegedly resulting in failure to disclose *Brady* evidence.

To show an official "practice" or "custom" that suffices for *Monell* purposes, the practice or custom must be "so persistent and widespread as to practically have the force of law." *See Johnson v. Harris County*, 83 F.4th 941, 946 (5th Cir. 2023). To the extent that Mr. Flanks alleges that, as of 1985, there was a persistent and widespread custom among OPDA prosecutors of deliberate suppression of *Brady* evidence, and that Mr. Connick was aware of and encouraged this practice, the allegation is entirely unsupported by facts that could render it plausible. At best, Mr. Flanks has alleged that (1) *Brady* violations occurred at a rate of approximately 1–2 per year, for reasons that are not explained; and (2) Mr. Connick was aware of some of these because they were the subject to court decisions. This does not come close to showing that Mr. Connick was aware of a "persistent and widespread" practice of suppressing *Brady* evidence, particularly considering the thousands of cases prosecuted by OPDA each year.[2]

**B.    Mr. Flanks has not alleged that Mr. Connick acted with deliberate indifference.**

Relatedly, Mr. Flanks has not adequately alleged that, as of 1985, Mr. Connick was on notice that his office's policies were causing the violation of defendants' constitutional rights through suppression of *Brady* evidence. Mr. Flanks alleges that such notice was provided by "29

---

[1] *See, e.g.*, Bennett v. City of Slidell, 728 F.2d 762, 767 (5th Cir. 1984) ("If a city may be liable only where the injury is inflicted in the execution of city policy, the complainant must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.").

[2] See, for example, *Verastique v. City of Dallas*, 106 F.4th 427, 434 (5th Cir. 2024), discussed further below, explaining that it is "necessary" to consider an alleged "pattern" within the context of the total number of relevant occurrences (arrests, cases, etc.).

specific cases that occurred in the 18 years leading up to [his] conviction in which OPDA prosecutors unconstitutionally withheld evidence." Doc. No. 33 at 24. But as explained in OPDA's original motion, there is no basis to conclude that Mr. Connick would have been aware of alleged *Brady* violations in cases where there was no court ruling on any *Brady* issue until after 1985. *See* Doc. No. 28-1 at 9–10. Mr. Flanks argues that Mr. Connick's "constructive knowledge" of these alleged violations "can be inferred," Doc. No. 33 at 25, but this still makes no sense.[3] OPDA also previously explained that many of the other alleged *Brady* cases do not involve "very similar" violations, as required by Supreme Court and Fifth Circuit precedent. *See* Doc. No. 28-1 at 10–12.[4]

However, even assuming the Court finds it appropriate to consider all of the other cases alleged by Mr. Flanks, his claim of deliberate indifference still must fail. Mr. Flanks argues that his allegations "demonstrate that, on average, OPDA prosecutors suppressed evidence to obtain a wrongful conviction more than once every year." Doc. No. 33 at 24. As made clear by the Fifth Circuit's recent decision in *Verastique v. City of Dallas*, 106 F.4th 427 (5th Cir. 2024), this is not enough.

---

[3] For example, how and why would Mr. Connick have been aware of a failure to disclose potentially exculpatory evidence in one of the many thousands of individual cases prosecuted in his office before the defendant has even made such an allegation?

[4] Mr. Flanks appears to argue that ***all*** *Brady* violations are "very similar." *See* Doc. No. 33 at 25 (arguing that "the violations cited in the Amended Complaint are 'very similar' to those in Mr. Flanks's case—in each, the court found that the OPDA had failed to disclose material exculpatory evidence in violation of defendants' Fifth and Fourteenth Amendment rights"). As explained above, as a factual matter, this could not be further from the truth. It is also contrary to Fifth Circuit precedent, which takes a much narrower view of similarity. *See, e.g.*, *Verastique*, 106 F.4th at 431–33 (holding that an alleged incident in which a police officer shot the plaintiff with a "less-than-lethan PepperBall round" was not sufficiently similar to other incidents in which the same officer hit other people with a flashlight or nightstick).

