UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RAYMOND FLANKS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 23-6897** |
| **THE CITY OF NEW ORLEANS et al.** | **SECTION: "G"(4)** |

## ORDER AND REASONS

This litigation arises from Plaintiff Raymond Flanks' ("Plaintiff") wrongful conviction for first-degree murder in 1985. Plaintiff names as Defendants the City of New Orleans; Jason Williams, in his official capacity as Orleans Parish District Attorney; Anne Kirkpatrick, in her official capacity as Superintendent of the New Orleans Police Department; John Dillmann, in his individual capacity; and John/Jane Does #1-20 in their individual capacities.[1] Plaintiff brings a *Monell* claim against Jason Williams in his official capacity as the District Attorney for Orleans Parish ("Defendant Williams").[2] Plaintiff alleges the Orleans Parish District Attorney's Office ("OPDA") secured his wrongful conviction in violation of his constitutional rights by withholding material exculpatory evidence in violation of the OPDA's obligations under *Brady v. Maryland*.[3] Before the Court is Defendant Williams' Second Motion to Dismiss for Failure to State a Claim.[4] Defendant Williams argues that the OPDA cannot be held liable under 42 U.S.C. § 1983 because Plaintiff has not identified any official policy, custom, or practice of the OPDA that led to the

---

[1] *See* Rec. Doc. 27.

[2] *Id.* at 51.

[3] *Id.* at 4–5. *See Brady v. Maryland*, 373 U.S. 83 (1963).

[4] Rec. Doc. 28. Other defendants in this matter did not join Defendant Williams' original motion to dismiss and do not join the instant motion.

constitutional violation, or established a causal link between the alleged OPDA policies and the constitutional violations in his case.[5] Plaintiff opposes the motion, arguing he has adequately alleged he was prosecuted, convicted, and imprisoned as a direct result of intentional suppression of exculpatory information by OPDA employees and that then District Attorney Harry Connick ("Connick") was the official policymaker of these policies.[6] Having considered the motion, the memoranda in support and opposition, the record, and the applicable law, the Court denies Defendant Williams' Second Motion to Dismiss.

## I. Background

In May 1985, a jury found Plaintiff guilty of first-degree murder in the death of Martin Carnesi ("Mr. Carnesi").[7] This was Plaintiff's second trial after the first trial in August 1984 resulted in a mistrial when the jury was unable to reach a verdict.[8] At both trials, Mr. Carnesi's wife, Faye Carnesi ("Mrs. Carnesi"), testified to the circumstances of her husband's death, including identifying Plaintiff as the suspect who shot her husband.[9]

According to the Amended Complaint, Mr. Carnesi was shot by the Actual Perpetrator ("Actual Perpetrator") on December 17, 1983, in a robbery gone wrong.[10] At the time, Mr. Carnesi was walking Mrs. Carnesi to her car that was parked in front of their home.[11] After Mr. Carnesi

---

[5] *Id.* at 1.

[6] Rec. Doc. 33.

[7] Rec. Doc. 27 at 12–13.

[8] *Id.* at 11–12.

[9] *Id.* at 12–13.

[10] *Id.* at 8–9.

[11] *Id.* at 9.

was shot, Mrs. Carnesi threw her purse at the Actual Perpetrator and ran away.[12] Initially, Mrs. Carnesi represented that the Actual Perpetrator was a Black man in his late twenties, about 5'10" and 150 pounds, with a medium build, brown skin, and a light mustache.[13] Mrs. Carnesi also reported that the Actual Perpetrator was wearing a shower cap and sped off in an aged, light blue car.[14] Approximately a week after the crime, NOPD detectives, including Dillman, visited Mrs. Carnesi at her home and showed her a photo lineup for identification.[15] Mrs. Carnesi narrowed it down to two photos, Plaintiff and one other individual.[16] Dillman then suggested to Mrs. Carnesi that Plaintiff was the perpetrator.[17]

Mrs. Carnesi testified before the grand jury and identified Plaintiff as the perpetrator, based on her identification of him when Dillman suggested that Plaintiff was the perpetrator.[18] Mrs. Carnesi testified that the Actual Perpetrator had a "little white blotch on the side of his cheek, a little white mark, like discolored looking," but rationalized her selection of Plaintiff from the photo lineup because she "didn't think they showed the side of his face with that mark in the photo."[19]

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.* at 11.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

Plaintiff's first trial began on August 28, 1984.[20] Mrs. Carnesi identified Plaintiff and testified that the car he was arrested in resembled the car she saw fleeing the scene.[21] OPDA prosecutors also presented testimony from an NOPD technician who testified that Mr. Carnesi was shot with the same gun as the gun in Plaintiff's possession.[22] This first trial resulted in a hung jury.[23] After the first trial, the Bureau of Alcohol, Tobacco, and Firearms conducted independent ballistics testing and determined that neither the bullets used to kill Mr. Carnesi nor the casing found at the scene matched Plaintiff's gun.[24] At the second trial, Mrs. Carnesi testified that she "knew 'it was him'" and also testified that Dillman did not suggest to her who to identify during the photo lineup.[25] The jury returned a guilty verdict for first-degree murder at this second trial.[26]

Nearly 37 years later, on November 17, 2022, Plaintiff's first-degree murder conviction was vacated.[27] At the November 17, 2022 exoneration hearing, the "OPDA stated that 'the State agrees that Mr. Flank's [sic] conviction was obtained in violation of *Brady v. Maryland*' because 'the State failed to disclose … materials [that] are favorable, and under circumstances of the State's case against Mr. Flank[s], material.'"[28] Plaintiff notes the OPDA specifically "acknowledged that 'there is a reasonable likelihood that had [Mrs. Carnesi's] prior testimony been disclosed, it could

---

[20] *Id.*

[21] *Id.* at 12.

[22] *Id.*

[23] *Id*.

