**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| RAYMOND FLANKS,<br><br>  *Plaintiff*,<br><br>v.<br><br>THE CITY OF NEW ORLEANS, *et al.*,<br><br>  *Defendants*. | Civil Action No. 23-06897<br><br>Section G<br>Chief Judge Nannette Jolivette Brown<br><br>Division 4<br>Magistrate Judge Karen Wells Roby |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant Jason R. Williams, in his official capacity as Orleans Parish District Attorney ("OPDA"), through undersigned counsel, respectfully submits this memorandum in support of OPDA's motion for summary judgment.

**INTRODUCTION**

Raymond Flanks claims that he was wrongfully convicted of murder because the State suppressed evidence that would have demonstrated his innocence. He further alleges that OPDA maintained an unconstitutional policy of suppressing exculpatory evidence, which caused the alleged suppression of evidence in his case. He therefore seeks an award of damages against OPDA under 42 U.S.C. § 1983, based on his allegedly wrongful conviction and imprisonment. But all of these claims are false, and Mr. Flanks cannot produce evidence that would lead a rational jury to find in his favor.

In 1985, an Orleans Parish jury convicted Mr. Flanks of the 1983 murder of Martin Carnesi. Mr. Carnesi's widow, Faye Carnesi, identified Mr. Flanks as the man who shot her husband while robbing the two of them. Over the years, Mr. Flanks advanced various challenges to his conviction in state and federal court, all of which were denied. Notwithstanding these denials, in 2022,

1

OPDA's Civil Rights Division agreed to review Mr. Flanks's conviction and ultimately joined in a motion to vacate his conviction. Now, having obtained his freedom with the assistance of OPDA's Civil Rights Division, Mr. Flanks has filed this lawsuit blaming OPDA and its prosecutors for his allegedly wrongful conviction.

OPDA does not believe that there was any *Brady* violation in Mr. Flanks's case. If this lawsuit proceeds to trial, the evidence will show that the joint motion to vacate Mr. Flanks's conviction was based on an incomplete and erroneous understanding of the facts. The evidence will also show that Mr. Flanks committed several similar robberies over the course of three weeks in the Pines Village neighborhood—including the armed robbery of Martin Carnesi that resulted in his murder, and the armed robbery of a cashier at a nearby store that Mr. Flanks admits he committed. The evidence will also show that there was no information or evidence known to the State that materially undermines Mrs. Carnesi's confident and consistent identification of Mr. Flanks as the man who shot her husband before her eyes.

Because there may be disputes of fact as to the *Brady* claim, OPDA does not seek summary judgment on the question of whether there was a *Brady* violation in Mr. Flanks's case. However, even if Mr. Flanks could prove that his constitutional rights were violated by suppression of evidence that caused him to be convicted when he otherwise would have been acquitted, his claims against OPDA would still fail because the alleged suppression was not directly caused by an official OPDA policy. Mr. Flanks cannot prove that OPDA's policymaker, District Attorney Harry Connick, adopted or implemented a facially unconstitutional official policy causing suppression of exculpatory evidence. Nor can he prove that Mr. Connick acted with deliberate indifference despite notice of a pervasive practice or custom in his office, or a defect in the office's policies, that was causing repeated *Brady* violations.

Mr. Flanks alleges that there is a "pattern" of several dozen confirmed *Brady* violations in other Orleans Parish cases over several decades. But he cannot produce competent summary judgment evidence demonstrating any significant pattern of similar *Brady* violations that Mr. Connick was aware of before 1985 (the date of Mr. Flanks's conviction). And even the alleged (*i.e.*, unproven) number of *Brady* violations is miniscule compared to the number of cases prosecuted in Orleans Parish—one in thousands, as explained in the opinion of an expert statistician attached to this motion. No reasonable jury could rely on such evidence to conclude that OPDA had an unconstitutional official policy or that Mr. Connick was deliberately indifferent to an obvious need for different policies or training concerning *Brady* disclosures.

Over more than three decades, various plaintiffs have alleged, like Mr. Flanks, that OPDA under former District Attorney Harry Connick maintained unconstitutional policies concerning *Brady* disclosures. These allegations have been rejected multiple times and have never been substantiated in any final judgment.

Most notable is the case of John Thompson, which bears some striking similarities to Mr. Flanks's case. Mr. Thompson was prosecuted in April and May of 1985—almost exactly the same time as Mr. Flanks. Assistant District Attorneys Eric Dubelier, Jim Williams, and Bruce Whittaker, who were responsible for the indictment and prosecution of Mr. Flanks, were also involved in Mr. Thompson's case. Mr. Connick ultimately admitted that there was a *Brady* violation in connection with Mr. Thompson's prosecution for armed robbery and joined in a motion to vacate that conviction. Mr. Thompson filed a § 1983 lawsuit against OPDA based on alleged *Brady* violations, which was tried in 2007. The jury "rejected Thompson's claim that an unconstitutional office policy" caused a *Brady* violation in his case. *Connick v. Thompson*, 563 U.S. 51 (2011). Although the jury found OPDA liable on a failure-to-train theory, the verdict and judgment were reversed

by the Supreme Court because the evidence was insufficient as a matter of law to show that "Connick, as the policymaker for the district attorney's office, was deliberately indifferent to the need to train the attorneys under his authority." *Id.* at 1365–66.

