Tim McElroy

Page 1
5/25/2005

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

JOHN THOMPSON,>>>>

>>Plaintiff    > CIVIL ACTION NO.

>>>>     >  03-2045

>>>>>>   SECTION: "J"

VERSUS

>>>>>>   MAGISTRATE 5

>>>>>       JUDGE CARL BARBIER

HARRY F. CONNICK,

et al.,

>>Defendants.>   MAGISTRATE JUDGE >>

>>>>>>>ALMA L. CHASEZ

>Videotaped deposition of TIM McELROY, taken at Goins Aaron, PLC, 1010 Common Street, Suite 2600, New Orleans, Louisiana on Wednesday, May 25, 2005, commencing at 9:23 a.m.

BY:  Brenda R. Breaux
> Registered Professional Reporter
> Certified Court Reporter

COPY

504 525 1979    ESQUIRE DEPOSITION SERVICES, LLC    504 525 1560
650 POYDRAS STREET, SUITE # 1515    NEW ORLEANS, LA 70130



EXHIBIT
27

OPDA-FLANKS020831

Tim McElroy

Q.>So that -- that I can understand where you fit in, can you just take me through the various positions that you held in the Orleans Parish District Attorney's Office, please.

A.>Sure.  I began in the office as a prosecutor in January of 1984.  And I was assigned to the magistrate division, a typical assignment, a typical start assignment.  I was then assigned to the trials division as an assistant district attorney, then I was a deputy chief of trials, a chief of trials, a chief of screening, and the first assistant.

Q.>Okay.

A.>Spanning 19 years in the office.

Q.>If you started with the DA's Office in January of 1984, when did you assume responsibilities in the trials division?

A.>You mean as chief or as a trial attorney?

Q.>Just as a trial attorney.

A.>The exact dates I cannot tell you, but I was promoted to the trial

OPDA-FLANKS020843

Tim McElroy

decisions.  We had continuing legal education regularly.  I don't know -- I don't remember the frequency in 1984 of the continuing legal education seminars, but I know as time progressed we -- as an office, we decided to conduct 15 hours of continuing legal education.  For our attorneys, we received permission from the bar association to conduct those.  And they regularly contained discussions of new opinions that dealt with both exculpatory information and all other disclosures, other areas of law as well.

>And then there's all the regular standard checks and balances.  The trial attorney was a required to review the case with his or her supervisor prior to actually going to trial.  That was what we call a pretrial.  There was, in the office, a point person known as a postconviction tracking attorney, an assistant district attorney appointed by Mr. Connick, or the first assistant, with Mr. Connick's concurrence, who reviewed the cases that were being forwarded to the file room as they were

OPDA-FLANKS020851

Tim McElroy

Q.>Anything else?

A.>If you are not certain, disclose.

Q.>Anything else?

A.>If you are not certain, ask the court to make a determination.

Q.>Anything else?

A.>Not at this point.  I may think of something later, but that's what I recall the gravamen of these instructions being.

Q.>One of the other checks and balances that you described was, quote, "regular trial meetings"?

A.>Yes.

Q.>And what did you mean by "regular trial meetings"?

A.>The trial division met on a weekly basis; that is, the staff attorneys assigned to the trial division, and the magistrate division, as I remember, met on a regular basis to discuss various cases, to discuss policy, to discuss recent opinions, other issues that may have been pertinent at the time.

Q.>Focusing on the 1984 or 1985 time frame, do you have any specific recollection

OPDA-FLANKS020865

Tim McElroy

of discussions at the trial division meetings concerning what is and is not Brady material?

A.>Regularly.  Regularly.

Q.>And I'm asking you about specific recollections.  What do you recall?

A.>Specifically, I recall that it was spoken about regularly at trial meetings discussing what was, what is, what could be exculpatory, what information the police had provided.  These are general topics of conversation that prosecutors have and have had and will continue to have.

Q.>Can you tell me about any specific conversation that took place in 1984, 1985 time frame at a trial division meeting concerning the subject of Brady?

A.>No, I cannot tell you about any specific conversation that may have been held 21 years ago.

Q.>And the discussions that took place, were they in the context of particular cases or were they broader discussions?

A.>Both.

OPDA-FLANKS020866

Tim McElroy

Q.>What else was discussed at these trial division meetings?

