UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ROBERT JONES

CIVIL ACTION NO:

VS.                              18-CV-0503-TTM-JCW

SECTION H(2)

LEON CANNIZZARO, JR, AND
ABC INSURANCE COMPANIES
1-10

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED DEPOSITION OF BRIDGET BANE

Taken on Thursday, April 18, 2019
At the Law Offices of
JONES WALKER
201 St. Charles Avenue
New Orleans, Louisiana  70170-5100

REPORTED BY:  DIXIE B. VAUGHAN, CCR, RPR

U.S. LEGAL SUPPORT, INC
504.264.6650

EXHIBIT
28

OPDA-FLANKS013476

Bridget Bane
April 18, 2019                                    16

the Section B cases with you and Mr. Lenfent, did they then undertake the same process with each of the other sections?

A.   As far as I can remember, yes.  I think that Section B, however, was outstanding as a serious docket-movement problem.

Q.   Understood.  So 500 cases on the Section B docket was a very high number of cases; correct?

A.   Correct, yes.

Q.   And the district attorney and first assistant at the time were concerned about trying to reduce the number of cases in that particular section; is that a fair characterization?

A.   Yes.

Q.   And who was the first assistant at that time?

A.   When I came to the office, it was Bill Wessel.

Q.   And who was the chief of trials when you joined?

A.   I think it was Joe McMahon.

Q.   Do you remember the deputy chief or if there was a deputy chief?

A.   I don't think there was a deputy chief.

Q.   And who succeeded Mr. Wessel?

OPDA-FLANKS013491

Bridget Bane
April 18, 2019                                          17

A.    Ralph Capitelli.

Q.    And who succeeded Mr. Capitelli?

A.    Dennis Waldron.

Q.    And then who succeeded Mr. Waldron?

A.    Jack Peebles.

Q.    And then who succeeded Mr. Peebles as first assistant?

A.    I did.

Q.    And who succeeded you?

A.    Ray Bigelow.

Q.    And with the deputy chief, let's run through kind of the history of the deputy chiefs while we're at this -- or the chief of trials.

So it was Mr. McMahon, you said, who was --

A.    Who was the --

Q.    -- the chief of trials?

A.    I believe so.

Q.    And do you recall who succeeded him?

A.    It could have been me.  I think it might have been me.

Q.    And do you recall --

A.    I don't recall anybody else besides him.

Q.    Between the two of you.  Do you recall approximately when you became chief of trials?

OPDA-FLANKS013492

Bridget Bane
April 18, 2019                                              18

A.    About a year and a half after I got there.

Q.    And you remained in that position for how long?

A.    Off -- off and on, I think I moved into --

Q.    Screening?

A.    -- a screening position and maybe a juvenile potion for a while to try to get me well-rounded.

Q.    Understood.

A.    But off and on, up until '88.

Q.    And I understand you were chief of trials and then you moved to the chief of screening and then ultimately chief of juvenile and then maybe even back to chief of trials at some point.  Do you recall who succeeded you when you moved over to chief of screening?

A.    When I was first in trials, I think I was the chief of trials myself, and then, at one point, I was the chief of trials and -- co-chief of trials with Nick Noriea, and then, at a later point, I was co-chief of trials with Joe --

Q.    Myers?

A.    -- Joe Myers.  And when I went to

OPDA-FLANKS013493

Bridget Bane
April 18, 2019                                    166

his reputation was?

A.    I had no experience with him.

Q.    When we were speaking about the written policy manual for 1987, you had mentioned that prior to that policy there may have been some hand-outs on Brady.  Do you recall that?

A.    I'm not sure if I would remember specifically Brady.  I would remember things that were maybe excerpted from some of the new cases because we did get some -- we did get the district attorney bulletin, you know, that contained a synopses of the cases.  And if they were important to us or we -- we would, you know, excerpt them from the excerpts and distribute or we would try, perhaps, in some cases, to make copies of the whole -- you know, the whole publications.  And there would be memos sent out.  Memos were being sent out regularly concerning problems or issues that had been discovered as well as administrative memos.  But, yeah, we -- we -- and we did have the appeals people come into the trial meetings, usually at the beginning of every session.  And sometimes they had news and sometimes they didn't.

