Leon A.  Cannizzaro, Jr.
April 16, 2019                                1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

*********************************************************

ROBERT JONES

                              Civil Action No.
VS.                           2:18-cv-0503-JTM-JCW

LEON CANNIZZARO, JR., AND      Section H(2)
ABC INSURANCE COMPANIES
1-10

*********************************************************

DEPOSITION OF LEON A. CANNIZZARO, JR.
Taken on April 16, 2019
at the offices of
Stanley, Reuter, Ross, Thornton & Alford, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana  70112


REPORTED BY:  RITA DEROUEN, CCR, RPR

*********************************************************

U.S. LEGAL SUPPORT, INC
504.264.6650



EXHIBIT
29

OPDA-FLANKS017012

Leon A.  Cannizzaro, Jr.
April 16, 2019                                        36

have never spoken to Mr. Connick about that.  But I would assume that in all likelihood that would have been a decision he made.

Q.    So how to deal with a rogue prosecutor from a discipline standpoint, you would have expected Mr. Connick as the district attorney to set that policy?

A.    Again, I do not know particularly how he would have dealt with that.  I can say that during the time that I was there, I don't know that we ever encountered that situation, so I would not -- I did not experience that or observe that from being inside from like 1978 through 1983.

Q.    And you mentioned that you were an assistant district attorney during those years, '78 to '83, correct?

A.    Yes, sir.

Q.    And then from '83 to, what, 2002, you were a criminal district judge?

A.    From '83 until February 1, '86, I was in private practice and I worked in the public defender's office.

Q.    And then what year did you become a criminal district court judge?

A.    I was -- I took the bench on February the 10th, 1986.

U.S. LEGAL SUPPORT, INC
504.264.6650

OPDA-FLANKS017047

Leon A.  Cannizzaro, Jr.
April 16, 2019                                    65

Q.    Or to disclose Brady.

A.    Again, even as early as magistrate court, if you would find, for instance, in a misdemeanor case that there was something that helped the defendant -- let's say it was a simple battery charge and there was a witness who would come forward and say that the victim struck the defendant first and the defendant only hit him in self-defense and fought back, you were instructed to make sure that the defense was aware of that witness who would help -- who would help the defense's case to establish a self-defense claim.

I use a very simple example, but certainly we were instructed, even at that early time, to say you have to turn that information over.  Or if, for instance, it was a possession-of-marijuana case, which we tried a bunch of those at that time, if the crime lab came back and said, "The substance that we tested that the police seized was not, in fact, a controlled and dangerous substance," then you would give that lab report to the defense attorney and let him know that this is a -- this is problematic, and you can present that in your case if the state wishes to pursue this matter.

So even at those early stages, you were advised that this is not what -- that you provide to the defense

OPDA-FLANKS017076

Leon A. Cannizzaro, Jr.
April 16, 2019                                          66

information that is of an exculpatory nature or that tends to help the defense in their proceeding.

Q.   During that time period, though, there was no written policy statement with respect to Brady, correct?

A.   To my knowledge, I never recall ever seeing a written policy from the office.

Q.   There was no formal training of NOPD in its -- so that it understood its obligations with respect to Brady, correct?

MR. ALFORD:  Object to the form.

A.   I cannot speak for the police department.

BY MR. CUNNINGHAM:

Q.   During your time as assistant district attorney, to your knowledge, OPDA did not provide any formal training to NOPD with respect to its obligations under Brady, correct?

MR. PAUL:  Object to the form.

A.   Again, to my knowledge, I do not know of any formal training that the district attorney's office would have provided to the police.

BY MR. CUNNINGHAM:

Q.   The shoestring budget under which you indicate Mr. Connick was operating under would have limited Mr. Connick's ability to hire and retain supervisory-level prosecutors, correct?

OPDA-FLANKS017077

Leon A. Cannizzaro, Jr.
April 16, 2019                                            129

witness, for instance, took the stand and said something that was inconsistent with the statement that he had.

