465

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

*****************************************************************

JOHN THOMPSON

V.

CIVIL ACTION NO. 03-2045 "J"
NEW ORLEANS, LOUISIANA
WEDNESDAY, FEBRUARY 7, 2007, 8:30 A.M.

HARRY F. CONNICK, et al.

*****************************************************************

**VOLUME III**
TRANSCRIPT OF TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:       MORGAN, LEWIS & BOCKIUS, LLP
                         BY:  J. GORDON COONEY, JR., ESQUIRE
                              MICHAEL L. BANKS, ESQUIRE
                              S. GERALD LITVIN, ESQUIRE
                         1701 MARKET STREET
                         PHILADELPHIA, PENNSYLVANIA, 19103


FOR THE DEFENDANT:       GOINS AARON, PLC
                         BY:  RICHARD GOINS, ESQUIRE
                              WILLIAM D. AARON, ESQUIRE
                              MARK C. CARVER, ESQUIRE
                         1010 COMMON STREET, SUITE 2600
                         NEW ORLEANS, LOUISIANA  70112


ALSO PRESENT:            HARRY CONNICK
                         EDDIE JORDAN

THOMPSON-004381

EXHIBIT
30

OPDA-FLANKS021708

468

**TIMOTHY McELROY**........................................ 736

DIRECT EXAMINATION BY MR. GOINS........................ 736

THOMPSON-004384

OPDA-FLANKS021711

750

chief, the junior, and the senior, were there any other individuals that would participate in the pretrial?

A.    No, it was a junior assistant, the senior assistant and the deputy chief on some occasions, and the trial chief.  If the assistants wanted a reduction on a case, the reductions would go directly to the trial chief, because only the trial chief could reduce cases.  So if a deputy chief could pretry with the senior and the junior, but the trial chief had to pretry reduction requests or dismissal requests.

Q.    What role, if any, did the pretrial play in the unearthing of *Brady* material?

A.    A closer examination of what exactly -- this is what pretrials were.  What's the theory of your case?  How do you intend to prove it?  Who are your witnesses?  Have you talked to them?  Have you gotten discovery from them?  Did you ask for discovery from them?  Do you have information that is favorable to the accused?  Have you been through any statements from the defendant that you have to advise the defense attorney about?  Statements, evidence, statements from the defendant, evidence taken from the defendant are matters that have to come before the judge alone.  You want to make sure those matters are handled and the judge has ruled on that before you call a jury.

Q.    Were there any other processes or checks and balances in existence in District Attorney Harry Connick's office in the 1984-1985 time frame other than the ones that you've just told

THOMPSON-004666

OPDA-FLANKS021993

751

the jury about?

A.    I told you about the LDAA function, the seminar.  There were trial meetings.  This is a very important training, since, again, I'm not sure exactly what the formal training question is.  This would be -- this would be all the trial attorneys meeting on a regular basis -- weekly basis with the trial chief.  Reviewing for the whole, there were ten sections of court in 1984.  They added two more criminal courts since then.  But there were ten criminal courts, so you would have at or about 20 attorneys.  They would be all gathering around and that's when you would share what happened this week.  What cases went to trial.  You would, it was very collegiate.  This is where you exchanged information.

There were also, and this is a very important piece of this, examination for *Brady* because that's where you continue to ask me, the chief of the Appeals Division in District Attorney Harry Connick's office was responsible for reviewing all most recent decisions, you would think so.  Whenever the appellate courts issued opinions, the chief of appeals would have to digest those opinions and would send out the opinions to the chief staff, chief staff.  The chief of all the different divisions.  Sometimes those opinions didn't require any further discussion from the chief of appeals.  Sometimes it took the chief of appeals to come in and tell us what they meant, describe for us and educate.  Sometimes the chief of appeals would teach, Bill

THOMPSON-004667

OPDA-FLANKS021994

752

Campbell, just recently died, was the chief of appeals when I was in the Trial Division. And Mike McMahon, who is the U.S. Attorney here would come and lecture us from a chief of appeals position. On those occasions where it was necessary. Otherwise, chief staff would disseminate those opinions to people who worked under them.

Q. Now, would those opinions to the best of your recollection, include analyses of cases that involved *Brady* material?

A. Of course. Of course. *Brady*'s only an aspect, a very important aspect of a prosecutor's responsibility. Another part of it is was were there statements from the defendant that were properly taken? Was it properly advised? Was there evidence taken from the defendant? In a legal way, was it legally seized. So there were many areas in which, in prosecution, and in criminal law you have to remain abreast.

Q. So you provided us with a number of processes, checks and balances designed to analyze *Brady* material. Were there any others than the ones that you've just provided us with?

A. We're still talking in that time frame in which I am an Assistant District Attorney, 1984, '85, '86, '87. '88 I am trial chief. '89 I am screening chief. Yes. We added more. As the decisions from the U.S. Supreme Court began focusing on exculpatory information, we added more instruction on exculpatory.

Q. Did you ever add any formal training? In the classroom

THOMPSON-004668

OPDA-FLANKS021995