**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **RAYMOND FLANKS** | * | **NO. 23-cv-06897** |
| | * | |
| **VERSUS** | * | **JUDGE NANNETTE JOLIVETTE** |
| | * | **BROWN** |
| **THE CITY OF NEW ORLEANS;** | * | |
| **JASON WILLIAMS, in his official** | * | **MAGISTRATE KAREN WELLS ROBY** |
| **capacity as Orleans Parish District** | * | |
| **Attorney; ANNE KIRKPATRICK, in her** | * | |
| **official capacity as Superintendent of the** | * | |
| **New Orleans Police Department; JOHN** | * | |
| **DILLMANN, in his individual capacity;** | * | |
| **and JOHN/JANE DOES #1-20, in their** | * | |
| **individual capacities** | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## <u>MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION ON THE PLEADINGS AND ALTERNATIVE MOTION FOR SUMMARY JUDGMENT</u>

**NOW INTO COURT**, through undersigned counsel, comes Defendants City of New Orleans ("City"), Anne Kirkpatrick in her official capacity as Superintendent of the New Orleans Police Department ("NOPD"),[1] and John Dillmann, in his individual capacity ("Dillmann") (collectively, the "City Defendants"), who respectfully submit this memorandum in support of their Motion for Judgment on the pleadings, pursuant to Federal Rule of Procedure 12(c). As an initial matter, John Dillmann asserts that he is entitled to qualified immunity from suit. Further, despite amending his complaint, Raymond Flanks ("Flanks") has not alleged plausible facts that state a claim for which relief can be granted against any of the City Defendants. Alternatively,

---

[1] For the remainder of this memorandum, all references to the City as a defendant in this lawsuit also include Anne Kirkpatrick in her official capacity, as there is no legal distinction between the two for purposes of this lawsuit.

Defendants are entitled to summary judgment because Flanks cannot offer any evidence to meet his burden of production. Accordingly, all claims against the City Defendants should be dismissed.

## INTRODUCTION

This is a civil rights case arising from Raymond Flanks' ("Flanks")[2] allegedly wrongful conviction for murder in 1985. Flanks brings his lawsuit under 42 U.S.C § 1983 against the OPDA, the NOPD, former NOPD Detective John Dillmann as well as twenty (20) unidentified individual defendants. Throughout his Amended Complaint, Flanks improperly conflates his factual allegations against the OPDA, an office of the State, with that of the NOPD and the City. Nevertheless, Flanks often refers to all Defendants collectively and makes his allegations of wrongdoing without the requisite specificity.

Flanks asserts federal claims for the deprivation of his civil rights (Counts 1-5) and related state claims (Counts 7-10, 12) against Dillmann and other, unnamed individual defendants. These claims arise from the alleged fabrication of evidence by Dillmann during the underlying homicide investigation and alleged withholding of exculpatory evidence in violation of *Brady v. Maryland*. Flanks also asserts violations of his civil rights by the OPDA, the NOPD, and the City based on their allegedly unconstitutional policies, customs, and practices pursuant to *Monell v. Department of Social Services* (Count 6). Flanks alleges that these policies condoned and encouraged misconduct, including the fabrication and suppression of criminal evidence, which resulted in his wrongful conviction. Last, Flanks asserts negligence, vicarious liability, and state constitutional claims against Dillmann and the City based on the same factual allegations (Counts 9, 11, 12).

As discussed in detail below, Flanks has failed to state a cognizable claim against the City Defendants for several reasons. First, Dillmann is entitled to qualified immunity because Flanks

---

[2] Numerous documents in the record may list Plaintiff's last name as "Flank" instead of "Flanks." For the sake of clarity, the Plaintiff is referred to throughout this memorandum as "Flanks."

has not pleaded facts that demonstrate that Dillmann deprived him of his constitutional rights or acted in an unreasonable manner. Second, the claims against Dillmann that are predicated solely on his trial testimony are barred by absolute immunity. And Third, Flanks has failed to establish the requisite pattern of constitutional violations needed to demonstrate the existence of an official City policy that resulted in a deprivation of his rights under *Monell*. Accordingly, this Court should render judgment on the pleadings in favor of the City Defendants and dismiss all the claims asserted against them with prejudice.

Even if Flanks was able to state a cognizable claim against the City Defendants, there is no genuine dispute as to any material facts regarding Detective Dillmann and the City, and this Court should, in the alternative, grant judgment in favor of the City Defendants as a matter of law.

## FACTUAL BACKGROUND[3]

On December 17, 1983, Fay Carnesi, a white woman, was walking to her car, which was parked in front of her house, when she noticed a black man wearing a shower cap walk past her ("the perpetrator").[4] Fay's husband, Martin Carnesi, accompanied her to the car.[5] The perpetrator demanded money from Martin.[6] When Martin reached into his pocket, the perpetrator pulled out a gun and fatally shot him.[7] The perpetrator then pointed his gun at Fay and demanded money from her.[8] Fay threw her purse at the perpetrator and fled from the scene.[9]

In her initial report to police, Fay Carnesi described the perpetrator as a black man in his

---

[3] The facts set forth in this section are based solely on Plaintiff's allegations in his Amended Complaint and are not offered as undisputed material facts for purposes of summary judgment. The City Defendants' Statement of Uncontested Material Facts is contained in a separate document filed along with the Motion for Judgment on the Pleadings and for Summary Judgment.

[4] R. Doc. 27 at ¶¶ 30-31.

[5] *Id.* at ¶32.

[6] *Id.* at ¶33.

[7] *Id.*

[8] *Id.* at ¶34.

[9] *Id.*

"late twenties, about 5'10" and 150 pounds, with a medium build, brown skin, and a light mustache."[10] She also recalled seeing the perpetrator speed away from the scene in a light blue car.[11] During her grand jury testimony, four weeks later, she also noted that the perpetrator as having a "little white blotch on the side of his cheek."[12] Flanks alleges that at the time of the crime, he could not have matched this description, as he was twenty years old, over six feet tall and did not have a white mark on the side of his cheek.[13]

NOPD investigators associated Fay Carnesi's description of the perpetrator with that of a suspect who had committed a string of similar armed robberies in the same area against elderly victims like the Carnesis.[14] On December 23, 1983, Flanks was arrested while fleeing from an armed robbery of an A&P Food Store.[15] Flanks does not contest his subsequent conviction for this armed robbery.[16] However, he notes that he was arrested for robbing a store, not an elderly person on the street, and he was not wearing a shower cap.[17] The arresting officer reported Flanks as having a "dark" complexion and a tattoo on his right hand.[18] Flanks was driving a light blue 1982 Chevrolet Citation.[19] Flanks alleges that this would have been a very new vehicle at the time of the murder in 1983, and that it is inconsistent with Fay Carnesi's description of an old car during the grand jury proceeding.[20] However, it is worth noting that when Carnesi original reported the crime to police, she did not specify the age, make, or model of the vehicle.[21]

---

[10] *Id.* at ¶38.
[11] *Id.* at ¶35.
[12] *Id.* at ¶38.
[13] *Id.* at ¶39.
[14] *Id.* at ¶41.
[15] *Id.* at ¶44.
[16] *Id.*
[17] *Id.*
[18] *Id.* at ¶46.
[19] *Id.* at ¶48.
[20] *Id.*
[21] *Id.* at ¶40.

A week later, detectives visited Carnesi at her home and showed her a photo array, which included a photo of Flanks.[22] Carnesi described her identification process at the grand jury proceeding.[23] She recalled being able to eliminate three of the "five" photos quickly.[24] Carnesi asked to use a flashlight so she could examine the last two in detail and be certain she was making an accurate identification.[25] Carnesi testified that she then recognized one of the photos as being of the man who shot and killed her husband.[26] She then told the detectives that she remembered seeing the white blotch on one side of the perpetrator's face, but the photo of the perpetrator did not show the side of the perpetrator's face with the mark.[27] She testified that one of the detectives said "[t]hat's him" following her statement describing the white mark.[28] Contrary to Flanks assertions regarding this testimony, Carnesi never identified Dillmann as the detective who responded to her statement.[29]

The case initially went to trial on August 28, 1984.[30] The jury was not able to reach a verdict, a mistrial was declared, and the case was reset.[31] At defense counsel's request, the firearm recovered from Flanks when he was arrested for robbery, which had been identified as the murder weapon, was examined by a Bureau of Alcohol, Tobacco, and Firearms ("ATF") Forensic Laboratory.[32] The lab determined that it was not the weapon used to kill Martin Carnesi.[33]

---

[22] *Id.* at ¶49.
[23] *Id.* at ¶50.
[24] *State v. Raymond Flank*, Police Item No. L-17352-83, Transcript of Grand Jury Testimony of Fay Carnesi, January 19, 1984 at p. 4. Attached as Exhibit B.
[25] *Id.*
[26] *Id.*at 5
[27] *Id.*
[28] *Id.*
[29] *See Id.*; *see also* Exhibit B, Fay Carnesi's Grand Jury Testimony; *see also State v. Flank*, No. 299-809, Joint Agreement and Motion to Vacate Conviction, at p. 5, fn. 5. Attached as Exhibit G
[30] R. Doc. 27 at ¶53.
[31] *Id.* at 57.
[32] *Id.* at 58.
[33] *Id.*

The second trial began on May 14, 1985.[34] Notably, Defense counsel did not introduce any impeachment evidence regarding the identification of the murder weapon in the previous trial, although it presumably could have.[35] Flanks does not dispute that he was carrying a gun when he robbed the A&P food store.[36] On the witness stand during the second trial, Carnesi positively identified Flanks as the man who killed her husband, noting that "[i]f I live to be a thousand years old. Every night when I go to bed, I see this man shoot my husband." [37] She testified that Dillmann, "didn't tell me anything," indicating whom to identify during the photo line-up.[38] Again, contrary to Flanks' assertions, this statement is not inconsistent with her testimony during the grand jury proceedings.[39] Dillmann was also called as a witness at trial. He testified that no one "indicate[d] in anyway [sic] that [he] wanted her to pick out a particular photograph."[40] This too is not inconsistent with Carnesi's grand jury testimony as Flanks contends.

