UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| RAYMOND FLANKS | * | NO. 23-cv-06897 |
| | * | |
| VERSUS | * | JUDGE NANNETTE JOLIVETTE |
| | * | BROWN |
| THE CITY OF NEW ORLEANS; | * | |
| JASON WILLIAMS, in his official | * | MAGISTRATE KAREN WELLS ROBY |
| capacity as Orleans Parish District | * | |
| Attorney; ANNE KIRKPATRICK, in her | * | |
| official capacity as Superintendent of the | * | |
| New Orleans Police Department; JOHN | * | |
| DILLMANN, in his individual capacity; | * | |
| and JOHN/JANE DOES #1-20, in their | * | |
| individual capacities | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>STATEMENT OF UNCONTESTED MATERIAL FACTS</u>

1. On December 17, 1983, around 10:00 a.m., Fay Carnesi and her husband, Martin Carnesi, walked to their vehicle parked in front of their home.[1]

2. As they approached the car, a Black male wearing a shower cap (the "perpetrator") passed by, demanded money, and fatally shot Mr. Carnesi when Mr. Carnesi reached toward his pocket.[2]

3. The perpetrator then pointed his gun at Mrs. Carnesi and demanded her purse.[3]

4. Mrs. Carnesi threw her purse before fleeing towards the middle of the street.[4]

---

[1] Trial Transcript from May 14 & 15, 1985, Mrs. Fay Carnesi Trial Testimony at pg.40. Attached as Exhibit A.
[2] *Id.* at pg.41.
[3] *Id.* at pg.42.
[4] *Id.*

5.  The perpetrator left in a light blue car.[5]

6.  Mrs. Carnesi described the perpetrator as a black man in his "late twenties, about 5'10" and 150 pounds, with a medium build, brown skin, and a light mustache."[6]

7.  New Orleans Police Department ("NOPD") Officers Albert Spiess and Leon Frisard, who were assigned to the 7th District arrived at the scene at 10:07 a.m., and upon arrival observed Mr. Carnesi lying on the ground next to a parked car.[7]

8.  Officer Spiess and Officer Frisard, the first officers on the scene, checked Mr. Carnesi and found that he had been shot in the chest and the officers could not retrieve any vital signs.[8]

9.  NOPD Homicide Detective John Dillmann arrived on the scene and began his investigation at 10:45 a.m.[9]

10. Detective Dillmann observed a spent 25 caliber casing on the ground next to Mr. Carnesi in the street.[10]

11. After completing his scene investigation, Detective Dillmann then coordinated with the Crime Lab and waited for the Coroner to arrive.[11]

12. At approximately 10:58 am, Crime Lab Technician James Ducos arrived on the scene and confiscated all physical evidence, measured the entire crime scene, and drew a detailed sketch of the scene.[12]

---

[5] *Id.*
[6] Exhibit A, at pg.13. *See also* Detective John Dillmann's Trial Testimony from Trial Transcript from May 14 & 15, 1985, pg.20. Exhibit A.
[7] Exhibit A, at p.11; Exhibit C, pp. 10-11.
[8] *Id.*
[9] Exhibit A, p. 18; *see also* Exhibit C, p. 8.
[10] *Id.*
[11] Exhibit A, p.19.
[12] Exhibit D, NOPD Supplemental Incident Report, p.3.

13. After meeting with NOPD Detective Mike Lentz, Detective Dillmann associated the murder of Martin Carnesi as potentially committed by the same person responsible for a series of recent armed robberies targeting elderly victims in the same area.[13]

14. On December 23, 1983, Flanks was arrested while fleeing from an armed robbery of the A&P Food Store.[14]

15. On December 23, 1983, Detective John Dillmann was contacted by Detective Richard Marino regarding a robbery that occurred that morning at the A&P Food Store, located at 6600 Morrison Road.[15]

16. At the time, he was driving a light blue 1982 Chevrolet Citation.[16]

17. When Flanks was arrested, he was in possession of a 25-caliber chrome plated automatic pistol.[17]

18. Detective Dillmann learned of Flanks' arrest on December 23, 1983; on the same day, he requested that NOPD Crime Lab Technician Otho Stubbs conduct ballistics testing to determine whether the gun in Flanks' possession fired the bullet that killed Martin Carnesi.[18]

19. Detective Dillmann also requested copies of the booking photographs ("mug shots") of Flanks from when he was booked on the morning of December 23, 1983.[19]

---

[13] *See* Exhibit D, Supplemental Report
[14] *Id.*
[15] *Id.* at p. 5.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*

20. On December 23, 1983, Technician Stubbs verbally told Detective Dillmann that the pellet recovered from the body of Mr. Carnesi was fired from the 25-caliber automatic pistol in Flanks' possession at the time of his arrest.[20]

21. On December 23, 1983, Detective Dillmann prepared a photographic "lineup" consisting of six sets of photographs of similar-looking individuals, including Raymond Flanks, and showed the photographs to Mrs. Carnesi at her residence.[21]

