STATE OF LOUISIANA

VERSUS

RAYMOND FLANK

CRIMINAL DISTRICT COURT

PARISH OF ORLEANS

CASE NUMBER: 299-809

SECTION "E"

\* \* \* \* \* \* \* \* \* \*

Transcript of the trial in the above entitled matter conducted on May 14, & 15, 1985 in Section "E", before Rudolph F. Becker, III, presiding judge.

\* \* \* \* \* \* \* \* \* \*

APPEARANCES:

MR. JIM WILLIAMS
MR. BRUCE WHITTAKER
    Assistant District Attorneys

MR. CLYDE MERRITT
    Attorney for the Defense

\* \* \* \* \* \* \* \* \* \* \*

REPORTED BY:

LOIS J. DAVEREDE
Official Court Reporter

EXHIBIT A

FLANKS_002760

WITNESS INDEX

WITNESSES CALLED BY THE STATE:

Doctor Monroe Samuels . . . . . . . . . . . . . . . . . . . . 2
Officer Albert Speiss . . . . . . . . . . . . . . . . . . . . 9
Detective John Dillman . . . . . . . . . . . . . . . . . . . 17
Faye Carnesi . . . . . . . . . . . . . . . . . . . . . . . . 38
Officer Claude Flot . . . . . . . . . . . . . . . . . . . . . 81
Johnnie Thomas . . . . . . . . . . . . . . . . . . . . . . . 87


WITNESSES CALLED BY THE DEFENSE:

Ralph Flank . . . . . . . . . . . . . . . . . . . . . . . . . 90


WITNESSES CALLED BY THE STATE IN REBUTTAL:

Officer Claude Flot . . . . . . . . . . . . . . . . . . . . .105

WITNESSES CALLED BY THE STATE IN THE SENTENCING PHASE:

Johnny Thomas . . . . . . . . . . . . . . . . . . . . . . . 115
Officer Clyde Flot . . . . . . . . . . . . . . . . . . . . . 118

FLANKS_002761

(At this time voir dire was conducted during which no objections were made. At this time Mr. Whittaker on behalf of the State made his opening statement during which no objections were made. At this time on behalf of the Defense Mr. Merritt made his opening statement during which no objections were made. The Court read the Bill of Indictment and arraignment to the jury.

BY THE COURT:

Gentlemen, I will place all witnesses under the Rule of Sequestration. If there are any witnesses either for the State or the Defense in the courtroom must step on the outside of the courtroom. They are not allowed to discuss their testimony except with their attorneys.

### DOCTOR MONROE SAMUELS

called as a witness by the State, after having been duly sworn, testified as follows:

### * * DIRECT EXAMINATION * *

EXAMINATION BY MR. WILLIAMS:

Q.      Doctor, would state your name and occupation for the record, please?

A.      Doctor Monroe Samuels. I am a physician specializing in Pathology.

Q.      Doctor, are you board certify to practice medicine in the State of Louisiana?

A.      Yes, sir.

Q.      Your Honor, at this time I would offer a stipulation

2

FLANKS_002762

to the Defense that Doctor Samuels is an expert in the field of Forensic Pathology and as such is able to give his expert opinion regarding cause of death.

BY MR. MERRITT:

That is acceptable, your Honor.

BY THE COURT:

Ladies and gentlemen, a stipulation is being entered into. I would like to explain to you what that is in case there are others that entered into this case. A stipulation is where both parties agree to the facts contained in that stipulation. In other words, there is no contest as to the facts in that stipulation. In this particular matter it is stipulated that Doctor Samuels is an expert in the field of Forensic Pathology. As such you should accept that stipulation as having been proved to you beyond a reasonable doubt. As such I will allow Doctor Samuels to testify in his expert opinion in that field.

EXAMINATION BY MR. WILLIAMS:

Q. Doctor, I would like to direct your attention back to December 17th, 1983. On that date did you have the occasion to perform an autopsy on one Martin Carnesi?

A. The Post-Morteum Examination was conducted on the 18th.

3

FLANKS_002763

Q.    Doctor, can you tell the ladies and gentlemen of the jury first when you had just been qualified as an expert in Forensic Pathology. Is that any different than just plain Pathology? Can you explain the difference to the jury, please?

A.    I will try to do so. Probably the best explanation I can offer to you is that the Forensic Pathologist is charged with the investigation of those deaths which fall under the jurisdiction of a Coroner. And these deaths are defined by law and the most part they include all deaths which are due to injury. Whether bullet wounds, automobile, accidents of any sort. In other words, traumatic deaths of any nature. Be they accidental, suicide, homicide, industrial accidents, or sudden unexplained deaths, deaths which occur in a hospital within twenty-four hours of admission, deaths which are caused by any disease which may pose a public health hazzard, electrocution. It goes on for about a page and a half of typed written specifications of those cases that fall under the jurisdiction of the Coroner. Primarily the major charges is the investigation of the traumatic deaths. Those that are due to injuries of any sorts. These include the gunshots, automobile

4

FLANKS_002764

fatalities and industrial accidents.

Q.  Now, Doctor, in connection with your autopsy of Mr. Carnesi can you tell the ladies and gentlemen of the jury what caused his death?

A.  Yes, sir.  The gentleman in question sustained a gunshot wound which entered the left side of his chest about, just about two inches to the left of the midline and bullet passed through the fourth intercostal space.  That is the space between fourth and fifth rib on the left side which is about in this level over here.  The bullet proceeded toward the back and somewhat to the right.  During its course it passed through and through the heart, crossed to the right side of the chest, passed through the middle portion of the right lung, passed between the tenth and the eleventh rib in the back and a small bullet was found imbedded in the muscles of the back right next to the spinal column.  And this bullet was removed and I marked it with my initial "S" on the base.

Q.  Okay.  Doctor, do you have a report in your possession, an autopsy protocal which reflects the autopsy performed on Mr. Carnesi?

A.  Yes.

Q.  I would like to show you now what I have marked

5

FLANKS_002765

as State's exhibit number-1. Can you identify this, please?

A. This is a document which the attorneys call a proces verbal and these are prepared in all cases of violent death by the office of the Coroner. This is the document so prepared in the case of Mr. Carnesi and the findings which are listed are the same findings that I have listed as a result of my autopsy.

Q. Doctor, I now show you a pair of photographs that I have marked as State's exhibits number 2 and 3. Will you examine these photographs, please, Doctor?

A. These are photographs of an elderly gentleman clothed as I have described the clothing in my autopsy protocal with a gunshot wound in the approximate location that I have described in my autopsy. This conforms with the description, but I don't of my own knowledge remember the facial features and I can't identify it per se.

Q. But the wound that you have described that killed Mr. Carnesi would be consistent with the wound that is demonstrated on those photos?

A. The hole in the jumpsuit and the hole in the chest conform with the description. Yes, sir.

Q. Thank you, Doctor Samuels.

6

FLANKS_002766

BY THE COURT:

Mr. Merritt?

* * CROSS EXAMINATION * *

EXAMINATION BY MR. MERRITT:

Q.   Doctor Samuels, is there anyway to indicate from the examination that you conducted the distance from which the shot was fired?

A.   No, sir.  I made no mention of any powder staining or smoke staining of the clothing and there is none apparent in the photographs.  So the only thing that I can say is that it was probably from a matter of some feet, but I have no knowledge of the firing characteristics of the weapon or anything of that nature.  So I can't really give you a good approximation.

Q.   Giving the benefit of your experience and prior testimony can you say with some degree of certainty the closest to which it could have been fired?

A.   Mr. Merritt, I made note of the fact that this was a small bullet.  To my mind this is anything between a .22 and a .32 caliber bullet.  I would have to say giving the usual firing characteristics it would have to be probably greater than two to three feet.

Q.   Greater than to to three feet?

A.   Yes, sir.

7

FLANKS_002767

Q.   Are you in the position to tell the members of the jury the trajectory that the entry wound maintained?

A.   Yes, sir. The bullet proceeded slightly downward and toward the right from the point of entrance, but I don't know the position of the assailant or the victim at the time that he was shot. In other words, if he was leaning forward slightly then a horizonal bullet could have done, could have gone along that track.

Q.   Now, one other thing. I noted that it is not noted in your protocal and it generally is. Are you able to independently remember the height of Mr. Carnesi?

A.   I don't have it documented, sir.

Q.   Is it safe to say as you remember that autopsy he was a very short man?

A.   I don't recall, sir.

Q.   You don't independently remember the autopsy at all?

A.   No, sir. I don't.

Q.   Is there any record or diagram or anything that you can use that might assist you in determining the height of Mr. Carnesi?

A.   No, sir. Unless I have it noted on some other document at the Corner's Office, namely the Day Record. But I don't have it on my autopsy protocal.

Q.   Is this the document you are referring to?

8

FLANKS_002768

A.      Yes, sir.

Q.      Does that enable you to determine the height of Mr. Carnesi?

A.      Yes, sir.  It is down here as five foot five inches and weight a hundred seventy-five pounds.

Q.      Are you in a position to determine, to tell this jury how tall I am for incidences?

A.      By estimation?

Q.      Yes.

A.      May I stand next to you?  Mr. Merritt, I think you are about 5'8".

Q.      Somewhat taller than five, five and a half?

A.      Yes, sir.

Q.      Thank you.

BY THE COURT:

Gentlemen, do you need the Doctor any further?

BY MR. WILLIAMS:

There is just a possibility that we may need him tomorrow.

BY THE COURT:

You have the Doctor's whereabouts?

BY MR. WILLIAMS:

Very remote possibility.

BY THE COURT:

All right.  Doctor Samuels, I will  discharge you on call, I guess.  Call your next witness, gentlemen.

BY MR. WHITTAKER:

Your Honor, the State calls Officer Speiss.

OFFICER ALBERT SPEISS

9

FLANKS_002769

called as a witness by the State, after having been duly sworn, testified as follows:

## * * DIRECT EXAMINATION * *

EXAMINATION BY MR. WHITTAKER:

Q. Officer Speiss, would you please tell the members of the jury your name?

A. Albert Speiss.

Q. And what is your occupation?

A. New Orleans Policeman.

Q. How long have you been a New Orleans Police Officer?

A. Fifteen years.

Q. Were you so employed on December 17th of 1983?

A. Yes, sir.

Q. What was your assignment at that time?

A. We were on routine patrol in New Orleans East, which is the Seventh District.

Q. Is that you present assignment?

A. Yes, I am still there.

Q. Referring to December 17th, 1983 did you have the occasion to respond to a murder scene at the intersection or near the intersection of Pine and Dianne?

A. Yes, I did.

Q. Is that in New Orleans East?

A. Yes, sir.

Q. That is in Orleans Parish?

A. Orleans Parish. Yes, sir.

Q. Would you please tell the members of the jury what took place, what you saw when you got there?

A. We originally received a call of an armed robbery. Upon arriving on the scene I observed

10

FLANKS_002770

the victim, Mr. Carnesi laying across the sidewalk. When I got there I got out and I immediately went to him and observed what appeared to a bullet hole in his left side of his chest. After looking at him he appeared to be dead to me so I notified headquarters via radio and advised them what we had and call all the proper units and have them sent out. We secured the scene, me and my partner. We secured the scene as best we could. I went inside and tried to get a statement from the victim's wife and a description of the wanted subject and found out exactly what had happened.

Q.   Do you remember her name?

A.   Mrs. Faye Carnesi.

Q.   Were you the first unit on the scene?

A.   Yes, sir. We were the first unit.

Q.   Officer Speiss, I am going to show you what has been marked as State's exhibit-2. Would you tell the members of the jury if you recognize what is depicted in that photograph?

A.   That is the lead bullet hole in Mr. Carnesi's chest.

Q.   Does that photograph accurately depict what you saw with your own eyes?

A.   Yes, sir.

Q.   I show you State's exhibit number-3 and ask you the same questions. Do you recognize

11

FLANKS_002771

Q. what is depicted in that photograph?

A. Yes, sir.  That is the victim, Mr. Carnesi.

Q. Does it accurately depict what you saw with your own eyes?

A. Yes, sir.

Q. State's exhibit-4.  Do you recognize what is depicted in that phorograph?

A. Yes, sir.

Q. What is it?

A. Mr. Carnesi laying on the ground with the bloodstain on his coveralls.

Q. Does it accurately depict what you saw with your own eyes?

A. Yes, sir.

Q. At the time that you arrived?

A. Yes, sir.

Q. When you got to the scene -- I noticed in the photographs there is a pillow under Mr. Carnesi's head.  Was that there when you got to the scene?

A. Yes, sir.  It was.  A pillow and a blanket, I believe on top of him.

Q. Officer Speiss, you indicated that you spoke to Mrs. Faye Carnesi or attempted to speak to Mrs. Faye Carnesi?

A. Yes, sir.  By the time we arrived she had been taken into the residence.  I went inside and attempted to get a description and got a brief description that I possibly could. She was very hysterical and kept passing out.  It was very hard to get the little description

12

FLANKS_002772

that I did get though.

Q.    Well, you said she had been taken inside by other police officers or by family members?

A.    No.  By family members that were on the scene when I got there.

Q.    Where did you speak to her?  Do you recall what part of the house?

A.    I guess you would call it the living room.  She was laying on the sofa.

Q.    You said she was passing out.  What do you mean by that?

A.    She was passing out.  She was blacked out completely. She would come to and she was crying and screaming, and in between the passing out and screaming I was able to get a brief description.

Q.    Would you tell the members of the jury the description that she was able to give you at that time?

A.    Black male, twenty to thirty, 5'10" to 6', a 135 to 145 pounds, thin mustache, thin built to medium possibly and brown complexion.

Q.    Did she describe the clothing that he was wearing?

A.    Dark colored pants, beige windbreaker, a shower cap which was possibly cream color. I think it was cream color.  That is it.  Also gave us a description of the vehicle, a light blue car.

Q.    You said possibly cream color or green color?

A.    Cream.

13

FLANKS_002773

Q.    Cream?

A.    Yeah.

Q.    What did you do once you received that information from Mrs. Carnesi?

A.    Like I said we secured the scene.  I broadcast that description over the radio in order that any other units in the area could possibly find the car that we were looking for.  Just waited until Detective Dillman and all of the other responding units got to the scene. When Dillman got there the investigation was turned over to him.

Q.    Why was it turned over to Detective Dillman?

A.    He is a homicide detective.  It is procedure.

Q.    That is the procedure?

A.    That is the procedure.

Q.    I tender.

BY THE COURT:

      Mr. Merritt?

            * * CROSS EXAMINATION * *

EXAMINATION BY MR. MERRITT:

Q.    Officer Speiss, do you recall which unit you were in at that time?

A.    706.

Q.    And that is the same unit which got credit for broadcasting a black male with a cream cap and dark clothing; is that correct?

A.    Yes, sir.

Q.    You also during that same broadcast broadcasted that the individual ran down Pine Street; didn't you?

14

FLANKS_002774

A.   Lets see.  The shooting occurred on Pine, which was only a few feet from the corner. He ran from -- what I got from Mrs. Carnesi he ran from there to a vehicle which was parked on Pine. Got in the vehicle and drove off.

Q.   The vehicle was parked on Pine?

A.   Yes, sir.

Q.   And Mrs. Carnesi didn't tell you that he got in the vehicle; did she?

A.   She said the subject ran.  All I got from her was that the subject ran and she observed the vehicle going down the street.

Q.   Do you recall -- have you ever at anytime during the course of the investigation or while Detective Dillman was present, did you ever get any better description than a twenty to thirty, 5'10" to 6', a 135 to 145?

A.   Me?  No, sir.  That is all I got.

Q.   And that is the best that has ever been given; isn't that true?

A.   To me.  As far as after I left I don't know what took place.

Q.   And the vehicle that was described as leaving her residence was a light blue vehicle?

A.   Yes, sir.

Q.   It wasn't light blue, dark blue?

A.   No, all I got was a light blue vehicle.

Q.   And not a late model or anything?

A.   No.  Just light blue .

15

FLANKS_002775

Q.    How long after you arrived and found Mrs. Carnesi in her home did Officer Dillman arrive?

A.    Time wise I would have to look at the report.  The time that Officer Dillman, Detective Dillman got on the scene I am pretty sure in our report.

