Eastern District
State of Louisiana


Raymond Flanks                    DOCKET NO. 23-CB6897

versus

City of New Orleans, et al


* * * * * * * * * * * * * * * * * * * * * * * * * *


Deposition of John Dillmann, taken at Murell Law Firm,

2831 St. Claude Avenue, New Orleans, Louisiana 70117, on

Thursday, July 31, 2025, at 10:00 a.m.


Reported By: Rhonda Broux, CCR;

Louisiana CCR No.2014008


EXHIBIT G

JOHN DILLMANN

INDEX

PAGE

Caption                              1

Index                                2

Appearance                           3

Stipulation                          4

Examination

By Mr. Murell.......                 5

By Mr. Goforth.......               246


Reporter's Page                    257

Reporter's Certificate             259

*****

Plaintiff Exhibits:

1 Handwritten Notes

2 Pages from Book

3 Operations Manual Pages

4 Operations Manual Excerpts

5 Carnesie Deposition

6 Dillmann Interrogatories

7 Police Report

8 Westlaw State vs Knapper

9 ATF Report

10 Floyd Complaint

JOHN DILLMANN

07/31/2025

Page 3

APPEARANCES

Representing the Plaintiff:

Christopher Murell

Murell Law Firm

2831 St. Claude Avenue

New Orleans, Louisiana 70117

Representing the City of New Orleans

Williams Goforth

City of New Orleans

1300 Perdido Street, Suite 5E03

New Orleans, Louisiana 70112

Representing Jason Williams in his

Official Capacity of District Attorney

Inga Petrovich

Stanley Teuter Alford Owen Munson & Paul, LLC

909 Poydras Street, Suite 2500

New Orleans, Louisiana 70112

Reported By: Rhonda Broux, CCR

Louisiana CCR No. 2014008

STIPULATION

It is stipulated and agreed by and among counsel that the deposition of John Dillmann, on Thursday, July 31, 2025, is hereby being taken under the Louisiana Code of Civil Procedure for all purposes as permitted under law;

The witness does reserve the right to read and sign the deposition. The original is to be delivered to and retained by Christopher Murell, Esq. for proper filing with the Clerk of Court;

All objections, except those as to the form of the questions and/or the responsiveness of the answers, are reserved until the time of the trial of this cause.

*******************

Rhonda Broux, Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the above-named witness.

VIDEOGRAPHER:

On July 31, 2025. This is the videorecorded deposition of John Dillmann in the matter of Raymond Flanks versus City of New Orleans, Et Al filed in the USDC Eastern District of Louisiana, case number 23-CB6897. Location of the deposition is 2831 Saint Claude Avenue, New Orleans. My name is Morgan Williams representing Veritext Legal Solutions, and I am the videographer. The court

reporter is Rhonda Broux from the firm Veritext

Legal Solutions. Counsel and all present may now

state their appearances and affiliations for the

record beginning with the noticing attorney.

MR. MURELL:

Christopher Murell on behalf of the

plaintiff.

MR. GOFORTH:

William Goforth on behalf of John Dillmann

and the City of New Orleans.

MS. PETROVICH:

Inga Petrovich with Stanley Reuter on behalf

of Jason Williams in his official capacity as

D.A.

MS. MATT:

Meghan Matt for the plaintiff.

MS. DAVIS:

Eleanor Davis also for the plaintiff.

VIDEOGRAPHER:

Will the court reporter swear in the

witness, and then Counsel may proceed.

MR. MURELL:

Good morning, Detective Dillmann, sir.

A.   Good morning.

Q.   My name is Chris Murell. I represent Raymond

Flanks, the plaintiff in this case. I wanted to go over a couple of ground rules about depositions. First, I presume we are all fine with the normal federal stipulations. So I wanted to ask you, I know you've been deposed before. How many times have you been deposed in wrongful conviction cases?

A. Two - three times.

Q. Do you recall which cases those were?

A. My memory sometimes takes a little longer, but it does come back. It pops back.

Q. I can give you some of the names.

A. I think I'm under pressure right now. I have them on the tip of my tongue, but I can't.

Q. Did you recall Reginald Adams?

A. Yes.

Q. You were deposed in that case?

A. That's correct.

Q. Do you recall John Floyd?

A. John Floyd.

Q. You were to deposed that case?

A. That's correct.

Q. Are there any other --

A. There's Curtis Kyles maybe. I think I may have been deposed in that case also.

Q. And besides Mr. Kyle's case were there any other

wrongful conviction cases?

A.   Not that I can think of, no.

Q.   My understanding from reading some prior deposition testimony is you have been deposed a number of other times in civil cases?

A.   Yes.

Q.   Can you tell me a little bit more about that?

A.   I think it was just civil cases that we just spoke about. I can't recall any other civil cases that I may have testified in. There was one civil case involving a detective by the name of Martin Venetia, and I think Kathy Alfers may have been a victim. I was asked by him to -- or his attorney if I would briefly testify, and I did. And that case, it turned into an all-day affair.

Q.   I believe that was Reginald Adams case. Does that sound right?

A.   It could've been, yes.

Q.   In that deposition you talked about doing 20 or 30 other depositions when you had an investigation company after you retired from in OPD?

A.   Correct, yes. I had a private investigator -- private investigation agency for 18 years here in New Orleans. I did work for all the big law firms here in the city and I was deposed on numerous occasions. Most of those cases were cases of we did defense work and personal

injury suits, so most of them were surveillance cases that we had gotten film on a plaintiff and it was that type of thing.

Q. So when you say surveillance on a plaintiff, for example if somebody claims their back was badly hurt in a car accident, and you all saw them going lifting up big things at the store, that's the kind of surveillance?

A. Correct.

Q. So you said that was most of the cases. What were the other cases besides those?

A. We did everything. Domestic cases were very, very small part of our business, maybe 5%.

Q. Before we move on from that domestic cases are we talking about divorce cases?

A. Divorce cases.

Q. Domestic was anytime somebody was suing somebody else for hurting them?

A. I'm sorry, could you repeat that?

Q. Were any of the domestic cases for example a wife suing a husband because of a battery on her, or was it always divorce?

A. Oh no, it was all divorce. That was very small. That was only maybe 3 to 5% of our business. I've handled murder cases. I've consulted with numerous large companies around the United States on different security and

JOHN DILLMANN

different cases that involve them.

Q.   I don't want to interrupt?

A.   And all the big law firms here in New Orleans, of course, and in the Gulf South.

Q.   When you say you worked on murder cases, who would hire you on those cases?

A.   Well as an example, and I can't recall the names; I apologize. But back years ago there was a young girl in a restaurant by not Lakeside Shopping Center, but the shopping center that was further out. I think it's closed now in Jefferson Parish. I forget the name of the restaurant. But she was the manager of the store, and it was in Kenner and she was locking up the store -- the business that night. She was forced at gunpoint back in the store, forced to open up the safe, was brought into the cooler and shot in the back of the head. The company -- and again I can't recall the name that owned the business they owned several restaurants hundreds around the United States. Kenner after two weeks they didn't have any suspects and it was a whodunit. And they approached me and asked me would I consult with and work with the Kenner Police Department, and I explained to them that I would have to talk to them and see if they would cooperate, and I would be glad to work with them, but they would just be wasting their money because if the police department

doesn't want to work with me or me with them there's nothing I could really do. So I worked that case. That's one particular.

Q. So when you say you worked that case did a suspect wind up getting identified in that case?

A. Yes, we solved the case.

Q. Do you recall did you give deposition testimony in that case, or was that just one you all worked on?

A. No, he was ultimately convicted and sentenced to life in prison.

Q. Have you ever been hired by a criminal defendant to investigate a murder case, or has that always been consulting with the State side?

A. I believe I did do some defense work. Yes, I did do some defense work during those 18 years; not a lot, but some.

Q. And so we talked about personal injury, divorce, criminal cases, companies. Were there any other kinds of investigations your company did?

A. We pretty much ran the hold gambit of investigation.

Q. So with depositions I'm sure you remember some of this. This is much more informal than I know you've testified hundreds of times in court. This is much less formal than that?

A. Yes, sir.

Q. If at any point you need to take a break just let us know and we can take a break?

A. Thank you.

Q. Don't thing I ask is if I've asked you a question that you finish your answer before we take a break. So if I ask you something finish your answer, and then if you need to go to the bathroom, if you need water, or if you need more coffee, anything just let me know?

A. No problem.

Q. If I ask anything that is not clear, or if my question is bad, it's not understandable, if I get tongue-tied on a question I want to make sure you and I are on the same page. I want to make sure you understand the question I'm asking, and you're answering the question that I'm asking. So if you don't please just tell me?

A. I will.

Q. The court reporter has to transcribe everything, so if these depositions -- you know -- if you and me were just sitting down having a cup of coffee all the time we would say oh yeah, Uh-huh, and nod. That doesn't work when we have a court reporter. So this is going to happen at some point. It happens in every deposition. If you say oh yeah, I'm going to have to ask you to say yes or no what you mean. I'm not trying to pick on you, or just be a

jerk. That's just how we have to do it with the court reporter.

A.   I understand.

Q.   And I think that's pretty much the background. Are there any questions you have about this process generally?

A.   No, sir.

Q.   So I first wanted to talk about how -- first I want to see going into this if we could just agree on some things. You were a detective from 19 -- you started NOPD in 1967?

A.   It was around that time '67 - '68.

Q.   My understanding is you were promoted to homicide in 1970?

A.   Three years, yeah.

Q.   During the first three years between '67 and '70 my understanding is you were on the second district?

A.   That's correct.

Q.   What duties -- what was your job with the second district, were you a responding officer, or you were a property crimes detective; what job did you have at the second district?

A.   I was a normal uniform patrol officer.

Q.   So you were typically -- you were a responding officer. If a call comes in, you were the one who

responded to it?

A. Correct.

Q. Before you were promoted to homicide had you ever been a lower-level detective, property crimes, violent crimes that weren't murder, anything like that?

A. No sir, I had not.

Q. And then my understanding is from 1970 until 1986 you were with NOPD homicide?

A. That's correct.

Q. Then we talked about your private investigation company. You went back to the Orleans District Attorney's Office as an investigator in 2009?

A. I did.

Q. That was at Leon Cannizzaro's invitation?

A. Correct.

Q. My understanding is that you investigated cold cases?

A. Cold cases. I was commander of the cold case department squad.

Q. When you were doing that did you investigate any cases other than cold cases?

A. No sir, I don't believe so.

Q. Okay.

A. May I rephrase?

Q. Oh yes, sir.

A.  The district attorney had a grant for a cold case squad at that time and I stayed several years and I was commander and I was able to pick my own people for those cold case squads. Once the district attorney lost the grant we disbanded the squad, but they asked me to stay as an investigator in the section of the court. I stayed for about a year doing that, so I did investigate some cases for that one year, and then I resigned.

Q.  Do you recall what section it was?

A.  I wish I could tell you, but I can't recall.

Q.  Do you recall what judge it was?

A.  I can't recall.

Q.  Did you -- when you were investigating with that section did you ever have to testify in front of a judge?

A.  I don't think so. I was mostly used as a go for, and somebody to carry the district attorney's papers across the street.

Q.  I was about to say I know that people have different ideas of what go-fors do. Being from Alabama we don't really have go-fors, so I just wanted you to explain what that means a little bit more?

A.  Go for, do this, a helpmate. Maybe that sounds a lot better. I was a helpmate to the system attorneys.

Q.  Were you going out and interviewing witnesses or following leads, or?

JOHN DILLMANN

07/31/2025

Page 15

A.  I may have, yes.

Q.  Do you recall any of the cases that you worked on when you were in the section?

A.  I wish so much I could help you, but my memory at my age right now is an especially in the last year has gotten worse and worse, so.

Q.  I don't mean to embarrass you, I just don't --

A.  No, it's true.

Q.  How old are you?

A.  I will be 79 in January.

Q.  What day is your birthday?

A.  January 2.

Q.  You're three days before my mom and eight days before my dad?

A.  Really, Capricorns.

Q.  They are.  So when you say -- you said your memory is getting worse, is that due to a medical condition, is it due to medicine, or is that just -- you know?

A.  I think it's just my age to be honest with you. I do have a lot of physical problems, but the memory part I think is just my age.

Q.  Are there any medical conditions that you've been diagnosed with that would affect your memory?

A.  Not that I --

Q.   Are there any medications that you've been on that may affect your memory?

A.   I'm on a ton of medications. I can't tell you all of the side effects they may have.

Q.   Are there any medications that you started, and then noticed after you started oh man, I'm just not remembering as much?

A.   No sir.

Q.   When you were investigating the cold cases are there any that you remember solving in the cold case unit?

A.   Would that be in --

Q.   In New Orleans. I know you went to Lafourche.

A.   In New Orleans, yeah. Mostly our job in the cold case squad in Mr. Cannizaro's office was to go back because of Katrina and locate witnesses. They lost so -- get in touch with so many witnesses, so many victims, so many different things. We did bring a lot of new cases back to the grand jury after we located witnesses and interviewed witnesses.

Q.   Do you recollect the names of any of the cold cases that you were able to bring to the grand jury?

A.   No sir. I'm sorry.

Q.   Did you ever testify in trial in any of the cold cases?

A.   I may have, but I can't give you a name of any

right at this point in time.

Q. So you said Mr. Cannizaro allowed you to bring on whoever you wanted into that division?

A. That's correct.

Q. How many people were you able to bring on?

A. I believe it was six.

Q. Who were they that you brought on?

A. Sidney Cates was one. I believe his dad is a judge here in New Orleans. I cannot recall the names of the other five. Some or most of them I had worked with in the past and they were retired. We were mostly a completely retired unit that came back to work.

Q. Were they people who you had worked with in homicide?

A. No. Unfortunately everybody I had worked with in homicide had passed.

Q. Where had you worked with those folks before?

A. I'm sorry.

Q. Where had you worked with those folks before?

A. Some of them I had worked on the Police Department with. Others -- and I knew them from the detective bureau. And others were ex-detectives from the city like Sidney that I knew him and was able to talk him into coming on board.

Q. After the grant ran out and you went to the

section, my understanding is that you ended your employment in January -- you resigned in January 2011?

A. Yes, correct.

Q. Why did you resign at that point?

A. Well the main reason to be honest with you was the spillway. I had to commute every day from Baton Rouge, Prairieville where I reside to the District Attorney's Office. And of course Howard was a commander there and over all the investigators, and we had to be there at a certain time and you better not be late, dressed in coat and tie and tiptop shape. And the drive was just taking its toll on me because one wreck on the spillway and I'd have to sit there two or three hours, and especially going home on a Friday evening -- almost every evening it just got to the point where it was ridiculous.

Q. I recall being there once for four hours trying to get back here. When you say Howard just so the record's clear who is Howard -- what's his full name?

A. What's Howard's last name. I apologize folks. It's cumbersome. Howard -- I know it as well as my own. I've known him 30 years. Unfortunately he's deceased also, but I worked with him in a second district and he was a high commander in the New Orleans Police Department before he took over. Howard Robinson.

Q. And that's one other thing is I just wondered

about these depositions, is if you need time to think you have time to think. This isn't like court where you have a judgment being like move this along, move this along.

A. It's just embarrassing.

Q. My parents are 81 and 84. You're remembering much more than they can, so I really appreciate you making this effort. So are you presently employed?

A. No, I'm retired.

Q. I know was it in 2016 you went to Lafourche?

A. Oh no. I retired in '17 and I was there seven years.

Q. Did you go immediately from Orleans to Lafourche?

A. I did.

Q. And at Lafourche what was your job there?

A. I worked completely under the sheriff Greg Weber, and I was his cold case homicide detective, the only one in Lafourche Parish. And my assignment was to go back as far back as I needed to go. I was given a vehicle, a gas card, and I could make my own hours, but I needed to produce and I was given sergeants pay.

Q. How did you wind up getting connected with that job in Lafourche?

A. This is going to be a little complicated. My wife's brother's son, his wife worked for the sheriff and was very close to the sheriff. She did all of the

photography and did all of the marketing for the department and all. And she used to talk about me all the time.

Q. Okay.

A. And she talked about me to Sheriff Weber all the time, and then she'd come back and tell me you ought to come back down, the sheriff wants to talk to you, and I never would go.  And finally that was the connection.

Q. When in 2017 did you leave Lafourche?

A. I want to say in January, but I'm not positive.

Q. Why did you leave Lafourche?

A. My mother-in-law lived in Poplarville, Mississippi, and she was getting back in my father-in-law's truck at church, and she fell out the truck and she broke her legs completely. And if they had to put a metal rod in her leg. So we brought her up to Baton Rouge to be operated on, and also for physical therapy. To make a long story short they moved in with us and never did leave. They stayed with us for 12 years. My mother-in-law was in a wheelchair and my father-in-law started to get dementia. So because my wife worked and I was working she would get up in the morning and she would take care of them, fix their breakfast, then go to work. I'd go to work. And then during the day my mother-in-law was able to take care of my father-in-law. He would help her physically, and she

JOHN DILLMANN

07/31/2025

Page 21

would help him with remembering and telling him what to do. And when my wife came home she took care of them until it was time to go to bed. Well about 2017 my mother-in-law had deteriorated to such a point that she couldn't take care of my father-in-law. My father-in-law got dementia so bad that he -- we had to change the locks on the house because he was leaving the house in the middle of the night and we were afraid he was going to get killed. So I stayed home with them and took care of them during the day. That was my main reason for retiring, plus I wanted to make 50 years in law enforcement and investigative work. I started when I was --

Q.   So '67 to 2017?

A.   Yeah.

Q.   When you made 50 years was that because there was a certain pension vesting, or was that just you wanted to make 50 years for yourself?

A.   Just so I could say so. That's all I've ever known. That's all I've ever done.

Q.   After you left Lafourche have you been employed by any other company or agency?

A.   I'm embarrassed. My wife is a -- she's Director of Human Resources for two Chick-Fil-A's in Baton Rouge. Her boss's son opened up a Chick-fil-A in Gonzales, Louisiana, and I was so bored after my mother-in-law and

father-in-law passed away -- they passed away within a week of each other. And I was so bored just walking around the house I didn't know what to do with myself. You can only sit in front of a computer for so long. So at breakfast one morning I mentioned to my wife's boss that owns her Chick-fil-A's because she's HR over, that I wish I could find a little part-time job not for the money just to be able to get out and just talk to people, because I'm starting to talk to my dog.  And he said well I can't hire you, but my son's got the Chick-fil-A. They do deliveries. If you want to do a couple of hours a night of delivery so I started working for them and I think I worked four months. I drove a Chick-fil-A truck with a chicken on it and I brought people there hot sandwiches.

Q.  Other than Chick-fil-A have you been employed?

A.  No, sir.

Q.  Since 2017 have you done any self-employed investigation or any type investigative work?

A.  No, sir.

Q.  So the last time you did any kind of law enforcement investigation was when you retired in 2017?

A.  That's correct.

Q.  Do you recollect the names of any of the cases that you worked on in Lafourche that you -- that got charged?

A. I remember the cases and I did a lot of cases out of -- I went out of state a lot locating witnesses and perpetrators or suspects I should say that had moved out of state, so I was out of state. But I can't right now -- they may come to me, but I can't right now tell you the names of any particular cases.

Q. What was -- before you joined the police in 1967 was NOPD your first job in law enforcement?

A. It was.

Q. What kind of employment did you have before that?

A. I was electrician's helper at Louisiana Cement Company out at Michoud. And before that I was a roustabout I guess is the best word I could say for Janky Shell Company on the Industrial Canal, and that's the only two jobs that I held before the Police Department.

Q. When you say a roustabout for Janky Shell Company what do you mean?

A. They would send a barge of shells that was dredged out of Lake Pontchartrain. We could dredge out of Lake Pontchartrain. They would send a barge as an example to Morgan City. The barge was full of clamshell. There was a hopper set up for the person they was selling the shell to, and the crane on the barge would take the clamshell and put it in the hopper, load it into the trucks, and that's how they were able to know how much shell to charge

the client. I would go to the scene and stay in a hotel. I'd have to go onto the barge and measure the barge length and width of how much shell, and then I would stay and count the yards that were put into the hopper so they could match up and make sure that all the figures were right on that particular barge.

Q.   Got you. What was the highest level of education that you attained?

A.   I graduated from Warren Easton High School and I did about a year and a half at Loyola University majoring in criminology. I did not graduate, but I took about a year and a half worth of courses.

Q.   What drew you to criminology to study for a year and a half?

A.   I'm sorry?

Q.   What drew you to criminology to study for a year and a half -- what drove you to pick criminology to study?

A.   That's all I ever knew.  I joined the Police Department when I was 20. When I got out of the Academy I wasn't even old enough to carry a gun. We have to be 21. So they put me in a vice squad doing pinball machines until I was old enough to carry a gun. So to answer your question all I've known since I'm 21 years old is law enforcement and investigating. I was married and I had a small child, and I thought that by going to Loyola I would

be able to further my -- what's the word I'm looking for. I would be able to advance in the Police Department because of my education.

Q.   You were already a member of the New Orleans Police Department when you went to Loyola?

A.   So I went at night, yes.

Q.   Were you already in the homicide division, or was this when you were in the Second Circuit -- not second circuit, second district?

A.   Second district.

Q.   I apologize. What drew you to New Orleans police; what made you start this law enforcement career in 1967?

A.   The first thing is undeniable was money. I was making minimum wages as a electrician's helper, and there was an ad in the paper for police officers that could make $500 -- I can't remember if it was 500 or 250 a month, but it was more money than I was making.  So that was an advantage. And then it's going to sound corny to you, but to protect and to serve, and I've always wanted to help people ever since I was young -- and real young, and that was an opportunity for me that I thought I would at least go take the civil service exam to see if I could pass it, and if I did I would go to the Academy and see if I liked it.  But it was monetarial and to protect and to serve.

Q.   Did you have family members who were in law

JOHN DILLMANN

07/31/2025

Page 26

enforcement?

A.   I did. I should've told you that. I apologize. I thought about it. My great-grandfather -- and I can show you pictures on my phone right here that I have in here -- he was a detective from 1829 until 1947. He was the oldest detective in New Orleans.

Q.   Oh wow.

A.   Nickname was Dutch. They called him Dutch, and I have tons of newspaper clippings and he was the oldest detective -- they made him retire in his 70s at 76.

Q.   What was his full name?

A.   George, George Dillmann.

Q.   George okay. And so I know this has been clarified in your earlier depositions, but just so we're on the same page. Your name has two Ls and two Ns in it.

A.   That's correct.

Q.   So it's a D - I - L - L - M - A - N - N?

A.   Correct.

Q.   There are a number of documents I know you've been shown over the years that has Dillmann with one N. It's your understanding that that's you; there were no other John Dillman's?

A.   No sir. That mistake's been -- and that's why I tell people all the time give it a deposition or whatever, John Dillmann, two Ls and two N's. Everybody laughs at it.

JOHN DILLMANN

Q.  So if we have records from John Dillman from 1970 to 1986 from the New Orleans Homicide Division those are --

A.  Those are -- that's me.

Q.  Outside your great-grandfather were there any other family members your had in law enforcement?

A.  No, just my great-grandfather.

Q.  When you applied to NOPD were there any other friends or anything that you had with NOPD?

A.  No.

Q.  I want to talk about training academy for a little bit. You said you went when you were 20 years old; is that right?

A.  That's correct.

Q.  How long were you at the training academy for?

A.  To my recollection as I sit here today I thought it was a six -- I think it was a six-month training period. I could be wrong, but that's what comes to me right now. When I was reading an earlier deposition you mentioned somebody named Donald Duke was one of your instructions.

A.  Donald Duke.

Q.  Was Donald Duke related to David Duke?

A.  Not that I know of.

Q.  What did Donald Duke teach you?

A.   Donald Duke was a physical Ed instructor. He taught us defense. He taught us how to -- I don't know the right word to use. He was a physical education instructor at the Academy?

Q.   So when you say physical education are you talking about like getting physically fit, or to how to physically deal with your job and suspects?

A.   Know how to deal with your job.

Q.   So this is not passing a physical fitness test. This was if you have to be physical with a suspect in the field this is how to do it?

A.   How to flip them, how to keep them from taking your gun out of your holster; that type of thing.

Q.   Do you recall the names of any other of your instructors?

A.   No, sir; I don't.

Q.   Do you recall what training you all were given on the law back -- I know this was in 1967. But was any part of your training about legal standards, what the Constitution said, what the law was right now?

A.   I thought about this because I perceived that this would be one of the questions I was answering. And I thought about it a lot, and to be perfectly honest with you as I sit here today I can't remember any of the training or what type of classes or -- I just have no

recollection of it whatsoever except the physical part or the physical training that we had with Donald Duke.

Q. To the best of your memory when I say Brady versus Marilyn are you familiar with that case?

A. I am.

Q. I have more questions about that later, but do you recall the first time you heard about Brady, Brady obligations, what you have to turn over, was that in the Academy or was that after you got to NOPD?

A. To the best that I could recall it was after I was in homicide and been promoted to homicide.

Q. Got it. Do you recall in what context that was?

A. I don't understand your question.

Q. Do you remember did you all have a class on it, did somebody come and speak to you all, was it one of your other officers told you about this?

A. Back in those days -- and you'll probably hear me say that a lot -- but back in those days everything you learned was on-the-job training.  You did get some written material that was given to you periodically, but the bulk of your training was from a training officer that you rode with for a certain length of time until they would tell the commander he's ready to go out on his own.  And I'm positive that the first time that I heard of Brady would have been during the time that I was trained by my

training officer in homicide.

Q. Who was your training officer in homicide?

A. Pascal Saladino.

Q. Is Mr. Saladino still alive, do you know?

A. No, sir; he isn't.

Q. Do you recall when he passed away?

A. I'm sorry?

Q. Do you recall about when he passed away?

A. A couple two or three years ago.

Q. I meant to ask this up at the beginning. I don't want to talk about anything that you and your lawyers have talked about at all, but have outside your lawyers have you talked to anybody about coming here and testifying in this deposition?

A. Just my wife and my daughter.

Q. What did you talk to your daughter about?

A. Just the fact that she knew about the John Floyd case that I was involved in, and then when this came up during family conversations -- you know -- I mentioned to her that there was a second one coming up that I was involved in, and I was going to have to be deposed and represented, and I would be driving into New Orleans on several occasions.

Q. So John Floyd is actually -- that was the next thing on my list. I'm glad that you brought that up. John

Floyd, do you recall in that deposition taking the fifth amendment throughout it and saying that you weren't answering questions?

A. I did. Worst day of my life.

Q. And I know from the transcript it was 230-ish pages of just asking questions and saying I'm taking the fifth, right?

A. And being -- never mind. I'm sorry.

Q. I'm interested in what you were going to say.

A. And being browbeat by the attorney who was asking the questions in my opinion and couldn't answer.

Q. When -- I don't want to talk about any conversations that you and your attorney had then. Are there any questions that you are planning to take the Fifth Amendment to today; is there anything that you are not planning to answer today?

A. No, sir.

Q. When you were asked the questions of John Floyd were there questions in there that you did know the answer -- I don't want to ask a specific question, but were there questions that you knew the answer and were saying I'm taking the fifth under your attorney's advice?

A. All of them.

Q. And with John Floyd you are aware that his conviction got reversed, and the City wound up settling

his claim, correct?

A.  I'm sorry?

Q.  You're aware that his conviction got reversed, and the City wound up settling that claim?

A.  Oh yeah.

MR. GOFORTH:

Object to the form of the question.

MR. MURELL:

One thing, if there are objections like that throughout the deposition that is just for the record. There are two types of objections you'll hear. You'll hear objection to form, objection to speculation, objection to hearsay. Those are to preserve the record for Ms. Petrovich and Mr. Goforth. You can answer those questions.  Only if -- Mr. Goforth is representing you is my understanding. If he tells you don't answer something that's something you two need to talk about. But if he just says objection we can keep going, okay.

A.  I understand.

Q.  How did you feel about the outcome of John Floyd's case, his conviction being reversed and being given a multimillion-dollar settlement?

MR. GOFORTH:

Object to the form of the question. You can answer.

A.  I can answer it?

MR. GOFORTH:

Yes, sir.

A.  I think it was disgusting.

Q.  How so?

A.  And a travesty of justice.

Q.  House so?

MR. GOFORTH:

Object to the form of the question. You can answer.

