UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

* * * * * * * * * * * * * * * * * * * * * * * * * *

RAYMOND FLANKS

NO. 23-CV-6897

VS.

(NJB)(KWR)

THE CITY OF NEW
ORLEANS; JASON
WILLIAMS, IN HIS
OFFICIAL CAPACITY
AS ORLEANS PARISH
DISTRICT ATTORNEY;
ANNE KIRKPATRICK,
IN HER OFFICIAL
CAPACITY AS
SUPERINTENDENT OF
THE NEW ORLEANS
POLICE DEPARTMENT;
JOHN DILLMANN, IN
HIS INDIVIDUAL
CAPACITY; AND
JOHN/JANE DOES
#1-20, IN THEIR
INDIVIDUAL
CAPACITIES

* * * * * * * * * * * * * * * * * * * * * * * * * *

CONTINUATION OF THE RULE 30(B)(6) DEPOSITION
OF THE CITY OF NEW ORLEANS WITH
DETECTIVE RYAN AUCOIN
AS THE DULY AUTHORIZED REPRESENTATIVE

Taken on Thursday, August 14, 2025
Commencing at 2:36 p.m.
At the Offices of
City Of New Orleans, Law Department
1300 Perdido Street, Room 5E03
New Orleans, Louisiana.

EXHIBIT I

Reported By:  CRYSTAL BALLAST, CCR, RPR

                              I N D E X

                                                          Page

  Caption                                                 1

  Appearances                                             3
  Appearances                                             4

Stipulation                                               5

  Examination
     BY MS. DAVIS                                         6
     BY MR. GOFORTH                                       32

  Reporter's Certificate                                  36


                    *  *  *  *  *  *  *  *  *
                      E X H I B I T S


  11               -    Notice of deposition    13

  7                -    Police file              24

A P P E A R A N C E S:


Representing RAYMOND FLANKS:

Murell Law Firm
2831 Saint Claude Avenue
New Orleans, LA   70117
504-717-1297
Chris@murell.law

          BY:   CHRISTOPHER MURELL


Shanies Law Office
110 West 40th Street
Tenth Floor
New York, New York   10018
212-951-1710
Eleanor@shanieslaw.com
David@shanieslaw.com

          BY:   ELEANOR C. DAVIS (VIA ZOOM)
                DAVID B. SHANIES (VIA ZOOM)


Representing THE CITY OF NEW ORLEANS AND JOHN
DILLMANN, IN HIS INDIVIDUAL CAPACITY:

City Of New Orleans, Law Department
1300 Perdido Street
Room 5E03
New Orleans, LA   70112
504-658-9800
Wrgoforth@nola.gov
Sean.markey@nola.gov

          BY:   WILLIAM R.H. GOFORTH
                SEAN MARKEY

Representing JASON WILLIAMS, IN HIS OFFICIAL
CAPACITY AS ORLEANS PARISH DISTRICT ATTORNEY:

Stanley Reuter Alford Owen Munson & Paul, LLC
909 Poydras Street
Suite 2500
New Orleans, LA   70112
504-523-1580
ICP@stanleyreuter.com

      BY:   INGA C. PETROVICH

Reported by:   Crystal Ballast, CCR, RPR
               Certified Court Reporter
               In and for the State of
               Louisiana and Registered
               Professional Reporter

S T I P U L A T I O N

It is stipulated and agreed by and Counsel that the testimony of the witness, City of New Orleans with Detective Ryan Aucoin as the duly authorized representative, is hereby being taken pursuant to Notice under the Federal Rules of Civil Procedure for all purposes permitted under law.

The witness waives the right to read and sign the deposition.  The original is to be delivered to and retained by Eleanor C. Davis for proper filing with the Clerk of Court.

All objections, except those as to the form of the questions and/or responsiveness of the answers, are reserved until the time of the trial of this cause.

                    *   *   *   *   *

Crystal Ballast, Certified Court Reporter in and for the State of Louisiana and Registered Professional Reporter, officiated in administering the oath to the witness.

