UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

RAYMOND FLANKS,

                                   Plaintiff,

    – against –

THE CITY OF NEW ORLEANS, *et al.*,

                                   Defendants.

No. 23-CV-6897 (NJB) (KWB)

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS CITY OF
NEW ORLEANS AND JOHN DILLMANN'S
STATEMENT OF ALLEGED UNDISPUTED MATERIAL FACTS**

Plaintiff Raymond Flanks, pursuant to Federal Rule of Civil Procedure ("Rule") 56(c) and

Eastern District of Louisiana Local Civil Rule ("Local Rule") 56.2, respectfully submits this

response to Defendants City of New Orleans and John Dillmann's ("Defendants") Statement of

Alleged Undisputed Material Facts (ECF No. 74-2) ("56.1 Statement").

**ALLEGED UNDISPUTED MATERIAL FACT 1**

On December 17, 1983, around 10:00 a.m., Fay Carnesi and her husband, Martin Carnesi, walked

to their vehicle parked in front of their home.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 1**

Admitted.

**ALLEGED UNDISPUTED MATERIAL FACT 2**

As they approached the car, a Black male wearing a shower cap (the "perpetrator") passed by,

demanded money, and fatally shot Mr. Carnesi when Mr. Carnesi reached toward his pocket.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 2**

Admitted.

**ALLEGED UNDISPUTED MATERIAL FACT 3**

The perpetrator then pointed his gun at Mrs. Carnesi and demanded her purse.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 3**

Admitted.

**ALLEGED UNDISPUTED MATERIAL FACT 4**

Mrs. Carnesi threw her purse before fleeing towards the middle of the street.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 4**

Admitted.

**ALLEGED UNDISPUTED MATERIAL FACT 5**

The perpetrator left in a light blue car.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 5**

Admitted.

**ALLEGED UNDISPUTED MATERIAL FACT 6**

Mrs. Carnesi described the perpetrator as a black man in his "late twenties, about 5'10" and 150 pounds, with a medium build, brown skin, and a light mustache."

**RESPONSE ALLEGED UNDISPUTED MATERIAL FACT 6**

Rule 56(c)(2) and (e) Objections.  Defendants fail to support this alleged undisputed material fact. Defendants include language in quotation marks, but neither of the sources to which they cite contains such a quote.  Defendants also cite to two, conflicting versions of the eyewitness's description of the perpetrator, and this alleged undisputed fact matches neither of them.  *See* Rule 56(c)(1)(B).

2

**ALLEGED UNDISPUTED MATERIAL FACT 7**

New Orleans Police Department ("NOPD") Officers Albert Spiess and Leon Frisard, who were assigned to the 7th District arrived at the scene at 10:07 a.m., and upon arrival observed Mr. Carnesi lying on the ground next to a parked car.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 7**

Rule 56(c)(2) Objection. Defendants fail to support this alleged undisputed material fact with admissible evidence. Defendants rely on the 1985 trial testimony of Albert Spiess and cite to pages "10-11" of a *nine*-page document (ECF No. 74-6) to support this alleged fact. First, Mr. Spiess's testimony is inadmissible hearsay and Defendants identify no applicable hearsay exception. Hearsay is inadmissible for purposes of a Rule 56 motion. *See, e.g.*, *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006). Defendants make no showing that Mr. Spiess is unavailable such that his prior testimony could be admissible under Federal Rule of Evidence 804(b)(1). Second, Defendants' reliance on non-existent pages of a police report, which also appears to be inadmissible hearsay, is also misplaced.

**ALLEGED UNDISPUTED MATERIAL FACT 8**

Officer Spiess and Officer Frisard, the first officers on the scene, checked Mr. Carnesi and found that he had been shot in the chest and the officers could not retrieve any vital signs.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 8a**

Plaintiff repeats and incorporates by reference his Response to Alleged Undisputed Material Fact 7, above.

**ALLEGED UNDISPUTED MATERIAL FACT 9**

NOPD Homicide Detective John Dillmann arrived on the scene and began his investigation at 10:45 a.m.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 9**

Rule 56(c)(2) and (e) Objections.  Defendants fail to support this alleged undisputed material fact.

Defendants cite to two sources to support this alleged undisputed facts, but those sources say

conflicting things.  One says Defendant Dillmann arrived at 10:15 a.m. (ECF No. 74-4 at 18) and

the other says he arrived at 10:45 a.m. (ECF No. 74-6 at 8).  The latter source is also inadmissible

hearsay, consisting of a police report for which no foundation as a record of regularly conducted

activity under Federal Rule of Evidence 803(6) has been established.  *See* Rule 56(c)(1)(B).

**ALLEGED UNDISPUTED MATERIAL FACT 10**

Detective Dillmann observed a spent 25 caliber casing on the ground next to Mr. Carnesi in the

street.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 10**

Rule 56(c)(2) and (e) Objections.  Defendants fail to support this alleged undisputed material fact

and rely on inadmissible evidence.  The testimony cited (ECF No.  74-4 at 18) says nothing about

a shell casing.  The police report cited (ECF No. 74-6 at 8) is hearsay, its author is unclear, and the

statement about what Defendant Dillmann allegedly "observed" is hearsay within hearsay.

Hearsay is inadmissible for purposes of a Rule 56 motion.  *See, e.g.*, *Warfield*, 436 F.3d at 559;

*see also* Rule 56(c)(1)(B).

**ALLEGED UNDISPUTED MATERIAL FACT 11**

After completing his scene investigation, Detective Dillmann then coordinated with the Crime Lab

and waited for the Coroner to arrive.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 11**

Rule 56(e) Objection.  Defendants fail to support this alleged undisputed material fact.  Defendants

cite to Defendant Dillmann's 1985 trial testimony (ECF No. 74-4 at 19), but that testimony did not

purport to describe what Defendant Dillmann did *after* his scene investigation; rather, it described the scene investigation itself. *See* Rule 56(c)(1)(B).

**ALLEGED UNDISPUTED MATERIAL FACT 12**

At approximately 10:58 am, Crime Lab Technician James Ducos arrived on the scene and confiscated all physical evidence, measured the entire crime scene, and drew a detailed sketch of the scene.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 12**

Rule 56(c)(2) Objection. Defendants rely on inadmissible hearsay in the form of a police report (ECF No. 74-7 at 3) for which no foundation as a record of regularly conducted activity under Federal Rule of Evidence 803(6) has been established.

