UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

RAYMOND FLANKS,

                              Plaintiff,

    – against –

THE CITY OF NEW ORLEANS, *et al.*,

                              Defendants.

---

No. 23-CV-6897 (NJB) (KWB)

**PLAINTIFF'S RESPONSE TO DEFENDANT JASON WILLIAMS'S
STATEMENT OF UNCONTESTED FACTS IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND
STATEMENT OF ADDITIONAL UNCONTESTED FACTS**

Plaintiff Raymond Flanks, pursuant to Federal Rule of Civil Procedure ("Rule") 56(c) and Eastern District of Louisiana Local Civil Rule ("Local Rule") 56.2, respectfully submits this response to Defendants City of New Orleans and John Dillmann's ("Defendants") Statement of Alleged Undisputed Material Facts (ECF No. 74-2) ("56.1 Statement").

**ALLEGED UNDISPUTED MATERIAL FACT 1**

There is no evidence that Orleans Parish prosecutors during Mr. Connick's administration were trained, instructed, or encouraged to suppress exculpatory evidence from defendants.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 1**

Disputed.   Evidence indicating that prosecutors at OPDA during Mr. Connick's administration were trained, instructed, and encouraged to suppress exculpatory evidence includes: (1) evidence of an ongoing pattern of *Brady* violations throughout Mr. Connick's tenure, *see, e.g.*, Ex. 3, Report of Laurie Levenson at 36-41 & Exs. 1, 2, & 3 (listing dozens of cases involving *Brady* violations throughout Mr. Connick's tenure, including before, during, and immediately after Mr. Flanks's wrongful conviction); (2) evidence that Mr. Connick did not track *Brady* violations,

but did track conviction rates, *see, e.g.*, Ex. 50, Connick Dep. Tr. in *Jones v. Cannizzaro*, at 65–66, 90–91 (OPDA didn't track *Brady* violations), 97:8–98:4 (OPDA did not have a policy requiring prosecutors to report *Brady* violations in either their cases or in other prosecutors' cases), 139–43 (Connick tracked individual prosecutors' conviction rates, believed that a high conviction rate showed that someone was a "good prosecutor," and considered conviction rates in making decisions about raises and promotions); (3) OPDA did not discipline its prosecutors for violating *Brady*, *see, e.g.*, Ex. 50, Connick Dep. Tr. in *Jones v. Cannizzaro*, at 154–55, 165, 170–71 (Connick could remember only two instances of prosecutors being disciplined for *Brady* violations, including one who received only a "stern lecture" and was subsequently promoted); (4) there was no policy governing information sharing regarding *Brady* material among prosecutors working on the same or related cases, *see, e.g.*, Ex. 50, Connick Dep. Tr. in *Jones v. Cannizzaro*, at 40:19–24 (Connick "d[i]dn't know th[e] mechanics engaged by prosecutors" regarding the sharing of *Brady* material between prosecutors working on cases against the same defendant); and (5) Mr. Connick himself had an, at best, extremely limited understanding of *Brady* and, at worst, a completely incorrect one, *see, e.g.*, Ex. 27, Connick Dep. Tr. in *Cousin v. Connick,* et al., 7:12–14 (describing exculpatory evidence as "[e]vidence that demonstrates that [the defendant is] not guilty of the crime with which he is charged").

## ALLEGED UNDISPUTED MATERIAL FACT 2

There is no evidence that, at the time of Mr. Flanks's prosecution in 1984–1985, there was any specific pervasive practice or custom among Orleans Parish prosecutors that was causing repeated *Brady* violations.

**RESPONSE TO ALLEGD UNDISPUTED MATERIAL FACT 2**

Disputed.  Evidence that there was a specific pervasive pattern and custom among OPDA prosecutors of repeatedly violating *Brady* includes: (1) evidence of an ongoing pattern of *Brady* violations throughout Mr. Connick's tenure, *see, e.g.*, Ex. 3, Report of Laurie Levenson at 36–41 & Ex. 1 (listing dozens of cases involving *Brady* violations throughout Mr. Connick's tenure, including before, during, and immediately after Mr. Flanks's wrongful conviction); (2) evidence that Mr. Connick did not track *Brady* violations, but did track conviction rates, *see, e.g.*, Ex. 50, Connick Dep. Tr. in *Jones v. Cannizzaro*, at 65–66, 90–91 (OPDA didn't track *Brady* violations), 97:8–98:4 (OPDA did not have a policy requiring prosecutors to report *Brady* violations in either their cases or in other prosecutors' cases), 139–43 (Connick tracked individual prosecutors' conviction rates, believed that a high conviction rate showed that someone was a "good prosecutor," and considered conviction rates in making decisions about raises and promotions); (3) OPDA did not discipline its prosecutors for violating *Brady*, *see, e.g.*, Ex. 50, Connick Dep. Tr. in *Jones v. Cannizzaro*, at 154–55, 165, 170–71 (Connick could remember only two instances of prosecutors being disciplined for *Brady* violations, including one who received only a "stern lecture" and was subsequently promoted); (4) there was no policy governing information sharing regarding *Brady* material among prosecutors working on the same or related cases, *see, e.g.*, Ex. 50, Connick Dep. Tr. in *Jones v. Cannizzaro*, at 40:19–24 (Connick "d[i]dn't know th[e] mechanics engaged by prosecutors" regarding the sharing of *Brady* material between prosecutors working on cases against the same defendant); and (5) Mr. Connick himself had an, at best, extremely limited understanding of *Brady* and, at worst, a completely incorrect one, *see, e.g.*, Ex. 27, Connick Dep. Tr. in *Cousin v. Connick*, 7:12–14 (describing exculpatory evidence as

3

"[e]vidence that demonstrates that [the defendant is] not guilty of the crime with which he is charged").

In addition, Mr. Connick himself has admitted that the caseload of the office meant that "[i]t was impossible" for Assistant District Attorneys ("ADAs") to have sufficient familiarity with their own files to ensure *Brady* was followed in every case, *see* Ex. 26, Connick Dep. Tr. in *Adams v. City of New Orleans*, at 14–16, and that, in the lates 1970s and early 1980s, it was not "the regular practice of the ADAs to seek out information from the [New Orleans Police Department] that was not provided to them," *id.* 72:8–15; *see also* 73:14–25. OPDA has also admitted that, from 1983 to 1985, it did not have any written policies regarding compliance with prosecutors' duty under the Fourteenth Amendment to provide information favorable to criminal defendants. *See* Ex. 6, OPDA Responses to Plaintiff's Requests for Admission ("RFA Responses"), RFA Response No. 8. Such policies—or lack thereof—inevitably led to repeated *Brady* violations by prosecutors.

## ALLEGED UNDISPUTED MATERIAL FACT 3

There is no evidence that, at the time of Mr. Flanks's prosecution in 1984–1985, Mr. Connick had actual or constructive notice of a pervasive practice or custom in his office that was causing repeated *Brady* violations.

## RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 3

Disputed. Evidence that Mr. Connick had actual and constructive notice of a specific pervasive pattern and custom among OPDA prosecutors of repeatedly violating *Brady* in 1984 to 1985 includes evidence of an ongoing pattern of *Brady* violations throughout Mr. Connick's tenure, *see, e.g.,* Ex. 3, Report of Laurie Levenson at 36–41 & Exs. 1, 2, & 3 (listing dozens of cases involving *Brady* violations throughout Mr. Connick's tenure, including before, during, and

4

immediately after Mr. Flanks's wrongful conviction).  In addition, Mr. Connick himself has admitted that the caseload of the office meant that "[i]t was impossible" for Assistant District Attorneys ("ADAs") to have sufficient familiarity with their own files to ensure *Brady* was followed in every case, *see* Ex. 26, Connick Dep. Tr. in *Adams v. City of New Orleans*, at 14–16, and that, in the lates 1970s and early 1980s, it was not "the regular practice of the ADAs to seek out information from the [New Orleans Police Department] that was not provided to them," *id.* 72:8–15; *see also* 73:14–25.  Such policies, along with the additional policies discussed in Responses to Facts 2 & 3, inevitably led to *Brady* violations; such inevitably was—or should have been—known to Mr. Connick, as the sole policymaker of OPDA.

**ALLEGED UNDISPUTED MATERIAL FACT 4**

There is no evidence that, at the time of Mr. Flanks's prosecution in 1984–1985, there was any defect in OPDA's official policies (including policies relating to training, supervision, and discipline) that was causing repeated *Brady* violations.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 4**

Disputed.  Evidence of defects in OPDA's policies in 1984 to 1985 that were causing repeated *Brady* violations includes:  (1) evidence of an ongoing pattern of *Brady* violations throughout Mr. Connick's tenure, *see, e.g.*, Ex. 3, Report of Laurie Levenson at 36–41 & Ex. 1 (listing dozens of cases involving *Brady* violations throughout Mr. Connick's tenure, including before, during, and immediately after Mr. Flanks's wrongful conviction); (2) evidence that Mr. Connick did not track *Brady* violations, but did track conviction rates, *see, e.g.*, Ex. 50, Connick Dep. Tr. in *Jones v. Cannizzaro*, at 65–66, 90–91 (OPDA didn't track *Brady* violations), 97:8–98:4 (OPDA did not have a policy requiring prosecutors to report *Brady* violations in either their cases or in other prosecutors' cases), 139–43 (Connick tracked individual prosecutors' conviction

5

rates, believed that a high conviction rate showed that someone was a "good prosecutor," and considered conviction rates in making decisions about raises and promotions); (3) OPDA did not discipline its prosecutors for violating *Brady*, *see, e.g.*, Ex. 50, Connick Dep. Tr. in *Jones v. Cannizzaro*, at 154–55, 165, 170–71 (Connick could remember only two instances of prosecutors being disciplined for *Brady* violations, including one who received only a "stern lecture" and was subsequently promoted); (4) there was no policy governing information sharing regarding *Brady* material among prosecutors working on the same or related cases, *see, e.g.*, Ex. 50, Connick Dep. Tr. in *Jones v. Cannizzaro*, 40:19–24 (Connick "d[i]dn't know th[e] mechanics engaged by prosecutors" regarding the sharing of *Brady* material between prosecutors working on cases against the same defendant); and (5) Mr. Connick himself had an, at best, extremely limited understanding of *Brady* and, at worst, a completely incorrect one, *see, e.g.*, Ex. 27, Connick Deposition in *Cousin v. Connick,* et al., 7:12–14 (describing exculpatory evidence as "[e]vidence that demonstrates that [the defendant is] not guilty of the crime with which he is charged"), as did multiple prosecutors who worked under him (including two of the prosecutors who worked on Mr. Flanks's case), *see, e.g.*, Ex. 32, Jim Williams Dep. Tr. in *Thompson v. Connick*, 97:23–98:2, 108:20–21, 170:22–25 (testifying that he relied upon the Louisiana Code of Criminal Procedure for his understanding of *Brady*, which did not include an obligation to disclose all favorable evidence); Ex. 31, Whittaker Dep. Tr. in *Thompson v. Connick*, 158:16–22 (in response to being asked to define "[e]xculpatory, testifying: "That's a good question.  I don't know if that was – That's the kind of stuff I think that was never, perhaps, clarified to the extent it should have been clarified.  Exculpatory means evidence that's going to – that may tend to acquit the guy.").

Indeed, Mr. Williams has testified that the reason he relied on Louisiana Code of Criminal Procedure for his understanding of *Brady* was because he was "instructed to follow what the rules

6

of the Louisiana Code of Criminal Procedure were"; in other words, he was explicitly instructed to follow a more limited understanding of what should be disclosed to the defense than that defined by *Brady*.  Ex. 32, Jim Williams Dep. Tr. in *Thompson v. Connick*, 97:23–98:2; *see also id.* at 108:17–21 ("I was always told that we are following the law and the law is that we don't have to turn those – those reports over.  Only what is described in the Louisiana Code of Criminal Procedure."), 170:22–25 ("[T]he Louisiana Code of Criminal Procedure dictated the rules that we had to play by.").  Mr. Whittaker testified that he did not recall receiving any training regarding his *Brady* obligations as a prosecutor.  Ex. 31, Whittaker Dep. Tr. in *Thompson v. Connick*, 158:23–159:5.

In addition, Mr. Connick himself has admitted that the caseload of the office meant that "[i]t was impossible" for Assistant District Attorneys ("ADAs") to have sufficient familiarity with their own files to ensure *Brady* was followed in every case, *see* Ex. 26, Connick Dep. Tr. in *Adams v. City of New Orleans*, at 14–16, and that, in the lates 1970s and early 1980s, it was not "the regular practice of the ADAs to seek out information from the [New Orleans Police Department ("NOPD")] that was not provided to them," *id.* 72:8–15; *see also* 73:14–25, even though NOPD frequently provided only incident reports and, in some cases, supplemental reports (in other words, did not provide documents that may include additional *Brady* information, such as daily reports, handwritten notes, or property cards), *see* Ex. 7, Whittaker Aff. ¶ 8 ("I do not recall ever seeing a police detective's handwritten notes from a notepad.").

## ALLEGED UNDISPUTED MATERIAL FACT 5

There is no evidence that, at the time of Mr. Flanks's prosecution in 1984–1985, Mr. Connick had actual or constructive notice of a defect in his office's policies (including policies relating to training, supervision, and discipline) that was causing repeated *Brady* violations.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 5**

Disputed.  Evidence that, at the time of Mr. Flanks's prosecution, Mr. Connick had actual or constructive notice of defects in his office's policies (including policies related to training, supervision, and discipline) that caused repeated *Brady* violations includes evidence of an ongoing pattern of *Brady* violations throughout Mr. Connick's tenure, *see, e.g.*, Ex. 3, Report of Laurie Levenson at 36–41 & Ex. 1 (listing dozens of cases involving *Brady* violations throughout Mr. Connick's tenure, including before, during, and immediately after Mr. Flanks's wrongful conviction).  In addition, Mr. Connick himself has admitted that the caseload of the office meant that "[i]t was impossible" for Assistant District Attorneys ("ADAs") to have sufficient familiarity with their own files to ensure *Brady* was followed in every case, *see* Ex. 26, Connick Dep. Tr. in *Adams v. City of New Orleans*, at 14–16, and that, in the lates 1970s and early 1980s, it was not "the regular practice of the ADAs to seek out information from the [New Orleans Police Department] that was not provided to them," *id.* 72:8–15; *see also* 73:14–25.  Such policies, along with the additional policies discussed in Responses to Facts 2 & 3, inevitably led to *Brady* violations; such inevitably was—or should have been—known to Mr. Connick, as the sole policymaker of OPDA.

