## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RAYMOND FLANKS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 23-6897** |
| **THE CITY OF NEW ORLEANS et al.** | **SECTION: "G"(4)** |

## ORDER AND REASONS

This litigation arises from Plaintiff Raymond Flanks's ("Plaintiff") wrongful conviction for first-degree murder in 1985. Plaintiff names as Defendants the City of New Orleans; Jason Williams, in his official capacity as Orleans Parish District Attorney; Anne Kirkpatrick, in her official capacity as Superintendent of the New Orleans Police Department; John Dillmann, in his individual capacity; and John/Jane Does #1-20 in their individual capacities.[1] Plaintiff brings a claim against Jason Williams in his official capacity as the District Attorney for Orleans Parish ("Williams") under *Monell v. Department of Social Services of the City of New York*.[2] Plaintiff alleges the Orleans Parish District Attorney's Office ("OPDA") secured his wrongful conviction in violation of his constitutional rights by withholding material exculpatory evidence in violation of OPDA's obligations under *Brady v. Maryland*.[3]

Before the Court is Williams's Motion for Summary Judgment.[4] Williams does not move for summary judgment on the issue of whether a *Brady* violation occurred.[5] Even assuming that a

---

[1] *See* Rec. Doc. 27.

[2] *Id.* at 51. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

[3] Rec. Doc. 27 at 4–5. *See Brady v. Maryland*, 373 U.S. 83 (1963).

[4] Rec. Doc. 66.

[5] Rec. Doc. 66-1 at 2.

*Brady* violation occurred, Williams argues that Plaintiff's claims against OPDA still fail because Plaintiff cannot present competent evidence to show: (1) that OPDA's policymaker, then District Attorney Harry Connick ("Connick"), adopted and implemented an unconstitutional policy concerning *Brady* disclosures; (2) that Connick acted with deliberate indifference to the rights of criminal defendants; or (3) that Connick's conduct directly caused the alleged suppression of evidence in Plaintiff's criminal case.[6] Plaintiff opposes the motion, arguing that he has put forth sufficient evidence to support *Monell* liability under three distinct theories.[7]

For the reasons discussed in more detail below, there are facts in dispute precluding summary judgment on the *Monell* claim brought against Williams. Plaintiff has not presented sufficient evidence to show that OPDA maintained an official policy in violation of *Brady*. However, the amount and similarity of *Brady* violations occurring under Connick's tenure, combined with other circumstantial evidence of a pervasive culture of indifference to *Brady*, is sufficient for a reasonable juror to conclude there was a custom of withholding exculpatory witness testimony within OPDA and that Connick had constructive and/or actual notice of the practice. The same facts are enough for a reasonable juror to find OPDA failed to train, supervise, and discipline its employees regarding their obligations under *Brady*, and that these failures amounted to deliberate indifference to the "known or obvious" risk that criminal defendants' rights would be violated. A reasonable juror could also find that the custom of *Brady* violations was the moving force behind Plaintiff's claimed constitutional violation. Accordingly, having considered the motion, the memoranda in support and opposition, the record, and the applicable law, the Court denies the motion.

---

[6] *Id.* at 2–6.

[7] Rec. Doc. 91.

## I. Background

In May 1985, a jury found Plaintiff guilty of first-degree murder in the death of Martin Carnesi ("Mr. Carnesi").[8] This was Plaintiff's second trial after the first trial in August 1984 resulted in a mistrial when the jury was unable to reach a verdict.[9] At both trials, Mr. Carnesi's wife, Faye Carnesi ("Mrs. Carnesi"), testified to the circumstances of her husband's death, including identifying Plaintiff as the suspect who shot her husband.[10]

According to the Amended Complaint, Mr. Carnesi was shot by the Actual Perpetrator ("Actual Perpetrator") on December 17, 1983, in a robbery gone wrong.[11] At the time, Mr. Carnesi was walking Mrs. Carnesi to her car that was parked in front of their home.[12] After Mr. Carnesi was shot, Mrs. Carnesi threw her purse at the Actual Perpetrator and ran away.[13] Initially, Mrs. Carnesi represented that the Actual Perpetrator was a Black man in his late twenties, about 5'10" and 150 pounds, with a medium build, brown skin, and a light mustache.[14] Mrs. Carnesi also reported that the Actual Perpetrator was wearing a shower cap and sped off in an aged, light blue car.[15] Approximately a week after the crime, NOPD detectives, including Dillmann, visited Mrs. Carnesi at her home and showed her a photo lineup for identification.[16] Mrs. Carnesi narrowed it

---

[8] Rec. Doc. 27 at 12–13.

[9] *Id.* at 11–12.

[10] *Id.* at 12–13.

[11] *Id.* at 8–9.

[12] *Id.* at 9.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* at 11.

down to two photos, Plaintiff and one other individual.[17] Dillmann then suggested to Mrs. Carnesi that Plaintiff was the perpetrator.[18]

Mrs. Carnesi testified before the grand jury and identified Plaintiff as the perpetrator, based on her identification of him when Dillmann suggested that Plaintiff was the perpetrator.[19] Mrs. Carnesi testified that the Actual Perpetrator had a "little white blotch on the side of his cheek, a little white mark, like discolored looking," but rationalized her selection of Plaintiff from the photo lineup because she "didn't think they showed the side of his face with that mark in the photo."[20]

Plaintiff's first trial began on August 28, 1984.[21] Mrs. Carnesi identified Plaintiff and testified that the car he was arrested in resembled the car she saw fleeing the scene.[22] OPDA prosecutors also presented testimony from an NOPD technician who testified that Mr. Carnesi was shot with the same gun as the gun in Plaintiff's possession.[23] This first trial resulted in a hung jury.[24] After the first trial, the Bureau of Alcohol, Tobacco, and Firearms conducted independent ballistics testing and determined that neither the bullets used to kill Mr. Carnesi nor the casing found at the scene matched Plaintiff's gun.[25] At the second trial, Mrs. Carnesi testified that she

---

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.* at 12.

[23] *Id.*

[24] *Id.*

[25] *Id.*

"knew 'it was him'" and also testified that Dillmann did not suggest to her who to identify during the photo lineup.[26] The jury returned a guilty verdict for first-degree murder at this second trial.[27]

Nearly 37 years later, on November 17, 2022, Plaintiff's first-degree murder conviction was vacated.[28] At the November 17, 2022 exoneration hearing, the "OPDA stated that 'the State agrees that Mr. Flank's [sic] conviction was obtained in violation of *Brady v. Maryland*' because 'the State failed to disclose … materials [that] are favorable, and under circumstances of the State's case against Mr. Flank[s], material.'"[29] Plaintiff notes OPDA specifically "acknowledged that 'there is a reasonable likelihood that had [Mrs. Carnesi's] prior testimony been disclosed, it could have affected the judgment of the jury' and 'defense counsel would have been able to present a compelling case that Mrs. Carnesi was innocently mistaken when presented with the wrong suspect, that Mr. Flank[s] did not resemble[] the perpetrator, and that the car he was arrested in did not fit the one at the crime scene.'"[30]

Plaintiff brings a *Monell* claim against Williams in his official capacity as the District Attorney for Orleans Parish.[31] Plaintiff alleges that "throughout the 1970s, 1980s, and 1990s, OPDA maintained policies and customs that promoted, facilitated, and condoned misconduct by prosecutors and other OPDA employees and agents, including concerning the suppression of exculpatory and favorable evidence to criminal defendants and their counsel."[32] Plaintiff further

---

[26] *Id.*

[27] *Id.* at 13.

[28] *Id.* at 14.

[29] *Id.*

[30] *Id.*

[31] *Id.* at 51.

[32] *Id.* at 19.

alleges OPDA's policymakers maintained a policy, custom, or pattern and practice of condoning official misconduct, including by failing to train, supervise, and discipline prosecutors.[33] According to Plaintiff, because he and his counsel "were not aware of the NOPD records showing inconsistencies between Mrs. Carnesi's initial description of the Actual Perpetrator and Mr. Flanks's appearance, the NOPD records showing a string of similar crimes with a consistently described perpetrator, or Mrs. Carnesi's grand jury testimony regarding the photo array and her initial identification of Mr. Flanks," this exculpatory material was unusable at trial.[34]

On January 18, 2024, Williams filed his first motion to dismiss.[35] This Court denied the motion without prejudice, granting leave to Plaintiff to amend the Complaint to "clarify certain issues so that the Court has the information it needs to analyze whether Plaintiff has sufficiently plead a *Monell* claim against Defendant Williams."[36] Plaintiff filed an Amended Complaint on June 4, 2024.[37] Williams then filed a Second Motion to Dismiss for Failure to State a Claim on June 18, 2024.[38] On February 28, 2025, the Court denied the motion.[39]

---

[33] *Id.* at 15.

[34] *Id.* at 13.

[35] Rec. Doc. 15.

[36] Rec. Doc. 26 at 27.

[37] Rec. Doc. 27.

[38] Rec. Doc. 28.

[39] Rec. Doc. 44.

