# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RAYMOND FLANKS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 23-6897** |
| **THE CITY OF NEW ORLEANS et al.** | **SECTION: "G"(4)** |

## ORDER AND REASONS

This litigation arises from Plaintiff Raymond Flanks's ("Plaintiff") wrongful conviction for first-degree murder in 1985. Plaintiff names as Defendants the City of New Orleans; Jason Williams, in his official capacity as Orleans Parish District Attorney; Anne Kirkpatrick, in her official capacity as Superintendent of the New Orleans Police Department; John Dillmann, in his individual capacity; and John/Jane Does #1-20 in their individual capacities.[1] Plaintiff alleges the Orleans Parish District Attorney's Office ("OPDA") secured his wrongful conviction in violation of his constitutional rights by withholding material exculpatory evidence in violation of OPDA's obligations under *Brady v. Maryland*.[2]

Before the Court is Defendants' Motion to Exclude Expert Testimony of Brandy Bradley ("Bradley").[3] Bradley is a vocational evaluator retained by Plaintiff to estimate the earnings he lost while incarcerated. Defendants contend that Bradley's proposed testimony is unreliable and

---

[1] *See* Rec. Doc. 27.

[2] *Id.* at 4–5. *See Brady v. Maryland*, 373 U.S. 83 (1963).

[3] Rec. Doc. 95.

1

irrelevant.[4] Plaintiff opposes the motion.[5] Having considered the motion, the memoranda in support and opposition, the record, and the applicable law, the Court denies the motion.

## I. Background

On November 16, 2023, Plaintiff filed a Complaint against Defendants in this Court for alleged violations of his constitutional rights under 42 U.S.C. § 1983 and alleged violations of state law.[6] On June 4, 2024, Plaintiff filed an Amended Complaint.[7] This matter is set for trial on December 8, 2025. This case is related to Plaintiff's alleged wrongful conviction in May 1985 for the first-degree murder of Martin Carnesi.

In May 1985, a jury found Plaintiff guilty of first-degree murder in the death of Martin Carnesi, and Plaintiff was sentenced to life in prison.[8] Nearly 37 years later, on November 17, 2022, Plaintiff's first-degree murder conviction was vacated.[9] At the November 17, 2022 exoneration hearing, the "OPDA stated that 'the State agrees that Mr. Flank's [sic] conviction was obtained in violation of *Brady v. Maryland*' because 'the State failed to disclose … materials [that] are favorable, and under circumstances of the State's case against Mr. Flank[s], material.'"[10]

Plaintiff retained Brandy Bradley, a licensed rehabilitation counselor and certified vocational evaluator, to testify regarding Plaintiff's lost wages while he was incarcerated. Bradley's report sets forth the following relevant facts. Plaintiff dropped out of high school in the

---

[4] Rec. Doc. 95-1 at 3.

[5] Rec. Doc. 106.

[6] Rec. Doc. 1.

[7] Rec. Doc. 27.

[8] Rec. Doc. 27 at 12–13.

[9] *Id.* at 14.

[10] *Id.*

2

10th or 11th grade after his mother passed away.[11] While incarcerated, Plaintiff earned his GED in 1995, he earned an associate's degree in theology in 1997, and he earned a bachelor's degree in theology in 1999.[12] The report notes that prior to his conviction, Plaintiff had a limited work history painting and renovating houses, doing landscaping work, working at the Royal Sonesta as an oyster shucker, and selling snow crab and shrimp.[13] Since his release from prison, Plaintiff has worked for Thrive NOLA as a handyman earning $17.50 per hour on a full-time basis.[14]

Bradley performed vocational testing, where Plaintiff performed in the low average to average range.[15] In the RIASEC Inventory, Plaintiff scored highest on the artistic and social scales.[16]

Based on Plaintiff's education during his incarceration and his post-incarceration vocational testing scores, Bradley opined that Plaintiff "could have established a career path had he not been incarcerated."[17] Bradley assumes that had Plaintiff not been convicted of first-degree murder in 1985, he would have been released on parole in 1991, after serving half of his fifteen-year sentence for a separate armed robbery conviction.[18] Bradley concludes that Plaintiff "had the potential to earn" wages equal to the annual mean wage for Black males with GEDs/high school

---

[11] Rec. Doc. 95-2 at 2.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.* at 2–3.

