UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RAYMOND FLANKS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 23-6897** |
| **THE CITY OF NEW ORLEANS et al.** | **SECTION: "G"(4)** |

**ORDER AND REASONS**

This litigation arises from Plaintiff Raymond Flanks's ("Plaintiff") wrongful conviction for first-degree murder in 1985. Plaintiff names as Defendants the City of New Orleans; Jason Williams, in his official capacity as Orleans Parish District Attorney; Anne Kirkpatrick, in her official capacity as Superintendent of the New Orleans Police Department; John Dillmann, in his individual capacity; and John/Jane Does #1-20 in their individual capacities.[1] Plaintiff alleges the Orleans Parish District Attorney's Office ("OPDA") secured his wrongful conviction in violation of his constitutional rights by withholding material exculpatory evidence in violation of OPDA's obligations under *Brady v. Maryland*.[2]

Before the Court is Defendants the City of New Orleans, Anne Kirkpatrick, and John Dillmann's (collectively, the "City Defendants") Motion to Exclude Expert Testimony of William Brooks ("Brooks").[3] Brooks's opinions concern police policies and practices. The City Defendants contend that Brooks's testimony should be excluded for four reasons: (1) Brooks's opinions are outside the area of his expertise; (2) Brooks's testimony will mislead the jury and confuse the

---

[1] *See* Rec. Doc. 27.

[2] *Id.* at 4–5. *See Brady v. Maryland*, 373 U.S. 83 (1963).

[3] Rec. Doc. 97.

1

issues; (3) Brooks's opinions on NOPD's policy on identification procedures are not based on any reliable methodology; and (4) expert testimony is not needed to establish that police should not tell witness who to pick in a lineup.[4] Plaintiff opposes the motion.[5] Having considered the motion, the memoranda in support and opposition, the record, and the applicable law, the Court denies the motion.

### I. Background

On November 16, 2023, Plaintiff filed a Complaint against Defendants in this Court for alleged violations of his constitutional rights under 42 U.S.C. § 1983 and alleged violations of state law.[6] On June 4, 2024, Plaintiff filed an Amended Complaint.[7] This matter is set for trial on December 8, 2025. This case is related to Plaintiff's alleged wrongful conviction in May 1985 for the first-degree murder of Martin Carnesi.

In May 1985, a jury found Plaintiff guilty of first-degree murder in the death of Martin Carnesi, and Plaintiff was sentenced to life in prison.[8] Nearly 37 years later, on November 17, 2022, Plaintiff's first-degree murder conviction was vacated.[9] At the November 17, 2022 exoneration hearing, the "OPDA stated that 'the State agrees that Mr. Flank's [sic] conviction was obtained in violation of *Brady v. Maryland*' because 'the State failed to disclose … materials [that] are favorable, and under circumstances of the State's case against Mr. Flank[s], material.'"[10]

---

[4] Rec. Doc. 97-1 at 5–7.

[5] Rec. Doc. 107.

[6] Rec. Doc. 1.

[7] Rec. Doc. 27.

[8] Rec. Doc. 27 at 12–13.

[9] *Id.* at 14.

[10] *Id.*

Plaintiff retained William Brooks as an expert in police policy and practices. Brooks makes three primary conclusions in his expert report:

(1) In 1983, NOPD did not have adequate written policies regarding photo arrays;

(2) In 1983, NOPD had inadequate training and supervision, which created a risk of suggestive identification procedures that could lead to a mistaken identification and possibly a wrongful conviction; and

(3) The identification procedure that Dillmann used in this case had two significant problems: Dillmann steered Mrs. Carnesi to identify Plaintiff and Dillmann used inappropriate "fillers" in the photo array he showed Mrs. Carnesi.[11]

On October 28, 2025, the City Defendants filed the instant Motion to Exclude Expert Testimony of William Brooks.[12] On November 4, 2025, Plaintiff filed an opposition to the motion.[13]

## II. Parties' Arguments

### A. *The City Defendants' Arguments in Support of the Motion*

The City Defendants move the Court to exclude Brooks as a witness.[14] The City Defendants contend that Brooks's testimony should be excluded for four reasons: (1) Brooks's opinions are outside the area of his expertise; (2) Brooks's testimony will mislead the jury and confuse the issues; (3) Brooks's opinions on NOPD's policy on identification procedures are not based on any reliable methodology; and (4) expert testimony is not needed to establish that police should not tell witness who to pick in a lineup.[15]

---

[11] Rec. Doc. 97-2.