4

In *Verastique*, plaintiffs alleged that a Dallas police officer, Roger Rudloff, used excessive force while arresting them during widespread protests. They sought to hold the City of Dallas liable under *Monell*, alleging that there were 19 prior complaints of misconduct **by Mr. Rudloff** over 23 years. However, the Fifth Circuit affirmed the district court's dismissal of the claim on the pleadings, concluding that the other incidents were "not sufficiently similar, specific, or numerous." *See Verastique*, 106 F.4th at 432–34. The Fifth Circuit first explained that the allegations regarding the 19 other incidents were "devoid of critical factual enhancement," including facts that would have elucidated how and why the incidents occurred: "Plaintiffs, for example, cite five incidents allegedly involving a flashlight or nightstick. Some are listed incident-by-incident. But all still remain totally devoid of critical facts. What prompted the encounters? Did the individuals threaten Rudloff with physical harm? Were they attempting to resist arrest?" *Id.* at 432.

The Fifth Circuit went on to explain that, even assuming these other alleged incidents were "sufficiently specific and similar" to the constitutional violations alleged in the lawsuit, they were insufficient as a matter of law to "create a pattern capable of providing constructive notice":

> It took twenty-three years to amass the nineteen incidents mentioned in the complaint. Plaintiffs posit that the protracted time span works in their favor. In their view, the fact that the incidents occurred over two decades further evinces a consistent pattern of failed discipline. Incorrect.
>
> Given a constant number of incidents, a longer time span yields a *lower rate* of violations—*militating against* constructive notice. Nineteen allegations over the span of twenty-three years yields a mere annualized incident rate of 0.826. In other words: Plaintiffs—at most—show that, for over two decades, Rudloff, on average, received *fewer than one accusation of misconduct per year*.

*Verastique*, 106 F.4th at 433–34.

The Fifth Circuit further explained that the complaint failed to provide information "such as department size and number of arrests" that would "provide the context necessary to evaluate

whether an alleged department-wide pattern is so obvious as to impart constructive notice." *Verastique*, 106 F.4th at 434. The Fifth Circuit explained that "it is *impossible* to identify the existence of a pattern—much less one that imparts constructive notice," without such context. *Id.* That is because "[g]iven a constant number of incidents, the percentage of conduct supporting a pattern of illegality shrinks as the size of the police department or the number of arrests increases." *Id.* Thus, the plaintiffs failed to show "whether nineteen incidents over twenty-three years is sufficiently frequent to be obvious in the context of [the Dallas Police Department]," which "employs 3,200 to 3,300 officers and serves one of the largest cities in the nation." *Id.* at 10.

Critically, the allegations in *Verastique* involved 19 incidents *by a single police officer*—not across the entire police department. Applying the same standard, Mr. Flanks does not come close to alleging a pattern that has "occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice." *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017). Even assuming for the sake of argument that all of the incidents alleged by Mr. Flanks are "very similar," 29 incidents over 18 years amounts to approximately 1.6 incidents per year, out of thousands of cases prosecuted each year by dozens of prosecutors at OPDA.[5] As explained in *Connick v. Thompson*, "*Brady* mistakes are inevitable. So are all species of error routinely confronted by prosecutors: losing a *Batson* claim; crossing the line in closing argument; or eliciting hearsay that

---

[5] *See also Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009) ("Although the record omits any evidence of the department's size or the number of its arrests, the department's own website indicates that it presently employs more than 1,500 officers, and that there were more than 67,000 incidents of crime in the last year alone. Given the department's size, and absent any evidence of its total number of arrests during the same time period, 27 incidents of excessive force over a period of four years do not reflect a pattern that can be said to represent official policy of condoning excessive force so as to hold the City liable for the acts of its employees' unconstitutional conduct. To hold otherwise would be effectively to hold the City liable on the theory of respondeat superior, which is expressly prohibited by *Monell*.").