[24] *Id.*

[25] *Id.*

[26] *Id.* at 13.

[27] *Id.* at 14.

[28] *Id.*

have affected the judgment of the jury' and 'defense counsel would have been able to present a compelling case that Mrs. Carnesi was innocently mistaken when presented with the wrong suspect, that Mr. Flank[s] did not resemble[] the perpetrator, and that the car he was arrested in did not fit the one at the crime scene.'"[29]

Plaintiff brings a *Monell* claim against Defendant Williams in his official capacity as the District Attorney for Orleans Parish.[30] Plaintiff alleges that "throughout the 1970s, 1980s, and 1990s, the OPDA maintained policies and customs that promoted, facilitated, and condoned misconduct by prosecutors and other OPDA employees and agents, including concerning the suppression of exculpatory and favorable evidence to criminal defendants and their counsel."[31] Plaintiff further alleges the OPDA's policymakers maintained a policy, custom, or pattern and practice of condoning official misconduct, including by failing to train, supervise, and discipline prosecutors.[32] According to Plaintiff, because he and his counsel "were not aware of the NOPD records showing inconsistencies between Mrs. Carnesi's initial description of the Actual Perpetrator and Mr. Flanks' appearance, the NOPD records showing a string of similar crimes with a consistently described perpetrator, or Mrs. Carnesi's grand jury testimony regarding the photo array and her initial identification of Mr. Flanks," this exculpatory material was unusable at trial.[33]

---

[29] *Id.*

[30] *Id.* at 51.

[31] *Id.* at 19.

[32] *Id.* at 15.

[33] *Id.* at 13.

Plaintiff attached to the Complaint an expert report prepared by Professor Laurie L. Stevenson.[34] Professor Stevenson's expert report discusses the extent to which the policies, customs, and practices of the OPDA complied with *Brady*.[35]

On January 18, 2024, Defendant Williams filed his first motion to dismiss.[36] This Court denied the motion without prejudice, granting leave to Plaintiff to amend the Complaint to "clarify certain issues so that the Court has the information it needs to analyze whether Plaintiff has sufficiently plead a *Monell* claim against Defendant Williams."[37] Plaintiff filed an Amended Complaint on June 4, 2024.[38] Defendant Williams then filed a Second Motion to Dismiss for Failure to State a Claim on June 18, 2024.[39] Plaintiff filed a Response[40] on July 30, 2024, and Defendant filed a Reply[41] on August 5, 2024.

## II. Parties' Arguments

### A.    *Defendant Williams' Arguments in Support of Second Motion to Dismiss*

Defendant Williams (hereafter, "Defendant") asserts Plaintiff has "not adequately alleged the elements necessary to hold OPDA liable" under a theory of municipal liability pursuant to

---

[34] Rec. Doc. 27-1. Professor Stevenson prepared the report for the plaintiff in *Robert Jones v. Leon Cannizzaro, Jr.*, No. 18-503 (ED. La.).

[35] *Id.* at 3.

[36] Rec. Doc. 15.

[37] Rec. Doc. 26 at 27.

[38] Rec. Doc. 27.

[39] Rec. Doc. 28.

[40] Rec. Doc. 33.

[41] Rec. Doc. 34.

Section 1983.[42] First, Defendant claims "any alleged suppression of exculpatory evidence was not caused by OPDA's official policies."[43] Defendant supports this assertion by arguing Plaintiff does not allege, at the time of his prosecution, the OPDA had a written or formal policy directing prosecutors to suppress *Brady* evidence.[44] Because Plaintiff does not allege an official policy or custom, Defendant contends, municipal liability is only proper where the "'need to take some action to control the agents of the local government entity is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'"[45]

Defendant characterizes the Amended Complaint as alleging that prosecutors were instructed to withhold documents that were not required by law to be disclosed.[46] Defendant claims a policy of only disclosing evidence required by law is not unconstitutional on its face.[47] Defendant further points out Plaintiff alleges the OPDA defined the scope of a prosecutors' disclosure obligations to include only evidence that was affirmatively exculpatory, but did not obligate prosecutors to divulge evidence that was impeaching or otherwise favorable to defendants.[48] Defendant contends Plaintiff fails to explain how this alleged definition was "purportedly

---

[42] Rec. Doc. 28-1 at 4.

[43] *Id.*

[44] *Id.*

[45] *Id.* (citing Rec. Doc. 26 at 19 (quotations and alterations removed)).

[46] *Id.* at 5.

[47] *Id.*

[48] *Id.* at 6.

memorialized, promulgated or conveyed to OPDA prosecutors before the time of his conviction in 1985," and it is therefore irrelevant to Plaintiff's claim.[49]

Defendant further avers Plaintiff's claim that Connick repeatedly and publicly stated contempt for *Brady* is "hopelessly vague" due to the fact it lacks any detail as to what Connick actually said, when it was said, and to whom it was said.[50] Defendant concludes, because Plaintiff did not adequately allege the OPDA promulgated official policies or customs that are facially unconstitutional, Plaintiff must demonstrate deliberate indifference on behalf of the OPDA's alleged official policymaker, Connick.[51]

Defendant contends Plaintiff failed to adequately allege Connick acted with deliberate indifference "because there was nothing to put him on notice," before Plaintiff's conviction in 1985, "that [Connick's] office's policies were likely to cause *Brady* violations."[52] Defendant argues, in the Fifth Circuit, only "'very similar violations'" can provide the notice necessary to give rise to deliberate indifference by policymakers like Connick.[53] While Plaintiff cites numerous cases and investigations before Plaintiff's conviction in 1985 demonstrating constitutional violations on behalf of the OPDA, Defendant asserts Plaintiff has failed to prove Connick was on notice of these issues before Plaintiff's conviction in 1985.[54] Defendant urges most of the 39 OPDA cases Plaintiff lists as involving suppression of *Brady* evidence are irrelevant because 11

---

[49] *Id.*

[50] *Id.*

[51] *Id.* at 7.