Even before the Supreme Court's landmark decision in *Thompson*, lawsuits against OPDA based on alleged *Brady* violations had been dismissed as legally insufficient. In *Cousin v. Small*, No. 00-cv-0069, 2001 WL 617455 (E.D. La. June 4, 2001), another section of this Court granted summary judgment dismissing the plaintiff's claims municipal liability claims against OPDA. In his summary judgment opposition, the plaintiff cited seven published court decisions issued before his 1995 trial that, according to him, found *Brady* violations by Orleans Parish prosecutors, along with another six prior decisions allegedly involving "discovery violation[s]" with respect to exculpatory evidence.[1] The Court held that "[t]aking judicial notice of the *tens of thousands* of cases handled by the Office of the District Attorney in Orleans Parish during Connick's tenure since April 1, 1974, the Court finds that the cases cited by the plaintiff span twenty-five years and are isolated, fact-specific incidents that do not constitute a pattern evidencing Connick's deliberate indifference." *Cousin*, 2001 WL 617455, at *8. The Court further explained: "While no constitutional violation is insignificant, the issue here is whether the violations occurred with such frequency that Connick could be deemed to be deliberately indifferent. At the very best, plaintiff has shown that *Brady* problems occurred in fewer than one out of a thousand cases. Further, plaintiff fails to provide the Court a benchmark to determine that his showing is significant enough to amount to a pattern." *Id.*

---

[1] *See* Memorandum in Reply to Motion to Dismiss or Alternatively for Summary Judgment, *Cousin v. Small*, EDLA Case No. 00-cv-0069, Doc. No. 33 at 22–23 & nn.26–27 (Jan. 30, 2001).

The Fifth Circuit affirmed the decision in *Cousin*, finding the plaintiff's reliance on "cases in which courts have found that prosecutors under Connick's supervision failed to disclose exculpatory evidence as required by *Brady*" to be insufficient to create a triable issue of fact. *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003). The Fifth Circuit explained that "citation to a small number of cases, out of thousands handled over twenty-five years, does not create a triable issue of fact with respect to Connick's deliberate indifference to violations of *Brady* rights." *Id.* The Fifth Circuit also found the plaintiff's other evidence—including "statements by Connick and other attorneys with respect to *Brady* rights, an open letter from a judge to the office of the district attorney expressing concern over its discovery practices, and evidence that Connick promoted [ADA Roger] Jordan despite Jordan's prior *Brady* violations"—to be insufficient. *See id.* at 637 and n.18.

The ruling in *Cousin* was consistent with *Bernard v. Connick*, in which another section of this Court had previously granted summary judgment on the plaintiff's municipal liability claims against OPDA after finding "no evidence whatsoever" of any official policy to withhold *Brady* evidence, "no evidence even suggesting that the *Brady* rule was a matter of deliberate indifference to the District Attorney's Office," and no evidence of a "custom . . . of withholding *Brady* material."[2] That ruling was affirmed by the Fifth Circuit. *Bernard v. Connick*, 9 F.3d 103 (5th Cir. 1993).

Since the Supreme Court's ruling in *Thompson*, courts have continued to reject evidence very similar to the evidence relied on by Mr. Flanks as legally insufficient. In *Truvia v. Julien*, 04-0680, 2012 WL 3948613, at *5–6 (E.D. La. Sep. 10, 2012), another section of this Court granted summary judgment on the plaintiffs' *Monell* claims against OPDA, finding that the evidence

---

[2] *Bernard v. Connick*, EDLA Case No. 89-cv-4916, April 8, 1991 Opinion at 8–14.

showed no official policy of violating *Brady*, no failure to train or supervise on *Brady* requirements, and no deliberate indifference. That ruling was affirmed by the Fifth Circuit. *Truvia v. Connick*, 577 F. App'x 317 (5th Cir. 2014).

To prove his claims against OPDA, Mr. Flanks must show (1) that OPDA's policymaker, Mr. Connick, adopted and implemented an unconstitutional policy concerning *Brady* disclosures, (2) with deliberate indifference to the rights of criminal defendants, (3) that directly caused the alleged suppression of evidence in his case. Because Mr. Flanks cannot come forward with competent evidence that could lead a reasonable jury to find in his favor on all elements of his claims, OPDA is entitled to summary judgment in its favor.

## LAW AND ARGUMENT

Summary judgment must be granted as to all or part of any claim or defense "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A). "A genuine dispute as to a material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Rogers v. Bromac Title Svcs., LLC*, 755 F.3d 347, 350 (5th Cir. 2014) (quotation omitted). "When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial." *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir. 1994). "However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* "Only when there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party is a full trial on the merits warranted." *Id.* (quotation omitted). "All facts and reasonable inferences are

construed in favor of the nonmovant, and the court should not weigh evidence or make credibility findings." *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020).