A.>I think I mentioned them: Whatever policy issues may have been published at or about that time; police reports, how they were submitted; whether or not we were still receiving completed reports.  That's what prosecutors are concerned about, whether or not they have everything in the police files.  And what we could do to safeguard that, to insure screening was certain -- screening had all of what it should have had in the case file prior to the file coming to the trial division.  There were a lot of policy questions involved, and still are, in prosecution.

Q.>Who -- Who ran the trial division meetings in 1984 and 1985?

A.>The trial chief.

Q.>And who else would participate?

A.>All of the trial attorneys.

Q.>So that would be the senior trial attorneys and the junior trial attorneys?

A.>That's correct.  And the

OPDA-FLANKS020867

Page 38
Tim McElroy
5/25/2005

magistrate attorneys, and the investigators.

Q. >And how long did the meetings typically last?

A. >About an hour.

Q. >What's your recollection with regard to the frequency of CLE presentations in the 1984-1985 time frame?

A. >I have no specific recollection of how often CLEs were held in that time period.

Q. >I think you did say that the number of CLEs, however, at some point increased over time?

A. >Right.  There was -- There was a point -- When the Brady doctrine began to evolve in the '80s and in the '90s, as the court was reforming its definition of what was considered Brady, the instruction became more necessary because the opinions of the courts and I think we've highlighted in several -- in several cases, specifically in Kyles, I believe it was reviewed by 17 different judges prior to the high court making a decision, five/four I might add, that Brady evidence was present in the Kyles

OPDA-FLANKS020868

Tim McElroy

as significant?

A.>I can't think of them by name at this point.

Q.>Okay.

>The requirement that a senior district attorney review a case with his or her supervisor, what was the purpose of that policy?

A.>Several things.  In prosecution it's critical that the lead attorney develop a theory of guilt.  It was important to hear the lead attorney -- it is important to hear a lead attorney express the theory of a case and the method by which the attorney hopes to achieve a conviction.  So pretrials -- pretrial conferences are designed to have the attorney state the evidence in a means by which the prosecutor intends to prove the case.

Q.>Were there any other purposes to the pretrial conference?

A.>Several other case-- Several other purposes.

Q.>Okay.

A.>To evaluate the effectiveness of

OPDA-FLANKS020871

Tim McElroy

any attorney.  I've used it for that.  To determine whether or not contact was made with all witnesses; to see how an attorney prepares a case, other than theory; to see whether or not discovery has been completed, satisfied; to determine whether or not the police have been spoken to; whether or not -- in some instances when you contact -- although you've prepared your case and you call the police officer, the day before trial you learn something that may not have been included in a report.

Q. >What was the procedure in 1984 or 1985 for how the -- this pretrial conference would determine whether or not discovery had been satisfied?

A. >Simple question:  Is discovery in the file?  Has there been discovery to the defense attorney, waived discovery?  Does your judge engage in discovery?  Some -- some specific divisions did not engage in discovery.  The judge would ask, "Is there a motion that lies in this case for either identification or recovery of evidence?"  And if there were none, many Courts just

OPDA-FLANKS020872

Page 43
Tim McElroy
5/25/2005

said, "Then we're going to set it for trial"; the discovery in that case waived.

Q.>How would the supervisor determine whether or not the State's Brady obligations were satisfied?

A.>Through the checklist that I just mentioned.

Q.>And how would they use the checklist to do that?

A.>Many times -- Well, the supervisor has a lot of -- a lot of experience, or generally did.  Many times it was a question of going through each of the issues I just discussed:  What's your theory?  Have you discussed it...

>On the back cover of the case file the attorney who is supervising would then initial and put a date that it had been pretried.

Q.>Would the supervisor have the responsibility for going through the entirety of the file, or would he or she be relying upon information provided to him or her by the trial time.

A.>It's a combination.  On occasions

OPDA-FLANKS020873

Tim McElroy

an inquiry was sufficient; on other occasions the supervisor would look at file.

Q.>Was there any policy that communicated to the supervisor what his or her responsibility was in terms of reviewing the entirety of the file to insure compliance with Brady?

A.>The policy was that there was their job.

Q.>That there was a written policy that said their job was to go through the entire file to determine whether there was compliance with Brady?

A.>No.  As a matter of fact, there was not a policy that required any supervisor to review an entire file specifically.  There is not that policy that required a supervisor to review a file to determine whether or not a piece of paper was in a file.

Q.>If one of the chiefs was the trial attorney, a chief of screening, for example, what policy was in place, if any, with regard to how the case handled by one of the chiefs would be pretried?

OPDA-FLANKS020874