Q.    So with respect to the -- you're referring to Louisiana District Attorney's

OPDA-FLANKS013641

Bridget Bane
April 18, 2019                                    167

Association --

A.    Right.

Q.    -- case synopses; correct?

A.    Right.

Q.    And do you recall from those case synopses any particular Brady case that was excerpted from the LDAA materials and circulated within the office?

A.    No.  But I'm sure that there were cases regarding Brady material, and I'm positive that if there were a case regarding Brady, that we would have disseminated.

Q.    But sitting here today, you can't remember any particular case; correct?

A.    (Shakes head.)

Q.    And with respect to the memos that you mentioned, it sounded like those memos that would be circulated interoffice could address any number of issues; correct?

A.    Yes.

Q.    And is it your recollection that those memos, at least one of those memos, addressed something related to Brady?

A.    I have no specific memory, no.

Q.    And so you don't have any specific

OPDA-FLANKS013642

Bridget Bane
April 18, 2019                                    168

memory of a particular case or decision that was

addressed in one of the memos that might have

dealt with Brady?

    A.   I do not.

    Q.   You don't have any copies of those memos

or are you aware of any place where we might be

able to identify or discover, get ahold of those

memos?

    A.   I don't.

    Q.   How about the LDAA excerpts?  Do you

know where -- did you retain any copies of those?

    A.   I don't.  But I would -- I think the

LDAA would still certainly have some kind of

probably electronic records at this point.  I

would imagine that they'd preserve them, but

that's just...

    Q.   Understood.  But they wouldn't have the

excerpts that were created by OPDA from --

    A.   No.

    Q.   -- those document; correct?

        And then you mentioned the appeals

division would come in and do a presentation at

the beginning of every Supreme Court session; is

that correct?

    A.   Every -- every meeting.

OPDA-FLANKS013643

Bridget Bane
April 18, 2019                                              169

Q.   I see.  And by "meeting," you're talking about the --

A.   -- trial meetings.

Q.   -- trial meetings?

And how long would those presentations last typically?

A.   Well, sometimes -- they weren't at every trial meeting.  There was -- when I would ask -- the appeals knew to show up at the meeting if they had something to say.  And it would take five minutes usually.  If it were an unusual situation, it might take -- and there were questions that people had, it might take ten minutes.

Q.   And they were typically doing a presentation on a recent decision; is that correct?

A.   Yes.

Q.   And do you recall any presentation that they made about a decision related to Brady?

A.   I do not.

Q.   I promised that we would get back to your systems, and so now I think is a good time to do that.

You'd mentioned one of the duties of being a chief of trials was deciding the

OPDA-FLANKS013644

Bridget Bane
April 18, 2019                                                    179

heavily upon me for writing all kinds of things for him, and he was -- he would complain if he saw any evidence of people's inability to express themselves well in writing.  So we -- we -- I think we had run into situations where, you know, we were getting trial reports and things that indicated we could -- should pay a little more attention to writing.  So we -- we got -- we ended up getting two writing samples from each candidate, short and sweet, and right while they were still with us.  So that's --

Q.    And what were the topics of those?

A.    One was Brady.  One might have been -- I can't remember -- exculpatory -- no -- exclusionary.  Yeah.

Q.    Do you know whose -- how those topics were selected?

A.    No.  I probably had something to do with it, but I can't remember.

Q.    You also mentioned weekly trial meetings if there were a number -- a sufficient number of people to justify holding one.  Do you recall that?

A.    Yes.

Q.    Tell me what was the purpose of the

OPDA-FLANKS013654

Bridget Bane
April 18, 2019                                    180

weekly trial meetings.

     A.   I think that the main purpose was to
exchange information among the attorneys in the
easiest possible way, make sure that we kept them
in communication with each other and with us, and
everything was a move- -- you know, a moveable
feast.  And the easiest way to bring up problems
and avoid repetition of problems was to just get
everybody in the same room talking about their
cases, what happened that week, any problems they
might foresee.  And they -- they could literally
ask for help.  You know, they could just say,
"I've got this horrible case coming up, and I
don't know what" -- "I don't know how to do A or B
or C or, you know" --

     Q.   Understood.

     A.   -- "I need help," and they wouldn't have
to wait in line for three hours to do it.  They
could do it right there (indicating).