We allege that the attorney was aware that we were calling a witness who had made a deal with us, and he was complaining that he didn't get the deal until before the trial, the Monday or something before the trial.

And that's essentially what the code says. That's what the discovery articles say. We have to comply -- we have to provide it to them prior to the trial or in accordance with a schedule set forth by the court. And I thought we were in compliance with that in this particular case.

BY MR. CUNNINGHAM:

Q. What takes precedence, the Louisiana Code of Criminal Procedure or the United States Constitution?

A. The United States Constitution.

Q. Now, when we talked about Brady policy, you testified that you're not aware of a written policy existing at the time that you were assistant district attorney, correct?

A. Yes, sir.

Q. And that information, then, was -- whatever Brady policy as you've described it existed was conveyed to you through staff meetings; is that correct?

OPDA-FLANKS017140

Leon A. Cannizzaro, Jr.
April 16, 2019                                    130

A.    We would have staff meetings.  We would also receive a summary of cases.  The Louisiana District Attorneys Association would send us a list of the cases that were handed down related to criminal law from the United States Supreme Court and the circuits -- the federal circuit courts.  And we would also receive cases from the Louisiana Supreme Court and, basically, synopses of the cases and the law.

We all had access to that as assistant DAs, and we would also have regular staff meetings.  It would be trial meetings.  Those in the trial division would meet usually every Friday or at least two times a month.

Q.    So you had the LDAA pamphlet, I think you've described it in the past.

A.    Yes, sir.

Q.    You have slip opinions that would be sent to the district attorney's office from the courts?

A.    Yes, sir.  And also at the time, Dennis Waldron -- Judge Waldron would keep this little index card -- this box of index cards, and Judge Waldron would make those available to all of us.

He was, when I entered the office, the chief of screening, and then he later became the first assistant, and then he was elected judge when I was in the office.  And he always made his little index card boxes available

OPDA-FLANKS017141

Leon A.  Cannizzaro, Jr.
April 16, 2019                                    131

to us, and we would make copies of those.

Q.   So through the pamphlet and through Judge Waldron's summaries of slip opinions, that was how you learned about the law?

A.   That's how we kept up with it.  That's how we kept up with it.  I mean, they -- again, we would have discussions at the staff meetings, the -- they would sit down at the staff meetings and go over -- someone from appeals, for instance, would come to the staff meetings on occasion and talk to us about the recent developments in the criminal law, especially some of the more important cases that they felt were coming out of the Louisiana Supreme Court.  Or if something came out of the U.S. Supreme Court, we would sit down and we would discuss that.

Q.   Any other types of documents that you or OPDA relied on during the time that you were an assistant district attorney to provide people with the ability to keep up with the law?

A.   Again, I don't -- I don't recall -- I don't recall other than -- you know, I will say that, again, I thought they did a good job of trying to keep us posted on the current developments in the law.

Q.   Do you remember any of the LDAA pamphlets or the index cards from Judge Waldron dealing with Brady

OPDA-FLANKS017142

Leon A.  Cannizzaro, Jr.
April 16, 2019                          132

issues?

A.   Absolutely.  Yes, sir.

Q.   Okay.  Which Brady cases came up, and in what context?

A.   I can't talk specifically, but certainly he would have had the Brady decision there.  He would have had the Giglio decision there.  And, again, if there had been anything that would have been handed down by the Louisiana Supreme Court, again, involving any other parish in Louisiana, he would have had that there.

Q.   And when you say "he," you're talking about Judge Waldron?

A.   Judge Waldron.  I apologize.  Yes, sir.

Q.   And, of course, he wasn't a judge at the time.

A.   Right.

Q.   These were index cards that he kept at his desk?

A.   Yes.

Q.   And were you required as a prosecutor to visit Judge Waldron and review the cards on a periodic basis?

A.   No.  No, it wasn't like that.  But, again, we -- you know, you wanted to keep up with the law, and you would -- certainly, Judge Waldron was considered to be sort of an expert with regard to the law.  And he was a very easy person to get along with.  He was a very

OPDA-FLANKS017143