Flanks was found guilty of first-degree murder and sentenced to life without parole.[41] He alleges that he and his counsel were not aware of Carnesi's grand jury testimony, or NOPD records, which demonstrate that the suspect who committed the string of robberies before Flanks arrest did not physically resemble him.[42] Flanks further alleges that had these materials been available to the defense at trial, they could have been used to question the reliability of Carnesi's identification of him, rebut Dillmann's testimony, and call into question the integrity of the investigation.[43]

In May 2022, IPNO contacted the Civil Rights Division of the OPDA, which then began

---

[34] *Id.* at 59.
[35] *Id.*
[36] *Id.* at 58.
[37] *Id.* at 60.
[38] *Id.*
[39] *See* Exhibit B at pp. 4-5.
[40] R. Doc. 27 at ¶62.
[41] *Id.* at ¶65-66.
[42] *Id.* at ¶67-68.
[43] *Id.* at ¶68.

its own review of the investigation.[44] At the conclusion of the investigation, IPNO and the OPDA filed a Joint Agreement and Motion to Vacate Flanks' conviction.[45] At the hearing, the OPDA stated that Flanks' conviction was obtained in violation of *Brady v. Maryland* because the OPDA had failed to disclose material evidence to defense counsel which could have be used to show that Carnesi was innocently mistaken in her identification of the perpetrator.[46] Notably, Flanks alleges no facts which would suggest that the City, NOPD, or Dillmann ever failed to disclose material evidence to the State. As the Joint Agreement and Motion to Vacate makes clear, the OPDA was in possession of the transcripts and NOPD reports that Flanks alleges could have been used to impeach the testimony of Carnesi or Dillmann at trial.[47]

Flanks filed the instant lawsuit on November 11, 2023.[48] The City Defendants answered on January 22, 2024, asserting failure to state a cause of action and qualified immunity among other affirmative defenses.[49] On June 4, 2024, Flanks amended his complaint, without providing a name for any of the twenty (20) as yet still unidentified defendants.[50] On June 19, 2024, the City Defendants answered the Amended Complaint, asserting the same defenses.[51]

## LAW AND ARGUMENT

I. **THE CLAIMS AGAINST THE CITY DEFENDANTS SHOULD BE DISMISSED PURSUANT TO FEDERAL RULE 12(c).**

The standard for dismissal under Rule 12(c) is the same as that for dismissal for failure to state a claim under Rule 12(b)(6). *Suri Holdings, L.L.C. v. Argent Mortg. Co., L.L.C.*, No. 21-20137, 2021 WL 5985320, at *2 (5th Cir. Dec. 16, 2021)(citing *Johnson v. Johnson*, 385 F.2d 503,

---

[44] *Id.* at ¶69.
[45] *Id.* at ¶70.
[46] *Id.* at ¶¶72-73.
[47] *Id.*; *See also State v. Flank*, No. 299-809, Joint Agreement and Motion to Vacate Conviction.
[48] R. Doc. 1
[49] R. Doc. 16.
[50] R. Doc. 27.
[51] R. Doc. 29.

529 (5th Cir. 2004)).[52]

Rule 12(b)(6) permits a party to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on the face of the complaint "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausibility does not equate to probability, but rather "it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly,* 550 U.S. at 557). Thus, if the facts pleaded in the complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* at 679 (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court employs the two-pronged approach utilized in *Twombly*. The court "can choose to begin by identifying pleadings that, because they are no more than conclusions [unsupported by factual allegations], are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "'[The] task, then, is to determine whether

---

[52] *See also Lively v. WAFRA Inv. Advisory Grp.,* 6 F.4th 293, 301-02 (2d Cir. 2021); *Perez v. Wells Fargo*, 774 F.3d 1329, 1336 (11th Cir. 2014); *Richards v. Mitcheff*, 696 F.3d 635, 637-38 (7th Cir. 2012); and *Grajales v. Puerto Rico Ports Auth.*, 682 F.3d 40, 45-46 (1st Cir. 2012).

the plaintiff has stated a legally cognizable claim that is plausible, not evaluate the plaintiff's likelihood of success.'" *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 385 (5th Cir. 2017)(quoting *Doe ex rel. Magee v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 854 (5th Cir. 2012)).

A court's review of a 12(b)(6) motion is typically limited to the contents of the complaint; however, "a district court may rely on evidence outside the complaint, without converting the Rule 12(b)(6) motion into a motion for summary judgment, if that evidence is either (a) a document attached to the Rule 12(b)(6) motion, referred to in the complaint, and central to the plaintiff's claim; or (b) a matter subject to judicial notice under Federal Rule of Evidence 201." *George v. SI Grp., Inc.*, 36 F.4th 611, 619 (5th Cir. 2022).

**A.    The claims against John Dillmann in his individual capacity should be dismissed.**

To state a § 1983 claim against an official in his individual capacity, a plaintiff must establish that the "official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham,* 473 U.S. 159, 166 (1985); *see also Cornish v. Corr. Servs. Corp.*, 402 F. 3d 545, 549 (5th Cir. 2005). Law enforcement officials are entitled to qualified immunity at the motion-to-dismiss phase of a § 1983 action unless the plaintiff has alleged facts sufficient to plausibly show that (1) the defendant's conduct violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged misconduct. *Harmon*, 16 F. 4th at 1163 (*citing Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 816, 172 L.Ed.2d 565 (2009)).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties responsibly." *Pearson*, 555

U.S. at 231. Qualified immunity shields a government official from civil liability for damages based upon the performance of discretionary functions unless the official's acts were objectively unreasonable in light of clearly established law. *Atteberry v. Nocoma Gen'Hosp.*, 430 F. 3d 245, 253 (5th Cir. 2005).

Flanks' Amended Complaint purportedly asserts claims against twenty-one defendants in their individual capacities, but he names only one: former NOPD Detective John Dillmann. Flanks never establishes whether the unidentified defendants were affiliated with the City, NOPD or OPDA. He similarly does not make any specific allegations as to what these individuals did to deprive him of his rights or demonstrate why the City or NOPD should be liable for them. Thus, with respect to the "individual defendants" referenced in his Amended Complaint, Flanks has only pleaded facts related to Dillmann's alleged actions. In a similar matter, another section of this Court recently dismissed all claims against another group of unnamed defendants after the plaintiff failed to identify them. *Walter v. City of New Orleans*, No. 23-4352, 2025 WL 1697150, at 6 (E.D. La. June 17, 2025).

Flanks' Amended complaint contains five Counts against Dillmann under § 1983: (1) deprivation of liberty without due process of law, (2) engaging in violations of due process that shock the conscience, (3) malicious prosecution and denial of fourth amendment rights, (4) failure to intervene, and (5) civil rights conspiracy. In the two-part test for defeating qualified immunity, Flanks has not overcome the first requirement—that he show a deprivation of rights. Accordingly, his claims against Dillmann in his individual capacity should be dismissed.

**1. Dillmann is entitled to qualified immunity because Flanks has not shown that Dillmann's actions deprived him of any constitutional right.**

   **a.** *Counts 1 and 2 – Due Process*

Flanks alleges that Dillmann violated his Due Process rights in three ways: (1) by

withholding exculpatory evidence from defense counsel in violation of *Brady*[53]; (2) by improperly influencing Fay Carnesi's identification of her husband's murderer during the photo lineup[54]; and (3) by falsely testifying at trial.[55] None have merit.

### i.  Dillmann did not violate *Brady*.

While *Brady* imposes a duty on prosecutors to share exculpatory evidence with the defense, it generally does not extend to police officers. *Dilosa v. City of* Kenner, CIV.A. 03-0310, 2004 WL 2984342, at 21 (E.D. La. Dec. 16, 2004) (citing *Mowbray v. Cameron County, Tx,* 274 F. 3d 269 278 (5th Cir. 2001). For a police officer to violate an individual's *Brady* rights, the officer must intentionally, or in bad faith, withhold *Brady* material from all parties, including the prosecution. *Dilosa*, 2004 WL 2984342 at 21 (citing *Villlasana v. Wilhoit*, 368 F.3 976, 980 (8th Cir. 2004)).

Flanks has not made any factual allegations that suggest that Dillmann or any other NOPD employee was responsible for failing to disclose potentially exculpatory evidence to prosecutors in violation of Due Process. As described below, Flanks has failed to show that this evidence is even exculpatory. Flanks provides only a conclusory assertion that "the individual defendants failed to disclose exculpatory evidence" without specifying which individual defendant withheld what evidence from whom.[56] Notably, Flanks supports his *Brady* allegations against *all* defendants with extensive jurisprudence related almost entirely to claims brought against the State.[57]

### ii.  Dillmann did not fabricate evidence *via* suggestive photo lineup.

Flanks' only allegations against Dillmann are that he fabricated evidence because he

---

[53] R. Doc 27 at 143, 144.
[54] *Id.* at 144.
[55] *Id.*
[56] R. Doc. 27 at ¶143, 151.
[57] *See* R. Doc. 27 at ¶¶122-124.