22. When showing the photographs, neither Detective John Dillmann nor the other police officers did or said anything to indicate that Fay Carnesi should pick a particular photograph or to suggest whether any of the photographs were of a person the police suspected of killing Martin Carnesi.[22]

23. Mrs. Carnesi quickly excluded four of the six photographs, examined the final two carefully with a magnifying glass, and then selected Flanks as the man who killed her husband.[23]

24. Mrs. Carnesi was positive that the photograph she selected depicted the person who shot Martin Carnesi.[24]

25. In addition, Mrs. Carnesi stated that she would never forget Flanks' face.[25]

26. Following the positive identification by Mrs. Carnesi, Flanks was booked for the armed robbery and murder of Mr. Carnesi on December 23, 1983.[26]

---

[20] *Id.*
[21] Exhibit A, at p. 21.
[22] Exhibit M, Sworn Declaration of Debra C. Gonzales.
[23] Ex. G at 125:10-24.
[24] *Id.*
[25] *Id.*
[26] Exhibit K OPDA-FLANKS023958 (Arrest Register).

27. After Flanks was booked for the murder of Mr. Carnesi, NOPD provided the complete investigative file for the case to the OPDA Office.[27]

28. On December 27,1983, Technician Stubbs produced a written report reflecting the results of his ballistics examination.[28]

29. Beginning on May 14, 1985, Raymond Flanks was tried in Orleans Parish Criminal District Court for the murder of Martin Carnesi.[29]

30. At trial, Doctor Monroe Samuels, the Pathology Physician, testified that Mr. Carnesi sustained a gunshot wound to the left side of his chest, which caused his death.[30]

31. Prosecutors introduced the autopsy report along with two photographs of Mr. Carnesi's body at the crime scene.[31]

32. At trial, the State called Officer Albert Speiss, Detective John Dillman, Fay Carnesi, Officer Claude Flot, and Johnnie Thomas to testify.[32]

33. At trial, the photographs that were used in the December 23, 1983 photographic identification procedure were shown to both Detective Dillmann and Mrs. Carnesi, then introduced into evidence as State's exhibit-5.[33]

34. At trial, two photographs of the automobile in Flanks' possession at the time of his arrest were introduced as exhibits.[34]

---

[27] Detective Ryan Aucoin's Deposition, pp. 10 & 15. Attached as Exhibit I. *See also*, e Case File. Attached as Exhibit J.

[28] 12/27/83 Report of the Crime Laboratory Firearms Identification. Attached as Exhibit H.

[29] Exhibit A.

[30] Exhibit A, at pg. 5.

[31] *Id* at pg. 6

[32] *Id*.

[33] *Id* at pp. 23, 52, 85.

[34] *Id*.

35. The Defense called one witness, Ralph Flank, who is Raymond Flanks' brother, to provide an alibi for Raymond Flanks' whereabouts at the time of the murder.[35]

36. At the conclusion of his criminal trial on May 15, 1985, Flanks was convicted of first-degree murder and sentenced to life imprisonment without parole.[36]

37. There is no evidence that Detective Dillman withheld any evidence regarding the murder of Martin Carnesi from OPDA.

38. The OPDA's file concerning the prosecution of Raymond Flanks for the murder of Martin Carnesi contains all of the records that were contained in the NOPD's file regarding its investigation into the murder of Martin Carnesi.[37]

39. There is no evidence that the NOPD, or the City of New Orleans more generally, had an official policy or practice of withholding *Brady* material from prosecutors in December of 1983.

40. There is no evidence that the NOPD, or the City of New Orleans more generally, had an official policy or practice of using suggestive photographic identification procedures to obtain witness identifications of suspected criminals.

41. There is no evidence that the NOPD failed to train, supervise, or discipline Detective Dillmann in a manner that it knew was likely to result in the use of a suggestive photographic identification procedure or the deliberate concealment of *Brady* material from prosecutors.

---

[35] Exhibit A, at pg.92
[36] Exhibit A, pg. 126.
[37] *See* Exhibit J (the complete NOPD case file); Exhibit I, (Deposition of Ryan Aucoin, as representative of the City of New Orleans,

Respectfully submitted,


/s/ *William R.H. Goforth*
**JALEN R. HARRIS, LSB #41073**
ASSISTANT CITY ATTORNEY
**SEAN M. MARKEY, LSB #41467**
ASSISTANT CITY ATTOENY
**WILLIAM R.H. GOFORTH, LSB #33153**
DEPUTY CITY ATTORNEY
**CORWIN ST. RAYMOND, LSB #31330**
CHIEF DEPUTY CITY ATTORNEY
**DONESIA D. TURNER, LSB #23338**
CITY ATTORNEY
1300 PERDIDO STREET
CITY HALL - ROOM 5E03
NEW ORLEANS, LOUISIANA 70112
TELEPHONE:  (504) 658-9800
FACSIMILE:  (504) 658-9868
E-MAIL:        wrgoforth@nola.gov

*Counsel for Defendants, John Dillmann, the City of New Orleans, and Anne Kirkpatrick, in her official capacity as Superintendent of the New Orleans Police Department*