Q.    How long was --

A.    -- Time wise a few minutes.  I know as soon as I observed Mr. Carnesi to appear to be dead I notified headquarters and they immediately notified everybody else.

Q.    Like fifteen or twenty minutes?

A.    I would be guessing if I told you anything.

Q.    Did the Coroner arrive before Officer Dillman?

A.    I would have to look at the report and check the times.

Q.    Thank you.  No further questions.

BY MR. WHITTAKER:

    Thank you, Officer Speiss.

BY THE COURT:

    Do you need the officer any further?

BY MR. WHITTAKER:

    No, your Honor.

BY THE COURT:

    Mr. Merritt?

BY MR. MERRITT:

    No, your Honor.

BY THE COURT:

    Thank you, Officer.  Call your next witness, please.

BY MR. WHITTAKER:

    State calls Detective John Dillman.

16

FLANKS_002776

DETECTIVE JOHN DILLMAN

called as a witness by the State, after having been duly sworn, testified as follows:

** DIRECT EXAMINATION **

EXAMINATION BY MR. WHITTAKER:

Q.    Tell the members of the jury your name.

A.    John Dillman.

Q.    What is your occupation?

A.    I am a Homicide Detective with the New Orleans Police Department.

Q.    How long have you been with the New Orleans Police Department?

A.    For the past eighteen years.

Q.    And how long have you been in Homicide?

A.    The past fourteen years.

Q.    Detective Dillman, were you so employed on December 17th of 1983?

A.    Yes, sir. I was.

Q.    On that date did you have the opportunity to respond to a homicide call at or near the intersection of Pine and Deanne in New Orleans East?

A.    Yes, sir. That was shortly after 10:00 A.M. that morning, the 17th of December.

Q.    Would you please tell the members of the jury the circumstances surrounding your getting there, why you went there and what happened when you arrived?

A.    Yes, sir. I received a call shortly after 10:00A.M. that morning. The call was a Signal-30, which is a murder at that location.

17

FLANKS_002777

I arrived at about 10:15 A.M. that morning. Spoke to the District Officers who were on the scene. They briefly informed me that the victim in this case, Mr. Carnesi had been killed during the perpetration of an armed robbery. Additionally I was informed that his wife was inside the residence. She was in an extremely emotional condition at that time. During the next forty-five minutes I conducted a scene investigation. Subsequently once the body was removed from the scene I did have the occasion to speak with Mrs. Carnesi inside her residence.

Q. You were there when the body was removed?

A. Yes, sir. I was.

Q. That would have been by the Coroner's Office People?

A. Yes, sir. That is correct.

Q. I will show you what has been marked as State's exhibit-4. Do you recognize what is in that photograph?

A. Yes, sir. I do.

Q. What is that?

Q. This is a photograph of the body of Mr. Carnesi as I viewed it on the scene that particular morning, the 17th of December.

Q. Is that an accurate depiction of what you saw with your own eyes?

A. Yes, sir. It is.

Q. Detective Dillman, you indicated that your scene investigation was how long? How long

18

FLANKS_002778

did you take?

A. Approximately forty-five mintues.

Q. Did you speak to Mrs. Carnesi before or after that?

A. After that scene investigation was completed.

Q. What do you mean by scene investigation? Would you just explain that for the jury?

A. When I state scene investigations it is my responsibility as a Homicide Investigator to coordinate Crime Lab. That is to direct what photographs are to be taken and physical evidence which is to be confiscated. I also wait for the Coroner's people to arrive on the scene and transport the body to the morgue. Attempt to locate any other witnesses who might of seen the offense occur.

Q. ANd that is what you did?

A. Yes, sir. That is correct.

Q. Once you completed that task did you have the opportunity to speak to Mrs. Carnesi?

A. Yes, sir. I did.

Q. Where did that take place?

A. In the den of her residence. It is on the corner of Deanne and Pines Boulevard, the 6900 block of Deanne Street.

Q. What was her condition like when you were introduced to her that morning?

A. She was still in a very emotional state. Obviously it was very traumatic from what had occurred. She knew that her husband had expired. Initially I waited the full forty-five minutes to even talk

19

FLANKS_002779

to her while members of her family calmed her down. Once she seemed able to speak to me she was lying on the couch in the den of her residence. And I sat alone with her on the couch and interviewed her for approximately a half hour.

Q. Would you tell the members of the jury, did she give you a description of the perpetrator in this case?

A. Yes, sir. She did.

Q. Would you tell the jury what that description was?

A. Mrs. Carnesi informed me that the perpetrator in this case was a black male in his mid to late twenties. She informed me that he was approximately 5'10" tall, a hundred fifty pounds, medium build. She mentioned that he was brown skinned, or light skinned. It wasn't a real, real dark, but of a lighter complexion. She made the indication to me that he was soft spoken. As a matter of fact, she did state that she thought that he was a fairly nice looking black man, as a matter of fact. Couldn't understand how someone that looked this neat could perpetrate something of this magnitude. She went on to add that he was attired in dark pants, a light tan colored windbreaker and had a shower cap, a light color white or

20

FLANKS_002780

pink shower cap on his head.  He was armed with a small caliber revolver, a small caliber automatic, I should say, and also he fled in a light blue late model automobile on Deanne Street in a lake direction.

Q.   Did she indicate anything about facial hair?

A.   Yes, sir.  She did.  She mentioned that he had a small mustache.  She did remember that.

Q.   Subsequent to that did you have the occasion to speak to Mrs. Carnesi again?

A.   Yes, sir.  I did.

Q.   Do you recall that date?

A.   Yes, sir.  That was Friday, December 23rd, approximately a week later.

Q.   What was that all about?  What did you go there for?

A.   I went to the Carnesi's residence in order to present a photographic line-up to Mrs. Carnesi. I had called earlier that day and I arrived at the residence sometime around 2:30 P.M. that evening.  I met with Mrs. Carnesi and again with members of her family in the kitchen of the residence.  I drank a cup of coffee with them at the table and then I conducted a photographic line-up.

Q.   Would you tell the members of the jury what a photographic line-up is?

A.   A photographic line-up is a line-up of six individuals. There are six individual photographs.

21

FLANKS_002781

All of people of the same general size, build, race. Everything in this nature. I took six color photographs including the photograph of the Defendant in this case, Mr. Flank and I placed them on the kitchen table in two rows of three each. I instructed Mrs. Carnesi for her to look at the photographs and see if she recognized anyone in this photographic line-up.

Q.    Prior to you getting there you said you called the house?

A.    Yes, sir. I did.

Q.    Did you talk to Mrs. Carnesi on the phone or did you talk to a family member? Do you know?

A.    I talked to one of the family members. I don't recall exactly which one it was, but I did talk to one of the family members.

Q.    Whoever you talked to did you tell them that I am coming over with a picture of the guy and I want you to pick it out?

A.    No, sir. I didn't.

Q.    When you sat three with Mrs. Carnesi drinking coffee did you say that I am going to show you some pictures and you got to pick one of them out or we don't have anything?

A.    No, sir. I did not.

Q.    Did you tell her that you better pick something out or the case is over?

A.    No, sir.

22

FLANKS_002782

Q.    Did you do anything to influence her to set her up to pick out a picture?

A.    No, sir. I did not.

Q.    When you selected that photograhic line-up did you pick out, did you make certain that Raymond Flank's background was a certain color? Was that an issue?

A.    No, sir. Not at all.

Q.    I am going to show you an envelope which I have marked as State's exhibit-5. I want you to open it and examine its contents very carefully and tell the members of the jury if you have seen what is in that envelope before?

A.    Yes, sir. This is the six color photographs including a photograph of the Defendant, Mr. Flank that I presented to Mrs. Carnesi on the 23rd of December.

Q.    Would you physically demonstrate for the members of the jury exactly how you presented those photographs to Mrs. Carnesi?

A.    (Witness complies). In two lines of three each.

Q.    I see that the photographs have numbers on the top. Did they have numbers on them at that time?

A.    Yes, sir. They did. I made those markings on the photographs myself one through six.

Q.    Why was that?

A.    To determine if Mrs. Carnesi was able to pick out a certain photograph to determine exactly which photograph she picked out.

23

FLANKS_002783

Q.   When you set them out did you line them out one through six?  Do you recall?  Did you just put them out as they came out of the envelope?

A.   Just as they came out of the envelope.  They weren't in any chronological order.

Q.   Did you tell Mrs. Carnesi that number-4 is Raymond Flank, the man that killed your husband?

A.   No, sir.  I did not.

Q.   Did you tell her -- did you show her anything in particular about anyone of those photographs before she looked at them?

A.   No, sir.  Only that I would like her to look at these six photographs and see if she recognizes any of them.  That was the only statement that I made to her.

Q.   Would you describe to the members of the jury what took place once you had done that, one you had told her that I want you to look at these and see if you can recognize somebody?

A.   Mrs. Carnesi immediately looked at the six photographs and took four of the photographs and immediately moved them on the side.  The remaining two photographs was, one of the photographs was a photograph of the Defendant, Mr. Flank.  The other photograph I don't recall exactly which one it was, but it was one of the other five photographs.  She moved

24

FLANKS_002784

these four photographs on the side and she asked her daughter to get her a flashlight.  Her daughter brought her a flashlight and she took the flashlight and looked at both pictures, picked up the photograph of Mr. Flank and handed it to me and begin crying. Once she stopped crying she told me that this was positively the man who had shot and killed Mr. Carnesi. I at that time asked her why she needed the flashlight.  I noticed she was wearing glasses.

BY MR. MERRITT:

We will let Mrs. Carnesi say why, your Honor.

BY THE COURT:

Don't tell us what she told you in response to that.

EXAMINATION BY MR. WHITTAKER:

Q.    You did ask her why did you ask for a flashlight?

A.    Yes, sir.  I did.

Q.    Why did you ask her that?

A.    I found it unusual that she asked for the flashlight. I have conducted hundreds of photographic line-ups and it was the first time that anyone had asked for a flashlight. There was -- the lighting conditions were good in the kitchen and I saw that Mrs. Carnesi was wearing glasses. I didn't know if she had any problems with her eyesight.

Q.    So you just wanted to ask?

25

FLANKS_002785

A.    I asked the question, yes.

Q.    Once Mrs. Carnesi had picked out the photograph of Raymond Flank, number-4 -- first off, during that whole time, the time that she looked at them, put two aside, got the flashlight, studied them and picked out number-4; did you or anybody indicate in anyway that you wanted her to pick out a particular photograph?

A.    No, sir.  We did not.

Q.    You are positive of that?

A.    I am positive of that.

Q.    What happened once you picked out that photograph and said that she was positive?

A.    Once she picked up this photograph she began crying as I stated.

Q.    I understand that.

Q.    Once she picked up the photograph and got her composure I asked her to please sign the photograph for identification purposes and also date the photograph.  Once she completed that I had her initial  the backs of the five remaining photographs and then I also initialed each one of the six photographs for identification purposes.

Q.    You had her sign how pictures?

A.    She signed one.  The one photograph and dated it of Mr. Flank and also initialed the back of the remaining photographs.

Q.    Are there other person's initials on the backs of those photographs?

26

FLANKS_002786

A. Yes, sir. There is.

Q. WHose are those?

A. There is my initials and also Detective Lenson, the Seventh District who was along with me during the photographic line-up.

Q. Did Detective Lenson, Officer Lenson or Detective Lenson?

A. Officer Lenson.

Q. Did he offer any kind of hint or anything of that nature to Mrs. Carnesi?

A. No, sir. He did not. As a matter of fact, he didn't say a word in the kitchen. He just took the ride. He happened to be at my office and took the ride with me when I went out.

Q. I tender.

BY THE COURT:

Mr. Merritt?

* * CROSS EXAMINATION * *

EXAMINATION BY MR. MERRITT:

Q. Detective Dillmann, when you arrived at Mrs. Carnesi's home you indicated that you discussed the matter with her and got a description; is this right?

A. This is on the 17th you are referring to?

Q. Yes. On the 17th.

A. Yes, sir. When I first arrived I didn't speak to her immediately, but it was approximately forty-five minutes later that I did interview her.

Q. That description was a black male?

27

FLANKS_002787

A.    Correct.

Q.    Thin build?

A.    Medium built.

Q.    Medium built.  Mid to late twenties?

A.    Mid to late twenties.

Q.    How tall?

A.    Five feet ten.  Approximately five feet ten inches tall.

Q.    So she tall you 5'10" or 6" or which?

A.    No, she said about -- a little shorter than me.  As a matter of fact, I can recall I had to stand up and she looked and she said, "No, that he was a little bit shorter than me."

Q.    Shorter than you?

A.    I am 5'11".  So I assumed about 5'--

Q.    Did she say that you were thinner or stouter?  Do you remember?

A.    A medium build.  She said that he was thinner than I was.

Q.    And a small mustache or a thin mustache?  What did she say?

A.    She said a small mustache as I recall.

Q.    Do you recall having written that in the report?

A.    Yes, sir.

Q.    Would you like to review it to see what she said?

A.    I assume it was small.  I recall small.  I can review it and see.

Q.    I would ask you to review it and see.

BY THE COURT:

      I will allow it.

28

FLANKS_002788

A.      (Witness complies).

EXAMINATION BY MR. MERRITT:

Q.      And what did she tell you?

A.      Small mustache.

Q.      And brown skin?

A.      She mentioned to me he was brown skin.  He wasn't real, real  dark.  He was more of a chocolate to a brown color.

Q.      And you were fortified with the normal police report?

A.      I am sorry.

Q.      You had with you your normal police report or the normal sheet that you use for taking descriptions?

A.      I don't have a normal sheet that I use for taking down descriptions.  I always take the description on a pad.

Q.      Well, normally you would ask nose, eyes, ears, facial hair, other mustache, eye brows; you would ask all of those; wouldn't you?

A.      Normally, yes, sir.

Q.      And you chose  not to ask her those?

A.      I ask her whatever questions.  I don't recall which ones, but whatever she could remember I jotted down.

Q.      She wasn't able to tell you the color of the eyes?

A.      No, sir.  Not that I recall.

Q.      She wasn't able to tell you the size of the nose, the bridge or anything?

A.      No, sir.

Q.      She wasn't able to tell you any facial characteristics, gold teeth, crooked teeth, no teeth?

29

A.    NO.  The only thing that she mentioned that she recalled was the mustache, a small mustache, the complexion.

Q.    You said that, Officer.  I am saying did you ask her these questions that you normally ask a witness to determine whether or not she could tell you these things?

A.    Not that I could recall.  I didn't ask her specifically did he have gold in his mouth, or was his nose big.  I asked her what she remembered about him.

Q.    You must of asked her the color of the eyes though?

BY MR. WILLIAMS:

Your Honor I would ask that Mr. Merritt allow the detective to finish his answers.

BY THE COURT:

Allow him to finish, Mr. Merritt.

A.    I don't recall, sir, if I asked that question or not.

EXAMINATION BY MR. MERRITT:

Q.    Did you ask her whether the man that she saw had any tatoos on his arms or any moles on his face or anything at all?

A.    I asked her if there was any facial hair or anything on his face other than the mustache that she could remember and she told me no.

Q.    And she told also that he had a cap on; is that correct?

A.    Yes, sir.

Q.    Now, you chose to take six photographs as opposed to a hundred or six hundred or fifty

30

FLANKS_002790

or any multiple other than; is that correct?

A.   That is correct.

Q.   And on those photographs were any of them wearing white caps?

A.   No, sir.

Q.   And you are the one that selected the photographs?

A.   Yes, sir.

Q.   Did you make any determination as to the other five photographs as to their ages?

A.   No, sir.  I did not.

Q.   Did you make any notation whether or not any of these were of thin builds or not?

A.   No, sir.  The only thing I attempted to do was to attempt to the best of my ability to make all six photographs as close to one another as I possibly could. I have no idea who these five other people even are.