A.  Well I believed then, I believe for the last 40 years and I believe as I sit here today that he was guilty as sin, and I know that I was accused of things that I would never do in a million years. I would go to jail before I would do them.

Q.  Like what?

A.  And I was accused -- you've read the depositions. I'm sure you know. I was accused of framing an innocent man to go to jail, for what reason -- that would make no reason -- you know. There's no bounties.  And that's a hundred percent against my -- what's the word I'm looking for. I just would never do anything like that under any circumstances.

JOHN DILLMANN

Q.  You're aware one of the allegations of John Floyd is that there were fingerprints at the scene that were labeled not John Floyd that were found, right?

A.  I'm very aware of it, yes.

Q.  Those weren't ever disclosed is my understanding, correct?

MR. GOFORTH:

Object to the form of the question. You can answer.

A.  I don't remember, but I don't think they were. That's not a positive. I don't think they were.

Q.  Do you recall why you did not disclose those?

MR. GOFORTH:

Object to the form of the question.  And to the extent that this might get into the area of where he has taken the fifth previously I'm going to instruct you to not answer unless we have the deposition and can show that this isn't something he wasn't --

Q.  Well let me ask you this. With regards to John Floyd I know you took the fifth on your attorney's advice. That was a different attorney than this. You had to hire Eric Hessler, right?

A.  Right.

Q.  Today are you still claiming your Fifth Amendment

privilege over what you did in the investigation of Mr. Floyd, or is that something that you will be willing to answer today?

MR. GOFORTH:

I'm going to object to the form of the question, and I believe that's getting into you asking for a matter that's been discussed between him and his attorney.

Q.   I don't want to know anything you and Mr. Hesler said, but just sitting here today if I ask you questions about Mr. Floyd's case are those things that you would be okay answering today, or are those things that you're going to keep saying I plead the fifth?

MR. GOFORTH:

Again objecting that it's a question that's calling for what really might be more of a legal advice situation. I may object and not -- and instruct him not to answer certain questions even if he wants to just as what happened in the previous depositions. I'm going to continue to object to any questions regarding subject matter that was brought up in the John Floyd depositions just to make it clear for the record. Mr. Dillmann, I'm going to instruct you not answer anymore questions about John Floyd to the extent

it covers things that were brought up in your

previous deposition.

MR. MURELL:

So we'll return to that at the end, because that's going to be -- we're going to have to go through and have that put on the record for a number of questions.

Q. For Mr. Flanks' case are you okay talking about the details of this case?

A. Yes, sir.

Q. For Curtis Kyles, are you okay talking about the details of that case?

A. Positively.

Q. And for Reginald Adams are you okay talking about the details of that case?

A. I don't remember Reginald Adams.

Q. That was the Alfers murder?

A. Yes. I don't have a problem with that.

Q. Outside of John Floyd is there any other cases that you worked on that you're going to exercise the Fifth Amendment for. I just want to do this is housekeeping, because I want to put that at the end. Because I want while we're still fresh and it's in the morning I want to get through all of the questions that you're not going to be able to go through.

A.   No, I'm not going to (Inaudible).

Q.   Okay.

A.   Are my feet messing you up here?

Q.   Oh no, you are totally good.

A.   Excuse me.

Q.   So moving back to when you were in NOPD homicide you first went there in 1970 and you were describing that you learned on the job from your training officer. When you were transitioned from the second district to homicide did you receive any additional formal training, or were you sent to any other Academy, were you given manuals to read, anything like that?

A.   No sir, I was not.

Q.   And when you say training my understanding is you would ride around with Mr. Saladina?

A.   Well when you say ride around, we didn't just ride around. I accompanied him on investigations?

Q.   I guess by ride around you would ride with him?

A.   Yes. I was assigned to him.

Q.   When you were with him as a training officer did you participate in those investigations, did you interview witnesses, did you collect evidence?

A.   I believe at first I was nothing more than an observer because he had a partner that also rode with him who he had been partners with for years and I can remember

JOHN DILLMANN

riding in the back of the car with them. So at first no, I didn't. By the end when I was able to go out on my own I could remember taking statements. But they would always review everything that I did.

Q. How long were you riding around before you -- how long were you riding around?

A. I don't recall. It could've been six months. It could've been a month. It could've been a year; I don't recall.

Q. And reading -- I believe it was in Reginald Adams deposition you said that your job was to keep your mouth shut and listen. How long was that your job before you would actually go out and be able to participate in the investigation?

A. That's pretty much the same question you just asked me.

Q. I'm just trying to assess it out little bit different. I'm really not trying to trick you. I'm just trying to get an idea like was it the last month.

A. I don't recall.

Q. When you -- after you got through with the training stent with Mr. Salidano did you immediately start becoming lead detective on cases, or were you working with -- were you a secondary detective on cases?

A. No, there was an order we had in homicide during

the time that I was there. There were three platoons, a day watch, a middle watch, and a graveyard watch. There were six men on each platoon with a sergeant, and as the cases -- I can remember back in the days long before the crime that we have now when we had 300 murders a year. And when I first went into homicide we not only handled murders, but we handled all major cases, rapes, everything. So we took turns. It was done on a rotational basis, so when my turn came up after I was on platoon and my turn came up yes, I was lead detective in the case.

Q. Who were the platoons -- do you recall before I get into the platoons, do you recall -- my understanding is that there was some point when you went from handling officer shootings, rapes, murders, to just murders?

A. That's correct, sir.

Q. Do you recall when that was?

A. No sir, I don't. It was some use after -- a year or two after I was in homicide, because I handled many rapes and many child abuses and things like that.

Q. Mr. Flanks' case was in 1983. By 1983 do you recall if you would've been handling just homicides or all crimes?

A. Just homicides.

Q. Okay. I know I got distracted when we started talking about John Floyd. In preparation for this

JOHN DILLMANN

07/31/2025

Page 40

deposition again, I don't want to talk about anything you and your attorney talked about, but did you review any documents?

A. Would you repeat the question please?

Q. When you were preparing for this deposition did you review any documents, did you review a --

A. I did.

Q. What documents did you review?

A. I reviewed my report on the case, and I believe I reviewed some grand jury testimony. I think that's about all.

Q. Did you review any of your testimony from that case?

A. I'm sorry, I did. I reviewed my testimony at trial.

Q. Did you review any of the other trial testimony or just yours?

A. Just mine.

Q. So the report, grand jury, and the grand jury testimony -- oh, go ahead.

A. I'm sorry, I'm wrong with the last answer I gave. I did review a page or two of the testimony of the victim's wife.

Q. Ms. Carnesie?

A. Yes.

JOHN DILLMANN

Q.   Is there any other testimony you reviewed?

A.   No, sir; not that I can recall.

Q.   So other than your report -- and when you say grand jury testimony do you mean -- whose grand jury testimony did you review?

A.   The wife.

Q.   Was there any other grand jury testimony that you reviewed besides hers?

A.   No, sir.

Q.   Then you reviewed some of the trial -- you reviewed your trial testimony and some on this Carnesie's trial testimony. Was there any other documents you reviewed in preparation for this deposition?

A.   I believe I reviewed an affidavit that I signed.

Q.   What affidavit.

A.   It was an affidavit relative to some case files that I had taken home out of the police department and had kept in the trunk of my car and at my home, and before I was able to return them Katrina took them.

Q.   So obviously we're coming up on the 20th anniversary of Katrina. That was August 2005. You retired in 1986. So am I understanding that when you retired in '86 you took some of the homicide files.

A.   I did.

Q.   Were there copies still at homicide, or these

were the original files?

A.   These were the original files.

Q.   From what I'm hearing you say and please correct me if I'm wrong, these were the only copies of these files?

A.   As far as I know, yes.

Q.   Why did you take them when you retired?

A.   Well I didn't take them actually the day that I retired, but I had had been -- I had the files with me either at my house or -- and it was SOP in those days. As long as you brought them back you could take files home. You could carry them in the trunk of your car. You switch and swapped them back and forth between detectives. That was one reason that I had them.  And the second reason I started to write my first book which was Unholy Matrimony and to be perfectly honest with you it saved me a year of research because my information was right in the case file. So I had planned on returning them before I retired and I didn't.

Q.   Got you. So these are not case of files that you leave the office and like oh, I want to come keep these. These are ones you had taken home while you were still part of the homicide division; is that right?

A.   Would you repeat the question.

Q.   Yes sir. These are files that you had taken home

when you were still an active member of NOPD homicide, or where any of them files that you got from the department after you were retired?

A. While I was still a member of the police department.

Q. Was Mr. Flanks case was amongst files?

A. I know it was not.

Q. How do you know it was not?

A. Because I've seen part of the file, and I know it went to trial, and I know positivity I didn't have it. I don't remember all the ones because there weren't that many, but I remember most of the ones that I had. Flanks was definitely not one of them.

Q. Do you recall Mr. Flanks case; do you recall that investigation?

A. I do now. When I was first subpoenaed I couldn't have told you Flanks, or the victim, or anybody was in the case. I didn't remember the case at all.

Q. Okay.

A. I do now.

Q. So I have more questions about that, but while we mentioned Unholy Matrimony I actually -- this is the book?

A. Yes, it is.

Q. That is a book you authored that's been published?

A. Right, correct.

Q. It's a nonfiction?

A. In 13 foreign languages and it was on the best sellers list for a week, and Reader's Digest condensed volumes with Sidney Sheldon and Robert Cook.

Q. When it was on the bestsellers list I imagined it was best sellers for nonfiction?

A. That's the genre, nonfiction.

Q. So what's in that book is the truth; this isn't a fictional book?

MR. GOFORTH:

I object to the form of the question. You can answer.

A. No, this -- the genre is true crime okay, so the facts in the book are correct. There are things written in the book for entertainment purposes, literary license that it often takes to change not the outcome of the book, but to change the entertainment value. I will give you an example of what I'm talking about so you'll understand. If in this book I was writing about a conversation that Fred Dantagner, my partner, I had driving in a 1980 LTD on the lakefront, and we had a conversation that was pertinent to the case that wanted to be at the book, my editor at Simon and Schuster would tell me are you crazy, John. Nobody cares about this conversation.  Put yourself at the Café

du Mond eating beignets and with the riverboat going up
with the paddlewheel, but have the same conversation.

Q. Got you.

A. So that's the best way I can explain it to you.

Q. I got you. So there were facts that were really
part of the case. You just embellished the circumstances
so it would be more attractive to readers?

A. Correct.

Q. Got you. When you went to homicide in 1970, was
there -- my understanding there was no list of duties you
all had a say homicide officer -- homicide detective?

A. I don't understand what you mean by list of
duties.

Q. When you went to homicide was there any kind of
these are the tasks you must perform on every case. Your
duty is to memorialize investigations, to memorialize
witness statements, to memorialize witness confessions, to
obtain and collect evidence. Was there any kind of
guidance you all had about these are the protocols that
should be followed in every murder case?

A. The guidance was given by your training officer,
by your sergeant. Written -- as far as anything written on
A, B, C, D, E, F, G this is what you do because every case
is different -- completely different. So no, there was no
list that this is just stuff you do, and you would watch

other people do it and you know that's what you had to do.

Q.   When you were a homicide detective did you go to any national conferences about how to perform an investigation, or did you all just learn from each other on the force?

A.   I may have taken classes here and there at the state police, but I don't know if I'm confusing that of when I was in Lafourche. We had a book that was given to us, and I guess it was given to all police officers, not just homicide detectives or people in the detective bureau. But it was a book of -- we called them keys, K - E Y - S, keys, and any time there was a new law that was passed, or there was something that the District Attorney or a new case law or whatever, it was written up in a key and it was given to each one of us, and we were told to read it and then put it in our book and we all kept that book.  I don't know what we called it. We just called it a book.

Q.   Was there any kind of -- did your supervisors -- did you have to sign something saying yes I read this that you had to sign; I know like performance reviews not often when you get a new policy you have to sign and give it back so there's a copy in your personnel file. Was there anything like that back then?

A.   No, sir.

Q. Was there any kind of -- do you recall if you would read all these keys memos as they came down and added them to your book?

A. It depends. I mean if I was given a key on the third watch at 10 o'clock at night and I didn't have something that I was going to do right there I might prop my feet on my desk, take my cup of coffee, smoke a cigarette and read it, yes. Another time it might be given to me during the day when they were filming a movie on the third floor with Clint Eastwood, and I was handling a homicide case, no I wouldn't read it. I would just stick it in my drawer and wait until I had time.

Q. Got you. I know this was a long time ago, but you do you specifically recollect any keys about Brady versus Maryland, Giglio versus United States, anything about those kinds of cases exculpatory or favorable evidence?

A. Sure. I mean I know what Brady is and all, but I don't recall any particular -- I mean I know what Brady is, and what the law means and what supposed to be done, but.

Q. Well we can go ahead. That was a little further down, but we can go ahead and jump there since we are there. What is your understanding when you were a police officer -- this is not a law school exam question about there's a right and wrong answer. But as a police officer

I also know you've been in law enforcement from '86, and I was born in '81 so you're in 38 years of law enforcement nearly after you were at NOPD.  Do you recall Brady being something that you discussed or talked about when you were at NOPD homicide?

A.  Brady material -- when I was in homicide for those years Brady material was left up to the district attorney's officer who was the district attorney had a certain amount of assistant DAs that reviewed cases. They reviewed them when they came in for the police department, and they made the determination what was Brady and what was not Brady.

Q.  You're talking about I believe they call them screening attorneys?

A.  Screening, thank you.

Q.  Do you recall who the screener was in the earlier years; I know Kenny Green was one?

A.  Who.

Q.  Kendall Green, do you remember him?

A.  No.

Q.  Do you remember anybody else who was one of the screening attorneys?

A.  I really don't.

Q.  So let's focus back at the time at NOPD. What was your understanding of Brady back when you were at NOPD?

JOHN DILLMANN

A.  My understanding was that Brady material was anything that would help the defense, or the defense needed to be made aware of had to be given to them. And I should say this and I'm sure you read this in my other depositions, that was a time when the district attorney fought all Brady. They even fought so much -- they fought Brady to the point of whether our confessions were admissible. They fought Brady to the point where we couldn't even give up our police report. They wouldn't even let them look at our police report. So until the judge or someone made a decision that it was Brady material. Now by the time I got to Lafourche Parish and I worked there we just gave them the whole file.

Q.  Got you. So when you say the district attorney fought Brady what do you mean by that?

A.  Okay.

Q.  Like how did that play out in a case?

A.  Well once the packet -- we called it a packet -- was made by our secretaries, and it was sent to the district attorney's office, the district attorney's office would review it -- the screeners, and then give it to I would assume a section or an assistant attorney who was going to prosecute the case. And once they read over all the statements and everything that was sent over to them, they would make a determination what they were going to

give the defense, or a determination if they were going to bring it to a judge and have a preliminary hearing to determine what in the judge's opinion whether it was Brady or not. Does that make sense?

Q. It does. I just have some follow-up questions about it. I know a lot of this is the lawyers.

A. I understand.

Q. Did you learn what the district attorney would turn over -- would they tell you we are not turning this over, we're not turning this over?

A. Not at all, except if I had to testify.

A. It was a confession and they were trying to hold it back from a defense attorney I'd have to testify. If it was my report and they didn't want to give my report to the defense then it would go in front of the judge and I would have to testify. But to know what was given and what was not given to the defense, no, I did not know.

Q. So when you say you'd have to testify i want to go and explore that a little bit. So say your report has something that the witness described the person -- the witness described the person as a six foot five white man, and then the person who was arrested wind up being a six-foot tall black man. It was just one witness said that. You determined that witness was not credible?

A. One witness.

Q.  Say there are three witnesses. Two said six-foot tall black man, one said six five white man, would you note that discrepant witness in your supplemental report?

MR. GOFORTH:

Object to the form of the question. You can answer.

Q.  I guess I can ask this a way that you talked about in the Adams deposition. Do you recall talking about in the Adams deposition that if there was information about an alternate suspect in a case and you ruled that suspect out you would not include that in your report?

A.  I don't recall that as I sit here today, but if I testified to it -- you know -- I'm sure it's correct.

Q.  This is page 88. I have a copy.

MR. GOFORTH:

That would be good, thank you.

A.  Could we take a quick break?

MR. MURELL:

Sure, absolutely.

Off the record 11:36 AM.

Back on the record 11:49 AM.

Q.  Mr. Dillman, you're still under oath okay?

A.  Yes, sir.

Q.  If they say they were would that be -- would you tell the secretary make sure to put these notes in, or

would that be the secretary pulling something --

A.   That would be the secretary pulling them. I wouldn't necessarily say put my notes in.

Q.   Do you know if the secretary had any kind of policies or training on when to turn that over and when not to?

A.   I have no idea.

Q.   So you would give her -- you would give the secretary the case file, you would give her the report, they would type it up, and then turn over --

A.   Actually I would give here -- I would give -- I would type my supplemental report as a draft. I would give it to my sergeant who would okay it, then I would give that draft report to the secretary. Then she would go pull the case file, and she would take it all from there.

Q.   Got you. So going back to the case file, so we talked about there being the incident reports. We talked about there being the dailies. What other documents in the early 80s were included in a case file?

A.   It could've been almost anything. It could've been anything from a note that's -- from a note that the desk sergeant left for you that someone called to return a call. It could've been something as little as that. It could've been -- it could've been a match or pack of what you call matches -- a matchbook. It could've been a

JOHN DILLMANN

matchbook with a phone number on it that you found at the scene that you didn't know if it had any bearing in the case or not, but you put it in your pocket and you laid it through with the case file.  It could've been reports from the crime lab that they sent back to you. There's so many different things it could've been.

Q.  That was one thing I wanted to ask -- the crime lab while we're just on that topic. Who decided -- back in the early 80s who made the decision about what evidence to submit to the crime lab on a case, was it the lead detective, was it sergeant?

A.  It would be the lead detective, yeah. If I -- I would direct -- by that time in the 80s we had our own crime lab technicians. You know there was a time early on when we would handle the crime scene personally ourselves. But in the 80's -- '83 that you're talking about we had a crime lab unit that would come out and process a scene, and I would oversee that, and I would tell them I want a blood sample from this, or I want a picture of this, or I want this, or I want that. So I would make the decisions of what they would take on the crime scene, and the same thing with evidence. And a lot of what we'd get would be common sense. If you had shell casings, that would be evidence. If you had pellets in a wall, you were going to dig them out of the wall, you know. That was evidence.

Q. And then so once the evidence is collected, who was it that made the decision to say send it off to the ballistics lab to see if these casings match, or send it off for serology or something like that?

A. It really wasn't a decision. It was you did it. I mean if you put it on the evidence book, and tests could be run against it, it would be sent to the crime lab. If it was a pellet, certainly it was going to be sent to the crime lab. If it was a casing it was going to be sent to the crime lab. But if it was a matchbook with a phone number, that would've been put into evidence. But if that was in evidence -- there had to be some test that they could run on the evidence for it to be sent. If not it would just stay in evidence inceptual evidence.

Q. And so when you sent something off, so say a casing gets collected, you send it off to the lab to be analyzed, once they finished the analysis who would their report go to?

A. Their report would come back -- normally we would get a phone call, and we would be given the results. And then a report would be made and it would be sent back up to my office. It would be put in my basket -- one of the little baskets. And then when I read it I would put it in a manilla file and put it in the case file.

Q. So the reports would go back to the lead

detectives on each case?

A. Correct.

Q. When they called you and gave you results were there any times that they didn't then follow up with a report that said oh, we don't need that; you don't need to bother with it?

A. It's so long ago, Mr. Murell, I don't recall. That may have happened sometimes.

Q. That's fair.

A. It's just been so long.

Q. When the secretary would put together the packet to send to the district attorney's office, would you review that packet before it was sent, or after it was sent; when did you find out what was actually sent to the DA's office, let's say for a case going to trial. Say for a case going to trial, when would you find out what out of your file actually made it to the DA's office?

A. When the district attorney would call me over for a conference, and we would sit there and go over testimony, witnesses, evidence.

Q. So it wouldn't be --

A. I would get a pretty good idea of what was sent over.

Q. Would that be something that happened early on in a case, like before grand jury, or would that be something

JOHN DILLMANN

07/31/2025

Page 56

that would happen only if the cases are actually going to go to a jury, like a jury trial?

A.   You know it just really depended. There was not set rule on it, because sometimes a case may sit for three months before it went to trial. Back in those days -- here we go again -- back in those days the district attorney could accept charges without taking it to a grand jury. And then on other occasions you'd get a phone call and -- from the district attorney and they'd say we're taking this to the grand jury tomorrow -- you know -- because they were trying to stop the preliminary hearing.

Q.   That's because if they indicted a case you know longer get a preliminary hearing?

A.   Right, correct.

Q.   When -- did you ever have to testify in front of a grand jury?

A.   Millions of times.

Q.   So I want to talk -- I obviously know there's lots of Louisiana laws that we can't talk about what happens in a grand jury, so I don't want to talk about any specific cases, okay. I just want to talk about the process generally. Where was the grand jury located then when you were testifying; where would you go?

A.   Well when I first was assigned a homicide the grand jury was in the old courthouse building on Broad

JOHN DILLMANN

Street right next from the snack bar across from magistrate court.

Q.   I know exactly where you're talking about.

A.   Later on in the new building under Leon they had a grand jury room.

Q.   So in the early 80s would it have been at Tulane and Broad in the courthouse?

A.   Probably so, yeah. I would think so.

Q.   So when you go to testify in front of the grand jury obviously there will be grand jurors, there's the prosecutor. Was there always a court reporter?

A.   I think so.

Q.   Do you remember any times when there wasn't a court reporter?

A.   As I sit here today my gut tells me there was always one there, and I can't remember any times if there were or weren't, but my gut tells me that there was always one there.

Q.   So in a case where your the lead on the case, and they're not just calling you to the grand jury, but also a witness, would you stay in the room -- you're the lead detective. Would you stay in the room when the witness testified?

A.   No.

Q.   So if say --

A.   No, sir.

Q.   So say for example in this case when the -- Ms. Carnesie came and testified to the grand jury were you in the room with her?

A.   No, sir.

Q.   All right. Did you ever get copies of the transcripts from the grand jury?

A.   Never.

Q.   Did you ever learn what witnesses said in the grand jury; would the prosecutors ever talked to you about that?

A.   Never. The only thing that we would get from the grand jury was who was ever presenting the case to the grand jury would come out and say we've got a bill or a no true bill.

Q.   Do you recall when you were preparing for trial -- so say a case gets indicted, defendant decides he's going to trial. Do you recall ever going over grand jury testimony with a prosecutor in preparation for trial?

A.   Never.

Q.   Do you --

A.   It's always been my opinion -- not my opinion. That's not the word. It's always been my understanding the grand jury testimony is secret, so there's no way I would've ever had any accessibility to any grand jury

testimony.

Q.   Do you recall any instance in your career from '70 to '86 where a DA turned over grand jury testimony to a defense attorney?

A.   Not that I know of.

Q.   It's a good thing I'm striking things off. So we're making progress. So in Reginald Adams deposition you said your time in homicide you were probably lead on 150 to 200 murders?

A.   I don't know, a bunch of them.

Q.   Do you recall how many murders a year you were getting assigned about?

A.   Well we were averaging anywhere between 200 and 300 a year depending on the timeframe.

Q.   And there were 18 of you all?

A.   Yeah. So I did -- I was lead in probably in a minimum of 10 or more a year, and I probably assisted on another 10 or 20, so it was quite a bit.

Q.   When -- I'm sorry. I'm trying to shorten this, because there's some of these things I don't think we really need to go over. So we've talked about dailies. We've talked about handwritten notes. We've talked about lab reports and other things. Were there other ways that as the investigation was going on that for yourself as the lead detective you would keep notes or something; would

JOHN DILLMANN

07/31/2025

Page 60

you have like a notebook with your progress from a case, or how would that work?

A. Well I always carried a pad -- you know -- and a pen with me. I wouldn't keep a daily log of what we did of each day unless I went out -- I was told of a witness say that had some information and I went out and interviewed him, and I might take notes from what he told me.

Q. So like say --

A. But I would take it on that pad. But it wouldn't be a running of the whole case.

Q. So let's say a case takes two or three months -- you know some cases are harder. Say it takes two or three months to close, is there anywhere where you would like when you have individual notepad for a case, or would there be somewhere you kept your progress on a certain case?

A. Well I would have my notes, and I would have -- if something was pertinent that I wanted to put into the report I would rip it out of my pad and put it in the case file. And also if it went long I would continuing writing dailies, because  from those notes and dailies would be how I would make my report. So there may be many, many dailies, more than one that particular night that was -- and you would have -- I would have a manilla folder in my case file just for dailies.

Q. With the dailies would you -- say you have a case that lasts three weeks, a month, would you write a daily every time on every day that you did something on the case?

A. No, sir.

Q. On what days would you write dailies?

A. When I -- in my opinion there was a point in the investigation between the initial night or day that it happened until this point that I needed to write something down so when I did my initial report I had something to reference back to, statements from witnesses, things like that.

Q. The stuff that we talked about earlier about discrepancies between witnesses or when a witness has a discrepancy from the scene to the time they get back to the office, or when you've eliminated alternate suspect, would you make dailies about those? Say you got a tip tat Joe Green committed this murder. You go track down the tip. It's bogus. Joe Green was in a basketball game with 50 people around him. Would you write a daily about that?

A. No.

Q. Why not?

A. There would be no reason for it if I didn't think it was pertinent to the case. If it was so unpertinent to the case that I wasn't going to make notes of it and put

it in my report, then it would be no reason for me to write a daily and for the whole homicide unit to read it.

Q. How did you -- you used that word pertinent twice. How did you determine what information was pertinent and what information wasn't?

A. The same you as an attorney would go over your work in your cases and make a decision what is pertinent to your cases and what's not. It's a personal decision.

Q. Were there any policies or practices in the early 80s about wat information needed to be recorded in dailies versus what should not be recorded -- doesn't need to be recorded?

A. No, not back then, and I don't know if there are now. I think it's -- I think it was left up to the experience of the person who was handling the case.

Q. Do you recollect any policies or practices about writing dailies if you received Brady evidence, or evidence that was favorable to a defendant?

A. No, sir. I don't recall anything like that.

Q. Do you recall back in the early 80s if you received evidence that was favorable for a defendant, but you decided -- but you determined through your investigation that this was bogus would you write a daily about that?

MR. GOFORTH:

Objection to the form of the question. You       can answer.

A.   I need to hear the question one more time.

Q.   In the early 80s if you received -- say somebody gives you a tip that would be favorable to a defendant if it bore out, but you investigate it and it doesn't bear out in your mind, would you --

A.   Let me stop you there. I don't understand what that means. It's favorable to one, but not favorable to another?

Q.   Say you have a suspect is Mr. Green. Somebody -- you haven't gotten enough to even an arrest warrant on Mr. Green. Somebody calls and says Mr. White is the murderer. You follow -- track it down. You don't believe Mr. White is the murderer. Do you write a daily of that?

A.   No.

Q.   Why not?

A.   No, sir. There would be no reason for me to. Mr. White was in New York at the time that the murder occurred, and I determined that he's got an alibi and he don't fit the description, and he has no police record, and no; I wouldn't have put that in a daily.

Q.   If there --

A.   Mr. White would walk free.

Q.   If say there was information that you received about again, Mr. Green is the suspect. Mr. White is --

somebody comes in and say he -- I saw him commit the murder. He's the murderer, but you decide this person's just not a believable person; like you say coo coo's. Would you put that in a daily?

A. If I have one person accusing another person and saying that they witnessed it I probably would've -- I don't know if I would've put it in a daily, or I would've just put it in my notes. But I definitely would've taken a statement from him.

Q. And so when you took a statement from somebody would those statements all wind up in your supplemental report, or you weigh or determine this wasn't pertinent, this person's not believable --

A. If I took a statement it went in the case file, and it went to the district attorney.

Q. Got you. In terms of the word pertinent did you all have -- did you get any instructions from your sergeant, from your brass, from the people above you about you all have to include these things in a daily, like if there's something that winds up saying -- was there anything that you were required to put in a daily every day?

A. No, sir. That was left up, again -- 90 percent of everything that we did was left up to our experience and our -- you know we were in charge of it, and at the end of

the investigation -- you know -- I might run something by my sergeant and all the guys in my platoon while we were having coffee together and get some feedback on what they thought about it. But it was our -- our cases were our responsibility.