DETECTIVE RYAN AUCOIN, having been first duly sworn, was examined and testified as follows:

BY MS. DAVIS:

Q.    Hello.

A.    Hi.

Q.    My name is Eleanor Davis.  I am an attorney for the plaintiff in this case, Raymond Flanks, in this lawsuit which names the City of New Orleans, the NOPD, the Orleans Parish District Attorney's Office, and a former NOPD officer, John Dillmann, as defendants.

Before we proceed, can you please state your full name for the record?

A.    Sure.  Ryan Aucoin.  It's A-u-c-o-i-n.

Q.    Have you been deposed before, Mr. Aucoin?

A.    Yes.

Q.    How many times?

A.    Probably less than ten, more than five. I'm not exactly sure.

Q.    All right.  So I know you're somewhat familiar with how these work.  It's always important, but even more so because I'm on Zoom, we really need to try not to speak over each other, so, as much as possible, please wait for me to

finish my question before you answer, and then I will also strive to wait for you to finish your answer before I ask my next question.

Does that make sense?

A.    Yes.

Q.    If you don't understand or I ask something that isn't clear, please ask me.  I want to make sure that we're on the same page about what I'm asking you and what you're answering, so just let me know if there's anything that you don't understand that isn't clear, okay?

A.    All right.

Q.    And, if at any time, you need a break, just let me know.  If I ask a question, we ask that you answer that question before we take a break, but, otherwise, we can take a break whenever you want or need one.

A.    Okay.

Q.    Are you currently employed?

A.    Yes.

Q.    Where are you employed?

A.    The New Orleans Police Department.

Q.    What is your role with New Orleans Police Department?

A.    I am a Cold Case Homicide investigator.

Q.    How long have you been in that role?

A.    Oh, in that particular role, 13 years.

Q.    And what are your duties as a Cold Case Homicide investigator?

A.    Primary role is I investigate cold case homicide.  At times, I will investigate active homicides but mainly cold case homicide.

Q.    And did you have another role at the NOPD before that?

A.    I was an active homicide detective prior to that, as a primary role.

Q.    And how long were you an active homicide detective?

A.    From 2004 until 2012.

Q.    And you said that was your primary role. Did you have any other roles during that time?

A.    No.  I was just using your words.  I'm sorry.  That was my primary duty.  Sorry.

Q.    All right.  No; no; no.  No problem.

And then, before that, did you have any other roles with the NOPD?

A.    So I started with the New Orleans Police Department in 2001.  From 2001 to 2004, I was assigned as a patrol officer and as a narcotics task force officer in that time frame.

Case 2:23-cv-06897-NJB-KWR    Document 74-12    Filed 09/00/25    Page 9 of 36
30(b)(6)                 CITY OF N.O. THROUGH RYAN AUCOIN                08/14/2025

Page 9

Q.    All right.  And when you started in 2001, did you attend the police academy?

A.    I did, yes.

Q.    Did you have any other jobs prior to starting at the New Orleans Police Department in 2001?

A.    Yes.

Q.    What other jobs did you have?

A.    I was a -- prior to coming on the Police Department, I was a relief captain and mate at Bally's Casino.  Prior to that, I was an offshore boat captain.  I don't remember what year I started that; maybe '97 or '98.  And then, prior to that, I was a stock boy at Canal Villere, which doesn't exist anymore.

Q.    Is that a grocery store?

A.    Yes.

Q.    I'm sorry.  What did you say your role at the casino was?

A.    I was a relief captain and first mate on the boat.

Q.    Got it.  I was going to ask what -- that was on a boat, okay.

A.    Yeah.

Q.    That makes sense.  Thank you.

All right.  Do you understand why you're here today?

A.    Yes.

Q.    What is that understanding?

A.    There was some questions about a cold case that I provided the file to the City Attorney's Office in relation to a wrongful conviction lawsuit that was filed.

Q.    And do you understand you are here testifying today as a corporate representative of NOPD?

A.    Yes.

Q.    Do you know what that means?

A.    I guess I don't understand your question.  Do I understand what it means that I'm here to testify as a representative of the Police Department?