**ALLEGED UNDISPUTED MATERIAL FACT 13**

After meeting with NOPD Detective Mike Lentz, Detective Dillmann associated the murder of Martin Carnesi as potentially committed by the same person responsible for a series of recent armed robberies targeting elderly victims in the same area.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 13**

Rule 56(c)(2) Objection. Defendants rely on inadmissible hearsay in the form of a police report (ECF No. 74-7) for which no foundation as a record of regularly conducted activity under Federal Rule of Evidence 803(6) has been established.

**ALLEGED UNDISPUTED MATERIAL FACT 14**

On December 23, 1983, Flanks was arrested while fleeing from an armed robbery of the A&P Food Store.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 14**

Admitted.

**ALLEGED UNDISPUTED MATERIAL FACT 15**

On December 23, 1983, Detective John Dillmann was contacted by Detective Richard Marino regarding a robbery that occurred that morning at the A&P Food Store, located at 6600 Morrison Road.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 15**

Rule 56(c)(2) Objection. Defendants rely on inadmissible hearsay in the form of a police report (ECF No. 74-7) for which no foundation as a record of regularly conducted activity under Federal Rule of Evidence 803(6) has been established.

**ALLEGED UNDISPUTED MATERIAL FACT 16**

At the time, he was driving a light blue 1982 Chevrolet Citation.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 16**

Admitted that Mr. Flanks drove a light blue 1982 Chevrolet Citation on December 23, 1983.

**ALLEGED UNDISPUTED MATERIAL FACT 17**

When Flanks was arrested, he was in possession of a 25-caliber chrome plated automatic pistol.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 17**

Admitted.

**ALLEGED UNDISPUTED MATERIAL FACT 18**

Detective Dillmann learned of Flanks' arrest on December 23, 1983; on the same day, he requested that NOPD Crime Lab Technician Otho Stubbs conduct ballistics testing to determine whether the gun in Flanks' possession fired the bullet that killed Martin Carnesi.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 18**

Rule 56(c)(2) Objection.  Defendants rely on inadmissible hearsay in the form of a police report (ECF No. 74-7) for which no foundation as a record of regularly conducted activity under Federal Rule of Evidence 803(6) has been established.

**ALLEGED UNDISPUTED MATERIAL FACT 19**

Detective Dillmann also requested copies of the booking photographs ("mug shots") of Flanks from when he was booked on the morning of December 23, 1983.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 19**

Rule 56(c)(2) Objection.  Defendants rely on inadmissible hearsay in the form of a police report (ECF No. 74-7) for which no foundation as a record of regularly conducted activity under Federal Rule of Evidence 803(6) has been established.

**ALLEGED UNDISPUTED MATERIAL FACT 20**

On December 23, 1983, Technician Stubbs verbally told Detective Dillmann that the pellet recovered from the body of Mr. Carnesi was fired from the 25-caliber automatic pistol in Flanks' possession at the time of his arrest.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 20**

Rule 56(c)(2) Objection.  Defendants rely on inadmissible hearsay in the form of a police report (ECF No. 74-7) for which no foundation as a record of regularly conducted activity under Federal Rule of Evidence 803(6) has been established.

**ALLEGED UNDISPUTED MATERIAL FACT 21**

On December 23, 1983, Detective Dillmann prepared a photographic "lineup" consisting of six sets of photographs of similar-looking individuals, including Raymond Flanks, and showed the photographs to Mrs. Carnesi at her residence.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 21**

Rule 56(c)(2) Objection.  Defendants rely on inadmissible hearsay in the form of Defendant Dillmann's 1985 testimony at Mr. Flanks's criminal trial.  For Defendants' purposes, that testimony is inadmissible hearsay.  We do not address whether testimony from a separate legal proceeding is properly cited to under Rule 56(c)(1)(A), because even assuming that it is, Defendants cannot rely on it, due to their failure to disclose crucial evidence about the identification procedure, which deprived Mr. Flanks of a "meaningful opportunity to cross-examine." *See, e.g.*, *Magouirk v. Warden*, 237 F.3d 549, 554 (5th Cir. 2001).  In addition, this alleged fact is disputed.  Faye Carnesi's grand jury testimony contradicts Defendant Dillmann's version of events.  *See* Ex. 2, Grand Jury Tr. at 4–5.

**ALLEGED UNDISPUTED MATERIAL FACT 21**

When showing the photographs, neither Detective John Dillmann nor the other police officers did or said anything to indicate that Fay Carnesi should pick a particular photograph or to suggest whether any of the photographs were of a person the police suspected of killing Martin Carnesi.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 22**

Disputed.  Contrary to the declaration that defense counsel wrote and gave Ms. Gonzales to sign, *see* Ex. 51, Gonzales Dep. Tr. at 102, Ms. Gonzales testified at her deposition that: (1) she did not recall what was said during the identification procedure ("I don't remember any details of that"); (2) Faye Carnesi "might have" made the comment she described in her grand jury testimony about the white blotch on the perpetrator's face, (3) she did not recall what Defendant Dillmann said to Faye Carnesi; (4) she did not remember whether the detectives looked at one another or whether one shook his head; and (5) she did not remember anything about Faye Carnesi's testimony at Mr. Flanks's first trial in 1984 or her testimony at his second trial in 1985.  *Id.* at 56–58, 62–64, 75–

8

77.  In addition, Ms. Gonzales testified that she did not remember anything about her conversation and meeting with the Orleans Parish District Attorney's Office in 2022, *id.* at 83–86, but also testified, implausibly, that the District Attorney's Office did not tell her *any* reason for their decision to ask the court to vacate Mr. Flanks's conviction during a meeting that lasted "maybe an hour."  *Id.* at 86–89.  Ms. Gonzales also testified that she did not recall anything about her conversations with defense counsel in 2025, shortly before her deposition.  *Id.* at 92–96.  Further, Ms. Gonzales's declaration is contradicted by the grand jury testimony of Faye Carnesi, which is admissible as prior testimony of a now-unavailable witness whom the opposing parties had a meaningful opportunity to cross-examine.  Fed. R. Evid. 804(b)(1).  *See* Ex. 2, Grand Jury Tr. at 4–5.