**ALLEGED UNDISPUTED MATERIAL FACT 6**

There is no evidence that, at the time of Mr. Flanks's prosecution in 1984–1985, there was a pattern of *Brady* violations caused by Orleans Parish prosecutors that were very similar to the alleged violations in Mr. Flanks's case.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 6**

Disputed.  Previous cases indicating OPDA's pattern of *Brady* violations include cases that were very similar to Mr. Flanks's case, including cases where: the state suppressed prior

8

inconsistent statements of eyewitnesses (Larry Hudson, Hayes Williams, Linroy Davis, Roland Gibson, Floyd Falkins, Errol Bernard, Norris Henderson, Calvin Williams, Larry Curtis, Isaac Knapper, Stephen Rosiere, Curtis Lee Kyles, Erin Hunter, Darryl Washington, Alvin Jeanmarie, Alfred Oliver, Darnell Lewis, Shareef Cousin, Juan Smith, James Walker, Salvador Perez, David Mahler, Eddie Triplett, George Lee, John Duncan, and Christopher Wells), the state failed to correct a witness's false testimony or inform the defense about the false testimony (Dwight Labran and Eddie Triplett), the state suppressed police reports and/or police notes containing *Brady* material (Juan Smith, David Mahler, Julian Robinson, George Lee, John Duncan, Ronald Warner, Larry Hudson, Hayes Williams, Michael Williams, Arthur Monroe, Errol Bernard, Gregory Bright, Earl Truvia, Norris Henderson, Calvin Williams, Isaac Knapper, William Perkins, Ronald Monroe, John Floyd, Reginald Adams, Stephen Rosiere, Curtis Lee Kyles, John Thompson, Darryl Washington, Alvin Jeanmarie, Daniel Rideau, Darnell Lewis, and Shareef Cousin), the state suppressed evidence that indicated the defendant did not match the perpetrator's characteristics or description (James Walker, Julian Robinson, Isaac Knapper, Reginald Adams, Curtis Lee Kyles, Darryl Washington, and Alvin Jeanmarie), the state suppressed evidence regarding police or prosecutorial misconduct (Norman Clark), and the state suppressed evidence of similar crimes committed by someone else (John Floyd).  Ex. 3, Report of Laurie Levenson, Ex. 1.

**ALLEGED UNDISPUTED MATERIAL FACT 7**

There is no evidence that, at the time of Mr. Flanks's prosecution in 1984–1985, Mr. Connick had actual or constructive notice of a pattern of *Brady* violations caused by Orleans Parish prosecutors that were very similar to the alleged violations in Mr. Flanks's case.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 7**

Disputed.  Evidence that Mr. Connick had actual or constructive notice of a pattern of *Brady* violations caused by Orleans Parish prosecutors that were very similar to the alleged violations in Mr. Flanks's case includes the Expert Report of Laurie Levenson and the evidence included therein.  Ex. 3, Report of Laurie Levenson.

**ALLEGED UNDISPUTED MATERIAL FACT 8**

There is no evidence that Mr. Connick took any action with deliberate indifference to the constitutional rights of criminal defendants.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 8**

Disputed.  As laid out in response to Fact 7, Mr. Connick had actual or constructive knowledge of repeated *Brady* violations in his office.  Nonetheless, he continued to maintain policies that permitted and encouraged such violations, including the policies laid out in Plaintiff's Responses to Facts 1–5.  In addition, people who worked as prosecutors in OPDA in the late 1970s and early 1980s have testified that prosecutors spoke openly about their disdain for *Brady*, including that prosecutors said "things like" "it's not *Brady* if the defense doesn't know about it" "all the time."  Ex. 37, Williams Dep. Tr. 120:23–121:5.

Other evidence illustrating the pervasive culture of indifference to *Brady* at OPDA during Mr. Connick's tenure includes: (1) the pervasive lack of knowledge regarding *Brady* obligations in the office, *see* Ex. 27, Connick Dep. Tr. in *Cousin v. Connick*, 7:12–14 (describing exculpatory evidence as "[e]vidence that demonstrates that [the defendant is] not guilty of the crime with which he is charged"); Ex. 32, Jim Williams Dep. Tr. in *Thompson v. Connick*, 97:23–98:2, 108:20–21, 170:22–25 (testifying that he relied upon the Louisiana Code of Criminal Procedure for his understanding of *Brady*, which did not include an obligation to disclose all favorable evidence);

Ex. 31, Whittaker Dep. Tr. in *Thompson v. Connick*, 158:16–22 (in response to being asked to define "[e]xculpatory, testifying: "That's a good question.  I don't know if that was – That's the kind of stuff I think that was never, perhaps, clarified to the extent it should have been clarified. Exculpatory means evidence that's going to – that may tend to acquit the guy."); and (2) the repeated *Brady* violations that occurred at the OPDA during Mr. Connick's tenure, *see* Ex. 3, Report of Laurie Levenson at 36–41 & Exs. 1, 2, & 3 (listing dozens of cases involving *Brady* violations throughout Mr. Connick's tenure, including before, during, and immediately after Mr. Flanks's wrongful conviction).

**ALLEGED UNDISPUTED MATERIAL FACT 9**

From 1974 through 1985, the average number of cases accepted by OPDA for prosecution was approximately 7,084 per year.[1]

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 9**

Plaintiff lacks sufficient information to admit or deny.

**ALLEGED UNDISPUTED MATERIAL FACT 10**

From 1974 through 1985, there were approximately 522 trials and 5,175 guilty pleas on average each year. Therefore, the total average number of combined trials and guilty pleas per year was approximately 5,698.[2]

---

1. Exhibit 1, Solanky Expert Report, at 5; *see also* Exhibit 2, Excerpts of 1989 Screening Division report, at 2, 4; Exhibit 3, Excerpts of 1990 Screening Division report, at 4; Exhibit 4, Excerpts of 1991 Screening Division report, at 6; Exhibit 5, Excerpts of 1992 Screening Division report, at 9; Exhibit 6, Excerpts of 1993 Screening Division report, at 8; Exhibit 7, Excerpts of 1994 Screening Division report, at 6; Exhibit 8, Excerpts of 1995 Screening Division report, at 7; Exhibit 9, Excerpts of 1996 Screening Division report, at 7; Exhibit 10, Excerpts of 1997 Screening Division report, at 7; Exhibit 11, Excerpts of 1998 Screening Division report, at 7; Exhibit 12, Excerpts of 1999 Screening Division report, at 7.