On September 30, 2025, Williams filed the instant Motion for Summary Judgment.[40] On October 24, 2025, Plaintiff filed an opposition to the motion.[41] On November 4, 2025, Williams filed a reply brief in further support of the motion.[42]

## II. Parties' Arguments

### A.    *Williams's Arguments in Support of the Motion for Summary Judgment*

Williams does not move for summary judgment on the issue of whether a *Brady* violation occurred.[43] Surprisingly, considering that his office joined in the motion to vacate Plaintiff's conviction, Williams asserts he will present evidence at trial to show that there is no evidence known to the State that materially undermines Mrs. Carnesi's identification of Plaintiff as the perpetrator.[44] Nevertheless, even assuming that a *Brady* violation occurred, Williams argues that Plaintiff's claims against OPDA still fail because Plaintiff cannot present competent evidence to show: (1) that Connick adopted and implemented an unconstitutional policy concerning *Brady* disclosures; (2) that Connick acted with deliberate indifference to the rights of criminal defendants; or (3) that Connick's conduct directly caused the alleged suppression of evidence in Plaintiff's criminal case.[45]

Williams argues there is no evidence that OPDA had a facially unconstitutional *Brady* policy, and the evidence does not show that Connick was on notice of a pervasive practice or

---

[40] Rec. Doc. 66.

[41] Rec. Doc. 91.

[42] Rec. Doc. 103.

[43] Rec. Doc. 66-1 at 2.

[44] *Id.*

[45] *Id.* at 2–6.

custom in his office that caused repeated *Brady* violations.[46] Williams submits that the only *Brady* violations relevant in showing actual or constructive notice to Connick are those that resulted in court findings before Plaintiff's conviction in May 1985.[47] Considered in the context of the number of cases prosecuted, Williams asserts the *Brady* violations identified by Plaintiff would not have put Connick on notice of a problem with his office's policies.[48] Williams also asserts Plaintiff cannot prove that there were enough "very similar" *Brady* violations before his conviction to provide adequate notice.[49] Williams argues that none of the alleged *Brady* violations before Plaintiff's conviction involved failure to disclose grand jury testimony that was favorable to the defense.[50] Williams submits that Plaintiff cannot carry his evidentiary burden of proving that prior *Brady* rulings were sufficiently similar to actually give Connick fair notice of the defects in OPDA's policies that led to a *Brady* violation in Plaintiff's case.[51]

Assuming that Plaintiff can show Connick was on notice of a pattern, Williams submits the evidence does not show Connick acted with deliberate indifference.[52] Instead, Williams argues OPDA's official policies and practices were reasonably calculated to ensure that *Brady* evidence was identified and disclosed to the defense.[53] Williams presents a declaration of Diane Major, who

---

[46] *Id.* at 9.

[47] *Id.* at 10–12.

[48] *Id.* at 12–13.

[49] *Id.* at 17.

[50] *Id.*

[51] *Id.* at 18–19.

[52] *Id.* at 19.

[53] *Id.*

was employed by OPDA from 1976 through at least 1988 as the grand jury reporter.[54] Mrs. Major attests that OPDA policy required her to prepare transcripts of all lay witnesses who testified before the grand jury in indicted cases and make those transcripts available to the prosecutors who would be trying the case.[55] Williams also presents the declaration of Judge Dennis Waldron, who served in various positions at OPDA until 1982, who confirmed that trial prosecutors were required to review the grand jury transcripts for potentially exculpatory material that would need to be disclosed to the defense.[56] Additionally, Williams presents deposition testimony of various former prosecutors who all testified that OPDA held weekly conferences, where one purpose was to ascertain what discovery had been provided in the case and whether the State had satisfied its *Brady* obligations.[57] Williams asserts it is not enough for Plaintiff to show that more, or better, training might have prevented the alleged constitutional violation.[58] Instead, Williams argues that Plaintiff must prove Connick was on notice "that a particular omission in [OPDA's] training program causes . . . employees to violate citizens' constitutional rights."[59]

Finally, Williams argues that Plaintiff cannot prove the "moving force" causation element because there is no evidence that the prosecutors who handled his case were acting pursuant to an unconstitutional policy.[60] According to Williams, there is no evidence that the prosecutors who handled Plaintiff's criminal case were following any specific policy causing suppression of

---

[54] *Id.*

[55] *Id.*

[56] *Id.* at 20.

[57] *Id.* at 20–21.

[58] *Id.* at 21.

[59] *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

[60] *Id.* at 22.

exculpatory evidence—much less a policy that was intended to prevent disclosure of exculpatory evidence.[61] Moreover, Williams contends there is no evidence that the prosecutors were trained or instructed in ways that caused them to misunderstand their *Brady* obligations or otherwise fail to comply with them.[62]

**B.    *Plaintiff's Arguments in Opposition to Motion for Summary Judgment***

In opposition, Plaintiff begins by arguing that his claim goes well beyond the theory rejected by the Supreme Court in *Thompson*.[63] Plaintiff argues that he has put forth sufficient evidence to support *Monell* liability under three distinct theories:

> (1) OPDA maintained unconstitutional policies by (a) using an improperly narrow definition of constitutional disclosure obligations, and (b) maintaining a system for assigning and reassigning cases in a manner that compartmentalized information and concealed exculpatory information even from prosecutors; (2) OPDA maintained an unconstitutional custom driven by a 'pervasive culture of indifference to *Brady*'; and (3) Harry Connick, having knowledge of multiple instances in which prosecutors suppressed material exculpatory evidence and presented false testimony, fostered practices constituting deliberate indifference toward *Brady* violations.[64]

First, Plaintiff argues a reasonable juror could conclude that OPDA maintained a policy, custom, and practice of permitting, encouraging, and condoning *Brady* violations.[65] Plaintiff contends the evidence shows that OPDA instructed prosecutors to follow an improperly restrictive

---

[61] *Id.*

[62] *Id.*

[63] Rec. Doc. 91 at 4.

[64] *Id.* at 13.

[65] *Id.*

interpretation of their *Brady* obligations.[66] Plaintiff submits that the jury should resolve the contradictory evidence on the training prosecutors received regarding their *Brady* obligations.[67]

Plaintiff also asserts a reasonable juror could conclude that OPDA's system for case assignment and reassignment guaranteed *Brady* violations.[68] Plaintiff submits that OPDA's policies made *Brady* violations inevitable by siloing the information learned by "screeners" (the prosecutors who first evaluated cases, made charging decisions, and conducted grand jury presentations) from the prosecutors who would try criminal cases.[69] Plaintiff cites evidence to show that screeners were not required to document witnesses' statements or communicate any statements to the trial prosecutor.[70] Plaintiff asserts that this system guaranteed that prosecutors who tried the case were not even required to know the substance of statements made to other prosecutors.[71] Plaintiff contends this problem was particularly acute regarding grand jury proceedings, and he contends that OPDA's witnesses gave conflicting testimony regarding what testimony was transcribed and what transcripts were provided to trial prosecutors.[72] Plaintiff argues that this dysfunctional policy is especially relevant here, where both trial prosecutors claim they were unaware of Mrs. Carnesi's grand jury testimony.[73]

---

[66] *Id.*

[67] *Id.* at 15–16.

[68] *Id.* at 16.

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.* at 16.

[73] *Id.* at 17.

Second, Plaintiff asserts a reasonable juror could conclude that OPDA maintained an unconstitutional custom driven by a pervasive culture of indifference to *Brady*.[74] Plaintiff claims "that prosecutors were so widely permitted to violate *Brady*, and violated *Brady* so often and with such brazenness, that OPDA effectively adopted a policy of permitting and encouraging such violations."[75] Plaintiff states his expert, Laurie Levenson, has identified 57 cases over a period of 45 years in which a court found that OPDA's nondisclosure of material exculpatory evidence violated the defendant's constitutional rights, 22 of which occurred in the 18 years prior to Plaintiff's conviction.[76] Plaintiff also cites testimony from former OPDA prosecutors that a saying around the office was, "it's not *Brady* if the defense doesn't know about it."[77] Plaintiff contends that Connick adamantly opposed open discovery and specifically instructed prosecutors not to disclose information that was not required to be disclosed by law.[78] Plaintiff asserts the *Brady* policy adopted by Connick in 1987 was wholly inaccurate, inadequate, and misleading.[79]

Plaintiff asserts he has also provided evidence of "very similar violations," including instances where the state did not disclose prior inconsistent statements of eyewitnesses, the fact that a witness testified falsely, police reports and/or notes containing *Brady* material, evidence that the defendant did not match the perpetrator's characteristics or description, evidence of police or prosecutorial misconduct, and evidence of similar crimes committed by someone else.[80] Plaintiff

---

[74] *Id.*

[75] *Id.* at 18.

[76] *Id.* at 18–19.

[77] *Id.* at 19.