[16] *Id.* at 3.

[17] *Id.* at 4.

[18] *Id.* at 1.

3

diplomas from 1991 to 2022.[19] Bradley calculates that Plaintiff lost wages in the amount of $975,578.00.[20] This figure is based on the conclusion that Plaintiff would have earned the annual mean wage for a Black male with a GED or high school diploma from 1994 to 2022.[21] Bradley notes that data for the annual mean wage for a Black male is unavailable for the years 1991, 1992, and 1993.[22] For these years, Bradley computed Plaintiff's annual wages "based on the year's minimum wage."[23]

As an alternative calculation, Bradley opines that "it is reasonable to assume [Plaintiff] would have, at the very least, earned minimum wage had it not been for his incarceration."[24] Based on that assumption, she calculates that he "would have earned a total of $393,692.00 had he worked full-time earning minimum wage" from July 1991 through 2022.[25]

On October 28, 2025, Defendants filed the instant Motion to Exclude Expert Testimony of Brandy Bradley.[26] On November 4, 2025, Plaintiff filed an opposition to the motion.[27] On November 10, 2025, Defendants filed a reply brief in further support of the motion.[28]

---

[19] *Id.* at 4.

[20] *Id.* at 4–5.

[21] *Id.*

[22] *Id.* at 4.

[23] *Id.*

[24] *Id.* at 3.

[25] *Id.* at 4.

[26] Rec. Doc. 95.

[27] Rec. Doc. 106.

[28] Rec. Doc. 111.

## II. Parties' Arguments

### A.    *Defendants' Arguments in Support of the Motion*

Defendants move the Court to exclude Bradley as a witness.[29] Defendants argue that Bradley's methodology is unreliable and leads to calculations that are irrelevant because they bear no relationship to Plaintiff's actual lost wages.[30] Defendants contend Bradley's calculations are inconsistent with Fifth Circuit caselaw holding that lost wages should be calculated based on the gross earnings of the injured party at the time of injury.[31] Defendants also cite an opinion by this Court in a wrongful death action excluding testimony by an expert economist calculating the decedent's lost future income based on the "prevailing wage" rather than his actual past earnings.[32] Although these cases do not involve wrongful convictions, Defendants suggest "there is no reason to believe that speculative testimony about potential wages, untethered from the plaintiff's actual employment history, is any more reliable in a wrongful conviction case than in other types of cases."[33] Defendants argue it is not reasonable to assume that a plaintiff would have maintained continuous, full-time employment at any wage, absent evidence that the plaintiff had obtained and maintained such employment before the injury complained of in his lawsuit."[34]

---

[29] Rec. Doc. 95.

[30] Rec. Doc. 95-1 at 4.

[31] *Id.* at 6 (citing *Culver v. Slater Boat Co. ("Culver II")*, 722 F.2d 114, 117 (5th Cir. 1983)).

[32] *Id.* at 9 (citing *Tajonera v. Black Elk Energy Offshore Operations, LLC*, No. 13-cv-366, 2016 WL 9414205, at *10–12 (E.D. La. May 23, 2016)).

[33] *Id.*

[34] *Id.* at 11.

5

Next, Defendants argue that the calculation of lost wages is unreliable because it does not deduct the expenses Plaintiff would have incurred had he not been out of prison earning minimum wage.[35] Defendants note that expenses for housing, food, clothing, healthcare, and transportation were minimal or nonexistent while he was in prison.[36] Defendants point out that Plaintiff would have had to spend substantial portions of his income on these expenses, if he had not been incarcerated.[37] Defendants also point out that Plaintiff would have had to pay various taxes on his earnings.[38]

Finally, Defendants argue that the calculation of lost wages is unreliable and irrelevant because it is based on the unreliable premise that Plaintiff would have been released on good time parole after serving 7.5 years in prison for the armed robbery conviction.[39] Since there is no evidence that Bradley has any technical or specialized knowledge about Louisiana criminal law and good-time credit policies in the 1980s and 1990s, Defendants contend Bradley lacks the knowledge necessary to determine whether Plaintiff's good-time credit would have qualified him for release on parole.[40]

### B.  *Plaintiff's Arguments in Opposition to Motion*

Plaintiff contends that Bradley's testimony should not be excluded because she is providing an estimate of his wage-earning capacity, rather than damages from lost earnings.[41] Plaintiff asserts

---

[35] *Id.*

[36] *Id.* at 12.