[12] Rec. Doc. 97.

[13] Rec. Doc. 107.

[14] Rec. Doc. 97.

[15] Rec. Doc. 97-1 at 5–7.

First, the City Defendants assert Brooks's opinions are outside the area of his expertise because during the relevant time period, 1983, he was a patrolman with no training or experience in identification procedures, policy development, or running a police department.[16] The City Defendants point out that Brooks did not begin working on these issues until the 2000s, and they argue modern eyewitness identifications procedures are not relevant to this case.[17] Additionally, the City Defendants suggest that Brooks's expertise does not extend to the impact of suggestive identification procedures on a witness, as Brooks does not have a background in psychology or any other scientific discipline.[18]

Second, the City Defendants argue that Brooks's testimony will mislead the jury and confuse the issues.[19] The City Defendants contend that Brooks's report contains a discussion of "why it is important to use reliable identification procedures" and a list of "ways to ensure that a photo array identification procedure is not suggestive."[20] The City Defendants also contend that Brooks's discussion regarding use of inappropriate "fillers" in photo arrays will not assist the jury in determining whether Dillmann told Mrs. Carnesi which photograph to pick and whether that statement caused her to falsely identify Plaintiff as the murderer.[21]

Third, the City Defendants assert Brooks's opinions on NOPD's policy on identification procedures are not based on any reliable methodology.[22] According to the City Defendants,

---

[16] *Id.* at 5.

[17] *Id.*

[18] *Id.*

[19] *Id.* at 6.

[20] *Id.*

[21] *Id.*

[22] *Id.*

4

Brooks's opinion that formal training on identification procedures was needed is contradicted by Brooks's own experience.[23] The City Defendants contend that Brooks's analysis on NOPD's policy is equally unreliable and based entirely on his own opinion about how officers might read into the absence of an express prohibition on suggestive techniques in photographic identification procedures.[24]

Fourth, the City Defendants contend that the jury does not need an expert to say that police should not tell witness who to pick in a lineup.[25] The City Defendants point out that Dillmann readily acknowledged such action was improper.[26] The City Defendants contend a jury instruction on this topic is sufficient.[27]

### B. *Plaintiff's Arguments in Opposition to Motion*

Plaintiff argues that the motion should be denied because: (1) Brooks's opinions are well within his area of expertise; (2) Brooks's testimony does not risk misleading the jury or confusing the issues; (3) Brooks's opinions regarding NOPD policies and training are reliable; and (4) Brooks's testimony regarding identification procedures will aid the jury.[28]

First, Plaintiff argues that Brooks's opinions are well within his area of expertise. Plaintiff contends that Brooks worked in law enforcement from 1977 to 2024, and from 1985 to 2000 Brooks was a Detective Sergeant who supervised a team of detectives.[29] Plaintiff points out that

---

[23] *Id.*

[24] *Id.* at 7.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] Rec. Doc. 107 at 2.

[29] *Id.* at 8.

5

Brooks relied on two widely used reference books and two Supreme Court decisions that predate 1983 to support his assertion that certain witness identification principles would have been known to police departments in the 1980s.[30] Plaintiff contends that Brooks is qualified to discuss the effect of suggestive identification procedures on a witness because that effect is inherently a part of studying, lecturing about, and developing model practices for, eyewitness identifications.[31]

Second, Plaintiff argues that Brooks's testimony does not risk misleading the jury or confusing the issues.[32] If the jury concludes that Dillmann did not explicitly tell Mrs. Carnesi whom to pick from the photo array, Plaintiff contends Brooks's opinion that Dillmann used at least two inappropriate "fillers" remains relevant.[33] Brooks also discusses ways that officers can ensure identification procedures are not suggestive.[34] Plaintiff contends the fact that some of those procedures were widely used by police departments in 1983 may be a potential topic for cross examination, but it is not a basis to exclude Brooks's testimony.[35]

Third, Plaintiff argues that Brooks's opinions regarding NOPD policies and training are reliable.[36] According to Plaintiff, Brooks's opinion regarding the need for formal training is based on his experience running a police department and designing training curriculum.[37] Plaintiff

---

[30] *Id.* at 9.