violates the Confrontation Clause." *Connick v. Thompson*, 563 U.S. 51, 73 (2011) (Scalia, J., concurring). Finding deliberate indifference based on *Brady* violations in a miniscule percentage of cases "would repeal the law of *Monell* in favor of the Law of Large Numbers." *Id.*

C. **Mr. Flanks's alleged official policy of providing no "guidance, training, or supervision" on *Brady* cannot establish municipal liability.**

Mr. Flanks further contends that Mr. Connick adopted an official policy "to *not* provide guidance, training, or supervision to individual prosecutors deciding whether to turn over evidence to the defense under *Brady*," and that this alleged policy was "facially insufficient." *See* Doc. No. 33 at 29–30. Even if this claim were true (it is certainly not), it would not establish *Monell* liability for OPDA.

Mr. Flanks's argument is notably unsupported by any Fifth Circuit jurisprudence. Indeed, it is directly foreclosed by Fifth Circuit precedent, which holds that an official policy that "merely commits some decisions" to the "discretion" of an official is not facially unconstitutional. *See Edwards v. City of Balch Springs*, 70 F.4th 302, 308–09 (5th Cir. 2023).[6] Moreover, Mr. Flanks's theory is materially indistinguishable from the "single-incident liability" theory rejected by the Supreme Court in *Connick v. Thompson*, 563 U.S. 51 (2011). The plaintiff in *Connick* argued that, because the need for training on *Brady* issues to avoid constitutional violations was "obvious," OPDA's alleged failure to train gave rise to municipal liability. *See id.* at 70–71. The Supreme Court explained, however, that "[f]ailure to train prosecutors in their *Brady* obligations does not

---

[6] *See also Edwards*, 70 F.4th at 309 ("An official, written policy is 'itself' unconstitutional only if it affirmatively allows or compels unconstitutional conduct. But where such an official, written policy merely commits some decisions to an individual officer's on-the-scene discretion, or gives some detailed instructions while omitting others, then that policy satisfies *Monell*'s moving-force element only if those features stem from the policymaker's deliberate indifference.").

fall within the narrow range of *Canton*'s hypothesized single-incident liability." *Id.* at 64 (referring to the decision in *Canton v. Harris*, 489 U.S. 378 (1989)).

The Court explained that "[a]ttorneys are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment." *Connick*, 563 U.S. at 64. The Court further explained that "[p]rosecutors are not only equipped but are also ethically bound to know what *Brady* entails and to perform legal research when they are uncertain." *Id.* at 66–67. The Court concluded:

> It does not follow that, because *Brady* has gray areas and some *Brady* decisions are difficult, prosecutors will so obviously make wrong decisions that failing to train them amounts to a decision by the city itself to violate the Constitution. To prove deliberate indifference, Thompson needed to show that Connick was on notice that, absent additional specified training, it was highly predictable that the prosecutors in his office would be confounded by those gray areas and make incorrect *Brady* decisions as a result. In fact, Thompson had to show that it was *so* predictable that failing to train the prosecutors amounted to *conscious disregard* for defendants' *Brady* rights.

*Id.* at 71 (quotation omitted).

Although Mr. Flanks appears to argue that an official policy of providing no guidance, training, or supervision on *Brady* issues would be facially unconstitutional, Supreme Court and Fifth Circuit precedent hold to the contrary. Such an alleged policy could establish municipal liability only if it was adopted with deliberate indifference. But for the reasons explained above, Mr. Flanks has not alleged and cannot allege deliberate indifference by Mr. Connick at the time of his conviction in 1985.

## CONCLUSION

For the reasons explained above and in the original memorandum, the claims against Jason Williams, in his official capacity as Orleans Parish District Attorney, must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

Respectfully submitted,

 */s/ Matthew J. Paul*
W. Raley Alford, III, 27354
Matthew J. Paul, 37004
STANLEY REUTER THORNTON ALFORD LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: (504) 523-1580
Facsimile: (504) 524-0069
wra@stanleyreuter.com
mjp@stanleyreuter.com

*Counsel for Jason R. Williams (in his official capacity as Orleans Parish District Attorney)*