[52] *Id.*

[53] *Id.* (internal citations omitted).

[54] *Id.* at 8.

of the defendants were not prosecuted until after Plaintiff and, of the remaining 28 defendants, the convictions of 18 were not vacated until after Plaintiff's conviction.[55]

Defendant submits the only cases relevant to a charge of deliberate indifference are the 10 cases finding a *Brady* violation before Plaintiff's conviction in 1985.[56] Otherwise, Defendant argues, there is no reason to believe Connick would have been aware of *Brady* violations or any deficiencies in his office's policies.[57] Of those 10 cases, Defendant argues that six of them are factually dissimilar to Plaintiff's case.[58]

Even of the four cases Defendant argues can be considered at least somewhat similar to the violations Plaintiff alleges,[59] Defendant claims only four cases out of many hundreds of cases tried does not reflect a number great enough to put Connick on notice that his office's policies violated the Constitution.[60] Defendant urges this Court to adopt the reasoning in *Connick v. Thompson*, where Defendant alleges the Supreme Court held that four convictions overturned during the ten years prior to the plaintiff's case were not sufficient to put Connick on notice that specific training was necessary to avoid constitutional violations, and thus, deliberate indifference was not found.[61]

---

[55] *Id.* at 7–8.

[56] *Id.* at 9.

[57] *Id.* at 12.

[58] *Id.* at 10–12. Defendant argues that the cases of Ronald Monroe, Johnny Ross, Norman Clark, Raymond Lockett, James Carney, and Linroy Davis are too dissimilar from Plaintiff's case to be considered.

[59] Defendant lists the cases of Floyd Falkins, Arthur Monroe, Larry Curtis, and William Perkins as at least somewhat similar to Plaintiff's case. *Id.* However, Defendant maintains these cases still do not reflect "very similar violations" as the violation that occurred in Plaintiff's case and, thus, did not provide Connick with the necessary notice be considered deliberately indifferent to the constitutional violation alleged in this case. *Id.*

[60] *Id.*

[61] *Id.* at 13 (citing *Connick v. Thompson* 563 U.S. 51 (2011)). *Thompson* will hereby be used as short form in place of *Connick v. Thompson* to avoid confusion, as Connick is the party sued in this case.

Defendant further argues Plaintiff failed to prove the required element of the OPDA's policies being the "moving force" causing the alleged suppression of evidence in Plaintiff's case.[62] Defendant avers there is no evidence the prosecutor or prosecutors responsible for the non-disclosures in this criminal case, who are not identified, were acting pursuant to an official policy when they failed to disclose information and records in the NOPD's possession.[63]

Lastly, Defendant submits Plaintiff has "not corrected the deficiencies noted by the Court with respect to his claims against the OPDA based on alleged fabrication of evidence or concealment of misconduct."[64] This Court granted Plaintiff leave to adequately allege claims against the OPDA for theories related to fabrication of evidence or affirmative concealment of evidence.[65] Defendant alleges Plaintiff removed a paragraph alleging the OPDA had a practice or custom of fabricating and concealing evidence, but that Plaintiff makes similar claims later in their Amended Complaint.[66] Defendant asserts Plaintiff has not made the necessary factual allegations to support these theories, and thus the fabrication of evidence claims should be dismissed.[67]

---

[62] *Id.* at 13.

[63] *Id.*

[64] *Id.* at 14.

[65] Rec. Doc. 26 at 26-7.

[66] Rec. Doc. 28-1 at 15.

[67] *Id.*

**B.    *Plaintiff's Arguments in Opposition to Motion to Dismiss***

In Opposition,[68] Plaintiff begins by arguing the Court has already held that Plaintiff sufficiently alleged the OPDA's custom of suppressing exculpatory evidence was the "moving force" behind the constitutional violations Plaintiff suffered.[69] Plaintiff asserts this is a settled question.[70]

Plaintiff moves on to contend he has alleged facts sufficient to support *Monell* liability according to three distinct theories:

> (1) that OPDA maintained a customary policy of withholding exculpatory evidence; (2) that [Connick], having knowledge of multiple instances in which OPDA prosecutors suppressed material exculpatory evidence, exhibited deliberate indifference in failing to act to prevent further *Brady* violations; and (3) that OPDA expressly adopted a policy of having no policy, *i.e.*, a policy that individual prosecutors were supposed to figure it out themselves with regard to *Brady* compliance.[71]

Plaintiff avers, in the Amended Complaint, he has specifically alleged 26 instances in which the OPDA was held to have withheld *Brady* evidence prior to Plaintiff's conviction.[72] Thus, Plaintiff maintains he sufficiently stated a claim against Defendant and the Motion to Dismiss should be denied.[73]

Plaintiff asserts he sufficiently alleged the custom of withholding *Brady* evidence reflected a facially unconstitutional OPDA policy.[74] Plaintiff alleged the OPDA "had a persistent,

---

[68] Rec. Doc. 33.

[69] *Id.* at 14.

[70] *Id.*

[71] *Id.* at 15 (internal citations and quotations omitted).

[72] *Id.*

[73] *Id.*

[74] *Id.* at 16.

widespread practice of withholding exculpatory evidence" supported by specific facts demonstrating a pattern of *Brady* violations similar to those in Plaintiff's case.[75] Plaintiff cites 37 cases over a period of 32 years where courts found the OPDA withheld material exculpatory evidence in violation of the constitutional rights of a defendant.[76] Of those cases, 26 occurred in the 18 years prior to Plaintiff's conviction, which Plaintiff emphasizes is enough to find a municipal custom or practice of withholding *Brady* evidence.[77]

Plaintiff additionally claims he alleges sufficient facts that the city "permitted or encouraged misconduct in violation of the Constitution," an established ground for *Monell* liability.[78] Specifically, Plaintiff contends the Amended Complaint includes factual allegations that OPDA prosecutors were permitted and encouraged to suppress exculpatory evidence in violation of *Brady*.[79] Plaintiff claims courts have "repeatedly established" officials with policymaking authority encouraging unconstitutional acts, whether explicitly or tacitly, can be deemed official policy.[80] "Because [Connick] tolerated, permitted, and encouraged an unconstitutional practice of withholding exculpatory evidence, that practice reflects 'official policy' of the OPDA."[81] Plaintiff claims this allegation is stated in sufficient detail in the Amended Complaint to support the inference Connick adopted an official policy of nondisclosure, with the

---

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] *Id.* at 19.