**I.      A municipality such as OPDA cannot be liable under § 1983 unless its policymaker has deliberately adopted and implemented an official policy that is facially unconstitutional, or that he knows or should know will most likely cause constitutional violations.**

"Three essential elements must be established for a municipality to face § 1983 liability." *Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018) (en banc). "There must be (1) a policymaker; (2) an official policy; and (3) a violation of a constitutional right whose 'moving force' is the policy or custom." *Id.* "An official policy usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.* at 389–90 (quotation omitted). However, "[a] city cannot be liable for an unwritten custom unless ***actual or constructive knowledge of such custom is attributable to a city policymaker***." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quotation omitted, emphasis added). The plaintiff "must demonstrate that the policy was implemented with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Id.* at 390 (quotations omitted).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).[3] "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on failure to train." *Id.* "To satisfy [§ 1983], a municipality's failure to train its employees in a relevant

---

[3] Thus, a "failure to train" claim against a municipality is merely one *type* of *Monell* "policy" claim, not a categorically different theory of liability.

respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Id.* (quotation omitted).

"Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of a city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). "Municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by city policymakers." *Id.* (quotation omitted). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quotation omitted). "Knowledge on the part of the policymaker that a constitutional violation ***will most likely result*** from a given official custom or policy is a *sine qua non* of municipal liability under section 1983." *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) (emphasis added). "Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally negligent oversight." *Alvarez*, 904 F.3d at 391 (quotation omitted).

"Because the standard for municipal fault is a stringent one, a pattern of similar constitutional violations by untrained employees is ordinarily required to show deliberate indifference." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quotations omitted); *see also Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017) ("A pattern requires similarly, specificity, and sufficiently numerous prior incidents."). The Fifth Circuit has explained that only "very similar violations" can provide the "notice" to policymakers that would give rise to deliberate indifference. *See Jason v. Tanner*, 938 F.3d 191, 198 (5th Cir. 2019); *see also Robinson v. Midland County*, 80 F.4th 704, 710 n.3 (5th Cir. 2023) ("The deaths of other

inmates are not sufficiently similar to put the county on notice of a failure to provide adequate medical care because only one of them is alleged to have involved a failure to follow proper procedures, and none of the allegations involve fabrication of medical reports."); *Johnson v. Harris County*, 83 F.4th 941, 946–47 (5th Cir. 2023) (The "specific facts" of the alleged practice "must be similar to the case at hand: Prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question.") (quotation omitted).

**II.      There is no evidence that OPDA had a facially unconstitutional *Brady* policy.**

Mr. Flanks does not allege that OPDA had a facially unconstitutional written policy pertaining to *Brady* disclosures at the time of his prosecution—in fact, he alleges that OPDA "did not create a written, *Brady*-specific policy" at all. Doc. No. 27 at ¶ 97. He also does not appear to be alleging that OPDA's policymaker, Harry Connick, adopted or approved an unwritten policy to train, instruct, or otherwise encourage prosecutors to suppress exculpatory evidence in violation of the U.S. Constitution. To the extent he does allege this, he cannot support this claim with competent evidence because it did not happen.

**III.      The evidence does not show that Mr. Connick was on notice at the time of Mr. Flanks's prosecution of a pervasive practice or custom in his office, or a defect in the office's policies, that was causing repeated *Brady* violations.**

Absent any evidence of a facially unconstitutional official policy, Mr. Flanks's allegations mostly focus on deliberate indifference, alleging that Mr. Connick should have known that better policies, training, supervision, etc., were necessary to prevent easily foreseeable constitutional violations. However, Mr. Flanks cannot produce competent evidence showing that, at the time of his prosecution in 1984–1985, Mr. Connick was on notice of a pervasive practice or custom in his office, or a defect in the office's policies, that was causing repeated *Brady* violations. He cannot show the "pattern of similar violations" required by jurisprudence. Nor can he show that Mr.

Connick took any action with deliberate indifference to the constitutional rights of criminal defendants.

Mr. Flanks alleges that *Brady* violations occurred in "at least 51 criminal cases from New Orleans." Doc. No. 27 at ¶ 121. Yet OPDA does not believe that Mr. Flanks can produce competent evidence proving that *Brady* violations occurred in 51 Orleans Parish cases. And even if he could, many would be irrelevant. For example, alleged *Brady* violations that occurred during the administration of a different district attorney (and therefore a different "policymaker") are not probative of the official policies that existed during Mr. Connick's administration. Additionally, alleged *Brady* violations that occurred after Mr. Flanks's conviction (or were not determined by a court until after Mr. Flanks's conviction) could not have put Mr. Connick on notice of problems with his office's policies before Mr. Flanks was prosecuted. Finally, only "very similar violations" can provide the "notice" to policymakers that would give rise to deliberate indifference. *See Jason*, 938 F.3d at 198.

> **A.     The District Attorney would have no notice of a *Brady* violation by one of his employees unless and until it is found by a court or otherwise brought to his attention.**

In its ruling on OPDA's motion to dismiss, this Court previously concluded that there is no support in precedent for the principle that "to put Connick on notice of similar *Brady* violations, the convictions in other cases must have been overturned *before* Plaintiff's conviction." Doc. No. 44 at 21. In that same ruling, the Court recognized that "[o]n a motion to dismiss, asserted claims are liberally construed in favor of the claimant . . ." Doc. No. 44 at 16. The Court also specifically noted that it was not considering whether "the evidence put forward was sufficient to prove actual or constructive notice," but rather applying a "lesser" standard "[a]t the motion to dismiss stage." *Id.* at 23 n.152.