     Q.   And you're referring back, then, to the
pretrial conferences; right?

     A.   Right.

     Q.   The -- and this was the meeting where
the appeals group might show up if they had
something to offer?

OPDA-FLANKS013655

Bridget Bane
April 18, 2019                          181

A.   Right.  We had a format.  I'm not quite sure that I could remember all of it.  But it was -- you know, I'm pretty sure that we started by getting someone from the appeals division if there were relevant things to report, there were announcements, there were administrative details, there were -- you know, there was housekeeping, and there was the -- the meat of it was generally going through -- you know, we went through each section --

Q.   Understood.

A.   -- A -- you know, A to, I think, J at the time and, you know, got a report, a brief report.  And if there were -- and then we'd take up any problems or assignments or any instruction.

So I'm not sure I've given you all of the components, but it was a -- we definitely had it laid out, and we had an agenda, and we distributed the agenda.

Q.   Where were these meetings held?

A.   In what we called the grand jury room at -- at the time, we called it that.  The grand jury had met in that room for a while until people realized that maybe the grand jury shouldn't be in the district attorney's office.  So we had a nice

OPDA-FLANKS013656

Bridget Bane
April 18, 2019                                              182

big room, and we met in the Grand Jury room.

Q.   Who was invited to attend?  This was trial division personnel?

A.   Trial division personnel.  If there were a topic or a case that involved a screener, we would get -- I mean, Kevin Boshea might come in and talk about a whole group of cases that had come in that he, you know, was screening, and that they were going to be coming up and that they were, you know, serious cases or child cases or -- you know, so we didn't -- we would get anybody in that was relevant to files such as --

Q.   How frequently would Mr. Connick attend these meetings?

A.   Whenever he decided that it was time.

Q.   And how frequently would that happen, approximately?

A.   Sometimes he would come in two weeks in a row and then maybe we wouldn't see him again for two months or three months.  And generally -- you know, or he might just walk-through, because the grand jury room was right next to the administrative suite with the first assistant and the DA and then secretaries to those.  So he could come in at any time.  And he did like to get in

OPDA-FLANKS013657

Bridget Bane
April 18, 2019                                      183

frequently.  But he would also more infrequently call a meeting of the whole office and then there was some -- some major thing that he wanted to discuss.  I can't even remember what.

Q.  Do you recall any all hands on deck to all office meetings involving any type of disclosure or Brady issues?

A.  I don't recall.

Q.  Do you -- when you had your weekly trial division meetings, would Mr. Connick typically participate actively or he would sit in the back and --

A.  In the trial meetings?

Q.  Yes.

A.  No.  He -- he would usually not stay more than five minutes.  If he came in, he would usually greet everybody, make a little statement, make a joke, tell people they were doing a great job, tell them they had to do a better job, and, you know, disappear.

Q.  Do you recall him ever saying anything about Brady during one of those meetings?

A.  I don't.  That doesn't mean he didn't, but I don't.

Q.  Do you recall Brady being a topic of

OPDA-FLANKS013658

Bridget Bane
April 18, 2019                                              184

discussion at any of those meetings?

A.   I know Brady was a topic of discussion in those meetings.  I have no specific, you know, date or time or case to give you.

Q.   Understood.  And when you say it would be a topic of discussion, it would come up in the context of somebody from one of the sections talking about a disclosure issue that they're --

A.   Yes.  Or a new case.  Or a new case.

And the fact that it was one of the topics that we chose to ask the candidates to write on reflects the level of concern that there was about Brady.

Q.   And then what day of the week were those weekly staff meetings typically held?

A.   I know they were -- we had them toward the end of the week because we were concerned that -- you know, that -- most of the courts had their misdemeanor days on Fridays, but I think we might have tried to avoid Friday.  We might have had them on Thursday evening, I think, because we thought we would be getting to the end of the felony trial week.

Q.   Understood.  You also mentioned that the division would periodically hold Saturday

OPDA-FLANKS013659