"improperly encouraged" Fay Carnesi to identify Flanks as the perpetrator in the photo lineup, and then falsely denied this purported misconduct when he later testified at trial.[58] But these allegations fall far short of the standard required to survive a Rule 12 motion.

In *Armstong v. Ashley,* 60 F.4th 262, 272 (5th Cir. 2023), the Fifth Circuit rejected allegations that defendant police officers had fabricated evidence which led to the plaintiff's wrongful conviction for murder, calling them "barebones" and "devoid of supporting factual detail that could render them plausible." The Fifth Circuit reasoned that the plaintiff had not shown how an allegedly fabricated statement implicated him for the crime, why he believed it to be fabricated or how the statement was used against him. *Id.*

Here, Flanks allegations are similarly barebones and devoid of the necessary factual support. Flanks has failed to adequately allege that Dillmann fabricated *any* evidence, why Flanks believed it to be fabricated, or how Dillmann purportedly used it against him. Flanks alleges that Fay Carnesi testified that Dillmann "shook his head and said, 'that's him' indicating the photo of Mr. Flanks" when she reviewed the photo lineup and identified the perpetrator. [59] But this is a selective reading of Carnesi's grand jury testimony, which is inaccurate at best and misleading at worst. Because Flanks has quoted this testimony directly in support of his Amended Complaint, and it is central to his claims against Dillmann, it is appropriate for the Court to consider it in its entirety for purposes of a Rule 12 Motion. *George v. SI Grp., Inc.*, 36 F.4th 611, 619 (5th Cir. 2022). An excerpt of the City's Exhibit B, the July 1984 Grand Jury Testimony of Fay Carnesi, is provided in pertinent part below:

Q      OK. Do you remember about a week later, uh, the detectives came to your house and showed you some pictures?

A      Yes.

---

[58] R. Doc. 27 at ¶144.
[59] R. Doc. 27 at ¶51.

Q    And the picture you picked, was that the individual who had shot your husband?

A    He had five of them. As soon as I looked I took three and pushed them on the side. And I had one here and one here. And I looked at this one. And I told my daughter, I said, "Get me a flashlight. I want to make sure that it's him if it's here. So I looked at this one and I put it down, and I took the one on this side and looked at it. And I kept looking and I recognized him. Then I told the detectives, I said, "I remember one thing about this man. He had a little white blotch on the side of his cheek, a little white mark, like discolored looking" **And then the three detectives looked at one another, and he shook his head** and said, "That's him." But I don't think they showed the side of his face with the mark, but I happened to remember it because I was looking him in his face twice, you see, and I remembered.

Q    Are you sure that the man you picked out in the pictures is the man that killed your husband?

A    Yes.[60]

As shown, Fay Carnesi testified that "three detectives" participated in the photo line-up, not just Dillmann. She also never identified Dillmann as the detective who shook his head and said "that's him" as Flanks alleges. *See* Exhibit B *in globo*. Further, it is clear that when this statement is viewed in the full context of Carnesi's grand jury testimony, the unnamed detective was likely responding to her comment regarding the "white blotch" on one side of the perpetrator's face. This is not simply a "rationalization" of her selection as mischaracterized in the Amended Complaint.[61] Moreover, Carnesi was asked by the district attorney if she was sure she had picked out the picture of the man that killed her husband following this exchange, and she indicated that she was.

### iii. Dillmann did not testify falsely at Flanks' trial.

Flanks' allegation that Dillmann further violated Due Process by falsely testifying at trial about his alleged misconduct is also without factual support.[62] First, as shown, Flanks has not

---

[60] Emphasis added.
[61] R. Doc. 27 at ¶52.
[62] R. Doc. 27 at ¶62.

pleaded sufficient facts to show that Dillmann committed any misconduct at all when presenting the photo lineup to Carnesi. Second, Dillmann's testimony that no one "indicate[d] in anyway [sic] that [he] wanted her to pick out a particular photograph" does not contradict what Fay Carnesi described regarding the photo identification. Carnesi testified to a white blotch on the perpetrator's face, and she recalled an unidentified detective responding to this comment, not that this or any other detective encouraged her to make any particular selection before she identified Flanks as the perpetrator.

Even Flanks' tortured reading of the grand jury testimony were reasonable, alleged facts which do not permit the court to infer more than the mere possibility of misconduct do not show that a plaintiff is entitled to relief. *Twombly* at 679. Flanks' entire argument against Dillmann rests on an alleged contradiction between Dillmann's trial testimony and Fay Carnesi's testimony regarding an unidentified detective during the grand jury proceeding.[63] He does not compare the testimony of the same witness in two different proceedings, but rather two different witnesses speaking about the same event. Further, Flanks has not shown how this supposed contradiction could even be considered exculpatory. Fay Carnesi identified Flanks in court at the second trial and was certain she had identified the perpetrator; just as she was when identifying Flanks in the photo line-up.[64]

Because Flanks' allegations that Dillmann violated Due Process by fabricating evidence and testifying falsely are conclusory assertions without plausible factual support, Counts 1 and 2 of the Amended Complaint should be dismissed and judgment rendered in favor of the City Defendants pursuant to Rule 12(c).

---

[63] Notably, to accept Flanks' argument, it would also be true that Mrs. Carnesi lied at Flanks' criminal trial. *See* summary judgment argument, *infra*.

[64] R. Doc. 27 at ¶60.

### b. *Count 3 -- Malicious Prosecution*

Flanks also alleges Dillmann engaged in conduct that amounted to malicious prosecution and the deprivation of Fourth Amendment rights.[65] But these claims fail for the same reasons as his first two counts. As before, Flanks has not pleaded sufficient facts to show that Dillmann's actions amounted to the deprivation of the rights he alleges, and he has therefore failed to overcome Dillmann's qualified immunity. Here, the burden of persuasion is even more difficult to satisfy than it is for his first two constitutional claims.

The Fifth Circuit has provided that the "constitutional tort" of malicious prosecution is made up of seven elements. *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001). A plaintiff must show that: (1) a criminal action commenced against them; (2) the prosecution was caused by defendants or with their aid; (3) the action terminated in the plaintiff's favor; (4) the plaintiff was innocent; (5) the defendants acted without probable cause; (6) the defendants acted with malice; and (7) the criminal proceeding damaged the plaintiffs *Id.* Similarly, the "constitutional torts" of false arrest, unreasonable seizure, and false imprisonment also require a showing of no probable cause. *Id.*

Flanks makes a number of threadbare factual allegations related to the conduct of a single individual City Defendant, Dillmann, and as shown above, these allegations are without the factual support necessary to state a plausible cause of action against him for the violation of Due Process. But even if this were not the case, Flanks' malicious prosecution claims would still fail. He has alleged no facts which would indicate that Dillmann caused Flanks' prosecution, alleging only that "the NOPD immediately associated" the Carnesi murder with "a series of similar armed robberies in the same area."[66] The criminal court vacated his conviction following a joint motion by defense

---

[65] R. Doc. 27 at ¶155.
[66] R. Doc. 27 at ¶41.

counsel and the  Civil Rights Division of the OPDA.[67] The criminal court found that Flanks "did not receive the justice that he deserved.[68]" It did not find that Flanks was factually innocent, and Flanks does not allege that it did.[69] Flanks has also failed to allege facts which would indicate what Dillmann intentions were during the events which lead to Flanks conviction, let alone that he was acting with malice.

Further, Flanks has alleged no facts which might suggest that Dillmann or any member of the NOPD lacked probable cause in investigating Flanks for the Carnesi murder. Indeed, the facts Flanks provides in his Amended Complaint indicate the opposite. The NOPD had responded to a number of armed robberies in the vicinity of the Carnesis' home in the days before and after the shooting.[70] The perpetrator of these crimes was a young black man who reportedly drove a light blue car like Flanks.[71] The victims of these crimes were elderly people, like the Carnesis.[72] Flanks was arrested a week after the murder for an armed robbery he does not contest, while driving a light blue car.[73]

Even if all of the differences Flanks alleges among these crimes are accepted as true, it is clear that the similarities of these crimes to the Carnesi murder would be sufficient for a reasonable officer to find probable cause. Overcoming qualified immunity on a malicious prosecution claim is a significant hurdle. As the Fifth Circuit noted "there must not even 'arguably' be probably cause for the search and arrest for immunity to be lost." *Brown*, 243 F. 3d at 190. (internal citation omitted). "If a reasonable officer could have concluded that there was probable cause upon the facts then available to him, qualified immunity will apply." *Id.*

---

[67] *Id.* at ¶70.
[68] *Id.* at ¶75.
[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.*
[73] *Id.* at ¶¶44, 48.

Flanks has plainly not pleaded sufficient facts to overcome Dillmann's qualified immunity here. Accordingly, this cause of action should be dismissed.

### c. *Count 4 – Failure to Intervene*

A § 1983 claim brought under a failure to intervene theory requires the plaintiff to show that an officer was present while another officer violated someone's constitutional right, was aware of the violation, and had a clear opportunity to intervene but failed do so. *Tuttle v. Sepolio,* 68 F.4th 969, 974 (5th Cir. 2023) (citing *Joseph v. Bartlett*, 981 F.3d 319, 343 (5th Cir. 2020).

Flanks has failed to plead plausible facts to support this cause of action. His allegations are conclusory and vague, amounting to a mere recitation of the elements. Flanks contends that "individual Defendants stood by without intervening to prevent other Defendants and others yet unknown from violating Mr. Flank's constitutional rights, even though those individual defendants had the opportunity to intervene."[74] Who these defendants are and what opportunities they may have had to intervene is never specified. He alleges no facts regarding Dillmann's behavior as a supervisor, or if Dillmann should even be considered one.