Q.   And there came a time when Mrs. Carnesi selected two of these; is that correct?

A.   Yes, sir.  She did.

Q.   And you don't which the other one is?

A.   No, sir.  She immediately looked at all six photographs and immediately moved four on the side and left two remaining.  One was a photograph of the Defendant and I don't recall who the second photograph is.

Q.   You didn't ask her to mark that one?

A.   No, sir.  I did not.

31

FLANKS_002791

Q.      Do you know whether these were in order or not?

A.      When you say in order, you mean as far as the numbers?

Q.      From one through six, listed on, two, three, four, five, six?

A.      No, sir.  They were not in order.  Not to my knowledge.

Q.      Are you certain that they were not?

A.      Yes, sir.  I am fairly certain.

Q.      Well, tell the jury how they were lined up then.

A.      I have no idea, but they weren't --

Q.      But then it possible they could have been listed one, two, three, four, five and six.  Isn't that true?

A.      Not that I recall.

Q.      Well, then tell the jury how they were listed so they could look at them?

BY MR. WHITTAKER:

Your Honor, the witness has answered the question as best as he can.

BY MR. MERRITT:

He has not answered the question.

BY THE COURT:

Let me hear the objection, please.

BY MR. MERRITT:

Pardon.

BY THE COURT:

Your objection.

BY MR. WHITTAKER:

My objection is he has answered the question as best as he can.  Mr. Merritt keeps asking the same thing.

BY THE COURT:

I'll sustain the objection.

32

FLANKS_002792

EXAIMINATION BY MR. MERRITT:

Q.    Then I will put it this way.  Taking the photographs as they are it is safe to say that you can not say what order you showed them to her?  Is that correct?

A.    That is correct, sir.

Q.    But you can say that they were not in numerical order, one through six?

A.    Yes, sir.

Q.    But nothing else you can give us?

A.    Nothing else I can give you.

Q.    It just so happens if they were in numerical order number four would have been the closest to Mrs. Carnesi as she was sitting at the table; wouldn't it?

A.    No closer than number five or number six would have been.

Q.    The first one on the left hand side?

A.    YEah.

Q.    ANd you placed them in front of this one in the middle which ever it is, the first three as she was sitting at the table.  Right in the middle of her?  Like that?

A.    Again, Mr. Merritt, I have attempted to answer your question.  I don't recall in what order these six photographs were.  Only that they were in two lines of three ech and that they weren't in numerical order.

Q.    So that we understand each other --

BY THE COURT:

One moment, Mr. Merritt.

33

FLANKS_002793

(At this time the Court took a short recess for the benefit of the jurors.)

BY THE COURT:

Let the record reflect that the Court has reconvened. All members of the jury are present and accounted for, the Defendant is present with counsel. Officer Dillmann, Detective Dillmann is still on the stand. Mr. Merritt?

EXAMINATION BY MR. MERRITT:

Q. Officer Dillmann, after Mrs. Carnesi identified this photograph did you conduct a line-up, a physical line-up with any of the parties in here or Raymond Flank and anyone else in the line-up?

A. No, sir. I did not do that.

Q. And it is safe to say that at no time were you ever given the description of the hair of the individual involved?

A. No, sir. Mrs. Carnesi wasn't able to see his hair because of the shower cap.

Q. It is safe to say if you had a line-up and there wasn't any seven people with shower caps on their head in the line-up either?

A. No, sir. There was not.

Q. Thank you, Officer.

* * RE-DIRECT EXAMINATION * *

EXAMINATION BY MR. WHITTAKER:

Q I have just a couple of questions. Officer Dillmann, how many photographic line-ups have you conducted in your experience as a Homicide Detective?

34

FLANKS_002794

A.  I am sure several hundred.

Q.  Without particular reference to the Raymond Flank's photograph, lets look at photograph number-3. Where would obtain a photograph like that?

A.  This photograph came from our B of I Section of the New Orleans Police Department, Bureau of Identification.

Q.  When would a photograph like that have been made?

A.  It would have been made--

Q.  --Not date wise, but under what circumstances, if you understand what I am saying?

A.  The circumstances were that this particular individual was arrested by the New Orleans Police Department, photographed by the New Orleans Police Department. I obtained this photograph from our B of I section after his arrest.

Q.  It is not a graduation picture? It is a booking photograph; right?

A.  That is correct.

Q.  In your experience as a Homicide Detective how many booking photographs have you run into where the person is wearing a shower cap?

A.  None that I can recall.

Q.  Why is that?

A.  Normally if anyone was wearing a cap it would be removed prior to the picture being taken or any type of a hat.

Q.  Dark sunglasses, same thing?

35

FLANKS_002795

A.      Yes, sir.  Anything that would alter his actual looks, his appearances.

Q.      Let me ask you this:  When you spoke to Mrs. Carnesi did you tell her or tell anybody on the phone that we this code, that photograph number-4 is the man that we want you to pick out?

A.      No, sir.

Q.      Did you say look it is a--

BY MR. MERRITT:

        Your Honor, this-- we have already been over this before.  It is leading,  but argumentative at that.  Nevertheless, he has been over it before.

BY THE COURT:

        It is leading.  I'lll sustain the objection to leading.  It is re-direct or your cross examination, Mr. Merritt.

EXAMINATION BY MR. WHITTAKER:

Q.      Is there a code about placement of photographs in a line-up?

A.      No, sir.

Q.      There is no such code?

A.      No, sir.

Q.      Did you inform Mrs. Carnesi that there was such a code?

A.      No, sir.

Q.      I have no other questions.

BY THE COURT:

        Did you need Detective Dillmann any further?

BY MR. WHITTAKER:

        No, your Honor.

36

FLANKS_002796

BY THE COURT:

Mr. Merritt?

BY MR. MERRITT:

No, your Honor. Thank you.

BY THE COURT:

Thank you. you are excused. Your next witness will be rather long I understand?

BY MR. WHITTAKER:

Correct, your Honor.

BY THE COURT:

I think this is a good time ladies and gentlemen for us to take our recess for the night. The next witness will be fairly lengthy, which would most probably put us late into the night. We will recess at this time. Let me again instruct you not to discuss the case amongst yourself until of course, all of the evidence has been heard both by the State and the Defense, and I have given the charge with regard to the law.

(At this time the Court adjourned at 5:42 P.M. until tomorrow morning, May 15, 1985 at 10:00 A.M. The jurors at this time were sequestered at the Quality Inn Motel, Tulane Avenue for meals and accomodations. The Defendant was remanded to Parish Prison.

\* \* \* \* \* \* \* \* \* \* \*

37

FLANKS_002797

WEDNESDAY, MAY 15, 1985

BY THE COURT:

Gentlemen, is the State ready to proceed?

BY MR. WILLIAMS:

Yes, your Honor.

BY THE COURT:

Is the Defense ready to proceed, Mr. Merritt?

BY MR. MERRITT:

Yes, your Honor.

BY THE COURT:

Let the record reflect that the Court has reconvened. The Defendant is present with counsel. All members and the alternate jurors are present and accounted for. At recess yesterday afternoon, gentlemen, it was still your case. You may call your next witness.

BY MR. WHITTAKER:

Thank you, Judge. State calls Mrs. Faye Carnesi.

BY THE COURT:

Mrs. Carnesi, please Sheriff. The rule of sequestration, gentlemen is still in effect.

FAYE CARNESI

called as a witness by the State, after having been duly sworn, testified as follows:

* * DIRECT EXAMINATION * *

EXAMINATION BY MR. WHITTAKER:

Q.    Mrs. Carnesi, would you identify yourself for the jury, please?

A.    I am Mrs. Faye Carnesi.  I live at 6901 Deanne Street.

Q.    How long have you lived there, ma'am?

38

FLANKS_002798

A. Thirty-three years.

Q. Were you living there in December of 1983?

A. Yes, I was.

Q. Who was living there with you at that time?

A. My husband and a daughter.

q. What was your husband's name?

A. Martin Carnesi.

Q. At that point and time how long had you and Mr. Carnesi been married?

A. Thirty-five years.

Q. Had you had any children?

A. Six children.

Q. Any grandchildren?

A. Six and one great grandchild.

Q. Was Mr. Carnesi working at that time?

A. Yes.

Q. What did he do for a living?

A. He was doing locksmith work. But he was retired from the Navy, retired from Woodward Wight Company. He did lock work. It was a hobby that he had with locks.

Q. Did you work?

A. Yes.

Q. What did you do?

A. On Saturday and Sunday I worked in Lacomb, Louisiana outside of Slidell. I use to sell at the Flea Market as a pass time, a hobby.

Q. Every Saturday and Sunday?

A. Right.

Q. Ma'am, I want you to think back to December 17th of 1983, it was a Saturday morning.

39

FLANKS_002799

Were you going to go to the Flea Market that morning?

A.    Yes.

Q.    Can we proceed?

A.    I usually leave about 9:30 in the morning.

Q.    You can compose yourself.    Just relax.

A.    My husband had a habit of walking me to my car
every Saturday and Sunday and kissing
me good-bye, telling me not to be
late, be careful driving.  That morning
I was running a little late.  I usually
leave about 9:30, but I -- it was
10:00 when I left.  I was getting
ready to leave  and my husband told
me -- he said, "Honey, go on out to
the car."  He takes my car out in
the drive early and leaves it on the
side of my house where the drive is.
So I walked down the walk.  I crossed--
I have a habit just crossing my yard.
It is a little small porch that I
walk down and I pass the side of my
house and go to, on the sidewalk to
where my car is.  I saw this guy pass
me  up.  He had a shower cap on his
head.  He passed me and he looked
me in the face and I stared at him,
because he had a shower cap on his
head.  I have never seen anyone with
a showercap on their head before.
I looked  at him good.  He almost

40

FLANKS_002800

came to a stop by me, but he kept going and the first thing you know my husband was right there. He started to talk to me. Before I knew it this guy was in between me and my husband. He told my husband -- he got in the front of us and he said, "Give me your money." And my husband didn't hear him. He said, "What are you talking about? What do you mean give you my money?" I said, "Honey, please, hurry up. Give him your money." At that point my husband put his hand-- he had a jumpsuit on. He had his wallet in his back pocket and he always kept the money in his pocket, his front pocket. He put his hands into his pocket to give him the money, because I kept begging him. "Give it to him. Give it to him. Give it to him." This guy kind of leaned over to reach into my husband's pocket and my husband made like a I step backward. He said, "Wait. You can wait a minute and I will give it to you." At that point he pulled the gun out and shot my husband. Then as soon as he shot my husband I saw the blood gush out of his chest. I said to him, "God, you killed my husband." At that point he turned around and he put the gun at me. He said, "Give

41

FLANKS_002801

me your purse. " I grabbed my purse and I threw my purse at him. I ran back to the back of my car and I started running, I ran across the street and I ran a short distance and I realized I wasn't going toward my house to get my daughter next door. I figured I could get help. They only have two houses in one block. It was right across the street where these neighbors live. I went to get them for help and they weren't home and the mailman saw me and he grabbed me. I said, "Leave me alone, please. My husband-- I think my husband is dead. Go help me. " I was screaming for God, Saint Jude and everybody to help me. I broke away from the mailman and he ran behind me. Then as I got to the end of my, end of my house to go run across my lawn I saw this blue car and it sped away. He got off so fast he would have killed -- if a child would have been in the street he would have killed the child. I couldn't see who it was. I just saw the blue car. It was a small blue car. He sped away.

Q.    Mrs. Carnesi, I hate to have to do this, but we need to go back over some of the things that you told the jury about. When you say the many was walking by and

42

FLANKS_002802

almost stopped and looked at you, how close was he to you? I will be him. You tell me where to go.

A. It is like this is the sidewalk. Right on the side of the sidewalk is the curve and they have grass in between that and I was standing in the grass section and he was passing on the sidewalk.

Q. I am going to walk -- I am going to back up from you and you tell me when to stop and when I get to where he was in relation to you. Do you understand?

A. When he was passing me?

Q. Yeah. I am talking about that point. You tell me when to stop. How close was he to you?

A. I guess about like that. (Indicating)

Q. About like this? (Indicating)

A. Yeah.

Q. You are wearing glasses now. Were you wearing glasses then?

A. Yes.

Q. Do you always wear glasses?

A. I always wear glasses when I drive, when I read. I always have my glasses. I had my glasses on.

Q. When you wear your glasses do you have corrected vision, 20/20?

A. 20/20. Yes.

Q. This is about what time in the morning?

A. I looked at the clock. It was ten o'clock and I even remarked to myself, Oh my God,

43

FLANKS_002803

I am running a little late, which was unusual.

Q. What were the weather conditions like?

A. It was cold. I had a heavy jacket. I remember it was fleece lined, because of it being cold. That is what held me back from running as fast as I could run, you know? The sun was out.

Q. It was sunny?

A. You could call the weather bureau. It was a beautiful morning.

Q. Okay. This man when you first observed him was about this far away from you?

A. Just come a little bit closer. I guess about like that.

Q. ANd he walked on the sidewalk and looked at you and then almost stopped?

A. Yes. I don't know whether he saw my husband coming or not that made him move, to go forward. Then when my husband got there it was within no time the man was in our face.

Q. I just want to take you over this again. Was he wearing a mask when you first saw him?

A. No.

Q. Was he wearing sunglasses?

A. No.

Q. Was he wearing any kind of thing to cover up his face?

44

FLANKS_002804

A.    No.

Q.    You could see his whole face?

A.    Yes in deed.  Yes, I saw his face.

Q.    Then as you are telling me your husband is there and in an incident it seems the man is in between the two of you; right?  Let me ask you about that.  At that point how close was that man to you?  Again, I am going to do the same thing.  I will walk toward to you and you tell me when to stop.  How close was he to you when you say he was right there in between?  You tell me when to stop.

A.    About like this.  (Indicating)

Q.    He right up on top of you?

A.    Right.

Q.    Where was your husband in relation to the man?

A.    He was standing to the back.  I was here and the guy was here. In between us.  (Indicating)

Q.    Was the man like this sort of, with you two like this?  (Indicating)

A.    Sort of like.

Q.    But about this close?

A.    Yeah.

Q.    Okay.  Was it the same man that you had seen walk by moments before and looked you in the face?

A.    Right.

Q.    You still had your glasses on?

A.    Oh yeah.

45

FLANKS_002805

Q.   When did he pull the gun out?  Did he pull the gun out immediately when he got between the two of you?

A.   No, he pulled the gun out and shot my husband-- when my husband took that step back and put his hands in his pocket to give him the money.

Q.   That is when he  pulled the gun out?

A.   He pulled the gun out and shot him.

Q.   How close was he to you--

A.   He told him, "Wait a minute.  I will give you my money."  He had a chance to get it, get it, but he didn't -- if he only waited a minute.

Q.   Take your time. Do you feel okay?

A.   I am okay.

Q.   When he pulled the gun out and shot your husband how close was he to you again?  Was he about in that same position like this?

A.   How close was it to me and my husband?

Q.   To you when he shot your husband?

A.   About the same.

Q.   About the same.  He was still pretty much like this?

A.   Right.

Q.   He didn't have a mask on at that time; did he?

A    No.

Q.   Did he have sunglasses on?

A.   What made me really look at him real good the first time was because he had a shower cap on.  I had never seen anybody wear a shower cap, and I looked at him good.

46

FLANKS_002806

Q.    But that didn't cover up his face?

A.    No.

BY MR. MERRITT:

Your Honor, I hate to do this, but Mr. Whittaker is leading the witness.

BY THE COURT:

I'll sustain the objection.

BY MR. MERRITT:

If he does I will have to object.

BY MR. WHITTAKER:

I apologize.

EXAMINATION BY MR. WHITTAKER:

Q.    Did the shower cap in anyway cover up his face?

A.    No. Not at all. Nothing, just the hair.

Q.    Fine. After the man shot your husband what did he do with the gun?

A.    I don't know. Wait. He shot my husband. That is when I screamed, "Oh my God. You killed my husband." Cause I knew that he was going to die. All of the blood was rushing from his heart. At that point he pointed the gun at me and he said, "Give me your purse." I grabbed my purse and I threw it at him like that and I started running. I didn't know whether he was going to shoot me. I just ran for my life.