Q. Did the district attorney's office -- do you ever recall either Mr. Conager or any of the other assistant district attorneys working for him telling you all this information needs to be recorded in a daily, certain -- say if you all learned a certain kind of information, you have to put that into a daily?

A. No, never.

Q. Do you ever recall Mr. Conager at the district attorney's office saying if you learn about some evidence that might -- I'll strike that. I phrased that question terribly because I don't know how I want to ask it yet. So I'll go back to that. Did you all ever receive any instructions from the DA's office about what needed to be included in a supplemental report?

A. No, sir.

Q. Did you all ever receive any instruction or training from the DA's office about what needed to be included in dailies?

A. No, sir.

Q. Did you all ever receive instruction or training

from the DA's office about when you were taking notes -- handwritten notes, what needed to be written down?

A.  No, sir.

Q.  Did you all ever get any instruction from the DA's office or any DA or training from them about how to document any kind of evidence, witness statements, or evidence collection?

A.  No.

Q.  Do you recall in your career any time after when a DA had read your supplemental report or looked through the file asking you to go back and right a further supplemental about something that wasn't in the case -- that wasn't documented?

A.  No, sir. Not that I can recall.

Q.  So from -- I want to do this in two chunks, because I think it makes more sense in my head, and I hope you'll agree. So from '67 to '70 when you were in the second district, do you recall there being any kind of disciplinary investigations, actions, complaints or grievances against you?

A.  One.

Q.  What was that?

A.  Myself and another uniform officer made an arrest, and I can't even remember what the arrest was about. And we brought him to central lockup and there's a

Sally port in central lockup. And I parked the car in central lockup, and my partner had not finished writing the report, and the arrested subject was still in the back of the car. I got out, left and went inside central lockup and went to the men's room, and while I was gone my partner, or the guy that I was riding with took him out of the back seat. And I don't know if when he was about to walk him in, and he slapped him in the head, or did something that -- something frivolous, but it was still shouldn't have been done, and it was on camera. So I was suspended for three days. And it really wasn't a suspension. It was -- we have what they call AWP days, which was hour two days off, so they took -- they made me work my two AWP days with no pay. And the reason being that there's a in the code of procedure you're not supposed to leave your partner alone in a car, so I was written up for that. And just as an aside, we took it to civil service and I was reinstated my two days.

Q.  Just so -- I don't know what AWP means. Do you recall that?

A.  It was your two days off, your Saturday and your Sunday, but it might be a Tuesday and a Wednesday.

Q.  Do you recall just that acronym -- A - W - P, what that was?

A.  No, I can't recall.

Q. And so they didn't -- when you got suspended -- or not suspended. When the complaint was filed against you, and before you went to the civil service board, you didn't actually get taken off the streets, they just took your two vacation days?

A. Oh no. They just made me work my two days and didn't pay me.

Q. So let's go from 1970 to '86 when you were in homicide. Do you recall any complaints, grievances, disciplinary proceedings against you during when you were a homicide detective?

A. No, I don't think so. I was given the department's highest award five times, so I don't think so.

Q. What was that award based on?

A. It was five awards.

Q. What were those five -- what were the criteria for those five?

A. Well I think one of them might've been when I was in the district during those three years, but the other four were for cases that I handled.

Q. Do you recall what cases?

A. No, I don't. It's been so long. But to answer your question, no complaints.

Q. Got you. Do you recollect any time -- do you

remember generally what your clearance grade was back then, clearance meaning closing cases versus other detectives in your platoon and the other platoons?

A.   As I sit here today I recall -- what I recall sitting here today - and I don't know if it's a hundred percent correct, but it's what I recall here today -- that during my whole time in homicide I only -- we only lost three of my cases.

Q.   Lost meaning went to trial and lost?

A.   Yes.

Q.   So in terms of the actual -- just like a case gets assigned to you, an arrest is made, disregarding what happens at trial just in terms of say you get assigned you were saying 10 to 15 cases a year, do you recall how many -- so I just want to make sure we're on the same term as clearance rate. So when I say clearance rate I'm talking about say you solve 10 of those, your clearance rate would be 66 because that's one third -- that's two thirds of the cases you got assigned. Do you recall if your clearance rate was higher or lower than other detectives?

A.   I don't recall, sir. But I can say this, that there was nothing -- there was no advantage to your clearance rate. If you got 10 cases that year and you've got 10 unsolved cases, well it was clearly obvious to your rank that you weren't -- you were coming to work and

JOHN DILLMANN

sitting up in the office and reading comic books all day. But other than that there was no -- you didn't get any -- there was no incentive to have more cleared cases than hung cases. Sometimes it was just luck of the draw and the type of cases you caught.

Q. Outside there being like official incentives in terms of like promotion or pay, was there -- did you all talk about if some guy was lagging behind and not clearing cases as fast as the rest or everybody else?

A. Can you repeat that one more time; I'm sorry to keep making you do this?

Q. You're doing perfect. You're doing exactly what I asked. I really want us to be on the same page. I don't want you answering a question that I'm not asking, so thank you for doing that. So say there is somebody who in a year is not zero, but -- you know -- somebody's only clearing three out of 15 cases. In your platoon would you all talk about like hey, you're not carrying your weight, you need to work harder?

A. Would we talk to them about it?

Q. Not in terms of a supervisory thing where like somebody's getting rewarded, but would it be discussions amongst the platoon about who's solving the most cases?

A. No. I could tell you this. Back in the 70s and 80s the six people in our platoon were like brothers, were

like service people in combat. My partner was the Godfather of my children, and I was the Godfather to his children. My sergeant, Paul Truhan, I was with him for 15 years. We were all like family. Jan Perreta was the name of the police detective that I told you was charged with murder who was up in homicide. I couldn't remember his name before. Someone like that that was on the platoon, you may talk to other detectives, but not Jan Perreta. And say man, what is this guy doing up here.

Q. Got you.

A. But you wouldn't talk to Jan himself. Does that make sense?

Q. That's perfect. When -- in the early 80s, and specifically, I don't know if you remeber Ddecember of '83, but like in 1983 around when Raymond's case was, do you recall who was the other five people that were in your platoon with you?

A. Paul Durant was my sergeant. I know that Fred Datagnin was my partner. Pascel Saladino, his partner I can't remember his first name was Lavealette was his last name, and Johnny Miller -- John Miller was on our platoon.

Q. In your platoon did you all have nicknames for each other?

A. Did we have?

Q. Nicknames for each other.

A.  Oh yeah.

Q.  Do you recall what anybody's nickname was from the early years?

A.  All of them.

Q.  What was your nickname?

A.  Is that relevant? Pascel Saladino was Dego. My partner Fred was Monk. Johnny Miller was Little Johnny -- Little Johnny Miller -- all three. Little Johnny Miller, Monk, Dego -- I think that was --

Q.  Did Lavealette have a nickname?

A.  I think we called him wolf or something. Never did cut his hair like he should or something.

Q.  What was your nickname?

A.  Who?

Q.  What was your nickname?

A.  I don't think I had one.

Q.  Okay, they just called you -- what did people -- not like now when I'm calling you Detective Dillmann. If one of your colleagues were coming up to you and like hey, what would they call you?

A.  Just Dillmann.

Q.  Okay.

A.  They'd call me by my last name more than my first name.

Off the record 11:50 A.M

Q.  A couple things or just a couple of questions I realize I didn't ask when we were going through things. When we were talking about dailies and notebooks you said that sometimes when you wrote down pertinent in a notebook you would rip the page out to stick in a case file.

A.  Uh-huh (affirmative).-

Q.  It has to be a yes or no for the court reporter.

A.  Yes -- yes.

Q.  What would happen to the rest of the notebook where your other notes about the case were on?

A.  The rest of the notebook that --

Q.  You said you would rip pages out of a notebook to put in the case file. What would happen to the other pages that had notes about the case?

A.  I don't know what other notes you're speaking of.

Q.  Maybe I misunderstood, but my understanding was we were talking about taking handwritten notes during cases and whether you had say for John White's murder, if you had notes that as you went along, and you mentioned that if there was a page with pertinent notes like a witness interview or something you would rip that page out and put it in the case file. Would you do that for all your notes about the case or only pertinent information?

A.  No. I think you may have misunderstood, or maybe I misspoke. But I thought the question that you asked me

was if someone called in with some information and I went out and spoke with them, and I determined the information may be good or may not be good, what would I do with that information. And I always carried a pad with me, and I said I might write their name and phone number and all down, and tear the page off. And sometimes I would put it in the case file, sometimes I wouldn't depending on how pertinent the information was.

Q. Got you. And so say somebody did that and you decided it wasn't pertinent, but you still had written it down in a notebook somewhere, where would that have gone?

A. If I didn't put it in the case file I tore it up and put it in the garbage can.

Q. Got you. Then we had talked about grievances, discipline, complaints while you were at NOPD from '67 to '70, and '70 to '86. While -- when you had your investigative company for 16 years, were you licensed by the state as a private investigator?

A. Positively. My partner sat on the board -- state board.

Q. Did you have any complaints lodged against you while you were a private investigator?

A. No, sir.

Q. When you went to the Orleans DA in 2009 to 2011 were there any disciplinary, complaints, grievances?

JOHN DILLMANN

07/31/2025

Page 75

A.  No, sir.

Q.  When you were at Lafourche from I believe it's 2011 to 2017 were there --

A.  No, sir; no complaints.

Q.  And then I asked you about nicknames you all had. Did the platoon -- did you all have -- did each platoon have its own nickname?

A.  No.

Q.  So it was just individuals had nicknames.

A.  And you know what I said before about us being like family, that was at work. Everybody was -- well we didn't necessarily -- well Fred and I -- my partner did, but the rest of us, we didn't socialize that much when we were off from work and all.

Q.  Got you. So in '86, I read your testimony in Adams about why you left NOPD, but I wanted to ask you about that. You talked to me about -- my recollection is you actually quit working in '85 because you had vacation time, and your official end date was in '86; is that right?

A.  Correct.

Q.  What made you decide to leave the department?

A.  I think I was just -- I was just dissatisfied in the way that I thought the department was going, number one. And number two, I had began writing Unholy Matrimony.

JOHN DILLMANN

And at first I would do it on the weekends and I would write on my days off. And then after a while I realized that you just can't sit down and write. You have to -- it's either there to do it, or it's not to do it. So because of those reasons I decided to go ahead and take my pension. And I might mention that I was in the last class of the New Orleans Police Department to be able to retire and get their pension right away without having to wait until they were 55 years old. So while I was still young enough for another career I decided to leave.

Q.  So when you say you were disappointed in the way the department was going what do you mean by that?

A.  Well I just didn't feel that the qualifications and the standards were the same as they were when I had come on years, and years, and years before.

Q.  How so?

A.  Well I guess I'll say the same thing I said in my last deposition, was what really put me over the hump one night I -- one day I was on the way to work and there was a female officer in uniform on her way to work in a marked unit, and she was next to me. And she was combing her hair and putting her makeup on while she was heading to work. And I thought that was not only dangerous, but I thought it was very not becoming to the uniform. And then another time I had some uniform officers right after that

bring some witnesses up to my office and we had a big glass cage, a room this big a conference room that they could sit. And while I was doing something, I looked over and the witness was sitting in chairs, and two uniform officers were sitting on the floor. And that was a nice gesture, but I didn't think that was very becoming to uniform officers to be doing that. So those were kind of the two things that put me over the hump from the other things that I mentioned to you.

Q.   So that was what I want to actually follow up on. I wasn't clear on -- the woman with the lipstick, was that somebody in homicide, or was that --

A.   No, that was just a uniform woman who was a lady officer who was on her way to work and obviously running late.

Q.   And then the people who were sitting on the floor, were those homicide detectives?

A.   No, they were normal --

Q.   Got you. We talked about -- so like in 1983 when Mr. Flanks' case was -- the 18 platoon members, the six and there were three platoons. How many of those detectives were white?

A.   The majority.

Q.   Were there any black detectives?

A.   Yes, there were maybe -- in the whole bureaus, or

JOHN DILLMANN

in --

Q.   In your 18, in the three platoons?

A.   Can you give me a second to think?

Q.   Sure.

A.   There were one or two on and off during that 16 - 15-year period, but the majority were white.

Q.   Do you recall the early 80s in '83 do you have any recollection if there were any black detectives at the time Raymond's investigation's going on?

A.   I really don't recall.

Q.   In that time period were there any women who were detectives, or was it all men?

A.   Right at around '83 I don't -- can't recall. I'd be guessing.

Q.   Do you recall any women who worked in homicide with you?

A.   Yes, they had -- not with me personally on my platoon, but there were women in homicide.

Q.   Were they on other platoons?

A.   Yes, sir.

Q.   The time that you were there from '70 to '86 did you ever have a woman on your platoon?

A.   No, sir.

Q.   How many women do you think while you were there rotated through the platoons?

A.   I can't recall how many.

Q.   Was it more than five?

A.   Probably not?

Q.   And then you rank, the people -- Sergeant?

A.   Druhan.

Q.   And then the other people who were your supervisors were any of them African-American or?

A.   We had a -- well we had a superintendent who was African-American during that time. We had a chief of detectives who was African-American during that time.  And we may have had some lieutenants that were also -- yeah, there were African-Americans that were in supervisory positions.

Q.   Were any of them directly supervising you?

A.   No, sir.

Q.   Did you ever have any person that directly supervised you who wasn't white?

A.   No, sir.

Q.   Did you ever have a woman who directly supervised you?

A.   No, sir.

Q.   The superintendent who was African-American what do you recall his name; is fine if you don't?

A.   I don't recall it. Woodfork maybe.

Q.   The chief of detectives do you recall his name?

A. He may have been Woodfork. I don't recall right offhand.

Q. And the lieutenants you said may have been do you recall any of their names?

A. No.

Q. So you mentioned Unholy Matrimony, and we have your book. These are just pages from your book. We will mark this as Plaintiff's exhibit number two. In Unholy Matrimony you discuss general police practices, correct; how you would investigate a case?

A. I'm sure I did.

Q. Was that based on your experience?

A. Yes.

Q. Was how you investigated a case -- we talked about some things and how you would embellish to make it a better story, right?

A. That's correct.

Q. Like being down at Cafe Dumond instead of on a drive by the lakefront. When you talk about investigative techniques you used was that embellishment or was that real?

A. I would say as I sit here today that it was all real. Of course if you would bring something to my attention that you may think is not I can look at it and see. But I would think that -- I would see no reason to

embellish that.

Q.   So I do want to show you if you could turn to page 18 of your book?

A.   18?

Q.   Yes sir.  I think this is a different version that I have. Read over this and see -- make sure that that is -- it should be the middle of chapter 1 so.  Okay, page 16. If you could read just down page 16 and 17?

A.   Do you want me to read it out loud?

Q.   No, could read it to yourself just to remember it.

A.   Okay.

Q.   So this is an actual copy of the book you wrote, right?

A.   Yes.

Q.   So I wanted to -- this is on page 16 of what you are looking at.  You write in there in this case the victim couldn't make an identification. Still I really wanted to believe I had the perpetrator. What case are you talking about right there?

A.   I will have to go back and read. Let's see. I don't recall, sir. It was obviously a rape case that I had been working, but exactly which case I couldn't tell you.

Q.   That's fine. I was just curious. I couldn't figure out what it was, so I was just wondering if you

remembered?

A.   It may have been a fill-in for what we were talking about before.

Q.   And so the next sentence is as always the temptation existed to prod the victim, make subtle suggestion to help her select individual I suspected. Every detective, even relatively inexperienced ones like me knew how to coax a witness and guide her without her knowledge towards the quote unquote right identification, but such methods had to be avoided regardless of the detectives feelings. Do you recall writing that?

A.   Uh-huh (affirmative).-

Q.   I really don't need to be fussing at you. It's just the court reporter has to -- you have to answer yes or no. Do you recall writing that?

A.   Yes, I do.

Q.   So you say every detective even the relatively inexperienced ones knew ways to coax a witness, guide her without her knowledge towards the right identification. How would you -- how did you know how to do that?

A.   Well, that was part of the -- I'm at a loss for words. It was part of the teaching, or part of the knowledge that you obtained while working with Saladina and Lavealette, and broken in for six months. I'm sure there were times that we talked about photo lineups. I'm

sure there were times that I stood with them while they conducted photo lineups and watched, and watched how to do it. And then developed -- went over the things you should do and went over things you should not do, and developed my own personal way of conducting a lineup without doing anything that I shouldn't be doing.

Q. So when you said you would learn personally from watching them what to do and what not to do, would you see detectives coax witnesses or guiding them without their knowledge?

A. Never.

Q. How would you know how to do?

A. How would I know how to?

Q. You say every detective knew how to coax a witness.

A. It was -- I don't want to use the word common knowledge. It was SOP in the detective bureau which I learned not only through Pascal and through Lavealette, but through other detectives that were out there too, that there were certain things you do or don't do in a photo lineup, things that can get the lineup thrown out you could lose your case.

Q. What would be some of the ways -- so you say every detective knows how to coax or guide without their knowledge. What would be some of the ways a detective

JOHN DILLMANN

07/31/2025

Page 84

could coax or guide?

A.  It could be -- you know -- just off the top of my head and I don't recall them all -- but it could be using to lineup pictures instead of six. It could be your suspect has a beard and putting five fill-ins that are clean-shaven. It could be -- it could be setting the pictures down in front of her, or him, or whoever it may be, whoever the witness is, and moving the pictures around so they're not in line and one is obvious that it's --

Q.  So physically touching the pictures?

A.  Yes. Not using fill-ins that -- the best fill-ins you could get, not using those or manipulating the photographs to make it quite obvious that you're putting one on the side.

Q.  And I know we're on video, but I want to make the record clear.

A.  No, that's okay.

Q.  When you say manipulating, you're talking about physically moving a certain picture with your hand away from the other pictures?

A.  Yeah, right.

Q.  Are there any other ways that you recall how a detective could do that?

A.  Well you're talking about subtly. The opposite of subtly would be putting photographs up and pointing the

finger down and saying do you recognize this guy. That's not subtly, but that would be another way of something you wouldn't do.

Q. And so with this -- and the reason you wouldn't do that is the goal is you as a detective is to actually solve a crime, not just close a case?

A. Correct. You want your identification -- if they could make an identification -- to be either a positive identification, or a tentative event. At the worst tentative, but the best the positive identification.

Q. And your goal wasn't just have -- if a police officer just went out and said I'm going to get somebody on this case. I don't care if they're guilty or not and does one of these tactics, that's the kind of thing that leads to a wrongful conviction, right?

A. Positively.

MR. GOFORTH:

Object to the form of the question. My apologies. You can answer.

Q. And you don't engage -- you know you shouldn't engage in these practices because it causes unreliability in an investigation?

MR. GOFORTH:

Objection to the form of the question. You can answer it.

A.  I knew that I wasn't supposed to engage in those type of situations number one, because I was taught that. Number two, I didn't want to lose a case that I worked so hard on. And number three, it wasn't the right thing to do.

Q.  And it wasn't the right thing to do because it could lead to innocent people going to prison?

A.  Yes.

MR. GOFORTH:

Objection to the form of the question. It's okay. I just have to lodge it.

A.  I did it again.

Q.  So I want to now turn -- we were just talking about the -- so turning to the guidelines and policies do you recall in the 70s and early 80s if you actually did physical lineups with individuals -- you know -- like on old TV shows where there are six people standing and somebody would go oh the third guy from the left?

A.  I don't think I've ever done one of those.

Q.  So from 1978 to 1986 you don't recall doing that. Do you recall what -- I'm going to show you an authored policy from NOPD about how to conduct a lineup in the 80s?

A.  I don't know. I don't recall, sir.

Q.  Do you recall if there was a policy change in the early 80s?

JOHN DILLMANN

A.  I don't recall.

Q.  Did you all have policies in general about written policies about how to conduct lineups?

A.  When you say we, are you talking about the homicide division, or are you talking about the police department in general?

Q.  That's a good point. Let's go through those each. Did the homicide department have any internal protocols about how to conduct photo ID -- not photo ID, how to conduct lineups in general?

A.  It was SOP of what we discussed a few questions before on what you should do and what you shouldn't do.

Q.  Which is what you mean SOP meaning standard operating procedure?

A.  Right.

Q.  And when you say what we were talking about, you were talking about having six pictures?

A.  Right. Having the right number of fill-ins and using fill-ins that is as identical as you can get with the suspect issued photograph.

Q.  I don't imagine that there would ever be an issue about what fill-in means, but fill-in means when you're showing a witness an identification, and you're talking about one person is the the suspect and the five other people fill in?

A. Are fill-ins, correct.

Q. When you say it was SOP, does that mean that was just how you all learned, or was there actually a written policy?

A. No, no written.

Q. So are you aware if there were any written policies about conducting in New Orleans for the whole of NOPD, not just homicide?

A. Not that I can recall ever reading.

Q. So I'm going to show you what will be marked as Plaintiff's exhibit number three. And while you're reading it, just for the record this it's Bates number 2764 through 2767 -- CNO 2764.

A. I see that the effective date on this is '82 -- December of '82, and I could say to you as I sit here today I've never seen this before.

Q. So the effective date at the top left corner is December 19, 1982?

A. Correct.

Q. Does this -- do you recognize this heading and font as being consistent with New Orleans Police documents?

A. Yes, it says operations managers -- manual, and this could be what I had to refer to before as a key that was sent -- that was supposedly sent to everyone. Whether

it was sent to me and I didn't read it, if it was sent to me, or wasn't sent to me, I don't -- this is the first time I'm ever seeing this. And I've never seen from the time and '82 that this was supposed to go into effect until when I left in '85 or whatever date I left, I never saw anyone else in the homicide division ever do any of these things.

Q. So I just need to go through and ask you a couple -- I know you haven't seen it. I just need to do this for the record.

A. Okay.

Q. I understand that you're not familiar with the document. The number at the top right where it says FSOP 5.0, SOP specifically means standard operating procedure. Do you know what the F means?

A. I don't have a clue.

Q. And then the 5.0, do you have an idea what that means?

A. No, sir.

Q. And then the title of this document's identification says suspects-lineups, crime scenes and mugshots?

A. What's your question?

Q. Right under operations manual it says title, right?

A.   Right.

Q.   And it says identification of suspects - lineups, crime scenes, mugshots, right?

A.   I see that; yes, sir.

Q.   And you had a chance to read over this document?

A.   I did.

Q.   This document seems to indicate the policy was in '82 to have a actual physical in-person lineup?

A.   It appears so.

Q.   But you don't ever recall doing one of those?

A.   Never.

Q.   So now to what we'll mark as Plaintiff's exhibit number four.

A.   Or see anyone else do it.

Q.   Just for the record this is CNO 4006 to 4010.

A.   May I ask a question?

Q.   Sure.

A.   This gives the police officers directives directing them to do a standup lineup, but at the back of the -- of it, it talks about mugshots. So I'm not clear on whether this directive is directing you to do a standup lineup, or it's giving you a choice to do a standup lineup or a mugshot lineup.

Q.   I agree it's kind of confusing. That's why I wanted to ask you about it.

A. Okay.

Q. So just in terms of this document at the top left there is the same box that says effective 12/09/82, right?

A. Yes, sir.

Q. But then it says -- there's a box that says revised 09/23/84?

A. Yeah, I do see that.

Q. And so the top of it the operations manual, were you provided an operations manual?

A. I think that might've been the manual that we were given -- that everybody got when they came on the police department -- the black binder that I was telling you about.

Q. So when you came onto the police department in '70 if this policy about identifications didn't come into effect until '82 this wouldn't have been in your binder.

A. Well if it was given to me as a key, then I was supposed to put it at the binder.

Q. And this as you said there's the same instructions about conducting a physical lineup. But then on page 4 of the document there's also a section that discusses identification by mugshots?

A. That's correct, sir.

Q. Which is not in the last document that you said?

A. Right.

Q. Do you recall when -- in the early 80s, do you recall any of these policies about identifications or procedures?

A. No sir, I don't.

Q. Do you ever recall reading these updates in the manuals?

A. No, sir; I don't.

Q. When the manual would be updated, in Mr. Adams case you said you'd be lying if you remembered reading all the updates in the manuals. Is that correct of the identification policies?

A. Would you repeat that please.

Q. Sure. In Mr. Adams' deposition you said quote, you would be lying if you said you remember reading updates to the manual. Is that applicable to the identification policy?

A. It is.

Q. And so in terms of how you conducted lineups, was that clearly based on your experience, or was there any actual written policy or protocol you remember?

A. Experience.

Q. So when you first came onto homicide in 1970 was it the practice in the 70s to use photo lineups in the homicide division?

A. It was.

Q.　There are a lot of questions I don't have to ask now, so we're moving through things.

A.　Okay.

Q.　So to the extent of these regulations existed, you operating by your training and experience, not these regulations?

MR. GOFORTH:

Object to the form of the question. You could answer it.

A.　As I testified to, I don't recall ever seeing these keys.　I may have -- if I would've read these keys, or anybody in homicide would've read these keys I'm sure we would have followed the instructions right away.

Q.　one in terms of --

A.　But I don't recall reading them, and I can tell you up until the date that I walked out of that third floor office I always did mugshot lineups.

Q.　Third floor office you're talking about 715 -- 615 Broad street over by Municipal Court -- homicide's onthe third floor?

A.　Right. Yes, sir. It's in the 700 block -- 715, that's it.

Q.　I know we've gone over a lot of this document already. One thing that I wanted to ask you about is your worked details during the time your 16 -- not 16, 26 years

you were at the department?

A. 60 years straight I worked them.

Q. And what -- In Mr. Adams deposition I read you state NOPD had starvation wages. The employer didn't ask anything about that, so I was wondering what exactly you meant by that?

A. Well I can't remember exactly, but I think that when I went on the department we were making 500 a month. And I believe about a year after I was on they gave us state pay, which I was able to actually get a house then, because the state pay was enough for me to pay my house note.

Q. When you say state pay what do you mean?

A. State supplemental pay, because the state gave us a check at $250 a month as a supplemental to the City of New Orleans pay.

Q. Got you. So you were given a check from the city of New Orleans, and then the State would give you supplemental paycheck?

A. Right and had $250 was enough for me to buy a home and use that ass my house note. But I can tell you this about starvation wages.  I spent all those years on the police department working two jobs, three jobs, details, and the most that I ever claimed income tax -- and I claimed it all, but the most income tax I ever paid

on in 18 years was $30,000. So I raised two kids on $30,000 a year until somebody offered me money for this book.

Q.   So the $30,000 was inclusive of city pay, state pay and details?

A.   And details.

Q.   You said you were working details for 16 years. Does that mean you started working them in '80 or '79?

A.   No, I started working them as soon as I got on the police department. I mean Alice Cooper Municipal Auditorium -- you know.

Q.   So from the time you got hired in '67 until '86 when you left you were working details?

A.   Not all the way, from say '70 until '80 -- yeah. Pretty much, yeah -- pretty much the whole time. Really as I think back on it about a year before I retired I quit working detail. When Simon Schuster offered me to write this book and I told him I didn't know how to write a book. I went Warren Easton and majored in recess. And they asked me well we will teach you -- you know. My editor will teach you how to write it. And I said well I can't. I don't have time. I have to work two and three jobs to make ends meet. And my editor in New York said well how much do you make in details every year, and I think I told him something like the most I ever made was probably 15,000,

JOHN DILLMANN

07/31/2025

Page 96

half of my salary is in details. And he said what I tell you what, I'm going to write you a check today for 20,000, and I don't want you to work anymore details and your job for the next year is to write this and just send the pages to me and I'll edit them by page as you go along. And that's when I quit working details.

Q.   That seems like a much better way to make money. So in the early 80s about half of the 30,000 you were making was from details. How many hours a week would you have to work on details?

A.   I probably put in at least 20 -- minimum of 20 to 25 hours per week.

Q.   I wanted to ask about -- so that brought me to the other question that you were mentioning. How did you get connected with Simon and Schuster?

A.   How did I do what?

Q.   How did you get connected with Simon connected with Simon and Schuster -- how did you and the publisher get connect about they were interested -- you were interested in writing a book, and the were interested in publishing the book?