Q.    Yes.

A.    Yes, I do understand that.  I'm assuming you want me to testify to my role in providing the case file or the case documents as custodian of records for the Cold Cases Division to the City Attorney.

Q.    Do you understand that you're here to speak for the Police Department and the City of New

Orleans, correct?

A.　　Sure; yes.

Q.　　When you testified previously in a deposition, you mentioned it was between five and ten times; is that correct?

A.　　From the best I can recall, yes.

Q.　　Do you recall what kind of cases those were?

A.　　I believe the last one was a -- was a lawsuit against the Police Department on a wrongful conviction, if I'm not -- I'm not 100 percent sure exactly what that was, but I testified on that one, I think, last year.

Q.　　And that was a deposition as well?

A.　　Correct.

Q.　　Do you remember the name of that case?

A.　　I do not.  I do not, no.  I'm sorry.

Q.　　And do you remember what kind of case you testified in in any of the other cases?

A.　　I believe they were all -- I believe they were all wrongful convictions.  I'm not 100 percent sure, though.

Q.　　Were they cases that you had worked on personally?

A.　　No, ma'am -- oh, I'm sorry.  The last

one was.  Yes, I did.  I did work on the last case. I'm sorry.

Q.    When you say, "the last case," that was the deposition you did last year?

A.    That's correct, yeah.  The last case -- the last deposition I attended was in reference to a case -- I think it was from 2009, and I was on the scene of that incident.

Q.    But you don't recall the name of that individual?

A.    I don't, no.  I wasn't the primary investigator.  I just assisted.

Q.    Did you review any documents to prepare for the deposition today?

A.    I reviewed the case file that I provided to the City Attorney's Office, and that's it. That's all I reviewed.

Q.    We'll get back to that.

Did you speak to anyone to prepare for your deposition today?

A.    I've spoken with Mr. Goforth yesterday, yes.

Q.    All right.  And don't tell me the substance of any of your communications with him, but was yesterday the only time you spoke with him

in preparation for today?

A.    In preparation, yes.

Q.    How long did you speak to him?

A.    Maybe ten minutes, fifteen minutes or so, over the phone.

Q.    Did you speak to anyone else about this deposition today?

A.    Not that I can recall, no.  No.

Q.    Did you speak to anyone else to prepare for this deposition today?

A.    No, ma'am.

Q.    Is there anything else that I haven't asked about that you did to prepare for your deposition today?

A.    No.

Q.    Did you take any notes while you were preparing for your deposition today?

A.    No, ma'am.

Q.    All right.  Let's look at what has already been marked as Exhibit Number 11.  This is the notice.

Do you recognize this document?

A.    Yes, I do.  Yes.

Q.    What is it?

A.    This is the -- I guess the -- it's an

affidavit from the Eastern District of Louisiana outlining the plaintiff and the defendant and, I guess, the facts of the case.

Q.    If you look at Schedule A, which starts on page 3.

A.    Okay, yes.

Q.    Do you see what I'm talking about?

A.    Yeah, got it.

Q.    If you look down to page 4, you're here to testify about part of this topic, topic 9; is that correct?

A.    Topic 9?

Q.    Yes, sir.

A.    Yeah, I'm here to talk about whatever you want me to talk about.  I can.

MR. GOFORTH:

        Just give it a read and let her know.

THE WITNESS:

        Okay.

A.    Yes.

BY MS. DAVIS:

Q.    Thank you.

        Are you fully prepared to testify?

A.    Sure; yeah.  Yes.

Q.    All right.  You said you identified the

case file relative to this case; is that right?

A.    Yes.

Q.    And that's the case file for the Carnesi murder; is that right?

A.    For the what?  I'm sorry?

Q.    Carnesi murder.

A.    That's correct, yes.

Q.    How did you identify that case file?

A.    The City Attorney's Office contacted me, I believe, via e-mail asking if I can locate a case file relative to -- I was provided the item number and, with that item number, I was able to locate the case file for the investigation.