**ALLEGED UNDISPUTED MATERIAL FACT 23**

Mrs. Carnesi quickly excluded four of the six photographs, examined the final two carefully with a magnifying glass, and then selected Flanks as the man who killed her husband.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 23**

Disputed.  Defendants rely exclusively on the self-serving testimony of Defendant Dillmann to support this alleged undisputed fact.  What happened during the identification procedure is one of the central factual disputes in this case, and Defendants are training Rule 56 to its limit by contending that their version of the facts is undisputed.  Evidence that contradicts Defendants' version of events includes Faye Carnesi's grand jury testimony.  *See* Ex. 2, Grand Jury Tr. at 4–5.

**ALLEGED UNDISPUTED MATERIAL FACT 24**

Mrs. Carnesi was positive that the photograph she selected depicted the person who shot Martin Carnesi.

9

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 24**

Plaintiff repeats and incorporates by reference his Response to Alleged Undisputed Material Fact 23, above.

**ALLEGED UNDISPUTED MATERIAL FACT 25**

In addition, Mrs. Carnesi stated that she would never forget Flanks' face.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 25**

Plaintiff repeats and incorporates by reference his Response to Alleged Undisputed Material Fact 23, above.

**ALLEGED UNDISPUTED MATERIAL FACT 26**

Following the positive identification by Mrs. Carnesi, Flanks was booked for the armed robbery and murder of Mr. Carnesi on December 23, 1983.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 26**

Admitted.

**ALLEGED UNDISPUTED MATERIAL FACT 27**

After Flanks was booked for the murder of Mr. Carnesi, NOPD provided the complete investigative file for the case to the OPDA Office.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 27**

Rule 56(c)(2) and (e) Objections. The cited deposition testimony (ECF No. 74-12 at 10, 15) does not support the allegation that "NOPD provided the complete investigative file" to the District Attorney's Office. Nor does Defendants' citation to the documents from the file themselves (ECF No. 74-13), which do not reflect any delivery to the District Attorney's Office, support Defendants' allegation.

10

**ALLEGED UNDISPUTED MATERIAL FACT 28**

On December 27,1983, Technician Stubbs produced a written report reflecting the results of his ballistics examination.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 28**

Admitted that Otto Stubbs's report is dated December 27, 1983, and otherwise disputed. The report is a fabrication and it has been proven false by subsequent testing by the United States Bureau of Alcohol, Tobacco, and Firearms. *See* Ex. 17, ATF Report.

**ALLEGED UNDISPUTED MATERIAL FACT 29**

Beginning on May 14, 1985, Raymond Flanks was tried in Orleans Parish Criminal District Court for the murder of Martin Carnesi.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 29**

Admitted.

**ALLEGED UNDISPUTED MATERIAL FACT 30**

At trial, Doctor Monroe Samuels, the Pathology Physician, testified that Mr. Carnesi sustained a gunshot wound to the left side of his chest, which caused his death.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 30**

Admitted.

**ALLEGED UNDISPUTED MATERIAL FACT 31**

Prosecutors introduced the autopsy report along with two photographs of Mr. Carnesi's body at the crime scene.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 31**

Admitted.

11

**ALLEGED UNDISPUTED MATERIAL FACT 32**

At trial, the State called Officer Albert Speiss, Detective John Dillman, Fay Carnesi, Officer Claude Flot, and Johnnie Thomas to testify.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 32**

Admitted.  The State additionally called Dr. Monroe Samuals to testify.  Ex. 1, Trial Tr. at OPDA-FLANKS000538 (witness index).

**ALLEGED UNDISPUTED MATERIAL FACT 33**

At trial, the photographs that were used in the December 23, 1983 photographic identification procedure were shown to both Detective Dillmann and Mrs. Carnesi, then introduced into evidence as State's exhibit 5.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 33**

Admitted.

**ALLEGED UNDISPUTED MATERIAL FACT 34**

At trial, two photographs of the automobile in Flanks' possession at the time of his arrest were introduced as exhibits.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 34**

Admitted.

**ALLEGED UNDISPUTED MATERIAL FACT 35**

The Defense called one witness, Ralph Flank, who is Raymond Flanks' brother, to provide an alibi for Raymond Flanks' whereabouts at the time of the murder.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 35**

Admitted.

**ALLEGED UNDISPUTED MATERIAL FACT 36**

At the conclusion of his criminal trial on May 15, 1985, Flanks was convicted of first- degree murder and sentenced to life imprisonment without parole.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 36**

Admitted.

**ALLEGED UNDISPUTED MATERIAL FACT 37**

There is no evidence that Detective Dillman withheld any evidence regarding the murder of Martin Carnesi from OPDA.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 37**

Disputed.  At a minimum, it is disputed whether Defendant Dillmann disclosed to the District Attorney's Office how he conducted the identification procedure with Faye Carnesi.  *See* Ex. 2, Grand Jury Tr. at 4–5.

**ALLEGED UNDISPUTED MATERIAL FACT 38**

The OPDA's file concerning the prosecution of Raymond Flanks for the murder of Martin Carnesi contains all of the records that were contained in the NOPD's file regarding its investigation into the murder of Martin Carnesi.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 38**

Rule 56(e) Objection.  The cited materials do not support this alleged undisputed fact.  Defendants cite generally to an exhibit that no witness has authenticated or identified as "the complete NOPD case file," and to the entire deposition of one of the NOPD's Rule 30(b)(6) witnesses, with no specific page(s) identified.  The lack of particularity violates Rule 56(c)(1)(A), which requires a party to cite to "*particular* parts of materials in the record" (emphasis added).  Neither the Court nor Plaintiff is required to comb through the entire deposition transcript to attempt to identify what

portion thereof supports Defendants' factual assertion.  Nor does Plaintiff believe there is any competent testimony in the deposition transcript to support the assertion.  *See* Rule 56(c)(1)(B).