2. Exhibit 1, Solanky Expert Report, at 10; *see also* Exhibit 13, Excerpts of 1988 Revised Annual Report at 2; Exhibit 14, Excerpts of 1989 Trial Division report at 5–7, 13–15; Exhibit 15, Excerpts of 1990 Trial Division report at 6–8, 14–17; Exhibit 16, Excerpts of 1991 Trials Division report at 7–9, 15–18; Exhibit 17, Excerpts of 1992 Trials Division report at 7–8, 13–16; Exhibit 18, Excerpts of 1993 Trials Division report at 6–7, 13–16; Exhibit 19, Excerpts of 1994 Trials Division report at 5–6, 11, 13–15; Exhibit 20, Excerpts of 1995 Trials Division report at 5–7, 13–15, 17–18; Exhibit 21, Excerpts of 1996 Trials Division report at 7–9,

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 10**

Plaintiff lacks sufficient information to admit or deny.

**ALLEGED UNDISPUTED MATERIAL FACT 11**

At the time of Mr. Flanks's prosecution in 1984–1985, OPDA employed a court reporter who was responsible for preparing transcripts of all testimony of lay witnesses (such as Mrs. Carnesi) before the grand jury in indicted cases. OPDA's official policy required that these transcripts be made available to the trial prosecutors, who were responsible for reviewing them for, among other things, exculpatory material that must be disclosed to the defense.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 11**

Disputed in part and admitted in part. Plaintiff admits that in 1984 to 1985 a court reporter transcribed some or all grand jury proceedings in New Orleans. Plaintiff disputes that OPDA policy required that transcripts be made available to the trial prosecutors. *See, e.g.*, Ex. 7, Whittaker Aff. ¶ 7.

**ALLEGED UNDISPUTED MATERIAL FACT 12**

At the time of Mr. Flanks's prosecution in 1984–1985, prosecutors in the trials division attended weekly meetings led by the chief of trials at which they discussed pending cases, recent court decisions, policy matters, and relevant issues, including *Brady* issues.[3]

---

14–16, 19–20; Exhibit 22, Excerpts of 1997 Trials Division report at 6–7, 12, 14, 17–18; Exhibit 23, Excerpts of 1998 Trials Division report at 5–7, 13, 15, 18–19; Exhibit 24, Excerpts of 1999 Trials Division report at 5–7, 13, 18–19.

3. Exhibit 27, McElroy Depo., at 13, 35–38; Exhibit 28, Bane Depo., at 10, 16–18, 179–184; Exhibit 29, Cannizzaro Depo., at 36, 129–132.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 12**

Disputed.  At the very least, evidence varies regarding whether, and to what, extent prosecutors received training on their *Brady* obligations.  *See, e.g.*, Ex. 28, Connick Dep. Tr. in *Bernard v. Connick* at 5–6 (noting ODPA "didn't do a lot of training" in the late 1970s and there was no training "as to recognizing what is exculpatory and what is not" "at that point in time"); Ex. 50, Connick Dep. Tr. in *Jones v. Cannizzaro* at 105 (could not recall specific details about when, to what extent, and during what time period *Brady* obligations were discussed at regular meetings); *see* Ex. 31, Whittaker Dep. Tr. in *Thompson v. Connick*, 158:23–159:5 (does not recall receiving training regarding *Brady* obligations); Ex. 29, Dubelier Dep. Tr. in *Thompson v. Connick*, 69:17–71:10 (same); *cf.* Ex. 25, Cannizzaro Dep. Tr. in *Adams v. New Orleans*, 93:3–5 (in early 1980s, "there was no formalized training procedures").

**ALLEGED UNDISPUTED MATERIAL FACT 13**

At the time of Mr. Flanks's prosecution in 1984–1985, copies of new appellate decisions, and memoranda regarding those decisions—including decisions involving *Brady* obligations— were circulated to prosecutors, and lawyers from the appeals division would regularly attend meetings of the trials prosecutors to discuss these new decisions.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 13**

Disputed.  At the very least, evidence varies regarding whether, and to what, extent prosecutors received training on their *Brady* obligations varies.  *See, e.g.*, Ex. 28, Connick Dep. Tr. in *Bernard v. Connick* at 5–6 (noting ODPA "didn't do a lot of training" in the late 1970s and there was no training "as to recognizing what is exculpatory and what is not" "at that point in time"); Ex. 50, Connick Dep. Tr. in *Jones v. Cannizzaro* at 105 (could not recall specific details about when, to what extent, and during what time period *Brady* obligations were discussed at

regular meetings); *see* Ex. 31, Whittaker Dep. Tr. in *Thompson v. Connick*, 158:23–159:5 (does not recall receiving training regarding *Brady* obligations); Ex. 29, Dubelier Dep. Tr. in *Thompson v. Connick*, 69:17–71:10 (same); *cf.* Ex. 25, Cannizzaro Dep. Tr. in *Adams v. New Orleans*, 93:3–5 (in early 1980s, "there was no formalized training procedures").

**ALLEGED UNDISPUTED MATERIAL FACT 14**

At the time of Mr. Flanks's prosecution in 1984–1985, prosecutors in the trials division were required to have pre-trial conferences with supervisors before taking a case to trial. One of the purposes of these conferences was to ascertain what discovery had been provided in the case and whether the State had satisfied its *Brady* obligations.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 14**

Disputed. To start, OPDA has not supported this fact, because its sole citation is to a deposition of someone who began work at OPDA in December of 1984 and was testifying wholly in his personally capacity (in other words, he cannot testify as to anything that happened in the office from January to December of 1984). In addition, the evidence cited does not support the proposition for which it is cited; on the cited pages, Mr. McElroy testified that there was "not a policy" that a supervisor review a file to determine compliance with *Brady* and that one purpose of the meeting was "to see whether or not discovery had been satisfied." *See* R. Doc. 66-29 at 42. Nowhere does he testify that insuring compliance with *Brady* was a purpose of any pretrial supervisory conference.

**ALLEGED UNDISPUTED MATERIAL FACT 15**

There is no testimony by any of the prosecutors who worked on Mr. Flanks's case suggesting that they were following a specific policy causing suppression of exculpatory evidence.

14

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 15**

Disputed.  Mr. Williams has testified that the reason he relied on Louisiana Code of Criminal Procedure for his understanding of *Brady* was because he was "instructed to follow what the rules of the Louisiana Code of Criminal Procedure were"; in other words, he was explicitly instructed to follow a more limited understanding of what should be disclosed to the defense than that defined by *Brady*.  Ex. 32, Jim Williams Dep. Tr. in *Thompson v. Connick*, 97:23–98:2; *see also id.* at 108:17–21 ("I was always told that we are following the law and the law is that we don't have to turn those – those reports over.  Only what is described in the Louisiana Code of Criminal Procedure."), 170:22–25 ("[T]he Louisiana Code of Criminal Procedure dictated the rules that we had to play by.").

**ALLEGED UNDISPUTED MATERIAL FACT 16**

There is no testimony by any of the prosecutors who worked on Mr. Flanks's case suggesting that they were trained or instructed in ways that caused them to misunderstand their *Brady* obligations or otherwise fail to comply with them.

**RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACT 16**

Disputed.  Mr. Williams has testified that the reason he relied on Louisiana Code of Criminal Procedure for his understanding of *Brady* was because he was "instructed to follow what the rules of the Louisiana Code of Criminal Procedure were"; in other words, he was explicitly instructed to follow a more limited understanding of what should be disclosed to the defense than that defined by *Brady*.  Ex. 32, Jim Williams Dep. Tr. in *Thompson v. Connick*, 97:23–98:2; *see also id.* at 108:17–21 ("I was always told that we are following the law and the law is that we don't have to turn those – those reports over.  Only what is described in the Louisiana Code of Criminal Procedure."), 170:22–25 ("[T]he Louisiana Code of Criminal Procedure dictated the rules that we

15

had to play by."). Mr. Whittaker and Mr. Dubelier both testified that they did not recall receiving any training regarding his *Brady* obligations as a prosecutor. Ex. 31, Whittaker Dep. Tr. in *Thompson v. Connick*, 158:23–159:5; Ex. 29, Dubelier Dep. Tr. in *Thompson v. Connick*, 69:17–71:10.

**PLAINTIFF'S ADDITIONAL STATEMENT OF UNCONTESTED FACTS**

1.      New Orleans is "the most incarcerated city in the world and the city with the highest number of exonerations." *Deliver Justice*, OPDA, https://orleansda.com/our-work/deliver-justice/ (last visited Oct. 21, 2025).

2.      New Orleans is an outlier in past defective convictions.

3.      Predecessors to Jason Williams in the Orleans Parish District Attorney's Office have contributed to the public's lack of trust in the Orleans Parish District Attorney's Office.

4.      Before Jason Williams became District Attorney, Orleans Parish had the highest per capita wrongful conviction rate in the world and the highest exoneration rate, meaning an innocent person was sitting in jail when the convicted person was left out in the community.

5.      On December 17, 1983, Faye Carnesi was walking to her car, which was parked in front of her house, when she saw a Black man wearing a shower cap (the "Perpetrator") walk past her. *See* Ex. 1, Trial Tr. 39:31–40:30.

6.      Mrs. Carnesi's husband, Martin Carnesi, walked out behind her to see her off. Ex. 1, Trial Tr. 39:7–16, 40:2–3.

7.      The Perpetrator stood between Mrs. Carnesi and her husband and demanded money. Ex. 1, Trial Tr. 40:6–8.

8.      Mr. Carnesi put his hand in his pocket and the Perpetrator pulled out a gun and shot him. Ex. 1, Trial Tr. 40:13–27.

16

9.      The Perpetrator then pointed a gun at Mrs. Carnesi and demanded her purse.  She threw her purse at him and ran away.  Ex. 1, Trial Tr. 41:31–42:1.

10.      Mrs. Carnesi then saw a light blue car speed off.   Ex. 1, Trial Tr. 42:1–5.

11.      At the time of the murder, Mr. Flanks was at home with his brother, Ralph Flanks. Ex. 1, Trial Tr. 91:25–92:12; Ex. 33, Raymond Flanks Dep. Tr. 116:7–8.

12.      Raymond Flanks had nothing to do with the murder.  Ex. 33, Raymond Flanks Dep. Tr. 112:16–21.

13.      Mrs. Carnesi initially described the Perpetrator as a Black man in his late twenties, about 5'10" and 150 pounds, with a medium build, brown skin, and a mustache.  Ex. 8, Dillmann Handwritten Notes, at OPDA-FLANKS000285.

14.      Mrs. Carnesi also noted that the Perpetrator was wearing "a white plastic shower cap on his head," which, as she said at trial, she noticed because she "ha[d] never seen anyone with a showercap [sic] on their head before," Ex. 1, Trial Tr. 40:26–30; *see also* Ex. 8, Dillmann Handwritten Notes, at OPDA-FLANKS000285.

15.      Mrs. Carnesi also told Detective John Dillmann, the lead investigator on the case, that she remembered that the perpetrator had "a white blotch" on his head and was driving an "older" car.  Ex. 34, Dillmann Dep. Tr. 220:15–17, 223:22–224:2.

16.      When Mrs. Carnesi appeared before the grand jury approximately four weeks after the crime, she similarly testified that the "one thing" she remembered about the Perpetrator was that he "had a little white blotch on the side of his cheek, a little white mark, like discolored looking" and that the car she saw speed away after the crime was "not a shiny car[,] [i]t was an old car."  Ex. 2, Grand Jury Tr. at OPDA-FLANKS000027–28.

17

17.   The NOPD immediately associated this crime with a series of similar armed robberies that had occurred in the same area.  *See* Ex. 10, Carnesi Suppl. Report, at OPDA-FLANKS000241.

18.   The assailant described by the victims of these crimes was largely consistent with Mrs. Carnesi's initial description of the Perpetrator: a Black man in his twenties, 5'8" to 5'11" tall, with a medium build and brown skin, with a mustache, and wearing a shower or "hospital type" cap in a variety of colors.  Ex. 10, Carnesi Suppl. Report, at OPDA-FLANKS000241–42; Ex. 11, Randazzo Incident Report; Ex. 12, Valentino Incident Report; Ex. 13, Soule Incident Report.

19.   He was also described as driving an "old, light blue or gray vehicle."  *See* Ex. 10, Carnesi Suppl. Report, at OPDA-FLANKS000242.

20.   As of December 19, 1983, two days after Mr. Carnesi's murder, the police had identified similar robberies on November 29, 1983; December 3, 1983; December 8, 1983; December 12, 1983; and December 18, 1983.  *See* Ex. 10, Carnesi Suppl. Report, at OPDA-FLANKS000242.

21.   One victim also described the perpetrator as being in his thirties, as having a "heavy" build, and as weighing approximately 200 pounds. *See* Ex. 12, Valentino Incident Report, at OPDA-FLANKS000370.

22.   Mr. Flanks became a suspect in Mr. Carnesi's murder after he was arrested while fleeing from an unrelated armed robbery of an A&P Food Store on December 23, 1983. *See* Ex. 14, A&P Food Store Incident Report; see also Ex. 10, Carnesi Suppl. Report at OPDA-FLANKS000242.

23.   Mr. Flanks was not described as wearing a shower cap. *See* Ex. 14, A&P Food Store Incident Report.

24. Mr. Flanks was not arrested with a shower cap (or any other hat). *See* Ex. 4, Pl.'s First Set of Requests for Admission to Dillmann ("Dillmann RFAs"), RFA 1; Ex. 5, Pl.'s First Set of RFAs to the City of New Orleans ("City RFAs"), RFA 1;[4] Ex. 6, OPDA's Responses & Objections to Pl.'s First Set of RFAs ("OPDA RFA Responses"), Response to RFA 1; Ex. 15, NOPD Property Card & Continuation Card.

25. Mr. Flanks did not have a "Jheri curl" hairstyle in December of 1983. *See* Ex. 44, Photos of Raymond Flanks.

26. There is no evidence that Mr. Flanks ever wore a "Jheri curl" hairstyle or a shower cap.

27. NOPD paperwork indicates that Otho Stubbs claimed he forensically matched Ralph Flanks's gun to the gun used for Mr. Carnesi's murder that same day. *See* Ex. 10, Carnesi Suppl. Report at OPDA-FLANKS000243.

28. Otho Stubbs issued his final report claiming to have matched Ralph Flanks's gun to the shell casing recovered from the murder scene on December 26, 1983. Ex. 16, Stubbs Report.