[78] *Id.*

[79] *Id.*

[80] *Id.* at 20.

contends that OPDA has not explained what cases it believes are not sufficiently similar.[81] Plaintiff asserts *Brady* violations that pre-date his conviction and later came to light are relevant and probative to show the practices and customs at OPDA during the time period before and during his criminal proceedings.[82]

Third, Plaintiff contends that a reasonable juror could conclude that Connick fostered practices constituting deliberate indifference toward *Brady* violations.[83] Plaintiff asserts that the evidence demonstrating that OPDA failed to train, supervise, and discipline its employees regarding their obligations under *Brady* and that these failures amounted to deliberate indifference to the "known or obvious" risk that criminal defendants' rights would be violated.[84] Plaintiff points to the evidence discussed above: (1) evidence regarding the widespread and persistent nature of *Brady* violations by OPDA in the 1970s and 1980s; (2) evidence of training, comments, and attitudes within the office indicating a pervasive disregard for and misunderstanding of *Brady*; and (3) numerous specific examples of other documented instances of such violations.[85] Plaintiff argues that Williams's evidence regarding the statistical likelihood of a *Brady* violation occurring is unpersuasive.[86] Unlike excessive force claims, Plaintiff contends that *Brady* claims involve concealed action (or inaction) for which there may be no documentation at all.[87] Plaintiff argues if the number of *Brady* violations in Orleans Parish—"the most incarcerated city in the world and

---

[81] *Id.*

[82] *Id.* at 21.

[83] *Id.*

[84] *Id.*

[85] *Id.* at 22.

[86] *Id.* at 23.

[87] *Id.*

the city with the highest number of exonerations," and "ground zero for unfairness in the criminal

legal system,"—is insufficient, then it is difficult to see how any plaintiff could ever establish

*Monell* liability based on *Brady* violations.[88]

Finally, Plaintiff argues that OPDA's policies were the moving force behind Plaintiff's

injuries.[89] Plaintiff submits OPDA is incorrect that there is not any evidence that the prosecutors

in his criminal case were trained or instructed in ways that caused them to misunderstand their

*Brady* obligations.[90] Plaintiff contends that the prosecutors' accounts differ as to: (1) whether

grand jury transcripts were provided to trial prosecutors; (2) what police records should have been

provided to the prosecutor and the defense; and (3) whether *Brady*-specific training was provided

to prosecutors in the years leading up to Plaintiff's criminal conviction.[91]

### C.    *Williams's Further Arguments in Support of the Motion for Summary Judgment*

In reply, Williams argues that the statements on OPDA's website regarding a high number

of exonerations does not suggest that OPDA had an unconstitutional *Brady* policy.[92] Williams

contends that Plaintiff misrepresents the testimony of former prosecutor Jim Williams, on which

Plaintiff relies to show that OPDA had an official policy of complying only with the Louisiana

Code of Criminal Procedure and ignoring *Brady*.[93] While Jim Williams explained that defendants

were not routinely given discovery beyond what they were entitled to under the Louisiana Code

---

[88] *Id.* at 24 (quoting Deliver Justice, OPDA, https://orleansda.com/ourwork/deliver-justice).

[89] *Id.* at 25.

[90] *Id.*

[91] *Id.* at 26.

[92] Rec. Doc. 103 at 2–3.

[93] *Id.* at 3–4. Jim Williams is referred to by his full name throughout this Order to distinguish from Defendant Jason Williams.

of Criminal Procedure, Williams submits that Jim Williams's testimony leaves no doubt that he understood that defendants were also entitled to *Brady* material.[94]

Williams contends there is no evidence that OPDA had unconstitutional policies concerning assignments of cases and taking notes of witness interviews.[95] According to Williams, Plaintiff has not identified anything that might have put Connick on notice that OPDA's policies with respect to grand jury testimony were inadequate to protect the rights of criminal defendants.[96]

Additionally, Williams submits there is no evidence that OPDA had a "persistent, widespread practice" of withholding exculpatory evidence.[97] Williams asserts "withholding exculpatory evidence" describes a result, not a practice, which can occur for a variety of reasons.[98] Williams contends that the report of Plaintiff's expert, Laurie Levenson, should not be considered because it makes unsupported and inaccurate assertions that *Brady* violations occurred in all of the cases listed.[99] Moreover, even if the report is considered, Williams points out that it establishes, at best, two purported *Brady* violations per year over a 47-year period.[100] According to Williams, something that occurs in far less than one percent of cases prosecuted is clearly not a persistent or widespread practice that is so common and well-settled as to be the *de facto* policy.[101]

---

[94] *Id.* at 4.

[95] *Id.* at 6.

[96] *Id.* at 8.

[97] *Id.*

[98] *Id.*

[99] *Id.* at 10–13.

[100] *Id.* at 13.

[101] *Id.*

Williams contends that Plaintiff has not produced evidence showing Connick acted with deliberate indifference.[102] Williams argues that Plaintiff's attempt to distinguish *Verastique* on the ground that police excessive force incidents are known and obvious, whereas *Brady* violations are hidden is both questionable as a factual matter and irrelevant.[103] Williams points out that nothing in *Verastique* suggests that the analysis pertains only to certain types of *Monell* claims.[104] Regardless of whether constitutional violations are apparent and easily discovered or concealed, Williams points out that the law does not permit municipalities to be held liable under Section1983 unless their policymakers have acted with deliberate indifference.[105]

Finally, Williams asserts that Plaintiff has not produced evidence showing OPDA's allegedly unconstitutional policies caused the *Brady* violation in his case.[106] Williams contends that Plaintiff has not even tried to explain how OPDA's official policies caused the prosecutors handling his criminal case to fail to disclose purported *Brady* evidence.[107] Additionally, Williams argues that Plaintiff has not explained the specific alleged deficiencies in OPDA's training and how the *Brady* violation in his case would have been avoided with better training on those issues.[108]

---

[102] *Id.* at 14.

[103] *Id.* at 15.

[104] *Id.*

[105] *Id.*

[106] *Id.* at 16.

[107] *Id.* at 17.

[108] *Id.*

## III. Legal Standard

### A.    *Motion for Summary Judgment*

Summary judgment is appropriate when the pleadings, discovery, and affidavits demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[109] To decide whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[110] All reasonable inferences are drawn in favor of the nonmoving party.[111] Yet "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[112] If the entire record "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists and, consequently, the moving party is entitled to judgment as a matter of law.[113] The nonmoving party may not rest upon the pleadings.[114] Instead, the nonmoving party must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[115]

The party seeking summary judgment always bears the initial responsibility of showing the basis for its motion and identifying record evidence that demonstrates the absence of a genuine

---

[109] Fed. R. Civ. P. 56(a); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[110] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000)).

[111] *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Reeves*, 530 U.S. at 150).

[112] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[113] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cites Serv. Co.,* 391 U.S. 253, 289 (1968)).

[114] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[115] *See id.*; *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

issue of material fact.[116] "To satisfy this burden, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element of the opponent's claim or defense."[117] If the moving party satisfies its initial burden, the burden shifts to the nonmoving party to "identify specific evidence in the record, and to articulate" precisely how that evidence supports the nonmoving party's claims.[118] The nonmoving party must set forth "specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."[119]

The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[120] Moreover, the nonmoving party may not rest upon mere allegations or denials in its pleadings.[121]

## B.    *Monell Claim*

To prevail on a *Monell* claim, a plaintiff must show "(1) an official policy (or custom), (2) that a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional

---

[116] *Celotex Corp.*, 477 U.S. at 323.

[117] *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir. 1991) (internal citation omitted).

[118] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

[119] *Morris*, 144 F.3d at 380; *see also Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).

[120] *Little*, 37 F.3d at 1075 (internal citations and quotation marks omitted).

[121] *Morris*, 144 F.3d at 380.

violation whose moving force is that policy (or custom)."[122] "Official policy is ordinarily contained in duly promulgated policy statements, ordinances or regulations."[123] But a custom can be evidenced by a " "widespread" practice of officials or employees that, while not officially adopted or promulgated, is "so common and well-settled as to constitute a custom that fairly represents municipal policy."[124] "[E]ven a facially innocuous policy will support liability if it was promulgated with *deliberate indifference* to the known or obvious consequences that constitutional violations would result."[125] To prove deliberate indifference, a "showing of simple or even heightened negligence will not suffice."[126] Instead, "Courts of Appeals have routinely equated deliberate indifference with recklessness."[127]

Plaintiff must additionally demonstrate actual or constructive knowledge of the official policy or custom and that the constitutional violation's "moving force" is that policy or custom.[128] Whether the moving force behind the constitutional violation is policy or custom is proved by a "direct causal link between the municipal policy and the constitutional deprivation."[129]

---

[122] *Moore v. LaSalle Mgmt. Co., L.L.C.,* 41 F.4th 493, 509 (5th Cir. 2022) (internal citations and quotations omitted).

[123] *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001).

[124] *Vardeman v. City of Houston*, 55 F.4th 1045, 1052 (5th Cir. 2022).

[125] *Piotrowski*, 237 F.2d at 579 (emphasis added).

[126] *Board of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997).

[127] *Farmer v. Brennan*, 511 U.S. 825, 836 (1994) (collecting cases).

[128] *Piotrowski*, 237 F.2d at 579.

[129] *Id.* at 580.