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.* at 13.

[41] Rec. Doc. 106 at 3.

6

that Defendants are conflating these two issues. Plaintiff argues that Defendants are relying on an inapposite Fifth Circuit decision on maritime personal injuries cases.[42] Unlike personal injury-type cases, Plaintiff points out the damages in wrongful conviction cases are backward-looking instead of forward-looking.[43] According to Plaintiff, "[u]nder Defendants' reading of Fifth Circuit precedent, a person wrongfully convicted at age 18 after he or she graduates from high school but before he or she enters the workforce would be entirely foreclosed from seeking lost earnings, because, at the time of conviction, the person had no earning history."[44] Plaintiff points out that Bradley offered two alternative calculations, which "are merely data points for the jury."[45]

Second, Plaintiff asserts the fact that Bradley did not deduct living expenses does not render her opinion unreliable or irrelevant. Plaintiff contends earning capacity (the topic on which Bradley opines) is distinct from net income or lost wages damages (a determination for the jury to make).[46] Plaintiff argues that Bradley is not the finder of fact and does not purport to opine about the amount of damages the jury should award Plaintiff for lost wages.[47]

Third, Plaintiff contends that Bradley's reliance on the assumption that Plaintiff would have been released in 1991 is a reasonable assumption based on another expert's opinion.[48]

---

[42] *Id.*

[43] *Id.* at 11.

[44] *Id.* at 13.

[45] *Id.* at 14.

[46] *Id.* at 16.

[47] *Id.*

[48] *Id.* at 17–18.

Plaintiff argues that expert witnesses are permitted to rely on reasonable assumptions, so Bradley's assumption was permissible and is, at most, a potential basis for Defendants to cross examine her.[49]

### C.   *Defendants' Arguments in Further Support of the Motion*

In reply, Defendants point out that Plaintiff cites no jurisprudence distinguishing lost income from earning capacity.[50] Defendants assert that that courts commonly use the terms interchangeably.[51] Defendants contend that Bradley should have begun with Plaintiff's demonstrated earnings at the time of his conviction, and then she could have presented information that his earnings would have increased due to his education, experience, or other factors.[52] Instead, Defendants assert Bradley "contravened the Fifth Circuit's instructions by ignoring his earnings history altogether and relying instead on a vocational assessment in 2025 that took into account events after [Plaintiff] went to prison."[53] Defendants also repeat their arguments that the failure to deduct living expenses renders Bradley's opinion unreliable and that the calculation is based on the unreasonable assumption that Plaintiff would have been released from prison in 1991.[54]

## III. Legal Standard

The district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702.[55] Rule 702 states that a witness "qualified as an expert by

---

[49] *Id.* at 18.

[50] Rec. Doc. 111 at 1.

[51] *Id.*

[52] *Id.* at 4.

[53] *Id.*

[54] *Id.* at 5–6.

[55] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138–39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000).

knowledge, skill, experience, training, or education," may provide expert testimony when "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."[56] For the testimony to be admissible, Rule 702 establishes the following requirements:

> (1) the testimony must be based upon sufficient facts or data,
>
> (2) the testimony must be the product of reliable principles and methods, and
>
> (3) the expert must reliably apply the principles and methods to the facts of the case.[57]

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court explained that Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."[58] The court's gatekeeping function mostly involves a two-part inquiry.

First, the court must determine whether the expert testimony is reliable, which requires an assessment of whether the expert testimony's underlying reasoning or methodology is valid.[59] The court's inquiry into the reliability of expert testimony is flexible and fact-specific.[60] The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.[61] In analyzing reliability, *Daubert* instructs courts to consider (1) whether the theory has been tested;

---

[56] Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[57] Fed. R. Evid. 702.

[58] *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (clarifying that the court's gatekeeping function applies to all forms of expert testimony).