[31] *Id.* at 10.

[32] *Id.*

[33] *Id.* at 11.

[34] *Id.*

[35] *Id.*

[36] *Id.* at 12.

[37] *Id.*

6

contends the fact Brooks himself did not receive such formal training is irrelevant.[38] Plaintiff asserts that explaining why the NOPD policy was flawed is well within the bounds of expert opinion testimony.[39]

Fourth, Plaintiff contends Brooks's testimony will aid the jury.[40] According to Plaintiff, Dillmann's opinion that it would have been improper for Dillmann to tell an eyewitness they made a "correct" identification and Dillmann use of at least two inappropriate "fillers" in the photo array, are not issues "within the ken of an average juror."[41]

### III. Legal Standard

The district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702.[42] Rule 702 states that a witness "qualified as an expert by knowledge, skill, experience, training, or education," may provide expert testimony when "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."[43] For the testimony to be admissible, Rule 702 establishes the following requirements:

(1) the testimony must be based upon sufficient facts or data,

(2) the testimony must be the product of reliable principles and methods, and

---

[38] *Id.*

[39] *Id.* at 13–14.

[40] *Id.* at 14.

[41] *Id.* at 15.

[42] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138–39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000).

[43] Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

(3) the expert must reliably apply the principles and methods to the facts of the case.[44]

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court explained that Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."[45] The court's gatekeeping function mostly involves a two-part inquiry.

First, the court must determine whether the expert testimony is reliable, which requires an assessment of whether the expert testimony's underlying reasoning or methodology is valid.[46] The court's inquiry into the reliability of expert testimony is flexible and fact-specific.[47] The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.[48] In analyzing reliability, *Daubert* instructs courts to consider (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) any evaluation of known rates of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) general acceptance within the scientific community.[49]

Second, the court must determine whether the expert's reasoning or methodology "fits" the

---

[44] Fed. R. Evid. 702.

[45] *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (clarifying that the court's gatekeeping function applies to all forms of expert testimony).

[46] *See Daubert*, 509 U.S. at 589. The party offering the testimony has the burden to establish reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994)).

[47] *Seatrax*, 200 F.3d at 372.

[48] *See Daubert*, 509 U.S. at 590.

[49] *Id.* at 592–94. In *Kumho Tire*, the Supreme Court emphasized that the test of reliability is "flexible" and that Daubert's list of specific factors does not necessarily nor exclusively apply to every expert in every case. *Kumho Tire*, 526 U.S. at 141. The overarching goal "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

facts of the case and whether it will assist the trier of fact in understanding the evidence.[50] The second inquiry primarily analyzes whether the expert testimony is relevant.[51]

Yet a court's role as a gatekeeper does not replace the traditional adversary system.[52] A "review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."[53] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[54] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left to the jury's consideration."[55]

Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue."[56] "The rule was enacted to change the old view that [] giving an opinion on an ultimate issue would 'usurp the function' or 'invade the province' of the jury."[57] The rule, however, "does not open the door to all opinions."[58] Witnesses may not "tell the jury what result to reach," nor may they "give legal conclusions."[59] The Fifth Circuit has explained

---

[50] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

[51] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

[52] *See Daubert*, 509 U.S. at 596.

[53] Fed. R. Evid. 702 advisory committee's note, "2000 Amendments."

[54] *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

[55] *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore Cnty.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

[56] Fed. R. Evid. 704(a).

[57] *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983).