[79] *Id.*

[80] *Id.*

[81] *Id.* at 20.

Amended Complaint, at minimum, alleging enough facts to raise a reasonable expectation that discovery will reveal evidence of Connick's tacit encouragement of unconstitutional conduct.[82]

Plaintiff next contends the Amended Complaint adequately alleges the OPDA's disclosure policies were "maintained with deliberate indifference to the known or obvious risk that defendants' *Brady* rights were violated."[83] Because the Amended Complaint alleges Connick was on notice of the violations but failed to create any policy remedying the violations, Plaintiff contends dismissal is inappropriate on the question of whether there was deliberate indifference.[84] Plaintiff asserts the cases outlined in the Amended Complaint are enough to demonstrate Connick had constructive knowledge of widespread and frequent *Brady* violations.[85] This pattern, Plaintiff alleges, indicated an "obvious need" for new or additional *Brady* policies, which Plaintiff maintains were not instituted.[86] Here, Plaintiff clarifies he is not relying on a theory of "single-incident liability," but instead a theory of a pre-existing pattern of violations that should have signaled to Connick the need for policies, training, and oversight to combat the *Brady* violations.[87]

Lastly, Plaintiff claims he sufficiently alleges the OPDA had an affirmative policy each prosecutor "figure it out themselves."[88] Plaintiff asserts this is enough basis for a *Monell* claim.[89]

---

[82] *Id.* at 20–22.

[83] *Id.* at 22–23 (internal citations and quotations omitted).

[84] *Id.*

[85] *Id.* at 24.

[86] *Id.* at 28.

[87] *Id.* at 29.

[88] *Id.*

[89] *Id.*

## C.    *Defendant Williams' Further Arguments in Support of the Motion to Dismiss*

In Reply,[90] Defendant argues that Plaintiff "has not alleged a facially unconstitutional official policy of suppressing *Brady* evidence."[91] Defendant avers Plaintiff failed to explain the specific alleged custom or practice of OPDA prosecutors that caused the purported *Brady* violations.[92] Because Plaintiff has not described the alleged custom particularly, Defendant reasons, the practice cannot be attributed to a municipality, as proof of a custom or practice must come with evidence the policymaker was aware of specific customs or practice.[93] Defendant urges this is impossible if Plaintiff cannot explain what the purported custom is.[94] Defendant claims Plaintiff has not shown an official policy or custom so persistent or widespread as to be sufficient for a *Monell* claim.[95]

Defendant further maintains Plaintiff has not adequately alleged Connick acted with deliberate indifference.[96] Defendant avers any cases that found a *Brady* violation after 1985, the year of Plaintiff's conviction, would not have given Connick constructive knowledge of the alleged violations.[97] Even if the Court were to look at all holdings no matter when they were decided,

---

[90] Rec. Doc. 34.

[91] *Id.* at 1.

[92] *Id.* at 2.

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.* at 3.

[97] *Id.* at 4.

Defendant argues, in the Fifth Circuit, similar violations have to be "sufficiently similar, specific, or numerous" to put a policymaker on constructive notice of constitutional violations.[98]

Defendant lastly claims Plaintiff's allegations of an official policy of providing no "guidance, training, or supervision" on *Brady* violations cannot establish municipal liability.[99] Defendant asserts Fifth Circuit precedent holds that official policies, committing some decisions to the discretion of an official, are not unconstitutional unless they are adopted with deliberate indifference, which Plaintiff has not adequately alleged.[100]

### III. Legal Standard

*A.    Motion to Dismiss*

Federal Rule of Civil Procedure 12(b)(6) provides that an action may be dismissed for "failure to state a claim upon which relief can be granted."[101] A motion to dismiss for failure to state a claim is "viewed with disfavor and is rarely granted."[102] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[103] "Factual allegations must be enough to raise a right to relief above the speculative level."[104] A claim is facially plausible when the plaintiff has pleaded facts that allow

---

[98] *Id.* at 5 (internal citations and quotations omitted).

[99] *Id.* at 7.

[100] *Id.* (internal citation omitted).

[101] Fed. R. Civ. P. 12(b)(6).

[102] *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir. 1982).

[103] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[104] *Twombly*, 550 U.S. at 555.

the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."[105]

On a motion to dismiss, asserted claims are liberally construed in favor of the claimant, and all facts pleaded are taken as true.[106] However, although required to accept all "well-pleaded facts" as true, a court is not required to accept legal conclusions as true.[107] "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."[108] Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will not suffice.[109] The complaint need not contain detailed factual allegations, but it must offer more than mere labels, legal conclusions, or formulaic recitations of the elements of a cause of action.[110] That is, the complaint must offer more than an "unadorned, the-defendant-unlawfully-harmed-me accusation."[111] From the face of the complaint, there must be enough factual matter to raise a reasonable expectation that discovery will reveal evidence as to each element of the asserted claims.[112] If factual allegations are insufficient to raise a right to relief

---

[105] *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556).

[106] *See Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007).

[107] *Iqbal*, 556 U.S. at 678–79.

[108] *Id.* at 679.

[109] *Id.* at 678.