OPDA respectfully submits that, at the summary judgment stage, Mr. Flanks cannot simply presume that Mr. Connick was actually or constructively aware of purported *Brady* violations occurring before his conviction—he must come forward with evidence showing that there were court decisions or other specific occurrences that would have brought these purported violations to Mr. Connick's attention.

Fifth Circuit precedent directly supports the common-sense conclusion that court rulings occurring *after* the events at issue in a § 1983 lawsuit could not have put the policymaker on notice of anything *before* those events. In *Truvia v. Connick*, 557 F. App'x 317 (5th Cir. 2014), the Fifth Circuit affirmed summary judgment in favor of OPDA on the plaintiffs' failure-to-train theory, explaining: "Appellants' citations to over a dozen federal and state cases to show a 'continuum' of *Brady* violations are not probative because the vast majority of them occurred after Appellants were convicted in July 1976."[4] *Truvia*, 577 F. App'x at 324; *see also id.* at 322 (noting that the plaintiffs had not "pointed to **case law preceding their convictions** that held the DA's office responsible for committing *Brady* violations or that upheld other criminal defendants' claims of *Brady* violations") (emphasis added). This Court's prior ruling did not cite or discuss the decision in *Truvia*.

This Court previously found that the decision in *Armstrong v. Ashley*, 60 F.4th 262, 278 (5th Cir. 2023) provided "guidance" showing that "reversals occurring after a plaintiff's conviction are relevant in determining if there existed an unconstitutional custom in Connick's office and if

---

[4] The Fifth Circuit went on to state: "The two cases that predated July 1976, *Davis v. Heyd*, 479 F.2d 446 (5th Cir. 1973), *overruled by Garrison v. Maggio*, 540 F.2d 1271 (5th Cir. 1976), and *State v. Carney*, 334 So. 2d 415 (La. 1976), surely did not convey the requisite notice under a failure-to-train theory." *Truvia*, 577 F. App'x at 324. It is clear that the decision in *Truvia* was considering the dates of the court decisions allegedly finding *Brady* violations, not the dates of the underlying prosecutions.

he had actual or constructive notice of it." Doc. No. 44 at 22. But the question of whether other *Brady* decisions must occur before the plaintiff's conviction was simply not addressed or decided—or even raised in the parties' appellate briefing—in *Armstrong*.[5] Indeed, the Fifth Circuit noted that none of the cases cited by the plaintiff involved a court finding of a *Brady* violation at any time. *See Armstrong*, 60 F.4th at 278. Moreover, the decision in *Armstrong* in fact *confirms* that a court decision finding a *Brady* violation is necessary to put the policymaker on notice: "Armstrong . . . argues that these cases should have put the District Attorney on notice even though the courts found no *Brady* violations. That is incorrect." *Id.* at 278 n.13.

There is no plausible reason why a district attorney would ordinarily be aware of a *Brady* violation in a case handled by one of his assistants, in which the district attorney had no personal involvement, before a court ruling has been issued finding such a violation. Nor is Mr. Flanks able to produce evidence showing that Mr. Connick was in fact aware, in 1985, of *Brady* violations in cases where no such finding had been made by any court. Accordingly, the only *Brady* violations relevant in showing actual or constructive notice to Mr. Connick are those that resulted in court findings before Mr. Flanks's conviction in May 1985.

**B.** **Considered in the context of the number of cases prosecuted, as required by Fifth Circuit jurisprudence, the *Brady* violations alleged by Mr. Flanks would not have put OPDA's policymaker on notice of a problem with his office's policies.**

This Court previously found that Mr. Flanks had alleged that there were *Brady* violations in 26 Orleans Parish cases before his 1985 conviction, eight of which had been identified in court

---

[5] It appears that this Court reviewed the First Amended Complaint on the district court docket to determine the dates of the alleged *Brady* violations in *Armstrong*. *See* Doc. No. 44 at 22 n.146. But again, considering that the dates of these alleged incidents were not even mentioned in the Fifth Circuit's ruling, or even in the appellate briefing, there is no basis to conclude that the Fifth Circuit was even aware of the dates, much less that it silently endorsed the consideration of events occurring after the alleged constitutional violation at issue in a *Monell* case.

decision before his conviction. Doc. No. 44 at 22–24 & nn.148, 153. As the plaintiff, Mr. Flanks of course has the burden of proving these allegations. However, even assuming he can adequately support them with evidence, Mr. Flanks cannot raise a genuine dispute as to whether, at the time of his 1985 conviction, Mr. Connick was on notice of a constitutional defect in his office's policies or practices. The alleged number of *Brady* violations put forth by Mr. Flanks is all but meaningless because he fails to include the necessary context—such as the number of cases prosecuted—to put these numbers in perspective. In a significant decision last year, the Fifth Circuit emphasized that such context is essential. *See Verastique v. City of Dallas*, 106 F.4th 427 (5th Cir. 2024).