Flanks makes one single passing reference to "Defendant Dillmann's supervisors at the NOPD" without pleading any facts to establish a failure to intervene claim.[75] He does not allege facts to indicate that any supervisor was present when Dillmann allegedly violated Flank's rights, that said supervisors were aware of the violation, or that they had a clear opportunity to intervene and failed to do so. Allegations against the municipality and the NOPD Superintendent in her official capacity are the subject matter of Flanks' *Monell* claim (Count 6). Flanks has not identified any of Dillmann's supervisors or pleaded any facts to support a failure to intervene theory against Dillmann himself. Accordingly, Dillmann is entitled to qualified immunity and the fourth cause of

---

[74] R. Doc. 27 at ¶162.
[75] R. Doc. 27 at ¶131.

action of the Amended Complaint should be dismissed.

### d.  *Count 5 – Civil Rights Conspiracy*

Conspiracy claims asserted under § 1983 require plaintiffs to prove "(1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Bevill v. Wheeler*, 103 F.4th 363, 374 (5th Cir. 2024) (citing *Armstrong v. Ashley*, 60 F.4th 262, 280 (5th Cir. 2023)). "Conspiracy" has been defined as actions "taken in concert by the defendants with the specific intent to violate the aforementioned right". *Kerr v. Lyford,* 171 F.3d 330, 340 (5th Cir. 1990). Mere conclusory allegations of conspiracy, absent reference to material facts, do not state a cause of action under § 1983. *See Marts v. Hines,* 68 F.3d 134, 136 (5th Cir. 1995).

Flanks' allegations in support of a conspiracy claim are vague and conclusory. He asserts that Defendants "acted in concert" to conceal exculpatory evidence and inconsistent witness statements, improperly encouraged Fay Carnesi to identify Flanks in the photo array, fabricated evidence, and affirmatively concealed such misconduct but provides no details which would support this alleged cooperative effort to deprive him of his rights.[76]  Moreover, he has not alleged who exactly was acting in concert. Flanks, again, has named only Dillmann individually. A conspiracy requires more than one individual. *Cousin v. Small*. No.00-0069, 2000 WL 1100384, at *3 (E.D. La. Aug. 4, 2000).

Flanks has not pleaded plausible facts which would support a claim of civil rights conspiracy but merely asserted that one exists. This is a legal conclusion couched as factual allegation. Therefore, this cause of action should be dismissed.

### e.  *Count 7 – State Malicious Prosecution*

---

[76] R. Doc. 27 at ¶168.

To succeed on a claim for malicious prosecution under Louisiana law, a plaintiff must prove these essential elements: (1) the commencement or continuance of an original criminal or civil judicial pleading; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damages. *Waste Mgmt. of Louisiana, L.L.C. v. Par. of Jefferson ex rel. Jefferson Par. Council*, 66 F. Supp. 3d 761, 776 (E.D. La. 2014).

This standard tracks with the standard for malicious prosecution under § 1983, and Flanks' claim fails for the same reasons as discussed in Section I.A.1.b, *supra.* Although factual innocence is not required under the State standard, the other requirements are nearly identical to the Federal standard. Here, Flanks has alleged no facts to establish that Dillmann caused the prosecution of Flanks, that Dillmann or anyone at the NOPD lacked probable cause, or that Dillmann was acting with malice. All of these elements are required. As such, Count 7 of the Amended Complaint should also be dismissed.

### f.   *Count 8 – State Law Wrongful Conviction and Imprisonment*

Under Louisiana Law, the tort of false imprisonment consists of two elements (1) detention of the person, and (2) the unlawfulness of the detention. *Waganfeald v. Gusman*, 674 F.3d 475, 480 (5th Cir. 2012). For the reasons discussed in Section I.A.1.a, *supra*, Flanks has not pleaded sufficient facts to show that he was unlawfully detained. Flanks has not pleaded any facts which would suggest that Dillmann violated his due process or any other consitutional rights and has therefore failed to overcome Dillmann's qualified immunity. Accordingly, Count 8 of the Amended Complaint should be dismissed for the same reasons as Counts 1 and 2.

### g. *Count 9 – Negligence*

The determination of liability in a negligence case usually requires proof of five separate elements: (1) proof that the defendant had a duty to confirm his conduct to a specific standard (the duty element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damage element). *Detraz v. Lee*, 2005-1263 (La. 1/17/07), 950 So 2d 557, 562.

As with his other claims against Dillmann, Flanks "repeats and realleges" the same facts he provides for his federal claims in asserting his negligence claim.[77] And also as before, this claim amounts to little more than a conclusion. Assuming that the court accepts as true that Flanks suffered damages because of his imprisonment, he has failed to allege plausible facts to show that Dillmann breached his duty of care and that this breach caused his injuries. As explained above, Fay Carnesi never identified Dillmann as the detective who allegedly encouraged her to identify Flanks' photograph in the lineup.[78] Flanks has similarly not alleged facts which would suggest Dillmann ever testified inconsistently, let alone falsely.[79] In addition, Flanks has not alleged any facts which would suggest that Dillmann or anyone at the NOPD failed to turn over their reports to the State in violation of *Brady*.[80] That the State was in possession of Dillmann's report and other NOPD materials at the time of trial is, of course, essential to Flanks' theory of this case.[81]

---

[77] R. Doc. 27 at ¶193.
[78] *See* Exhibit B
[79] *See* discussion in Section I.A.1, *supra.*
[80] *Id.*
[81] R. Doc. 27 at ¶¶72-73; *See also State v. Flank,* No. 299-809, Joint Agreement and Motion to Vacate.

Flanks has similarly failed to allege any plausible facts to show that Dillmann was a cause-in-fact of his allegedly wrongful conviction. Again, the State was in possession of Dillmann's report[82] and Fay Carnesi positively identified Flanks as the perpetrator at trial.[83] Further, Flanks' assertion that Carnesi identified Dillmann in her grand jury testimony, as shown above, is demonstrably false.[84]

Because Flanks has failed to plead facts which would support an inference that Dillmann breached any standard of care, and that this breach caused his conviction and imprisonment, his negligence claim fails.

### h.  *Count 10 –Intentional Infliction of Emotional Distress*

In order to recover for intentional infliction of emotional distress in Louisiana, a plaintiff must establish "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *Prest v. Louisiana Citizens Prop. Ins. Corp.,* 2012-0513 (La. 12/4/12), 125 So. 3d 1079, 1089, n. 5 (internal citations omitted).

This claim also fails for the same reasons as Flanks' other State claims against Dillmann and here the standard is much more difficult to satisfy than mere negligence. *Spencer v. Valero Ref. Meraux, L.L.C.*, 2022-00469 (La. 1/27/23), 356 So. 3d 936, 949. As mentioned, Flanks has pleaded no facts which would allow the Court to draw any inference related to Dillmann's state of mind or intention at any point during the homicide investigation. Further, he has failed to plead *any* facts which suggest Dillmann breached a standard of care, let alone that such an alleged breach

---

[82] *Id.*
[83] R. Doc. 27 at ¶60.
[84] *See* Exhibit B; [ADD CIT TO FACTS/Affidavit]

was "extreme and outrageous." Thus, Count 10 of the Amended Complaint should be dismissed for the same reasons as Count 9.

### i. *Count 12 – State Constitutional Claims.*

The due process clauses in the Louisiana Constitution and the U.S. Constitution are nearly identical in language, and the two clauses are coextensive and provide the same due process protections. *Robinson v. St. Tammany Par. Pub. Sch. Sys.*, 983 F. Supp. 2d 835, 844 (E.D. La. 2013), *aff'd*, 569 F. App'x 303 (5th Cir. 2014) (citing La. Const. Art. I § 2). Therefore, Flanks' Louisiana constitutional claims against Dillmann fail for the same reasons as discussed in Section I.A.1.a, *Supra.*

La. Const. art. I § 3 states:

> No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime.

Flanks has not alleged any facts indicating that that he was denied equal protection of the laws or discriminated against on the basis of any protected class.  Flanks has not alleged any violation of this constitutional provision.

La. Const. art. I § 5 states "Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court."

La. Const. art. I § 12 provides a constitutional right to be from discrimination on the basis

of certain protected classes with respect to "access to public areas, accommodations, and facilities." Flanks has made no allegations regarding his access to public areas, accommodations, and facilities."

La. Const. art. I § 13 states:

When any person has been arrested or detained in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest or detention, his right to remain silent, his right against self incrimination, his right to the assistance of counsel and, if indigent, his right to court appointed counsel. In a criminal prosecution, an accused shall be informed of the nature and cause of the accusation against him. At each stage of the proceedings, every person is entitled to assistance of counsel of his choice, or appointed by the court if he is indigent and charged with an offense punishable by imprisonment. The legislature shall provide for a uniform system for securing and compensating qualified counsel for indigents.

Flanks has not alleged facts regarding any of the procedural rights in this section.

La. Const. art. I § 15 states:

Prosecution of a felony shall be initiated by indictment or information, but no person shall be held to answer for a capital crime or a crime punishable by life imprisonment except on indictment by a grand jury. No person shall be twice placed in jeopardy for the same offense, except on his application for a new trial, when a mistrial is declared, or when a motion in arrest of judgment is sustained.

Flanks has not alleged that any of these rights were violated.

La. Const. art. I § 16 states, in relevant part:

Every person charged with a crime is presumed innocent until proven guilty and is entitled to a speedy, public, and impartial trial in the parish where the offense or an element of the offense occurred, unless venue is changed in accordance with law. No person shall be compelled to give evidence against himself. An accused is entitled to confront and cross-examine the witnesses against him, to compel the attendance of witnesses, to present a defense, and to testify in his own behalf.