Q.    He shoots your husband--

BY MR. MERRITT:

Objection.

BY THE COURT:

Sustain, Mr. Merritt.

47

FLANKS_002807

EXAMINATIONBY MR. WHITTAKER:

Q.    How close was he to you when he pointed the gun at you?

A.    About--

Q.    --About the same distance.

A.    About the same distance it was my husband.  It was like in between.

Q.    Where was your purse?

A.    I had my purse on the seat of the car, because I had put my purse down to talk to my husband.  I grabbed the purse from the seat of the car and I threw it at him and I ran.

Q.    When the shooting took place were you sitting in your car or standing by your car?

A.    I was standing.

Q.    Did you have to go into the car to get the purse?

A.    No, I had the purse on the seat.  I am almost positive the car door was open ready for me to leave, to go.  Because I had the purse on the seat where I sit, where I drive.  The driver's side right on the sidewalk.  You know?  Where we were.  I put my purse down there.  When he said, give me your purse I grabbed my purse quick and I gave him my purse.

Q.    What was in your purse?

A.    I didn't have money in my purse.  I never kept money in my purse.  It killed me and he killed my husband.  He never got a dime out of us.  Just my identification

48

FLANKS_002808

cards. I had all of my money in my pants pocket. I had about a hundred twenty-five dollars with me that I always kept. I never kept my money in my purse, because of all of the robberies that were going on.

Q. Mrs. Carnesi, the blue car that you made reference to, did you get to see the whole car, if you know what I am saying?

A. I couldn't see the whole car. As I ran to the edge of the house I saw the back of the car. It was blue. It was a light blue car. I have these two large bushes, you know, at the end of my walk. They are huge bushes. Taller than myself and as wide. You just have enough space down my walk to go through. The car was in between. When I got to the end, to the end of my house I looked and I saw this car. The first thing you know it went off. It was so fast you couldn't of seen anything.

Q. I am going to show you a photograph I have marked State's exhibit-6. I am going to ask you does that look like anything that you have seen before?

A. That looks exactly like the back of the car. That is what I saw. This back section and the color.

Q. Mrs. Carnesi, do you see the man in this courtroom that shot and killed your husband?

49

FLANKS_002809

A.    There he is.  (Indicating)  He is sitting over there. I can't forget that man's face.

Q.    I know that this is painful for you, but I have to ask you this.  What is he wearing? Where is he sitting in this courtroom today so that the jury knows exactly who you are talking about?

A.    This man over here.  (Indicating)

Q.    Is he wearing a suit?

A.    No.  He is next to Mr. Merritt.

Q.    Mrs. Carnesi, on that date, December 17th did you speak to the police officers that came out to your house?

A.    I don't remember.  I can't remember speaking to police officers.  I was hysterical and I was passing out and they were giving me oxygen, and they were calling my doctor.  I don't know whether, whether I gave them a description or not.  The only one that I remember giving a description to is the Homicide. By the time I believe he came out they more or less kind of got me, you know, I wasn't passing out.  They were still giving me oxygen though I think when the Homicide Detective did come.

Q.    Do you remember his name?

A.    Mr. Dillmann.

Q.    You do remember talking to Detective John Dillmann?

A.    Yes.

50

FLANKS_002810

Q. One moment, please. I know that it has been a while, but do you recall what description you gave to Detective Dillmann, if you remember?

A. Well, I told him that he had a shower cap on his head. He had a little mustache. He had a beige jacket like a windbreaker and jeans, bluejeans. He asked me how tall he was and I told him, I said, "I don't know. Look at my son-in-law. He is about the size of him, of my son-in-law." I said, "He was about like him, built like him." I was so upset.

Q. Did you say anything about his skin color?

A. About what?

Q. About the skin color of the man?

A. I just said he wasn't real black. He wasn't real black.

Q. Subsequent to that date, and that was December 17th, did you meet with Detective Dillmann again at your house on December 23rd?

A. Yes, he called my home and asked me how I felt. I told him that I was still, you know, real upset and real nervous. He asked me if he could come to my home and show me some pictures or that he would like me to look at some pictures.

Q. Did he say anything like I got a picture of the guy that killed your husband and I want you to identify him?

51

FLANKS_002811

A.    No. No. He said he wanted me to look at the pictures and see if I could identify anyone in the pictures.

Q.    I have to ask you-- Did he say anything like--

BY MR. MERRITT:

Judge, that is leading. He asked --

BY MR. WILLIAMS:

Is that an objection, Mr. Merritt?

BY MR. MERRITT:

That is an objection, Mr. Williams.

BY THE COURT:

Objection is sustained. Rephrase your question.

EXAMINATION BY MR. WHITTAKER:

Q.    Did he tell you something about picture number-4?

A.    No.

Q.    Did he tell you about any particular number on the top?

A.    No.

Q.    Did he tell you anything about a background on the telephone?

A.    Background?

Q.    Yeah.

A.    No.

Q.    Would you tell the members of the jury -- I'll show you an envelope marked State's exhibit-5 and I want you to open it up and study it very carefully and tell the members of the jury if you recognize what is in that envelope. Take your time.

A.    This is the man that I picked out. (Indicating)

Q.    All right. Before we get to that though. I want you to look on all of the backs on

52

FLANKS_002812

all of these too.

A.    (Witness complies).

Q.    Look on the back of all of them.    Have you seen that group of photographs before?

A.    Yeah.

Q.    When?

A.    When Mr. Dillmann came to the house he showed them to me.

Q.    Those are the pictures that he showed you?

A.    These pictures he showed me.

Q.    Would you describe to the jury how he showed you the pictures?    Eactly what happened.

A.    I don't really know what order they were in.

Q.    That is fine.    Just describe as best as you can.

A.    He took -- it was in my kitchen on my kitchen table.
He took them and placed them out.
I guess similar to this.  If you don't
recognize anyone in these pictures,
if you don't recognize anybody just
put them on the side  if you don't
know who they are, if you don't recognize
them.  I looked at them like the four
and I did this and I put them aside.
They had like two left.  I glanced
at these -- In other words, I looked
at four of them at first and I put
them on the side.  I had two left
and I looked at them.  I looked at
one picture and then looked at this
and I got hysterical, and said this
is the man.  I am sure this is the

53

FLANKS_002813

man. My son-in-law was there. My daughter, Debbie was there. I don't know who else was there, and my daughter, Gayle was there. I said, "I am sure this is the guy. I am sure this is the guy." I started shaking and I grabbed my son-in-law's hand so tight until his hand was white from me gripping it. I said, "Get me a flashlight, Jerry. Let me look. I have to be positive. I am sure. If this is the guy I got to be positive. I do not want to accuse anyone of killing my husband unless I am sure." He got the flashlight and put the flashlight on it and it was him. This is the man that killed my husband. This man. I can't forget his face never, ever. If I live to be a thousand years old. Every night when I go to bed I see this man shoot my husband.

Q.    Can I go on, Mrs. Carnesi?

BY THE COURT:

Take your time.

A.    Okay. I am fine.

EXAMINATION BY MR. WHITTAKER:

Q.    During the time Detective -- from the time Detective Dillmann arrived at your house until the time that you picked out that photograph did he point at any particular photograph in anyway?

A.    No.

54

FLANKS_002814

Q.   Did he tell you --

A.   No, he just wanted me to look at them and see if I could recognize any of the men in this envelope.  He put them out in front me.

Q.   Did he tell you anything about a certain number photograph?

A.   No.

Q.   Did he tell you anything about a certain placement?

     Did he tell you anything --

BY MR. MERRITT:

     He is doing the same thing.

BY THE COURT:

     Objection is overruled for leading.  If it is for leading, if that is the objection that objection is overruled.

EXAMINATION BY MR. WHITTAKER:

Q.   Did he tell you anything like it is going to be the picture on the bottom left corner?  Anything like that?

A.   No.  He didn't tell me anything like that.  All he said, he had some pictures that he wanted to show me.  He said I am going to put them out on your table and see if you can recognize anyone in these pictures.  The man didn't tell me anything.

Q.   Did he tell you anything about the backgrounds in the pictures if that meant anything?

A.   No.

Q.   Why did you pick out that picture, ma'am?

55

FLANKS_002815

A.    God, because -- because I recognized it being the man that killed my husband.  I couldn't forget his face.

Q.    Once you picked out that picture did Detective Dillmann tell you to do anything with the picture?

A.    No.  He just told me to put my initials, I think it was on the back of it.

Q.    All right.

A.    I put my initials on all of them.

Q.    Did you sign any of them?  Do you remember?

A.    It seemed like I signed the one that was him, I think.  I remember signing my full name on one and I think my initials on the other one.  I am not quite too sure.

Q.    Mrs. Carnesi, you said you seen a face in your dreams or your sleep?

BY MR. MERRITT:

    Now that is leading, your Honor.  That is not material.

BY THE COURT:

    Sustained.

A.    I have nightmares of that man. Lets face it.  Lets face it I can't forget his face.

EXAMINATION BY MR. WHITTAKER:

Q.    In your nightmares do you see the photograph or do you see the man that shot your husband?

A.    I see him and I see the tragedy.    I can't go on the side of my yard.  I can't go in my backyard.  I am going have to sell my home.  There is too many memories.

56

FLANKS_002816

in that house. I can't live there.

My husband and I had a beautiful marriage.

BY MR. MERRITT:

Your Honor, that is going far afield that is required in this courtroom.

BY THE COURT:

All right, Mr. Merritt. Objection is sustained.

BY MR. WHITTAKER:

Mrs. Carnesi, compose yourself.

A.   I am sorry. I can't help it.

BY THE COURT:

That is all right. Just take your time, Mrs. Carnesi.

EXAMINATION BY MR. WHITTAKER:

Q.   Do you feel you can go on? Can we go on?

A.   I beg your pardon.

Q.   Can we continue?

A.   Yes.

Q.   I have no further questions. Would you please answer Mr. Merritt's questions?

* * CROSS EXAMINATION * *

EXAMINATION BY MR. MERRITT:

Q.   Mrs. Carnesi, would you like a break before we start?

A.   Would I like what?

Q.   Would you like a break or a short recess?

A.   I would like to go to the dressing room, please.

BY THE COURT:

We will take a short recess.

(At this time the court recessed from 10:45 A.M. to 11:00A.M.)

BY THE COURT:

Let the record reflect that the Court has reconvened.

All members of the jury and the alternate

57

FLANKS_002817

present and accounted for.  Is the
State ready to proceed?

BY MR. WHITTAKER:

Yes.

BY THE COURT:

Mr. Merritt?

BY MR. MERRITT:

Yes, your Honor.

BY THE COURT:

Mrs. Carnesi is still under oath.

EXAMINATION BY MR. MERRITT:

Q.    Mrs. Carnesi, before we begin, we might call it
a couple of household chores here.
I have drawn what in my limited ability
purports to be a typical four corner
street in the city of New Orleans
in order to help you orient yourself.
I have indicated that this is the
lakeside.  If you like you can make
the lakeside wherever you want.  I
would like you to draw Pines and is
is Jenneane?

A.    It is Deanne Street.

Q.    All right, Deanne then.  Pines and Deanne.  Which
way they run?  Where you live and
where you car was parked before you
left for Slidell?

A.    (Witness complies).  Mr. Merritt?

Q.    Yes, ma'am.

A.    Okay.  In other words, this is the lake going toward
Slidell.

Q.    But if this confuses you as being the lake -- no

58

FLANKS_002818

the lake going toward Slidell would be -- you would travel east to go to Slidell. The lake would be if you traveled north. The lake does make its funny turn around there. That is why if that confuses you at all -- we are talking about the lake which would be north.

A.  Okay. What would you like be to write here, like the street?

Q.  Yes, ma'am. The name of the street. Put it over here.

A.  Put the front of the house street? Deanne Street? Like that?

Q.  Yes, ma'am. If you would have traveled on Deanne and then you are going to either Slidell or Jefferson; is that correct?

A.  No. If I was on the side of my house it was facing Slidell. That is Pines Boulevard.

Q.  Okay. All right. To help me out, because I am now confused. I am aware of the area, but from this I am confused. Would you tell me where does the sun come up at your house? Which side?

A.  I think on the side. The sun comes like on Pines.

Q.  And this is the east and this is the north.

A.  This is the side of my house. This is the front of my house. (Indicating)

Q.  Your house is on the corner?

A.  On the corner.

Q.  And your driveway where your automobile was on that day was on the side of the house?

59

FLANKS_002819

A. The side of my house is a garage, a drive. My husband took the car out of the drive.

Q. Put a mark here where the car was.

A. (Witness complies).

Q. Now, to spare you the necessity of you facing Raymond Flank at this time will you for the jurors point out on my head where the shower cap was?

A. It was about here. (Indicating)

Q. Right above the eyebrows?

A. Yeah.

Q. ANd how did it come as it faced the back?

A. Well, it hid the back of the hair.

Q. Kind of like that then? Is that it? (Indicating)

A. I don't know whether it covered the ear or not. I am not sure.

Q. The jurors should know. You don't know whether you saw the ears or not, you are saying?

A. I don't remember seeing ears. All I remember is that shower cap. It was on his head. It was about like this. I don't know whether it went under the ear or over the ear. But I didn't see any -- I couldn't see any hair.

Q. On December 17th, 1983 the man who attacked your husband to you was an entire stranger; is that correct?

A. Right, Mr. Merritt.

Q. You had never seen him to your knowledge in the neighborhood?

A. No.

60

FLANKS_002820

Q.   And it is also safe to say -- On how many occasions
     did you view the photographs with
     the prosecution in preparation of
     this case?

A.   The photographs?

Q.   Yes, ma'am.  The six photographs that were here.

A.   Repeat that, please.

Q.   On how many occasions did you view the photographs,
     those six photographs that are here
     with the prosecutors in preparation
     of this case?

A.   Once.

Q.   Once.  And you also on August 22nd, 1984 in this
     courtroom at a discovery motion hearing
     you and I were going through the same
     thing as we are going through now
     and you viewed the photographs at
     that time; is that correct?

A.   You mean I saw them before with you?

Q.   Yes, ma'am.

A.   Right.

Q.   So today is not the first time that you saw the
     photographs from December 23rd; is
     it?

A.   No.

Q.   Do you recall the number of the photograph that you
     picked out that you say is Raymond
     Flank?

A.   No.

Q.   Don't remember?

A.   I remember writing my name.

61

FLANKS_002821

Q.    Between December 17th, 1983 and December 23rd, 1983 you didn't see the man that attacked your husband again; is that true?

A.    Between what date?

Q.    December 17th when some man ran away--

A.    Right.

Q.    And then until someone brought some photographs to you during that period of time you didn't see anyone as you would recognize?

A.    No.

Q.    ANd then on December 23rd the police called you and told you that they were coming out to see you?

A.    Right.

Q.    And the only investigation that was done as far as you are concerned as to you was the Homicide of your husband; is that correct?

A.    The Homicide Detective?  He called me first and he came out.

Q.    And the only reason that you knew that he would be coming out, your only contact with Detective Dillmann was in reference to the killing of your husband; isn't that true?

A.    He asked me how I was.  I was feeling  -- he asked me -- he told me that he had some pictures that he would like me to look at.  He said I would just like you look at -- do you feel up to it?  If you feel up to it, if not I'll call you another time and I'll come

62

FLANKS_002822

back. I said, "I think I can handle it."

Q. At that time he gave you six photographs?

A. Right.

Q. And on that day and time where did he show you these photographs by the way? On the sofa or at a kitchen table?

A. No, on my kitchen table.

Q. And you don't recall how he set them in front of you; do you?

A. No. He just put them out in front of me.

Q. And the photograph that you ultimately identified as Raymond Flank, do you know where it was in the stack?

A. Not really.

Q. And you have indicated that you selected two photographs; is that correct?

A. I didn't reall select the two. What I did, I just glanced down at four of them and I pushed them on the side, and I had these two left. So I looked at this guy and I looked at him and I did this. I said, "I am sure this is the guy." I have to be positive though.