A.   I met a movie actor by the name of Jim Drewry. Jim Drewry used to pay play the Virginian on TV years and years ago, and he was in another TV series.  And I met him while he was in New Orleans and he was doing a show at a

place they used to call the Beverly Dinner Playhouse, and he was the head of -- the star of that show. And I'm not proud of it, but I met him at a bar room in Jefferson Parish. We kind of hit it off and we became friends. That was back when I was young.  And we became friends and he invited -- he gave my mom and my -- gave me tickets for my parents and my sister and all to come to the Beverly Dinner Playhouse free and we went saw the show and we ate and we drank free. And we went to a party afterwards, so we became pretty good friends. And while over cocktails I started telling him about this case that I was working on because I was right in the middle of Unholy Matrimony.  So after he left the Dinner Playhouse we kept in touch. He moved back to Texas and he kept calling me and asking me -- he kind of got fascinated with the case and he wanted to know how it was doing. So he followed it all the way through its --

Q.   When you say that case what keys are you talking about?

A.   The Albert Owskey murder in the book Unholy Matrimony. So he followed it all the way through, and he told me he said listen, I want to -- this is got to be a movie.  I'm laughing just thinking he's loaded.  And I want to play you in the movie.  And I said -- you know -- I just left. I thought it was just the alcohol talking. So

we kept in touch back and forth over the years. And then back around '85 maybe or '84 or something like that I was somewhere on a case and I was flying back on a redeye from Dallas to New Orleans, and the cocktail waitress in the front of the plane -- not the cocktail waitress, the stewardess.  She came back and said there's a gentleman in first class that wants you to come sit with him.  So I went up there to see who it was, and it was Jim Drewry. He was flying to New Orleans. And he was in first class and he was all loaded in first class. So I sat down with him and I had a drink with them.  And he said look man whatever happened about that case, and I told him nothing happened. We convicted him and that was the end of it. He said man before I retire I still want to play you in that case. He says look I'm going to have a movie producer friend of mine call you, and we are going to make a movie off of this and I'm going to play. And I just blew him off and just blew him off as ha ha ha -- you know -- and that was it. And about a week later I get a call from a producer in Los Angeles and he wants to write -- he wants to buy the movie rights to my book, and I'm telling him I'll be glad to sell you the movie rights to my book, but there is no book.  He said will Jim Drewery told me the story. He said man it's going to make a great TV series. He said I want to buy the rights to it. I said well you

have nothing to buy -- you know.  And he said well why
don't you go ahead and write the book and I'll buy it in
advance. And I said I barely can write a police report.  I
can't write a book. So he said I'm going to have somebody
call you. And I'm thinking all these people are just
crazy. And I'm not worried about it. I'm just going on
with my business. About another week later I get a call
from Simon and Schuster, from my editor and he says a
producer in Los Angeles called me and he wants to buy a
book, and I hear you haven't written a book. Would you
like to talk to me about writing a book.  And I said I
could talk to you but --

VIDEOGRAPHER:

I'm sorry, we've got to go off the record         really quick.
Off the record 2:46 PM.

Back on the record 2:48 PM.

A.  So as I was saying I received a call from my
editor at Simon and Schuster by the name of Ned Chase, and
he had spoken to the producer in Los Angeles wanting to
buy a book that didn't exist. So he asked me about the
story and I told him about whole story on the phone, and
he says listen I need to talk to you in person. He said
why don't you --

VIDEOGRAPHER:

I'm so sorry. It cut out again. I'm so         sorry.

JOHN DILLMANN

Off the record 2:49 PM.

Back on the record 2:52 PM.

Q.   Simon and Schuster reached out because they had heard about movie but there wasn't a book yet?

A.   Right. So I speak with Ned on the phone for a while and he said look I need you to come up here to New York and we need to sit down and talk about this, and I told him I said Mr. Chase, I'm a police officer. I work details. I don't have the money to just take off from work and just fly up there and see you in  New York. He said no, I'm going to send you tickets for you to come up here. If you want to bring your wife, bring your wife. Come up here I'll have your hotel, spend two days with me. And I was in my 20s. I said a free trip to New York -- hello, that's me. So I flew up to New York, and I'd never been to New York before. And I went up to New York and I saw some sites, and I went and visited Mr. Chase, who turned out to be Chevy Chase's dad. And I talked with him and I explained to him that I couldn't write the book because of the salary that I made, and I had a wife and two children that I was raising. And he said I'll tell you what I'll do. I'm going to write you a check for $20,000 today, and he said you don't work anymore details. He says you go home and on the days that you were off ad  you are going to work your detail, you work on this book, and he said I

want you to send it to me every five or 10 pages that you write and I'm going to edit it page by page, and that's what he did.

Q.  Whatever happened to the movie?

A.  We made it.

Q.  Oh, you did?

A.  Oh Yeah. It was two parts, a B series.

Q.  What channel was it on?

A.  Oh geez, I don't remember.  It was -- remember Dallas?

Q.  Uh-huh (affirmative).-

A.  Who's the guy -- Patrick Duffy.

Q.  I remember Dallas. I know it was something that happened when I was very, very young?

A.  Patrick Duffy played me in the movie. Charles Gurney, he was in it. It's a couple of good actors.

Q.  Did you write the script?

A.  No. I worked with the screenwriter.

Q.  Who was the screenwriter, do you remember?

A.  I can't recall his name right off.

Q.  Do you have like a video copy of that movie still somewhere?

A.  I may at home yeah, if I didn't lose it in Katrina. If not one of my family members might have it.

Q.  So what -- this is something that you may be able

to get your hands on?

A.   Yeah, I'll try. I'll get your card before I leave.

Q.   I can't talk to you directly. It's best to do it through your attorney. I can't. But I will follow up with him. I don't want to get in trouble with the bar things like that so.

A.   I don't want to do anything wrong either.

Q.   Were there any restrictions at NOPD about sharing information about those cases; like was it fine with your bosses that you were doing that?

A.   You mean talking with him about the case, I don't think anybody knew about it but may be my partner. But there were no restrictions. No one was -- I wasn't giving out any information. The case was long over and gone. Everybody had been convicted and went to jail. I mean it was over with so.

Q.   When did that case go to trial; I don't remember?

A.   It was in the 70s.

Q.   Okay.

A.   You know Ralph Whalen?

Q.   I do know Ralph Whalen.

A.   Ralph prosecuted that case.  He and I had -- when you get a chance to talk to Ralph tell him about -- that you know me.

Q.   He has an office over on Esplanade?

A.   I'm sorry?

Q.   He has an office on Esplanade. Then there were a few background questions -- talking about Raymond's case specifically. You wrote a resignation letter for Mr. Cannizzaro's office when you left in 2011?

A.   I did.

Q.   One of the lines out of that resignation letter was that quote, I remain loyal and supportive to you and your office. You have to say yes for the court reporter.

A.   Yes.

Q.   What did you mean by loyal and supportive?

A.   I meant that I didn't want to leave his office burning any bridges, and I was loyal and supportive to it. It speaks what it says.

Q.   Loyal and supportive -- well it says loyal and supportive of you -- like I get Cannezaro, but when it says your office what were you speaking of?

A.   I think you're trying to read into something that's not there, sir.

Q.   That's why I'm asking.

A.   There's nothing there other than what it says on the paper. I was loyal to him and loyal to his office, and I didn't have any problems while I was there. I enjoyed working there and I didn't want to burn any bridges. When

I left Lafourche I wrote the same letter and the same kind of letter which is available for you.

Q.   Got you. The last background questions were just about some of the stuff you looked over. And so I know you said you read the complaint back when you got served with it. The other documents you talked about reading, the transcript of Ms. Carnesie, the grand jury, your transcript at trial. When did you read those; was this like yesterday, a week ago, a month go?

A.   Which ones again are you asking me. The first one was the complaint.

Q.   The complaint?

A.   That was way back. All the rest of them maybe a week ago.

Q.   Okay. Did you review those on your own at your house, or were you with anybody?

A.   No, sir. I met with my attorney.

Q.   Okay, so I don't want to talk about any of that. So Raymond's case, so you said when you got a copy of the complaint you didn't remember Mr. Flanks' case and now you do. So tell me what you remember about Mr. Flanks' case from having looked at these documents?

A.   What I remember about the Flanks case by looking at which documents, sir?

Q.   Everything that you reviewed up through today,

JOHN DILLMANN

07/31/2025

Page 105

what you would've --

A.   Like deposition with everything.

Q.   Specifically about Mr. Flanks. He was interested. Mr. Carnesie was killed in December of 1983?

A.   Right.

Q.   So what do you remember about that crime, the investigation of Mr. Flanks, the arrest --

A.   Oh I thought you were asking me about Floyd.

Q.   Oh â€" no â€" no â€" no.

A.   That's what threw me off completely. My apologies.  As I mentioned earlier in my deposition when I first got the complaint I didn't even know who Mr. Flanks was, and I didn't know if it was even my case. That's how much I remember about this case. So the documents that I read reflected -- helped my memory come back, and I remember the case now. But I didn't even know who these people were. It was not a case that stood out in my mind.

Q.   So the memories that you have, are those -- you know -- I'm sure you got asked this question a million times when you were testifying as a police officer. Are these things that you actually still have an independent memory of, or you just know this is what happened because you read it, you know testified to it; that must've been what happened?

A.   No, at my age once I read my report which I stand

on, and I read the grand jury testimony and I read my testimony I do remember now.

Q.   So what do you remember?

A.   It jogged my memory of one of hundreds of cases that I've handled.

Q.   What do you remember -- well let's just start at the beginning. What do you remember about being assigned the case and responding to the scene?

A.   Well as I recall I don't remember what time of the day. I can't give you all of those particulars.  I remember that I was up with the case. I remember that I responded to the case to the crime scene.  I remember that my partners and a couple of my other detectives, or my platoon assisted me. I remember getting to the scene and handling the crime scene which would consist of directing the crime scene technician who was there. I remember brief -- I couldn't speak with the victim's wife because she was too hysterical, and I may have talked to her for just a few seconds while she was inside on the sofa. I pretty much got an overview of what happened by the people who had arrived on the scene before me and talked to her, and learned that she was -- I learned -- you want me to go into this much detail?

Q.   Yes, I do. I was just going to ask when you say people on the scene are you talking about responding

JOHN DILLMANN

07/31/2025

Page 107

officers or other --

A.   Yeah, responding officers. I learned that she was going out and she got in her car and she noticed somebody walked in the back of her car. And she gave them a description of them I believe. And as she was getting ready to back out of the driveway her husband came out the house and he walked down the steps, or walked out of the house to her car, and he went to kiss her goodbye. And when he went to kiss her goodbye the guy that had walked by came back around behind him and robbed him. And he wouldn't give him the money or there was a scuffle. He was shot and killed, and then he took off and left in a light blue car. That's what I was told initially.

Q.   Did Ms. Carnesie relay that to the responding officers; how did they know that information?

A.   I can't tell you sitting here today who told it to me, or whatever I testified to in my report. That report was within a timeframe that I would've remembered. So I'd have to rely on my report.

Q.   Okay. To the best of your knowledge were there any witnesses besides Ms. Carnesie?

A.   I noticed on this paper that you gave me before --

Q.   Which?

A.   -- which was my notes. I noticed that I wrote

George and Murell Pentaguy, and a Dr. Jerry -- no, that was the doctor that came on the scene. These people I have them as witnesses, but I don't know -- I don't have my case file and I don't remember in my report if they actually gave statements. But they either saw him in the neighborhood, or they saw his car leaving; something to that effect.

Q. How many photo lineups did you show in this case?

A. Just one.

Q. And that was to Ms. Carnesie.

A. Right. And if these people would've seen him I would've showed them the lineup too.

Q. So to the best of your knowledge the only eyewitness in this case was Ms. Carnesie?

A. Eyewitness was the wife, correct.

Q. And Ms. Carnesie was the only one to identified Mr. Flanks?

A. Yes, sir; that's correct.

Q. So when you get there Ms. Carnesie is obviously in a lot of distress?

A. Yeah.

Q. Tell me about -- I know you got to talk to her at some point that day. Tell me about that conversation?

A. I would have to go back into my report. It's outlined in my report, because I remember when I read it

last week I said something about she was on the sofa still hysterical.  I remember something -- I remember me asking her do you think you could identify this guy again, and I can remember her -- now that's this the day; the date it happened -- hysterical on the couch. I can remember her telling me I would know him anywhere. I'll never forget that face. I was this far away from him, but she was hysterical.

Q.  Okay. You've seen in these notes the description at the bottom of page 2.

A.  Right.

Q.  That description at the bottom of page 2 -- that Bates number OPDA 31, that's the description Ms. Carnesie gave you?

A.  That had to be, yes.

Q.  Do you recall -- you said you read her grand jury testimony. Do you remember -- do you recall at her grand jury testimony how she discusses a white blotch on the defendant's face?

A.  I do. I do.

Q.  Did she tell you that at the scene?

A.  I don't remember if she told it to me at the scene, or if she told it to me a day or two later, or a week later when I took her statement. But she did inform me of it.

Q.  And had she informed you of it before you did the photo lineup?

A.  Yes, she did.

Q.  Do you recall if Mr. Flanks has any white blotches on his face?

A.  Who?

Q.  My client, Raymond Flanks?

A.  I don't recall. I don't recall.

Q.  Is there any other description that Ms. Carnesie gave you besides the blotches on the face that you recall that's not in here?

A.  She gave me height, approximate weight, a slight small mustache. She described his clothes. She described a white shower cap that he was wearing. And of course the nickel plated automatic revolver.

Q.  Is there any other description that you can remember?

A.  Not that I recall, but while I was on the scene I was met by a plainclothes officer for the seventh district -- a follow-up unit officer from the second district. I think his name is Mike Lentz -- L - E - N - T - Z. And Mike pulled me on the side and told me that the victim's wife's description closely fit the description of a male who had been robbing elderly people within a eight or 10 block area around there for the last couple weeks or

whatever.  It was the same MO. The same everything. The same light blue car, same.

Q.  As a homicide detective why is that important information to you; I know it seems like maybe a dumb question, but just tell me when you heard that what were you thinking?

A.  I was thinking that the perpetrator who had been robbing all of these elderly people finally killed one.

Q.  And I know you said that Mike Lentz, was it the seventh or the second district?

A.  Seventh.

Q.  Seventh is the one out east. I'm sorry, not to bug you but you're going to have to say yes or no?

A.  Yes. Yes, sir.

Q.  So that's information you learned on the scene the night of the -- all right?

A.  On the scene, yes.

Q.  Did you receive on the night of the killing did you receive any other descriptions or information about the perpetrator?

A.  I don't recall. Those witnesses I don't recall -- I have them written here. I don't know if -- I seemed to -- something once they tell me that they saw the blue car, but if they would've given me a description of him I think I would've written it in these notes.

JOHN DILLMANN

Q. And we will go to police report. I just want to talk and see what's coming to mind?

A. Yes, I appreciate you being so kind.

Q. Did you ever connect Mr. Flanks to a blue -- a light blue car?

A. Did I ever --

Q. Connect Mr. Flanks a light blue car?

A. Only when he was arrested.

Q. Tell me about that?

A. He was arrested I think in a light blue car.

Q. So you get the description?

A. After robbing an A and P grocery store with a nickel plated gun.

Q. After the night of the incident what do you recall being the next step in terms of moving the investigation forward?

A. I don't recall it -- from the time that I got back to office, until the time I took her statement I don't know. I can't recall exactly what I did during that time. I can't tell you. But I do know that I -- and I don't remember at one point in time. I'd have to look through all that paperwork -- at one point in time I was contacted by Lentz who told me that your client had been arrested on armed robbery at an A and P grocery store.

Q. The other cases Lentz had told you about, those

were not stores, those were elderly people in an eight to ten block radius?

A. Yes, just like the victims. Probably what I went and did was went and got copies of all of those reports. That's what I think I would've done.

Q. When you say those reports you're talking about the reports of the other elderly folks that were robbed.

A. Yes, sir. That's correct.

Q. By the way, I know we've been going for a little bit. If anybody is the take a break at any time just tell me. I get really focused in, so I just kind of forget about it, so please interrupt me if anybody needs a break. Robbing the elderly is a pretty distinct crime, do you agree; going around and robbing elderly people in a eight to ten block radius?

A. Yes, especially in a certain area -- in a confined area of so many blocks and so many blocks.

Q. I'm sure you had many, many cases where stores were robbed?

A. Well being in homicide I wouldn't have gotten that many.

Q. I'm sure okay. That's fine. So when did Ms. Carnesie come in and give you an interview?

A. I think it was about a week later.

Q. And that time when she came did she come to the

state station to give you an interview?

A.   yeah. I may have went picked her up and drove her up, or she may have met me with her family. I don't recall.

Q.   Was that the same day she did the identification, or before that?

A.   That was before the identification, because I went to her home for the identification.

Q.   When you spoke with Ms. Carnesie approximately a week later, what do you recall she was able to tell you then that you weren't able to learn the night of the shooting?

A.   Not too much more. It was just more detailed, and she wasn't as hysterical. And I believe that's the night -- I believe -- I think I recall that that's when she told me about the blotch on one of his cheeks.

Q.   Did she describe the blotch further?

A.   Only that it was a light spot -- only a blotch.

Q.   Did she say how large it was?

A.   I don't recall.

Q.   When -- do you recall any other identifying information that you learned when she was more calmed down when you talk to her a week later?

A.   I mean she went into a lot more detail that -- you know -- she came out the house, she got into the car,

her husband came out to kiss her goodbye. She had seen the guy on the corner when she came out the house. She saw him walk down the sidewalk in back of her car. I didn't know that. Then she thought he was gone and disappeared. Then when her husband came out her husband kissed her goodbye. And when she looked to kiss her husband he was standing in back of her and that's when he robbed her husband, shot him. She became hysterical, saw him run down to the corner where there was a light blue car that he got in and left.

Q. I think it's probably safe to say Ms. Carnesie wanted this murder solved?

A. What's that?

Q. Ms. Carnesie wanted her husband's killer found?

MR. GOFORTH:

Objection to the form of the question. You can answer.

A. Yes.

Q. Was she being cooperative with your investigation?

A. I don't think I've ever met any relation of a victim who didn't want their case solved.

Q. Was Ms. Carnesie cooperative with you?

A. Yes.

Q. Would she answer the questions you would ask her?

A. Yes.

Q.   Did Ms. Carnesie seem like a person who would lie?

A.   Lie to me, no; not it all.

Q.   Did Ms. Carnesie seem like a person who would lie under oath?

A.   No, not at all.

Q.   So you interview Ms. Carnesie about -- let's just say approximately a week later. I'm not going to pick you down on a day. How did the case progressed from there?

A.   I believe that that's when I found out about your client's arrest.  I keep forgetting his --

Q.   Raymond Flanks.

A.   -- Flanks. That Flanks was arrested for armed robbery at the A and P, and that's when I went got the -- compiled the photo lineup and made arrangements to go show the lineup.

Q.   And then that's the lineup you showed her at her house?

A.   That's correct.

Q.   Tell me before we get to that, between the night of the murder and when you went to her house to show the lineup, had you developed any other evidence connecting Mr. Flanks directly to that shooting?

A.   No, sir.

Q.   Other than Ms. Carnesie, are you aware of any

JOHN DILLMANN

other evidence that directly implicated Mr. Flanks in that shooting?

A. No, I'm not. Oh only the gun that I was told matched the murder weapon.

Q. Okay. I want to go into that in a little bit also. What do you recall about that -- tell me more about that.

A. Well there's not much detail. According to her testimony the perpetrator had a nickel plated automatic revolver. Mr. Flanks was arrested with a automatic revolver -- nickel plated revolver, small handgun. It was sent to our crime lab for ballistics comparison, and I got a phone call from the technician and was told that it was a match.

Q. Would that report have been in your case file?

A. If he sent it to me it would've been.

Q. Before I start showing you documents I just want to keep going through this. So the gun -- anything else besides the gun?

A. What is your question again?

Q. Besides Ms. Carnesie and that gun is there anything else that implicates Mr. Flanks in this murder?

A. Just the MO of all the robberies of elderly people in her neighborhood by someone who fit the exact description and gun of and car of Flanks.

Q.  The description of the gun besides being semi plated, small and semiautomatic was there any other description of the gun?

A.  At one time in my report I think she called it chrome and I wrote nickel, or either she called it nickel and I wrote chrome, but same thing.

Q.  Outside the color, size and the fact that it was a semi automatic instead of a revolver was there any further description of that specific gun by Ms. Carnesie?

A.  No, sir; not that I recall.

Q.  When you go -- let's talk about the lineup then. When you go to the lineup you said you were at her house?

A.  Yes.

Q.  Tell me about that?

A.  I think some of her family were there, and I had Mr. Flanks photograph -- B OF I photograph, and I might mention now at this point that the photographic lineup shows a frontal view and a side view, but not both sides; just one side.

Q.  I want to talk about that. Because I actually haven't seen the lineup, because it doesn't -- nobody seems to have found them. When you say frontal view and a side view does that mean there was two pictures of each people?

A.  No, one photograph cut in the middle. You've got

the guy standing there holding up his number, and then you have a side view of him right next to it on the same picture.

Q. So it would be two different pictures of the same person for each one of the people in the lineup?

A. Correct.

Q. So there were six people in the lineup?

A. Yes.

Q. And of those six there were two pictures of each of those six?

A. Yes, but the two pictures were on one photograph, so you only got six photographs with two images of each person on each picture.

Q. So six photographs, 12 images?

A. Got it.

Q. With the pictures on the front were you able to see Mr. Flanks' face?

A. Yes, sir.

Q. So when you go to show the lineup did you have any other officers with you?

A. I believe my partner Fred Dantagnin was there, but I would have to look at the lineup because once she made a positive identification and signed it -- let me say this, and I think this would help a whole lot. This is how I always -- after I went out on my own from Saladino and

Lavealette I always handled my lineups the same way . I would take six photographs, five fill-ins and one of the suspect. I would write the numbers on the back of one through six photographs.  When I brought it to the witness and like this lady I would put the photographs -- I wouldn't say a word to them. I would say I want to show you something, and I would put three and three with no numbers on them. I mean the numbers aren't showing in the front, but I wouldn't put one, two, three, four, five, six. I'd mix them up, and I would put three photographs and three photographs, and then I would always say this and only this; do you recognize anybody in these photographs.

Q.  And so when you say, or just so the record's clear when you say three and three you mean there was a row with three people with two pictures of each person a piece, and then another row of three people?

A.  Horizontally, yes.

Q.  Okay. When you got to Ms. Carnesie's house other than your partner are you aware if there was any other law enforcement with you?

A.  Lentz may have been there. That's possible.

Q.  Is that what you had told him -- how would he have wound up there?

A.  He is -- he at that time was a plainclothes

follow-up in the district on the district level, and they handled just stuff in the seventh district; armed robberies, they'd followed up on burglaries, that kind of stuff. So a murder in their area is a big thing for them. It's just another routine murder to me, but it's a big thing to him. So Mike comes out and tells me about it, but he wants to be involved. He wants to know what's going on. He wants to know hey, I not only want to solve -- see you -- joint solve this murder, but I want to solve these other five or six or whatever how many there were armed robberies that we think that this guy was involved in besides A and P.  So he may have been there when I went. The only way I would know -- and this is going further -- after the witness if they made a positive identification I would have them sign the back for identification purposes, then I would sign for identification purposes. And if there were any witnesses there, be it Dantagnin, my partner, or Lentz, I would have them sign it also.

Q.  When you went to her house --  well first with the lineups did you pick the other fillers -- the fill-ins -- the other five?

A.  I don't remember if I personally went down and went through all the B OF I photographs. If I was doing something else and I asked one of the guys to go do it for me, because they all knew to get as close to this guy as

you could get. Or sometimes even the guy that worked in B of I we would give him the picture of the suspect and he would go to the hundreds of pictures to find out.  I don't recall who actually put it together.

Q.   Just for the record B of I is.

A.   Bureau of Investigations?

Q.   Is that part of the NOPD?

A.   Yes.

Q.   So tell me about I -- a much more recent the NOPD -- tell me about how you all selected -- whoever did lineup when you say go to the B of I and looked at photos tell me about that. I actually have no idea?

A.   Well back then -- here I go again -- back in the day they had these big roller machines, and when you were arrested they took your photograph. It was developed and that went to the record room. And in the record room they had these big roller machines with nothing but hundreds and hundreds of photographs on them. They'd have white males, white females, black males, black females and you'd go to the rolls -- if your suspect was a black male you'd go through the black male roll and you'd start looking at all the pictures and pick out the fill-ins that you could best match the suspect that you had.

Q.   So were the rolls divided by -- was it just chronological as people got arrested, or was it there were

black men, white man or was it just men; do you remember?

A.   I can't recall it. I remember it was all males either black or white or Chinese or whatever, but it was -- how chronologically how old they were and all I have no idea.

Q.   Were they grouped by any way; so for example say a suspect was bald, was there a roll where you could see just people without hair?

A.   No, sir.

Q.   Were they divided in any way at all, or were they just bunch of people's photos?

A.   Well they were in -- I don't know what you would call it. I mean they weren't just thrown in a box where you had to pick pictures up and lay them all out on a table. It was in some kind of rolling machine where you turn it and look at them.

Q.   My question is were they in any way organized by category like tall people, skinny people, short people, people with long hair, people with brown eyes, brown eyes?

A.   No, sir; not at all.

Q.   So it would just be you would have your suspect and start rolling through until you found somebody who looked like them?

A.   Right.

Q.   Got you. And what you brought the lineup, the

pictures I know that this has been done differently at NOPD at different times. Were they individual pictures or were there six all on one sheet; how was that?

A. I hate to ask you, but can you repeat one more time.

Q. Sure. There are lineups now where there will be one sheet and six people's pictures on it like that. And then other lineups where there would be six people's pictures separately that you would put on a table?

A. These were each separate.

Q. Okay. So it was separate pictures of six different people that to look at one you didn't have to look at all of them?

A. No.

Q. How did you carry those, were they in an envelope?

A. A little small manila envelope.

Q. Did Ms. Carnesie know that you were coming out there that day?

A. I made an appointment with her.

Q. What did you tell her when you made the appointment?

A. I told her that we had a suspect in her husband's death, and I note that she told me that she'd never forget his face, and I would like her if she felt up to it

because she was in such hysterics at her it think she was 68 back then, and asked her if she felt up to it can I come over because I needed her to take a look at these pictures (Inaudible).

Q. So when you get to her house what -- you get to the door, ring the doorbell or knock on it, what happens after that?

A. I can't remember all of that. The only thing I remember is that my report brought back to me remembering was that I laid them out on the table. And I don't remember if her family was there or not, and I stood over her and asked her was there anyone there -- was there anyone in these pictures that she recognized like I would always do. And she immediately looked at them and she took four of them and moved them over on the side. Then she picked up the two and she asked one of her family members to get her a magnifying glass. And they brought her a magnifying glass and she put them down and she looked at them with a magnifying glass -- just above this amount of time she looked at them with a magnifying glass and picked it up and handed me the picture. And I asked her at that time is this a tentative identification, or is this a positive identification, and she told me at that time no, this is positive; I'll never forget his face.

Q. So you -- how long does it take from the time

that you set the six photos down on the table for her to push four aside?

A.  Almost immediately.

Q.  The two that remained do you recall -- do you know if it's noted anywhere who other suspects were -- not the suspects, but with the fill-in people were?

A.  Who the other fill-ins were?

Q.  Would you keep any records somewhere?

A.  Probably would've wrote that in my -- that's probably in my supplemental report.

Q.  So the two are there --

A.  In fact it should be in my supplemental report.

Q.  So the two are at the table, how long did she look at those two before she asked her family member to bring her something?

A.  Well she moved the four and then immediately asked her family member whoever it was would you bring me a magnifying glass.

Q.  How long did it take for that person to get back with the item?

A.  It wasn't long.

Q.  Did you and her have any discussions while the family member was away grabbing the item?

A.  No.

Q.  Was she continuing to look at the pictures while

the family member was away?

A. I don't recall?

Q. Once the family member got back how long did she look at the two pictures before she made an identification?

A. Five seconds, 10 seconds, just long enough to like down like this and do this.

Q. Five or 10 seconds each, or overall?

A. Just overall, just in that position. And then she picked it up and held it up.

Q. So given this case involves robberies of multiple elderly people and the murder of Mr. Carnesie was this what you would call a --

MR. GOFORTH:

Objection to the form of the question.