Q.    When you say you were able to locate it with the item number, how did you do that?

A.    Sure.  So the New Orleans Police Department's Cold Case Unit maintains an archive. It's located at old Police Headquarters at 717 South Broad.  It's like a warehouse of sorts.  I was able to take that item number, locate the date and time that the homicide took place.  I then went to these old boxes that we have and located the case file.

Q.    All right.  The old boxes that you have, are those sorted by date and time?

Type text here

A.   No.  There's -- well, I mean, kind of.
We sort them by "H" number or homicide number, so,
in this case in 1983, like, the files would be
broken down based on the "H" number or the order in
which they occurred.

So, in a way, it's by date and time, but
it's also -- there may be an instance where
somebody was shot on a Monday but didn't die for a
month later.  The "H" number would be corresponding
to the month that the shooting actually took place,
if that makes sense.

Q.   All right.  So it's the month when the
shooting took place, not the month when the person
died; is that right?

A.   No.  That's flip-flopped.  I'm sorry if
I said it backwards.  It's the month that the
person dies.

Q.   When it actually became a homicide?

A.   Correct.

Q.   Understood.

And is the "H" number different from the
item number?

A.   Yes.

Q.   What is the difference?

A.   The item number is assigned by the

Communication Division as -- it's a rolling number for each call or each incident that takes place in the city, and the "H" number just identifies the number that is assigned to that particular homicide.

Q.   And, so, would it be accurate to say that the item number is the system for numbering all --

A.   All calls.

Q.   All calls that come in, thank you.

And the "H" number is homicide specific?

A.   Yes.

Q.   And the records for homicide cold cases -- or, I guess, let's talk about this.  So you mentioned you're cold case.  What is -- what falls under the category of a cold case?

A.   When a case is unsolved for a period of two years or more.

Q.   Does the Cold Case Unit have an archive that includes only cold cases or are other cases part of the cold case archive?

A.   We maintain the entire -- the entire homicide archive, so it's not just unsolved cases. It's solved cases as well.

Q.   But going back to the question about

numbering, so "H" numbers are just for homicides, correct?

A.    Correct.

Q.    And when you go to search the cold case archive, which includes the archives for all homicides, those are sorted by "H" number?

A.    Correct; yes.  Every homicide that takes place in the city of New Orleans gets a "H" number or homicide number for that year, and that's how we identify the cases.

Q.    Does the "H" number appear on the incident report or the supplemental report for a case?

A.    It doesn't currently.  I don't recall if they did it in the past.  I don't think so.  The only place that it's normally displayed in reference to a case is on the folder that holds the contents of the homicide file.

Q.    Did you search -- let me start over.

What would typically be included in the case file that's kept in the cold case archives?

A.    So it differs from -- I mean, again, so I joined the Police Department in 2001, started in Homicide, 2004, so I can only really tell you for certain, like, what goes in a case file from when I

start working homicides.

It would normally be the initial report that's taken by the patrol officers, like the first responding officers would do an incident report. There would then be a supplemental report or case report that's written by the assigned homicide investigator, and then any other documents that directly relate to the homicide investigation.

There's no set -- like, there's no set things that go into a case file other than the incident report and the case report.

Q.    Would dailies be included in the --

A.    Yes.

Q.    -- file?

A.    Yes.

Q.    Would ballistics reports be included in the file?

A.    Typically, yes.  If there was ballistics that were done, it would be in the case file.

Q.    Would any handwritten notes of the detective or anyone else who worked on the case be included in the case file?

A.    In recent history, yes.  I have come across older cases where there weren't any handwritten notes in case files, but I've seen it

in both instances where there were handwritten notes and where there weren't handwritten notes.

Q.    If the handwritten notes were not in the case files, is there anywhere else they might be?

A.    With the original detective that wrote them possibly, but, as far as the New Orleans Police Department, there's no other place where those would be stored unless they were logged as evidence for some reason, but I don't -- I've never seen that in my time.

Q.    And speaking of evidence, if an item is logged as evidence, is that kept separate from the case file?

A.    Yes.

Q.    Where is that kept?

A.    At the Central Evidence & Property Division for the New Orleans Police Department.

Q.    And did you attempt to obtain any records from the Central Evidence & Property Division related to this case?

A.    We searched the database of -- or at least I searched the database of items that were listed for this item number, and I don't believe that I came across anything, but I didn't physically go down to the Central Evidence &

Property Division and search for it.