**ALLEGED UNDISPUTED MATERIAL FACT 39**

There is no evidence that the NOPD, or the City of New Orleans more generally, had an official policy or practice of withholding *Brady* material from prosecutors in December of 1983.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 39**

Disputed.  Evidence that NOPD had an official policy or practice of withholding *Brady* material from prosecutors in December of 1983 includes evidence indicating that: (1) NOPD did not provide formal training regarding police officers' obligations under the Fourteenth Amendment to the United States Constitution to provide information favorable to criminal defendants, Ex. 5, Pl.'s First Set of RFAs to the City of New Orleans ("City RFAs"), RFA 3;[1] Ex. 34, Dillmann Dep. Tr. 29:3–30:1; 37:6–13; 169:9–173:14; (2) NOPD did not have any written policies regarding police officers' obligations under the Fourteenth Amendment to the United States Constitution to provide information favorable to criminal defendants, Ex. 5, City RFAs, RFA 4; (3) detectives at NOPD did not necessarily include all exculpatory information in reports, *see* Ex. 34, Dillmann Dep. Tr. 61:13–63:23; 174:11–19; 175:25–176:6; and (4) detectives at NOPD did not regularly provide handwritten notes or daily information reports to OPDA, *see* Ex. 41, City 30(b)(6) (Barnes) Dep. Tr. 47:14–23 (documents provided to OPDA were the incident report, with attachments, and forensic reports); Ex. 7, Whittaker Aff. ¶ 8 (he does not recall ever seeing handwritten notes of a police officer while working as a prosecutor).

---

1.  Neither Dillmann nor the City responded to Plaintiff's First Set of Requests for Admission.  Accordingly, they have admitted to all matters contained therein.  *See* Fed. R. Civ. P. 36(a)(3) ("A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney.").

**ALLEGED UNDISPUTED MATERIAL FACT 40**

There is no evidence that the NOPD, or the City of New Orleans more generally, had an official policy or practice of using suggestive photographic identification procedures to obtain witness identifications of suspected criminals.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 40**

Disputed. First, this is a legal conclusion, not a statement of fact. Evidence of an unconstitutional policy or practice includes the Expert Report of William Brooks (Ex. 39) and the materials cited therein.

**ALLEGED UNDISPUTED MATERIAL FACT 41**

There is no evidence that the NOPD failed to train, supervise, or discipline Detective Dillmann in a manner that it knew was likely to result in the use of a suggestive photographic identification procedure or the deliberate concealment of *Brady* material from prosecutors.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 41**

Disputed. First, this is a legal conclusion, not a statement of fact. Evidence of NOPD's failure to train, supervise, and discipline Defendant Dillmann includes Defendant Dillmann's deposition testimony, *see* Ex. 34, Dillmann Dep. Tr. at 29:3–30:1, 37:6–13, 169:9–173:14, and the Expert Report of William Brooks (Ex. 39) and the materials cited therein.

**PLAINTIFF'S ADDITIONAL STATEMENT OF UNCONTESTED FACTS**

1.      New Orleans is "the most incarcerated city in the world and the city with the highest number of exonerations." *Deliver Justice*, OPDA, https://orleansda.com/our-work/deliver-justice/ (last visited Oct. 21, 2025).

2.      New Orleans is an outlier in past defective convictions.

3.      Predecessors to Jason Williams in the Orleans Parish District Attorney's Office have contributed to the public's lack of trust in the Orleans Parish District Attorney's Office.

4.      Before Jason Williams became District Attorney, Orleans Parish had the highest per capita wrongful conviction rate in the world and the highest exoneration rate, meaning an innocent person was sitting in jail when the convicted person was left out in the community.

5.      On December 17, 1983, Faye Carnesi was walking to her car, which was parked in front of her house, when she saw a Black man wearing a shower cap (the "Perpetrator") walk past her. *See* Ex. 1, Trial Tr. 39:31–40:30.

6.      Mrs. Carnesi's husband, Martin Carnesi, walked out behind her to see her off. Ex. 1, Trial Tr. 39:7–16, 40:2–3.

7.      The Perpetrator stood between Mrs. Carnesi and her husband and demanded money. Ex. 1, Trial Tr. 40:6–8.

8.      Mr. Carnesi put his hand in his pocket and the Perpetrator pulled out a gun and shot him. Ex. 1, Trial Tr. 40:13–27.

9.      The Perpetrator then pointed a gun at Mrs. Carnesi and demanded her purse. She threw her purse at him and ran away. Ex. 1, Trial Tr. 41:31–42:1.

10.      Mrs. Carnesi then saw a light blue car speed off.  Ex. 1, Trial Tr. 42:1–5.

11.      At the time of the murder, Mr. Flanks was at home with his brother, Ralph Flanks. Ex. 1, Trial Tr. 91:25–92:12; Ex. 33, Raymond Flanks Dep. Tr. 116:7–8.

12.      Raymond Flanks had nothing to do with the murder. Ex. 33, Raymond Flanks Dep. Tr. 112:16–21.

13.      Mrs. Carnesi initially described the Perpetrator as a Black man in his late twenties, about 5'10" and 150 pounds, with a medium build, brown skin, and a mustache. Ex. 8, Dillmann Handwritten Notes, at OPDA-FLANKS000285.

14.     Mrs. Carnesi also noted that the Perpetrator was wearing "a white plastic shower cap on his head," which, as she said at trial, she noticed because she "ha[d] never seen anyone with a showercap [sic] on their head before," Ex. 1, Trial Tr. 40:26–30; *see also* Ex. 8, Dillmann Handwritten Notes, at OPDA-FLANKS000285.

15.     Mrs. Carnesi also told Detective John Dillmann, the lead investigator on the case, that she remembered that the perpetrator had "a white blotch" on his head and was driving an "older" car.  Ex. 34, Dillmann Dep. Tr. 220:15–17, 223:22–224:2.

16.     When Mrs. Carnesi appeared before the grand jury approximately four weeks after the crime, she similarly testified that the "one thing" she remembered about the Perpetrator was that he "had a little white blotch on the side of his cheek, a little white mark, like discolored looking" and that the car she saw speed away after the crime was "not a shiny car[,] [i]t was an old car."  Ex. 2, Grand Jury Tr. at OPDA-FLANKS000027-28.