29. Otho Stubbs did not forensically test the shell casing that was recovered from the crime scene. Ex. 16, Stubbs Report.

30. In 1985, the United States Bureau of Alcohol Tobacco and Firearms conducted an examination and testing, at the request of the New Orleans Police Department and Orleans Parish District Attorney's Office, to determine whether the bullet recovered from Mr. Carnesi's body and/or the shell casing collected from the crime scene could have been fired from the gun recovered at the time of Mr. Flanks's arrest. *See* Ex. 4, Dillmann RFAs, RFA 2; Ex. 5, City RFAs, RFA 6;

---

4. Neither Dillmann nor the City responded to Plaintiff's First Set of Requests for Admission. Accordingly, they have admitted to all matters contained therein. *See* Fed. R. Civ. P. 36(a)(3) ("A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney.").

Ex. 45, Letters Requesting ATF Testing. *Cf.* Ex. 45, OPDA RFA Responses, Response to RFA 2 (admitting that, "at the request of Mr. Flanks's counsel and pursuant to the order of the Court, NOPD and OPDA sent the gun recovered from Mr. Flanks at the time of his arrest, ammunition found in that gun, the bullet recovered from Mr. Carnesi's body, and the shell casing collected from the crime scene to the [ATF] for comparison").

31.    The ATF's official report, dated February 13, 1985, stated that the result of the testing was that neither the bullet nor the shell casing could have been fired from the gun recovered at the time of Mr. Flanks's arrest.  *See* Ex. 8, Dillmann RFAs, RFA 3; Ex. 5, City RFAs, RFA 7; Ex. 17, ATF Report.  *Cf.* Ex. 6, OPDA RFA Responses, Response to RFA 3 (admitting that "the ATF's official report, dated February 13, 1985, stated that '[t]he test-fired bullets and shells were compared macroscopically with the evidence bullet (item 2) and the discharged shell (item 3) with negative results,' and that 'it is the opinion of this writer that neither the bullet (item 2) nor the discharged shell (item 3) were fired in the firearm submitted for examination (item 1).'").

32.    On the day of his arrest, Mr. Flanks was driving a 1982 light blue Chevrolet Citation.  *See* Ex. 14, A&P Food Store Incident Report at OPDA-FLANKS000253.

33.    About a week after Mr. Carnesi's murder, NOPD detectives—including Defendant John Dillmann—visited Mrs. Carnesi at her home and showed her a photo array with photos of either five or six individuals, including Mr. Flanks.  *See* Ex. 10, Carnesi Suppl. Report at OPDA-FLANKS000243; Ex. 2, Grand Jury Tr. at 4.

34.    Mrs. Carnesi testified about this identification procedure at the grand jury.  She testified that she narrowed the lineup down to two photos—Mr. Flanks and one other—and then asked her daughter to bring her a flashlight to "make sure that it's him if it's here."  Ex. 2, Grand Jury Tr. at 4–5.

35.    Notably, two of the "fillers" lacked mustaches, despite that being part of the witness's description of the Actual Perpetrator.  Ex. 42, 1984 Suppression Hr'g Tr. 21–22.

36.    Mrs. Carnesi told the detectives that the "one thing" she remembered about the Perpetrator was the "little white blotch on the side of his cheek, a little white mark, like discolored looking."  Ex. 2, Grand Jury Tr. at 5.  In response, Defendant Dillmann "shook his head and said, 'that's him,'" indicating the photo of Mr. Flanks.  *Id.*; *see also* Ex. 1, Trial Tr. 27 (Dillmann only detective who spoke to Mrs. Carnesi during the identification procedure); Ex. 35, Lentz Dep. Tr. 53:4–24 (same).

37.    Mr. Flanks first went to trial on August 28, 1984.  *See* Ex. 18, 1984 Trial Minute Entries.

38.    At trial, the State produced testimony from NOPD Technician Otho Stubbs regarding the ballistics evidence.  *See* Ex. 18, 1984 Trial Minute Entries at FLANKS_003149.

39.    At the 1984 trial, Mr. Flanks's brother Ralph Flanks testified that Mr. Flanks was home with him at the time of the murder.  *See* Ex. 18, 1984 Trial Minute Entries at FLANKS_003149; Ex. 19, Tr. of 1984 Testimony of Ralph Flanks.

40.    After two and a half hours of deliberations, the jury at Mr. Flanks's 1984 trial could not reach a verdict and the court declared a mistrial.  Ex. 18, 1984 Trial Minute Entries at FLANKS_003150.

41.    Mr. Flanks's second trial began on May 14, 1985.  Ex. 1, Trial Tr. at OPDA-FLANKS000537.

42.    There is no evidence that the State produced the ATF Report to Mr. Flanks or his attorney.

43. There is no evidence that the State produced Mrs. Carnesi's grand jury testimony to Mr. Flanks or his attorney.

44. There is no evidence that the State produced Dillmann's handwritten notes to Mr. Flanks or his attorney.

45. There is no evidence that the State produced any NOPD daily reports to Mr. Flanks or his attorney.

46. There is no evidence that the State produced the ATF report to Mr. Flanks or his attorney.

47. The state did not introduce ballistics evidence at Mr. Flanks's trial, nor did Otho Stubbs testify. *See* Ex. 1, Trial Tr.

48. While preparing for trial, Mr. Flanks and his counsel were not given or made aware of the NOPD records showing inconsistencies between Mrs. Carnesi's initial description of the Perpetrator and Mr. Flanks's appearance, the NOPD records showing a string of similar crimes with a consistently described perpetrator, or Mrs. Carnesi's grand jury testimony regarding the photo array and her initial identification of Mr. Flanks. *See* Ex. 7, Whittaker Aff. ¶¶ 4, 7; Ex. 6, OPDA RFA Responses, Responses to RFAs 4–6; Ex. 5, City RFAs, RFA 1–2; Ex. 20, Joint Agreement & Motion to Vacate at 1, 5; Ex. 21, Vacatur Hr'g Tr. at 7–10.

49. In May of 2022, the Innocence Project of New Orleans ("IPNO") contacted the Civil Rights Division of OPDA about Mr. Flanks's case, and OPDA began its own review and investigation. Ex. 20, Joint Agreement & Motion to Vacate at 9.

50. At the conclusion of those investigations, on November 14, 2022, OPDA and Mr. Flanks's IPNO attorneys filed a Joint Agreement and Motion to Vacate his conviction. *See* Ex. 20, Joint Agreement & Motion to Vacate.

51.    A hearing on the motion to vacate was held on November 17, 2022. *See* Ex. 21, Vacatur Hr'g Tr.

52.    At the hearing on the motion to vacate, OPDA stated that "Mr. Flank's [sic] conviction was obtained in violation of *Brady v. Maryland*" because "the State failed to disclose . . . materials [that] are favorable, and under the circumstances of the State's case against Mr. Flank[s], material." *See* Ex. 21, Vacatur Hr'g Tr. at 10.

53.    OPDA acknowledged that "there is a reasonable likelihood that had [Mrs. Carnesi's] prior testimony been disclosed, it could have affected the judgment of the jury" and "defense counsel would have been able to present a compelling case that Mrs. Carnesi was innocently mistaken when presented with the wrong suspect, that Mr. Flank[s] did not resemble the perpetrator, and that the car he was arrested in did not fit the one at the crime scene." *See* Ex. 21, Vacatur Hr'g Tr. at 9.