## **IV. Analysis**

This case centers around a prosecutor's duty to disclose evidence to the defense. In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused [] violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[130] The prosecutor's duty to provide favorable evidence includes impeachment evidence and exculpatory evidence.[131] The prosecutor's duty to disclose evidence includes both evidence in its own possession and any other "favorable evidence known to the others acting on the government's behalf in the case, including the police."[132] "[T]he duty to disclose such evidence is applicable even though there has been no request by the accused."[133] To prevail on a *Brady* claim, a criminal defendant must show: (1) the prosecutor suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material to guilt or punishment.[134]

Williams does not move for summary judgment on the issue of whether a *Brady* violation occurred.[135] Even assuming that a *Brady* violation occurred, Williams argues that Plaintiff's claims against OPDA still fail because Plaintiff cannot present competent evidence to show: (1) that Connick adopted and implemented an unconstitutional policy concerning *Brady* disclosures; (2) that Connick acted with deliberate indifference to the rights of criminal defendants; or (3) that

---

[130] *Brady*, 373 U.S. at 87.

[131] *United States v. Bagley*, 473 U.S. 667, 676 (1985).

[132] *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

[133] *Strickler v. Greene*, 527 U.S. 263, 279 (1999).

[134] *Miller v. Dretke*, 431 F.3d 241, 245 (5th Cir. 2005) (citing *Brady*, 373 U.S. at 87).

[135] Rec. Doc. 66-1 at 2.

Connick's conduct directly caused the alleged suppression of evidence in Plaintiff's criminal case.[136] The Court considers each of these arguments in turn.

A. *Whether Plaintiff has Presented Evidence upon which a Reasonable Juror Could Conclude that OPDA Maintained a Policy, Custom or Practice of Permitting Brady Violations*

To succeed on a *Monell* claim, Plaintiff must present facts to establish Connick had actual or constructive knowledge of an official policy, practice, or custom of similar constitutional violations. Plaintiff argues that he has put forth sufficient evidence to support *Monell* liability under three distinct theories:

> (1) OPDA maintained unconstitutional policies by (a) using an improperly narrow definition of constitutional disclosure obligations, and (b) maintaining a system for assigning and reassigning cases in a manner that compartmentalized information and concealed exculpatory information even from prosecutors; (2) OPDA maintained an unconstitutional custom driven by a 'pervasive culture of indifference to *Brady*'; and (3) Harry Connick, having knowledge of multiple instances in which prosecutors suppressed material exculpatory evidence and presented false testimony, fostered practices constituting deliberate indifference toward *Brady* violations.[137]

Establishing an official policy, practice, or custom can be done in one of three ways. First, there may be a policy that is "officially adopted and promulgated" by the municipality or an official within the municipality with policymaking authority.[138] Second, there may be a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy."[139] A persistent, widespread practice may include allegations that a

---

[136] *Id.* at 2–6. Williams does not dispute that Connick was a policymaker.

[137] Rec. Doc. 91 at 13.

[138] *Burge v. Par. of St. Tammany (Burge II)*, 336 F.3d 363, 369 (5th Cir. 2003).

[139] *Id.*

policymaker failed to act affirmatively, "if the need to take some action to control the agents of the local governmental entity 'is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r] … can reasonably be said to have been deliberately indifferent to the need.'"[140] A policymaker with policy-making authority must have actual or constructive knowledge of the custom.[141] Third, "a single decision by a policy maker may, under certain circumstances, constitute a policy for which a municipality may be liable."[142]  In this case, Plaintiff argues that there is evidence to support a *Monell* claim under the first and second options.[143]

### 1.      Official Policy

Plaintiff asserts that OPDA maintained two official unconstitutional policies: (1) using an improperly narrow definition of constitutional disclosure obligations and (2) maintaining a system for assigning and reassigning cases in a manner that compartmentalized information and concealed exculpatory information even from prosecutors.[144]

> #### a.      Alleged Policy of Instructing Prosecutors to Adopt an Improperly Narrow Definition of Brady

Plaintiff relies on statements by two of the prosecutors in his case, Jim Williams and Bruce Whittaker, to argue that "OPDA instructed prosecutors to follow an improperly restrictive

---

[140] *Burge v. Par. of St. Tammany (Burge I)*, 187 F.3d 452, 471 (5th Cir. 1999) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

[141] *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (internal citations omitted).

[142] *Id.* (quoting *Brown v. Bryan Cnty., OK*, 219 F.3d 450, 462 (5th Cir. 2000)).

[143] Plaintiff does not assert a theory of "single-incident liability," a path foreclosed in the *Brady* context by the Supreme Court's opinion in *Thompson*, 563 U.S. at 62–72.

[144] Rec. Doc. 91 at 13.

interpretation of their *Brady* obligations."[145] Plaintiff argues that this testimony suggests  that OPDA had an official policy of complying with only the Louisiana Code of Criminal Procedure and ignoring the constitutional requirements of *Brady*. Williams contends this is an unfair characterization of the testimony.[146]

During a deposition taken in the *Thompson* case, Jim Williams testified it was Connick's policy not to turn over witness statements.[147] Jim Williams stated this policy was consistent with the Louisiana Code of Criminal Procedure, and prosecutors "were instructed to follow what the rules of the Louisiana Code of Criminal Procedure were."[148] Jim Williams also testified that "if a witness got up on the stand and testified in a way that was inconsistent with his prior sworn statement," he would "absolutely" have to disclose that to the defense or it would be "a violation of the *Brady* decision."[149] He testified that "Mr. Connick expected that all the attorneys who worked for him knew what *Brady* was and they knew what it meant, and that they knew that if there was *Brady* material, then it's—you were duty bound to turn it over."[150] He stated that if "evidence was potentially favorable to the defense but would not, in and of itself, exculpate the defense," he was obligated to disclose it to the defense.[151] He explained that he typically would not produce a copy of a supplemental police report to the defense "unless . . . the report contained

---

[145] *Id.*

[146] Rec. Doc. 103 at 3–6.

[147] Rec. Doc. 91-33 at 97–98.

[148] *Id.* at 98–99.

[149] *Id.* at 99.

[150] *Id.* at 113.

[151] *Id.* at 193.

*Brady* material."[152] Jim Williams further testified that OPDA did not disclose witness statements and police reports to criminal defendants in the 1980s "on a routine basis."[153]

On October 16, 2025, Jim Williams was deposed again in reference to this case. During his recent deposition, Jim Williams testified that he could not recall ever having disclosed supplemental reports, "dailies," or grand jury testimony in any case.[154] He further testified that he did not discuss *Brady* obligations with other assistant prosecutors or supervisors when preparing for trial:

> We knew what our responsibilities were. So . . . using those words in that fashion, no, that wouldn't have been done. I mean, we knew. And when we would talk about a problem, we wouldn't say, you know, hey Joe, I've got a *Brady* problem here. It would be, "hey, Joe, look, this witness, you know, is recanting their story; they're now telling a different story." We wouldn't say, "we've got a *Brady* problem; this is our problem." It would—and that would—could in effect have been a *Brady* problem.[155]

Plaintiff also relies on an affidavit of Bruce Whittaker ("Whittaker") to argue that "[p]rosecutors were . . . told that grand jury testimony was always confidential and not to be disclosed, making no exception for *Brady* information."[156] Whittaker attests "it would not be normal to have transcripts of grand jury testimony available when trying a case."[157] Although he knew that grand jury proceedings were recorded, it was his understanding that they were not routinely transcribed as the testimony was "confidential."[158]

---

[152] *Id.* at 107.

[153] *Id.* at 171.

[154] Rec. Doc. 91-38 at 95–96.

[155] *Id.* at 126–27.

[156] Rec. Doc. 91 at 14.

[157] Rec. Doc. 91-8 at 2.

[158] *Id.*

Whittaker was subsequently asked in his deposition what he would have done if he had encountered exculpatory material in grand jury testimony, and he explained:

> If I found exculpatory evidence or was aware that we possessed exculpatory evidence, I would turn it over to the defense. If it was a grand jury, you mentioned showing it to the judge, I might have had some hesitation because of the confidential nature of it. But I either would've turned it over or I would've consulted with someone in the office or I would've talked to the judge about it. . . . I was well aware that despite the confidentiality of grand jury material, . . . exculpatory evidence had to be turned over. I just would've wondered, how do I do this without screwing up.[159]

Viewing this evidence in the light most favorable to Plaintiff, he has not demonstrated that OPDA had an official policy of instructing prosecutors to adopt an inappropriately narrow definition of their constitutional disclosure obligations under *Brady*. A review of the testimony as a whole does not support Plaintiff's argument that prosecutors were instructed to ignore their *Brady* obligations and follow a more limited disclosure obligation under Louisiana state law. Jim Williams explained that defendants were not routinely given discovery beyond what they were entitled to under the Louisiana Code of Criminal Procedure. Nevertheless, Jim Williams's testimony leaves no doubt that he understood that defendants were also entitled to *Brady* material.

While Whittaker's affidavit suggests that grand jury testimony was "confidential," it does not say whether or not "confidential" grand jury testimony was disclosed when it contained *Brady* material. Moreover, Whittaker's subsequent deposition testimony suggests that he would have understood that *Brady* material found in grand jury testimony would need to be disclosed. Therefore, Plaintiff has not presented any competent summary judgment evidence to support his argument that OPDA had an official policy of instructing prosecutors to adopt an inappropriately narrow definition of their constitutional disclosure obligations under *Brady*.