[59] *See Daubert*, 509 U.S. at 589. The party offering the testimony has the burden to establish reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994)).

[60] *Seatrax*, 200 F.3d at 372.

[61] *See Daubert*, 509 U.S. at 590.

9

(2) whether the theory has been subject to peer review and publication; (3) any evaluation of known rates of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) general acceptance within the scientific community.[62]

Second, the court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will assist the trier of fact in understanding the evidence.[63] The second inquiry primarily analyzes whether the expert testimony is relevant.[64]

Yet a court's role as a gatekeeper does not replace the traditional adversary system.[65] A "review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."[66] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[67] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left to the jury's consideration."[68]

Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just

---

[62] *Id.* at 592–94. In *Kumho Tire*, the Supreme Court emphasized that the test of reliability is "flexible" and that Daubert's list of specific factors does not necessarily nor exclusively apply to every expert in every case. *Kumho Tire*, 526 U.S. at 141. The overarching goal "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

[63] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

[64] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

[65] *See Daubert*, 509 U.S. at 596.

[66] Fed. R. Evid. 702 advisory committee's note, "2000 Amendments."

[67] *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

[68] *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore Cnty.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

because it embraces an ultimate issue."[69] "The rule was enacted to change the old view that [] giving an opinion on an ultimate issue would 'usurp the function' or 'invade the province' of the jury."[70] The rule, however, "does not open the door to all opinions."[71] Witnesses may not "tell the jury what result to reach," nor may they "give legal conclusions."[72] The Fifth Circuit has explained that "the task of separating impermissible question which call for overbroad or legal responses from permissible questions is not a facile one," but one that requires courts to exclude questions or answers from experts that "would supply the jury with no information other than the expert's view of how its verdict should read."[73]

## IV. Analysis

Defendants move the Court to exclude Bradley as a witness.[74] Defendants argue that Bradley's methodology is unreliable and leads to calculations that are irrelevant because they bear no relationship to Plaintiff's actual lost wages.[75] Defendants contend Bradley's calculations are inconsistent with Fifth Circuit caselaw holding that lost wages should be calculated based on the gross earnings of the injured party at the time of injury.[76]

---

[69] Fed. R. Evid. 704(a).

[70] *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983).

[71] *Id.*

[72] *Id.* (citing *United States v. Fogg*, 652 F.2d 551, 557 (5th Cir. 1981)).

[73] *Id.*

[74] Rec. Doc. 95.

[75] Rec. Doc. 95-1 at 4.

[76] *Id.* at 6 (citing *Culver II*, 722 F.2d at 117).

In support of this argument, Defendants primarily rely on *Culver v. Slater Boat Co.*, where the Fifth Circuit established the method for calculating future lost wages in maritime cases. The court stated:

> In calculation of damages suffered either by a person whose personal injuries will result in extended future disability or by the representatives of a deceased person involves four steps: estimating the loss of work life resulting from the injury or death, calculating the lost income stream, computing the total damage, and discounting that amount to its present value.[77]

When calculating the lost income stream the fact-finder "begins with the gross earnings of the injured party at the time of injury."[78] "To this amount other income incidental to work, such as fringe benefits, should be added."[79] "From it, the fact-finder should subtract amounts the wage earner would have been required to pay, such as income tax and work expenses."[80] "Under *Culver II*, adjusting for inflation must occur after a fact-finder calculates the lost income stream."[81] "Above all, *Culver II* established that '[t]he paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned.'"[82]

Defendants argue that Bradley's testimony must be excluded because it is inconsistent with *Culver II*, as Bradley did not "begin with" Plaintiff's earnings at the time of his wrongful conviction. This case is obviously distinguishable from *Culver II* in two significant ways: (1) it is

---

[77] *Culver II*, 722 F.2d at 117.

[78] *Id.*

[79] *Id.*

[80] *Id.* at 120.

[81] *Vaughn v. Am. Com. Barge Line, L.L.C.*, No. 23-30494, 2025 WL 2945812, at *3 (5th Cir. Oct. 17, 2025) (citing *Nesmith v. Texaco, Inc.*, 727 F.2d 497, 498 (5th Cir. 1984)).