[58] *Id.*

[59] *Id.* (citing *United States v. Fogg*, 652 F.2d 551, 557 (5th Cir. 1981).

that "the task of separating impermissible question which call for overbroad or legal responses from permissible questions is not a facile one," but one that requires courts to exclude questions or answers from experts that "would supply the jury with no information other than the expert's view of how its verdict should read."[60]

## IV. Analysis

The City Defendants move the Court to exclude Brooks's testimony for four reasons: (1) Brooks's opinions are outside the area of his expertise; (2) Brooks's testimony will mislead the jury and confuse the issues; (3) Brooks's opinions on NOPD's policy on identification procedures are not based on any reliable methodology; and (4) expert testimony is not needed to establish that police should not tell witness who to pick in a lineup.[61] Each of these arguments is addressed in turn.

### A.  *Whether Brooks's Opinions are Within the Area of His Expertise*

An expert "need only possess a higher degree of knowledge, skill, experience, training, or education than an ordinary person in the subject matter of [his or her] testimony."[62] Brooks is a former Chief of Police of the Norwood Police Department in Norwood, Massachusetts.[63] He began his career as a Patrolman from 1977 to 1985; served as a Detective Sergeant from 1985 to 2000; served as Deputy Chief of Police from 2000 to 2012; and served as Chief of Police from 2012 until he retired in 2024.[64] He has a bachelor's degree in criminal justice from Stonehill College and a

---

[60] *Id.*

[61] Rec. Doc. 97-1 at 5–7.

[62] *See, e.g.*, *Thomas v. Chambers*, No. CV 18-4373, 2019 WL 8888169, at *12 (E.D. La. Apr. 26, 2019) (Vance, J.)

[63] Rec. Doc. 107-2 at 2.

[64] *Id.*

master's degree in criminal justice from Western New England College.[65] He is a state-certified instructor on eyewitness identification; he authored a model policy on eyewitness identification for the Massachusetts Chiefs of Police Association; he has been appointed to study and develop best practices for eyewitness identifications by the Supreme Judicial Court of Massachusetts and by the United States Court of Appeals for the Third Circuit; and he has lectured about eyewitness identification procedures to numerous law enforcement agencies, law schools, bar associations, and other professional groups.[66] Considering this experience, the Court finds that Brooks is qualified to testify as an expert on eyewitness identifications.

The City Defendants assert Brooks's opinions are outside the area of his expertise because during the relevant time period, 1983, he was a patrolman with no training or experience in identification procedures, policy development, or running a police department.[67] Brooks became a Detective Sergeant in 1985, where he "supervised a team of Detectives."[68] Therefore, he had some supervisory experience in the 1980s.

Moreover, the fact that he was not overseeing a police department until the 2000s does not render him unqualified. The expert report cites two widely used reference books from 1956 and 1965 to support the assertion that "eyewitness identification issues became a prominent topic in the law enforcement community" by "the mid-twentieth century."[69] He also discusses two U.S. Supreme Court decisions from 1968 and 1977, which discussed the risks related to

---

[65] *Id.*

[66] Rec. Doc. 97-2 at 1–2.

[67] Rec. Doc. 97-1 at 5.

[68] Rec. Doc. 97-2 at 1.

[69] *Id.* at 3.

11

misidentifications.[70] Brooks states that certain witness identification "principles would have been known to police departments in the 1980s," but he also acknowledges that some of the present-day best practices he cites were not all "widely used by police departments in 1983."[71] Therefore, Brooks opinions appear to be based both on his experience and his review of reference materials from the relevant time period.

Additionally, the City Defendants suggest that Brooks's expertise does not extend to the impact of suggestive identification procedures on a witness, as Brooks does not have a background in psychology or any other scientific discipline.[72] In 1977, the Supreme Court acknowledged that a witness' recollection "can be distorted easily by the circumstances or by later actions of the police."[73] Brooks's proposed testimony references "the well-documented risk of suggestive influence," which could lead to mistaken identification.[74] He does not opine about specific psychological impacts for which scientific qualifications would be necessary. Therefore, the proposed testimony is within the area of Brooks's expertise.

### B.      *Whether Brooks's Testimony Will Mislead the Jury or Confuse the Issues*

The City Defendants argue that Brooks's testimony will mislead the jury and confuse the issues because it references best-practices that were not all widely used by police departments in 1983.[75] As a general rule, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's

---

[70] *Id.* at 4.

[71] *Id.* at 4–6.

[72] Rec. Doc. 97-1 at 5.