[110] *Id.*

[111] *Id.*

[112] *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009).

above the speculative level, or if it is apparent from the face of the complaint that there is an "insuperable" bar to relief, the claim must be dismissed.[113]

### B.    Monell *Claim*

To prevail on a *Monell* claim, a plaintiff must show "(1) an official policy (or custom), (2) that a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom)."[114] "Official policy is ordinarily contained in duly promulgated policy statements, ordinances or regulations."[115] But a custom can be evidenced by a "persistent" or "widespread" practice of officials or employees that, while not officially adopted or promulgated, is "so common and well-settled as to constitute a custom that fairly represents municipal policy."[116] "[E]ven a facially innocuous policy will support liability if it was promulgated with *deliberate indifference* to the known or obvious consequences that constitutional violations would result."[117] To prove deliberate indifference, a "showing of simple or even heightened negligence will not suffice."[118] Instead, "Court of Appeals have routinely equated deliberate indifference with recklessness."[119]

---

[113] *Carbe v. Lappin*, 492 F.3d 325, 328 n.9 (5th Cir. 2007); *Moore v. Metro. Hum. Serv. Dist.*, No. 09-6470, 2010 WL 1462224, at * 2 (E.D. La. Apr. 8, 2010) (Vance, J.) (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)).

[114] *Moore v. LaSalle Management Company, L.L.C.*, 41 F.4th 493, 509 (5th Cir. 2022) (internal citations and quotations omitted).

[115] *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001).

[116] *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir. 1984).

[117] *Piotrowski*, 735 F.2d at 579 (emphasis added).

[118] *Board of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997).

[119] *Farmer v. Brennan*, 511 U.S. 825, 836 (1994) (collecting cases).

Plaintiff must additionally demonstrate actual or constructive knowledge of the official policy or custom and that the constitutional violation's "moving force" is that policy or custom.[120] Whether the moving force behind the constitutional violation is policy or custom is proved by a "direct causal link between the municipal policy and the constitutional deprivation."[121]

## IV. Analysis

Unlike in the Original Complaint,[122] the Amended Complaint does not bring claims against Defendant for fabrication of evidence or affirmative concealment of misconduct.[123] Thus, this Court only considers whether Plaintiff has adequately pled a *Monell* claim in relation to the OPDA withholding *Brady* evidence.[124]

### A.    *Whether Plaintiff Sufficiently Alleged an Official Policymaker*

As an initial matter, this Court previously granted Plaintiff leave to amend the Complaint to specifically allege that Connick was the official policymaker for the OPDA.[125] As the Fifth Circuit made clear, a plaintiff "must identify a policymaker with final policymaking authority . . ."[126] to succeed on a *Monell* claim. The identification of a policymaking official is a question of state law.[127]

---

[120] *Piotrowski*, 735 F.2d at 579.

[121] *Id.* at 580.

[122] Rec. Doc. 1.

[123] Rec. Doc. 33 at 15 n.3.

[124] *See id.*

[125] Rec. Doc. 26 at 18.

[126] *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003).

[127] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988).

Under Louisiana law, a district attorney is unquestionably considered a policymaker.[128] In the Amended Complaint, Plaintiff clearly brings claims against Williams in his official capacity as the current Orleans Parish District Attorney, identifying Connick as the Orleans Parish District Attorney from 1974 until around 2003, including the year 1985 when Plaintiff was convicted.[129] Thus, Plaintiff adequately identified a policymaker with final policymaking authority under state law.

**B.    *Whether Plaintiff Sufficiently Alleged that Connick had Actual or Constructive Notice of an Official Policy or Custom***

Next, to succeed on a *Monell* claim, Plaintiff must plead sufficient facts to establish Connick had actual or constructive knowledge of an official policy, practice, or custom of similar constitutional violations. In this case, Plaintiff alleges an official policy, practice, or custom of withholding exculpatory witness testimony in violation of *Brady.*[130]

Establishing an official policy, practice, or custom can be done in one of three ways. First, there may be a policy that is "officially adopted and promulgated" by the municipality or an official within the municipality with policymaking authority.[131] Second, there may be a "persistent, widespread practice of city officials or employees, which, although not authorized by officially promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy."[132] A persistent, widespread practice may include allegations that a policymaker

---

[128] *See* La. Const. Art. V, § 26.

[129] Rec. Doc. 27 at 7.

[130] *See* Rec. Doc. 33 at 15.

[131] *Burge v. St. Tammany Parish (Burge II)*, 336 F.3d 452, 471 (5th Cir. 1999) (quoting *City of Canton v. Harris*, 489 U.S. 378, 380 (1989)).

[132] *Id.*

failed to act affirmatively, "if the need to take some action to control the agents of the local government entity 'is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r] … can reasonably be said to have been deliberately indifferent to the need.'"[133] A policymaker with policy-making authority must have actual or constructive knowledge of the custom.[134] Third, "a single decision by a policy maker may, under certain circumstances, constitute a policy for which a municipality may be liable."[135]

Plaintiff does not seem to assert the OPDA had an official written policy of violating *Brady*.[136] Neither does Plaintiff assert a theory of "single-incident liability," a path foreclosed in the *Brady* context by the Supreme Court's opinion in *Connick v. Thompson*.[137] That leaves Plaintiff with the second option, demonstrating a "persistent, widespread practice of city officials or employees, which, although not authorized by officially promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy," and proving Connick had actual or constructive knowledge of that custom.[138]

Plaintiff cites 26 OPDA prosecutions predating his 1985 trial where *Brady* violations occurred. Plaintiff contends these cases demonstrate Connick had actual or constructive notice of

---

[133] *Burge v. Parish of St. Tammany (Burge I)*, 187 F.3d 452, 471 (5th Cir. 1999) (quoting *Harris*, 489 U.S. at 380).

[134] *Webster*, 735 F.2d at 842.

[135] *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (quoting *Brown v. Bryan Cnty.*, 219 F.3d 450, 462 (5th Cir. 2000)).