In *Verastique*, plaintiffs alleged that a Dallas police officer, Roger Rudloff, used excessive force while arresting them during widespread protests. They sought to hold the City of Dallas liable under *Monell*, alleging that there were 19 prior complaints of misconduct **by Mr. Rudloff** over 23 years. However, the Fifth Circuit affirmed the district court's dismissal of the claim on the pleadings, concluding that the other incidents were "not sufficiently similar, specific, or numerous." *See Verastique*, 106 F.4th at 432–34. The Fifth Circuit first explained that the allegations regarding the 19 other incidents were "devoid of critical factual enhancement," including facts that would have elucidated how and why the incidents occurred: "Plaintiffs, for example, cite five incidents allegedly involving a flashlight or nightstick. Some are listed incident-by-incident. But all still remain totally devoid of critical facts. What prompted the encounters? Did the individuals threaten Rudloff with physical harm? Were they attempting to resist arrest?" *Id.* at 432; *see also Jason v. Tanner*, 938 F.3d 191, 198 (5th Cir. 2019) (holding that only "very similar violations" can provide the "notice" to policymakers that would give rise to deliberate indifference); *Robinson v. Midland County*, 80 F.4th 704, 710 n.3 (5th Cir. 2023) ("The deaths of other inmates are not sufficiently similar to put the county on notice of a failure to provide adequate

13

medical care because only one of them is alleged to have involved a failure to follow proper procedures, and none of the allegations involve fabrication of medical reports.").

In *Verastique*, the Fifth Circuit went on to explain that, even assuming these other alleged incidents were "sufficiently specific and similar" to the constitutional violations alleged in the lawsuit, they were insufficient as a matter of law to "create a pattern capable of providing constructive notice":

> It took twenty-three years to amass the nineteen incidents mentioned in the complaint. Plaintiffs posit that the protracted time span works in their favor. In their view, the fact that the incidents occurred over two decades further evinces a consistent pattern of failed discipline. Incorrect.
>
> Given a constant number of incidents, a longer time span yields a *lower rate* of violations—*militating against* constructive notice. Nineteen allegations over the span of twenty-three years yields a mere annualized incident rate of 0.826. In other words: Plaintiffs—at most—show that, for over two decades, Rudloff, on average, received *fewer than one accusation of misconduct per year*.

*Verastique*, 106 F.4th at 433–34.

The Fifth Circuit further explained that the complaint failed to provide information "such as department size and number of arrests" that would "provide the context necessary to evaluate whether an alleged department-wide pattern is so obvious as to impart constructive notice." *Verastique*, 106 F.4th at 434. The Fifth Circuit explained that "it is *impossible* to identify the existence of a pattern—much less one that imparts constructive notice," without such context. *Id.* That is because "[g]iven a constant number of incidents, the percentage of conduct supporting a pattern of illegality shrinks as the size of the police department or the number of arrests increases." *Id.* Thus, the plaintiffs failed to show "whether nineteen incidents over twenty-three years is sufficiently frequent to be obvious in the context of [the Dallas Police Department]," which "employs 3,200 to 3,300 officers and serves one of the largest cities in the nation." *Id.* at 10.

14

Critically, the allegations in *Verastique* involved 19 incidents *by a single police officer*—not across the entire police department. Applying the same standard, Mr. Flanks does not come close to alleging a pattern that has "occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice." *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017).

More recently, in *Damond v. City of Rayville*, 127 F.4th 935, 939 (5th Cir. 2025), the Fifth Circuit held that the plaintiff failed to adequately allege a "custom of allowing inmate-on-inmate violence by failing to separate violent and non-violent inmates" at the Richland Parish Detention Center. The Fifth Circuit noted that the plaintiff had identified "six instances in which inmates attacked others but were later returned to their dormitory." *Id.* The Fifth Circuit explained, however, that the plaintiff had "fail[ed] to identify the jail personnel who were present for or involved in the violent incidents." *Id.* The Fifth Circuit further explained that these incidents were "dissimilar to" the attack on the plaintiff, and that they "occurred over the course of several months, were motivated by differing factors, and took place in different locations." *Id.* The Fifth Circuit concluded that "[t]hese alleged incidents are insufficient to allege a custom or policy of tolerating widespread, unprovoked violence in the detention center or to put the officials on notice of the repeated constitutional violations." *Id.*

In its earlier motion to dismiss, OPDA discussed the ruling in *Verastique* and Mr. Flanks's failure to provide the necessary context in his complaint. The Court's ruling did not cite *Verastique* or otherwise acknowledge the Fifth Circuit's guidance regarding "the context necessary to evaluate whether an alleged department-wide pattern is so obvious as to impart constructive notice." *See Verastique*, 106 F.4th at 434. OPDA respectfully submits that if this context is considered, Mr. Flanks cannot create a genuine dispute as to deliberate indifference.

15

OPDA retained an expert statistician, Dr. Tumulesh Solanky, to help put the number of alleged *Brady* violations in perspective and provide the necessary context that Mr. Flanks omits. Specifically, Dr. Solanky considered the alleged *Brady* violations set forth in the opinion of Mr. Flanks's retained expert witness, Laurie Levenson.[6] Dr. Solanky reviewed OPDA annual reports providing information about the numbers of cases screened, accepted, and tried over a period of 12 to 15 years. Dr. Solanky found that the average number of cases accepted for prosecution annually was approximately 7,084.[7] Extrapolating from the available data, Dr. Solanky found that between 1974[8] and 1985, there were approximately 522 trials and 5,175 guilty pleas on average each year.[9] Thus, the total average number of combined trials and guilty pleas per year was approximately 5,698.[10]

---

[6] To be clear, the report and proposed testimony of Ms. Levenson are objectionable for multiple reasons, and OPDA intends to move to exclude her testimony at trial if this motion is not granted.