Flanks has not alleged any facts to support a claim for violation of these rights.

La. Const. art. I § 20 states: "No law shall subject any person to euthanasia, to torture, or to cruel, excessive, or unusual punishment. Full rights of citizenship shall be restored upon termination of state and federal supervision following conviction for any offense." Flanks has not

alleged that any of these rights were violated by the City Defendants.

La. Const. art. I § 22 states "All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights." Flanks has not alleged that the City Defendants did anything to violate these rights.

La. Const. art. I § 24 states "The enumeration in this constitution of certain rights shall not deny or disparage other rights retained by the individual citizens of the state." Flanks has not identified any unenumerated right nor alleged facts to support a claim for violation of said unenumerated right.

As shown, Flanks has failed to plead plausible facts to support any of his claims against Dillmann in his individual capacity (Counts 1-5, 8-10, and 12). This Court should dismiss all of these claims with prejudice and grant judgment on the pleadings in favor of Dillmann pursuant to Federal Rule 12(c).

**2. Claims against Dillmann predicated solely on Dillmann's trial testimony are barred by absolute immunity.**

Even if Flanks was able to establish that Dillmann testified falsely at trial, which he has not, claims based on the content of Dillmann's testimony alone are barred by absolute immunity. The United States Supreme Court has held that government officials enjoy no less protection than any other witness in a judicial proceeding.

In *Briscoe v. LaHue,* 460 U.S. 325, 345 (1983), the Supreme Court, held that the same rationale that established absolute immunity for judges and prosecutors applies to trial witnesses. The Court found that Congress never intended for § 1983 to abrogate the traditional witness immunity found in the common law. *Id.* at 339. Like the case at bar, *Briscoe* was a case brought by plaintiffs, convicted of felonies, who claimed deprivations of due process because of a police

officer's allegedly false testimony and suppression of exculpatory evidence. *Id.* at 327. The *Briscoe* Plaintiffs, like Flanks, claimed that the officer's testimony wrongfully implicated them in the underlying crimes, and this ultimately led to their convictions. *Id.*

The Court explained that "a police officer on the witness stand performs the same functions as any other witness; he is subject to compulsory process, takes an oath, responds to questions on direct examination and cross-examination, and may be prosecuted subsequently for perjury." *Id.* at 342. Taking into consideration the frequency with which police officers testify in criminal matters, the Court acknowledged the possibility that some criminal defendants might be unjustly convicted based on the false testimony of police officers but that limiting an official's immunity would do a greater disservice to the public interest. *Id.* at 345. "Subjecting government officials, such as police officers, to damage liability under § 1983 for their testimony might undermine not only their contribution to the judicial process but also the effective performance of their public duties." *Id.* at 343. Without such protections, the potential proliferation of § 1983 litigation against officials would likely impose significant burdens on judicial and law enforcement resources. *Id.*

The Fifth Circuit has recognized the "well-established rule that prosecutors and witnesses, including police officers, have absolute immunity from their testimony at trial" even if such testimony is perjurious and could give rise to a due process violation. *Castellano v. Fragozo*, 352 F.3d 939, 958 (5th Cir. 2003). Other Circuits have been more explicit in their articulation of the rationale the Supreme Court provides in *Briscoe*, finding that "a government witness is entitled to testimonial immunity no matter how egregious or perjurious that testimony was alleged to have been." *Clemans v. Scarborough*, 3:24-cv-P334-JHM, 2024 WL 4453819, at *7 (W.D. KY. Oct. 9, 2024) (*citing Moldowan v. City of Warren*, 578 F.3d 351, 390 (6th Cir. 2009) (*further citations omitted*)). Some courts have even extended immunity to "preparatory activities inextricably tied

to testimony, such as conspiracies to testify falsely." *Piptone v. Barksdale*, 2:24-CV-04072-PSG-AJR, 2024 WL 4372267, at *2 (C.D. Cal. Oct. 1, 2024)(*citing* Lisker v. City of Los Angeles, 780 F.3d 1237, 1241 (9th Cir. 2015).

In a factually similar matter, another section of this Court, recently dismissed claims against City Defendants for the exact reasons discussed above. *Walter v. City of New Orleans*, No. 23-4352, 2025 WL 1697150, at 6 (E.D. La. June 17, 2025).

Louisiana state courts have also applied similar reasoning in various state tort actions, finding that "witness immunity is an 'absolute privilege' because the privilege protects the witness from civil suit regardless of malice or falsity." *Marrogi v. Howard*, 805 So.2d 1118 (2002) 2001-1106 (La. 1/15/02) 805 So.2d 1118, 1125. The courts have extended this protection to police officers testifying in a criminal proceeding, even if the testimony was actually false. *Jeansonne v. City of Marksville,* 2015-298 (La. App. 3 Cir. 11/25/15), 180 So. 3d 608, 615, *writ denied*, *2016-0376 (La. 4/15/16), 191 So. 3d 1032,* and *writ denied,* 2016-0375 (La. 4/15/16), 191 So. 3d 1036. (citing *Lauga v. McDougall*, 463 So.2d 754 (La. App. 4 Cir. 1985). Further, Louisiana state courts have held that even if not asserted by defendants "absolute immunity" that is apparent on the face of a petition may properly form the basis of sustaining an exception of no cause of action." *Id.* (internal citation omitted).

In the instant case, Flanks has offered no reason why Dillmann, who testified at trial to the work he performed while investigating a crime, should not be protected by this well-established absolute immunity for witness testimony. As discussed *supra*, Flanks has not alleged any facts to support the claim that Dillmann encouraged Fay Carnesi to choose a particular photograph from the line-up. Flanks' only other factual allegation against Dillmann is that he testified falsely at trial, but this too is wholly conclusory. As shown, Carnesi did not identify Dillmann in her grand

jury testimony; and Flanks has made no factual allegations which would demonstrate that there is anything inconsistent or false about Dillmann's trial testimony. Flanks has conspicuously failed to cite any testimony or statement given by Dillmann before the trial. Flanks' state claims against Dillmann and the City incorporate the same conclusory allegations.[85] All of Flanks' claims against Dillmann are solely predicated on this testimony and are therefore barred by absolute immunity.

Flanks took the opportunity to amend his Complaint, but failed to provide additional facts that might substantiate his assertions regarding Dillmann. Accordingly, all federal and state law causes of action against Dillmann should be dismissed.

**B. The City is Entitled to Judgment on the Pleadings.**

**1. Flanks has not stated a § 1983 claim against the City under *Monell*. (Count 6)**

A suit against a government official in her official capacity is treated the same as a suit against a municipal entity. *See White v. Texas*, 2024 WL 1826245 at *3 (5th Cir. 2024)(citing *Kentucky v. Graham,* 473 U.S. 159,166 (1985). Thus, Flanks' claims against Anne Kirkpatrick in her official capacity as superintendent of the NOPD are analyzed under the same standard as Flanks' § 1983 claims against the City.

It is well settled that municipalities are subject to lawsuits under § 1983. *Monell v. Department of Social Services*, 436 U.S. 658 (1978). A government entity cannot be held liable under § 1983 pursuant to a theory of *respondeat superior*; rather, it can only be responsible when the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy, inflicts the injury." *Id.* at 694. Thus, to establish municipal liability under §1983, "a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a

---

[85] *See* R. Doc. 27 at ¶¶ 183, 189, 193, 196, and 203.

constitutional right." *Hicks-Fields v. Harris Cnty. Tex.,* 860 F.3d 803, 808 (5ᵗʰ Cir. 2017) (quoting *Peterson v. City of Fort* Worth, 588 F.3d 838, 847 (5ᵗʰ Cir. 2009)). An official policy usually exists in writing but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom. *Alvarez v. City of Brownsville*, 904 F.3d 282, 390 (5ᵗʰ Cir. 2018) (en banc). To succeed on a municipal claim under § 1983, a plaintiff must also show that the policy was implemented with "deliberate indifference" to the known or obvious consequences that constitutional violations would result. *Id.*

Flanks alleges that the NOPD's unlawful policies, customs, and practices include: (1) "suppressing and failing to timely disclose material exculpatory evidence," (2) "fabricating evidence, including but not limited to false witness statements," and (3) "engaging in the affirmative concealment of such misconduct."[86] Flanks further alleges that the City and NOPD's failure to train and supervise their employees caused this misconduct to occur, and ultimately led to Flanks' wrongful conviction.

Flanks has failed to plead plausible facts that satisfy the elements necessary to sustain any of these claims under *Monell*.

### a. Flanks has not pleaded sufficient facts to establish an official policy of the City or NOPD that deprived him of a constitutional right.

Flanks has not pleaded sufficient facts to allege that a City or NOPD policy was the "moving force" that deprived him of a constitutional right.

A civil rights plaintiff may carry his burden of proof under the official policy prong of *Monell* in three ways. *See Brown v. Bryan Cnty., OK*, 219 F.3d 450,457 (5th Cir. 2000). First, he can demonstrate the existence of "a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to

---

[86] R. Doc 27 at ¶173.

whom the lawmakers have delegated policy-making authority." *Id.* (quoting *Bennett v. City of Slidell*, 735 F. 2d 861, 862 (5th Cir. 1984) (en banc)). Second, an official policy can also be evidenced by custom, that is, "[a] persistent, widespread practice of city officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Id.* (quoting *Bennett,* 735 F. 2d at 862). Finally, "[w]hen the person who committed the challenged act is in charge of policymaking in that part of the government, 'policy' can sometimes be found to have been established by the very act itself." *Hampton Co. Nat'l Surety, LLC v. Tunica Cnty., Miss.,* 543 F. 3d 221, 227 (5th Cir. 2008).