Q. Of the two that were left are you able to pick them out of here, the second one, the one that represents the fifth or the sixth photograph?

A. I didn't really pick him out.

Q. You set it aside.

A. I took one and did this and they had two, two left. I think this is the other one. I

63

FLANKS_002823

think.   After I pushed the other ones.

Q.   And of course, the last time I asked you do this you said you couldn't do that for us; is that correct?

A.   Couldn't do what?

A.   That is put aside the fourth photograph or the fifth photograph or the other photograph of the two.  Do you remember that?

A.   No.  I just -- I put them aside.  After I glanced I looked at them.

Q.   Do you recall going over this with me before?

A.   Yes.

Q.   And do you recall telling me you could not pick out the other photograph?  The only one that you could pick out of there was the one of Raymond Flank and you could not pick out the other one?

A.   I am sure I picked out another one that was left.

Q.   The officer told us that occurred, yes.  Now, as to your ability to now select that second photograph is it safe to say that on August 22nd you said that you couldn't?

BY THE COURT:

I don't think she understands.

A.   Not to my knowledge.

BY MR. MERRITT:

Q.   I don't want to argue with you about it, but I am asking you:  Are you denying that it happened?

64

FLANKS_002824

BY THE COURT:

Mr. Merritt, I don't think she understands the question.

BY MR. MERRITT:

If you want to ask her you can.

BY THE COURT:

Mrs. Carnesi, what Mr. Merritt is asking you is that: When you were in court for the motion hearing and Mr. Merritt was talking to you about these pictures at that time were you able to pick out the other photograph that you held with Mr. Flank's photograph, that day in court?

A.    I am sure I did. Didn't I? I picked out-- I thought that it might of been this fellow here with Flank.

EXAMINATION BY MR. MERRITT:

Q.    Let me ask you: Do you deny that at that time you told me you could not pick out the second photograph?

A.    Well, how can I have told you that when I told you that I had these two last? In front of me.

Q.    That is what you are telling me now. All I am asking you either on August 22nd or August 24th did you at that time say that you could not pick out the second photograph? You did know know which it was?

A.    I don't really remember. The only think I remember, when I looked at them I said this is the other guy that I picked, that

65

FLANKS_002825

was there.  Then I just looked at four of them and pushed them aside and had two left. I am sure this is the guy that was left, him.

Q.    Write an "X" on the back of here for me please.

A.    (Witness complies).

Q.    Mrs. Carnesi,  the stranger that appeared at your house, is it safe to say that the amount of time that passed from the time that the man first -- you were sitting in your automobile by the way?

A.    No, I got up.

Q.    When did you get up?

A.    I got out -- I was standing waiting for my husband. I had the car -- I am almost positive I had the door opened.  My purse was on the end of the seat.

Q.    And you were standing outside the automobile?

A.    Right.

Q.    And then a man passed wearing a shower cap?

A.    Right.

Q.    And he then returned and then your husband was shot?

A.    Right.

Q.    And then you left not to see that man again?  Is that correct?

A.    How do you mean that I left?

Q.    You either went to the postman for security or you ran from the scene?

A.    Right.

Q.    As did the man who did the shooting?  That's right?

66

FLANKS_002826

A.   I don't know.  I didn't see him run.  All I did was run for help.

Q.   You didn't tell Police Officer Frisard or his partner that the man ran down on Pine Street; is that what you are saying or you don't remember?

A.   When that policeman came I didn't know my own name.

Q.   Then you don't know what you told him; is that correct?

A.   I don't remember what I told him because I was passing out.  I was hysterical.  I don't know what I told him.

Q.   Now the question is from the time that you first saw the man until no longer did you see him can you give the jury the approximate amount of time that was?

A.   You mean after it had happened?

Q.   Yes, ma'am.  From the first time that you saw the man until you could no longer see the man.

A.   I don't know.  I mean--

Q.   -- Was it twenty seconds, thirty seconds?

A.   No.  Well, I didn't see him, only when the car sped off from there.  I don't know exactly how long it took.

Q.   Give the jury the best estimate that you can in terms of seconds, minutes, hour?

A.   I guess for about a minute and a half.

Q.   Of that minute and one half how much time did you get of that particular time or a percentage if you want, which ever you can deal with best?  How much time did you get to view the individual

67

FLANKS_002827

from anything other than his back?

A. Oh, this went on I imagine for about a minute and a half, me seeing him.

Q. Then the total time that the man walked passed and came back and then your husband was shot was what? More than a minute and a half then?

A. You mean when he left, when he walked passed me and came back?

A. Yes, ma'am.

Q. I guess it seemed to be within seconds, to my knowledge. It was fast.

Q. It is safe to say then most of that time you got to look at the man, a minute, a minute and a half or seconds?

A. Right. I looked at him passing me on the sidewalk. I stated at him.

Q. And then six days later the policeman came with some photographs for you to view; is that correct?

A. Yeah.

Q. Now, do you recall how long after your husband was shot that the first policeman arrived?

A. God, I don't know. Honest. I couldn't tell you a time. I was crazy. I was hysterical. I didn't know what was going on.

Q. Now, of the time that you talked to that policeman do you recall telling him the man was in his late twenties or thirties?

A. I don't remember.

Q. Do you recall whether or not if you told him that he was 5'10" to 6'?

68

FLANKS_002828

A.   I remember talking to him.  It seem like I remember him being there and trying to help me and then the para-medic unit came.  I can't recall what I told.

Q.   Do you recall telling him that the man had a thin mustache?

A.   I don't recall that.

Q.   Do you recall telling him that the man had dark clothing and ran down Pine Street?

A.   I really can't remember what I told the policeman, because it was right after it happened.

Q.   That was the first policeman?

A.   Right.

Q.   Do you recall telling him that the man was black?

A.   I can't recall telling him.

Q.   But you don't deny that you did tell them, is that safe to say?

BY MR. WHITTAKER:

     Your Honor, she doesn't remember.

BY MR. MERRITT:

     She is under cross examination.

A.   I was hysterical.  I was passing out.

Q.   You do not denied that you did tell the first officer that appeared that the man was 6', 5'10" to 6'?

A.   I can't recall telling him that.  I am sorry.  Now, I am really sorry.

Q.   Now, when -- how much time past after seeing that first policeman and the medic unit did you then see Detective Dillmann?

A.   I think it was the same day.  It was late in the afternoon.  I had  kind of sort of got

69

FLANKS_002829

myself together by the time he got there. I don't remember the time.

Q. Does forty-five minutes seem like --

A. I would be lying if I told you. My mind was crazy.

Q. Now, you do recall giving a description of the individual to Detective Dillmann; do you?

A. Yeah.

Q. And that description was a white, milky white shower cap; was it not?

A. I didn't say milky white.

Q. What did you say?

A. I said a clear shower cap.

Q. Clear, not milky white?

A. I don't remember saying milky white.

Q. And if Officer Dillmann said a white shower cap?

BY MR. WILLIAMS:

Objection to that.

A. Well, it is white.

BY MR. WILLIAMS:

She comment on what Officer Dillmann may or may not have said.

BY THE COURT:

I'll sustain the objection.

EXAMINATION BY MR. MERRITT:

Q. There is a distinction in their mind between clear and white; isn't there?

A. To me it is white. It is not a color.

Q. But at least the nature of the tone of the shower cap did not afford you the right to see whether there was any hair under there? You could not see his hair is what you said; is that right?

70

FLANKS_002830

A.    Mr. Merritt, I didn't look for his hair.  All I could see was that face.

Q.    All right.

A.    I am sorry.

Q.    When you were being interviewed by Detective Dillmann did you likewise tell him the height of the individual or did you use -- you have said in here you used your son-in-law for the height?

A.    Yeah.

Q.    Why is that?

A.    He asked me what his height was.  I said, I don't know.  Look at my son-in-law.  He might of been the size and the height of my son-in-law .

Q.    Did you tell him a little taller and a little stouter?

A.    I said he maybe a little taller.

Q.    And a little stouter?

A.    Maybe a little stouter.

Q.    Is your son-in-law in the court today?

A.    Yes.

Q.    Would you ask him to come up please?

(At this time Mrs. Carnesi's son-in-law came into the courtroom.)

A.    I want you to remember one thing at this time I can't be exact.at a time like that.  I just took him for an example.

Q.    But you took him and not Officer Dillmann?  You didn't say Officer Dillmann he is taller than you and stouter than you?

A.    No, I didn't even notice his height.  He was sitting down on the sofa.

Q.    But you did tell him than your son?

71

FLANKS_002831

A.   Well, yeah.   Than my son-in-law.

Q.   You did like wise tell Officer Dillmann the man had a small mustache or a thin mustache?

A.   Yeah.

Q.   And you did tell Officer Dillmann the nature of the color of the tone of his skin was not black but brown?

A.   I said it wasn't really black.   Y eah.

Q.   And that is the only description that you could give?

A.   That sounds right.

Q.   When he asked you for the color of his eyes you couldn't tell; isn't that true?

A.   I don't know whether I told him or not to tell the truth.   I don't know what is in the statement.

Q.   ANd right now you don't know the color of the eyes of the man who shot your husband; do you?

A.   Probably brown, I guess.

Q.   Not probably brown, -- the answer is you do not know?

A.   I didn't look for his eyes.   I looked at this man's face.   I looked at this man's face.

Q,   And Officer Dillmann, or one of the other officers asked you on several occasions would you describe the nature of the nose, the bridge or the flat, the terms they use?   Is it flat, pug, red, long, pointed?

A.   I don't recall them asking me that.

72

FLANKS_002832

Q. And you were not able to give them that information if he did?

A. I don't remember him asking me that.

Q. ANd did he ask you for incidence whether the man was wearing any earrings?

A. No.

Q. Did he ask you whether or not the man had any gold in his teeth, crooked teeth, no teeth?

A. No.

Q. And right to this day you do not know whether the man that shot your husband has gold teeth, crooked teeth, or straight teeth; is that correct?

A. I didn't look at his teeth.

Q. Of these six photographs you picked out one?

A. Right.

Q. Of a complete stranger from December 17th, is that right, prior to your life prior to that time?

A. Mr. Merritt, my life was in this man's hands. I can't forget his face. I know this man.

Q. All right. What color is his eyes then?

A. I looked at his face. I didn't look at -- I just looked at his face.

Q. It is safe to say that the man that viewed, you did know whether one he was bald, whether he had curley hair, straight hair or long hair?

A. You could see through the cap that he had hair. How long I don't know.

73

FLANKS_002833

Q.      Could you see hair or just a black foundation?

A.      I couldn't see -- I didn't notice the hair.

Q.      And until this day you still don't know whether
or not the hair -- whether or not
there was short hair or long hair,
curley hair or anything under that
hat; isn't that right?

A.      It looked more like it was short.

Q.      Raymond stand up.  Is this the man that you described
as being stouter than your son-in-law?

BY MR. WILLIAMS:

        Your Honor, I am going to object to that question.
        I would like to approach the bench.

BY MR. MERRITT:

        On what basis?

(At this time all counsel approached the bench for a brief
discussion.)

BY THE COURT:

        Objection is overruled.

EXAMINATION BY MR. MERRITT:

Q.      Had your son-in-law changed any since -- has he
gained any weight, any considerable
amount of weight?

A.      I don't know.  You will have to ask him.

Q.      Well you can look at him?

A.      He looks the same.

Q.      And to the best of your knowledge does Raymond Flank
look the same?

A.      Well, he looks like he is thinner to me.

BY THE COURT:

        I didn't hear you.  I am sorry, Mrs. Carnesi I didn't
hear you.

74

FLANKS_002834

A.      I beg your pardon.

BY THE COURT:

I didn't hear what you said.

A.      I said he looks thinner.

EXAMINATION BY MR. MERRITT:

Q.      Are there any other changes that you can notice?

A.      I don't think he has a mustache.  Does he?  Wait.
        Yeah.  Not really.

Q.      Thank you, ma'am.  Now, your husband was how tall?
        Do you recall?

A.      I don't know my husband -- I didn't know my husband's
        height.  He was taller than myself
        and I am 5'2".

Q.      A little shorter than I am say?

A.      If you stand straight?  No, he was tall, a little
        taller than you.

Q.      He was taller than me.  Are you in a position to
        tell this jury today whether or not
        the man that shot your husband was
        taller than your husband?

A.      I didn't notice height.  I mean -- how do you notice
        it.  You don't notice those things.
        You just look at this man in the face.
        I was petrified.

Q.      Mrs. Carnesi, what color is this?

A.      It is blue.

Q.      Light blue, dark blue?

A.      Light.

Q.      Now, you indicated that an automobile -- please
        mark where the automobile was parked
        on here that you saw leave from your
        home.

75

FLANKS_002835

A.      It is a little further down than the middle of my yard, my house.

Q.      On Pine or on Deanne?

A.      On Pine.

Q.      All right.  And your car was parked where?

A.      My car was parked right here.

Q.      On Pine also?

A.      On Pine.  Facing Slidell, facing the lake.

Q.      And it is safe to say that this automboile that you never noticed at anytime until it drove away?

A.      Well, probably.

Q.      No, ma'am.

A.      I didn't notice the car down the walk for the simple purposes we have these two large bushes that hide --

Q.      -- Whatever the reason it is safe to say--

BY MR. WHITTAKER:

        She can explain the answer.

BY MR. MERRITT:

        No. No.  She answers the question and if you want you can ask that.

BY MR. WILLIAMS:

        No, sir.  She can explain her answers.

BY THE COURT:

        Make you objection properly.

BY MR. WHITTAKER:

        Your Honor, I am objecting.  He is interrupting the witness.

BY THE COURT:

        All right.  I will allow her to explain her answers.

76

FLANKS_002836

A.   I did not walk down by walk.  Right here, right here (Indicating) on Deanne Street. This is my door, my front door.  They have a small little step off, little small porch.  Right here.  I stepped off this porch, little porch and went to the side  to the front of my house. I always take a short cut.  I never go down my walk.   .

Q.   Whatever  reason, the answer to my question is: You did not see a blue car in front of your house?

A.   Because I didn't know.  I didn't look down the walk.  I was in a hurry to leave that morning too.

Q.   And the only time that you saw a blue car was when--

A.   -- I had to look at it -- as I got to the edge of my house I glanced and I saw the back of this blue car.  The first think you know it went like that. (Indicating) I got a glance at it.  That was it. And it was gone.  It was speeding.

Q.   Then you don't know what the front of the car looked like, whether it was a two door or four door?

A.   It was a small car. But you don't know whether it was a two door, or four door or what the front looked like?

A.   No. Cause all I saw was the back, but I saw speed off.  It went so fast I couldn't I couldn't tell.

77

FLANKS_002837

Q.    You likewise don't know whether anyone got into
the car, was in the car the whole
time?

A.    Whoever it was had gotten in the car.

Q.    Or was in it all the while?  Right?

A.    I don't know when he got in the car.

Q.    You do not know whether it was a male or female,
or black or white driver; isn't that
true?

A.    I couldn't see the driver.

Q.    Allow me one moment, your Honor.  Maybe we can avoid
this, Mrs. Carnesi, if we can.

A.    Don't show me the picture of my husband.

Q.    I am not.  I won't do that to you.

A.    Please.

Q.    All I am saying is of the six photographs that you
picked out the one that you said is
Raymond Flank and now, are you saying
right now you are not sure this is
the one that you picked out or, are
you sure?

BY MR. WHITTAKER:
Your Honor, we have been over this.  This has been
asked and answered like three times.

BY THE COURT:
Objection overruled.

A..   I wasn't interested in this man.  I just took those
four, I glanced at them and I looked
at them and I put them aside and there
was two of them left.  Then I glanced
at this guy and I did this.  I looked
at him and I said, "Oh my God."  I
got hysterical.

78

FLANKS_002838

Q.    Is it safe to say all I am trying to point out is that this that you have now identified as photograph-2 that you think it was, but you are not positive that is the one that showed to the police?

A.    I don't really remember what the other one was. I really wasn't interested in that. I saw this guy and then I knew.