Q. Is this what you would call a heater?

A. Would you repeat that?

Q. Sure. Given that the perpetrator of this crim is also suspected in multiple other armed robberies of elderly couples was this something that you would have considered a heater?

A. That I would've been?

Q. Considered a heater?

A. A heater, no.  No sir.

Q. When Ms. Carnesie said this is him what did you

say? I don't actually know what Ms. Carnesie said. When Ms. Carnesie made the identification what did --

A. She handed the picture to me of Flanks, and I asked her are you -- is this a positive identification, and she told me yes it was?

Q. At that point did you tell her that she'd identified the suspect?

A. I don't recall. I may have and I may not have. She may have asked me and she may not have. I just don't recall.

Q. Is that something that you would've shared with the witness if she had asked you?

A. Yeah, I mean -- yeah, if she had picked the right person and it was -- and everything. I wouldn't have told her anything if she picked the right person -- yeah, I would've before I made her sign.

Q. You would've --

A. Yeah, I was trying to remember if I would've told her that after I made her sign the photograph and I signed it or before, but I would've done it before if she asked me.

Q. Got you. But you're not sure if she asked?

A. No, I'm not sure.

Q. After she signed the photograph did you all have any further discussion about the identification?

A.   She was so upset, I mean she just -- she was just her age and it was obvious that her and her husband were very close, and she just (Inaudible).

Q.   After you perform that identification did Ms. Carnesie or any of her other -- did Ms. Carnesie or anybody else give you any more information that further -- that helped your investigation that day?

A.   I don't believe so, not that I recall.

Q.   After you left Ms. Carnesie that day did you ever again personally interact with her?

A.   No, I did not.

Q.   Did you see her at the trial?

A.   Probably, yeah. I'm sure I did.

Q.   But between the identification -- and you're obviously aware that she testified at the grand jury, because you read the transcript?

A.   Right.

Q.   Do you recall if you saw her at the grand jury?

A.   I may have. I don't recall, but I may have. Because I mean everyone sits on a little bench right in front of the -- everyone sits on the little bench, so I may have. And I'm sure I saw her at trial?

Q.   Do you recall if you all had a conversation about Mr. Flanks' case at that point?

A.   I don't recall. I mean probably the judge told us

not to talk to one another, and we didn't, so at trial. I don't know about at the grand jury or not.

Q. Once Ms. Carnesie made the identification, did you take any further steps in the investigation to --

A. Now, I don't -- no, I did not. But as a side, now that I look back at my report I knew what she was doing with that magnifying glass. I knew it, that she was looking to see if that spot on his cheek. And in hindsight I wish today I would've went back and saw, or I would've made a mental note at it and looked at Flanks to see if he had that spot, or if he had it covered up or whatever. Obviously it wasn't on that side of his face that the picture was taken, but I never did. I just pretty much took the -- she was so sure of the identification I just took it?

Q. The perpetrator -- she never said the perpetrator's face was covered?

A. No.

Q. Her statement was that she could see the entire perpetrators face?

A. Yes, sir.

Q. Perpetrator didn't have a bandanna covering part of his face?

A. No, sir.

Q. Are you aware since I haven't seen the actual

lineups in the lineup -- in the photo of Mr. Flanks did he have a white spot on his face or a white blotch on his face?

A.   On the photo lineup no, not that I could see.

Q.   Okay. And so after you did this lineup you looked at the photos and you did not see a white blotch on his face?

A.   Right.

Q.   And was there any other evidence that you found that implicated Mr. Flanks of this murder?

A.   No, I thought that was pretty conclusive.

Q.   When did you first find out that Ms. Carnesie testified that you told her who to pick at the grand jury?

MR. GOFORTH:

Objection to the form of the question. You can answer.

Q.   You're aware that Ms. Carnesie testified at the grand jury that you told her what suspect to pick?

MR. GOFORTH:

Object to the form of the question. You can answer.

A.   When did I find out?

Q.   You're aware that she did testify to that, correct?

MR. GOFORTH:

Object to the form of the question. You can answer it.

A. Am I aware that she testified that I told her what?

Q. Which suspect to pick out?

A. No, I didn't know that.

Q. Let me show you -- and this will be -- are we on Plaintiff's five?

MS. PETROVICH:

Yes.

Q. And for the record this is OPDA 23 to 29.

A. I don't see in here where she says I told her who to pick out. I see where she says that she asked me did she pick the right one.

Q. Let's just read this word for word for the record, okay. So I'm starting at the bottom of page 4. The picture -- this is a question. So the first page of this document you recognize this as a transcript, correct?

A. I do.

Q. State of Louisiana versus Raymond Flanks, correct?

A. Yes. Yes, sir.

Q. The witnesses is listed as Mrs. Fay Carnesie on the front of the transcript?

A. Yes.

Q. And this was taken in front of an Orleans grand

jury on January 19, 1984?

A.   Yes.

Q.   In this the district attorney asked and the picture you picked was that individual who had shot your husband?

A.   What page are you on.

Q.   Bottom of page 4. Page four is at the top -- I'm sorry. It's the second to the last page. It says four at the top and 27 at the bottom.

A.   Okay.

Q.   So the last question and the answer on that page is and the picture you picked was that individual who had shot your husband. Answer, he had five of them. As soon as I looked I took three and pushed them aside. And I had one here and one here. And I looked at this one and I told my daughter get me a flashlight. I want to make sure if it's here.  So let's stop right there. Do you recollect if it was five or six pictures. If she says five, do you think it would've been five?

A.   I -- to my recollection as I sit here today it was six photographs.  Also, if you go back to page 3 at the top of the page she testifies to the grand jury I'm treated my nerves. I'm so nervous right now.

Q.   So I understand that you want to make her nervous, but her testimony is that what she said was there

were five photos, correct?

MR. GOFORTH:

Objected to the form of the question. You can answer it.

A. There were six.

Q. So Ms. Carnesie's lying?

MR. GOFORTH:

Object to the form of the question.

A. She's mistaken.

Q. Ms. Carnesie -- the next line is I told my daughter to get me a flashlight. I want to make sure it's him if it's here. And here she says flashlight. You had testified magnifying glass?

A. Right.

Q. Do you recall if it was a magnifying glass or a flashlight?

A. I think she's mistaken. I recall it was a magnifying glass.

Q. Okay. So the second sentence she says I want to make sure that it's him if it's here, correct; do you recall her saying that?

A. No, I do not.

Q. The next sentence so I looked at this one, I put it down and I put this one on this side and looked at it, and I kept looking and I recognized him. That's what she

says, right?

A. Uh-huh (affirmative).-

Q. You have to say yes or no; I'm sorry?

A. Yes, sir.

Q. Then I told the detectives I said I remember one thing about this man. He had white blotch on the side of his cheek, a little white mark like discolored looking, correct?

A. Correct.

Q. And then the three detectives looked at one another and he shook his head and said that's him, correct?

A. That's what she's saying, yes.

Q. This is a woman whose husband had been murdered, correct?

A. Right.

Q. She wanted the case solved, right?

A. Sure.

Q. She didn't -- there's no reason she had to lie to the grand jury?

MR. GOFORTH:

Object to the form of the question. You can answer it.

A. No, there's no reason she should.

Q. So the best --

A.   But I would argue with you that she was lying.

Q.   I understand that you would argue about this.

A.   This is a woman as I recall that in my opinion would not lie. Mistaken yes, but not lie.

Q.   So in here it says after she says that after she makes an identification she then immediately says next the one thing she remembers is the white blotch, right?

A.   That's what she says, yes.

Q.   Raymond doesn't have a white blotch in the picture, correct?

A.   Does not.

MR. GOFORTH:

Object to the form.

Q.   And there were three detectives that looked at one another, shook his head and said that's him, correct?

MR. GOFORTH:

Object to the form of the question.

Q.   That's what she testified to?

A.   Yes.

Q.   That would've been before she signed the picture?

A.   What she's testifying to there would've been before she signed the picture, yes. But this isn't what I recall happening?

Q.   Now you remember Curtis Kyles case, right?

A.   I do.

Q.   Curtis Kyles you're familiar with allegation that the witness said she could not identify a witness and you told her who to put identify as well, correct?

MR. GOFORTH:

Object to the form of the question.

A.   Would you repeat that, please?

Q.   Sure. Do you remember the Curtis Kyle's case --

A.   I remember the case, yes.

Q.   Do you recall one of the witness testified that when she was shown a lineup she could not pick him out, but you told her who to pick?

A.   That was her allegation, yes.

Q.   How many other people made an allegation against you that you told them who to pick?

A.   As far as I know this was the only allegation -- the Kyles case was only allegation.

Q.   Curtis Kyles was another patient who I've --

A.   Because I don't see this as an allegation.

Q.   Oh that's fine. We disagree.

A.   We disagree.

Q.   But in Curtis Kyles case there's no question that witness actually testified under oath she did not know who the perpetrator was and you told her who to pick, correct?

A.   She lied.

Q.   That's what she testified to?

A.   That's what she testified to.

Q.   And you say she lied. You're aware that multiple cases that you've had have resulted in their -- vacations of the sentence because Brady evidence wasn't disclosed?

MR. GOFORTH:

Object to the form of the question. You can answer.

A.   Repeat please.

Q.   You're aware that multiple cases that you've been the lead detective on have been reversed because of evidence that was hidden?

A.   That's what --

Q.   Except (Inaudible), yes.

A.   Yes, sir.

Q.   You're aware that John Floyd -- I don't want to ask you about John Floyd, because we're not talking about him because you're taking the fifth. You're aware that Reginald Adams was found to be actually innocent, correct?

A.   I don't remember anything about that case except I didn't even go to the scene at that case. The only thing I remember about that case at all was the fact that it wasn't my case. I didn't handle it. It was the case of one of my coworkers was transferred to another division.  I do know that he's been -- that he was let go.

Q.   Are you aware that he was given a multimillion

dollar settlement by the City?

A. No, I do not.

Q. How many times have you been named as a defendant in a 1983 suit in a civil rights action about wrongful conviction?

A. As far as I know only these two.

Q. So you were named in John Floyd, correct?

A. Right.

Q. You were named in John Thompson, correct?

A. I don't recall Thompson.

Q. You recall there were allegations in Thompson that you fabricated evidence in that case, right?

MR. GOFORTH:

Object to the form of the question.

Q. Do you recall what the allegations against you in John Thompson's case was?

A. No.

Q. Do you recall what the allegations  in John -- not John Floyd -- in Reginald Adams' case were?

A. No.

Q. Your aware that Mr. Flanks' conviction has been reversed?

A. I am.

Q. So I want to talk about you -- I don't want to talk about your conversations with your attorney, but do

you -- I'm going to show you what we will mark as Plaintiff's Exhibit 6. And for the record this is the responses to Plaintiff's first set of interrogatories addressed to Mr. Gillmann. Have you gotten a chance to look through that?

A.  Yes, sir; I have.

Q.  Do you recall answering these questions, or have you ever seen this document before -- specifically this document?

A.  The interrogatories?

Q.  Yes.

A.  No.

Q.  No. I don't want to go over anything you and your attorney talked about, but did you draft this or did you --

A.  I answered questions from my attorney.

Q.  Okay. So I don't want to talk about anything else you all talked about. That's off limits. There are some things -- was there anybody else there when you were answering these questions?

A.  Not that I recall.

Q.  Have you talked about these questions to anyone else besides your attorney?

A.  No.

Q.  In --

JOHN DILLMANN

A.   Maybe my wife.

Q.   What did you and your wife talk about?

A.   I'm saying I don't recall if we did, but if it would've been anybody it would've been her.

Q.   Reviewing these answers, are these answers -- is there anything that's incorrect in here that we need to -- because some of these I have questions about, but just format. Is there anything that's wrong in here?

A.   There's a lot of them that I answered I don't recall, but after seeing the documents that my attorney showed me last week it brought some things back to my memory.

Q.   That makes sense. So maybe the better way to go -- actually let's just do this first, and then I'm going to give you the reports to look through. And maybe we should take a break then, because they're like --

A.   Yeah, I'm going to need a break pretty soon.

Q.   Well we can go ahead and break now.

A.   I can wait a little while.

Q.   Okay.  So let's just go through these. On interrogatory number one you were asked if there's any other person who may have knowledge of this case. Your answer was Fred Donahan and Paul Druhant who are both deceased?

A.   Fred and Paul Druhant, yeas; they are both

deceased.

Q. Is there -- having reviewed your case file is there anybody else who -- having reviewed this and having your memory refreshed is there anybody else who you know who may have information about the case?

A. I don't believe.

Q. For the second one about your positions at NOPD I really only have one question is in here it says that you went to homicide and that you started it NOPD in '69. It says that you are patrolman in the second district for three years '69 to '72, and '72 you went to homicide. I know we had talked about you starting in '67 and got to homicide in '70. I don't think that this is anything intentional. I think this is just a typos somewhere?

A. Yeah.

Q. I just want to know which one of those is the right timeline?

A. The '69.

Q. Okay so you started in '69.

A. Right, yes.

Q. You were in second district from '69 to '72, and then homicide from '72 to '86?

A. Right.

Q. So when we were earlier talking by '67 to '70 that really -- and again, I'm not trying to trip you up. I

just want to make sure we're on the same page.

A. Right.

Q. So all the times were talking earlier about '67 to '70, that should be '69 to '72, and all the times we were talking about '70 to '86 should be '72 to '86?

A. Correct.

Q. Okay. On the third question we talked about -- we already talked about this in the deposition. I presume the three days on the brutality complaint is what we discussed with your partner that was on video. Sorry, for the court reporter I have to ask you to say yes or no?

A. Yes. Yes, sir.

Q. And so -- and that is the only one that you recall as of today?

A. Yes, sir.

Q. For question number four it says that the answer is you may have communicated with your partner, but you're not certain that you did. When you are -- in that answer were you're talking about back when this case was pending in the 80s or since then?

A. Back in the 80s.

Q. Okay so the last time -- had you talked before this lawsuit was filed had you talked to anybody about Mr. Franks' case since his trial?

A. I didn't even remember the case, and I'm

embarrassed about that, but I haven't.

Q.   I don't remember my cases from back and I'm a lot younger than you so. Some of these I just want to make sure that's what I thought, but I just want to make sure we're clear on that.

A.   Yes, sir?

Q.   On number five it says that you can't recall information about a specific case. That's obviously something you said you'd reviewed the reports and there is information that you recall?

A.   Right.

Q.   So we will go over -- like I said the next thing is I'm going to give you the reports and we can talk about them. So that answer doesn't need to be changed. You do have a different memory than when you answered this question?

A.   From when I answered the question, yes.

Q.   For number six, is that the same thing that you now --

A.   After reading my testimony at trial and -- you know -- it brought back memories of the case, or some memories of the case?

Q.   And question number seven do you have -- I think we've already talked about this. Is the answer to number seven correct?

A.  Yes, that's correct.

Q.  Is there anything else that needs to be added, or edited, or changed?

A.  No, sir.

Q.  For question number eight we have gone through I think most of the questions I had about that. Is there anything -- is the answer to question number eight on here accurate?

A.  No, that's correct.

Q.  Is there anything that you wish to add, or change, or modify, or delete?

A.  When I say that in the homicide division it was standard operating procedure to provide the DAs office with the finished police report that would be my supplemental report, and all evidence collected in the case. It would actually be not the physical evidence, but the results of any testing or anything like that, that would be in my report. But not the physical evidence.

Q.  That's actually what I wanted to ask about right then because you had talked about earlier like a matchbook might actually wind up in the police file. Do you recall if there was anything like that recovered in Mr. Flanks' case?

A.  Not that I recall.

Q.  Then otherwise number eight's accurate?

A.   Yes. Yes sir.

Q.   For number nine is that answer to interrogatory number nine accurate?

A.   Yes, it's accurate.

Q.   When was the first time -- okay, let me ask you this.  Do you recall that Mr. Flanks had two separate trials; he went to trial one time and the jury hung, and then the second time --

A.   I could not recall it until I met with my attorney last week and went over the documents?

Q.   For either of the trials -- either the first one or the second one what Ms. Carnesie testified to the grand jury do you recall ever talking to the prosecutor about her grand jury testimony?

A.   I always thought grand jury was secret. I was flabbergasted when I found out what she said in it.

Q.   So it's safe to say that you hadn't seen her grand jury testimony before?

A.   Positively no.

Q.   When you say you were flabbergasted what did you mean; what flabbergasted you?

A.   Flabbergasted after reading her testimony to the grand jury that she was mistaken about so many things, obviously nervous.

Q.   Before we move on from that question -- with Ms.

Carnesie's grand jury testimony I just want to go through page by page, and if you can tell me any mistakes you see. Because I want to make sure all we really talked about are was the last two pages. I want to see if there are any other mistakes that you see.

A. We might want to take that break before we start that.

Q. Okay, yes; that's fine.

Off the record 4:06 PM

Back on the record 4:16 PM.

Q. Detective Gillmann, while we were off the record having reviewed your police report there was something that you wanted to correct about the officer in the seventh district?

A. Yes. After reviewing my report I made a mistake earlier and testified that the plainclothes officer from the seventh district his last name was Lentz, when in fact it was Richard Moreno.

Q. Got you. Okay where we left off was I wanted to go through Ms. Carnesie's grand jury testimony, and I don't need to read the whole thing, because I know I would be taking a bunch of everybody's time already, and I don't want to take more of it than I need to. If we could just start with Ms. Carnesie, the page that has 24 at the bottom. It's the second page of the document.  It should

be just page number two. That's the trial transcript.

A.   Trying to remember which is which, okay. Page 4 again?

Q.   Yes, just flip to the next page. So there's the cover page, the second page where it says -- the first line says Fay Carnesie Foreman. Can you read that page and tell me you if see -- so the first page is a cover page right?

A.   Yes, this one.

Q.   So if we flip that page that's where Ms. Carnesie begins testifying.  Is there anything on that page which is OPDA page 24 for the record that you see that's incorrect for Ms. Carnesie's testimony?

A.   Yes. She -- her answer at the bottom of the page about her going to Slidell and she sells antiques and her husband always comes out and tells her goodbye, she never did ever tell me any of that.

Q.   Okay, so did she tell you something to the contrary to that, or is that just something she didn't tell you?

A.   No, she just did not. I had no idea of that.

Q.   Okay. Do you see on that page, page 24 any mistakes that she made?

A.   No, not that I can see. So we will flip to the next page which is page 25. Maybe it might just be easier

for me to read this. I will just ask you after each question do you see any mistakes.

A.   That'll be fine.

Q.   So on page 25 -- let's go back to page 24 because the sentence starts where it says I told him I said quote well I will meet you out by the car. Are you with me. That was the last sentence on page 24 and it runs over onto page 25.

A.   Okay

Q    You're with me?

A.   Yes.

Q.   Okay. Meanwhile he had a habit of taking the car out of drive and park it on the side of my house facing Slidell. Is there any mistake you see in that sentence?

A.   This is the first time I -- she did not tell me that anytime during either the initial investigation or times that I met her to take a statement.

Q.   So the next -- the next couple sentences are I walked outside of my house, I was going across my yard and went down the sidewalk. When I did this black guy passed me. Are there any mistakes you see on those three sentences?

A.   No.

Q.   She goes on he had a â€"- what you call those -- the shower cap. He had a shower cap on his head and he

passed by and looked at me. I looked up at him. Do you see any mistakes there?

A.  No, sir.

Q.  Next line, and I said to myself for God sakes, what does he have on his head, this guy -- you know -- and I took a look at him. Is there any mistakes you see there?

A.  No, sir.

Q.  She testifies he was neatly dressed. He passed me. Meanwhile I opened the door of my car, and I had a habit of just throwing my purse in the car on the side of the seat where I drive. Are there any mistakes in those sentences?

A.  No, sir.

Q.  She continues and meanwhile my husband came out. I had the car door open. My husband came out and he came to tell me goodbye. Are there any mistakes in those sentences?

A.  Only that she told me that the door was closed that I recall.

Q.  The car door, or the house door?

A.  The car door.

Q.  Okay. So where she says I had the car door open, and your recollection is she said that she had the car door closed?

A.  That the car door was closed and he was reaching

in to kiss her.

Q. Through the window?

A. Yes.

Q. So she had told you this communication happened through the window, not through an open door?

A. Correct.

Q. Then the next sentence and before I knew it this black guy was between us, and he said in a low voice quote unquote give me your money. Are there any mistakes you see there?

A. No sir.

Q. So when the DA asked question ma'am, were you seated in the car at that time, or were you standing outside the car, and she responds I don't remember whether I was seated and I got out quick. Now I can't remember that. Are there mistakes you see in those first two sentences?

A. According to me she -- according to her she told me that she was seated in the car.

Q. Okay, other than her saying that she was seated in the car?

A. Other than that it's correct.

Q. The next sentence is when he said give me your money I think I was seated on the end of the car and I jumped up. Do you see any mistakes there?

A.  She did not tell me anything about jumping up.

Q.  Did you ever to her -- I was confused on this line where she says I think I was seated on the end of the car. Do you have any idea what she's talking about right there?

A.  No. I mean she is -- all of this that she's testifying to so far that was read at the grand jury, 90 percent of it she didn't tell me.

Q.  So when she says she was seated on the end of the car you're not sure what she means?

A.  I think -- I'm reading that she means on the end of the car seat. Because she told me she was seating in the car and he was kissing her through the window.  And then she says to the grand jury that she was standing up. Well if she's standing up I'm assuming it was right next to the car door and the seat. So I'm assuming again that when she's talking about the end of the car she mean the end of the car seat.

Q.  But that's not something she discussed with you?

A.  No.

Q.  Because she didn't tell you about that?

A.  No, it is not. No, sir.

Q.  The next sentences are and I said my husband said to him what did you say, and I said honey give him your money, and he just looked at me stunned like -- you know.

Are there any mistakes you see in those sentences?

A. She may have told me some of that in the statement she gave me, but she positively didn't tell me all of that the night on the scene.

Q. Are there any mistakes other than her not including it all --

A. No.

Q. -- are there any actual mistakes you see?

A. No sir.

Q. The next sentence is well the guy had a khaki like a light beige jacket on with pale blue jeans. They were light blue jeans. Do you see any mistakes there.

A. No, no mistakes.

Q. So we are flipping to page 26. I'm treating for my nerves. I'm so nervous right now. Do you recall actually -- of course, do you see any mistakes there?

A. I'm sorry?

Q. Do you see any mistakes there?

A. No. She said she was treated for her nerves. I mean she didn't tell me that. I just thought that she was distraught over her death.

Q. Do you have any personal recollection of seeing her at the grand jury that day and the state she was in?

A. I wouldn't know her if she walked it here right now.

Q.   Would you have known her in 1983 or 1984?

A.   No.

Q.   So the prosecutor says just take your time, and her response is I have got high blood pressure too, and oh wait now. Let me get it right. Yes, I said honey give him your money. Are there any mistakes you see in that first part?

A.   Not that I know of.

Q.   The next part says he said what money are you talking about -- what money are you talking about. Do you see -- did she talk to you about that?

A.   Never -- never mentioned it at any time.

Q.   I was unclear --s o I was unclear when she said he said what money are you talking about. Did she ever talk to you about either the perpetrator or her husband saying what money are you talking about?

A.   Only that he was robbed and that was -- you know.

Q.   So the next sentences are so meanwhile my husband put his hand -- he had a jumpsuit on. Excuse me. He put his hand by his pocket -- by the jumpsuit pocket and he kind of hesitated like.  Do you see any mistakes there?

A.   No mistakes other than that was not told to me.

Q.   The next sentence is this guy pulled a gun out. I think he had the gun in his jacket in a side pocket, and

he pulled the gun out and he put it on my husband. Do you see any mistakes there?

A.   No, sir.

Q.   The next sentence -- next sentences are and my husband still had his hand in his pocket, and then he shot my husband. Do you see any mistakes there?

A.   No, sir.

Q.   She continues and when he did I saw the blood coming out of my husband's jumpsuit and I said to him oh my God, you shot my husband.  Do you see any mistakes there?

A.   No. No sir.

Q.   Did she tell you that in either of the other interviews?

A.   No, sir.

Q.   The next sentences are so he turned around and he put the gun at me -- at my chest. He said quote give me your purse. I grabbed my purse out of the car quick and I handed it to him quick. Do you see any mistakes there?

A.   No, sir.

Q.   Did she tell you that in either of the interviews?

A.   I think during the statement.

Q.   The next sentences are and what I did I went to the back of my car and I started running in the middle of

the street screaming toward -- not toward my house but toward the corner for the guy across the street. I was screaming his name. Do you see any mistakes there?

A.  No, only that she didn't tell me that.

Q.  Did she ever tell you about the neighbor that she was running towards?

A.  No.

Q.  Did she ever talk to you about any neighbor that she was running towards in any of the interviews?

A.  (Nods head affirmatively)

I hate to keep doing this, but --

A.  No, sir.

Q.  And then I didn't see him. So I -- the mailman grabbed me and he started running back to my house. Do you see any mistakes there?

A.  No sir.

Q.  Do you recollect her telling you about the mailman?

A.  No, sir. She didn't tell me that.

Q.  Did you ever try to locate a mailman as a witness?

A.  I never knew anything about a mailman until right now.

Q.  The next sentence says while I was doing nothing but screaming for help, I knew I couldn't help my husband.

I know -- you know.  That was because blood was coming for him, and -- going on to page 27 -- I think like from the heart. Do you see any mistakes there?

A.  No, sir.

Q.  Did she tell you that in either of the interviews?

A.  No, sir.

Q.  Next sentences are and -- Uh -- as I got to the corner of my house I ran across my yard and I saw this blue car parked in front of my house between these two shrubs that I have. Do you see any mistakes there?

A.  I don't.  The only thing she told me was she watched the perpetrator run to the corner where he got into a pale blue car.

Q.  So you don't see mistakes there. There's just extra details?

A.  Just extra details she's saying.

Q.  The next sentences are it was a pale blue kind of shiny car. It was an old car. It was pale blue and I saw him just speed off as fast as he could take off. Do you see any mistakes there?

A.  No, I don't. And I do recall her telling me that the light blue car was pale, it wasn't shiny. I do remember that.

Q.  The portion about the perpetrator speeding off as

fast as he could, did she tell you that?

A. No, not that I recall.

Q. The next question is and that was the same man -- the question from the prosecutor is that was the same man. The man in the car was the same man that shot her husband, yes -- yes. Do you see any mistakes there?

A. No, sir.

Q. Did she tell you this in the interviews?

A. No, she didn't.

Q. The next question is ma'am do you remember about -- and then that question stops, and she begins to answer now I didn't see him in the car, but I know it was him -- you know -- because it just sped off. Do you see any mistakes there?

A. No mistakes, but she did not tell me that.

Q. The next sentence is he would've killed somebody if they had been in the street. That's how fast he went. Do you see any mistakes there?

A. No.

Q. She tell you about -- did she make those statements to you?

A. No sir.

Q. Did she ever tell you about the speed of the car driving away?

A. I don't recall.

Q.  Do you recall if she ever talked about the perpetrator -- any details of the perpetrator what he did when he jumped in the car and drove away?

A.  only that he ran to the car and jumped in the car.

Q.  The next sentence is okay, do you remember a week later the detectives came to your house and showed you some pictures, and she said yes. Do you see any mistakes there?

A.  No. No sir.

Q.  The next question is were you able to pick the picture out of those pictures they showed you. She says yes. Do you see any mistakes there?

A.  No, sir.

Q.  And the pictures you picked, was that the individual -- he had shot my husband. And her answer was he had five of them. My understanding is you believe that is a mistake.

A.  That is a mistake.

Q.  The next sentence is as soon as I looked I took three and pushed them to the side. And my understanding is you believe that's a mistake because she actually pushed four to the side?

A.  Yes, sir; that's correct.

Q.  Is there anything else that you see that's

incorrect in that sentence?

A. No, sir.

Q. And the things that were -- she hasn't told you, do you recall if you asked her those questions and she didn't tell you, or is this just something you all didn't --

A. No, she just didn't -- no. I didn't go into great detail with her about her husband and selling antiques in Slidell at the time.