Q.    All right.  And you said you searched the database.  What database is that?

A.    It's call -- BEAST is the name of it. It's an acronym.  I'm not sure what it stands for, but it's an active list of all pieces of evidence or property that are currently in the possession of the New Orleans Police Department.

Q.    And does that go back in time to evidence that came into the possession of the New Orleans Police Department from the '70s and '80s?

A.    Typically, yes, but since Hurricane Katrina -- you know, the evidence room was located in the basement of Police Headquarters during Hurricane Katrina, so a lot of evidence was destroyed or floated out of the evidence room.

So, if it's physically in possession of the Police Department, I've seen evidence -- probably the earliest I've seen is maybe '88 or so. I have a case from '88 that did have evidence that survived Katrina, so that was in Central Evidence & Property, so my answer is, yes, if it's there, it would be in BEAST, and I would be able to tell you that it is there.

Q.    And you said you did not physically go

and look in Central Evidence & Property?

A.    No, I can't.  I'm not allowed to.  I'm not assigned to that division.  The Central Evidence & Property Division would have searched for anything in their possession.

Q.    Do you know if they did that in relation to this case?

A.    I don't know for sure.

Q.    Do you know who was the lead detective on this case?

A.    Detective John Dillmann.

Q.    Did you contact Mr. Dillmann to see if he had any records related to this case?

A.    I did not, no.

Q.    Did you review to see whether any of John Dillmann's other files are in the cold case unit archive?

A.    I know for sure that they are, yes.

Q.    How do you know that?

A.    IPNO sent a public records request for me to identify every case file that was led by John Dillmann from 1974 through, I want to say, maybe 1986 or '87, so, for months, I had to go into the archive, dig through each box, and take a picture of the case file that had John Dillmann's name

listed as the lead investigator.

Q.    Oh, I see.    Were any of those filings missing?

A.    There were files that -- well, I don't -- I can't say they were missing.    I don't -- I can only identify the files that were -- that were listed as him as the lead investigator, if that makes sense.    I was just looking for the file that has "John Dillmann" as lead investigator, take a picture of it, and then send it in to public records' request.

We don't have paper records that go back that far that are easily readable to identify what cases were assigned to what detective.

Q.    So if I have this correctly, there would be no way for you to know if there was a case he was assigned to and the file isn't there?

A.    That's correct.

Q.    Did you search any offsite storage facilities?

A.    Did you say "outside storage facilities"?

Q.    I said "offsite," but I think it comes to the same.

A.    No.    I searched the Homicide archive.

That was it.

Q.    All right.  Do you know about any searches anyone else may have conducted in connection with that case?

A.    No, ma'am.

Q.    I'd actually like to take a look at the file, which has been marked as Exhibit 7 --

MS. DAVIS:

But I don't think that you have a hard copy ready, Chris, unfortunately, but, hopefully, folks have that on hand?

MR. GOFORTH:

Which one is Exhibit 7?

MS. DAVIS:

Exhibit 7 is the police file.

MR. GOFORTH:

Okay.

MS. DAVIS:

We did use the OPDA stamped version, but I mean, I want to ask about one of the daily reports from Dillmann.  Let me see if I can find the right one, yeah, I wanted to ask about.

MR. MURELL:

Eleanor, is this the one at 239?

MS. DAVIS:

At CNO OPDA 239?

MR. MURELL:

It's not OPDA; it's 239.

MS. DAVIS:

It's OPDA 266.

Oh, yes.  The exhibit starts at OPDA 239, yeah.

Oh, you do have that.  Thanks, Chris.

BY MS. DAVIS:

Q.    Looking at the first page of the document, do you recognize this document?

A.    I've seen it, yes.

Q.    What is it?

A.    It looks to be a carbon copy version of a daily, what we would consider a homicide daily report.

Q.    All right.  And can you see in the bottom right-hand corner, a string of numbers beginning with OPDA, numbers and letters?