17.     The NOPD immediately associated this crime with a series of similar armed robberies that had occurred in the same area.  *See* Ex. 10, Carnesi Suppl. Report, at OPDA-FLANKS000241.

18.     The assailant described by the victims of these crimes was largely consistent with Mrs. Carnesi's initial description of the Perpetrator: a Black man in his twenties, 5'8" to 5'11" tall, with a medium build and brown skin, with a mustache, and wearing a shower or "hospital type" cap in a variety of colors.  Ex. 10, Carnesi Suppl. Report, at OPDA-FLANKS000241–42; Ex. 11, Randazzo Incident Report; Ex. 12, Valentino Incident Report; Ex. 13, Soule Incident Report.

19.     He was also described as driving an "old, light blue or gray vehicle."  *See* Ex. 10, Carnesi Suppl. Report, at OPDA-FLANKS000242.

20.    As of December 19, 1983, two days after Mr. Carnesi's murder, the police had identified similar robberies on November 29, 1983; December 3, 1983; December 8, 1983; December 12, 1983; and December 18, 1983.  *See* Ex. 10, Carnesi Suppl. Report, at OPDA-FLANKS000242.

21.    One victim also described the perpetrator as being in his thirties, as having a "heavy" build, and as weighing approximately 200 pounds.  *See* Ex. 12, Valentino Incident Report, at OPDA-FLANKS000370.

22.    Mr. Flanks became a suspect in Mr. Carnesi's murder after he was arrested while fleeing from an unrelated armed robbery of an A&P Food Store on December 23, 1983.  *See* Ex. 14, A&P Food Store Incident Report; see also Ex. 10, Carnesi Suppl. Report at OPDA-FLANKS000242.

23.    Mr. Flanks was not described as wearing a shower cap.  *See* Ex. 14, A&P Food Store Incident Report.

24.    Mr. Flanks was not arrested with a shower cap (or any other hat).  *See* Ex. 4, Pl.'s First Set of Requests for Admission to Dillmann ("Dillmann RFAs"), RFA 1; Ex. 5, Pl.'s First Set of RFAs to the City of New Orleans ("City RFAs"), RFA 1;[2] Ex. 6, OPDA's Responses & Objections to Pl.'s First Set of RFAs ("OPDA RFA Responses"), Response to RFA 1; Ex. 15, NOPD Property Card & Continuation Card.

25.    Mr. Flanks did not have a "Jheri curl" hairstyle in December of 1983.  *See* Ex. 44, Photos of Raymond Flanks.

---

2.   Neither Dillmann nor the City responded to Plaintiff's First Set of Requests for Admission.  Accordingly, they have admitted to all matters contained therein.  *See* Fed. R. Civ. P. 36(a)(3) ("A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney.").

26.     There is no evidence that Mr. Flanks ever wore a "Jheri curl" hairstyle or a shower cap.

27.     NOPD paperwork indicates that Otho Stubbs claimed he forensically matched Ralph Flanks's gun to the gun used for Mr. Carnesi's murder that same day.  *See* Ex. 10, Carnesi Suppl. Report at OPDA-FLANKS000243.

28.     Otho Stubbs issued his final report claiming to have matched Ralph Flanks's gun to the shell casing recovered from the murder scene on December 26, 1983.  Ex. 16, Stubbs Report.

29.     Otho Stubbs did not forensically test the shell casing that was recovered from the crime scene.  Ex. 16, Stubbs Report.

30.     In 1985, the United States Bureau of Alcohol Tobacco and Firearms conducted an examination and testing, at the request of the New Orleans Police Department and Orleans Parish District Attorney's Office, to determine whether the bullet recovered from Mr. Carnesi's body and/or the shell casing collected from the crime scene could have been fired from the gun recovered at the time of Mr. Flanks's arrest.  *See* Ex. 4, Dillmann RFAs, RFA 2; Ex. 5, City RFAs, RFA 6; Ex. 45, Letters Requesting ATF Testing. *Cf.* Ex. 45, OPDA RFA Responses, Response to RFA 2 (admitting that, "at the request of Mr. Flanks's counsel and pursuant to the order of the Court, NOPD and OPDA sent the gun recovered from Mr. Flanks at the time of his arrest, ammunition found in that gun, the bullet recovered from Mr. Carnesi's body, and the shell casing collected from the crime scene to the [ATF] for comparison").

31.     The ATF's official report, dated February 13, 1985, stated that the result of the testing was that neither the bullet nor the shell casing could have been fired from the gun recovered at the time of Mr. Flanks's arrest.  *See* Ex. 8, Dillmann RFAs, RFA 3; Ex. 5, City RFAs, RFA 7; Ex. 17, ATF Report.  *Cf.* Ex. 6, OPDA RFA Responses, Response to RFA 3 (admitting that "the

ATF's official report, dated February 13, 1985, stated that '[t]he test-fired bullets and shells were compared macroscopically with the evidence bullet (item 2) and the discharged shell (item 3) with negative results,' and that 'it is the opinion of this writer that neither the bullet (item 2) nor the discharged shell (item 3) were fired in the firearm submitted for examination (item 1).'").

32.    On the day of his arrest, Mr. Flanks was driving a 1982 light blue Chevrolet Citation. *See* Ex. 14, A&P Food Store Incident Report at OPDA-FLANKS000253.

33.    About a week after Mr. Carnesi's murder, NOPD detectives—including Defendant John Dillmann—visited Mrs. Carnesi at her home and showed her a photo array with photos of either five or six individuals, including Mr. Flanks. *See* Ex. 10, Carnesi Suppl. Report at OPDA-FLANKS000243; Ex. 2, Grand Jury Tr. at 4.

34.    Mrs. Carnesi testified about this identification procedure at the grand jury. She testified that she narrowed the lineup down to two photos—Mr. Flanks and one other—and then asked her daughter to bring her a flashlight to "make sure that it's him if it's here." Ex. 2, Grand Jury Tr. at 4–5.

35.    Notably, two of the "fillers" lacked mustaches, despite that being part of the witness's description of the Actual Perpetrator. Ex. 42, 1984 Suppression Hr'g Tr. 21–22.