54.    OPDA explicitly agreed that the State's conduct violated Mr. Flanks's constitutional right to due process and that Mr. Flanks "didn't receive a fair trial." *See* Ex. 21, Vacatur Hr'g Tr. at 10.

55.    Judge Rhonda Goode-Douglas of the Orleans Parish Criminal Court also acknowledged "that Mr. Flank[s] did not receive the justice that he deserved" at trial and vacated his conviction. *See* Ex. 21, Vacatur Hr'g Tr. at 23–24.

56.    OPDA concluded that Mr. Flanks was "wrongfully convicted" due to the "non-disclosure of favorable evidence," including "testimony that exculpates Mr. Flank[s]" and "other evidence of [his] innocence. *See* Ex. 20, Joint Motion and Agreement to Vacate, at 1.

57.    OPDA conceded that the suppression of favorable evidence violated Mr. Flanks's due process rights. *See* Ex. 20, Joint Agreement and Mot. to Vacate at 10.

58.     From 1983 to 1985, NOPD did not provide formal training regarding police officers' obligations under the Fourteenth Amendment to the United States Constitution to provide information favorable to criminal defendants.  Ex. 5, City RFAs, RFA 3; Ex. 34, Dillmann Dep. Tr. 29:3–30:1, 37:6–13, 169:9–173:14.

59.     From 1983 to 1985, NOPD did not have any written policies regarding police officers' obligations under the Fourteenth Amendment to the United States Constitution to provide information favorable to criminal defendants.  Ex. 5, City RFAs, RFA 4.

60.     OPDA did not have a written policy manual until 1987.  Ex. 6, OPDA RFA Responses, Response to RFA 7.

61.     From 1983 to 1985, OPDA did not have any written policies regarding compliance with prosecutors' duty under the Fourteenth Amendment of the United States Constitution to provide information favorable to criminal defendants.  Ex. 6, OPDA RFA Responses, Response to RFA 8.

62.     From 1983 to 1985, OPDA did not have any written policies regarding the transcription or disclosure of grand jury testimony to trial prosecutors or criminal defendants.  Ex. 6, OPDA RFA Responses, Response to RFA 9.

63.     From 1976 to 1990 (the "Relevant Time") OPDA maintained a custom and practice of encouraging due process violations that was so pervasive as to constitute an official municipal policy.  *See, e.g.*, *see* Ex. 3, Levenson Report at 36–41 & Exs. 1, 2, & 3 (listing dozens of cases involving *Brady* violations throughout Mr. Connick's tenure, including before, during, and immediately after Mr. Flanks's wrongful conviction); Ex. 37, Williams Dep. Tr. at 97 (prosecutors said "things like" "it's not *Brady* if I don't know about it" "all the time").

24

64.     During the Relevant Time, the caseload of the office meant that "[i]t was impossible" for ADAs to have sufficient familiarity with their own files to ensure *Brady* was followed in every case.  *See* Ex. 26, Connick Deposition in *Adams v. City of New Orleans* at 14–16.

65.     During the Relevant Time, it was not "the regular practice of the ADAs to seek out information from the [NOPD] that was not provided to them." Ex. 26, Connick Dep. Tr. in *Adams v. City of New Orleans* at 72:8–15; 73:14–25.

66.     During the Relevant Time, OPDA directed its prosecutors to rely on Louisiana law to guide their understanding of their disclosure obligations.  *See* Ex. 32, Williams Dep. Tr. in *Thompson v. Connick*, 97:23–98:2, 108:20–21, 170:22–25 (testifying that he relied upon the Louisiana Code of Criminal Procedure for his understanding of *Brady*, which did not include an obligation to disclose all favorable evidence).

67.     During the Relevant Time, OPDA did not track *Brady* violations, but did track conviction rates, *see, e.g.*, Ex. 50, Connick Dep. Tr. in *Jones v. Cannizzaro* at 65–66, 90–91 (OPDA didn't track *Brady* violations), 97:8–98:4 (OPDA did not have a policy requiring prosecutors to report *Brady* violations in either their cases or in other prosecutors' cases), 139–43 (Connick tracked individual prosecutors' conviction rates, believed that a high conviction rate showed that someone was a "good prosecutor," and considered conviction rates in making decisions about raises and promotions).

68.     During the Relevant Time, there was no policy governing information sharing regarding *Brady* material among prosecutors working on the same or related cases, *see, e.g.*, Ex. 50, Connick Dep. Tr. in *Jones v. Cannizzaro*, at 40:19–24 (Connick "d[i]dn't know th[e] mechanics

25

engaged by prosecutors" regarding the sharing of *Brady* material between prosecutors working on cases against the same defendant).

69.     During the Relevant Time, there was a pervasive lack of knowledge regarding *Brady* obligations in the OPDA.  *See* Ex. 27, Connick Dep. Tr. in *Cousin v. Connick,* et al., 7:12–14 (describing exculpatory evidence as "[e]vidence that demonstrates that [the defendant is] not guilty of the crime with which he is charged"); Ex. 32, Williams Dep. Tr. in *Thompson v. Connick*, 97:23–98:2, 108:20–21, 170:22–25 (testifying that he relied upon the Louisiana Code of Criminal Procedure for his understanding of *Brady*, which did not include an obligation to disclose all favorable evidence); Ex. 31, Whittaker Dep. Tr. in *Thompson v. Connick*, 158:16–22 (in response to being asked to define "[e]xculpatory, testifying: "That's a good question.  I don't know if that was – That's the kind of stuff I think that was never, perhaps, clarified to the extent it should have been clarified.  Exculpatory means evidence that's going to – that may tend to acquit the guy.").

70.     During the Relevant Time, prosecutors at OPDA did not regularly review grand jury testimony or produce it to the defense.  *See* Ex. 7, Whittaker Aff. ¶ 7; Ex. 43, Whittaker Dep. Tr. 13:3–21; Ex. 37, Williams Dep. Tr. at 83–84 (does not recall ever reviewing or requesting to review grand jury testimony), 127–28 (did not review the grand jury testimony in Mr. Flanks's case prior to trial), 162 (agrees with everything in the Whittaker affidavit other than that he believed grand jury proceedings were regularly transcribed); Ex. 4, Capitelli Dep. Tr. at 140 (unable to recall a single instance where grand jury testimony was provided to the defense); Ex. 38, McElroy Dep. Tr. 170–71 (there was no mechanism for tracking or confirming whether an ADA had reviewed grand jury testimony for any given case).

71.     During the Relevant Time, detectives at NOPD did not receive formal training on how to properly conduct photographic identifications.  Ex. 34, Dillmann Dep. Tr. 37:6–13; Ex. 35,

Lentz Dep. Tr. 45:4–17 (unable to remember any specific training regarding photographic identification procedures).