---

[159] Rec. Doc. 91-44 at 143–44.

b.     *Alleged Policy for Case Assignment and Reassignment*

Plaintiff also argues that OPDA had an unconstitutional *Brady* policy because the prosecutors who screened cases to determine whether they should be accepted for prosecution were typically not the same prosecutors who brought the cases to trial, and the screening prosecutors were not required to document all statements made to them by witnesses during interviews and relay those statements to the trial prosecutors.[160]

To support this argument, Plaintiff cites deposition testimony from a former prosecutor, Timothy McElroy ("McElroy"). According to McElroy, when screening prosecutors interviewed witnesses, they were neither required to document any witness's statement nor required to communicate to the trial prosecutor the substance of any witness's statement.[161] McElroy also recognized that "what constitutes *Brady* information can evolve over the lifespan of a case."[162] Despite this recognition, Plaintiff argues that OPDA's system guaranteed that the prosecutors who tried a case were not even required to know the substance of their witnesses' statements to other prosecutors.[163] Plaintiff contends this dysfunctional policy is especially relevant to the *Brady* violation at issue here because both trial prosecutors testified they were unaware of Mrs. Carnesi's grand jury testimony.[164]

Plaintiff must show either that "'the policy itself was unconstitutional'" or that "'[the policy] was adopted with deliberate indifference to the known or obvious fact' that a specific

---

[160] Rec. Doc. 91 at 16.

[161] Rec. Doc. 91-39 at 211–12.

[162] *Id.* at 242.

[163] Rec. Doc. 91 at 16.

[164] *Id.* at 17.

constitutional violation would follow."[165] Plaintiff has not demonstrated that the policy of assigning prosecutors to screen cases was facially unconstitutional. "[A] written policy is not facially unconstitutional just because it leaves out detailed guidance that might have averted a constitutional violation."[166] "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident."[167] "An official, written policy is 'itself' unconstitutional only if it affirmatively allows or compels unconstitutional conduct."[168] The screening policy does not affirmatively allow or compel prosecutors to violate *Brady*. Therefore, Plaintiff has not demonstrated that the policy is facially unconstitutional.

Additionally, Plaintiff has not produced any evidence that Connick approved an official policy directing screening prosecutors not to take notes of witness interviews. Instead, Plaintiff appears to challenge the lack of an official policy requiring screeners to document witness communications. "Liability for failure to promulgate policy . . . require[s] that the defendant acted with deliberate indifference."[169] "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights."[170] Plaintiff has not demonstrated that *Brady* violations were a likely consequence of OPDA failing to adopt a policy requiring screening prosecutors to take notes.

---

[165] *Edwards v. City of Balch Springs, Tex.*, 70 F.4th 302, 308 (5th Cir. 2023) (quoting *Liggins v. Duncanville, Tex.*, 52 F.4th 953, 955 (5th Cir. 2022)).

[166] *Id.* at 310.

[167] *City of Canton*, 489 U.S. at 392.

[168] *Edwards*, 70 F.4th at 309 (citing *Doe v. United States*, 831 F.3d 309, 318 (5th Cir. 2016)).

[169] *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011).

[170] *Id.*

Plaintiff does not cite any jurisprudence suggesting that the Constitution requires prosecutors to document all interactions with witnesses. Therefore, Plaintiff has not presented any competent summary judgment evidence to support his argument that OPDA's policy of case assignments and reassignments guaranteed *Brady* violations.

### 2.    Persistent, Widespread Practice or Custom

Plaintiff also argues that OPDA had "a persistent, widespread practice' of withholding exculpatory evidence . . . that was 'so common and well settled as to constitute a custom that fairly represents municipal policy."[171] Plaintiff claims "that prosecutors were so widely permitted to violate *Brady*, and violated *Brady* so often and with such brazenness, that OPDA effectively adopted a policy of permitting and encouraging such violations."[172] In response, Williams asserts "withholding exculpatory evidence" describes a result, not a practice, which can occur for a variety of reasons.[173] Williams contends that Plaintiff has failed to explain what practice caused exculpatory evidence to be repeatedly withheld.[174] Williams does not cite any caselaw to support his contention that "withholding exculpatory evidence" is not a practice. Therefore, the Court rejects that argument.

To succeed on this claim, Plaintiff must demonstrate that there was a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy," and proving Connick had actual or constructive knowledge of that

---

[171] Rec. Doc. 91 at 17.

[172] *Id.* at 18.

[173] Rec. Doc. 103 at 8.

[174] *Id.*

custom.[175] Where an alleged custom or practice "is unconstitutional on its face, it necessarily follows that a policymaker was not only aware of the specific policy, but was also aware that a constitutional violation will most likely occur."[176] However, where the alleged custom or practice "is facially innocuous, establishing the requisite official knowledge requires that a plaintiff establish that [the custom or practice] was 'promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result."[177] The alleged custom or practice at issue here—withholding exculpatory evidence—is unconstitutional on its face. Therefore, a finding of deliberate indifference is not required. Moreover, even if a finding of deliberate indifference is required, there are facts in dispute that would preclude summary judgment on that issue.[178]

"A customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct."[179] A plaintiff must demonstrate "a pattern of abuses that transcends the error made in a single case."[180] Establishing a pattern "requires similarity and specificity; 'prior indications cannot simply be for any and all bad or unwise acts, but rather must

---

[175] *Burge II*, 336 F.3d at 369.

[176] *Id.* at 370 (quoting *Piotrowski*, 237 F.3d at 579).

[177] *Id.* (quoting *Piotrowski*, 237 F.3d at 579).

[178] *See Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003) ("To satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations. . . .'"). As discussed in great detail herein, there is evidence upon which a reasonable juror could rely to find a pattern of similar violations.

[179] *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 168 (5th Cir. 2010).

[180] *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850–51 (quoting *Piotrowski*, 237 F.3d at 582).

point to the specific violation in question."[181] "A pattern also requires 'sufficiently numerous prior incidents' as opposed to 'isolated instances.'"[182]

Williams argues, to put Connick on notice of similar *Brady* violations, the convictions in other cases must have been overturned *before* Plaintiff's conviction, making many of the cases Plaintiff cites irrelevant to proving notice.[183] The Fifth Circuit has recognized that "[a] pattern requires similarity, specificity, and sufficiently numerous *prior* incidents."[184] *Brady* violations that pre-date Plaintiff's conviction, and later came to light are relevant and probative to show the practices and customs at OPDA during the time period before and during Plaintiff's criminal proceedings. "The fact that similar *Brady* violations continued unabated in the years after the *Brady* violation in [Plaintiff's] case, under the same policymaker, enforcing the same *Brady* policy, constitutes powerful circumstantial evidence of the unconstitutional policy, practice, or custom in place at OPDA during [Plaintiff's] prosecution."[185] As this Court found in its prior Order denying Williams's motion to dismiss, "reversals occurring after a plaintiff's conviction are relevant in determining if there existed an unconstitutional custom in Connick's office and if he had actual or constructive notice of it."[186]

---

[181] *Id.* (citation and quotation marks omitted).

[182] *Id.* (citation and quotation marks omitted).

[183] *See* Rec. Doc. 66-1 at 10–12.

[184] *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017), as revised (Mar. 31, 2017) (emphasis added). *See also Thompson*, 563 U.S. at 63 ("[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide 'notice to the cit[y] and the opportunity to conform to constitutional dictates.'").

[185] *Jones v. Cannizaro*, No. 18-503, 2021 U.S. Dist. LEXIS 13312, at *15 (E.D. La. Jan. 21, 2021).

[186] Rec. Doc. 44 at 25.

Plaintiff's expert, Laurie Levenson, has identified 47 cases[187] in which a court found that OPDA's nondisclosure of material exculpatory evidence violated the defendant's constitutional rights, 22 of which occurred in the 18 years prior to Plaintiff's conviction.[188] Harrick Connick was District Attorney from 1974 to 2003.[189] Six of the cases Levenson identifies were tried after 2003.[190] Therefore, 41 cases are relevant circumstantial evidence of the unconstitutional policy, practice, or custom in place at OPDA during Plaintiff's prosecution.[191]

Levenson also identifies eight additional cases where she finds that OPDA's conduct amounted to an admission of *Brady* claims, three of which predate Plaintiff's conviction; seven additional cases involving credible *Brady* claims against OPDA that were resolved on other grounds, four of which predate Plaintiff's conviction; and 22 additional cases in which OPDA has subsequently admitted to a *Brady* violation, including three that predate Plaintiff's conviction.[192] Williams argues that Levenson's methodology with respect to these cases is improper. This issue

---

[187] Plaintiff's opposition references 57 cases. Rec. Doc. 91 at 18. However, Exhibit 1 to the expert report only lists 47 cases. Rec. Doc. 91-4.

[188] Rec. Doc 91-4.

[189] Rec. Doc 66-1 at 16.

[190] John Duncan, Michael Anderson, Christopher Wells, Henry Bruer, Ronald Warner, Robert Jones.

The trials of Larry Hudson, Hayes Williams, Linroy Davis, and Roland Gibson pre-date the Connick administration. Because the *Brady* violations were found during the Connick administration, the Court finds the cases relevant to the issue of whether Connick had actual or constructive notice.