[82] *Id.* (quoting *Culver II*, 722 F.2d at 120).

not a maritime personal injury case and (2) Bradley is trying to establish Plaintiff's lost *past* wages due to his allegedly wrongful incarceration, not future lost wages due to a personal injury.

The only court to consider *Culver II* in the context of a wrongful conviction case, has found that the rule on calculating future lost wages is not applicable.[83] The district court reasoned:

> There is a fundamental difference between a discrete injury to someone's person that prevents him prospectively from performing the employment that he had been performing up until the time of an injury, and an injury like a wrongful conviction that for every day the person is incarcerated in violation of his rights may have prevented that person from making a positive life-changing decision to do something different, such as becoming an electrician. In the personal injury scenario, the physical injury may foreclose what the plaintiff had been doing for his livelihood leading immediately up to the injury so it makes sense that the income stream should be based on pre-injury income. But in the wrongful conviction scenario, the plaintiff may have been foreclosed every day for decades from making a better life for himself, which people sometimes do against all odds. Perhaps [the plaintiff] could have changed his life for the better had he not spent over 26 years in prison. The Court is persuaded that he should be allowed to make his case to the jury.[84]

This Court agrees that Plaintiff should be free to make an argument to the jury that he could have earned more than his pre-incarceration income suggests. Defendants have not shown that Bradley's opinions were so irrelevant and unreliable as to require exclusion pursuant to the Court's gatekeeping obligation under *Daubert* and its progeny. Bradly provides two alternative lost earning capacity calculations—$393,692.00 if Plaintiff had earned minimum wage from 1991 through 2022 or $975,578.00 if Plaintiff had earned the annual mean wage for a Black male with a GED or high school diploma. Defendants are free to cross-examine Bradley regarding these conclusions. Presumably, Defendants will present testimony to show that Plaintiff would have earned even less than $393,692.00, because he was not earning minimum wage at the time of his incarceration.

---

[83] *Reeder v. Williams*, No. CV 22-4614, 2025 WL 1142179, at *4 (E.D. La. Apr. 17, 2025).

[84] *Id.*

Defendants can question Bradley on this issue, and they are free to present evidence showing how much Plaintiff earned in the years preceding his incarceration. If the jury finds for Plaintiff on liability, it will then be for the jury to decide how much Plaintiff would have earned had he not been wrongfully incarcerated.

Defendants also argue that Bradley's calculations are unreliable because they do not account for expenses that Plaintiff would have sustained had he been out of prison. Plaintiff does not appear to dispute that such a reduction would be appropriate, but he asserts it should be done by the factfinder rather than the expert. Consistent with prior cases on this issue, the Court will require Bradley to amend the report to reduce the lost wages/benefits numbers to account for expenses that Plaintiff would have sustained had he been out of prison. [85]

Finally, Defendants contend that Bradley's testimony should be excluded because it is based on the incorrect premise that Plaintiff would have been released from prison in 1991 on the armed robbery conviction. The Court has addressed this issue in an Order addressing a challenge to Plaintiff's expert, Robert Lancaster, who Plaintiff planned to present to testify that Plaintiff could have been eligible for release in 1991 after serving half of his 15-year sentence on the armed robbery conviction. The Court will instruct the jury on the applicable law regarding "good time" release. If the jury finds for Plaintiff on liability, it will then be tasked with the factual determination on when Plaintiff would have been released from prison absent the allegedly wrongful conviction. Based on that determination, the jury will then decide how much income Plaintiff lost from the time he would have been released until his actual release in 2022. This is not a basis for exclusion of Bradley's testimony.

---

[85] *Id.*

## V. Conclusion

For the reasons stated above,

**IT IS HEREBY ORDERED** that Defendants' Motion to Exclude Expert Testimony of Brandy Bradley[86] is **DENIED**. On or before December 5, 2025, Bradley shall amend the report to reduce the lost wages/benefits numbers to account for expenses that Plaintiff would have sustained had he been out of prison.

**NEW ORLEANS, LOUISIANA**, this  1st  day of December, 2025.

                                              **NANNETTE JOLIVETTE BROWN**
                                              **UNITED STATES DISTRICT JUDGE**

---

[86] Rec. Doc. 95.