[73] *Manson v. Brathwaite*, 432 U.S. 98, 112 (1977)

[74] Rec. Doc. 97-2 at 11.

[75] Rec. Doc. 97-1 at 6.

consideration."[76] To the extent Brooks cites some best-practices that were not widely used in 1983, the City Defendants can cross-examine Brooks on this issue. It is not a basis for outright exclusion of his testimony.

The City Defendants also contend that Brooks's discussion regarding use of inappropriate "fillers" in photo arrays will not assist the jury in determining whether Dillmann told Mrs. Carnesi which photograph to pick and whether that statement caused her to falsely identify Plaintiff as the murderer.[77] If the jury concludes that Dillmann did not explicitly tell Mrs. Carnesi whom to pick from the photo array, Brooks's opinion that Dillmann used at least two inappropriate "fillers" in the photo array remains relevant to Plaintiff's argument that the photo array was suggestive.

C.     *Whether Brooks's Opinions are Based on a Reliable Methodology*

Next, the City Defendants assert Brooks's opinions on NOPD's policy on identification procedures are not based on any reliable methodology.[78]

In *Brown v. Illinois Cent. R. Co.*, the Fifth Circuit explained that "[t]o establish reliability under *Daubert*, an expert bears the burden of furnishing 'some objective, independent validation of [his] methodology.'"[79] "The expert's assurance that he has utilized generally accepted [principles] is insufficient."[80] Furthermore, "[w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."[81]

---

[76] *14.38 Acres of Land*, 80 F.3d at 1077 (quoting *Viterbo*, 826 F.2d at 422).

[77] Rec. Doc. 97-1 at 6.

[78] *Id.*

[79] *Brown v. Illinois Cent. R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013) (quoting *Moore*, 151 F.3d at 276) (alteration in original).

[80] *Id.* (alteration in original).

[81] *Id.* (quoting *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2008) (alteration in original).

13

Brooks's report cites an Eyewitness Identification Model Policy.[82] Additionally, Brooks relies on his own experience running a police department and designing training curriculum. According to the City Defendants, Brooks's opinion that formal training on identification procedures was needed is contradicted by Brooks's own experience.[83] The fact that Brooks did not receive formal training on identification procedures when he began his career can be raised on cross-examination, but it does not provide a basis for exclusion of the proposed testimony.

The City Defendants also contend that Brooks's analysis on NOPD's policy is equally unreliable and based entirely on his own opinion about how officers might read into the absence of an express prohibition on suggestive techniques in photographic identification procedures.[84] Brooks reviewed NOPD policy, which included a specific rule against suggestive behavior for lineups but did not include a specific rule for photo arrays.[85] Brooks opines that "[b]y including a specific rule against suggestive behavior for one type of identification procedure and omitting that rule for the other, an officer could easily infer that making the rule apply only to lineups was intentional."[86] Brooks appears to base this opinion both on his experience and on the Eyewitness Identification Model Policy. To the extent the City Defendants believe this opinion is unsubstantiated, that issue is better left to cross-examination.

---

[82] Rec. Doc. 97-2 at 5–6.

[83] Rec. Doc. 97-1 at 6.

[84] *Id.* at 7.

[85] Rec. Doc. 97-2 at 6.

[86] *Id.*

### D. Whether Expert Testimony is Needed

Fourth, the City Defendants contend that the jury does not need an expert to say that police should not tell witness who to pick in a lineup.[87] The City Defendants point out that Dillmann readily acknowledged such action was improper.[88] The City Defendants contend a jury instruction on this topic is sufficient.[89] This argument oversimplifies the issues identified in Brooks's expert report. Brooks explains why he believes the procedure used in this case was suggestive. These issues are not common knowledge, and Brooks's testimony will assist the jury in this case.

### V. Conclusion

For the reasons stated above,

**IT IS HEREBY ORDERED** that the City Defendants' Motion to Exclude Expert Testimony of William Brooks[90] is **DENIED**.

**NEW ORLEANS, LOUISIANA**, this  1st  day of December, 2025.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[87] Rec. Doc. 97-1 at 7.

[88] *Id.*

[89] *Id.*

[90] Rec. Doc. 96.