[136] *See* Rec. Doc. 33.

[137] *Thompson*, 563 U.S. at 62–72.

[138] *Id.*

a custom of similar *Brady* violations.[139] Defendant disagrees these cases put Connick on notice of any custom.

Defendant argues, to put Connick on notice of similar *Brady* violations, the convictions in other cases must have been overturned *before* Plaintiff's conviction, making many of the cases Plaintiff cites irrelevant to proving notice.[140] But that rule is not supported by precedent. In *Connick v. Thompson*, the Supreme Court held a theory of "single-incident liability" could not apply to prosecutors in the *Brady* context.[141] The plaintiff in *Thompson* did "not contend that he proved a pattern of similar *Brady* violations."[142] Regardless, the plaintiff pointed out, during the 10 years preceding his armed robbery trial, Louisiana courts had overturned four convictions because of *Brady* violations by prosecutors in Connick's office. The Supreme Court observed that "[t]hose four reversals could not have put Connick on notice that the office's *Brady* training was inadequate with respect to the sort of Brady violation at issue here."[143]

As an initial matter, the Court notes this statement is dicta, as the plaintiff did not contend there was a pattern of similar violations. Additionally, the *Thompson* Court did not create a rule requiring reversals occur before a given plaintiff's conviction for constructive notice to attach. The Court never stated a requirement that reversals occur prior to the plaintiff's trial or conviction in

---

[139] Rec. Doc. 33 at 26.

[140] *See* Rec. Doc. 28-1 at 9.

[141] *Thompson*, 563 U.S. at 64.

[142] *Id.* at 62.

[143] *Id.*

order to demonstrate a pattern of constitutional violations sufficient to demonstrate a custom or to put a policymaker on notice of particular constitutional violations.[144]

While *Thompson* does not reflect binding precedent on this issue, the Fifth Circuit provided guidance on when constitutional violations must be acknowledged to put a policymaker on notice of similar violations. In *Armstrong v. Ashley*, the Fifth Circuit examined 9 cases over a 24-year period to determine if a policymaker could be said to have been on notice of the *Brady* violations that occurred in the plaintiff's case.[145] The plaintiff in *Armstrong* was convicted for murder in 1984.[146] Four of the nine cases the Fifth Circuit considered occurred *after* the defendant was convicted.[147] It follows that reversals occurring after a plaintiff's conviction are relevant in determining if there existed an unconstitutional custom in Connick's office and if he had actual or constructive notice of it.

With this guidance in mind, the next question the Court must address is if Plaintiff cites enough similar cases to demonstrate a policy or custom of which Connick had actual or constructive notice. In the Amended Complaint, Plaintiff cites 26 convictions obtained by OPDA prosecutors in which a *Brady* violation was subsequently found on the ground that material exculpatory evidence was withheld by prosecutors.[148] The earliest conviction in those 26 cases

---

[144] *Id.*

[145] 60 F.4th 262, 278 (5th Cir. 2023).

[146] *Armstrong v. Ashley*, No. 5:15-CV-544, Rec Doc. 86 (W.D. La.).

[147] *Id.*

[148] Rec. Doc. 33 at 28. Plaintiff does not clarify exactly what cases cited in their Amended Complaint qualify as the 26 with convictions prior to Plaintiff's in 1985 and a subsequent reversal on *Brady* grounds. However, it appears Plaintiff is referencing cases involving the following defendants: John Thompson, Curtis Lee Kyles, John Floyd, Larry Hudson, Hayes Williams, Linroy Davis, Roland Gibson, James Carney, Michael Williams, Arthur Monroe, Norman Clark, Raymond Lockett, Floyd Falkins, Errol Bernard, Gregory Bright, Earl Truvia, Norris Henderson, Calvin Williams, Larry Curtis, Issac Knapper, William Perkins, Ronald Monroe, Reginald Adams, Stephen Rosiere, Calvin Duncan, and George Toca, Jr. *Id.* at 28–36.

was in 1967, with 22 of those convictions occurring in the eleven years preceding Plaintiff's conviction in 1985. As noted in this Court's previous order, "[t]he Supreme Court's decision in *Thompson* and the Fifth Circuit's decision in *Armstrong* did not create a bright line rule as to how many similar cases predating a defendant's conviction where courts have found *Brady* violations would be sufficient to demonstrate a custom of the OPDA violating *Brady*."[149]

Guidance from appellate courts on how many cases are enough to prove a custom and notice to the policymaker is sparse. But the *Thompson* Court suggested 4 cases in a 10-year period would not be enough to support notice of similar constitutional violations.[150] The *Armstrong* Court implied 9 cases in a 24-year period would not be enough.[151] In this case, Plaintiff points to 22 cases in an 11-year period, more than five times the number of cases in the 10-year period in *Thompson*. Similarly, Plaintiff cites 26 cases in an 18-year period, almost three times the number of cases in a six-year shorter period than in *Armstrong*. Plaintiff points to a much greater number of cases in similar timespans to both *Thompson* and *Armstrong*.[152] Considering the large number of cases cited, Plaintiff has alleged sufficient, plausible facts to find a custom of *Brady* violations in the OPDA with Connick on constructive or actual notice of those violations, thus alleging Connick was deliberately indifferent to the need to train, supervise, and discipline prosecutors.

---

[149] Rec. Doc. 26 at 23–24.

[150] *Thompson*, 563 U.S. at 62.

[151] *Armstrong*, 60 F.4th at 278.