[7] Exhibit 1, Solanky Expert Report, at 5; *see also* Exhibit 2, Excerpts of 1989 Screening Division report, at 2, 4; Exhibit 3, Excerpts of 1990 Screening Division report, at 4; Exhibit 4, Excerpts of 1991 Screening Division report, at 6; Exhibit 5, Excerpts of 1992 Screening Division report, at 9; Exhibit 6, Excerpts of 1993 Screening Division report, at 8; Exhibit 7, Excerpts of 1994 Screening Division report, at 6; Exhibit 8, Excerpts of 1995 Screening Division report, at 7; Exhibit 9, Excerpts of 1996 Screening Division report, at 7; Exhibit 10, Excerpts of 1997 Screening Division report, at 7; Exhibit 11, Excerpts of 1998 Screening Division report, at 7; Exhibit 12, Excerpts of 1999 Screening Division report, at 7.

[8] Mr. Connick first took office as Orleans Parish District Attorney in 1974.

[9] Exhibit 1, Solanky Expert Report, at 10; *see also* Exhibit 13, Excerpts of 1988 Revised Annual Report at 2; Exhibit 14, Excerpts of 1989 Trial Division report at 5–7, 13–15; Exhibit 15, Excerpts of 1990 Trial Division report at 6–8, 14–17; Exhibit 16, Excerpts of 1991 Trials Division report at 7–9, 15–18; Exhibit 17, Excerpts of 1992 Trials Division report at 7–8, 13–16; Exhibit 18, Excerpts of 1993 Trials Division report at 6–7, 13–16; Exhibit 19, Excerpts of 1994 Trials Division report at 5–6, 11, 13–15; Exhibit 20, Excerpts of 1995 Trials Division report at 5–7, 13–15, 17–18; Exhibit 21, Excerpts of 1996 Trials Division report at 7–9, 14–16, 19–20; Exhibit 22, Excerpts of 1997 Trials Division report at 6–7, 12, 14, 17–18; Exhibit 23, Excerpts of 1998 Trials Division report at 5–7, 13, 15, 18–19; Exhibit 24, Excerpts of 1999 Trials Division report at 5–7, 13, 18–19.

[10] *See id.*

Dr. Solanky found that the eight cases allegedly involving a *Brady* violation found by a court as of 1985 represented approximately one *Brady* violation out of every 9,950 cases tried or resolved by plea—approximately one in ten thousand.[11] Dr. Solanky noted that this probability is only somewhat higher than the likelihood of a person being struck by lightning over a 30-year lifespan (probability of 0.000101 as compared to 0.000065).[12] Even if the Court considers that the relevant number of alleged *Brady* violations is 26 rather than eight—approximately three times as many—the proportion is still only one out of several thousand. As the Fifth Circuit previously explained, in a case involving exactly the same issue, "citation to a small number of cases, out of thousands handled over twenty-five years, does not create a triable issue of fact with respect to Connick's deliberate indifference to violations of *Brady* rights." *Cousin*, 325 F.3d at 637.

Thus, even if Mr. Flanks could prove that that there were eight, or 26, or some similar number *Brady* violations in Orleans Parish cases before his trial, and even if he could prove that Mr. Connick was aware of all of them at that time, and even if he could prove that the alleged *Brady* violations in all of these cases were very similar to the alleged violations in his case, the claims against OPDA would still fail. Failure to disclose evidence in a fraction of one percent of cases prosecuted hardly demonstrates an unconstitutional official policy.[13] As explained in

---

[11] Exhibit 1, Solanky Expert Report, at 14–15.

[12] Exhibit 1, Solanky Expert Report, at 14–15.

[13] *See also Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009) ("Although the record omits any evidence of the department's size or the number of its arrests, the department's own website indicates that it presently employs more than 1,500 officers, and that there were more than 67,000 incidents of crime in the last year alone. Given the department's size, and absent any evidence of its total number of arrests during the same time period, 27 incidents of excessive force over a period of four years do not reflect a pattern that can be said to represent official policy of condoning excessive force so as to hold the City liable for the acts of its employees' unconstitutional conduct. To hold otherwise would be effectively to hold the City liable on the theory of respondeat superior, which is expressly prohibited by *Monell*.").