Here, Flanks does not allege the existence of any written unconstitutional municipal policy; nor does he allege that his rights were violated by the person in charge of policymaking. Rather, it appears he attempts to demonstrate the existence of an official policy through custom, that is, a pattern of violations that allegedly led to a series of wrongful convictions. However, "[a] city cannot be liable for an unwritten custom unless actual or constructive knowledge of such custom is attributable to a city policymaker." *Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (internal quotations omitted).

In *Peña*, the Fifth Circuit found the policymaker element unsatisfied when a plaintiff's complaint "invite[d] no more than speculation that any particular policymaker, be it the chief of police or the city commission, knew about the alleged custom" of tasing non-threatening non-suspects. *Id.* Given the plaintiff's "utter failure to allege facts connecting this floating custom to any particular policymaker," she could not demonstrate any actual or constructive knowledge of the custom. *Id.* at 624, n. 15.

Additionally, establishing a municipal policy through a pattern of conduct requires "specificity and sufficiently numerous prior incidents." *Davidson v. City of Stafford,* 848 F.3d 384, 396 (5th Cir. 2017). The alleged conduct "must be similar to the case at hand: Prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question." *Johnson v. Harris County*, 83 F.4th 941,946-47 (5th Cir. 2023) (quotation omitted). Only "very similar violations" can provide the "notice" to policymakers that would give rise to deliberate indifference. *See Jason v. Tanner*, 938 F.3d 191, 198 (5th Cir. 2019); *see also Robinson v. Midland County*, 80 F. 4th 704, 710 n. 3 (5th Cir. 2023).

In *Armstrong,* 60 F.4th at 277-78, the Fifth Circuit held that "nine constitutional violations over a 24-year period and thousands of prosecutions are hardly sufficient to show a municipal custom." In the instant case, Flanks has provided even fewer examples of misconduct by employees of the City or NOPD over a similar period, most of which are inapplicable to the facts at bar.

Flanks points to four wrongful conviction cases that involve alleged misconduct by Dillmann: *Isaac Knapper, Kyles v. Whitley, Kevin Seward, and John Floyd*.[87] In each of these cases, the defendants' convictions were vacated *after* Flanks was convicted, so they could not have provided notice to policymakers of a pattern of violations that rise to the level of deliberate indifference as Flanks alleges.[88] Further, none of these cases involved allegations of an improper photo identification procedure, which is the central allegation of this case. And all were decided based on *Brady* violations on the part of prosecutors.

---

[87] R. Doc. 27 at ¶130.

[88] *See Floyd v. Vannoy,* No. 11-2819, 2017 WL 1837676 (E.D. La. May 8, 2017), *aff'd,* 887 F.3d 214 (5th Cir. 2018), *superseded on denial of reh'g en banc,* 894 F.3d 143 (5th Cir. 2018), and *aff'd,* 894 F.3d 143 (5th Cir. 2018); *Kyles v. Whitley,* 514 U.S. 419 (1995); *State v. Knapper*, 579 So.2d 956 (La. 1991); *State v. Seward*, 509 So. 2d 413 (La. 1987).

Indeed, the overwhelming majority of the cases Flanks cites have nothing to do with photo identification procedure or false testimony, but rather *Brady* allegations against the OPDA that resulted in the exoneration of criminal defendants. Of the thirty-eight wrongful conviction cases Flanks references in his Amended Complaint only two, *Norman Clark* and *Raymond Lockett*, involve findings of due process violations by an NOPD officer prior to Flanks' conviction in 1985.[89] Both cases relate to the conduct of a single NOPD officer who encouraged eyewitness to leave the State in advance of a criminal trial.[90] Neither case involved a finding that an NOPD officer conducted an improper photo line-up or provided inaccurate testimony.

At paragraph 132, Flanks cites *United States v. Duzac,* 622 F.2d 911 (5th Cir. 1980) as evidence of the NOPD's alleged "practice of condoning the fabrication of evidence" because Duzac, an NOPD police officer, was indicted for lying to a grand jury and willfully depriving an arrestee of his civil rights. Flanks does not allege that the NOPD was responsible or even aware of Duzac's false testimony during a presumably closed grand jury proceeding. A single indictment of one NOPD officer's wrongdoing cannot plausibly demonstrate a "policy, custom, and practice" of the NOPD. Further, no court has ever found that Dillmann's testimony at trial was false. *Duzac* is simply not an analogous case.

Flanks pleads facts related to three other cases—*Bobbie Jean Johnson, Reginald Adams, and Shareef Cousins*—that arguably involve police misconduct, but like those cases discussed at the beginning of this section, these were decided well after Flanks' conviction and could not, therefore, provide notice to the NOPD of "known and obvious" misconduct to which it was "deliberately indifferent."[91]

---

[89] R. Doc. 27 at ¶123, subparts "h" and "i."
[90] *Id.*
[91] *Id.* at ¶123, subparts "t" and "aa."; ¶124, subpart "b".

Flanks has failed to demonstrate a pattern of the NOPD committing the specific violations alleged in this case and has accordingly failed to establish the existence of a municipal policy, custom, or practice under *Monell*.

### b. Flanks has not identified a policymaker at the City or NOPD.

Even if Flanks were to have established the existence of a municipal policy that deprived him of his rights, he has not made clear who the policymaker was that would have promulgated it.

As mentioned, throughout his Amended Complaint, Flanks frequently conflates his allegations against the City, NOPD, OPDA, and Dillmann. He has confusingly identified the NOPD and the OPDA as "agencies of Defendant the City of New Orleans and/or Orleans Parish".[92] This is not entirely correct. The NOPD is a department of City, but the OPDA is not. *See* La. R.S. 16:1-16. The OPDA is an office of the State and prosecutes crimes on behalf of the State. The City has no authority over the OPDA's policies, practices, or customs. Nor does the OPDA have authority over the City's policies, practices, or customs. To the extent that Flanks' specific allegations against the City and NOPD can be separated from his allegations against any other defendant, they are without factual support. Flanks has not made clear which final policymaker promulgated a policy that allegedly led to the deprivation of his constitutional rights.

Article VI of the Louisiana State Constitution and Chapter 5 of the Home Rule Charter of the City of New Orleans vests authority over the administration and supervision of the NOPD in a Superintendent. Here, the only NOPD Superintendent named as a Defendant in Flanks' Amended Complaint is Anne Kirkpatrick, the current Superintendent of NOPD. There is no question that Anne Kirkpatrick did not promulgate any policy of the NOPD at the time of Flanks' conviction as she has held her current position for less than two years.[93] Flanks references Kirkpatrick's

---

[92] R. Doc. 27 at ¶24.
[93] https://nopdnews.com/post/september-2023/anne-kirkpatrick-sworn-in-as-nopd-interim-superint/

"predecessors in office"[94] but does not name which of them would have been the policymaker who promulgated a policy that deprived him of his rights. He has similarly pleaded no facts which would indicate that any of Dillmann's alleged misconduct was controlled or influenced by this unidentified policymaker.

### c. Flanks fails to plead sufficient facts to support his failure to train, supervise, and discipline claims.

A cognizable failure to train, supervise, or discipline claim requires a plaintiff to prove three elements: (1) the City failed to train, supervise, or discipline the officers involved; (2) there is a causal connection between the alleged failure to supervise, train, or discipline and the alleged violation of the plaintiff's rights; and (3) the failure to train, supervise, or discipline constituted deliberate indifference to the plaintiff's constitutional rights. *See Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (stating standard for failure to train or supervise); *Hunter v. City of Houston*, 564 F. Supp. 3d 517, 529 (S.D. Tex. 2021), *appeal dismissed sub nom. Hunter v. City of Houston, Texas*, No. 21-20632, 2022 WL 1782610 (5th Cir. Mar. 21, 2022) (citing *Deville v. Marcantel*, 567 F.3d 156, 171 (5th Cir. 2009)) (noting test for failure to discipline). In order for "liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 170 (5th Cir. 2010) (quoting *Roberts v. City of Shreveport,* 397 F.3d 287, 293 (5th Cir. 2005). Moreover, "absent specific allegations supporting a plausible causation inference" such a claim is a legal conclusion that "warrants dismissal under Rule 12(b)(6)."  *Ratliff v. Aransas Cnty., Texas*, 948 F.3d 281, 285 (5th Cir. 2020).

Here, in what amounts to little more than a recitation of claims, Flanks alleges that the City and NOPD "failed to conduct any in-service or advanced training for supervisors; failed to ensure

---

[94] R. Doc. 27 at ¶24.

Page **33** of **45**

that its supervisors had the training and resources to supervise investigations, including of murders; and failed to document and enforce disciplinary investigations."[95] It is unclear as to how the foregoing conclusory statements apply to Flanks' alleged constitutional deprivations. He pleads no specific facts that could plausibly establish causation. Flanks points to reports published by the International Association of Chiefs of Police and the Louisiana National Guard that found a lack of training at NOPD, but he pleads no facts which connect these general assessments with the alleged misconduct of Dillmann or the deprivation of Flanks' rights.[96] Moreover, both reports were published years *after* Flanks' conviction (in 1991 and 1994, respectively) and could not have provided the notice of constitutional violations Flanks alleges. Flanks has, therefore, failed to plead facts to allege the deliberate indifference of the policymaker or establish the existence of a policy that was the moving force behind his claims. Accordingly, Flanks has not satisfied the elements necessary for his failure to train, supervise and discipline claims.