Q.    And that is the same position that you have taken in the past, you don't really remember what was the second photograph?  Right?

A.    Well, the one I think I showed you now was the one.

Q.    But you are not sure?

A.    Well, I am almost sure.

Q.    Do you recall on August 24th telling me that you really can't be positive which one you put on the side, you can't be, which ever one it was would you please show the members of the jury and at that time you couldn't?  Do you remember that?

A.    Well, I picked one out and I said I think it was this one.

Q.    And that is the way that you feel today?  You think that it is?

A.    Right.  I really wasn't interested in his looks. I knew it wasn't the man.

BY THE COURT:

Anything else, Mr. Merritt?

BY MR. MERRITT:

I don't know, your Honor.  Let me check.

79

FLANKS_002839

BY THE COURT:

All right, sir.

EXAMINATION BY MR. MERRITT:

Q.   It is likewise safe to say that when the police
asked you about the apparel, or the
clothing that the individual was wearing
you couldn't tell them whether he
had a shirt on or not?

A.   I told them it was cold.  He had a jacket on.  He
had like a windbreaker, a beige looking
windbreaker.  He had jeans on.

Q.   And jeans were either brown, or black, blue or black?

A.   Blue.  They were kind of medium shade bluejeans.

Q.   And do you likewise recall me asking you whether
or not, or whether asking you now,
Do you remember whether the jacket
was zipped up or not?

A.   I don't recall.

Q.   I likewise ask you if you recall the type of shoes
the individual had on ?

A.   No.  I didn't look at his shoes.  I just noticed
those clothes on him.

Q.   I only have one more question, ma'am.  When you
were being interviewed by the police
and they asked you whether or not
he had long sideburns or short sideburns
you told them what?

A.   I don't remember what I told them.

Q.   Could you have told them that the shower cap covered
it and you couldn't see?

A.   I can' recall it.  I was too upset.

80

FLANKS_002840

Q.       Thank you, Mrs. Carnesi.

BY THE COURT:

         Mr. Whittaker?

BY MR. WHITTAKER:

         Thank you, Mrs. Carnesi.

BY MR. WILLIAMS:

         State calls Officer Claude Flot.

BY MR. MERRITT:

         Your Honor, before the Officer testifies I think
                    this is an opportune time to ask the
                    jury to be removed so that we can
                    discuss the matter of law.

BY THE COURT:

         Would you approach the bench, Mr. Merritt?

(At this time all counsel approached the bench for a brief
                    discussion.)

                    OFFICER CLAUDE FLOT

called as a witness by the State, after having been duly
sworn, testified as follows:

                    * * DIRECT EXAMINATION * *

EXAMINATION BY MR. WILLIAMS:

Q.       Officer, would you state your name and your current
                    assignment for the record, please?

A.       Claude Flot.  I am assigned to the Burglary Division.

Q.       And how long have you been assigned to the Burglary?

A.       Since October.

Q.       Let me direct your attention back to December of
                    1983.  Do you recall where you were
                    assigned at that time?

A.       Yes, sir.  I do.

Q.       Where was that?

81

FLANKS_002841

A.    Seventh District.

Q.    Where is the Seventh District in New Orleans?

A.    New Orleans East, 54.

Q.    Let me direct your attention to the early morning hours of December 23rd, 1983.  Were you working at that time?

A.    Yes, sir.  I was.

Q.    And I would like to ask you if you recall making an arrest of a subject around 7:30, 8:00 in the morning?

A.    Yes, sir.  I do.

Q.    Do you see the person in court that you arrested?

A.    Yes, sir.  I do.

Q.    Would you point him out please for the record?

A.    He is  wearing a white shirt with green pants.

Q.    Let the record reflect that the witness has identified the Defendant before the Bar.  Where did that arrest take place, Ofifcer?

A.    At Franklin and Alvar.

Q.    And is that in the Seventh District?

A.    That is in the Fifth District.

Q.    In the Fifth District.  I show you two photographs which have been previously marked as State's exhibit-6 and 7.  Do you recognize the automobile that is depicted in those photos?

A.    Yes, sir.  I do.

Q.    Was this car at the scene of the arrest of the Defendant, Ralph Flank?

A.    Yes, sir.  It was.

82

FLANKS_002842

Q.      Through your investigation were you able to ascertain who was driving that car?

A.      Yes, sir.

BY MR. MERRITT:

That is hearsay.

BY THE COURT:

That is proper.  From here on out it might be hearsay.

EXAMINATION BY MR. WILLIAMS:

Q.      Were you able to ascertain?

A.      Yes, sir.

BY MR. MERRITT:

Your Honor --

BY THE COURT:

Just yes or no.

EXAMINATION BY MR. WILLIAMS:

Q.      As a result of the arrest of the Defendant was this car towed in?

A.      Yes, sir.  It was.

Q.      I have no other questions.

BY THE COURT:

Mr. Merritt?

BY MR. MERRITT:

I have no questions.

BY THE COURT:

Do you need Officer Flot any further?

BY MR. WILLIAMS:

No, sir.

BY THE COURT:

Thank you, Officer.  You are excused.  Call your next witness.

BY MR. WILLIAMS:

At this time the State would make its offer of evidence.

83

FLANKS_002843

BY THE COURT:

All right, sir.

BY MR. WHITTAKER:

The State would offers into evidence at this time state's exhibit-1, the Autopsy Protocal.

BY THE COURT:

Any objection, Mr. Merritt?

BY MR. MERRITT:

No objection.

BY THE COURT:

I will allow S-1 to be introduced.

BY MR. WHITTAKER:

State's exhibit-2.

BY MR. MERRITT:

No objection.

BY THE COURT:

I will allow S-2 to be introduced.

BY MR. WHITTAKER:

State's exhibit-3.

BY MR. MERRITT:

It is accumlative and also prejudicial.

BY THE COURT:

I'll take a look at it.  I will reserve my ruling on that, Mr. Merritt.

BY MR. MERRITT:

I have no objection as to it being entered into evidence.  The question is what happened to it after.

BY THE COURT:

I will allow S-3 to be introduced also.

BY MR. WHITTAKER:

State's exhibit-4.

84

FLANKS_002844

BY MR. MERRITT:

I have no objection to it.

BY THE COURT:

I will allow S-4 to be introduced.

BY MR. WHITTAKER:

State's exhibit-5.

BY MR. MERRITT:

No objection.

BY THE COURT:

I will allow S-5 to be introduced.

BY MR. WHITTAKER:

State's exhibit-6 and 7.

BY MR. MERRITT:

No objection.

BY THE COURT:

I will allow S-6 and 7 to be introduced.

BY MR WHITTAKER:

Your Honor, at this time the State would request that the jury have the opportunity to examine these exhibits.

BY MR. MERRITT:

I would ask that you restrict two of the three wounds.

BY THE COURT:

They appear to be cumulative, Mr. Whittaker.

BY MR. WHITTAKER:

Could you hear us on that, Judge?

BY THE COURT:

Yes.

BY MR. WHITTAKER:

The State's position is, your Honor, that State's exhibit-3 is certainly not cumulative

85

FLANKS_002845

showing the identity, the face of Mr. Carnesi and also showing the only full frontal view of him. State's exhibit-4 is not cumulative because it is the only quasar full length shot of Mr. Carnesi as he was found lying on the ground. They are not cumulative for those reasons.

BY THE COURT:

One of them is cumulative, Mr. Whittaker. I will allow over objection, Mr. Merritt, the jury view S-4.

BY MR. MERRITT:

I have no objection to anyone of them. Two of them I see no relevant purpose in two of them.

BY MR. WHITTAKER:

The State's position is that they are clearly relevant. They offer three different angles and three different aspects.

BY THE COURT:

I have already introduced S-2, but I will not allow the jury to view S-2. I feel that it is cumulative. I will allow the jury to view both S-3 and S-4. I see probative value in both of those pictures.

BY MR. WHITTAKER:

May they examine all of these exhibits, your Honor?

BY THE COURT:

Yes, they may.

(At this time all the jurors viewed the State's exhibits

86

FLANKS_002846

at this time.)

BY THE COURT:

All of the members of the jury have viewed the evidence.

BY MR. WILLIAMS:

The State would call one further witness.  Mr. Johnnie Thomas.

**JOHNNIE THOMAS**

called as a witness by the State, after having been duly sworn, testified as follows:

**\* \* DIRECT EXAMINATION \* \***

EXAMINATION BY MR. WILLIAMS:

Q.    Mr. Thomas, would you state your name and address?

BY MR. MERRITT:

Your Honor, I think this is the time to remove the jury. We may have some discussion about this witness' testimony.

BY THE COURT:

Counsel approach the bench.

(At this time all counsel approach the bench for a brief discussion.)

BY MR. MERRITT:

I withdraw the motion.

EXAMINATION BY MR. WILLIAMS:

Q.    Mr. Thomas, state your name and address for the record, please.

A.    My name is John Thomas, 2834 Richland.

Q.    Mr. Thomas, what do you do for a living, sir?

A.    I am a route salesman for Borden's Milk.

Q.    Let me direct your attention back to December 23rd, 1983.  Do you recall who you were working for at that time?

87

FLANKS_002847

A.    Yes.  I was working for Bordens.

Q.    Do you recall your whereabouts approximately between 5:30, 6:00, 7:00 in the morning?

A.    Yes, I was servicing a grocery store on Morrison Road.

Q.    Is that in New Orleans East?

A.    Yes, it is.

Q.    Sir, I am going to show you two photographs which have been previously marked as State's exhibit-6 and 7.    Do you recall seeing an automobile that looked like that automobile at that time, December 23rd, 1983, the early morning hours?

A.    Yes, I do.

Q.    Did you see the person that was driving that car?

A.    Yes, I did.

Q.    Do you see that person in court today?

A.    Yes, I do.

Q.    Would you point him out please for the record?

A.    That gentleman sitting over there.  (Indicating)

Q.    Let the record reflect that the wintess has identified the Defendant before the Bar.  I have no other questions.

BY MR. MERRITT:

      No questions.

BY THE COURT:

      Do you need Mr. Thomas any further, gentlemen?

BY MR. WILLIAMS:

      No.

BY THE COURT:

      You are excused.  Call your next witness.

88

FLANKS_002848

BY MR. WILLIAMS:

Your Honor, at this time the State rest subject to its right of rebuttal.

BY THE COURT:

Mr. Merritt?

BY MR. MERRITT:

I would ask for a few minutes.

(At this time the jury was withdrawn from the courtroom for a fifteen minute recess.)

BY MR. MERRITT:

I have a motion at this time. At this time I move for a mistrial on the following grounds: The District Attorney has placed in the record an arrest not related to this offense. He likewised put on a witness that states that a car was seen in the New Orleans East area. That same car that was an arrest from on Alvar and Almonaster.

BY THE COURT:

Motion for Mistrial is denied.

BY MR. MERRITT:

Note exception.

BY THE COURT:

Exception is noted. Let the record reflect that jury had been withdrawn during that motion. Anything else, Mr. Merritt?

BY MR. MERRITT:

Thirteen minute break.

(At time recessed for lunch 12:05 P.M. and reconvened 12:30 P.M.)

FLANKS_002849

BY THE COURT:

Let the record reflect that the Court has reconvened and the Defendant is present with counsel. All members of the jury and the alternate are present and accounted for. The State has rested, Mr. Merrit. Your case.

BY MR. MERRITT:

Ralph Flank.

### RALPH FLANK

called as a witness by the Defense, after having been duly sworn, testified as folows:

### * * DIRECT EXAMINATION * *

EXAMINATION BY MR. MERRITT:

Q.    Would you please give your full name to the court reporter?

A.    Ralph John Flank.

Q.    And your address?

A.    830 North Prieur.

Q.    How old are you, Ralph?

A.    I am twenty-three years old of age.

Q.    And where do you live now?

A.    830 North Prieur.

Q.    And on December 17, 1983 where did you live?

A.    Pardon.

Q.    On December 17, 1983 where did you live?

A.    830 North Prieur.

Q.    And whom did you live with?

A.    My younger brother, Raymond.

Q.    What is his name?

A.    Raymond Leo Flank.

Q.    And how long have you lived with your brother on December 17, 1983 or before December 17, 1983?

90

FLANKS_002850

A.  All my life.

Q.  Now, since December 17, 1983 have you had an opportunity to visit him on occasion?

A.  Yes.

Q.  How often is that?

A.  Well, it use to be on every Thursday at eight o'clock but something happened and they changed it since he had gotten into the accident.

Q.  Since December 17, 1983 and until today has your brother changed much?

A.  No.  Not weight wise or the height.  All except for his eye, disposition of his face a little bit on the right hand side.

Q.  And what is that?

A.  His eye being closed.

Q.  Do you know why?

A.  A light bulb blew up in his eye.

Q.  When did that happen?

A.  Not exactly.  I don't know.  It happened while he was up here in jail.

Q.  Are you in a position to tell the members of this jury where your brother was between 9:00 and 10:30 on December 17, 1983?

A.  Yes.

Q.  Please tell them where he was?

A.  He was at home preparing to go to the cleaners to get some clothes that he was planning on wearing on Christmas, during the Christmas holidays.

Q.  Is it safe to say that your brother could not have been on Pine and Dianne?

91

FLANKS_002851

BY MR. WILLIAMS:

Objection.  Leading question.

BY THE COURT:

Objection sustained.

BY MR. MERRITT:

I have no further questions.  Tender the witness.

* * CROSS EXAMINATION * *

EXAMINATION BY MR. WILLIAMS:

Q.     Mr. Flank, you have testified, you just testified that your brother was with you on December 17, 1983 in the morning?

A.     Yes, he was at home.

Q.     Where was he on December 10, 1983?

A.     December 10?

Q.     Yes, sir.

A.     I have no idea.

Q.     No idea.  Where was he on December 3, 1983 in the morning?

A.     In the morning?

Q.     Yes, sir.

A.     Well, he usually be home until about three o'clock.

Q.     Talking about -- I am sorry continue.

Q.     He usually be home until around three o'clock or maybe earlier.  But he usually be home until that time, the evening.  By doing that time too he was working at a  restaurant in the quarter.

Q.     I am asking you specifically on December 3, 1983, do you know where he was in the morning?

A.     Not exactly.

Q.     Do you know what day of the week December 3rd was?

92

FLANKS_002852

A. No, I don't.

Q. Do you know what day of the week December 10 was?

A. No, I don't.

Q. Do you know what day of the week December 17th was?

A. Yes, I do.

Q. What day of the week that was?

A. It was a Saturday.

Q. How do you know that?

A. Because -- well, we usually eat breakfast every Saturday morning and Sunday morning on a weekend when I be home. That was the only time really had spent together. We talked and look at cartoons and stuff maybe in the morning.

Q. I just asked you after -- prior to this on December 10th which was one week prior to December 17th a Saturday you said you had no idea where he was. Is that still your answer? The previous Saturday, December 10th, 1983, do you know where he was?

A. December 10th?

Q. Yes, sir.

A. He still with us.

Q. I am sorry.

Q. It is still my answer.

Q. You don't know where he was?

A. Well, not exactly. What really brought it to my attention was finding out and evaluating where he was at then on the 17th, when a murder that was suppose to have been committed had happened was

93

FLANKS_002853

that that he was preparing to go to the cleaners and we had been sitting down and doing some talking and stuff and having breakfast. He had a special jacket that he was going to put in the cleaners and that he was planning on wearing, a jacket, a pinned striped white jacket and a pair of white slacks, a cream colored slacks.

Q. You have a pretty good memory of what he did with his laundry that day; is that right? You just told us?

A. Yes.

Q. When was the time prior to that that he took his laundry out?

A. Well, he hadn't really -- he never did really take his laundry out before that, because he never did really put his stuff into the cleaners. It was only washed and ironed by hand.

Q. So you are saying on December 17th, 1983 is the first day that your brother ever took his clothes to the laundry?

A. Not really.

Q. I want to know what date, what date prior to December 17t did you brother prepare his clothes to take them to the laundry?