Q. Do you recall asking her about the speed of the car driving away?

A. The speed of the car?

Q. Do you recall asking her about the car driving --

A. Once she told me she saw him run to the car and get in the car and speed off I didn't ask her about how fast, did he burn tires or anything like that.

Q. And where earlier she says about the car being parked between the shrubs?

A. No, I didn't.

Q. You never asked about that?

A. No, I did not.

Q. So getting back where the third sentence at the bottom of page 27, and I had one here and one here. Do you see any mistakes there?

A. Well I don't know exactly what she means by one

here and one there. As I recall she moved four and she had the other two right next to one. She put the other two right next to one another.

Q. She says -- the next sentences are and I looked at this one and I told my daughter I said get me a flashlight, I want to make sure that it's him if it's here. And that runs over on the top of page 28. Do you see mistakes there?

A. Only that when she says her daughter to get her a flashlight, I didn't recall which member of the family it was. But I thought it was a magnifying glass.

Q. Okay so other than it being a magnifying glass is there anything else that you see that you believe is incorrect in the sentences?

A. No, everything else is correct.

Q. Turning to page 28, so I looked at this one and I put it down, and I took the one on this side and looked at it. And I kept looking and I recognized him. Is there anything there that you see that is a mistake?

A. No. Everything is correct.

Q. The next lines are then I told the detective I said I remember one thing about this man. He had a little white blotch on the side of his cheek, a little white mark like discolored looking. Do you see any mistakes there?

A. Yes, because I don't remember her saying that

during the course of the identification. I don't remember her saying anything about the blotch. I recall her telling me about the blotch either when she was lying on the sofa after the shooting, or during her statement. But I don't remember her saying anything about that during the ID of the photo lineup. And the reason that I believe that is because I believe that she had the -- that she was looking for that blotch when she asked for the magnifying glass -- or she said flashlight.

Q.  Running back to the earlier page, are you -- when you -- she says flashlight, and you remember magnifying glass. Are you confident that it was a magnifying glass?

A.  No, I'm not a hundred percent positive.

Q.  Could it have been a flashlight?

A.  I wouldn't bet my life on it. I thought it was a magnifying glass. It very well could have been a flashlight.

Q.  Got you. The next sentence is then I told the detectives I said I remember -- that's what we just read, sorry. The next sentence was and the three detectives looked at one another and he shook his head and he said that's him. Do you see anything that you believe is mistaken there?

A.  Yes, that's a complete mistake, because that -- as far as I recall that did not happen.

Q. When she says three detectives do you know who she would've been referring to; so obviously one was yourself. Do you know who the other two would've been?

A. Probably Fred Dantagnin and Marino instead of Lentz.

Q. When you say probably is that you're certain, or that's just the best of your recollection?

A. The best of my recollection.

Q. In terms of the three detectives looking at one another and shaking their heads, do you -- is that a mistake?

A. Yes.

Q. And when she says the detective said that's him, is that a mistake?

A. Yes. I think it is.

Q. Okay?

A. It is.

Q. The next sentence is but I don't think they showed the side of his face with that mark, but I happen to remember it because I was looking at his face twice -- you see -- and I remember. Do you see any mistakes in that sentence?

A. No.

Q. Did she talk to you about having seen the face twice?

A.  No, she did not.

Q.  Did she talk to you about how long she saw the perpetrator's face?

A.  You know as far as when she saw him -- you're talking about the lineup, or when the incident occurred?

Q.  That's a very good point. So let's start at the house. At the house when you interviewed her for the 45 minutes did she talk about how long she saw the perpetrator's face.

A.  No, she did not.

Q.  Did she talk to you at the house about how many times she saw the perpetrator's face?

A.  No, only that she would never, ever, ever forget it again.

Q.  So a week later when you do the formal interview do you recall if she talked to you about how long she saw the perpetrator's face?

A.  Never did give me a time limit, only that she was in the car, the guy came up, shot her husband and then ran.  So my estimation was it would've been less than a minute, but I didn't ask that.

Q.  That would -- you got my next question. I was going to ask did you ask her about how long she saw perpetrator's face.

A.  I pretty much figured about how much time.

Q.   Did you ever ask her that question directly?

A.   No.

Q.   Did you ever ask her how many times she saw the perpetrator's face?

A.   No.

Q.   Did you ever ask her how -- when -- for the time she saw the perpetrator's face how long those lasted -- like how long those -- that's a bad question. I think you've already answered this, but you all didn't talk about -- you didn't ask about how many times or how long she saw the perpetrator's face?

A.   No, sir.

Q.   And the identification which is the last one, you all had three interactions, right; the first day, the interview and identification?

A.   Three, correct.

Q.   When she did the identification did you talk about how long she had seen the perpetrator's face?

A.   No, sir; did not.

Q.   Did she talk about how many times she had seen the perpetrator's face?

A.   She did not bring that up.

Q.   Did you ask about that?

A.   I did not.

Q.   The next question are you sure the man you picked

out in the picture is the man that killed your husband, yes. Okay ma'am. Any questions. No response. Okay, thank you Ms. Carnesie. Do you see any mistakes in there?

A.   No, sir; I don't.

Q.   Do you still have those interrogatories in front of you?

A.   Yes, I have them.

Q.   So we were on number nine when we jumped over to that. Is there anything else that we needed to add, change, anything about number nine?

A.   Let me read it again, because it's been a minute. I do not recall, no. There's nothing that I could add to that.

Q.   Before I forget there's one other -- do you recall Isaac KKnapper's case; does that name ring a bell to you?

A.   Isaac KKnapper, yeah the name sounds real familiar.  I'm trying to remember the case. Isaac KKnapper. Was that the lady at Schwegman's?

Q.   Schwegman's was Curtis Kyles.

A.   That was Kyles.

Q.   This was on April 12 -- you can read it as well I can. I'll mark this as -- we are on number eight.  These are the facts of the case right there. It's just these two paragraphs right there.

JOHN DILLMANN

A.   Yes, I remember the case now.

Q.   Are you aware that Mr. Knapper has been exonerated and released from prison?

A.   You all are going to wind up letting all of Angola out before it's over with.

Q.   Everybody who was wrongfully convicted I hope.

A.   No, I had no idea that Knapper was let out.

Q.   Are you aware of Mr. Knapper's allegation of misconduct against you.

A.   I am not.

Q.   Has anybody from the prosecutor's office, or has anybody ever talked to you about Mr. Knapper's case in the last 10 years?

A.   No. No, sir.

Q.   So going onto interrogatory number 10 it says identify and describe -- for interrogatory number 10 is there -- it says identify and describe any instances that discipline of the prosecutors, police officers or other employees of City, NOPD, NOPDA which is the district attorney's office that took place between January 1, 1976 and December 31, 1990 relating to the improper use of identification techniques including improper use of photo array.  And it asks for specification and you said you could not recall?

A.   That's correct, sir.

Q. So I wanted to see do you recall any single incident, or you never recall --  I wasn't sure when you said you didn't recall if you were meaning you couldn't recall all of them, or you can't recall a single incidence?

A. I couldn't recall any of them that there was any question on the photo lineups.

Q. Okay. Interrogatory number 11 is essentially the same question, but regarding fabrication of evidence and improper use of ballistics evidence and eyewitness identification. Your answer again was in interrogatory 11 is you can't recall, and I have the exact same question. Does that mean you can't recall any, or just cannot recall one?

A. Any.

Q. The second to the last interrogatory number 12 is about identify all officers, employers and agents of the district attorney's office NOPD or the City responsible for drafting, approving, amending, implementing, enforcing, or advising any rules, regulations, policies, customs, practices, guideline manuals or procedures for or applicable to NOPD or the district attorney's office from January '76 to December 31, '90 regards to compliance with Brady and its progeny and training, supervision and discipline thereto. And your response was defendant can't

recall. He does recall that printed sheets with updates court decisions and legal developments would be handed out to detectives. He believes these updates may have come from the NOPD Academy. Before -- I have just a couple questions about that.  Is there anything else before I ask -- is there anything else that you need to add or change or anything.

A.  No, sir.

Q.  Specifically with regards to Brady and Giglio and their progeny, which progeny is a lawyer word for cases that follow those cases. They are just Brady cases. Do you recall specifically if there were any printed sheets with updates or I guess we've been calling them keys sheets about Brady?

A.  I don't recall specifically if they were.

Q.  Do you recall if homicide detectives when you were there from 1972 to 1986 ever were trained internally by NOPD about Brady obligations?

A.  The only training to my knowledge that was given about Brady if at all would have been a key that was given to us to read.

Q.  Okay.

A.  There was no classes.

Q.  You never had actual -- you know -- group like this where somebody was saying this is how you need to do

Brady?

A.   No.

Q.   Do you recall if the district attorney ever came to you all and said --

A.   No, sir; never did?

Q.   Do you recall if any district ever discussed Brady obligations with you?

A.   Brady applications?

Q.   Obligations?

A.   Obligations.

Q.   About what evidence you must preserve --

A.   Maybe briefly during meetings when we were getting ready to go to trial, or I should say getting ready to go in front of a judge to determine whether it's Brady or not.

Q.   So when you say maybe does that mean you don't specifically recall, but it could've happened?

A.   Yes, could've happened, maybe.

Q.   You're not certain one way or the other?

A.   No, I'm not.

Q.   And other than the police department, the prosecutor's office did you while you were at NOPD have any other kind of training, policy manuals given out about how to comply with Brady?

A.   No, sir.

Q.  Are you aware if there were any written policies about how to comply with Brady?

A.  No, sir.

Q.  Were there any patterns or -- were there any practices within the homicide division about how to comply with Brady that were division wide instead of person by person?

A.  It was our understanding at that time it was our understanding that we turned over all our evidence and reports to the district attorney and they would determine what was Brady and what was not Brady, and it was not our obligation to do so.

Q.  Did you all ever get internally you all ever talk about what evidence has to be disclosed to the district attorney to comply with Brady so they could decide whether to turn it over or not -- I mean did you all ever have to have any training or ever have any guidance about if you have this kind of evidence you need to preserve it, document it, and let the DA decide whether to turn it over or not?

A.  No. No, sir.

Q.  Did you all ever have any training, anything in manuals, or any policies about what exculpatory evidence means?

A.  Only if it was in a key that had been given to us

to read.

Q.   When I say exculpatory evidence what is your understanding of that term?

A.   Exculpatory or inculpatory.

Q.   Exculpatory.

A.   Exculpatory my understanding would be that it's evidence that is not favorable to the defense -- oh no, I'm sorry. I only know what the inculpatory or exculpatory would be as far as -- I don't know about vocabulary. I can't think of the right words to use right now.  In other words if someone makes a statement to you if it's inculpatory or it's exculpatory. That's my understanding of it.

Q.   To you what --

A.   Only in statements. That's the only thing that I understand of it?

Q.   When you say statements do you mean statement of any witness or statements of --

A.   In other words if you told me that you just killed somebody and I hadn't given you your Miranda rights, would that be inculpatory or exculpatory. That's the kind of thing I'm talking about.

Q.   So I just want to be clear. Are we talking about just statements by a defendant that if you didn't give them their Miranda rights that would be exculpatory?

A.  Right.

Q.  Do you have -- were you ever thinking about exculpatory evidence in terms of statements of other witnesses about what happened?

A.  Right.

Q.  Did you ever think about exculpatory evidence as if a witness gave descriptions that had discrepancies with them that that would be exculpatory?

A.  No.

Q.  Did you ever think of exculpatory evidence as if there were three witnesses and they gave different accounts as to height, weight, description that would be exculpatory?

A.  No, I did not.

Q.  Question 13 is describe in detail what you understand Brady versus Maryland and its progeny to require of you in a criminal prosecution. Your answer is first defendant objects to this interrogatory as calling for legal conclusion, outside the scope. Subject to objection when the defendant worked in NOPD homicide he believed that for cases in which he was lead detective and an arrest had been made it was the defendant's responsibility to provide the case file to the secretary in the homicide division who would transmit it to the district attorney's office. All right before -- there were

a couple of questions I had about that. Is there anything in there you would wish to change or modify?

A.   No, sir.

Q.   And in terms of the question that what you understood Brady to require of you in a criminal prosecution did you -- outside of things that you did I remember in Reginald Adams' deposition you said back in the '80s you called it interrogation, and now you have to call it interviews?

A.   Correct.

Q.   So let's use that word so we don't get the word interviews jumbled up. So interrogation my understanding is if something exculpatory happened during an interrogation you would be obligated to tell the prosecutor?

A.   Yes.

Q.   But if something exculpatory happened with a witness that was not something that you all were --

A.   No, sir.

Q.   Okay. So I gave you your police reports. I know it's a bunch of them. Do you need any time to look over them, or I have a couple of questions about --

A.   Of my report?

Q.   Yes.

A.   Why don't you ask me the questions and if I don't

-- can't answer them I'll look them up in my report. Would that work?

Q. Sure. Yes. We are making progress. All of this stuff is crossed off. Well one more thing before I move on from Brady. Did you understand there to be any requirement of information you had to document under Brady about identification procedures?

A. No, sir.

Q. So and your understanding of Brady there's nothing that you needed to document or turn over to the prosecutor about what happened in the --

A. To wrap it up in a nutshell for the time that I was in -- assigned to the homicide division in the New Orleans Police Department until the time I retired I was under the impression, and all the detectives in homicide were under the impression that Brady material -- the decision on what was Brady and what was not Brady was not up to us, it was up to the district attorney.

Q. Got you. And so you all turned over your file to the DA and then they did whatever they did?

A. Well we turned over our file to the secretary who put a package together for the district attorney. Then if they wanted anything else or had any questions they would get in touch with us.

Q. Got you. But independent of that, your

understanding and the entire homicide department's understanding was Brady didn't make you all -- Brady didn't say you all had to document certain information and give it to the prosecutors?

A.  No. No sir. Later after I left the department, but not at that time.

Q.  We really are getting towards the end. A lot of stuff we've asked. Do you recall who else from the homicide in your platoon worked on Raymond's case with you?

A.  The only one that really would've -- my partner Fred Dantagnin, he would've been the only one who -- because it was not that much work to do all at once. In other words -- you know -- sometimes if we would go on a case and we had six or seven witnesses everybody would jump in and take statements and get involved. But on this case we didn't even take the wife's statement for a week.

Q.  And so when say -- how long were you and your partner, how many years were you all partners, you and Fred?

A.  From the time I was 21 until -- from the time I was 21 until I was -- until 1986. From the time I came on the job, he broke me in, in the district and we stayed partners all the way through district and all the way through homicide.

Q.   So if you all are partners say on Raymond -- like we don't need to use Raymond's case, because that's our case and I don't want to get into the specifics of that with this question. But say you get a case assigned to you, when you do follow-up on the case does your partner always come with you, or would you do things on your own -- when he was lead would you always do things with him or would he do things on his own?

A.   If it was my case and he was working something active on his case I would do many things alone. He would not be there.

Q.   Got you.

A.   The times he would come with me is if it wasn't urgent he could help and vice versa.

Q.   Were there any practices you all had in homicide if you were interviewing a witness having multiple people present -- multiple law enforcement officers present?

A.   Present for what?

Q.   The interview. So say you're bringing a witness into the interview, was there any practices you all had in homicide that two detectives needed to be in for an interview.

A.   No sir.

Q.   For identification procedures I know that there were multiple people at this one. Where there any policies

or practices that you all had that there should be multiple officers at an identification procedure, or that (Inaudible)?

A.   No, sir.

Q.   When you say no sir there wasn't any policies, correct?

A.   That's it.

Q.   For one question I just did have this in my face and was looking at it. Turning back to his, this is page 28 which is page 5 of Ms. Carnesie's grand jury deposition testimony. Earlier we had talked about before when we went through this line by line, when we first started talking about Ms. Carnesie's testimony we were talking about -- I said something to the effect of she told -- she said that you told her who to pick. You said that you disagreed with me that that's what this sentence says.  In your mind this paragraph that says and so I looked at this one, put it down, and I took the one on this side and looked at it, and I kept looking and I recognized him. Then I told detectives, I said I remember one thing about this man; he had a little white blotch on the side of his cheek, a little white mark like discolored looking. And then three detectives looked at each other, and he shook his head and said that's him.  If you don't agree with my interpretation, how do you interpret that?

A.  Well your interpretation is that she's saying that I --.

Q.  Told her to who to pick.

A.  -- told her who to pick, and that's not true.

Q.  So what is your interpretation of these sentences?

A.  My interpretation is after she made the identification, and this didn't even happen, first of all, so we are talking about a hypothetical -- we're talking about a hypothetical situation to begin with, because this did not happen. But if it did happen I would say that it was an -- what's the word I'm looking for -- an approval of telling her after she made the identification that yes, she did pick the right guy that who was our suspect.

Q.  So in that interpretation why would she have said the three detectives looked at each other, and shook his head and said that's him. What does that mean to you?

A.  I have no idea. I have no idea why this woman would say half of the stuff that she said here. She talked more to the grand jury than she talked to me during the statement and the interview. I have no idea.

Q.  Okay I think I'm actually finally done with that document for good, so I think we're just in the police report from now on, so.

A.  Okay.

Q.  You said -- so when we were talking about your notes I believe somewhere over here, you said that you learned some information probably from the responding officers which is how you knew what happened since Ms. Carnesie couldn't really talk to you?

A.  They probably talked to me on the scene.

Q.  Do you have any recollection who the responders were at this time?

A.  I would have to look at the incident report and get their names.

Q.  Whatever's in the incident report is the best of your memory who it was?

A.  Right.

Q.  You don't have any independent recollection oh yes, Mike was out there?

A.  No.

Q.  Now getting back to those notes, I do want to get back to this last page where it has -- where it says witnesses. You said when we were talking about that before you couldn't recall and you needed to see your report. Having read your report do you know what those names are now; do you know who those are?

A.  No, I do not. I definitely wrote them as witnesses, or I may have -- I may have wrote the witnesses hoping to find witnesses, but evidently I don't know who

these people are. Obviously they're neighbors, but I don't remember what they told me or if it was anything that I felt was pertinent enough to put it into report or not.

Q.   So when you say obviously they're neighbors are you saying that because of their address?

A.   Yes.

Q.   Do you have any recollection of talking to George or Murell Pentaguy?

A.   I have no recollection.

Q.   You said Dr. Jerry Rosenberg you recognize that name.

A.   I think that was Coroners -- the doctor that came out with the coroner's office.

Q.   On the second to last page in your notes there's three family members listed, the daughter, the son and another daughter. Are you aware did those people -- did those three have any information about the case, or were you just noting them because they were present?

A.   Just noting them because they were present and family members.

Q.   We had talked about Michael Lentz.  If we go through those notes -- do you have his notes -- this is Bates number 31. I do see -- so there are some numbers there and then officer's names. So 706 where it says Leon Perzaro and Al --

A. That was the two officers who responded to the -- it was their section.

Q. And 706, the seven denotes him being in the seventh district, correct?

A. Seventh District, right.

Q. And 710 Lieutenant John Ruth, do you remember what he did?

A. He was just the rank for the seventh district officers.

Q. And then 762 Mike Lentz, that is the name that you had mentioned before?

A. He's one of the plainclothes officers of the seventh district.

Q. So isn't Mr. Lentz -- was he a detective or I don't know. I don't want to take --

A. I think at that time they didn't call the detectives. They just -- they were assigned to the district as patrolmen, but they were plainclothes follow-up. Does that make sense?

Q. Yes.  And so do you recall if Lentz gave you -- you talked about learning the information about the other robberies in the 8 to 10 blocks?

A. Yeah, but I think I was from Moreno.

Q. Do you know if Lentz -- did he give you any information about the case.

A.  You know I -- it could've been Lentz, but my report says Moreno, so I'm relying on my report.

Q.  You don't have any personal recollection right now of who you talked to?

A.  No, sir.

Q.  Is the sole reason Raymond Flanks was the main suspect in this case because he was arrested for the A P Tureaud robbery?

A.  Repeat that please.

Q.  Is the only reason Mr. Flanks was developed as a suspect in this case and put into the lineup because he was arrested for the AP Tureaud robbery?

A.  Not because of just the robbery, but because of the color of the automobile, the clothing, the gun, the MO, the description -- you know.

Q.  Are you talking about between the similarities between the AP Tureaud robbery and the Carnesie murder, or the --

MS. PETROVICH:

I'm going to object to the form of the                question.

Q.  Or the other elderly robberies and murder.

MS. PETROVICH:

I'm just going to clarify you're saying AP                Tureaud.

MR. MURELL:

I'm sorry. I'm saying AP Tureaud. That's

right, A P food store.

Q. I'm sorry for the Tureaud in there. I apologize. So where -- Mr. Flanks, you're aware was arrested for the AP food store robbery?

A. A and P, right.

Q. I'm going to get that right from now on. A and P food store. Was Mr. Flanks when he was arrested for that, was he -- are you aware if he was a suspect in the other robberies of the elderly couples; had he been identified?

A. I don't recall.

Q. What was it about --

A. I don't recall if they did it before I arrested him or after.

Q. What do you recall about the A and P food store robbery that was similar between Mr. Flanks and the Carnesie murder?

A. Only what I was told by either Moreno or Lentz, whichever one.

Q. Which was?

A. Which was that he fit the description and his automobile fit the description, and the gun fit the description.

Q. Beyond like him fitting the description did they say he fit the description because he was this height, this weight, or did they just say he fit the description?

A.   They didn't go into the first victim of the five -- I'm just saying there was five. First victim of the five said he was 5'10. The second victim said he was 5'10. The third victim said he was 5'11, but we didn't go into that kind of detail. He was a black male, fit the age group. He was an armed robber. He had the same kind of gun.  He had the same color car. There was more than probable cause to -- for them to believe that he may have been a suspect in this murder.

Q.   So a couple of questions about that. The gun, I just want to make sure nothing else -- at that point the only information about the gun was the size, the color, and the semiautomatic?

A.   Correct.

Q.   And in terms of the car the only thing that matched was color?

A.   Color.

Q.   Not the model?

A.   We didn't have a model.

Q.   Did Ms. Carnesie ever give you a description of the model?

A.   I don't -- I thought it was just a light blue car.

Q.   Did you ever ask her about the model of the car?

A.   I don't recall.

Q. Do you remember asking about the make of the car?

A. I don't recall.

Q. Do you remember asking her if it was a big car or a small car?

A. I think she told me it was a small car.

Q. Was the -- do you recall if the robbery of the A and P food store was a small car?

A. I didn't get into all of that.

Q. So the detective said this matches, and that's why you --

A. Yeah. There's enough MO here to make him a suspect.

Q. So I do actually want to talk about one page of the police report. Do you see these numbers at the bottom?

A. Yes.

Q. Can we go to page 244, please?

A. 244?

Q. Yes sir.

A. Okay.

Q. On there do you see the sentence it was learned from technician Stubbs that the pellet recovered from the body of Martin Carnesie was positively fired from the 25 caliber automatic confiscated from --

A. I might have a wrong page here. Did you say 244?

Q. I apologize. Give me one second and we will get

back to that.  Do you recall the gun and the bullets in this case being sent to the ATF for testing?

A.  I had no idea that that had been done until this case started.

Q.  How -- who would've sent those to the ATF?

A.  I have no idea.

Q.  Okay.

A.  Well I'm lying to you. During lunch time there was a piece of paper over on one of these tables that I happened to walk by, and when I looked down I saw Whitaker's name who was a district attorney who was a friend of mine, and I picked it up and looked at it.

Q.  Got you. And so that piece of paper -- what number only are we on -- that's this piece of paper?

A.  Yeah. But that's the first I had heard of it sent to --

Q.  Got you. And so this is a report from the Bureau of Alcohol Tobacco and Firearms, correct.

A.  Uh-huh (affirmative).-

Q.  I hate keep saying this, but you have to say yes or no for the court reporter.

A.  Yes. It's been a long time since I've done this.

Q.  Trust me I don't relish in having to remind people, because I feel like an asshole. So where it says date received it says January 25, 1985?

A.  Yes. Yes, sir.

Q.  And then if you look at the box in the top right it appears that the date of the report is February 13, 1985?

A.  Yes, sir.

Q.  With these do you see that a 25 caliber Raven (Inaudible) firearm model MP25, white metal finish with grip and magazine was sent for testing?

A.  Yes, sir.

Q.  So was that the gun that was seized from Mr. Flanks at the A and P food robbery?

A.  I would think so.

Q.  So it says it has a white metal finish. That's different than silver or blue, correct?

MR. GOFORTH:

Objection to the form of the question. You can answer.

A.  Should I answer?

MR. GOFORTH:

Yes, you can answer.

A.  I can't answer that question, because so many people call gun colors so many different things whether it be chrome, nickel, blued, matt finish.

Q.  Have you in your experience had people who are in law enforcement confuse white metal finish with chrome

finish or blue finish?

A. Have I --

Q. Not a layperson. Not like me trying to describe a gun, but have you had somebody who's in law enforcement in your experience would they make the mistake of calling something a white metal finish when it was actually blue or silver?

A. Not blue, but silver they might say white metal. Very well and especially someone that works at the -- with the feds or at AT&T. Not AT&T, ATF.

Q. ATF.

A. Bad as the A and P store.

Q. To you what does a white metal finish mean?

A. I have no idea. It could be chrome. It could be nickel.

Q. The description --

A. It could be painted white.

Q. The description of this gun says wooded grips. Did Ms. Carnesie ever describe wood grips on the gun?

A. She never did; no, sir.

Q. Did she describe the gun as only one color?

A. Nickel plated is what she used.

Q. And she never described seeing any wood on the gun?

A. No sir; she did not.

Q.  Have you -- and you see item 2 has a (Inaudible) copper jacket. Item three is a shell from a 25, and item 4 is also three 25 caliber lay cartridges. You see that those were sent for comparison with the 25 caliber that was taken from Mr. Flanks?

A.  Yes, sir.

Q.  The results of the conclusion read the above described firearm, item one, was examined and testified by the undersigned. It is mechanically sound and in operable condition. The test fired bullets and shells were compared macroscopically with the evidence bullet item 2, and the discharged shell with negative results. It is the opinion of the writer that neither the bullet nor the discharged she'll were fired from the firearm submitted for examination. All exhibits to be returned to submitter via registered mail.  Despite we've had some disagreements I think we both agree what that means is the bullets and shells didn't come from the 25 that Mr. Flanks was stopped with?

A.  According to this report.

Q.  According to Daniel Degarner the Chief of Forensic Lab in the national laboratory center?

A.  Correct.

Q.  It was actually page 263 that --

MR. GOFORTH:

Did we mark the ATF report?

MR. MURELL:

That was eight, right?

MS. DAVIS:

It would be nine.

MR. MURELL:

Q. So in the supplemental report on page -- let me just ask you this. What do you recall about the results that you received from ballistics that this was a match between the gun and the casings?

A. The only thing that I recall is Otto called me and told me it was a match.

Q. Did you ever get a written report?

A. I don't recall. I should have.

Q. If you had gotten a written report would that have been in the file?

A. It should have been. It should have in the file and it should've been sent to the district attorney's office. And the secretary knew for sure to do that.

Q. Do you remember the case of Kevin Stewart; it was the murder of Nancy Morris Crumpler on June 16, 1978?

A. Vaguely.

Q. Do you recall the allegations against you in that case that you beat Mr. Stewart into confessing?

A.  I remember the allegations, yes.

Q.  You're aware that the Court of Appeals in Louisiana found that those allegations were medically founded?

A.  Yes, I am.

Q.  What's your response?

A.  I don't agree with them.

Q.  I was going to ask you tell me your response to those allegations?

A.  They're false. They're lies.

MR. GOFORTH:

Object to the form. You can answer. You're fine.

Q.  You're aware that the person who examined Mr. Stewart was a doctor at Charity Hospital, correct?

MR. GOFORTH:

Object to the form of the question.

Q.  Are you aware that the person who examined Mr. Stewart was doctor?

A.  I was not aware of who examined him.

Q.  You're aware that he was medically examined?

MR. GOFORTH:

Object to the form. You can answer.

A.  Not until after the suit.

Q.  You are -- are you aware that a medical

professional came to the conclusion that his injuries were consistent with being beaten by police?

A. I read that. Yes, sir.

Q. Did you beat Mr. Stewart?

A. Positively, absolutely not.

Q. So this doctor is wrong?

MR. GOFORTH:

Object to the form of the question, but you can answer it.