A.    Oh, hold on.  I see it now.  OPDA_Flanks 000266?

Q.    Yes.  Okay.  I just wanted to confirm we're looking at the same documents, and we are?

A.    Okay.

Q.    I'm sorry.  You said this is familiar?

A.    Yes; yes.

Q.    What is it?

A.    This is -- it appears to be a carbon copy of a homicide daily report from 1983.

Q.    All right.  And do you see in the middle, items listed 1 through 6?

A.    Yes.

Q.    And those are -- I suppose there are six different item numbers associated or listed there; is that correct?

A.    Yeah.  One of the item numbers is the actual item number of the homicide that's -- that we're in reference to, so I would say it's five other item numbers.

Q.    That is true, so fair enough.

All right.  Did you conduct a search for any records relating to any of these item numbers other than the one that relates to this murder?

A.    I did not, no.

Q.    Do you know if anyone else did?

A.    I'm not aware.  I didn't have access to those records, so I didn't.  I don't know if anybody else did.

Q.    You say you didn't have access to those

records.  Would they be stored separately because they're not -- weren't homicides?

A.    That's correct.

Q.    Where would those be stored?

A.    With the Record Room.

Q.    Where is the Record Room?

A.    I believe they're currently on the fifth floor of 1615 Poydras.

Q.    Does the cold case archives only include homicide files?

A.    So, to answer your question, yes. Inside that space, there's also some child abuse and sex crimes records, but from a homicide standpoint, the homicide files are in that location.

Q.    When you say, "in that same space," do you mean that the cold case archives --

A.    Yes.

Q.    They're in the same physical space as the cold case archives, but they are not a part of the cold case archives?

A.    That's correct.

MR. GOFORTH:

Wait.  I'm sorry.  I got confused by the question that was being asked.  Can you

repeat it?  I just might have been confusing.
I'm sorry.

MS. DAVIS:

That's all right.  So he had testified
that the -- there were --

BY MS. DAVIS:

Q.     You said sex abuse?

A.     There are child abuse and sex crime
files that are kept in the same building or area of
the building where the homicide archives are
located.

MS. DAVIS:

Yes.  And, Will, what I had asked was
those files are in the same physical
location --

MR. GOFORTH:

Okay.

MS. DAVIS:

-- as the cold case archives, but they
are not a part of the cold case archives.

MR. GOFORTH:

I'm clear now.  Thank you.

BY MS. DAVIS:

Q.     And that's correct, right, just --

A.     That's correct.

Q.    Yes.  Thank you, just for the record.

Going back to Detective Dillmann, you said that it wouldn't be clear from the cold case archives whether any cases that he had worked on were missing; is that correct?

A.    That's correct.

Q.    Do you know if it would have been normal practice for detectives to take files home with them?

A.    It wouldn't be normal -- well, today it would not be normal practice at all.  The files don't leave the Homicide office or where they're stored, current dead cases are stored.

I don't know what the policy would have been back in the '80s.  It doesn't seem like it would be best practices, but this doesn't mean it didn't happen.

Q.    Understood.

Do you know if it would be normal for detectives to keep case -- excuse me.  Let me try again?

Do you know if it would have been normal for detectives to keep case files about homicides they had worked on after they left the department?

MR. GOFORTH:

I'm sorry.  I'm going to object at this point as it's outside the scope of the topics that this witness is here to testify about.

MS. DAVIS:

We can move on.

BY MS. DAVIS:

Q.    Did you conduct any other search for any other documents related to this case that I haven't asked you about yet?

A.    No.  I just searched for the case file.

Q.    Did you speak to anyone who's conducted any other kind of search for this case other than what we've already talked about?

A.    Not that I can recall, no.

Q.    If you were to search for files related to this case generally, is there anywhere else you would look that you haven't mentioned to me yet?

A.    No, ma'am.

Q.    Let me look through my notes.

Who decided where to search for the documents in this case?