36.    Mrs. Carnesi told the detectives that the "one thing" she remembered about the Perpetrator was the "little white blotch on the side of his cheek, a little white mark, like discolored looking." Ex. 2, Grand Jury Tr. at 5. In response, Defendant Dillmann "shook his head and said, 'that's him,'" indicating the photo of Mr. Flanks. *Id.*; *see also* Ex. 1, Trial Tr. 27 (Dillmann only detective who spoke to Mrs. Carnesi during the identification procedure); Ex. 35, Lentz Dep. Tr. 53:4–24 (same).

37. Mr. Flanks first went to trial on August 28, 1984. *See* Ex. 18, 1984 Trial Minute Entries.

38. At trial, the State produced testimony from NOPD Technician Otho Stubbs regarding the ballistics evidence. *See* Ex. 18, 1984 Trial Minute Entries at FLANKS_003149.

39. At the 1984 trial, Mr. Flanks's brother Ralph Flanks testified that Mr. Flanks was home with him at the time of the murder. *See* Ex. 18, 1984 Trial Minute Entries at FLANKS_003149; Ex. 19, Tr. of 1984 Testimony of Ralph Flanks.

40. After two and a half hours of deliberations, the jury at Mr. Flanks's 1984 trial could not reach a verdict and the court declared a mistrial. Ex. 18, 1984 Trial Minute Entries at FLANKS_003150.

41. Mr. Flanks's second trial began on May 14, 1985. Ex. 1, Trial Tr. at OPDA-FLANKS000537.

42. There is no evidence that the State produced the ATF Report to Mr. Flanks or his attorney.

43. There is no evidence that the State produced Mrs. Carnesi's grand jury testimony to Mr. Flanks or his attorney.

44. There is no evidence that the State produced Dillmann's handwritten notes to Mr. Flanks or his attorney.

45. There is no evidence that the State produced any NOPD daily reports to Mr. Flanks or his attorney.

46. There is no evidence that the State produced the ATF report to Mr. Flanks or his attorney.

47. The state did not introduce ballistics evidence at Mr. Flanks's trial, nor did Otho Stubbs testify. *See* Ex. 1, Trial Tr.

48. While preparing for trial, Mr. Flanks and his counsel were not given or made aware of the NOPD records showing inconsistencies between Mrs. Carnesi's initial description of the Perpetrator and Mr. Flanks's appearance, the NOPD records showing a string of similar crimes with a consistently described perpetrator, or Mrs. Carnesi's grand jury testimony regarding the photo array and her initial identification of Mr. Flanks. *See* Ex. 7, Whittaker Aff. ¶¶ 4, 7; Ex. 6, OPDA RFA Responses, Responses to RFAs 4–6; Ex. 5, City RFAs, RFA 1–2; Ex. 20, Joint Agreement & Motion to Vacate at 1, 5; Ex. 21, Vacatur Hr'g Tr. at 7–10.

49. In May of 2022, the Innocence Project of New Orleans ("IPNO") contacted the Civil Rights Division of OPDA about Mr. Flanks's case, and OPDA began its own review and investigation. Ex. 20, Joint Agreement & Motion to Vacate at 9.

50. At the conclusion of those investigations, on November 14, 2022, OPDA and Mr. Flanks's IPNO attorneys filed a Joint Agreement and Motion to Vacate his conviction. *See* Ex. 20, Joint Agreement & Motion to Vacate.

51. A hearing on the motion to vacate was held on November 17, 2022. *See* Ex. 21, Vacatur Hr'g Tr.

52. At the hearing on the motion to vacate, OPDA stated that "Mr. Flank's [sic] conviction was obtained in violation of *Brady v. Maryland*" because "the State failed to disclose . . . materials [that] are favorable, and under the circumstances of the State's case against Mr. Flank[s], material." *See* Ex. 21, Vacatur Hr'g Tr. at 10.

53. OPDA acknowledged that "there is a reasonable likelihood that had [Mrs. Carnesi's] prior testimony been disclosed, it could have affected the judgment of the jury" and

22

"defense counsel would have been able to present a compelling case that Mrs. Carnesi was innocently mistaken when presented with the wrong suspect, that Mr. Flank[s] did not resemble the perpetrator, and that the car he was arrested in did not fit the one at the crime scene." *See* Ex. 21, Vacatur Hr'g Tr. at 9.

54.    OPDA explicitly agreed that the State's conduct violated Mr. Flanks's constitutional right to due process and that Mr. Flanks "didn't receive a fair trial." *See* Ex. 21, Vacatur Hr'g Tr. at 10.

55.    Judge Rhonda Goode-Douglas of the Orleans Parish Criminal Court also acknowledged "that Mr. Flank[s] did not receive the justice that he deserved" at trial and vacated his conviction. *See* Ex. 21, Vacatur Hr'g Tr. at 23–24.

56.    OPDA concluded that Mr. Flanks was "wrongfully convicted" due to the "non-disclosure of favorable evidence," including "testimony that exculpates Mr. Flank[s]" and "other evidence of [his] innocence. *See* Ex. 20, Joint Motion and Agreement to Vacate, at 1.

57.    OPDA conceded that the suppression of favorable evidence violated Mr. Flanks's due process rights. *See* Ex. 20, Joint Agreement and Mot. to Vacate at 10.

58.    From 1983 to 1985, NOPD did not provide formal training regarding police officers' obligations under the Fourteenth Amendment to the United States Constitution to provide information favorable to criminal defendants. Ex. 5, City RFAs, RFA 3; Ex. 34, Dillmann Dep. Tr. 29:3–30:1, 37:6–13, 169:9–173:14.

59.    From 1983 to 1985, NOPD did not have any written policies regarding police officers' obligations under the Fourteenth Amendment to the United States Constitution to provide information favorable to criminal defendants. Ex. 5, City RFAs, RFA 4.

23

60.     OPDA did not have a written policy manual until 1987.  Ex. 6, OPDA RFA Responses, Response to RFA 7.

61.     From 1983 to 1985, OPDA did not have any written policies regarding compliance with prosecutors' duty under the Fourteenth Amendment of the United States Constitution to provide information favorable to criminal defendants.  Ex. 6, OPDA RFA Responses, Response to RFA 8.