72.     During the Relevant Time, police officers did not receive formal training on promotion to a new role as a detective, including as a homicide detective.  Instead, they just "rode with" another detective who "until they would tell the commander he's ready to go out on his own."  Ex. 34, Dillmann Dep. Tr. 29:17–23; *see also id.* at 37; Ex. 35, Lentz Dep. Tr. 27:23–28:15; Ex. 41, City 30(b)(6) (Barnes) Dep. Tr. 58:8–59:9.  There were no guidelines or set standards for what would be included in this training.  Ex. 41, City 30(b)(6) (Barnes) Dep. Tr. 83:2–23.

73.     During the Relevant Time, detectives at NOPD did not include all exculpatory information in reports, *see* Ex. 34, Dillmann Dep. Tr. 61:13–63:23; 174:11–19; 175:25–176:6, and were not provided any instruction or policy directing them to do so, *see* Ex. 41, City 30(b)(6) (Barnes) Dep. Tr. at 82–84, 95.

74.     During the relevant time, the understanding of the detectives in the homicide department was that exculpatory evidence only include statements made in an interview conducted by an NOPD officer.  *See* Ex. 34, Dillmann Dep. Tr. at 171–176 (discussing "the entire homicide department's understanding" of their *Brady* obligations).

75.     During the Relevant Time, detectives at NOPD did not regularly provide handwritten notes or daily information reports to OPDA.  *See* Ex. 41, City 30(b)(6) (Barnes) Dep. Tr. 47:14–23 (documents provided to OPDA were the incident report, with attachments, and forensic reports), 89:19–91:13 (doesn't know whether handwritten notes or daily reports provided to OPDA); Ex. 7, Whittaker Aff. ¶ 8 (he does not recall ever seeing handwritten notes of a police officer while working as a prosecutor); Ex. 35, Lentz Dep. Tr. at 24 (at NOPD Academy he was

27

only instructed him to turn over the final report to prosecutors), 31 (did not keep handwritten notes in the case file).

76.     In 1982 to 1983, detectives at NOPD generally did not follow an NOPD policy requiring that an in-person lineup be conducted following a photo array that resulted in a positive identification. *See* Ex. 48, 1982 NOPD Policy re: Identification of Suspects, at 4; Ex. 34, Dillmann Dep. Tr. 92:1–93:17; Ex. 35, Lentz Dep. Tr. at 138–139.

77.     That same policy included a requirement for in-person lineups that "[n]othing shall he said or done which might prompt a witness or victim to identify a particular person in the lineup," and included several other detailed procedural guidelines for conducting in-person lineups. *See* Ex. 48, 1982 NOPD Policy re: Identification of Suspects, at 3.  No such requirements were included in the portion of the policy discussing identification by photo array. *See id.* at 4.

78.     During the Relevant Time, detectives at NOPD generally were not aware of, and did not follow, an NOPD policy requiring that they communicate directly with ADAs regarding their reports and other material.  *See* Ex. 34, Dillmann Dep. Tr. 51:24–52:15 (secretaries would provide documents to OPDA), 55:11–20 (detectives did not review packet of documents provided to OPDA); Ex. 41, Barnes Dep. Tr. 47:14–48:12; 50:22–51:18 (no evidence to contradict testimony that secretaries were responsible for providing documents to OPDA).

79.     During the Relevant Time, detectives at NOPD regularly did not read policy updates without consequence. *See* Ex. 34, Dillmann Dep. Tr. 92:5–17.

80.     Dillmann has been accused of committing serious malfeasance in numerous cases. Dillmann contends all the accusations are lies.  *See* Ex. 34, Dillmann Dep. Tr. 33:19–34:4, 191:21–193:12, 196:3–15.

81. "[A] code of silence existed at the NOPD." *Thomas v. City of New Orleans*, 687 F.2d 80, 82 (5th Cir. 1982); *see also Christopher Hero v. Dep't of Police*, No. 1775 (Civil Service Commission, City of New Orleans, Mar. 17, 1983) (finding it "established beyond doubt that a 'code of silence' does operate within the New Orleans Police Department").

82. In 1975, NOPD "suffer[ed] from the absence of clearly defined and enforced ground rules of behavior," and "police personnel fe[lt] free to behave as they wish in most instances." Ex. 40, McManis Mem. at 6.

83. There is conflicting evidence about OPDA's policies regarding grand jury testimony, including about what testimony was required to be transcribed, *compare* Ex. 47, OPDA (Grey) Dep. at 193:15–197:11 (it was against OPDA policy for all witness testimony at the grand jury not to be transcribed), *with* Ex. 46, Decl. of Michael Grey ¶ 6 (it was normal practice for lay witness testimony, but not law enforcement testimony to be transcribed), *and* Ex. 7, Whittaker Aff. ¶ 7 (grand jury testimony was "not routinely transcribed"); what transcripts (if any) were required to be provided to trial prosecutors, *compare* Ex. 7, Whittaker Aff. ¶ 7 ("[I]t would not be normal to have transcripts of grand jury testimony available when trying a case."), *with* Ex. 37, Jim Williams Dep. 103–104 (prosecutors would ask for the grand jury testimony when needed, but would not do so in every case, and it would not be provided with the case file), *and* Ex. 38, McElroy Dep. at 190 (as general practice, if grand jury testimony of any lay witnesses was not already in the case file, the prosecutor would order that transcript from the court reporter); who (if anyone) was responsible for this, *compare* Ex. 38, McElroy Dep. at 190 (it may be in the file already or line prosecutor may have to obtain from the court report), *with* Ex. 38, McElroy Dep. at 197 (court reporter generally followed up with trial prosecutor to provide grand jury transcripts), *and* Ex. 37, Jim Williams Dep. 103–104 (prosecutors would ask for the grand jury testimony when needed,

and it would never be provided with the case file), *and* Ex. 46, Decl. Of Michael Grey ¶ 7 (same), *and* Ex. 47, OPDA (Grey) Dep. at 195–96 (screening division attorney would be responsible for obtaining transcript and adding to case file); and what (if any) documentation was required, *compare* Ex. 46, Decl. Of Michael Grey ¶ 8 (documentation not required to obtain transcript), *and* Ex. 47, OPDA (Grey) Dep. at 203 (documentation required to obtain transcript).

84. No prosecutor could provide an account of any formal *Brady* training, or any detail about any other Brady training they may have received. *See, e.g.*, Ex. 31, Whittaker Dep. Tr. in *Thompson v. Connick* at 158:23–159:5 (did not recall any training re: *Brady*); Ex. 37, Williams Dep. Tr. at 28:23–29:4, 29:21–30:18; 78:3–12 (did not recall training re: *Brady*).

Dated: October 24, 2025
New York, New York


MURELL LAW FIRM

By: */s/ Christopher J. Murell*
Christopher J. Murell
La. Bar No. 32075
Meghan K. Matt
La. Bar No. 39975
4005 Saint Claude Avenue
New Orleans, Louisiana 70117
(504) 717-1297 (Tel)
chris@murell.law
meghan@murell.law

SHANIES LAW OFFICE

By: David W Shanies
David B. Shanies* (T.A.)
Deborah I. Francois*
Tristan M. Ellis*
Eleanor C. Davis*
110 West 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com
deborah@shanieslaw.com
tristan@shanieslaw.com
eleanor@shanieslaw.com

*Admitted *Pro Hac Vice*


*Attorneys for Plaintiff Raymond Flanks*