[191] Larry Hudson, Hayes Williams, Linroy Davis, Roland Gibson, James Carney, Michael Williams, Arthur Monroe, Norman Clark, Floyd Falkins, Errol Bernard, Gregory Bright, Earl Truvia, Norris Henderson, Calvin Williams, Larry Curtis, Issac Knapper, William Perkins, Ronald Monroe, John Floyd, Reginald Adams, Stephen Rosiere, Curtis Lee Kyles, John Thompson, Erin Hunter, Darryl Washington, Eugene Lindsey, Alvin Jeanmarie, Alfred Oliver, Jerome Morgan, Daniel Rideau, Darnell Lewis, Shareef Cousin, Dan Bright, Dwight Labran, Juan Smith, James Walker, Salvador Perez, David Mahler, Eddie Triplett, Julian Robinson, and George Lee.

[192] Rec. Doc. 91-4.

31

is briefed in a pending motion to exclude Levenson's testimony. Therefore, the Court does not consider these additional cases at this stage.

Of the 41 cases where Levenson represents a court found that OPDA's nondisclosure of material exculpatory evidence violated the defendant's constitutional rights, Williams takes issue with the case of George Lee, stating that Lee's case actually ended in a mistrial.[193] Williams also takes issue with the case of James Walker, suggesting that Levenson's finding of a "*Brady* violation" appears to be based on comments made by the judge in the middle of a trial.[194] Williams states he is not aware of any rulings finding that Walker's constitutional rights were violated.[195] Excluding these two cases, the Court is still left with evidence of *Brady* violations adjudicated in 39 cases.[196]

Williams asserts that the evidence establishes, at best, two purported *Brady* violations per year.[197] According to Williams, something that occurs in far less than one percent of cases prosecuted is clearly not a persistent or widespread practice that is so common and well-settled as to be the *de facto* policy.[198] As discussed above, a *de facto* policy must be a "persistent, widespread

---

[193] Rec. Doc. 103 at 11. Williams also takes issue with the case of Henry Bruer, where the defendant was acquitted at trial. *Id.* However, the Court has already excluded this case as the trial post-dates the Connick administration.

[194] *Id.* Williams takes issue with the case of Christopher Wells for this same reason. *Id.* However, the Court has already excluded this case as the trial post-dates the Connick administration. *Id.*

[195] *Id.* at 11–12.

[196] Larry Hudson, Hayes Williams, Linroy Davis, Roland Gibson, James Carney, Michael Williams, Arthur Monroe, Norman Clark, Floyd Falkins, Errol Bernard, Gregory Bright, Earl Truvia, Norris Henderson, Calvin Williams, Larry Curtis, Issac Knapper, William Perkins, Ronald Monroe, John Floyd, Reginald Adams, Stephen Rosiere, Curtis Lee Kyles, John Thompson, Erin Hunter, Darryl Washington, Eugene Lindsey, Alvin Jeanmarie, Alfred Oliver, Jerome Morgan, Daniel Rideau, Darnell Lewis, Shareef Cousin, Dan Bright, Dwight Labran, Juan Smith, Salvador Perez, David Mahler, Eddie Triplett, and Julian Robinson.

[197] Rec. Doc. 103 at 13.

[198] *Id.*

practice of city officials or employees" that is "so common and well settled as to constitute a custom that fairly represents municipal policy."[199] The reason for this, of course, is to ensure that "a municipality cannot be held liable *solely* because it employs a tortfeasor."[200] Requiring a persistent, widespread practice ensures that a municipality is not held liable unless the injury is caused by the execution of a custom made by those "whose edicts or acts may fairly be said to represent official policy."[201] Repeated conduct is necessary to "demonstrate[s] the governing body's knowledge and acceptance of the disputed conduct."[202] Although similar, repetitive conduct is required in order to demonstrate the municipality's knowledge and acceptance of the conduct, the Fifth Circuit has often stated that it has "no rigid rule regarding numerosity to prove a widespread pattern of unconstitutional acts."[203]

The Fifth Circuit's cases suggest that whether a pattern exists depends on not only the number of instances, but also the nature of the conduct. Williams relies on the Fifth Circuit's recent decisions in *Verastique v. City of Dallas*[204] and *Damond v. City of Rayville*[205] to argue that in the context of the number of cases prosecuted, the *Brady* violations alleged would not have put Connick on notice of a problem with his office's policies.[206]

---

[199] *Piotrowski*, 237 F.3d at 579

[200] *Monell*, 436 U.S. at 690.

[201] *Id.* at 694.

[202] *Zarnow*, 614 F.3d at 168.

[203] *Jackson v. Valdez*, 852 F. App'x 129, 135 (5th Cir. 2021).

[204] 106 F.4th 427 (5th Cir. 2024).

[205] 127 F.4th 935 (5th Cir. 2025).

[206] Rec. Doc. 66-1 at 12–13.

In *Verastique*, the plaintiffs alleged that a Dallas police officer, Roger Rudloff, used excessive force while arresting them during widespread protests.[207] The plaintiffs sought to hold the City of Dallas liable under *Monell*, alleging that there were 19 prior complaints of misconduct by Rudloff over 23 years.[208] The Fifth Circuit affirmed the district court's dismissal of the claim on the pleadings, concluding that the other incidents were "not sufficiently similar, specific, or numerous."[209] The Fifth Circuit found that the allegations regarding the prior incidents were "devoid of critical factual enhancement," including facts that would have elucidated how and why the incidents occurred.[210] Even assuming these other incidents were "sufficiently specific and similar," the Fifth Circuit found they were insufficient as a matter of law to "create a pattern capable of providing constructive notice" because the incidents occurred over a 23 year time-span:

> Given a constant number of incidents, a longer time span yields a lower rate of violations—militating against constructive notice. Nineteen allegations over the span of twenty-three years yields a mere annualized incident rate of 0.826. In other words: Plaintiffs—at most—show that, for over two decades, Rudloff, on average, received fewer than one accusation of misconduct per year.[211]

The Fifth Circuit further explained that the complaint failed to provide information "such as department size and number of arrests" that would "provide the context necessary to evaluate whether an alleged department-wide pattern is so obvious as to impart constructive notice."[212] The Fifth Circuit reasoned that "[g]iven a constant number of incidents, the percentage of conduct

---

[207] *Verastique*, 106 F.4th at 431.

[208] *Id.* at 433.

[209] *Id.* at 434.

[210] *Id.* at 432 ("Plaintiffs, for example, cite five incidents allegedly involving a flashlight or nightstick. Some are listed incident-by-incident. But all still remain totally devoid of critical facts. What prompted the encounters? Did the individuals threaten Rudloff with physical harm? Were they attempting to resist arrest?").

[211] *Id.* at 434.

[212] *Id.*

supporting a pattern of illegality shrinks as the size of the police department or the number of arrests increases."[213] "Given the departments size [3,200 officers], and absent any evidence of its total number of arrests during the same time period," the Fifth Circuit stated "only one conclusion can reasonably follow: Nineteen incidents over twenty-three years does not support any inference of a department-wide pattern of illegality."[214]

More recently, in *Damond v. City of Rayville*, the Fifth Circuit held that the plaintiff failed to adequately allege a "custom of allowing inmate-on-inmate violence by failing to separate violent and non-violent inmates" at the Richland Parish Detention Center.[215] The Fifth Circuit noted that the plaintiff had identified "six instances in which inmates attacked others but were later returned to their dormitory."[216] The Fifth Circuit explained, however, that the plaintiff had "fail[ed] to identify the jail personnel who were present for or involved in the violent incidents."[217] The Fifth Circuit further explained that these incidents were "dissimilar to" the attack on the plaintiff, and that they "occurred over the course of several months, were motivated by differing factors, and took place in different locations."[218] The Fifth Circuit concluded that "[t]hese alleged incidents are insufficient to allege a custom or policy of tolerating widespread, unprovoked violence in the detention center or to put the officials on notice of the repeated constitutional violations."[219]

---

[213] *Id.*

[214] *Id.*

[215] *Damond*, 127 F.4th at 939.

[216] *Id.*

[217] *Id.*

[218] *Id.*

[219] *Id.*

These cases suggest that the mere number of incidents must be viewed in context of the type and frequency of the disputed conduct. It is therefore unsurprising that 19 incidents of excessive force in *Verastique*, and six incidents of inmate violence in *Damond*, were insufficient to demonstrate a pattern given how frequently officers use force and how often violence in jails occurs. Plaintiff correctly points out that *Brady* claims are distinguishable from excessive force claims or claims regarding inmate violence, because *Brady* claims necessarily involve concealed action (or inaction) on the part of the State for which there may be no documentation at all. Given that *Brady* violations are less common than police uses of force or violence in jails, *Verastique* and *Damond* do not compel the conclusion that there is insufficient evidence to establish a *de facto* custom.

As this Court previously recognized in its Order denying Williams's motion to dismiss, guidance from appellate courts on how many cases are enough to prove a custom and notice to the policymaker in the *Brady* context is sparse. But the *Thompson* Court suggested 4 cases in a 10-year period would not be enough to support notice of similar constitutional violations.[220] The *Armstrong* Court implied 9 cases in a 24-year period would not be enough.[221] Plaintiff points to 39 cases in a 32-year period.[222] Of those cases, 22 went to trial in the 17 years preceding Plaintiff's 1985 trial.[223] Plaintiff points to a much greater number of cases in similar timespans to both *Thompson* and *Armstrong*.