[152] It is also important to note that *Thompson* was an appeal from a jury verdict against the city, meaning the question presented to the Supreme Court was if the evidence put forward was sufficient to prove actual or constructive notice of the constitutional violation in a verdict against the city. *Thompson*, 563 U.S. at 54. At the motion to dismiss stage, the standard is lesser, looking only to if a plaintiff has stated a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Even if the Court were to adopt Defendant's proposed rule—that prior cases demonstrating *Brady* violations must acknowledge the violation before a plaintiff's conviction to successfully demonstrate constructive notice on behalf of a policymaker—Plaintiff cites 8 prior cases that meet this standard.[153] These 8 cases were reversed in the 12 years preceding Plaintiff's conviction in 1985. This is one less case than was cited in *Armstrong*, but in half the measured time.[154] Therefore, even if this Court were to adopt Defendant's proposed rule, the Amended Complaint still plausibly alleges Connick was on constructive notice of similar constitutional violations as the one that occurred in Plaintiff's case.

In addition to arguing Plaintiff fails to allege an adequate number of cases to demonstrate constructive notice on behalf of Connick, Defendant argues the cases Plaintiff cites are distinguishable from the one before this Court, leading to the conclusion they could not plausibly have put Connick on notice of similar constitutional violations.[155] However, exact similarity between cases is not mandatory to find a policymaker was on notice of similar Constitutional violations, with the Fifth Circuit noting the "specificity required should not be exaggerated . . ."[156] Courts in this Circuit look for prior acts that are "fairly similar to what ultimately transpired" in the case before them.[157]

---

[153] These 8 cases are those that involved the conviction and subsequent reversal of Linroy Davis, James Carney, Arthur Monroe, Norman Clark, Floyd Falkins, Larry Curtis, William Perkins, and Ronald Monroe. Rec. Doc. 27-1 at 54–69. These cases, taking Plaintiff's allegations as true, all implicate some sort of suppression of witness statements or testimony.

[154] The *Armstrong* Court held 9 cases in a 24-year period was not enough to demonstrate constructive notice. 60 F.4th 262, 278 (5th Cir. 2023).

[155] Rec. Doc. 28-1 at 7–8 (citing *Jason v. Tanner*, 938 F.3d 191, 198 (5th Cir. 2019); *Robinson v. Midland Cnty.*, 80 F.4th 704, 710 n.3 (5th Cir. 2023)).

[156] *Estate of Davis ex rel. McCully v. City of North Richland Hills,* 406 F.3d 375, 383 (5th Cir. 2005).

[157] *Id.*

In *Thompson*, as part of law enforcement's investigation, a swatch of fabric from the victims' pants stained with the robber's blood was collected and analyzed by a crime laboratory.[158] The Assistant District Attorney in the case received a report from the laboratory, but failed to disclose the report to the defendant.[159] The plaintiff cited other cases where *Brady* violations had occurred, but the Court explained none of those cases "involved failure to disclose blood evidence, a crime lab report or physical or scientific evidence of any kind."[160] Therefore, the Supreme Court observed those cases were not similar enough to put Connick on notice that specific training was necessary to avoid the constitutional violation that occurred in the plaintiff's case.[161] In that case, the only similarity between the other *Brady* violations and the one alleged was simply that they were generally *Brady* violations.

Accepting all of the allegations in the Amended Complaint as true, in this case, the similarities between the instant case and at least 20 of the 26 cases cited by Plaintiff are much more apparent. In the case at hand, the OPDA failed to disclose Mrs. Carnesi's prior exculpatory testimony. The testimony the OPDA withheld revealed Mrs. Carnesi, at one point, claimed Plaintiff did not resemble the perpetrator of her husband's murder and that the car Plaintiff was arrested in did not resemble the one she saw at the scene of the crime.[162] In short, the constitutional

---

[158] *Thompson*, 563 U.S. at 55.

[159] *Id.*

[160] *Id.* at 62–63.

[161] *Id.*

[162] *Id.*

violation in the instant case is the ODPA withheld potentially exculpatory witness testimony that also could have been used to impeach Mrs. Carnesi.[163]

Defendant claims 10 of Plaintiff's cited 26 cases do not contain similar enough *Brady* violations to the one in this case to successfully provide notice to Connick of that specific type of violations.[164] Defendant takes issue with 4 of those 10 cases[165] on the grounds that none of the cases involve grand jury testimony, which Mrs. Carnesi's statements consisted of.[166] But Defendant admits all 4 of these cases unquestionably involve constitutional violations pertaining to pre-trial statements of witnesses that could have been used to impeach witnesses at trial or otherwise support Plaintiff's defense.[167] The fact these cases all involve the withholding of potentially exculpatory witness statements is enough similarity at the motion to dismiss stage. Thus, these four cases are sufficiently similar to the instant case to potentially show Connick was on notice of the type of *Brady* violation that occurred in Plaintiff's case.

Defendant contends the other 6 cases are completely dissimilar from the constitutional violations alleged in Plaintiff's case.[168] But upon closer examination, taking Plaintiff's description of the cases as true,[169] the violations in 5 of those 6 cases appear similar enough to possibly put

---

[163] Rec. Doc. 26 at 4–5 (internal citations omitted).

[164] Rec. Doc. 28-1 at 10–12.

[165] *Id.* at 12. These cases include Floyd Falkins, Arthur Monroe, Larry Curtis, and William Perkins.

[166] *Id.*

[167] *Id.*

[168] *See* Rec. Doc. 28-1 at 10–12. Defendant appears to claim the cases of Ronald Monroe, Johnny Ross, Norman Clark, Raymond Lockett, Linroy Davis, and James Carney are completely dissimilar from Plaintiff's case. *Id.*

[169] This Court treats Plaintiff's description of the constitutional violations in previous cases as factual allegations, which, at the motion to dismiss stage, are accepted as true. The parties clash over these factual allegations

Connick on notice of the type of *Brady* violation that occurred in Plaintiff's case.[170] In each of these 5 cases,[171] Plaintiff pleads a clear form of concealment or suppression of witness statements or testimony.[172] Again, considering the *Brady* violation occurring in Plaintiff's case similarly involves the suppression of a witnesses' testimony, Plaintiff has plead sufficient facts to demonstrate the similarity between the cases cited and Plaintiff's case.