*Connick v. Thompson*, "*Brady* mistakes are inevitable. So are all species of error routinely confronted by prosecutors: losing a *Batson* claim; crossing the line in closing argument; or eliciting hearsay that violates the Confrontation Clause." *Connick v. Thompson*, 563 U.S. 51, 73 (2011) (Scalia, J., concurring). Finding deliberate indifference based on *Brady* violations in a miniscule percentage of cases "would repeal the law of *Monell* in favor of the Law of Large Numbers." *Id.*

      **C.**      **Mr. Flanks cannot prove that there were enough "very similar" *Brady* violations before his conviction to provide adequate notice to OPDA's policymaker.**

Mr. Flanks also cannot prove that the alleged *Brady* violations occurring before his conviction were "very similar" to the alleged violations in his case, such that they could have provided notice that might have averted the alleged violations in his case. *See, e.g.*, *Jason*, 938 F.3d at 198. Mr. Flanks's *Brady* claim is primarily based on the alleged failure to disclose grand jury testimony by Mrs. Carnesi that he contends was inconsistent with her testimony at trial. Significantly, none of the alleged *Brady* violations before Mr. Flanks's conviction involved failure to disclose grand jury that was favorable to the defense. Thus, none of these decisions would have put Mr. Connick on notice that his office's policies regarding grand jury testimony were inadequate. Even expanding the scope beyond grand jury testimony specifically, to failure to disclose *any* pretrial statements of State's witnesses that might have been used to impeach their trial testimony, it is apparent, even from Mr. Flanks's allegations, that many of the prior cases are dissimilar.

This Court previously held that several of the cases cited by Mr. Flanks had "enough similarity at the motion to dismiss stage" to "possibly put Connick on notice of the type of *Brady* violation that occurred in Plaintiff's case," accepting his characterization of those cases as true. Doc. No. 44 at 26–27 & n.169. However, OPDA submits that Mr. Flanks cannot carry his evidentiary burden of proving that prior *Brady* rulings were sufficiently similar to actually give

Mr. Connick fair notice of defects in his office's policies that ultimately led to a *Brady* violation in Mr. Flanks's case.

      **D.**      **Mr. Flanks cannot prove that OPDA had an official policy of deliberate indifference.**

Assuming for the sake of argument that Mr. Flanks is able to show that Mr. Connick was on notice of a significant pattern of *Brady* violations, the evidence does not show that he responded with deliberate indifference. To the contrary, OPDA's official policies and practices were reasonably calculated to ensure that *Brady* evidence was identified and disclosed to the defense.

As noted above, Mr. Flanks's *Brady* claim is primarily based on the alleged failure to disclose grand jury testimony. At the time of Mr. Flanks's prosecution, OPDA employed a court reporter who was responsible for preparing transcripts of all testimony of lay witnesses (such as Mrs. Carnesi) before the grand jury in indicted cases. OPDA's official policy required that these transcripts be made available to the trial prosecutors, who were responsible for reviewing them for, among other things, exculpatory material that must be disclosed to the defense.

Specifically, Diane Major was employed by OPDA from 1976 through at least 1988 as the grand jury reporter. Mrs. Major has provided a sworn declaration explaining that OPDA policy, as communicated to her by senior prosecutors, required her to prepare transcripts of all lay witnesses who testified before the grand jury in indicted cases and make those transcripts available to the prosecutors who would be trying the case.[14] Mrs. Major further states that the trial prosecutors were expected to obtain these transcripts from her and review them, and that the trial prosecutors did so in most cases.[15]

---

[14] Exhibit 25, Declaration of Diane Major, at ¶¶ 2–5.

[15] Exhibit 25, Declaration of Diane Major, at ¶ 4.

Judge Dennis Waldron, who served in various positions at OPDA (including First Assistant) until 1982, has provided a sworn declaration as well. Judge Waldron confirms Mrs. Major's testimony regarding grand jury transcripts and further states that, pursuant to OPDA policy, the trial prosecutors were required to obtain and review these transcripts for, among other things, any potentially exculpatory material that would need to be disclosed to the defense.[16] Judge Waldron also states that these policies were communicated to Assistant District Attorneys in training sessions and discussions with supervisors.[17]

Beyond grand jury issues, OPDA implemented other measures to help ensure compliance with *Brady* obligations. Prosecutors in the trials division attended weekly meetings led by the chief of trials at which they discussed pending cases, recent court decisions, policy matters, and other relevant issues.[18] Tim McElroy, who began working as an Orleans Parish Assistant District Attorney in January 1984, has testified that discussions of "what is and is not Brady material" occurred "regularly" at those meetings.[19] Similarly, Bridget Bane, who was chief of trials at the time of Mr. Flanks's prosecution, has testified: "I know Brady was a topic of discussion in those meetings."[20] Leon Cannizzaro, who served as an Assistant District Attorney between 1978 and 1983, likewise has testified that appellate decisions on *Brady* issues "absolutely" were discussed at these staff meetings.[21] Judge Cannizzaro further testified that, from his earliest days at OPDA, when he was working in magistrate court, he was instructed and advised "that you provide to the

---

[16] Exhibit 26, Declaration of Dennis Waldron, at ¶¶ 3–9.

[17] Exhibit 26, Declaration of Dennis Waldron, at ¶ 10.

[18] Exhibit 27, McElroy Depo., at 35–38.

[19] Exhibit 27, McElroy Depo., at 13, 35–36.

[20] Exhibit 28, Bane Depo., at 10, 16–18, 179–184.