Because Flanks has failed to allege any facts that satisfy the elements necessary to sustain a cognizable *Monell* claim, the sixth count of his Amended Complaint should be dismissed, and judgment on the pleadings should be rendered in favor of the City pursuant to Federal Rule 12(c).

### 2. Flanks fails to state a claim against the City for vicarious liability under state law (Count 11).

Under Louisiana law, an employer is liable for the torts of an employee committed while the employee is acting within the course and scope of his employment. La. Civ. Code art. 2320. "Vicarious liability rests in a deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accident which may fairly be said to be characteristic of its activities." *Valenza v. Santos*, No. 16-1058, 2016 WL 7210347, at *3 (E.D. La. Dec. 13, 2016). Louisiana

---

[95] *Id.* at ¶ 78.
[96] *Id.* at ¶¶ 79, 82.

courts have generally determined vicarious liable by examining four factors: "(1) whether the tortious act was primarily employment rooted; (2) whether the [act] was reasonably incidental to the performance of the employee's duties; (3) whether the act occurred on the employer's premises and (4) whether it occurred during the hours of employment." *Id.* (internal citations omitted). Of course, for an employer to be liable for the torts of its employee, an employee must be "found liable in the first instance." *Chatman v. Plaquemines Par.*, No. 23-1688, 2025 WL 270627 at *2 (E.D. La. Jan. 22, 2025).

Flanks seeks to hold the City vicariously liable for Dillmann's alleged wrongdoing.[97] He has named no other individual Defendant and pleads no additional facts in support of this claim. The City does not dispute that Dillmann was in the course and scope of his employment when he participated in the Carnesi murder investigation and testified at trial. However, this Count fails because there is no violation "in the first instance." *See Id.* For the reasons discussed above, Flanks has not alleged sufficient facts to show that Dillmann ever violated Flanks' civil rights. Because there is no underlying tort, the City cannot be held vicarious liable. Count 11 of the Amended Complaint should be dismissed, and judgment rendered in favor of the City.

## II. IN THE ALTERNATIVE, THIS COURT SHOULD GRANT SUMMARY JUDGMENT IN FAVOR OF THE CITY DEFENDANTS

Summary judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Barrios v. Clipps*, 825 F.Supp.2d 730 at 6 (5th Cir. 2011) (citing Fed. R. Civ. P. 56(a)). When the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact then the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If

---

[97] R. Doc. at 27 at ¶200-202.

the moving party has made an initial showing that there is no evidence to support the non-moving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita,* 475 U.S. at 586, 106 S.Ct 1348 (1986).

A court's first step in the summary judgment process is "consulting the applicable substantive law to determine what facts and issues are material." *Bros. v. Klevenhagen*, 28 F. 3d 452, 455 (5th Cir. 1994) (citing *King v. Chide*, 974 F.2d 653, 655-56 (5th Cir. 1992). Thus, a court should make an initial determination of the essential elements of the plaintiff's claims to ensure the plaintiff has set forth evidence of "specific facts in support" of every element. *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986)). If a fact will not "affect the outcome of the lawsuit under governing substantive law," even a genuine dispute about the fact will not preclude summary judgment. *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir. 1987).

When a court considers evidence on summary judgment it should "view facts in the light most favorable to the non-movant" and "draw all reasonable inferences" in favor of the non-movant. *Coleman v. Houston Indep. Sch. Dist.,* 113 F.3d 528, 533 (5 th Cir. 1997) (citing *Klevenhagen*, 28 F. 3d at 455). However, a fact can only be viewed in a light favorable to the non-movant when there is conflicting evidence, *i.e.,* "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075-76 (5th Cir. 1994). If the evidence regarding a fact at issue is not contradicted, it can only be viewed in one light. Similarly, when there is no evidence at all of a factual issue, the court may not, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F. 3d at 1076 (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed.

Page **36** of **45**

2d 695 (1990)); *see also Bibbins v. City of Baton Rouge*, 489 F. Supp. 2d 562, 573 (M.D. La. 2007).

Finally, the substantive threshold of evidentiary support that a non-movant must need to create a genuine issue of fact requires more than a "scintilla" of evidence. *Little v. Liquid Air Corp.*, 37 F. 3d 1069, 1075-76 (5th Cir. 1994)(citing *Lujan*, 497 U.S. at 888, 110 S.Ct. at 31888, for proposition that "it will not do to 'presume' the missing facts"). Furthermore, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). Thus, to survive judgment, a plaintiff must present comprehensive evidence, without gaps, that could support a jury's conclusion that the plaintiff has met his burden of proving each element of his claims.

Flanks cannot meet this burden for any of his claims against the City Defendants.

## A. There is no evidence to support any of the claims against Dillmann in his individual capacity.

As shown above, Flanks has failed to allege sufficient plausible facts to support any of his claims against Dillmann. But even if the Court were to find that these claims were well-pleaded, there is no evidence in the record or elicited through discovery which supports them. Therefore, Dillmann is entitled to judgment as a matter of law. All of Flanks' claims against Dillmann depend completely upon three central allegations. First, Flanks alleges that Dillmann failed to disclose exculpatory evidence to his Defense counsel prior to his criminal trial in violation of *Brady*.[98] Second, Flanks alleges that Dillmann fabricated evidence when he improperly encouraged "an

---

[98] R. Doc. 27 at ¶143, 151.

Page **37** of **45**

uncertain" Fay Carnesi to choose his photograph from the line-up.[99] And Third, Flanks alleges that Dillmann lied about "this misconduct when testifying at Mr. Flanks' trial."[100] The City incorporates the arguments provided in Section I, and addresses the evidentiary issues with each of these claims in turn.

### 1. *Brady*

As established above, Dillmann complied with his obligations under *Brady* by turning over to the prosecution all material evidence favorable to the defense. The record evidence clearly establishes that this occurred. All of the documents located in the NOPD's case file for the Carnesi murder can be found in the OPDA's files for the prosecution of either the Carnesi murder or the A&P robbery. Accordingly, Dillmann did not withhold **any** evidence, let alone exculpatory evidence, from the prosecution. "[P]olice officers have no constitutional duty under *Brady* to disclose exculpatory evidence to defense counsel." *Mowbray v. Cameron Cnty., Tex.*, 274 F.3d 269, 280 (5th Cir. 2001).

Even if Flanks could point to *Brady* material that was in the possession of Dillmann, but not the OPDA, which is denied, Flanks cannot offer any evidence that any such failure to disclose was deliberate or made in bad faith. *See DiLosa v. City of Kenner*, No. CIV.A. 03-0310, 2004 WL 2984342, at *21 (E.D. La. Dec. 16, 2004) ("The few decisions that have extended *Brady* duties to officials other than prosecutors have involved allegations of intentional or bad faith failure to disclose Brady material to all parties, including the prosecution"). Dillmann testified that "It was our understanding at that time it was our understanding that we turned over all our evidence and reports to the district attorney and they would determine what was Brady and what was not Brady,

---

[99] *Id.* at ¶144
[100] *Id.*

and it was not our obligation to do so."[101]  Dillmann further testified that he did not even make the final decision about what evidence to turn over to the OPDA: "we turned over our file to the secretary who put a package together for the district attorney. Then if they wanted anything else or had any questions they would get in touch with us."[102]

Flanks' claims against Dillmann that rest upon *Brady* violations must be dismissed because Flanks cannot offer evidence that Dillmann deliberately or in bad faith failed to provide the prosecution with exculpatory evidence or evidence that was otherwise favorable to the defense in Flanks' criminal case.

### 2. The photographic identification procedure with Fay Carnesi was not suggestive

When the record evidence regarding the photographic identification procedure is taken as a whole, a reasonable jury could not conclude that Dillmann did anything to fabricate evidence by suggesting that Mrs. Carnesi should select the photograph of Raymond Flanks.  Through the course of discovery so far, the parties have identified five instances of sworn testimony about the photo identification procedure that led Mrs. Carnesi to identify Flanks as the murderer.  The transcript of the criminal trial in 1985 contains testimony from both Detective Dillmann and Mrs. Carnesi.  Detective Dillmann also gave a deposition in this civil litigation.  There is a transcript of testimony that Mrs. Carnesi gave to the grand jury in *State v. Flanks* on January 19, 1984.  Finally, Mrs. Carnesi's daughter, Debbie Gonzales, has signed a sworn declaration.  The relevant portions of each of these five instances of testimony are quoted below.

**2025 Dillmann Deposition**

> I laid them out on the table. And I don't remember if her family was there or not, and I stood over her and asked her was there anyone there -- was there anyone in these pictures that she recognized like I would always do.· And she immediately

---

[101] Ex. G, Dillmann Deposition, p. 171:8-9
[102] Ex. G, Dillmann Deposition, p. 175:21-24.

looked at them and she took four of them and moved them over on the side. Then she picked up the two and she asked one of her family members to get her a magnifying glass. And they brought her a magnifying glass and she put them down and she looked at them with a magnifying glass -- just above this amount of time she looked at them with a magnifying glass and picked it up and handed me the picture. And I asked her at that time is this a tentative identification, or is this a positive identification, and she told me at that time no, this is positive; I'll never forget his face.[103]

## 1985 Criminal Trial – Dillmann Testimony

I went to the Carnesi's residence in order to present a photographic line-up to Mrs. Carnesi. I had called earlier that day and I arrived at the residence sometime around 2:30 P.M. that evening. I met with Mrs. Carnesi and again with members of her family in the kitchen of the residence. I drank a cup of coffee with them at the table and then I conducted a photographic line-up.

* * * *

I took six color photographs including the photograph of the Defendant in this case, Mr. Flank and I placed them on the kitchen table in two rows of three each. I instructed Mrs. Carnesi for her to look at the photographs and see if she recognized anyone in this photographic line-up.