A. Before then I would always take some of the stuff to the cleaners, to my cleaners.

Q. Mr. Flank, my question to you, sir is what day--

BY MR. MERRITT:

I can see no difference in the manner which Mr. Flank

94

answered the question and Mrs. Carnesi.
He is explaining it in the answer.

BY THE COURT:

He is explaining the answer. That is not an objection,
I take it. It is a statement.

EXAMINATION BY MR. WILLIAMS:

Q.    My question to you, Mr. Flank, is this:  I want
to know since you say that you are
positive on December 17th, your brother
Raymond was home with you and you
know that because he was taking his
laundry to the dry cleaner, ready to
go?

A.    Right.

Q.    I want to know at what time, when, what day, what
week prior to December 17th did he
last prepare his laundry to take
it to the cleaners?

A.    I can't remember none.

Q.    How is it that you specifically remember this day
so well, a date a year and a half
ago?

A.    Because I hadn't been taking my clothes to my cleaners.

Q.    Now, at what point and time, what date do you
recall finding out that he was
under arrest for First Degree Murder?
When did you find that out?

A.    It just have been -- I think it was the 23rd, 24th.
By that Monday.  By that Monday.

Q.    Monday after that Saturday?

A.    Yes.

95

FLANKS_002855

Q.   So that would be--

A.   The 25th.

Q.   The 25th?

A.   Yes.

Q.   The 25th of December of 1983?

A.   Yes.

Q.   That is when you found that your brother was charged with First Degree Murder?

A.   Yes.

Q.   And at that time you knew that he couldn't have committed the murder; didn't you?

A.   Well, I didn't feel as though my younger brother was a murder, if that is what you are asking.

Q.   No, Mr. Flank, I am asking you is because you just told this jury that he was home with you on the morning that this murder occurred, you knew as soon as he was arrested for that murder that he couldn't had none it?

A.   So what?

Q.   You knew that he couldn't have done it?

A.   So what.   Yes.

Q.   Would you answer my question yes or no?

A.   Yes.

Q.   Why didn't you go to the police and tell them?

A.   That Monday?

Q.   At anytime between that Monday and August of 1984, about ten or eleven months?  Why did you not go to the police and tell them that your brother couldn't have done it because he was at home with you?

96

FLANKS_002856

A.   Well, really the only thing that was actually visualized to me was that he was confused, implicated with a robbery and that took the majority amount of my thinking toward that and wondering why he -- him being a part of a robbery.

Q.   Mr. Flank, would you please answer my question, sir? My question to you: I'll ask it again. You have testified just now that your brother was home with you at the time that this murder occurred? Is that what your testimony-- Is that still your story, sir?

A.   Yes.

Q.   Why didn't you go to either the New Orleans Police Department or the District Attorney's Office and tell them that my brother couldn't have done that murder because he was at home with me? Why didn't you go to the police or the District Attorney's Office?

A.   Because it did not really, you know, come to be at that time. I really hadn't paid any attention to it until I started coming to court and finding out actually just what kind of charges that was put on my younger brother.

Q.   So in other words what you are trying to say Mr. Flank is he wasn't really home with you? You didn't make you alibi until about ten months after it happened? Is that what you are saying?

97

FLANKS_002857

A. No, certain things made me realize what had happened. I couldn't actually make that up.

Q. You couldn't make that up?

A. Not just like talking about it. Because I feel too this is still yet somebody's life on the line. And me being -- you don't know me. Don't know who I am. I don't know you. We have never met before. Right?

Q. Right. That's right.

A. So I am telling you about myself.

Q. I want to ask you this question. Is Raymond Flank your brother?

A. Yes, he is .

Q. Is he your natural brother?

A. Yes, he is.

Q. Is your mother alive?

A. No, she is not.

Q. Now, you all came from the same mother; is that correct?

A. Yes, sir. Yes, the same.

Q. And you knew for a fact and you love your brother; don't you?

A. Yes.

Q. And yet you are telling this jury that you let your brother stay in jail without telling anybody that he couldn't have done it for over eight or ten months before you went to anybody? Do you understand my question?

A. Yes. Well, what was explained to me was that he was a suspect, lawyer.

98

FLANKS_002858

Q. When did you find out that he was charged and indicted in First Degree Murder and he went to court on? When did you first find that out?

A. After -- right before the first case came up about the robbery.

Q. I don't care about anything else. All I want to know what date you found out that he was indicted and charged with First Degree Murder? Give me a month and a year or a day if you remember.

A. I can't really remember, sir.

Q. Is it safe to say that it was a -- you knew that he was charged with murder, you knew it way before you ever told anybody that he was home with you; is that true?

A. No, it is not.

Q. How can you explain? I want you to in your own way explain to this jury why it is that you didn't tell the police or the District Attorney's office that your brother couldn't of done it? You let him stay in jail facing a First Degree Murder charge which carries the possibility of the electric chair and yet you didn't come forward for some eight months after you knew that he was arrested for First Degree Murder?

A. It wasn't eight months.

Q. Why didn't you come forward and tell the police?

99

FLANKS_002859

A.    I did all the explaining that I could do.

Q.    Did you go to the police at all?

A.    No, they came to me after I had called them and told them that my jacket was missing, which had my pistol in it.  I put it away so my sister wouldn't get it.

Q.    Mr. Flank, did you ever go to any member of the New Orleans Police Department at anytime and say gentlemen, officers, please. My brother couldn't have committed this crime because he was home with me?  Yes or no.

A.    No, I didn't.

Q.    Did you ever go to the District Attorney's Office and ask, I want to know who is in charge of screening homicide cases. I want to know who is responsible for my brother being charged with murder, because he didn't do it and I can prove it.  Did you do that? Yes or no.

A.    No, I didn't.

Q.    Do you recall where your brother was on December 23rd in the morning?

A.    Yeah.  Well, he had been in jail.  That morning, no.  The robbery had took place. He wasn't at home.  Evidently he was in jail.

Q.    Do you recall testifying back in August at a previous hearing about where you brother was on December 23rd, about in the early morning hours?

100

FLANKS_002860

A.    Yes.

Q.    Do you remember what you said?

A.    Yes.

Q.    What did you say?

A.    I said that he wasn't home and then I looked around and was wondering why he wasn't home, and it kind of got to me.  So after that I checked around and kept checking and then it came to me to check my belongings.  Then I found my trench coat and the pistol that was in it in there from out of my chifforobe.  So I then fleed out of the house and I went checking around the neighborhood trying to find out.

Q.    Then after that I couldn't do nothing about it being early.  I tried to call up the police department on Tulane and Broad.  Later on that that Monday I found out that he was in jail.  By it being a Saturday going into a Sunday it was hard for me to get information leaning to where was.

Q.    Mr. Flank, my question was:  Do you remember your testimony in August about where your brother was on the morning of December 23rd, 1984?

A.    Yes.  I just now told you.

Q.    You remember your answer?

A.    I just now told you.

Q.    I direct your attention to the transcript which was  taken of your testimony and I

101

FLANKS_002861

want you to start reading right here to yourself. Read that and I show you right here, question-- this is your name right here. Ralph J. Flank.

BY MR. MERRITT:

I don't think that he laid the proper basis for it, but I don't object to it, your Honor.

EXAMINATION BY MR. WILLIAMS:

Q. I want you to read that and tell me if you are going to keep the same answer.

BY THE COURT:

Give us a page number, please, Mr. Williams.

BY MR. WILLIAMS:

I am reciting from the transcript of the testimony of Ralph J. Flank taken at a hearing on August 29th, 1984, page ten, toward the bottom. Would you read that?

BY THE COURT:

Just read it to yourself, Mr. Flank.

A. (Witness complies).

EXAMINATION BY MR. WILLIAMS:

Q. Keep reading. This is page eleven. Read up to this point right here. Line number nine. I am going to ask you again, do you recall where your brother was on December 23rd, 1984 in the morning?

BY MR. MERRITT:

He must mean 1983, your Honor.

EXAMINATION BY MR. WILLIAMS:

A. I am sorry. 1983.

102

FLANKS_002862

A.    Yes.

Q.    Where was he?

A.    He was home.  He had been home until he had been arrested and then after he was arrested I told you I couldn't find out any information by that going into Saturday, I mean a Sunday morning, being a Sunday everybody is off from work.  By the time I found out it was Monday.

Q.    What do you consider the morning?  What do you consider the morning?  Up until noon time?

A.    Yes.

Q.    I want you to read your testimony.  The question is --

BY MR. MERRITT:

No.  Ask him does he deny having said it and then if he denies it then you have a right.

BY THE COURT:

I'll sustain your objection.

EXAMINATION BY MR. WILLIAMS:

Q.    All right.  I am going to read to you-- do you deny having said on -- in a hearing that you just read, August 29th, 1984 to the question -- I asked you the question again.  December 23rd, 1983 your brother was home the better part of the morning?  Your answer was: To my knowledge, yes.  Do you deny that now?

A.    No.

Q.    Next question.  Are you positive about that?  Question again, yes or no.  Your answer was:

103

FLANKS_002863

Well, I don't know how long he was home. Do you deny saying that ?

A.    No.

Q.    Next question. But he was home during the morning and your answer was yes. Do you deny saying that?

A.    No.

Q    So now you are saying that he was home the better part of the morning?

A.    Yes.

Q.    I have no other questions.

BY THE COURT:

        Mr. Merritt?

BY MR. MERRITT:

        I have no questions.

BY THE COURT:

        Do you need Mr. Flank any further?

BY MR. MERRITT:

        No, sir.

BY THE COURT:

        Mr. Williams?

BY MR. WILLIAMS:

        No, sir.

BY THE COURT:

        Thank you, Mr. Flank. You are excused.

BY MR. MERRITT:

        Your Honor, the defense rest.

BY THE COURT:

        Any rebuttal by the State?

BY MR. WILLIAMS:

        One moment, your Honor. Your Honor the State calls Officer Flot to the stand.

104

FLANKS_002864

OFFICER CLAUDE FLOT

EXAMINATION BY MR. WILLIAMS:

Q.   Officer, you are still under oath.  Do you recall arresting Raymond Flank on December 23, 1983?

A.   Yes, sir.

Q.   Do you recall the time that he was arrested?

A.   Approximately 7:00 in the morning.

BY MR. MERRITT:

Your Honor, that is in the record already.  He has testified to that before.

BY THE COURT:

I don't remember it, Mr. Merritt.  I will overrule your objection.

EXAMINATION BY MR. WILLIAMS:

Q.   At the time that he was arrested was he taken into custody, into your custody?

A.   Yes, sir.  He was.

Q.   At anytime was he released that day to go home?

A.   No, sir.

Q.   No other questions.

BY THE COURT:

Mr. Merritt?

BY MR. MERRITT:

No questions.

BY THE COURT:

Thank you, Officer.  Any other witnesses, Mr. Williams?

BY MR. WILLIAMS:

No, sir.  The State rest.

(At this time the Court recessed for lunch at 12:55 p.m. and reconvened at 2:00 p.m.)

105

FLANKS_002865

BY THE COURT:

Let the record reflect that the Court has reconvened and the Defendant is present with counsel. All members of the jury and the alternate are present and accounted for. Is the State ready to proceed?

BY MR. WHITTAKER:

Yes, your Honor.

BY THE COURT:

Is the Defense ready to proceed, Mr. Merritt?

BY MR. MERRITT:

Yes, your Honor.

BY THE COURT:

Counsel may proceed with closing arguments.

(At this time Mr. Jim Williams gave closing argument on behalf of the State during which the following excerpts were taken:

BY MR. WILLIAMS:

Here are the photographs. Does that appear, does that photograph to you in anyway appear to be a white background as to compared to all the others. Here is one, number three. Which has the lighter background? Here is number one. Which has the lighter background? Here is number six. It is the same kind of background. That was Mr. Merritt-- his way of trying to inject into this case doubt. Trying to raise doubt in your mind that do not exist. The man over there is a very capable trial

106

FLANKS_002866

attorney.  I would submit to you that--

BY MR. MERRITT:

Your Honor, that is hardly a proper argument, the first argument to begin with.  It is not at any time and it is not now.  It has nothing to do with the evidence.

BY THE COURT:

I overrule your objection.

* * * * * * * * * * * *

BY MR. WILLIAMS:

Now, he could take anyone of you and put you on the witness stand and probably raise some sort of doubt in your own mind about what you had for breakfast this morning and who you had breakfast with and what were the conditions.

BY MR. MERRITT:

I note a continuing objection, your Honor.

BY THE COURT:

You note a continuing objection.

* * * * * * * * * * * *

BY MR. WILLIAMS:

This was done under the guidelines provided by law.

BY MR. MERRITT:

That is outside of the evidence also.

BY THE COURT:

Overrule, Mr. Merritt.

* * * * * * * * * * *

(At this time on behalf of the Defense Mr. Merritt gave his closing argument during which no objections were made.  On behalf of the State Mr. Whittaker gave

107

FLANKS_002867

his Rebuttal Arugment during which the following excerpts were taken:

BY MR. WHITTAKER:

She positively identified the man that killed her husband. She will never forget it. She won't get up here and lie about it. Your job as jurors is to recognize the fact that you are in a courtroom right now with a man who has committed murder. And if you don't recognize that fact he gets up and walks away--

BY MR. MERRITT:

Your Honor, I know that is not allowed. That is not allowed.

BY MR. WILLIAMS:

Is that an objection?

BY MR. MERRITT:

That is an objection. I am asking that -- to ask the Judge to tell the jury, to admonish that remark and ask the prosecutor not to make it again.

BY THE COURT:

I'll overrule your objection, Mr. Merritt.

BY MR. MERRITT:

Note an exception, your Honor.

BY THE COURT:

Exception noted.

* * * * * * * * * *

(At 3:10 P.M. the Court charged the jury as to the law that is applicable in this case. At 3:35 P.M. the jury retired to deliberate their verdict in this case. At this time the Court discharged the alternate

FLANKS_002868

juror, Deborah A. Lee .)

BY MR. MERRITT:

If your Honor pleases, I would move for a mistrial and/or ask that the jurors be returned to instruct them on reasonable doubt. It is my belief that the reasonable doubt charge given to the jury is incorrect.

BY THE COURT:

In which manner, Mr. Merritt, for the record?

BY MR. MERRITT:

There are areas in the incorporation of the serious substantial doubt which has already been dealt with in our court in the area of which you discussed the moral certainty and the lack of moral certainty.

BY THE COURT:

I believe that my charge is correct. I will deny your motion.

BY MR. MERRITT:

And as to the definition of specific intent.

BY THE COURT:

Yes, sir.

BY MR. MERRITT:

I'll ask that you define the law right from the Code of Criminal Procedure without anymore -- I indicate that what you gave is not in the Code of Procedure is not correct.

BY THE COURT:

I defined from the Code Procedure.

109

FLANKS_002869

BY MR. MERRITT:

That is mine --

BY THE COURT:

-- Your Motion is denied.

BY MR. MERRITT:

Thank you.

BY THE COURT:

We will stand in recess until the jury is ready
to return.

(At 4:54 P.M. the jury returned into open court and through
their Foreman requested additional instructions
by the Court as to First and Second Degree Murder.
This was all done in the presence of the Defendant,
his counsel, and counsel for the State. At 5:03 P.M.
the jury again retired to consider their verdict.)

BY THE COURT:

Any objections by the State as to my explanations?

BY MR. WILLIAMS:

No objections.

BY THE COURT:

Any objections by the Defense?

BY MR. MERRITT:

Yes, your Honor. Based on an objection of what
is in fact premeditation or not and
in terms of specific intent as I understand
Louisana Law, premeditation is that
which doesn't have to be the length
of time. Specific intent is formed
based on at one of the elements of
specific intent is in fact -- there
is in fact premeditation however long
that is. Secondly, that the example

110

FLANKS_002870

given by the Court what is First Degree Murder -- what is in fact First Degree Murder is arguably the same facts of this case except that it is not a bank hour.

BY THE COURT:

I'll note your objection. We will stand in recess until the jury returns.