A. Is the doctor wrong, the doctor is wrong that I beat him. I don't know if anyone else did or didn't, but I didn't touch him.

Q. Are you aware of when you were around Mr. Stewart did you see any of your colleagues lay a hand on him?

A. I did not.

Q. Is it your belief that Mr. Stewart was beaten?

A. Possibly, but not by police officers.

Q. Who do you think he was beat by?

A. Someone in jail.

Q. So you believe the injuries that the doctor -- do you believe the injuries the doctor ascribed to being hit by the police and the court of appeals found credible were actually caused by somebody in the jail?

MR. GOFORTH:

Object to the form of the question. You can

answer.

A.  I believe that the Court of Appeals are reaching their decisions by reading reports and not talking or interviewing people.

Q.  So -

A.  And they're human and they could be wrong just like anyone else?

Q.  So in your opinion the Court of Appeals judges are wrong also?

MR. GOFORTH:

Object to the form of the question. You can answer.

Q.  Ms. -- the witness in Kyles liar right, that said that you told them who to identify; that person's a liar?

MR. GOFORTH:

Object to the form of the question.

Q.  Ms. Carnesie is wrong, right?

MR. GOFORTH:

Object to the form of the question. You can answer unless I tell you not to.

A.  Okay. So say again.

Q.  The person who accused you of telling them who to identify in Kyles, they're lying is your testimony, correct?

MR. GOFORTH:

Object to the form of the question.

A.   The person who accused me of?

Q.   Telling them who to identify when they didn't actually know who committed the shooting. You're saying that they're a liar?

MR. GOFORTH:

Object to the form of the question.

A.   I don't remember first of all who accused me in the lineup of Curtis Kyles. And I will answer you truthfully. I don't recall it at all.

Q.   Do you recall -- and so is it your belief that Ms. Carnesie is also wrong about what she said about you and the identification?

A.   That I --

MS. PETROVICH:

And I'm going to object to the form of the question.

Q.   You can answer.

A.   Would you repeat?

Q.   Sure. Do you believe Ms. Carnesie was wrong about who -- what you said and did during the identification procedure?

MS. PETROVICH:

Object to the form of the question.

Q.   You can answer.

A.  I still don't understand what you're getting at or what your question actually is.

Q.  Let's not talk about where I'm getting at. Let's just talk about questions one by one. You testified in a deposition in Curtis Kyle's case, correct?

A.  I did.

Q.  In that deposition did you say the witness was lying when she said you told her who to identify?

A.  Yes, I'm sure I did.

Q.  That was Darlene Cahill. You remember that name?

A.  No, I don't remember the name but -- yes, I do recall the name.

Q.  And your testimony was Darlene Cahill lied about --

A.  Correct. Correct.

Q.  Ms. Carnesie -- your testimony you believe that she's wrong about what you said and did at the identification, correct.

MS. PETROVICH:

Object to the form of the question.

MR. GOFORTH:

Objecting and note that it's a vague question.

MS. PETROVICH:

And mischaracterizes the testimony.

MR. MURELL:

Okay. So we can do this a long way then. Where is the grand jury testimony.

Q. The long way, Ms. Carnesie testifies on page 27 of the OPDA as soon as I looked at the three of them I pushed them on one side. You believe Ms. Carnesie is wrong about that, correct?

A. I do.

Q. Ms. Carnesie testified get me a flashlight. You believe she's wrong about that, that it was a magnifying glass?

A. Possibly.

Q. Ms. Carnesie says that the three detectives looked at one another, and then you shook his head and said that's him. You believe Ms. Carnesie was mistaken about that as well?

A. Mistaken, I do. Not lying, mistaken.

Q. You believe the Court of Appeals judges were mistaken about the conduct in the case that we were talking about?

A. Conduct with me as far as me beating anybody, I do.

Q. But you also said you believe those injuries came from somebody at the jail, not a fellow officer, right?

A. I didn't see any other police officers beating

him.

Q.   The medical doctor who said he was beaten by police, that was wrong too, right; that's your opinion?

MR. GOFORTH:

Object to the form of the question. I'm going to object it's been asked and answered.

A.   Repeat please.

Q.   It's your belief that the doctor is wrong, that those injuries were from police?

MR. GOFORTH:

Object to the form of the question, misleading.

A.   Yes sir. Yes I believe they was wrong that he was beaten by police.

Q.   Okay so this is not something I promise you I relish talking about, but in Reginal Adams deposition they talk you about your use of the word nigger, right?

A.   Yes sir.

Q.   That's a word that -- is that a word you use?

A.   Is that a word I use now?

Q.   Is that a word that you used in the 80s?

A.   Positively.

Q.   Is that a word you use with your colleagues?

A.   Is that a word I use what?

Q.   With your colleagues in the homicide department

in the 80s?

A. Positively.

Q. Is that a word used with your family in the 80s?

A. Positively.

Q. Who else did you use that word with in the 80s?

A. Who else?

Q. Did you use it with friends?

A. I used it with black -- other Afro-American detectives. I've used it -- it was a common thing in the 80s. Most Afro-American people spoke to one another using that term.

Q. Did you believe --

A. It was not insulting or a -- or had the -- what's the word I'm looking for. It was thought of differently in the 80s than people are now. And let's just get this completely out of the thing, okay. Number one, I'm a Christian, okay. Number two, half of my -- my brother-in-law is the pastor of our church. Half to three quarters of our congregation are black people -- Afro-American. My daughter married a great, wonderful man who's half Afro-American and half Spanish, and I have two of the most beautiful grandchildren in the world that are half black, so if you are implying by any way, shape or form that I'm racist or I was racist, ever have been racist against black people that's not true. I am not.

JOHN DILLMANN

07/31/2025

Page 200

Q.   The victim in Curtis Kyle's case where you were accused of misconduct their victim was white, right?

A.   Curtis Kyles.

Q.   This was the Schwegman's murder.

A.   This Schwegman's murder and the victim was white, correct.

A.   Yes sir. Elderly white lady is white.

Q.   And the victim in this case where you're accused of misconduct is white, correct -- in Raymond Flanks' case?

A.   Correct.

Q.   And Isaac KKnapper's case the victim was white, correct?

A.   Which murder was that again?

Q.   The one we're looking for on --

A.   We might've had it right here. I apologize, but I just can't remember all of this.  Yes, she was a tourist from out of town.

Q.   The victim in Stewart where you were accused of misconduct they were white, correct?

A.   In which case?

Q.   In State versus Stewart in the murder of Nancy Morris Crumpler.  Nancy Morris Crumpler was white?

A.   Yes, sir, I believe so.

Q.   And all of the cases where you've been accused of

misconduct all of the victims have been white, correct?

MR. GOFORTH:

     Object to the form of the question.

A.  Yeah, if that's a fact, then that's a fact.

Q.  You said that -- I just want to make sure I'm clear on this.  Do you believe -- is it your testimony that you believe there was no problem with a white man saying nigger in the early 80s?

A.  I'm not saying there was a problem with it.  I'm saying it wasn't called the N-word then. It wasn't something that people would kick your face in for using as I saw on TV last night.

Q.  From your perspective as a white police officer in the early 1980s it was okay for you to use the word nigger.

A.  I didn't say okay. I just said it was not looked at -- it was an everyday routine word that people used, and it was not looked at the way that it's looked at today by society.

Q.  In the 80s did you think it was okay to say nigger?

A.  I didn't say okay. You asked me that three times.

Q.  I'm asking you the exact question. You say you haven't said it's okay. Now I'm asking you the question was it okay?

MR. GOFORTH:

Object to the form of the question.

A. I don't understand your question. You're going to have to reword it.

Q. So we've clearly established that you have not yet said whether it was okay to use the word nigger in the early 80s?

A. Okay to who, to me?

Q. To you, correct. Was it okay to you -- did you have any internal conflict or problems with --

A. In the 80s?

Q. In the 80s.

A. No, I did not.

Q. Did you perceive the difference in the 80s between black officers calling each other nigger and you calling them nigger?

A. No.

Q. It was acceptable -- in your opinion in the 80s was it acceptable as a white detective to call black people niggers.

MR. GOFORTH:

Object to the form of the question.

A. I'm just going to have to ask you to repeat it again. I don't understand what you're trying to -- you know you're asking me question after question after

question, but I don't see a point to the question.

Q. You are here as a witness just to answer questions. You don't need to understand the point. Was it acceptable to you in the early 80s for you as a white detective to use the word nigger?

MR. GOFORTH:

Object to the form of the question.

A. Yes.

Q. Now my understanding is that on the advice of your present Counsel that you are declining to answer any questions about John Floyd's case; is that right?

MR. GOFORTH:

I'm just suggesting -- my objection was to specific questions. You have specific questions you want to ask we can consider -- I'll make the decision on what to instruct him on each question.

MR. MURELL:

Sure.

Q. I know you said you had a copy of Floyd's -- Flanks' OPDA (Inaudible). I have one hard copy.

MR. MURELL:

Would you be okay with you and him sharing?

MR. GOFORTH:

I don't have it handy if you could email it

to me.

MS. DAVIS:

I can email it to you right now.

Q. Did you write a book called Blood Warning?

A. I did.

Q. Was that book truth or fiction?

A. True crime was the genre.

Q. I understand what you said about embellishing things to make it more readable, but were the underlying facts that you wrote true to the best of your belief?

A. To the best of my knowledge, yes.

Q. Do you understand when you wrote the story -- strike that. Are the -- in the book the steps that you took in the investigation of the murders of Bill Hines and Rodney Robinson, were those factually accurate as to the steps you took in that investigation?

A. All of the facts were accurate in the Hines case. I can't testify that they were in the --

Q. Robinson.

A. -- Robinson case because I was not the lead detective and I only worked off of a report.

Q. Got you. So what you wrote about the Robinson case was based upon the reports, not your personal knowledge?

A. Right.

Q. But what you wrote about the Hines case is the actual investigation?

A. Actual investigation.

Q. Okay. Do you know Michael Rice?

A. Very well.

Q. Is it somebody you worked with for many years?

A. Many, many years.

Q. Did you investigate with Michael Rice -- did he participate in the investigation of the murder of Bill Hines and Rodney Robinson?

A. Did I work with Mike on that, yes; I did.

Q. So we talked a little bit about this, and I believe this is where we started getting into the Fifth Amendment problem. You're aware of the issue in John Floyd's case that there was fingerprints marked not John Floyd?

A. I do.

Q. Tell me what your understanding of that is.

A. My understanding of it is that there were two glasses, and I think a bottle of whiskey next to the bed. John Floyd testified or John Floyd stated in his confession that both he and the victim had a drink before they had sex. It's my understanding that the prints were taken from those glasses and neither one of the prints came back to the victim or to John Floyd.  And it's my

understanding, I think, that that was not made -- that that was not conveyed to the defense, or to the defendants.

Q. In the Floyd deposition you were asked about whether the Hines and Robinson murders were likely committed by the same perpetrator. In that deposition you took the fifth. Is that something you want to answer now?

MR. GOFORTH:

Say that again, I'm sorry.

Q. In the Floyd deposition you were asked that very early on in the investigation into the Hines and Robinson murders that the two were likely committed by the same perpetrators and your answer was on the advice of counsel I want to invoke my Fifth Amendment rights. Are you willing to answer that question now?

MR. GOFORTH:

Can we go off the record for just a minute?

MR. MURELL:

Sure

Off the record 5:38 PM.

Back on the record 5:51 PM.

Q. All right Detective Gillmann. There was one last question I wanted to ask you with regard to Mr. Flanks' case that I didn't before, is it your belief that the ID procedure you conducted with Ms. Carnesie in Mr. Flanks'

case was in accordance with NOPD policy and procedure at that time?

A. Yes, I do.

Q. So the rest of these questions are all going to be repeats -- just to give you heads up, these are all going to be a repeats of what you were asked in Mr. Floyd's deposition.

A. Okay.

Q. And those to which you took -- you didn't answer on the advice of counsel.

A. Correct.

Q. I want to make clear I do not want to know anything that you and your lawyer talked about.

A. Okay.

Q. I'm going to ask you a question and I'm going to ask you will you answer this today.

A. You're going to ask me?

Q. Are you going to answer this today.

A. Oh okay.

Q. Are you going to plead the fifth again, or are you willing to answer this question today.

A. Okay.

Q. And if you will answer I want to get your answer. If you're going to plead the fifth on the advice of your attorney, plead the fifth and -- you know how that goes.

A.   Yeah.

Q.   Seven hours of that last time. If you all need a moment to step out and talk, feel free.  I don't want to pressure you if there's a question that you're not sure if you should plead to fifth on are not. If you need a minute just let me know. So I just want to go through and ask you these questions because they didn't get answered and Mr. Floyd's deposition and they're ones that we do our --

A.   Are we on the record?

Q.   Yes.

A.   The only thing that I don't want to happen -- and I'll be glad to answer your questions -- is in the case where I took the Floyd, once the attorney realized that I was taking the fifth on everything they raked me over the coals.

Q.   I think you could tell I ask hard questions sometimes, but I think I ask fair questions.

A.   You do. You do.

Q.   And so a lot of those questions that you got asked --

A.   I don't want to go throuogh that again.

Q.   -- we're not going to go over that stuff again. So we did talk about Blood Warning. We talked about the investigation into Bill Hines and Rodney Robinson.  I don't want to ask questions that we've already talked

about, so we're not going to go through with that. You and Detective Rice, you were asked before if you all worked closely on a number of homicide investigations. Is that something you will answer today?

A. Yes sir.

Q. Did you all work closely on a number of homicide investigations?

A. We did.

Q. Do you know approximately -- like about how many?

A. There's no way of me giving you an exact number. I would say we were on the same platoon for several years, so I would say that it would be at least in double digits.

Q. That was my next question, do you know how long you all were on the same platoon together?

A. Yes several years; three, four, five years, something like that.

Q. Okay. In the Floyd deposition you were asked about in the book Blood Warning you talked about communication you had with Steve London, and you said you didn't want to talk about that on the advice of Counsel. Is that something that you will talk about today?

A. Yes.

Q. So at the time Steve London -- Steve London at the time of the investigation of the murder of Bill Hines he was above you in the chain of command?

A. He was my lieutenant, yes. And I should mention to him before he was promoted he worked on the platoon with me.

Q. Okay.

A. So he was friends. He worked on the platoon and he was one of those -- he was a coworker.

Q. How long -- do you recall about when Detective -- or was he lieutenant, sergeant, captain?

A. When he worked with me, or during --

Q. When who was your supervisor what was --

A. He was a Lieutenant. He had made lieutenant and he was put in charge of homicide.

Q. When did Mr. London get promoted to Lieutenant; do you have a memory of that?

A. It was several years before the Floyd case.

Q. The Floyd case was '78; do you recall what year the Floyd case was?

A. I don't now.

Q. But anyway it was several years before that.

A. Yes.

Q. How long had you all worked together on a platoon before it was --

A. We probably worked four or five years also. He and Richard Bonnie was -- they were partners and both of them were on my platoon.

Q. Did Steve London have a nickname?

A. I'm sorry.

Q. Did Steve London have a nickname?

A. No.

Q. I see you're smiling. Why are you smiling?

A. I was going to tell you the funny story later.

Q. I don't need that on the record. Did Richard Bonnie have a nickname?

A. I hate to say it, melon head.

Q. What race was Mr. Bonnie?

A. White -- Caucasian.

Q. Why was he called melon head?

A. Because he had a big old head.

Q. That's a good answer. Was -- do you in the deposition -- are you okay answering any other questions I want to ask about Steve London, or do I need to ask?

A. Yeah, I have no problems with it.

Q. Was -- you were asked before if Mr. London -- if Lieut. London was closely involved in monitoring your investigation during the murders of the Hines and Robinson investigation?

A. Yes.

Q. So was he?

A. Hey again, I hate to keep asking you to repeat but I'm hard of hearing.

Q.   I would much rather -- you don't need to hate to do that. That's exactly what I asked you to do, and thank you. I want to make sure we are talking about the same thing. Was Mr. London closely monitoring your investigation of the Hines and Robinson murders?

A.   I don't think he was closely -- I guess maybe he was closely -- he was monitoring mor4 closely -- I know that's not correct English -- than he would normal cases. That was a heater case, so yes he was.

Q.   What made that case a heater case?

A.   It made it a heater case because the news media -- first of all it was brutal. Both murders were brutal. Robinson was a tourist which the news media picked up. Robinson was killed in Fairmont Roosevelt Hotel which brought it -- the news media into it more.  The Hines was working for the Times Picayune.

Q.   Okay.

A.   Yeah, he was working for the newspaper which brought the news media into it more.  So -- and there was a possibility because of the MO that we had a serial killer, because both murders had so many things that were the same MO in both murders.

Q.   So how was Lieut. London's revision of you on Floyd different than your other cases in terms of -- you said you were talking to him. Were you talking to him more

about Floyd's case -- about the Hines and Robinson murder than other cases?

A.  It would be more or less things like have you heard anything, are you getting any calls, are you getting any suspects.  We had a police officer by the name of John Riley. John Riley worked the French Quarter for years and years and years, and John Riley was gay. He was homosexual.  And because both of these cases involved homosexuality, and they were homosexual murders -- I might not be using the right terminology.

Q.  Like I said, I'm not going to jump on you like that last deposition.

A.  Because they were both gay murders in the French Quarter John Riley was brought in to work with me because he knew everybody in the Quarter and he could help.

Q.  Got you.

A.  So he assisted me in the investigations.

Q.  So Detective Riley, Detective Rice. Was there anybody else who was largely working on the case with you?

A.  John Riley worked. John Riley, Mike -- and Mike more or less handled his case.

Q.  The Robinson case.

A.  Yeah. He more or less worked it separately until we got -- until we got Floyd as a suspect.

Q.  Got you.  You were asked in the deposition it was

JOHN DILLMANN

you and your Lieutenant London that -- actually this is skipping over back to Stewart, the case with the person who claimed to be beat during the confession. Lieutenant London was one of the officers involved in that case as well, correct?

A.  I believe what you're saying.

Q.  Do you have any independent recollection?

A.  I don't have any recollection.

Q.  Do you remember you were asked about taking a confession of a named Smith Together in the 1970s, and you said that you were asserting the fifth. Do you recall taking a confession of someone named Smith Together?

A.  No, I don't recall. I don't recall that at all.

Q.  I know that what you talked about before that since it's the true crime genre that you would embellish details like the conversations happened in a more interesting place than where it was. Was the substance of the conversations between you and Lieutenant London that are contained in Blood Warning the substance of those conversations happen even if it wasn't necessarily with the same place, just a --

A.  No, I truly -- I would have to sit down and read the book or whatever, or you would have to bring up to me exactly what our conversations were. But to my recollections everything was true with the conversations

that we had?

Q.  Got you.

A.  The weren't embellished in any way, shape or form.

Q.  How early on in the investigation on the Hines and Robinson case did you and Detective Rice come up -- start to believe that the murders were committed by the same person?

A.  Right away.

Q.  What caused you to believe that?

A.  Because of the brutality, because of the wounds on the bodies, because both of the victims were gay or homosexual, and that they both happened within a week or so off one another.  So we didn't know for sure, but there was a -- we both felt that they were connected.

Q.  And when you say the brutality, what specifically I mean brutality obviously means a lot of different things to a lot of different people. When you say the brutality of the murders what do you mean?

A.  Both of them were stabbed numerous times. I would have to go back to the report, but they were numerous times well over 10 -- 20 times each. But more importantly both of them's throat were caught and their heads were almost severed. Both of them fought. There were blood all over everything.

Q.   In the Blood Warning book you say that Steve London communicated to you that he was facing pressure about the fact the victim in the Hines murder was an employee of the Times Picayune. Do you recall writing that?

A.   No, I don't recall. But I believe that I may have.

Q.   Do you as we sit here today, do you recall anything about Lieut. London feeling pressure about that case because one of the victims was a Times Pic writer?

A.   I think he was feeling pressure from the news media. Not pressure -- pressure is a bad word. He was getting calls from the news media and trying to get stories on both victims and what was going on in the investigation. I don't know if it was specifically from -- it could've been from the Times Picayune. It was probably from every newspaper station.

Q.   And you were asked in the prior deposition that there was also pressure coming from the Mayor and Tourism Board because one of the victims was a tourist as you said?

A.   Right.

Q.   Do you recall that that as an accuracy?

A.   I don't recall to be honest with you.

Q.   Were you -- did you receive any pressure from any

rank to solve the Hines case faster than your other cases?

A.   Positively not. Whatever pressure I had I put on myself.

Q.   You testified in Mr. Floyd's trial in 1982, right -- well let's just say you testified in Mr. Floyd's trial?

A.   Right.

Q.   And you also testified at his suppression hearing right?

A.   Correct.

Q.   Are the statements that you made at the suppression hearing -- I think I was one year old so I don't know how briefings work. But I presume at the suppression hearing you had to take an oath say swear to tell the truth whole truth and nothing but the truth?

A.   Are you saying suppression?

Q.   Suppression -- suppression of the -- there was a statement -- Mr. Floyd, a confession of Mr. Floyd.

A.   Confession, right okay.

Q.   And the defense attorneys sought to suppress that.

A.   Yes.

Q.   Do you recall that?

A.   Yes, and I was under oath.

Q.   When you were under the oath at that suppression hearing did you tell the truth throughout that suppression

hearing?

A.  Positively.

Q.  Were there any -- have you -- do you recollect if you said anything that was untrue at the suppression hearing?

A.  Nothing right now that I recall.

Q.  In your recollection do you ever recall lying under oath about Mr. Floyd's case?

A.  Lying under oath no, I don't.

Q.  Have you read -- when John's Floyd's case got filed did you get served?

A.  Yes, I was. And I have read the complaint.

MR. MURELL:

Just so you will have it, there's copies of it. We'll Mark that as Plaintiff's exhibit number 10.

Q.  And in case you need to look through to refresh your memory. To your recollection what were the allegations made by the defense attorney -- by Mr. Floyd's attorney about misconduct by you in that case?

A.  I don't know if I can sit here right now and tell you A, B, C, D what the allegations were, but basically the allegations were that for some unknown reason I picked John Floyd's name out of a hat -- innocent man that was just a male prostitute in the French Quarter, and for some

reason I just picked him and brought him up to headquarters, kicked him with my shoe, and then brought him over, made him confess. Then after he confessed to both murders brought him over to a typewriter, sat down and typed the confession. And after I typed the confession told him if he didn't take the confession I would throw him out of a window. In other words that I framed an innocent man. Basically that's it.

Q.   So one of the allegations was that you coerced Mr. Floyd into confessing?

A.   Positively.

Q.   And it's your -- let me ask you did you coerce Mr. Floyd into confessing?

A.   Positively not.

Q.   Are you aware if or do you recall that one of the claims made by the confession by Mr. Floyd was in today's terminology intellectually disabled. Back then we were calling it mentally retarded?

A.   I know that that was part of the defense that he was, but he never did at any point in time -- I don't recall it's been so many years ago that I asked him. I may have asked him what grade he went up to, but he never did show me any -- he was a normal person. He was crazy, but he was a normal person. He didn't look -- there was no indication to me that he was retarded at all, none, zilch.

Q.  Have any other defendants to the best of your knowledge who you've taken confessions are interrogated made allegations about you threatening to throw them out the window?

A.  Not that I recall.

Q.  I want to bump over just put a pause right there because my cocounsel is telling me there's something I forgot to ask about Raymond's case, so that's probably the more important one.  With Raymond's case Ms. Carnesie's description of the car I know it was light blue.  Did she talk about the car being old versus new?

A.  I don't recall, sir. I'd be lying. I don't recall. I do remember her saying it was light blue and it was a smaller car.

Q.  Do you recall if she had told you it was older -- it was an older car?

A.  Yes, I recall that she did.

Q.  And we had earlier talked about the A and P food store robbery and Mr. Flanks being arrested in a light blue car. Are you aware that that car was only a year old?

A.  I have no idea until today you're telling me that.

Q.  So when the detectives had told you that Mr. Flanks in the A and P food store matched the description did you ask about the age of the car that Mr. Flanks was

found in?

A.  I don't recall. It's been too many years.

Q.  Would that be a significant difference in your mind the witness described an old car and Mr. Flanks was found in one year old car?

A.  I still would've considered him a suspect, and I still would've made a photographic lineup and brought it to her to look at.

Q.  Well --

A.  The car would have not made a difference to me, old or new?

Q.  Okay.

A.  And the reason that would be is I'm talking to a 68-year-old lady who is completely devastated that her husband was just shot and killed in front of her, and I don't know if she really understood if it was a new car or an old car.

Q.  When -- d you have any reason to believe -- I know Ms. Carnesie was very sad and stressed out. Do you have any reason to believe a week afterward she would've had a reason to not remember the age of the car?

A.  I have no way of knowing that.

Q.  The other -- there were several other robberies in the 8 to 10 block of older folks. Did you interview any of those victims to see what their description of the

perpetrator was?

A.  I did not. I read the reports, but the plainclothes officer in the seventh district handled those.

Q.  Do you recall if the victims in the other robberies described the car that the perpetrator drove as an old car?

A.  I don't recall. I only recall that it was off blue or light blue.

Q.  If Ms. Carnesie and the other victims had all described an older car and Mr. Flanks was in a one year old car, would that be important or pertinent in your investigation?

A.  It would be pertinent, but it still would not have kept me from going the same route that I went with him being a suspect.

Q.  I understand --

A.  He was a suspect if he would've been in a purple car?

Q.  So my understanding is the reason he was a suspect -- so Ms. Carnesie was sure the person had a white blotch on their face, you're not aware if Mr. Flanks does or not, correct?

A.  I'm not aware of?

Q.  Are you aware Mr. Flanks has -- you're not aware

JOHN DILLMANN

if Mr. Flanks has a white blotch in his face, are you?

A.   I'm not aware.

Q.   Do you think that it would've been important to investigate discrepancies in the descriptions of the car?

MR. GOFORTH:

Object to the form of the question. You can answer.

MR. MURELL:

What is wrong with the form of that question?

MR. GOFORTH:

It just calls for opinion testimony. You can answer it. I'm just objecting to the form.

A.   Say that again.

Q.   You wouldn't have been -- the victims in the Floyd case, would it have been important to you -- would you have wanted -- how -- let me stop. I'm sorry. I'm getting tongue tied. In the Floyd -- in Mr. Flanks' case you said it wouldn't have mattered if the car was purple, or if it was old or new?

A.   Correct.

Q.   You're aware that Mr. Flanks -- Ms. Carnesie said that there is a white blotch on the perpetrator's face, correct?

A.   Correct.

Q. You're not aware whether or not Mr. Flanks has a white blotch on his face?

A. I did not read -- I don't recall because of the amount of time, at what point in time she told me about the white blotch.

Q. Would it be an important fact to you as an investigator if Mr. Flanks does not have a white blotch on his face?

A. There were so many things that fit the MO that I really can't tell you one way or the other whether it would've been important enough or not. Because it was so many things that were important that at the very least made him a suspect.

Q. Say let's -- I know you don't know. Let's just say hypothetically he does not have a white blotch on his face. Would that have impacted how you viewed the case if Ms. Carnesie said the perpetrator has a white blotch on his face, and Mr. Flanks does not. Would that be pertinent information?

A. It would be pertinent, yeah.

Q. Did you document that?

A. Again, if I was 10 years younger and this was 40 years ago I could answer that question. It's just been too many years. I can't.

Q. Why would it be pertinent in your opinion if Mr.

Flanks did not have a white blotch in his face and Ms. Carnesie said the perpetrator did?

A. Let me answer it this way.

Q. Can we answer that question first, and then you can say whatever you want.

A. Okay.

Q. The question is why wouldn't it be pertinent to you if Mr. Flanks didn't have a white blotch and Ms. Carnesie said the perpetrator did?

A. Well it would be pertinent to me if there were no other things that matched the MO of the suspect. But the white blotch could've been a pimple, or the white blotch could have been a 68-year-old lady that thought she saw a white blotch because she was so upset. I don't know.

Q. Ms. Carnesie didn't say a pimple, right?

A. But the bottom line on the thing is he became a suspect because of the armed robbery and because of all the robberies that had been taking place in the area. He fit the description, and he had the same description of the gun. And he was a suspect. If I would've went to Ms. Carnesie and showed her the photographs and she would've said no, it's none of these guys, then I would've done a whole lot more?