A.    I'm trying to make sure I understand your question.

Q.    Please.

A.    Who decided where to search?

Case 2:23-cv-06897-NJB-KWR    Document 64-13    Filed 09/00/25    Page 31 of 36
30(b)(6)    CITY OF N.O. THROUGH RYAN AUCOIN    08/14/2025

Page 31

Q.    Yes, sir.

A.    Me.

Q.    Did anyone else participate in your search?

A.    I don't recall.  I don't think so.

No.  I think whatever I located, I brought back and provided to the City Attorney.

Q.    And I'm sorry.  I know I've already asked some questions about the old case archive and you said they're in boxes sorted by "H" number, correct?

A.    By year and by "H" number, yes.

Q.    By year and by "H" number, all right. So is the box -- is the physical box literally labeled, you know, year, and then "H" number is "X" through "Y"?

What is the labeling system?

A.    Typically, that's how they were done. Some years they didn't label them at all, and we've had to go back and try to rebuild that system.

Q.    Is there some kind of index for the archive?

A.    We're trying to put together a robust one.  There are ways that we can try to locate "H" numbers based -- there's like a card -- we have a

card catalog system that has typed information about a case, and it's kind of broken down by victim's name or by arrested subject's name or by item number.

We have some spreadsheets that go back like to '99 or so that we've worked on, but, outside of that, there's nothing else.

Q.    Going back to the very beginning when you were discussing your other previous depositions, does the name "Kaleigh Smith" ring a bell?

A.    No, it does not.

MS. DAVIS:

All right.  Then that's all I have for you.

THE WITNESS:

Okay.

MR. GOFORTH:

Inga, do you have anything?

MS. PETROVICH:

No.

MR. GOFORTH:

Okay.

BY MR. GOFORTH:

Q.    I just have a couple of questions,

Detective.

We were talking about evidence from the Carnesi murder case that, you know, might be located in Central Evidence & Property, and you said you searched the BEAST system and didn't find anything, right?

A.    That's correct.

Q.    Do you have any reason to think that there might be evidence related to this homicide investigation that's in Evidence & Property physically but is not logged in the BEAST system?

A.    I haven't come across any instances where that's happened, so I wouldn't believe that -- if it was there, it would be cataloged and then put into the BEAST system.

Q.    Okay.  You were asked about offsite storage.  Are you aware of any Homicide records that are stored in offsite storage?

A.    No.  The only files that I know of are the ones at 715 South Broad, which is the archive, and then we have current day records at 1615 Poydras, which is like the -- from 2019 or so to current case files.

Other than that, I don't know of any other place where they would be stored.

MR. GOFORTH:

Okay.  Those are all the questions I have.  Thank you.

Eleanor, do you have any follow-up?

MS. DAVIS:

I do not for once, so...

MR. GOFORTH:

I was, hopefully, just clarifying for you.

I think we can go off the record.

MS. DAVIS:

Yes.

(Deposition adjourned at 3:12 p.m.)

* * * * * *

REPORTER'S PAGE


I, Crystal Ballast, Certified Court Reporter in and for the State of Louisiana, the officer as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434 (B) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the record;

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that ellipses (...) have been used to indicate a trailing off of the speaker's thought; that same is the proper method for a Court Reporter's transcription or proceeding, and that dashes (--) and ellipses (...) do not indicate that words or phrases have been left out of this transcript; that any words and/or names which could not be verified through reference material have been denoted with the phrase "phonetic."

                        CRYSTAL BALLAST, 2012-009
                        CERTIFIED COURT REPORTER
                        REGISTERED PROFESSIONAL REPORTER

REPORTER'S CERTIFICATE

Certification is valid only for a transcript accompanied by my original signature and original required seal or my certified digital signature on this page.

I, Crystal Ballast, Certified Court Reporter in and for the State of Louisiana, and Registered Professional Reporter, as the officer before whom this testimony was taken, do hereby certify that DETECTIVE RYAN AUCOIN, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 34 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter nor is there any such relationship between myself and a party litigant in this matter.  I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.


_____
CRYSTAL BALLAST, 2012-009
CERTIFIED COURT REPORTER
REGISTERED PROFESSIONAL REPORTER