62.     From 1983 to 1985, OPDA did not have any written policies regarding the transcription or disclosure of grand jury testimony to trial prosecutors or criminal defendants.  Ex. 6, OPDA RFA Responses, Response to RFA 9.

63.     From 1976 to 1990 (the "Relevant Time") OPDA maintained a custom and practice of encouraging due process violations that was so pervasive as to constitute an official municipal policy.  *See, e.g.*, *see* Ex. 3, Levenson Report at 36–41 & Exs. 1, 2, & 3 (listing dozens of cases involving *Brady* violations throughout Mr. Connick's tenure, including before, during, and immediately after Mr. Flanks's wrongful conviction); Ex. 37, Williams Dep. Tr. at 97 (prosecutors said "things like" "it's not *Brady* if I don't know about it" "all the time").

64.     During the Relevant Time, the caseload of the office meant that "[i]t was impossible" for ADAs to have sufficient familiarity with their own files to ensure *Brady* was followed in every case.  *See* Ex. 26, Connick Deposition in *Adams v. City of New Orleans* at 14–16.

65.     During the Relevant Time, it was not "the regular practice of the ADAs to seek out information from the [NOPD] that was not provided to them." Ex. 26, Connick Dep. Tr. in *Adams v. City of New Orleans* at 72:8–15; 73:14–25.

66.    During the Relevant Time, OPDA directed its prosecutors to rely on Louisiana law to guide their understanding of their disclosure obligations. *See* Ex. 32, Williams Dep. Tr. in *Thompson v. Connick*, 97:23–98:2, 108:20–21, 170:22–25 (testifying that he relied upon the Louisiana Code of Criminal Procedure for his understanding of *Brady*, which did not include an obligation to disclose all favorable evidence).

67.    During the Relevant Time, OPDA did not track *Brady* violations, but did track conviction rates, *see, e.g.*, Ex. 50, Connick Dep. Tr. in *Jones v. Cannizzaro* at 65–66, 90–91 (OPDA didn't track *Brady* violations), 97:8–98:4 (OPDA did not have a policy requiring prosecutors to report *Brady* violations in either their cases or in other prosecutors' cases), 139–43 (Connick tracked individual prosecutors' conviction rates, believed that a high conviction rate showed that someone was a "good prosecutor," and considered conviction rates in making decisions about raises and promotions).

68.    During the Relevant Time, there was no policy governing information sharing regarding *Brady* material among prosecutors working on the same or related cases, *see, e.g.*, Ex. 50, Connick Dep. Tr. in *Jones v. Cannizzaro*, at 40:19–24 (Connick "d[i]dn't know th[e] mechanics engaged by prosecutors" regarding the sharing of *Brady* material between prosecutors working on cases against the same defendant).

69.    During the Relevant Time, there was a pervasive lack of knowledge regarding *Brady* obligations in the OPDA. *See* Ex. 27, Connick Dep. Tr. in *Cousin v. Connick,* et al., 7:12–14 (describing exculpatory evidence as "[e]vidence that demonstrates that [the defendant is] not guilty of the crime with which he is charged"); Ex. 32, Williams Dep. Tr. in *Thompson v. Connick*, 97:23–98:2, 108:20–21, 170:22–25 (testifying that he relied upon the Louisiana Code of Criminal Procedure for his understanding of *Brady*, which did not include an obligation to disclose all

25

favorable evidence); Ex. 31, Whittaker Dep. Tr. in *Thompson v. Connick*, 158:16–22 (in response to being asked to define "[e]xculpatory, testifying: "That's a good question.  I don't know if that was – That's the kind of stuff I think that was never, perhaps, clarified to the extent it should have been clarified.  Exculpatory means evidence that's going to – that may tend to acquit the guy.").

70.    During the Relevant Time, prosecutors at OPDA did not regularly review grand jury testimony or produce it to the defense.  *See* Ex. 7, Whittaker Aff. ¶ 7; Ex. 43, Whittaker Dep. Tr. 13:3–21; Ex. 37, Williams Dep. Tr. at 83–84 (does not recall ever reviewing or requesting to review grand jury testimony), 127–28 (did not review the grand jury testimony in Mr. Flanks's case prior to trial), 162 (agrees with everything in the Whittaker affidavit other than that he believed grand jury proceedings were regularly transcribed); Ex. 4, Capitelli Dep. Tr. at 140 (unable to recall a single instance where grand jury testimony was provided to the defense); Ex. 38, McElroy Dep. Tr. 170–71 (there was no mechanism for tracking or confirming whether an ADA had reviewed grand jury testimony for any given case).

71.    During the Relevant Time, detectives at NOPD did not receive formal training on how to properly conduct photographic identifications.  Ex. 34, Dillmann Dep. Tr. 37:6–13; Ex. 35, Lentz Dep. Tr. 45:4–17 (unable to remember any specific training regarding photographic identification procedures).

72.    During the Relevant Time, police officers did not receive formal training on promotion to a new role as a detective, including as a homicide detective.  Instead, they just "rode with" another detective who "until they would tell the commander he's ready to go out on his own." Ex. 34, Dillmann Dep. Tr. 29:17–23; *see also id.* at 37; Ex. 35, Lentz Dep. Tr. 27:23–28:15; Ex. 41, City 30(b)(6) (Barnes) Dep. Tr. 58:8–59:9.  There were no guidelines or set standards for what would be included in this training.  Ex. 41, City 30(b)(6) (Barnes) Dep. Tr. 83:2–23.

73. During the Relevant Time, detectives at NOPD did not include all exculpatory information in reports, *see* Ex. 34, Dillmann Dep. Tr. 61:13–63:23; 174:11–19; 175:25–176:6, and were not provided any instruction or policy directing them to do so, *see* Ex. 41, City 30(b)(6) (Barnes) Dep. Tr. at 82–84, 95.

74. During the relevant time, the understanding of the detectives in the homicide department was that exculpatory evidence only include statements made in an interview conducted by an NOPD officer. *See* Ex. 34, Dillmann Dep. Tr. at 171–176 (discussing "the entire homicide department's understanding" of their *Brady* obligations).