---

[220] *Thompson*, 563 U.S. at 62.

[221] *Armstrong v. Ashley*, 60 F.4th 262, 278 (5th Cir. 2023).

[222] The earliest case considered is Larry Hudson (December 1967 trial). The latest case considered is Juliana Robinson (February 1999 trial).

[223] Larry Hudson, Hayes Williams, Linroy Davis, Roland Gibson, James Carney, Michael Williams, Arthur Monroe, Norman Clark, Floyd Falkins, Errol Bernard, Gregory Bright, Earl Truvia, Norris Henderson, Calvin Williams, Larry Curtis, Issac Knapper, William Perkins, Ronald Monroe, John Floyd, Reginald Adams, Stephen Rosiere, and Curtis Lee Kyles.

Williams argues that the number of *Brady* violations is miniscule when compared to the average number of trials and guilty pleas OPDA handled per year. According to an expert statistician retained by Williams, between 1974 and 1985 there were approximately 522 trials and 5,175 guilty pleas on average each year.[224] Therefore, Williams reasons that the proportion of *Brady* violations was one in several thousand, when compared to all of the cases tried or resolved by a guilty plea at OPDA each year.[225] The Court finds the comparison of cases where a *Brady* violation is adjudicated following trial to cases that resolved in a guilty plea unpersuasive. The Fifth Circuit has recognized that generally "a guilty plea precludes the defendant from asserting a *Brady* violation."[226] Therefore, it is unlikely that any *Brady* violation would ever come to light in the 5,175 cases OPDA resolved on average each year through guilty pleas.

Plaintiff asserts that *Brady* violations are far more likely to come to light in cases where a defendants appeal or challenge their convictions through post-conviction relief. Therefore, Plaintiff contends the appropriate "denominator" for any statistical analysis is the number of cases with an appeal or post-conviction proceeding. Williams responds that this argument is faulty because a defendant would not be able to raise a *Brady* claim until after the purported evidence is discovered. The Court questions how frequently (if at all) a criminal defendant would discover that material evidence was not disclosed unless the defendant or counsel is reviewing the record in preparation for an appeal or post-conviction relief motion? The Court has limited the *Brady*

---

[224] Rec. Doc. 62-4.

[225] Rec. Doc. 66-1 at 17.

[226] *United States v. Conroy*, 567 F.3d 174, 178 (5th Cir. 2009). *See also Alvarez v. City of Brownsville*, 904 F.3d 382, 394 (5th Cir. 2018) ("[C]ase law from the Supreme Court, this circuit, and other circuits does not affirmatively establish that a constitutional violation occurs when *Brady* material is not shared during the plea bargaining process. The en banc court will not disturb this circuit's settled precedent and abstains from expanding the *Brady* right to the pretrial plea bargaining context for Alvarez.").

violations it is considering on summary judgment to those that were adjudicated by a court (*i.e.* on appeal or in post-conviction proceedings). Therefore, the Court agrees with Plaintiff that a more appropriate denominator would be the number of cases with an appeal or post-conviction proceeding.

The Court also notices a pattern that of the 39 cases identified, 33 involved murder or manslaughter.[227] Four of the cases involved armed robbery and aggravated rape.[228] All of those charges are clearly serious felonies, and they are all classified as "crimes of violence" under Louisiana law.[229] The Court has not been presented with any evidence of the number of trials for murder, manslaughter, armed robbery, and aggravated rape that OPDA handled on average per year. But the Court questions whether this would be a more appropriate denominator.

Plaintiff has not provided the Court with any evidence of the number of appeals and post-conviction proceedings that occurred on average per year. Although it is Plaintiff's burden to "provide the context necessary to evaluate whether an alleged department-wide pattern is so

---

[227] Larry Hudson (first-degree murder), Hayes Williams (first-degree murder), Linroy Davis (manslaughter Roland Gibson (first-degree murder), James Carney (second-degree murder), Michael Williams (second-degree murder), Errol Bernard (second-degree murder), Gregory Bright (second-degree murder), Earl Truvia (second-degree murder), Norris Henderson (second-degree murder), Calvin Williams (first-degree murder), Larry Curtis (second-degree murder), Issac Knapper (first-degree murder), William Perkins (first-degree murder), Ronald Monroe (first-degree murder), John Floyd (second-degree murder), Reginald Adams (first-degree murder), Stephen Rosiere (second-degree murder), Curtis Lee Kyles (first-degree murder), John Thompson (attempted armed robbery and first-degree murder), Erin Hunter (second-degree murder), Darryl Washington (manslaughter), Eugene Lindsey (second-degree murder), Alvin Jeanmarie (second-degree murder), Jerome Morgan (second-degree murder), Daniel Rideau (first-degree murder), Shareef Cousin (first-degree murder), Dan Bright (first-degree murder), Dwight Labran (first-degree murder), Juan Smith (first-degree murder), Salvador Perez (first-degree murder), David Mahler (manslaughter), and Julian Robinson (aiding and abetting second-degree murder).

[228] Arthur Monroe (armed robbery), Floyd Falkins (armed robbery), Alfred Oliver (armed robbery and second-degree kidnapping), Darnell Lewis (aggravated rape, aggravated burglary, aggravated crime against nature),

Norman Clark's conviction for distribution of heroin and Eddie Triplett for cocaine possession are not classified crimes of violence.

[229] La. Rev. Stat. § 14:2(B).

obvious as to impart constructive notice,"[230] Williams does not cite any caselaw requiring that a statistical analysis like the one he proposes be undertaken. Even if the Court were to require such an analysis, one or two *Brady* violations out of 522 trials is sufficiently numerous for a reasonable juror to find Connick had constructive notice of the ongoing violations. Considering the large number of *Brady* violations adjudicated, Plaintiff has presented sufficient, plausible evidence upon which a reasonable juror could find a custom of *Brady* violations in OPDA with Connick on constructive or actual notice of those violations.

In addition to arguing that Plaintiff fails to present an adequate number of cases to demonstrate constructive notice on behalf of Connick, Williams argues that the cases Plaintiff cites are not sufficiently similar.[231] However, exact similarity between cases is not mandatory to find a policymaker was on notice of similar Constitutional violations, with the Fifth Circuit noting the "specificity required should not be exaggerated . . ."[232] Courts in this Circuit look for prior acts that are "fairly similar to what ultimately transpired" in the case before them.[233]

In *Thompson*, as part of law enforcement's investigation, a swatch of fabric from the victims' pants stained with the robber's blood was collected and analyzed by a crime laboratory.[234] The Assistant District Attorney in the case received a report from the laboratory, but failed to disclose the report to the defendant.[235] The plaintiff cited other cases where *Brady* violations had occurred, but the Court explained none of those cases "involved failure to disclose blood evidence,

---

[230] *Verastique*, 106 F.4th at 434.

[231] Rec. Doc. 61-1 at 18.

[232] *Est. of Davis ex rel. McCully v. City of North Richland Hills,* 406 F.3d 375, 383 (5th Cir. 2005).

[233] *Id.*

[234] *Thompson*, 563 U.S. at 55.

[235] *Id.*

a crime lab report or physical or scientific evidence of any kind."[236] Therefore, the Supreme Court observed those cases were not similar enough to put Connick on notice that specific training was necessary to avoid the constitutional violation that occurred in the plaintiff's case.[237] In that case, the only similarity between the other *Brady* violations and the one alleged was simply that they were generally *Brady* violations.

In this case, the similarities between the instant case and the cases cited by Plaintiff are much more apparent. In the case at hand, OPDA failed to disclose Mrs. Carnesi's prior exculpatory testimony. The testimony that OPDA withheld revealed Mrs. Carnesi, at one point, claimed Plaintiff did not resemble the perpetrator of her husband's murder and that the car Plaintiff was arrested in did not resemble the one she saw at the scene of the crime.[238] In short, the constitutional violation in the instant case is that ODPA withheld potentially exculpatory witness testimony that also could have been used to impeach Mrs. Carnesi.[239] Of the 39 cases identified, at least 32 of the cases involve the withholding of potentially exculpatory witness statements.[240] These cases are sufficiently similar to the instant case for a reasonable juror to conclude Connick was on notice of the type of *Brady* violation that occurred in Plaintiff's case. The Court finds that there is sufficient evidence for a reasonable juror to conclude that Connick had knowledge of and accepted the conduct. For the plethora of reasons discussed above, there are material facts in dispute regarding

---

[236] *Id.* at 62–63.

[237] *Id.*

[238] *Id.*

[239] Rec. Doc. 26 at 4–5 (internal citations omitted).

[240] Larry Hudson, Hayes Williams, Linroy Davis, Roland Gibson, Michael Williams, Arthur Monroe, Norman Clark, Floyd Falkins, Errol Bernard, Gregory Bright, Earl Truvia, Norris Henderson, Calvin Williams, Larry Curtis, Issac Knapper, William Perkins, Ronald Monroe, Stephen Rosiere, Curtis Lee Kyles, Erin Hunter, Darryl Washington, Eugene Lindsey, Alvin Jeanmarie, Alfred Oliver, Daniel Rideau, Darnell Lewis, Shareef Cousin, Dwight Labran, Juan Smith, Salvador Perez, David Mahler, and Eddie Triplett.

whether there were sufficiently similar, specific, or numerous *Brady* violations at OPDA to put Connick on notice of those violations.