Lastly, Plaintiff points to several of Connick's statements, which Plaintiff contends demonstrate Connick was on notice of *Brady* violations in his office. In Plaintiff's expert report attached to the Amended Complaint, Plaintiff points to specific comments by Connick representing his alleged mischaracterization and downplaying of *Brady* as an "ethical, not legal, obligation," and his alleged failure to circulate seminal *Brady* cases at the suggestion of Judge Calvin

---

and, accordingly, the legal conclusion that can be drawn from them–whether they demonstrate similar enough violations as occurred in Plaintiff's case to put Connick on notice of certain constitutional violations.

[170] The case of Johnny Ross, according to Plaintiff 's description of it, does not appear similar enough of a violation to that which occurred in Plaintiff's case. *See* Rec. Doc. 27 at 39–40; *see Thompson*, 563 U.S. at 62–63 (explaining that reversals not resulting from a failure to disclose any type of scientific evidence could not be similar enough to a reversal based on mishandling of blood evidence to demonstrate sufficient notice of a lack of training on behalf of a policymaker to avoid that specific type of constitutional violation). Johnny Ross's case involved the OPDA admitting violations surrounding failing to disclose information regarding the perpetrator's blood type, but the case did not involve suppression of any witness statements or testimony. Rec. Doc. 27 at 39–40.

[171] These cases include those of Ronald Monroe, Norman Clark, Raymond Lockett, Linroy Davis, and James Carney. Rec. Doc. 27 at 28–40.

[172] *Id.* Plaintiff describes Ronald Monroe's case as involving a *Brady* violation related to "suppressing information given to the police that implicated a different individual in the crime, specifically note[ing] . . . that the victim's husband had confessed to her murder in a different jurisdiction." *Id.* at 3. Norman Clark's case, according to Plaintiff, involved an NOPD officer testifying to the fact they decided to send certain material eyewitnesses out of state, which the Fifth Circuit concluded was a flagrant constitutional violation. *Id.* at 31 (citing *Clark v. Blackburn*, 632 F.2d 531, 525 (5th Cir. 1980)). Plaintiff contends Raymond Lockett's case revealed deliberate concealment of named eyewitnesses in violation of the Constitution as held by the Fifth Circuit. *Id.* at 32 (citing *Lockett v. Blackburn*, 571 F.2d 309, 313 (5th Cir. 1978)). Plaintiff relates that Linroy Davis's case resulted in a Fifth Circuit finding "that OPDA suppressed inconsistent statements by testifying and non-testifying witnesses that support[ed] the defendant's version of events, contradicted the state's version of events, and could have been used for impeachment." *Id.* at 30 (citing *Davis v. Heyd*, 479 F.2d 446, 453 (5th Cir. 1973)). Lastly, Plaintiff contends James Carney's conviction was vacated due to the OPDA "violat[ing] *Brady* by suppressing a cooperation agreement with a key witness that could have been used to impeach his testimony." *Id.* at 30 (citing *State v. Carney*, 334 So.2d 415, 419 (La. 1976)). All of these cases invariably contain, based on Plaintiff's summaries, some violation related to the suppression of witness testimony.

Johnson.[173] At the motion to dismiss stage, these facts further support Plaintiff's allegation that Connick had constructive notice of *Brady* violations occurring in his office.

**C.    *Whether Plaintiff Sufficiently Alleged the Policy or Custom is the "Moving Force" Behind Plaintiff's Constitutional Violation***

As discussed in the Court's prior order,[174] to establish "moving force" causation, a "plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."[175] Plaintiff cites 26 cases where a court convicted a defendant before 1985 and the defendant's conviction was later reversed due to a *Brady* violation, at least 20 of which are similar to Plaintiff's case.[176] This by itself is enough to adequately allege deliberate indifference, and thus culpability, to the risk failing to train or supervise prosecutors to avoid *Brady* violations entailed. Additionally, as the Court explained in its prior order, Plaintiff alleges Connick "repeatedly and publicly expressed disdain for the *Brady* doctrine and rebuffed suggestions . . . that prosecutors be instructed on their *Brady* obligations and that the OPDA take steps to ensure compliance with the law and the Constitution." [177]

As the Court held previously, Connick's alleged affirmative conduct in expressing disdain for *Brady* and rebuffing suggestions to ensure compliance with *Brady* is more than heightened negligence, demonstrating potential culpability and a causal link between the alleged widespread

---

[173] Rec. Doc. 27-1 at 26–27.

[174] Rec. Doc. 26.

[175] *Brown*, 520 U.S. at 404.

[176] Rec. Doc. 33 at 28.

[177] Rec. Doc. 27 at 22; Rec. Doc. 27-1 at 26–27.

practice of *Brady* violations and the *Brady* violation claimed by Plaintiff in this case.[178] Plaintiff has sufficiently alleged that the OPDA's custom of suppressing exculpatory evidence in violation of *Brady* was the moving force behind the constitutional violations Plaintiff suffered.

## V. Conclusion

In all, Plaintiff has alleged enough facts to survive a motion to dismiss. First, Plaintiff has successfully alleged that Connick was the official policymaker for the OPDA. Second, the amount and similarity of *Brady* violations occurring to conviction prior to Plaintiff's is enough to plausibly allege there was a custom of withholding exculpatory witness testimony within the OPDA and Connick was on constructive or actual notice of the practice. Third, the same facts are enough to plausibly allege that the custom of *Brady* violations was the moving force behind Plaintiff's claimed constitutional violation.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Jason Williams's Second Motion to Dismiss for Failure to State a Claim[179] is **DENIED.**

**NEW ORLEANS, LOUISIANA**, this 28th day of February, 2025.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[178] Rec. Doc. 26 at 25.

[179] Rec. Doc. 28.