[21] Exhibit 29, Cannizzaro Depo., at 36, 129–132.

defense information that is of an exculpatory nature or that tends to help the defense in their proceeding."[22]

Copies of new appellate decisions, and memoranda regarding those decisions, were circulated to prosecutors, and lawyers from the appeals division would regularly attend meetings of the trials prosecutors to discuss these new decisions.[23] Mr. McElroy testified that analyses of cases concerning *Brady* obligations were among these.[24] Similarly, Ms. Bane testified: "I'm sure that there were cases regarding Brady material, and I'm positive that if there were a case regarding Brady, that we would have disseminated."[25] Additionally, prosecutors in the trials division were required to have pre-trial conferences with supervisors before taking a case to trial.[26] One of the purposes of these conferences was to ascertain what discovery had been provided in the case and whether the State had satisfied its *Brady* obligations.[27]

Mr. Flanks will likely argue that OPDA should have done even more to prevent *Brady* obligations from ever occurring. However, it is not enough for Mr. Flanks to show that more, or better, training might have prevented the alleged constitutional violation in his case. He must prove that OPDA's policymaker was on notice "that a ***particular*** omission in [OPDA's] training program causes . . . employees to violate citizens' constitutional rights." *Connick*, 563 U.S. at 61 (emphasis added). As this Court previously noted, a "showing of simple or even heightened negligence" cannot prove deliberate indifference—something more akin to "recklessness" is required. Doc.

---

[22] Exhibit 30, Cannizzaro Depo., at 65–66.

[23] Exhibit 28, Bane Depo., at 166–169; Exhibit 30, McElroy Trial Testimony, at 750–752.

[24] Exhibit 30, McElroy Trial Testimony, at 752.

[25] Exhibit 28, Bane Depo., at 167.

[26] Exhibit 27, McElroy Depo., at 21.

[27] Exhibit 27, McElroy Depo., at 41–44.

No. 44 at 17 (quotation omitted). Considering that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," *Connick*, 563 U.S. at 61, Mr. Flanks cannot put forth evidence that would persuade a rational jury that OPDA had an official policy of deliberate indifference.

**IV.      Mr. Flanks cannot prove the "moving force" causation element because there is no evidence that the prosecutors who handled his case were acting pursuant to an unconstitutional policy.**

"It is only when the execution of the government's policy or custom . . . inflicts the injury that the municipality may be held liable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (quotation omitted). Accordingly, there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Id.* "This connection must be more than a mere 'but for' coupling between cause and effect." *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992). The Fifth Circuit has emphasized that the causation element for municipal liability under § 1983 is "rigorous" and "stringent." *See Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998); *see also id.* at 795 ("*Monell* set a high threshold for causation . . . ").

Even if Mr. Flanks could prove that (1) there was a *Brady* violation in his case, and (2) OPDA's policies, training, or supervision regarding *Brady* disclosures were constitutionally defective in some way, Mr. Flanks's claims against OPDA still must fail because there is no evidence that those alleged defects caused the alleged *Brady* violation in his case—in order words, they were not the "moving force" causing the alleged violation. There is no evidence that the prosecutors who handled Mr. Flanks's case were following any specific policy causing suppression of exculpatory evidence—much less a policy that was intended to prevent disclosure of exculpatory evidence. Nor is there any evidence that they were trained or instructed in ways that caused them to misunderstand their *Brady* obligations or otherwise fail to comply with them.

22

OPDA does not believe the prosecutors erred in Mr. Flanks's case, because the alleged *Brady* evidence was not favorable and material and therefore was not required to be disclosed. However, assuming for the sake of argument that prosecutors erred in Mr. Flanks's case—by making a mistaken judgment call, by failing to appreciate the exculpatory nature of some evidence, by failing to identify all exculpatory materials in their files or in the state's possession, or for some other reason—there is no evidence suggesting that such an error happened because of OPDA's official policies.

In *Alvarez*, the Fifth Circuit held that a plaintiff's § 1983 *Brady* claim against a police department failed as a matter of law because (among other reasons) there was no "direct causal link between the policy and the violation." *Alvarez*, 904 F.3d at 390. The plaintiff alleged that the police department had a policy of "not freely sharing information from the internal administrative investigations with the criminal investigation division," which had caused exculpatory video evidence not to be disclosed in his criminal case. *Id.* The Fifth Circuit discussed the testimony of several officers involved with the incident, who testified that the evidence should have been requested by the criminal investigation division and would have been disclosed if it had been requested. *Id.* The Fifth Circuit ultimately concluded that the nondisclosure was the result of a "series of interconnected errors within the Brownsville Police Department that involved individual officers," rather than a "general policy of non-disclosure of information from the internal administrative investigations." *Id.* at 390–91. Thus, "[t]he general policy of non-disclosure was not a direct cause of [the plaintiff's] injury." *Id.* at 391.

For similar reasons, Mr. Flanks's claim must be dismissed because the alleged non-disclosure of exculpatory evidence in his criminal case was not caused by any constitutionally defective policy of OPDA.

23

**CONCLUSION**

For the reasons set forth above, summary judgment should be entered in favor of OPDA, dismissing Plaintiff Raymond Flanks's claims with prejudice.

Respectfully submitted,

*/s/ Matthew J. Paul*
W. Raley Alford, III, 27354
Matthew J. Paul, 37004
Inga C. Petrovich, 31284
STANLEY REUTER ALFORD
  OWEN MUNSON & PAUL, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: (504) 523-1580
Facsimile:  (504) 524-0069
wra@stanleyreuter.com
mjp@stanleyreuter.com
icp@stanleyreuter.com

*Counsel for Jason R. Williams (in his official capacity as Orleans Parish District Attorney)*