* * * *

Q.    Did you do anything to influence her or set her up to pick out a picture?

A.    No, sir. I did not.

* * * *

Q.    Did you tell her – did you show her anything in particular about anyone of those photographs before she looked at them?

A.    No, sir. Only that I would like her to look at these six photographs and see if she recognizes any of them. That was the only statement that I made to her.

* * * *

A.    Mrs. Carnesi immediately looked at the six photographs and took four of the photographs and immediately moved them on the side. The remaining two photographs was, one of the photographs was a photograph of the Defendant, Mr. Flank. The other photograph I don't recall exactly which one it was, but it was one of the other five photographs. She moved these four photographs on the side and she asked her daughter to get her a flashlight. Her daughter brought her a flashlight

---

[103] Ex. G, Dillmann Deposition, p. 125: 10-24.

Page **40** of **45**

and looked at both pictures, picked up the photograph of Mr. Flank and handed it to me and begin [*sic*] crying.  Once she stopped crying she told me that this was positively the man who had shot and killed Mr. Carnesi.[104]

**1985 Criminal Trial – Carnesi Testimony**

Q.    Subsequent to that date, and that was December 17th, did you meet with Detective Dillmann again at your house on December 23rd?

A.    Yes, he called my home and asked me how I felt.  I told him I was still, you know real upset and real nervous.  He asked me if he could come to my home and show me some pictures or that he would like me to look at some pictures.

Q.    Did he say anything like I got a picture of the guy that killed your husband and I want you to identify him?

A.    No.  No.  He said he wanted me to look at the pictures and see if I could identify anyone in the pictures.

\*\*\*\*

Q.    Did he tell you something about picture number-4?

A.    No.

Q.    Did he tell you about any particular number on the top?

A.    No.

\* \* \* \*

A.    He took -- it was in my kitchen on my kitchen table.  He took them and placed them out.  I guess similar to this.  If you don't recognize anyone in these pictures, if you don't recognize anybody just put them on the side if you don't know who they are, if you don't recognize them.  I looked at them like the four and I did this and I put them aside.  They had like two left.  I glanced at these – In other words, I looked at four of them and first and I put them on the side.  I looked at one picture and then looked at this and I got hysterical, and said this is the man.  I am sure this is the man.  My son-in-law was there.  My daughter, Debbie was there.  I don't know who else was there, and my daughter, Gayle was there.  I said, "I am sure this is the guy.  I am sure this is the guy."  I started shaking and I grabbed my son-in-law's hand so tight until his hand was white from me gripping it.  I said, "Get me a flashlight, Jerry.  Let me look.  I have to be positive.  I am sure.  If this is the guy I got to be positive.  I do not want to accuse anyone of killing my husband unless I am sure."  He got the flashlight and put the flashlight on it and it was him.  This is the man that killed my husband.  This man.  I can't forget his face never,

---

[104] Ex. A, Criminal Trial Transcript, FLANKS_002781, line 19 - FLANKS_002785, line 10.

ever.  If I live to be a thousand years old."[105]

**1984 Grand Jury – Carnesi Testimony**

Q.    OK.  Do you remember about a week later, uh, the detectives came to your house and showed you some pictures?

A.    Yes.

Q.    Were you able to pick a picture out of those pictures that they showed you?

A.    Yes.

Q.    And the picture you picked, was that the individual who had shot your husband?

A.    He had five of them.  As soon as I looked I took three and pushed them on the side.  And I had one here and one here.  And I looked at this one.  And I told my daughter, I said, "Get me a flashlight.  I want to make sure that it's him if it's here."  So I looked at this one and I put it down, and I took the one on this side and looked at it.  And I kept looking and I recognized him.  Then I told the detectives, I said, "I remember one thing about this man.  He had a little white blotch on the side of his cheek, a little white mark, like discolored looking."  And then the three detectives looked at one another, and he shook his head and said, "That's him."  But I don't think they showed the side of his face with that mark, but I happened to remember it because I was looking him in his face twice, you see, and I remembered.

Q.    Are you sure that the man you picked out in the pictures is the man that killed your husband?

A.    Yes.[106]

**2025 Sworn Declaration – Debra Gonzales**

1.  My father, Martin Carnesi, was shot and killed on December 17, 1983.

2.  On or about December 23, 1983, I was with my mother, Fay Carnesi, when Detective John Dillmann and two other police officers came to my mother's house and asked her to look at photographs of individuals to see if she recognized anyone as the person who shot Martin Carnesi.

3.  I saw the photographs that were shown to my mother, and none of them stood out to me as noticeably different from the others.

---

[105] Ex. A, Criminal Trial Transcript, OPDA-FLANKS_002811, line 20 – OPDA-FLANKS002814, line 20.
[106] Ex. B, Carnesi Grand Jury Testimony, OPDA-FLANKS024146 - OPDA-FLANKS024147.

4. When showing the photographs, neither Detective John Dillmann nor the other police officers did or said anything to indicate that Fay Carnesi should pick a particular photograph or to suggest whether any of the photographs were of a person the police suspected of killing Martin Carnesi.

5. After looking at the photographs shown to her by the police, Fay Carnesi picked the photograph of Raymond Flanks; she said she was certain that the person in the photograph she picked was the person who shot Martin Carnesi.[107]

When read together, the great weight of the evidence shows that Dillmann presented Mrs. Carnesi with six photographs of individuals who were sufficiently similar in appearance to each other and to Mrs. Carnesi's description of the perpetrator. Dillmann only instructed Mrs. Carnesi to look at the photographs and tell him if any of them showed the person who shot Martin Carnesi. Neither Dillmann nor another officer did or said anything else with respect to the photographs until after Mrs. Carnesi had positively identified Raymond Flanks. When Mrs. Carnesi selected the photograph of Raymond Flanks, she was certain that the photograph depicted the person who shot her husband.

A reasonable jury could not read Mrs. Carnesi's grand jury testimony as evidence that John Dillmann made an improper statement about the identity of the individual in the photograph that Mrs. Carnesi had selected. Rather, the grand jury testimony reflects that after Mrs. Carnesi identified Raymond Flanks as the perpetrator, an unspecified man said "That's him." This grand jury testimony does not contradict the testimony of Mrs. Carnesi and John Dillmann, as well as the sworn declaration of Debbie Gonzales, which all unequivocally state that John Dillmann did not do or say anything to influence Mrs. Carnesi's selection of Raymond Flanks during the photographic identification procedure on December 23, 1983.

Because a reasonable jury could not find that Detective Dillmann did anything to make the photo identification procedure suggestive, Dillmann is entitled to summary judgment dismissing

---

[107] Ex. M, Sworn Declaration of Debra C. Gonzales.

all claims arising for fabrication of evidence through a suggestive identification procedure.

### 3. The allegedly false testimony

While Detective Dillmann is entitled to absolute immunity for his testimony at trial, there is also no evidence that his testimony at Flanks' criminal trial was false.  As demonstrated above, Detective Dillmann's trial testimony regarding the photographic identification procedure is consistent with the testimony of Fay Carnesi, both at trial and during the grand jury proceedings, and the Sworn Declaration of Debra Carnesi.

Simply put, Flanks cannot offer any evidence that a reasonable jury could rely upon to find in favor of any of the state or federal claims against Detective Dillmann.

### B. There is no evidence to support Flanks' claims against the City.

The City incorporates the arguments provided in Section I regarding the claims against it. As with his claim against Dillmann, even if this Court were to find that Flanks met his burden under Rule 12, he has not provided evidence sufficient to support summary judgment. His *Monell* claim against the City remains unsupported and wholly conclusory. He cannot offer evidence which would support a claim that an official City policy was the moving force behind the deprivation of any of his rights.  Flanks also cannot offer evidence that *Brady* violations or suggestive identification procedures were widespread practices in NOPD at the time Flanks was arrested.  Last, Flanks cannot offer evidence to demonstrate that NOPD failed to train, supervise, or discipline Detective Dillmann in a manner that resulted in both a violation of Flanks' constitutional rights and his wrongful conviction for the murder of Martin Carnesi.

Furthermore, since Flanks cannot offer evidence to support his state law claims against Detective Dillmann, Flanks also cannot establish his state law vicarious liability claims against the City.  Accordingly, the City is entitled to summary judgment dismissing all of the claims against

it as a matter of law.

## CONCLUSION

For the foregoing reasons, Flanks has failed to plead sufficient facts to support the required elements of each of his claims. This Court should render judgment on the pleadings in favor of the City Defendants or, in the alternative, grant summary judgment in their favor and dismiss all of the claims contained in Flanks' Amended Complaint with prejudice.

Respectfully submitted,

/s/ *William R.H. Goforth*
**SEAN M. MARKEY, LSB #41467**
ASSISTANT CITY ATTORNEY
**JALEN R. HARRIS, LSB #41073**
ASSISTANT CITY ATTORNEY
**WILLIAM R.H. GOFORTH, LSB #33153**
DEPUTY CITY ATTORNEY
**CORWIN ST. RAYMOND, LSB #31330**
CHIEF DEPUTY CITY ATTORNEY
**DONESIA D. TURNER, LSB #23338**
CITY ATTORNEY
1300 PERDIDO STREET
CITY HALL - ROOM 5E03
NEW ORLEANS, LOUISIANA 70112
TELEPHONE:  (504) 658-9800
FACSIMILE:   (504) 658-9868
E-MAIL:         sean.markey@nola.gov

*Counsel for Defendants, City of New Orleans and Anne Kirkpatrick, in her official capacity as Superintendent of the New Orleans Police Department*