* * * * * * * * * * * *

(At 5:17 P.M. the jury returned into open court and in the presence of the defendant, his counsel, and counsel for the State, through their Foreperson announced the following verdict: "May 15, 1985, New Orleans, Louisiana. We, the jury, find the Defendant, Raymond Flank, Guilty as Charged. Angela Flake, Foreperson.

On motion of the Defense, the Court ordered jurors to submit their individual poll slips to the Court to be polled. The jury was polled by the Court and the verdict was unanimous. The Court found the verdict good and sufficient in law and ordered same recorded.

At 5:23P.M. the Court asked the jury to retire to the jury room.   The Court reconvened at 5:40 P.M.)

BY THE COURT:

You may consider evidence that was adduced at the guilty determination trial in doing so.  Mr. D:As. is the State seeking the Death Penalty in this matter?

BY MR. WILLIAMS:

Yes, your Honor.

BY THE COURT:

The State alleges, ladies and gentlemen, the following aggravating circumstances in seeking

111

FLANKS_002871

the death penalty and that is the commission of an Armed Robbery or an Attempted Armed Robbery.  Mr. Williams, you may proceed.  Gentlemen, you may proceed with opening statements.

(At this time Mr. Williams gave his opening statement during which no objections were made.)

BY THE COURT:

Mr. Merritt?

BY MR. MERRITT:

May I approach the bench?

BY THE COURT:

Sure.

(At this time all counsel approached the bench for a brief discussion.)

BY THE COURT:

I will allow Mr. Merritt to take a short recess.

(At this time Mr. Merritt took a short recess.)

(At this time Mr. Merritt on behalf of the Defense gave his opening statement during which no objections were made.)

BY MR. WILLIAMS:

Your Honor, at this time the State will offer into evidence and mark as S-1 the entire proceedings from the trial in chief, including all evidence that was introduced and all testimony at trial.

BY THE COURT:

All right, sir.

BY MR. WILLIAMS:

As State's exhibits-- are there any objections?

112

FLANKS_002872

BY THE COURT:

You are just referring to the evidence that has been -- there is no need to be introduced. The jury may refer to it. You are referring to it for the jury, instructing them that you are referring to the evidence that was induced at the guilt determination trial.

BY MR. WILLIAMS:

Yes, sir. As State's exhibit number-2 the State will offer, file, introduce into evidence the entire record in case number 299-825 wherein the State of Louisiana, Criminal District Court for the Parish of Orleans, Joseph Tostrich, Assistant District Attorney for the Parish of Orleans, who in the name and by the authority said State, prosecutes, in this behalf, in proper person comes to the Criminal District Court for the Parish of Orleans and gives the said Court to understand that one Raymond Flank on the 23rd of December of 1983 in the Parish of Orleans while armed with a dangerous weapon to wit a pistol robbed one Alice F. Eldrado of $1209.00 of lawful money in the State of Louisiana -- of United States of America. Further the record will reflect that on July 12th, 1984 the Defendant Flank appeared attended by his attorneys Jeff Smith, and Clyde Merritt and withdrew his

113

FLANKS_002873

former plea of not guilty and enter a plea of guilty as charged.  He is yet to be sentenced on that case . Further, your Honor, the State will offer as a part of the record of the Sentencing Hearing, the plea of guilty form that the Defendant, Raymond Flank at the time that he plead guilty told this Court that he did in fact plea guilty only because it was the advice of his attorneys and that he did not in fact commit the offense for which he plead guilty.  That is in the record, part of the sentencing.

BY THE COURT:

Mr. Merritt, any objection?

BY MR. MERRITT:

Yes, I would ask that the jury be excused.

BY THE COURT:

You may approach the bench?

(At this time all counsel approached the bench for a brief discussion.)

BY THE COURT:

Mr. Merritt, I will deny the motion for a mistrial.  I will allow Mr. Merritt to perfect his record.  Anything further, Mr. Williams?

BY MR. WILLIAMS:

Yes, your Honor.  The State would call John Thomas.

BY MR. MERRITT:

At this time I would object to any testimony with reference to that case, your Honor.  So I don't have to continue objecting.

114

FLANKS_002874

BY THE COURT:

Note your objection, Mr. Merritt.  I'll overrule it.  Exception is reserved.

**JOHNNY THOMAS**

called as a witness by the State, after having been duly sworn, testified as follows:

**\* \* DIRECT EXAMINATION \* \***

EXAMINATION BY MR. WILLIAMS:

Q.  Mr. Thomas, again would you state your name and address for the record, please?

A.  My name is John Thomas.  My address is 2834 Richmond.

Q.  Mr. Thomas, let me direct your attention back to December 23rd, 1983.  Do you recall where you were in the early morning hours of that day?

A.  Yes, sir.

Q.  Where was that?

A.  I was at the A&P Grocery Store on Morrision Road.

Q.  Sir, at that time were you a witness to an armed robbery?

A.  Yes, I was.  I just begin -- I just served the grocery story with milk and I was about to approach the door to leave when I turned around to say bye to the cashier when the Defendant, Raymond Flank pulled a gun on the cashier.

Q.  The cashier that he pulled the gun, did you know her name?

A.  I know her first name was Alice.  I am not sure of her last name.

Q.  What happened that you saw?

115

FLANKS_002875

A.    I seen a gun and, of course I was scared.

Q.    Can you describe what kind of gun it was?

A.    I knew it was, you know, kind of so-so.  Like I said I walked out of the door when I seen the gun.  I went out to my truck and was going to wait to see what happened from there.  As I sat there he came out and put the gun in his bag, an A&P bag and got in a blue Citation, four door.  I looked to my helper and said look at this fool.  He getting in a car with a flat tire and he just robbed the place.  And for some reason I felt like maybe I should try to catch him.  I chased him in my milk truck which was loaded pretty full and tried to get close enough to ram him or try to stop him.  We went through the subdivision him driving the car with a flat tire.

Q.    Was anybody else in the car or was he by himself?

A.    He was by himself.  He was wearing a blue and brown kind of like trench coat.  As we went through the neighborhood he started back toward the interstate and we went up the interstate the wrong way.  I didn't want to hit anybody or hurt anybody in the truck.  So I thought it might be best if I go back and give a description to the police of the car and what it looked like and which direction it was going.  Maybe

116

FLANKS_002876

they could help out better than I could. When I went back to the -- the policemen were there at the scene. They asked me if I knew the description and I told them that it was a blue Citation in the late eighties, four door and it had a flat tire on the passenger's side and which way he was going. Shortly later I heard that he was caught.

Q. The man you have identified as Raymond Flank, do you see him in court?

A. Yes, I do.

Q. Is that the same person you identified in the case earlier to day?

A. That is him, but he is squinching a little more.

Q. Let the record reflect the witness has identified the Defendant before the Bar. This offense occurred out in New Orleans East?

A. Yes, it did.

Q. Would you answer that gentleman's questions?

BY MR. MERRITT:

No questions.

BY THE COURT:

Do you need the gentleman any further?

BY MR. WILLIAMS:

No, sir.

BY THE COURT:

Mr. Merritt?

BY MR. MERRITT:

No.

117

FLANKS_002877

BY MR. WILLIAMS:

State calls Officer Flot.

BY MR. MERRITT:

It will be a continuing objection?

BY THE COURT:

Yes, it will be a continuing objection.

### OFFICER CLYDE FLOT

called as a witness by the State, after having been duly sworn, testified as follows:

### * * DIRECT EXAMINATION * *

EXAMINATION BY MR. WILLIAMS:

Q. Officer, would you again state your name and current assignment for the record please?

A. Clyde Flot, assigned to the Burglary Division, New Orleans Police Department.

Q. Officer I would like to direct your attention back to December 23rd, 1983, do you recall your whereabouts around 7:00 in the morning?

A. Yes, sir.

Q. At that time had you responded to a call of an armed robbery of an A&P Grocery Store?

A. Yes, sir. I did.

Q. Were you able to make an arrest in this case?

A. Yes, sir. I did.

Q. Do you see the person in court that you arrested?

A. Yes, sir. I did.

Q. Would you point him out, please?

A. Raymond Flank, with the white shirt, green pants.

Q. Let the record reflect that the witness has identified the Defendant before the Bar. What sort of car was he in?

118

FLANKS_002878

A. He was in a light blue Chevy Citation.

Q. And where was he stopped?

A. He was stopped, arrested at Franklin and Elder.

Q. Is that near an off ramp from the I-10?

A. Yes, sir. It is.

Q. When he was arrested did he have any property with him?

A. Yes, sir.

Q. What property did he have?

A. He was in possession of money checks made out to the A&P Grocery, a weapon, and the vehicle.

Q. What kind of weapon?

A. .25 caliber automatic.

Q. Thank you. I have no other questions.

BY THE COURT:

Mr. Merritt?

* * CROSS EXAMINATION * *

EXAMINATION BY MR. MERRITT:

Q. Officer, let me show you an exhibit that the prosecutor has introduced into evidence presumably for the truth of the matter. I ask you note on there where he was arrested from?

BY THE COURT:

Mr. Merritt, I am sorry. Before you answer that would you more particularly describe that document, Mr. Merritt, for the record?

EXAMINATION BY MR. MERRITT:

Q. I show you for purposes of identification what is called an arrest register, magistrate

119

FLANKS_002879

or Municipal copy. That copy that appears in here, the yellow copy -- where does that indicate that he was arrested from?

A.   This indicates that the location of arrest was 830 North Prieur Street.

Q.   Thank you. No further questions.

* * RE-DIRECT EXAMINATION * *

EXAMINATION BY MR. WILLIAMS:

Q.   I do. Officer, did you prepare that arrest register?

A.   No, sir. I did not.

Q.   Where was that man arrest for the armed robbery, on what street?

A.   Franklin and Elder.

Q.   You were there when he was arrested?

A.   Yes, sir.

Q.   Do you know of your own knowledge who prepares this arrest register?

A.   Deputies at Central Lock Up. I am not sure who prepared it.

Q.   Thank you. Nothing further.

BY THE COURT:

Do you need the officer any further?

BY MR. WILLIAMS:

No, sir.

BY THE COURT:

Mr. Merritt?

BY MR. MERRITT:

Yes.

* * RE-CROSS EXAMINATION * *

EXAMINATION BY MR. MERRITT:

120

FLANKS_002880

Q. Do you know who was the reporting officer in this offense?

A. I was the reporting officer.

Q. And have you had the opportunity to look at your report that you have prepared?

A. I have not looked at it recently.

Q. Do you have it available?

A. Not on me.

Q. And isn't it a fact that the site of the arrest, the only one that can give that to the deputies to type onto the computer is you?

A. I can write -- I write it on the report.

Q. Do you have your reports?

A. I don't have it with me.

Q. You would deny that your report also says 830 North Prieur; do you?

A. I don't recall what my report says.

Q. And you are the only one that determines where the arrest is made?

A. The arrest was made at Franklin and Elder.

Q. That is what you arer saying today.  On the evening of December 23rd on the other report it says 830 North Prieur; doesn't it?

A. I don't recall what my report says.

Q. Well, please produce your report for this jury.

BY MR. WHITTAKER:

I can go get it right now, your Honor.  We have a copy of it.

BY THE COURT:

121

FLANKS_002881

Don't read your report, Officer.  Just -- I mean don't read it outloud.  Just read your report and then they can ask questions.

A.    Arrest location Elder and Franklin.

BY MR. WILLIAMS:

Nothing further, your Honor.

BY THE COURT:

Do you need Officer Flot any further?

BY MR. WILLIAMS:

No, sir, your Honor.

BY THE COURT:

Mr. Merritt?

BY MR. MERRITT:

Pardon.

BY THE COURT:

Do you need the officer any further?

BY MR. MERRITT:

No, sir.

BY MR. WILLIAMS:

Your Honor, the State rest.

BY THE COURT:

Mr. Merritt?

BY MR. MERRITT:

Jimmy Domnick.

(At this time Jimmy Domnick was call, but  did not appear.)

BY MR. MERRITT:

The Defense rest.

BY THE COURT:

Defense rest.  Are you ready to proceed with argument?

BY MR. WILLIAMS:

Yes, we are.

122

FLANKS_002882

BY THE COURT:

You may proceed.

(At this time Mr. Whittaker on behalf of the State gave his closing argument during which no objections were made. At this time Mr. Merritt on behalf of the Defense gave his opening argument during which the following excerpts were taken:

BY MR. MERRITT:

Now, he killed a white man and the opportunity, the chances of him being given the death sentence has now increased from fifty --

BY MR. WILLIAMS:

Your Honor, with all due respect to Mr. Merritt I must object to that. There is no evidence whatsoever regarding the statements he made in the record for the trial and I must object.

BY MR. MERRITT:

It is a relative mitigating factor. I can consider it. There is no question that they know that the race is different.

BY THE COURT:

I think it is proper and I'll overrule your objection.

* * * * * * * * *

(At this time Mr. Williams on behalf of the State gave his Rebuttal Argument during which the following excerpts were taken:

BY MR. WILLIAMS:

Ladies and gentlemen, most importantly lets think of the family of Martin Carnesi.

123

FLANKS_002883

BY MR. MERRITT:

No, sir, your Honor. That can not be done. That is not allowed under any circumstances.

BY THE COURT:

Sustain the objection.

* * * * * * * *

BY MR. WILLIAMS:

What you do, make a message to all the criminals, all the people like him and make them stop. We got to stop this. We have to stop being prisoners in our own homes.

BY MR. MERRITT:

Your Honor, I would ask you to instruct the jury to ignore the last remarks.

BY THE COURT:

I will have to do so, Mr. Merritt. I will sustain the objection and I will tell the jury to disregard the last remarks of the District Attorney. Confine yourself, please, Mr. Williams to the facts of this case.

* * * * * * * *

(At this time the Court charged the jury to the law that is applicable to this case. At 7:08 P.M. the jury retired to deliberate the sentence in this case.)

BY THE COURT:

Let the record reflect that the jury has left the courtroom. Mr. Merritt?

BY MR. MERRITT:

I move that the Court mistrial the case at this stage and declare a life sentence for Raymond Flank based on repeated

124

FLANKS_002884

violations of fair play by the prosecution and you had admonished him at least four occasions that he was going afield.

BY THE COURT:

I will deny your motion, Mr. Merritt. I will reserve your exceptions. You had also wanted to perfect the record in another matter. I allowed you -- I overruled your objection on a mistrial but would now allow you to perfect your record on that.

BY MR. MERRITT:

I didn't recall what it was. Will you help me?

BY THE COURT:

The fact that Mr. Williams made reference to the fact he was not guilty -- I believe it was that he was pleading guilty on the advice of his counsel.

BY MR. WILLIAMS:

Yes, your Honor. In connection with that I submit to the Court that that is a part of record which was introduced and I will order a copy of that transcript and make that a part of the record.

BY THE COURT:

Mr. Merritt, anything further that you would like on that particular --

BY MR. MERRITT:

No, your Honor.

BY THE COURT:

Mr. Merritt, moved for a mistrial for the record at bench with counsel on the basis that Mr. Williams had referred to

125

FLANKS_002885

the fact that on the plea bargain agreement there was placed -- of the armed robbery-- there was placed a notation that Mr. Flank was pleading guilty not because he was guilty but on the advice of counsel. I denied the mistrial. Mr. Merritt reserved his exceptions and is now perfecting the record. We will stand in recess until the jury is ready to return.

(At 7:36 P.M. the jury returned into open court and in the presence of the Defendant, his counsel, and counsel for the State, through their foreperson returned the following verdict: "The jury unanimously recommends that the defendant be sentenced to life imprisonment without benefit of probation, parole or suspension of sentence, signed Angela Q. Flake, Foreperson." At this time the Court ordered that the jury's verdict be recorded and informed the Defendant of his right to appeal. Sentence was set June 11, 1985.)

* * * * * * * * *

126

FLANKS_002886

**C E R T I F I C A T E**

I, Lois J. Daverede, the undersigned court reporter hereby certifies that the foregoing one hundred twenty-six pages are true and correct and to the best of my ability and understanding.

_Lois J. Daverede_
LOIS J. DAVEREDE
Official Court Reporter

127

FLANKS_002887