Q. So let me ask you this question a different way. If Mr. Flanks had a white blotch in his face would that

have been significant?

A. I can't tell you is I sit here today that I remembered -- that I remember back then right away that she even told me he had the white blotch.

Q. Do you recall --

A. Because I can go back if you want and look at her statement and see if she put it in her statement, but she may have told me that on the scene when she was so upset and I'm not even -- it might've went right over my head.

Q. But if she said the perpetrator had a white blotch and Mr. Flanks did have a white blotch, why would that be pertinent to your investigation?

A. Because it would just be another reason along with all the other ones that I mentioned to you that he became a suspect.

Q. And so the other --

A. You have to realize he was a suspect. We didn't go --

Q. He was a suspect in the A and P food robbery?

A. Right. Well no, he was arrested for the A and P.

Q. But that was how he --

A. He was only a suspect for me. So in my case he was just a suspect, and the probable cause came from the robbery, the location of the robbery, coupled with all the elderly people, the gun, all of that. So he was just a

suspect in my case. If I would've put those six photographs down and she said no that's none of them, and that I would've had a lot more work to do.

Q.   So if she had said I'm not sure if the perpetrator's in there you would've had a lot more work to do?

A.   Oh yeah.

Q.   So if she would've said I'm not sure because the suspect had a white blotch and I don't see a white blotch you would've had a lot more work to do?

A.   It would. It would've been a tentative identification and not a positive.

Q.   If she made a tentative identification, and you then told her that's the suspect, that would be something that you should not do, correct?

A.   Positively, and would never have done it.

Q.   Because something like that is what causes wrongful convictions?

MR. GOFORTH:

    Object to the form of the question.

Q.   Something like that is what causes wrongful convictions?

A.   Yes.

Q.   And you knew that back in the 80s?

A.   Positively.

Q.  Ms. Carnesie never described a pimple on -- you said maybe she was describing a pimple. She never used the word pimple. She only use the word blotch?

A.  She only used blotch, and I don't recall if she ever told me it was the size of a quarter, the size of a half-dollar, or the size of a pinhead. I don't recall that I don't recall asking.

Q.  You answered my question. So in terms of identifying Mr. Flanks the description we have that he's black, he's approximately the same age, he's approximately the same height, and he's approximately the same build. Is there any other part of the description of Mr. Flanks that made him match physically?

A.  Match physically.  The mustache -- very thin mustache. And I don't recall if he was wearing a shower cap When he robbed the A and P or not.

Q.  Where was the A and P located when comparing to Ms. Carnesie's house?

A.  I want to say a few blocks.

Q.  So we have height, weight, mustache, build. Is there anything else that physically matched?

A.  Not physically.

Q.  So there were those things, there were the gun and the car.  Was there anything else; we've already talked about the gun and the car. I don't want to ask you

JOHN DILLMANN

07/31/2025

Page 229

about that anymore. Is there anything else?

A. Nothing I can think of.

Q. Are you aware if there was someone else in the seventh district that was known as wearing a shower cap around the neighborhood and potentially being a criminal and robbing people?

A. No.

Q. Did you say no there was not, or you were not aware?

A. No, I was not aware.

Q. Did you ever ask around about that?

A. I didn't ask around. I was approached by the -- you all excuse me. I'm just getting tired.  I was approached by the plainclothes officers in the seventh district who told me about all the robberies of the elderly people with the subject with a shower cap.  And after they told me that I did not say well are there any other people with shower caps robbing people in the seventh district; no, I did not.

Q. Would you agree with me or not that wearing a shower during a armed robbery is a pretty distinctive trait?

A. Would I agree that it is a pretty distinctive trait?

MR. GOFORTH:

Object to the form of the question.

Q. With your experience as a New Orleans police detective would somebody wearing a shower cap during a robbery, would that be a significant fact two or multiple robberies with somebody wearing a shower?

A. Only if they had something to hide on their head.

Q. Was it common for -- did you see a lot of robberies with people wearing shower caps in the 80s; was that a pretty distinctive look to go commit a robbery to have a shower on?

A. Yes.

Q. When you -- let's go back to Floyd. Do you remember interviewing with Detective Rice a security guard named Gladys McKinney?

A. I don't remember if Mike interviewed her alone, or if I was there. I don't recall.

Q. Do you recall chasing a suspect in the Floyd case named O.W. Carter with Detective Rice; does that ring a bell?

A. I think a Mike might've done that alone I think. Was he the victim's friend who he was with earlier that night.

Q. I believe so?

A. Yeah, I know who he is.

Q. Was that Detective Rice alone in that chase, or

were you with him?

A.  I may have read his statement, or I may have been there. I don't recall.

Q.  Right now I'm skipping all the questions that I don't think were fair to ask. Do you recall testifying -- after Mr. Floyd was convicted, do you recall testifying at any postconviction hearing where appellate lawyers were trying to get his convictions reversed?

A.  I have testified on that case so many times it's --

Q.  In all the times that you've testified have you ever told a lie about Mr. Floyd's case?

A.  No. No sir.

Q.  I know that we obviously didn't have DNA back then, but fingerprinting that was a pretty established science in the early 80s?

A.  Yes, it was.

Q.  And that was something you certainly could do if you found latent -- what is a latent fingerprint mean?

A.  I imagine -- I'm guessing that it's a fingerprint that is left on an object that is found at a later time.

Q.  Were you -- it was certainly possible for you to in the early 80s if somebody's fingerprint was found on the scene and you had a suspect and compared the fingerprint found on the scene -- that was something that

was within you all's technological capacity, correct?

A.  Yes, correct.

Q.  Do you recall Timothy Sezinall being involved in the Floyd investigation?

A.  Susanall?

Q.  Susanall.?

A.  Yes, but I don't remember in what capacity. I know he was working at the crime lab, but you have to refresh my memory on exactly what he --

Q.  Do you recall asking him to dust the whiskey bottle and Mr. Hines' apartment?

A.  I don't remember doing it, but if he was handling the crime scene I would've asked him to do that.

Q.  Why would you have asked him to do that?

A.  To see if he could find latent prints.

Q.  In terms of the crime why was it important -- why was the whiskey bottle important?

A.  Well hopefully I was going to find a print of John Floyd on the bottle or on the glass.

Q.  Did you already have John Floyd as a --

A.  I may have. There was so many prints on the bottle and on the glass that you can visibly see them with the naked eye.

Q.  When it was your belief in Mr. Floyd's case that Mr. Hines and the perpetrator were having a drink before

the murder, correct?

A. That's correct.

Q. That's why the whiskey bottle and the glasses were important?

A. They actually had a drink at a bar before they came back to Hines' home.  But John did tell me in his confession that they had a drink at the house before they had sex.

Q. Is that why you asked for the glasses and bottles?

A. Correct?

Q. And the fingerprints that came back from that were not John Floyd's?

A. They were not.

Q. Okay.

A. May I add something?

Q. Sure.

A. It is not unusual for my experience of 15 years or so in the homicide unit and working many, many gay murders for homosexuals, gay, whatever term you want to use that pick up prostitutes -- in other words the prints were not -- I wasn't surprised when it didn't come back with John, because Hines could've had somebody there an hour before he picked up.

Q. But Mr. Floyd had told you that they had drinks

together, correct?

A.    Correct.

Q.    And so you said these glasses were -- had fingerprints all over them, right?

A.    Yeah.

Q.    So these glasses are certainly things you would leave your fingerprints on?

A.    Positively.  There were certain leads that needed to be looked at.

Q.    You did not disclose to the defense in Mr. Floyd's case that the fingerprint testing occurred and it was not Mr. Floyd's fingerprints?

MR. GOFORTH:

Object to the form of the question.

A.    Answer?

MR. GOFORTH:

You can answer.

A.    I don't recall whether I put that in my report or I didn't.

Q.    Do you recall if you put the crime lab report?

A.    I should have.

Q.    Is there a --

A.    I should have and it should have been in my report. And whether it was our -- I can't tell you right now for sure, because I don't recall.

Q.   If you didn't why would you not have included that?

A.   It would have strictly been a mistake. And certainly the report when it came back from the crime lab that it was negative, that report would've gone in my case file and certainly should've been in my report. When you say certainly why should that have certainly have been in your report and in the case file.

A.   Because that was SOP as in other cases were any -- any crime lab reports that you get back. I don't recall if Susanall called me like Stubbs did. I don't know if Susanall called me and said he look, those prints didn't match, or whether he never did call me, or even send a report. If the report would've came back and if it was sent it would've come to me and it would've been in my report.

Q.   Since you all believe that Mr. Hines and Mr. Robinson's murder was related, do you recall that there was a black male's hair recovered from Mr. Robinson's bed?

A.   I do.

Q.   Mr. Floyd is white, right -- John Floyd is a white male?

A.   Yes.

Q.   Was that significant to you at all?

A.   It was significant -- It was significant to me,

but yet it didn't take away the fact of Floyd being a suspect, because as I mentioned before there could've been people in the bed with Robinson an hour before or an hour -- or the night before or whenever.

Q.  I have 15 minutes and 30 seconds left. So I do have more questions about Mr. Floyd, but I actually do want to ask a couple more questions about Mr. Flanks which I think is more important. When you think back on Mr. Flanks' case, and now that you've read what you've read, and we've talked all day about this, is there anything that you wish you had done different in that investigation?

MR. GOFORTH:

Object to the form of the question. You can answer.

A.  And which case is this?

Q.  In Raymond's case, the case that we are here for?

A.  No, I wouldn't have handled it in any different at all than I did. I can't think of anything that I would've done differently, no.

Q.  So in your opinion the way that you handled Mr. Flanks case -- not Mr. Floyd, my client Mr. Flanks. There's not a single thing that if you had t redo that investigation that you would do?

A.  I'm getting confused with all the different cases

JOHN DILLMANN

now.

Q.   We're just talking about my client Raymond?

A.   Right. I really can't think of anything. It was -- I don't want to use the terminology cut and dry because no murder is cut and dry. But it was a scene investigation that was handled with an armed robbery. A suspect became available, and the only -- one and only eyewitness positively identify the perpetrator. And so I don't know what more --

Q.   So -- So there's nothing you would've additionally done -- nothing you would've done differently?

A.   If we would've had the luxury of being able to take a case and stay on it for six months and not have to worry about other cases, or other work load, or whatever, I may have done more. I may have gone back and looked at the car. I may have gone back and talked to the other victims. But once she made the identification, I arrested him.

Q.   And I was a public defender for a long time. I understand what having a lot of cases is. But there's some cases I think back gosh, I wish I had done that in this case. Is there anything about Raymond's case that you wish thinking back now that you actually remember it that you would've done differently.

MR. GOFORTH:

Object to the form of the question, but you can answer.

A. Probably I wish I would've paid more attention to the blotch.

Q. Why do you wish that?

A. Well just as a homicide detective who wants to be asked thorough as I could be, I wish I would've paid more attention, asked more questions about it, so on and so forth. And probably if that would've been the only thing that she had -- you know -- as a description, I probably would've paid more attention to it.

Q. This is -- I know you said you didn't totally remember. Do you recall testifying -- you read your testimony from Mr. Flanks' trial. We talked about that. You read it before this?

A. Right.

Q. Do you recall testifying at Mr. Flanks trial that if Ms. -- the victim's wife told her daughter to go get a flashlight. I'm not trying to -- this is not a got you moment. What I read in the testimony -- I'm just going through my notes. I'm just seeing flashlight. I didn't realize we were going to be talking about magnifying glasses.

A. Did I remember --

Q.  Do you recall testifying at trial that --

A.  I may have said flashlight, because I believe I testified a little bit earlier that I wasn't a hundred percent sure it was a magnifying glass.

Q.  Like I said this is not it -- but I just wanted to make sure that we're --

A.  It was one of the two, that's for sure. And it was obvious that she wanted to get a closer look?

Q.  And so what you testified at trial back in '86 was that it was a flashlight is that probably right?

A.  Yes.

Q.  When you say you wish you had paid more attention -- I mean I know you have a huge caseload, but if you could've done one thing over it would've been paying more attention to the blotch. What would you have done with that information, or why would that have been significant?

A.  If we didn't have anything else -- if he never would've been arrested at the A and P, if he never would've had the gone, if he never would've had a blue car, if he never would've had a short mustache, if he never would fit the description, if all of that was out I would've paid attention to the blotch.

Q.  I'm not talking about if all that's out. I'm just saying when you said if there was one thing that you could go back and do, you'd pay more attention to the blotch.

Why would you have paid more attention to it?

A. Well I can recall her talking about the blotch, and I can remember looking at the photograph and not see. I don't remember Flanks at all. I don't even remember if I even laid eyes on him to be honest with you. I think the only thing I saw was the B OF I photograph, and the B OF I photograph did not show a blotch. And I can remember looking for. And then I can remember saying to myself well either the camera didn't pick it up, or it's on the other side of his face.

Q. Could have been an option that Mr. Flanks just didn't have the blotch and wasn't the perpetrator?

A. Oh, I have -- I don't think so. I believe he's guilty as sin.

Q. What makes you -- and your belief about that is based on Ms. Carnesie's identification?

A. Correct. If you would've been there for the identification she was positive who it was.

Q. Do you recall -- hold on one second. I have more questions about Floyd. I have seven minutes and 30 seconds. I want to make sure we finish Flanks first so we're not just bouncing back and forth. Do you recall there being an issue in Mr. Floyd's case about potential witnessing a Craig's, and information about Mr. Hines. Do you remember a Mr. Clagg?

A. I remember him, yes.

Q. And do you recall there being an issue about -- in Mr. Floyd's case about properly documenting what Mr. Clegg said to you that the attorneys were --

A. There was not a question in -- how did you phrase it -- I'm not documenting it. It's a question of he lied. He did not positively ever, ever tell me that Hines just preferred black males.

Q. Who lied, Mr. Clegg.

A. Clegg, yeah. Clegg lied. He positively didn't tell me that. And why he came back at a later date and said that I have no idea.

Q. So the allegation was Mr. Clegg said he told you that -- was it Mr. Hines or Mr. Robinson only preferred black men?

A. No Hines.

Q. So your police so the allegation was Mr. Clegg came and testified that you misrepresented what he said and that he has said and he that he had decided Mr. Hines only preferred black men?

A. Correct. And I have no reason and I think that was years later or at some point in time later that he came back with that, and I have no idea why he changed that testimony or why he gave that statement. But it was strictly fabricated, because he at no time told me that.

Q.  So it's your belief that Mr. Clegg's lying about misconduct?

A.  Positively he's lying.

Q.  Okay.

A.  I believe Hines also had sex with black males, but I think that he had sex with white men also.

Q.  Did you write something in your police report about what Mr. Clegg told you?

A.  I think I did.

Q.  Did you write in your police report Mr. Clegg told you that he --

A.  I interviewed him, so I had to put something in my report about it, yes.

Q.  And so what did you put in your report was that Mr. Clegg had said Mr. Hines both slept with black and white men. Do you recall what you wrote in your report in Mr. Floyd's case was Mr. Clegg had told you that Mr. Hines slept with both black and white men?

A.  If that's what I put in my report, then that's what he told me.

Q.  That's when Mr. Clegg later said --

A.  It was only black men, okay. That's straightens it out. I know he changed his statement from me.

Q.  Do you recall that in the Robinson murder that there was indications that the perpetrator had type A

blood tape type?

A. Yes, sir ;I do.

Q. Mr. Floyd was type B correct?

A. Correct.

Q. Was that documented in your report?

A. I didn't write the Robinson report.  Mike Rice did.

Q. The criminalist in Mr. Robinson's case was able to identify through the semen that it was a type A secretor, right?

A. Yes.

Q. Do you believe Mr. Floyd is guilty?

A. Of?

Q. Murdering Mr. Hines and Mr. Robinson?

A. Yes, I do.

Q. You only have three minutes left. I only have that much time to ask questions. Do you recall the allegation by Mr. Sutton that you and Detective Riley bought Mr. Floyd drinks before interrogating him?

A. Yes, I do.

Q. Is that true?

A. Not drinks, a drink.

Q. Is that true?

A. Yes.

Q. So you bought a drink, not multiple drinks?

JOHN DILLMANN

A.  Yes.

Q.  Why did you buy him a drink before interrogating him?

A.  John had found him in the bar and was already drinking with him and then John called me.

Q.  John Riley?

A.  John Riley, yeah. And I came in and I didn't want to -- this was a guy who that was -- we didn't know how dangerous he was. At that point he was a suspect that had brutally killed two men, so I didn't just walk into a gay bar and walk up to him and handcuff him at the bar.

Q.  Do you recall -- I'm sorry to cut you off. I have two minutes. There's one question I really do want to ask. Do you recall writing in your draft narrative on January 19, 1981 that Mr. Floyd was quote located drunk at the Louisiana Purchase Bar, and then later changing that to located drinking?

A.  I don't recall that either way.

Q.  Why would you have changed the word drunk to drinking?

A.  I have no idea. I have no knowledge that it was changed. But if it was I have no reason that I would've done that.

Q.  You would understand as an officer at that time if the suspect was drunk when you were interrogating him

the defense could try to exclude the confession based on that; that it was on voluntary.

A.   Uh-huh (affirmative).

Q.   I'm sorry, you have to say no yes or no?

A.   Yes.

Q.   Do you recall that you denied taking Mr. Floyd to a holding cell and leaving him there?

A.   I recall that I?

Q.   That Mr. Floyd claimed that you took him to holding cell, and that's where he was threatened, and that you had testified you never brought Mr. Floyd to a holding cell?

A.   I may have.

Q.   Do you recall that Detective Riley testified that you had taken him to a holding cell?

A.   It's possible that I was wrong. We did have holding cells on the third floor, and when I brought John in I needed a place to interrogate him, or to interview him, and to --

Q.   Last question. This is actually the last question. Do you know how many drinks Detective Riley had with Mr. Floyd before you arrived?

A.   I didn't ask him. I don't know.

Q.   Okay.

A.   But I can say this. I know that he did tell me

that once he found him, because he had been looking all over the fridge order for him. Once he found him and he recognized him. They new one another, and that he had a drink with him and he excused himself and went called my office to find out if I was on duty. And then he found out I was at home and called me at home.  So it couldn't have been hours like John says it was.

Q.  So that's the end of the questions I can ask. Ms. Petrovich and Mr. Goforth can ask you questions if they wish.

MS. PETROVICH:

No questions.

MR. GOFORTH:

Mr. Gillmann, we're going to try to go as fast as possible here.

By MR. GOFORTH:

Q.  Way back this morning we were talking about Unholy Matrimony, and a portion of that book where you talked about the temptation to prod the victim and however the cop knew certain techniques. And you said that was part of the teaching from Saladino. Were you talking about how that was part of the teaching as to what not to do?

A.  Positively.  Teaching was on what to do and what not to -- and what is taboo.

Q.  Were suggestive techniques things you were taught

to do or things you were taught not to do?

A. Would you repeat please.

Q. Were suggestive techniques in identification procedures things were taught to do, or things were taught not to do?

A. To positively not do.

Q. Just want to make sure we were clear on that. You were asked on several occasions about the reasons why Mr. Flanks was considered a suspect, and why you proceeded with the lineup with Ms. Carnesie. How did the ballistics testing results that you were told by the crime lab play into your decision-making?

A. They were the cherry on top of the Sundae.

Q. Okay.

A. We already had a positive identification from -- well I can't say for sure if he told me before or after, but with the murder weapon and a positive identification it seemed like an airtight case.

Q. Very briefly let's look at P7 which includes your supplemental report. And let's look at OPDA Flanks 000242 and that should be the fourth page in P7.

A. I should never have put these up.

Q. And we're going to look at the third paragraph from the bottom. And it says once this information was obtained Detective Dillmann proceeded to the crime lab

where he spoke to technician (Inaudible) Stubbs?

A. Detective Dillmann requested technician Stubbs run a comparison test on the recovered 25 caliber automatic and the pellet recovered from the body of Mr. Martin Carnesie. Additionally Detective Dillmann requested copies of the recent B OF I photographs of Flanks obtained when he was booked that morning.

Q. Okay. I think you maybe read the wrong part?

A. Did I?

Q. I think I did. I'm sorry. We're going to look at the very next page which is 243, and it's the third paragraph down from the top?

A. Upon returning to the homicide office Detective Dillmann was contacted by (Inaudible) Stubbs. It was learned from the technician Stubbs that the pellet recovered from the body of Martin Carnesie was positively fired from the 25 caliber automatic confiscated from Raymond Flanks. Additionally the 25 caliber casing that was found on the crime scene was positively fired from the weapon confiscated from Mr. Flanks.

Q. Okay. Does that information that you just read, does that accurately reflect or match your memory of what happened?

A. Positively.

Q. Okay. And then the next paragraph, am I correct

that it says that you then after learning that information about the ballistics you then prepared the lineup?

A.   I prepared the necessary forms and transported --

Q.   Oh, I'm sorry.

A.   Oh, that's the wrong one.

Q.   So wait, did you do the lineup before you did the -- based on that report did you do the lineup before you did the -- got the ballistics report?

A.   I could look at my report and find out.

Q.   That is your report, so if you want to just take a look and confirm for me.

A.   Is seems to me that I probably did it ahead of time before I took her --

Q.   I'm actually going to do the lineup procedure, do you remember or can you look at your report and tell whether -- which one happened first, the lineup procedure or the ballistics report?

A.   So I need page --

Q.   Exhibit 243.

A.   On December 23 I found out about Flanks and I asked Ortho to run the gun on the 23rd. And I got the B OF I photographs together December 12.

Q.   Was the --

A.   On December 12 I returned to my office. You see on December 12 here that I returned to my office and was

JOHN DILLMANN

contacted by Stubbs on the 12.

Q.   Okay. That must have been --

A.   So her lineup was --

Q.   So is that a type -- based on the report when did the offense occur?

A.   The 12; could be a typo.

Q.   Okay.

A.   No, she looked at the lineup on the 12. Do you see right here?

Q.   I'm just going to show you the original incident report which starts on Flanks 244. Based on that what's the date of the incident?

A.   The 17, so the 12 is --

Q.   So it couldn't have been --

A.   Had to be a typo.

Q.   We're going to ignore that and I'm going to move on. Looking again at -- you were asked some questions about individuals who were mentioned in your handwritten notes. The Pentaguys?

A.   Yeah, the two people, right; at the bottom.

Q.   Let's take it at your -- again this is P7 and the incident report. You didn't write the original incident report; is that right?

A.   No, sir; I did not.

Q.   Do you know who wrote that or who would've

written that?

A. The two officers that originally came out from the seventh district in 706. I had their names.

MR. MURELL:

I'm sorry, what page are you at.

Q. I'm going to refer you to Flanks 248?

A. Okay.

Q. Down at the bottom do you see where it mentions George Penatguy?

A. It does.

Q. Okay. And on the next page 249 just look at -- let's just move to 249. The next witness mentioned is Merle (Inaudible)?

A. Yes.

Q. Are those the same two people mentioned in your handwritten notes?

A. Yes, it is. And obviously, yeah. They were spoken to by the two uniformed officers.

Q. Does that give you any indication why their names would be in your handwritten --

A. Why their names would be in my notes. They gave me their names.

Q. Okay.

A. They gave me their names as witnesses and what they had to say.

Q. Okay.

A. And they put it in their report.

Q. Got it. Do you know if he spoke to them?

A. I don't recall. I didn't see their names in my report, so I may not have. I was reading here exactly what they had to say and it might not have been -- just give me one second here.

Q. That's okay.

A. They were sitting at the table and they saw this guy in the neighborhood, but I don't think that they could make an identification on him, and that's probably why I didn't put it in my report.

Q. Okay. Have we marked the trial testimony yet?

MR. MURELL:

No, I just referenced it.

MR. GOFORTH:

Okay.

Q. So the last thing I want to ask you, I think Mr. Dillmann, have you ever in any of the sworn testimony that has been discussed today whether handwritten items or in connection with John Floyd investigation to this case today, any sworn testimony that you've given, have you ever made any intentional misstatements about anything?

A. I have not. I've told a complete truth.

Q. Okay. As far as testimony you've given here today

have you given any statements that you know to be contradictory to anything you said in sworn testimony in the past?

A.   No, sir.

Q.   Okay.  If it happens with anything you said today is different from something you said in the deposition in the Reginald Adams case, or in your trial testimony in the Raymond Flanks prosecution, which do you think would be more accurate?

A.   It would be a mistake if it was because of the amount of years that have passed and my memory.

Q.   Okay.

A.   But not intentionally.

Q.   Did you listen to any other witness testimony at the trial of Raymond Flanks?

A.   No sir. I was sequestered.

Q.   Okay, so you didn't hear Ms. Carnesie's testimony at trial?

A.   I don't think so. Not that I recall.

Q.   When you conducted the identification procedure with Ms. Carnesie during your investigation, did you intentionally do anything to indicate to Ms. Carnesie who the suspect was?

A.   Positively not. I handled the photo lineup identification like I had handled hundreds before?

Q. Okay. Did you intentionally withhold from your police report or the NOPD case file any information or evidence that was beneficial to Mr. Flanks?

A. No sir, I did not.

Q. All right. Okay. I don't have any further questions. Thank you.

MR. MURELL:

Just two quick follow-ups.

Q. You testified in response to Mr. Goforth that you didn't think the Pentaguys -- I'm saying that name right -- but Murrill -- the people who saw --

A. The witnesses, yeah?

Q. You said that you didn't think they could make an identification. Why didn't you think they could make an identification?

A. If they could've made -- if they could've made an identification -- a positive identification on the subject I would've put that in my report. And I would've taken statements from them, positively.

Q. You never spoke to them?

A. I don't think so.

Q. You never showed them a lineup?

A. I don't think so.

Q. The report says the responding officers spoke to them and they saw the perpetrator, right?

A. That's correct. They saw him in the neighborhood.

Q. And you didn't ever follow up with them?

A. No, I did not.

Q. In terms of -- I'll represent to you I know you don't know what was in your file. I imagine -- do you recall every paper that was in your file when it got turned over to the DAs office in 1983?

A. Right.

Q. I'll represent to you that this packet that we've been going through is the file that we've been provided in this case through discovery. Is there anywhere in your report that you discuss receiving an actual crime lab report saying that this guy matched the bullets?

A. Not that I recall.

Q. I don't see a crime lab report in here. Is there a reason why you wouldn't have included a crime lab report in here?

A. In my supplemental report?

Q. Right. Number one, in your supplemental report.

A. Yeah, if it's not in my report I didn't receive a report from Stubbs.

Q. Okay. So if it's -- so you didn't write that you ever received a report from Stubbs. You just said you talked to him on the phone, correct?

A. On the phone, correct.

Q.  So does that mean you never received a report from Stubbs?

A.  Obviously not, no.

Q.  Then Stubbs was never called to testify by the State at Mr. Flanks' trial, correct?

MS. PETROVICH:

Object to the form of the question. Which                trial?

Q.  I think that's all, Detective Dillmann. I appreciate -- I'm sorry for taking your day. I know you have to go back to Prairieville now.

Off the record 7:10 P.M.

REPORTER'S PAGE

I, Rhonda Broux, Certified Court Reporter in and for the State of Louisiana, the officer as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434 (B) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the Record; That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a Court Reporter's transcription or proceeding, and that dashes (--) do not indicate that words or phrases have been left out of this transcript; that any words and/or names which could not be verified through reference material have been denoted with the phrase "phonetic." Ellipses (...) indicate a trailed-off sentence.

_____

Rhonda Broux

CERTIFIED COURT REPORTER

LOUISIANA CCR NO. 2014008

REPORTER'S CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, Rhonda Broux, Certified Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was administered, do hereby certify that John Dillmann, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 259 pages;

That this testimony was reported by me in the voice writing reporting method; was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

That the foregoing transcript has been prepared in compliance with transcript format guidelines required by statute or by the Rules of the Louisiana Certified Shorthand Reporter Board; and

That I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangement for deposition services;

that I have acted in compliance with the prohibition on contractual relationships, as defined by the Louisiana Code of Civil Procedure Article 1434 and in rules and

advisory options of the board;

That I have no actual knowledge or any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter, nor is there any such relationship between myself and a party litigant in this matter.

That I am not of counsel, not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

_____

RHONDA BROUX

CERTIFIED COURT REPORTER

LOUISIANA CCR NO.2014008