75. During the Relevant Time, detectives at NOPD did not regularly provide handwritten notes or daily information reports to OPDA. *See* Ex. 41, City 30(b)(6) (Barnes) Dep. Tr. 47:14–23 (documents provided to OPDA were the incident report, with attachments, and forensic reports), 89:19–91:13 (doesn't know whether handwritten notes or daily reports provided to OPDA); Ex. 7, Whittaker Aff. ¶ 8 (he does not recall ever seeing handwritten notes of a police officer while working as a prosecutor); Ex. 35, Lentz Dep. Tr. at 24 (at NOPD Academy he was only instructed him to turn over the final report to prosecutors), 31 (did not keep handwritten notes in the case file).

76. In 1982 to 1983, detectives at NOPD generally did not follow an NOPD policy requiring that an in-person lineup be conducted following a photo array that resulted in a positive identification. *See* Ex. 48, 1982 NOPD Policy re: Identification of Suspects, at 4; Ex. 34, Dillmann Dep. Tr. 92:1–93:17; Ex. 35, Lentz Dep. Tr. at 138–139.

77. That same policy included a requirement for in-person lineups that "[n]othing shall he said or done which might prompt a witness or victim to identify a particular person in the lineup," and included several other detailed procedural guidelines for conducting in-person

27

lineups. *See* Ex. 48, 1982 NOPD Policy re: Identification of Suspects, at 3. No such requirements were included in the portion of the policy discussing identification by photo array. *See id.* at 4.

78. During the Relevant Time, detectives at NOPD generally were not aware of, and did not follow, an NOPD policy requiring that they communicate directly with ADAs regarding their reports and other material. *See* Ex. 34, Dillmann Dep. Tr. 51:24–52:15 (secretaries would provide documents to OPDA), 55:11–20 (detectives did not review packet of documents provided to OPDA); Ex. 41, Barnes Dep. Tr. 47:14–48:12; 50:22–51:18 (no evidence to contradict testimony that secretaries were responsible for providing documents to OPDA).

79. During the Relevant Time, detectives at NOPD regularly did not read policy updates without consequence. *See* Ex. 34, Dillmann Dep. Tr. 92:5–17.

80. Dillmann has been accused of committing serious malfeasance in numerous cases. Dillmann contends all the accusations are lies. *See* Ex. 34, Dillmann Dep. Tr. 33:19–34:4, 191:21–193:12, 196:3–15.

81. "[A] code of silence existed at the NOPD." *Thomas v. City of New Orleans*, 687 F.2d 80, 82 (5th Cir. 1982); *see also Christopher Hero v. Dep't of Police*, No. 1775 (Civil Service Commission, City of New Orleans, Mar. 17, 1983) (finding it "established beyond doubt that a 'code of silence' does operate within the New Orleans Police Department").

82. In 1975, NOPD "suffer[ed] from the absence of clearly defined and enforced ground rules of behavior," and "police personnel fe[lt] free to behave as they wish in most instances." Ex. 40, McManis Mem. at 6.

83. There is conflicting evidence about OPDA's policies regarding grand jury testimony, including about what testimony was required to be transcribed, *compare* Ex. 47, OPDA (Grey) Dep. at 193:15–197:11 (it was against OPDA policy for all witness testimony at the grand

28

jury not to be transcribed), *with* Ex. 46, Decl. of Michael Grey ¶ 6 (it was normal practice for lay witness testimony, but not law enforcement testimony to be transcribed), *and* Ex. 7, Whittaker Aff. ¶ 7 (grand jury testimony was "not routinely transcribed"); what transcripts (if any) were required to be provided to trial prosecutors, *compare* Ex. 7, Whittaker Aff. ¶ 7 ("[I]t would not be normal to have transcripts of grand jury testimony available when trying a case."), *with* Ex. 37, Jim Williams Dep. 103–104 (prosecutors would ask for the grand jury testimony when needed, but would not do so in every case, and it would not be provided with the case file), *and* Ex. 38, McElroy Dep. at 190 (as general practice, if grand jury testimony of any lay witnesses was not already in the case file, the prosecutor would order that transcript from the court reporter); who (if anyone) was responsible for this, *compare* Ex. 38, McElroy Dep. at 190 (it may be in the file already or line prosecutor may have to obtain from the court report), *with* Ex. 38, McElroy Dep. at 197 (court reporter generally followed up with trial prosecutor to provide grand jury transcripts), *and* Ex. 37, Jim Williams Dep. 103–104 (prosecutors would ask for the grand jury testimony when needed, and it would never be provided with the case file), *and* Ex. 46, Decl. Of Michael Grey ¶ 7 (same), *and* Ex. 47, OPDA (Grey) Dep. at 195–96 (screening division attorney would be responsible for obtaining transcript and adding to case file); and what (if any) documentation was required, *compare* Ex. 46, Decl. Of Michael Grey ¶ 8 (documentation not required to obtain transcript), *and* Ex. 47, OPDA (Grey) Dep. at 203 (documentation required to obtain transcript).

84.    No prosecutor could provide an account of any formal *Brady* training, or any detail about any other Brady training they may have received. *See, e.g.*, Ex. 31, Whittaker Dep. Tr. in *Thompson v. Connick* at 158:23–159:5 (did not recall any training re: *Brady*); Ex. 37, Williams Dep. Tr. at 28:23–29:4, 29:21–30:18; 78:3–12 (did not recall training re: *Brady*).

29

Dated: October 24, 2025
      New York, New York


MURELL LAW FIRM                    SHANIES LAW OFFICE


By: */s/ Christopher J. Murell*      By: _David W Shanies_
    Christopher J. Murell          David B. Shanies* (T.A.)
    La. Bar No. 32075          Deborah I. Francois*
    Meghan K. Matt          Tristan M. Ellis*
    La. Bar No. 39975          Eleanor C. Davis*
    4005 Saint Claude Avenue      110 West 40th Street, Tenth Floor
    New Orleans, Louisiana 70117   New York, New York 10018
    (504) 717-1297 (Tel)       (212) 951-1710 (Tel)
    chris@murell.law         (212) 951-1350 (Fax)
    meghan@murell.law        david@shanieslaw.com
                        deborah@shanieslaw.com
                        tristan@shanieslaw.com
                        eleanor@shanieslaw.com

                        *Admitted *Pro Hac Vice*


        *Attorneys for Plaintiff Raymond Flanks*