In addition to the number of cases where *Brady* violations have been adjudicated, Plaintiff cites additional circumstantial evidence of a pervasive culture of indifference to *Brady*. During his recent deposition, Jim Williams testified that he heard people at OPDA "make light" by saying things like "it's not *Brady* if the defense doesn't know about it."[241] During a deposition taken in the *Thompson* case, former prosecutor John Glas also testified that he heard the phrase "It's not *Brady* . . . unless they know about it."[242] Jim Williams denied that Connick or any of the supervisors at OPDA repeated such phrases.[243] Jim Williams emphasized: "Harry Connick never would have said anything like that ever."[244] Nevertheless, Jim Williams testified "that kind of thing came up all the time" at OPDA.[245]

Plaintiff also cites evidence showing there was no mechanism for tracking or reporting *Brady* violations, decreasing the likelihood that patterns of *Brady* violations would be promptly identified and corrected.[246] Plaintiff cites evidence suggesting that Connick adamantly opposed any steps toward open file discovery and repeatedly resisted attempts to open up discovery for the defense.[247] Williams correctly points out that neither tracking of violations or open-file discovery

---

[241] Rec. Doc. 91-38 at 121–22.

[242] Rec. Doc. 91-31 at 146.

[243] Rec. Doc. 91-38 at 124.

[244] *Id.*

[245] *Id.* at 122.

[246] Rec. Doc. 91-4 at 23–24 (citing depositions of Harry Connick, Bridget Bane, Camille Buras, and other OPDA employees).

[247] *Id.* at 26 (citing depositions of Harry Connick and Bridget Bane).

are legally required. Although this evidence would not be conclusive of an unconstitutional policy on its own, it bolsters Plaintiff's other evidence of a custom or practice of withholding exculpatory evidence. Additionally, the parties dispute whether Connick's office ever conducted any *Brady* training.[248] The Court cannot weigh the evidence on summary judgment. Thus, there are material facts in dispute regarding whether OPDA conducted *Brady* training under Connick.

Plaintiff also points to a written *Brady* policy adopted by OPDA in 1987, two years after his trial and conviction. Plaintiff argues that the policy was "wholly inaccurate, inadequate, and misleading" because: (1) it incorrectly suggested that *Brady* obligations are triggered by a judicial order issued in response to the defense's request for disclosure; (2) did not explain what exculpatory evidence was; and (3) referred only to "information in the possession of the State," without clarification that the term encompassed exculpatory evidence in the possession of both the prosecutor and law enforcement.[249] Williams argues that the written policy adopted in 1987 could not have led to misunderstandings that resulted in an alleged failure to disclose exculpatory evidence in advance of Plaintiff's 1985 trial. Nevertheless, it is relevant evidence on how OPDA viewed *Brady*.

Again, on a motion for summary judgment the Court must view the evidence in the light most favorable to Plaintiff, as the non-moving party, and draw all reasonable inferences in his favor.[250] So construed, based on the evidence discussed above, the Court finds that a reasonable jury could find that the *Brady* violation resulted from a "persistent, widespread practice of

---

[248] *Compare* Rec. Doc. 66-1 at 20–21 (citing testimony from former prosecutors that *Brady* was discussed during office meetings) *with* Rec. Doc. 91-4 at 23 (citing testimony from former prosecutors that could not recall *Brady* training).

[249] Rec. Doc. 91 at 19; Rec. Doc. 91-4 at 20–23.

[250] *Turner*, 476 F.3d at 343 (quoting *Reeves*, 530 U.S. at 150).

[OPDA], which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy," and that Connick had actual or constructive knowledge of that custom.[251]

### 3. Failure to Train

Finally, Plaintiff contends that a reasonable juror could conclude that Connick fostered practices constituting deliberate indifference toward *Brady* violations.[252] Plaintiff asserts that the evidence demonstrating that OPDA failed to train, supervise, and discipline its employees regarding their obligations under *Brady* and that these failures amounted to deliberate indifference to the "known or obvious" risk that criminal defendants' rights would be violated.[253]

"It is well-established that a municipality's failure to train its [] officers can give rise to § 1983 liability."[254] To establish a failure to train claim, a plaintiff must show "(1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question."[255] "Deliberate indifference is 'more blameworthy than negligence' but less blameworthy than purposeful harm."[256] "The standard is 'stringent' and requires that the supervisory actor disregarded a known consequence of his action."[257] "To satisfy the deliberate

---

[251] *Burge II*, 336 F.3d at 369. Based on the same evidence of a pattern of violations, a reasonable juror would be able to find deliberate indifference.

[252] Rec. Doc. 91 at 19.

[253] *Id.*

[254] *Westfall v. Luna*, 903 F.3d 534, 552 (5th Cir. 2018).

[255] *Zarnow*, 614 F.3d at 170.

[256] *Id.* at 169 (quoting *Farmer*, 511 U.S. at 835).

[257] *Id.* at 169–70 (citing *Southard v. Tex. Bd. of Crim. Justice*, 114 F.3d 539, 551 (5th Cir. 1997)).

indifference prong, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is 'obvious and obviously likely to result in a constitutional violation.'"[258]

Plaintiff has presented sufficient evidence upon which a reasonable juror could rely to find a pervasive pattern of *Brady* violations sufficient to put Connick on notice that OPDA's policies were constitutionally deficient. As discussed in detail above, Plaintiff cites: (1) evidence regarding the widespread and persistent nature of *Brady* violations by OPDA in the 1970s and 1980s; (2) evidence of training, comments, and attitudes within the office indicating a pervasive disregard for and misunderstanding of *Brady*; and (3) numerous specific examples of other documented instances of such violations.[259] This evidence, when considered collectively, is more than sufficient to create a genuine issue of fact as to whether OPDA's *Brady* training procedures were adequate, and whether Connick was deliberately indifferent in adopting its training policy.[260]

**B.    *Whether Plaintiff has Presented Evidence that the Policy or Custom is the "Moving Force" Behind Plaintiff's Constitutional Violation***

Finally, Williams argues that Plaintiff has not produced evidence to show OPDA's alleged unconstitutional policies or customs were the moving force behind the alleged *Brady* violation in his case. To establish "moving force" causation, a "plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."[261] Critically, "[t]he causal link 'moving force' requirement and the degree of culpability 'deliberate indifference' requirement

---

[258] *Cousin*, 325 F.3d at 637.

[259] Rec. Doc. 91 at 22.

[260] *Zarnow*, 614 F.3d at 170.

[261] *Brown*, 520 U.S. at 404.

must not be diluted, for 'where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.'"[262] Still, "'[w]here a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so,' the causation determination 'is straightforward.'"[263]

Plaintiff argues that because he has presented evidence upon which a reasonable juror could find that OPDA's unconstitutional customs caused his constitutional injury, he has met the causation requirement of the "moving force" element. Causation has been discussed to an extent in the discussion above on whether there was a custom of suppressing exculpatory evidence within OPDA. Plaintiff has presented evidence to show that 39 convictions were vacated because of *Brady* violations occurring during Harry Connick's tenure as the District Attorney for Orleans Parish. If proven, a custom of withholding evidence in violation of *Brady* is clearly unconstitutional, and Plaintiff alleges that same custom caused the *Brady* violation in his case. Therefore, Plaintiff has presented evidence upon which a reasonable juror could find that OPDA's custom of suppressing exculpatory evidence in violation of *Brady* was the moving force behind the constitutional violations he suffered.

## V. Conclusion

There are facts in dispute precluding summary judgment on the *Monell* claim brought against Williams in his official capacity as District Attorney. Plaintiff has not presented sufficient evidence to show that OPDA maintained an official policy in violation of *Brady*. However, the amount and similarity of *Brady* violations occurring under Connick's tenure, combined with other

---

[262] *Covington v. City of Madisonville, Tex.*, 812 F. App'x 219, 225–26 (5th Cir. 2020) (quoting *Alvarez*, 904 F.3d at 390).

[263] *Jauch v. Choctaw Cnty.*, 874 F.3d 425, 436 (5th Cir. 2017) (citation omitted).

circumstantial evidence of a pervasive culture of indifference to *Brady*, is enough for a reasonable juror to conclude there was a custom of withholding exculpatory witness testimony within OPDA and Connick had constructive and/or actual notice of the practice. The same facts are enough for a reasonable juror to find OPDA failed to train, supervise, and discipline its employees regarding their obligations under *Brady* and that these failures amounted to deliberate indifference to the "known or obvious" risk that criminal defendants' rights would be violated. A reasonable juror could also find that the custom of *Brady* violations was the moving force behind Plaintiff's claimed constitutional violation.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Jason Williams's Motion for Summary Judgment[264] is **DENIED.**

**NEW ORLEANS, LOUISIANA**, this <u>24th</u> day of November, 2025.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[264] Rec. Doc. 66.