**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**RAYMOND FLANKS**                                          **CIVIL ACTION**

**VERSUS**                                                          **NO. 23-6897**

**THE CITY OF NEW ORLEANS, ET AL.**                **SECTION: "G"(4)**

## ORDER AND REASONS

This litigation arises from Plaintiff Raymond Flanks's ("Plaintiff") wrongful conviction for first-degree murder in 1985. Plaintiff names as Defendants the City of New Orleans (the "City"); Jason Williams, in his official capacity as Orleans Parish District Attorney ("Williams"); Anne Kirkpatrick, in her official capacity as Superintendent of the New Orleans Police Department ("Kirkpatrick"); and John Dillmann, in his individual capacity ("Dillmann").[1]

Before the Court is the City, Kirkpatrick, and Dillmann's (collectively, "the City Defendants") Motion for Judgment on the Pleadings or Alternatively for Summary Judgment, which seeks dismissal of all claims pending against the City Defendants.[2] Plaintiff opposes the motion.[3] In a prior order, the Court addressed multiple issues raised in this motion, and granted Dillmann qualified immunity on any state or federal constitutional claims brought against him.[4] The remaining claims include state law claims against Dillmann for intentional or reckless infliction of emotional distress and negligence and/or gross negligence.[5] Further, Plaintiff brings

---

[1] *See* Rec. Doc. 27.

[2] Rec. Doc. 74.

[3] Rec. Doc. 90.

[4] Rec. Doc. 161.

[5] Rec. Doc. 27 at 56.

the state law claims of negligence and/or gross negligence, and violations of due process under the Louisiana State Constitution directly against the City, and seeks to hold the City vicariously liable for Dillmann's tortious conduct.[6] Additionally, Plaintiff brings *Monell* claims under 42 U.S.C. § 1983, against the City, Kirkpatrick, and Williams.[7] This Order addresses all of the remaining claims brought by Plaintiff, which are listed above. Having considered the motion, the memoranda in support and opposition, the record, and the applicable law, the Court grants the motion in part and denies the motion in part.

## I. Background

In May 1985, a jury found Plaintiff guilty of first-degree murder in the death of Martin Carnesi ("Mr. Carnesi").[8] This was Plaintiff's second trial after the first trial in August 1984 resulted in a mistrial when the jury was unable to reach a verdict.[9] At both trials, Mr. Carnesi's wife, Faye Carnesi ("Mrs. Carnesi"), testified to the circumstances of her husband's death, including identifying Plaintiff as the suspect who shot her husband.[10]

According to the Amended Complaint, Mr. Carnesi was shot by the Actual Perpetrator ("Actual Perpetrator") on December 17, 1983, in a robbery gone wrong.[11] At the time, Mr. Carnesi was walking Mrs. Carnesi to her car that was parked in front of their home.[12] After Mr. Carnesi

---

[6] *Id.* at 56, 58.

[7] Rec. Doc. 27 at 51–53.

[8] Rec. Doc. 27 at 12–13.

[9] *Id.* at 11–12.

[10] *Id.* at 12–13.

[11] *Id.* at 8–9.

[12] *Id.* at 9.

was shot, Mrs. Carnesi threw her purse at the Actual Perpetrator and ran away.[13] Initially, Mrs. Carnesi represented that the Actual Perpetrator was a Black man in his late twenties, about 5'10" and 150 pounds, with a medium build, brown skin, and a light mustache.[14] Mrs. Carnesi also reported that the Actual Perpetrator was wearing a shower cap and sped off in an aged, light blue car.[15] Approximately a week after the crime, New Orleans Police Department ("NOPD") detectives, including Dillmann, visited Mrs. Carnesi at her home and showed her a photo lineup for identification.[16] Mrs. Carnesi narrowed it down to two photos, Plaintiff and one other individual.[17] According to the Amended Complaint, Dillmann then suggested to Mrs. Carnesi that Plaintiff was the perpetrator.[18]

Mrs. Carnesi testified before the grand jury and identified Plaintiff as the perpetrator, based on her identification of him when Dillmann suggested that Plaintiff was the perpetrator.[19] Mrs. Carnesi testified that the Actual Perpetrator had a "little white blotch on the side of his cheek, a little white mark, like discolored looking," but rationalized her selection of Plaintiff from the photo lineup because she "didn't think they showed the side of his face with that mark in the photo."[20]

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* at 11.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

Plaintiff's first trial began on August 28, 1984.[21] Mrs. Carnesi identified Plaintiff and testified that the car he was arrested in resembled the car she saw fleeing the scene.[22] The Orleans Parish District Attorney ("OPDA") prosecutors also presented testimony from an NOPD technician who testified that Mr. Carnesi was shot with the same gun as the gun in Plaintiff's possession.[23] This first trial resulted in a hung jury.[24] After the first trial, the Bureau of Alcohol, Tobacco, and Firearms conducted independent ballistics testing and determined that neither the bullets used to kill Mr. Carnesi nor the casing found at the scene matched Plaintiff's gun.[25] At the second trial, Mrs. Carnesi testified that she "knew 'it was him'" and also testified that Dillmann did not suggest to her who to identify during the photo lineup.[26] The jury returned a guilty verdict for first-degree murder at this second trial.[27]

Nearly 37 years later, on November 17, 2022, Plaintiff's first-degree murder conviction was vacated.[28] At the November 17, 2022 exoneration hearing, the "OPDA stated that 'the State agrees that Mr. Flank's [sic] conviction was obtained in violation of *Brady v. Maryland*' because 'the State failed to disclose … materials [that] are favorable, and under circumstances of the State's case against Mr. Flank[s], material.'"[29] Plaintiff notes the OPDA specifically "acknowledged that

---

[21] *Id.*

[22] *Id.* at 12.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.* at 13.

[28] *Id.* at 14.

[29] *Id.*

'there is a reasonable likelihood that had [Mrs. Carnesi's] prior testimony been disclosed, it could have affected the judgment of the jury' and 'defense counsel would have been able to present a compelling case that Mrs. Carnesi was innocently mistaken when presented with the wrong suspect, that Mr. Flank[s] did not resemble[] the perpetrator, and that the car he was arrested in did not fit the one at the crime scene.'"[30]

Plaintiff brings numerous state law and 42 U.S.C. § 1983 claims, including *Monell* claims, against the City Defendants.[31] Plaintiff asserts that:

> [t]hroughout the 1970s, 1980s, and 1990s, the NOPD maintained a widespread practice of promoting, facilitating, and/or condoning improper, illegal, and unconstitutional investigative techniques, including, but not limited to: (a) creation and presentation of false or materially misleading evidence; and (b) failure to document and disclose exculpatory and impeachment evidence to prosecutors, defense counsel, and courts; as well as engaging in the affirmative and/or passive concealment of those types of misconduct.[32]

Plaintiff further alleges that the NOPD's policymakers maintained a policy, custom, or pattern and practice of condoning official misconduct, including by failing to train, supervise, and discipline police officers.[33] According to Plaintiff, because he and his counsel "were not aware of the NOPD records showing inconsistencies between Mrs. Carnesi's initial description of the Actual Perpetrator and Mr. Flanks'[s] appearance, the NOPD records showing a string of similar crimes with a consistently described perpetrator, or Mrs. Carnesi's grand jury testimony regarding the photo array and her initial identification of Mr. Flanks," this exculpatory material was unusable

---

[30] *Id.*

[31] Rec. Doc. 27 at 45–56.

[32] *Id.* at 16.

[33] *Id.* at 15.

at trial.[34] Plaintiff contends that the NOPD and OPDA's "policies, customs, and practices directly and proximately caused the violations of Mr. Flanks'[s] constitutional rights described herein and his wrongful conviction, imprisonment, and other damages."[35]

On September 30, 2025, the City Defendants filed the instant Motion for Judgment on the Pleadings or Alternatively for Summary Judgment.[36] On October 24, 2025, Plaintiff opposed[37] the motion, but consented to the dismissal of multiple claims.[38] On October 31, 2025, the City Defendants filed a reply brief in further support of the motion.[39] On December 11, 2025, the Court granted Dillmann qualified immunity on any state or federal constitutional claims brought against him.[40] This Order addresses the state law claims against Dillmann and the claims against the City and Kirkpatrick.

## II. Parties' Arguments

### A.    *The City Defendants' Arguments in Support of the Motion*

The City Defendants first argue that they are entitled to judgment on the pleadings under Rule 12(c).[41] Alternatively, the contend they are entitled to summary judgment.[42]

---

[34] *Id.* at 13.

[35] *Id.* 22–23.

[36] Rec. Doc. 74.

[37] Rec. Doc. 90.

[38] Rec. Doc. 90 at 2, n. 2.

[39] Rec. Doc. 101.

[40] Rec. Doc. 161. The Court also dismissed several claims that Plaintiff did not oppose dismissing.

[41] *Id.*

[42] *Id.* Because the Court previously determined that the instant motion is subject to a summary judgment standard and the City Defendants' arguments for Rule 12(c) and Rule 56 dismissal are redundant. This summary of the parties' arguments imputes the City Defendants' assertions that Plaintiff has both failed to plead sufficient facts or put forth sufficient evidence to support his claims.

1.      **Claims Against Dillmann**

The City Defendants assert that Plaintiff has not stated a negligence claim against Dillmann because, even if Plaintiff suffered damages from his imprisonment, Plaintiff has failed to establish that Dillmann breached his duty of care and that this breach caused his injuries.[43] The City Defendants assert that Mrs. Carnesi never identified Dillmann as the detective that allegedly encouraged her to identify Plaintiff in the photograph lineup.[44] Further, the City Defendants point out that Plaintiff has not alleged any facts which would suggest that Dillmann ever testified inconsistently, let alone falsely, or that Dillmann failed to turn over reports to the State.[45] Additionally, the City Defendants contend that Plaintiff has not put forth plausible facts to show that Dillmann was a cause-in-fact of Plaintiff's allegedly wrongful conviction.[46] Thus, the City Defendants argue that Plaintiff has failed to plead any facts which would support Dillmann having breached any standard of care, so the negligence claim should fail.[47]

The City Defendants assert that Plaintiff has pleaded no facts which would allow the Court to draw any inference to Dillmann's state of mind or intention at any relevant point in time, which is a requirement for an intentional or reckless infliction of emotional distress ("IIED") claim.[48] Further, the City Defendants contend that Plaintiff has failed to plead any facts which would establish Dillmann carrying out extreme and outrageous conduct.[49] Therefore, the City Defendants

---

[43] Rec. Doc. 74-1 at 20.

[44] *Id.*

[45] *Id.*

[46] *Id.* at 21.

[47] *Id.*

[48] *Id.*

[49] *Id.* at 21–22.

argue that neither element of the IIED claim is met, and the Court should dismiss it for the same reasons as the negligence claim.[50]

### 2.    Claims Against the City and Kirkpatrick

The City Defendants assert that Plaintiff's *Monell* claims against Kirkpatrick and the City are based off his contention that:

> NOPD's unlawful policies, customs, and practices include: (1) "suppressing and failing to timely disclose material exculpatory evidence," (2) "fabricating evidence, including but not limited to false witness statements," and (3) "engaging in the affirmative concealment of such misconduct." [Plaintiff] further alleges that the City and NOPD's failure to train and supervise their employees caused this misconduct to occur, and ultimately led to Flanks' wrongful conviction.[51]

The City Defendants argue that Plaintiff has failed to plead plausible facts that satisfy the elements of these claims under *Monell*.[52]

First, the City Defendants assert that Plaintiff has not pleaded sufficient facts to allege that the City or NOPD policy was the "moving force" that deprived him of a constitutional right.[53] The City Defendants contend that Plaintiff neither alleges the existence of any written unconstitutional municipal policy, nor does he allege that his rights were violated by the person in charge of policymaking.[54] The City Defendants also contend that Plaintiff has not cited the requisite amount

---

[50] *Id.* at 22.

[51] *Id.* at 28.

[52] *Id.*

[53] *Id.*

[54] *Id.* at 29.

of "very similar violations" that would provide "notice" to policymakers of a custom giving rise to their deliberate indifference.[55]

The City Defendants attempt to distinguish the four wrongful convictions cases cited by Plaintiff that involve alleged misconduct by Dillmann by asserting that none of those cases involved allegations of improper photo identification procedure, which is the central matter of this case.[56] Further, the City Defendants point out that all of those cases were vacated after Plaintiff was convicted, and thus could not have provided notice to policymakers of a pattern of violations.[57] Regarding the wrongful conviction cases cited by Plaintiff that did not involve Dillmann, the City Defendants highlight that only two of those cases involve findings of due process violations by an NOPD officer prior to Plaintiff's conviction in 1985.[58] Further, the City Defendants distinguish those two cases, because they both related "to the conduct of a single NOPD officer who encouraged eyewitness[es] to leave the State in advance of a criminal trial."[59]

Second, the City Defendants allege that, even if Plaintiff is found to have established the requisite municipal rights-depriving policy, he has not identified the policymaker who would have promulgated it.[60] The City Defendants contend that the only Defendant named by Plaintiff who has authority "over the administration and supervision of the NOPD" is Anne Kirkpatrick, the

---

[55] *Id.* (citing *Jason v. Tanner*, 938 F.3d 191, 198 (5th Cir. 2019)).

[56] *Id.* at 30; *See Floyd v. Vannoy*, No. 11-2819, 2017 WL 1837676 (E.D. La. May 8, 2017), aff'd, 887 F.3d 214 (5th Cir. 2018); *Kyles v. Whitley*, 514 U.S. 419 (1995); *State v. Knapper*, 579 So. 2d 956 (La. 1991); *State v. Seward*, 509 So. 2d 413 (La. 1987).

[57] *Id.*

[58] *Id.* at 31 (citing *Clark v. Blackburn*, 632 F.2d 531, 535 (5th Cir. 1980); *Lockett v. Blackburn*, 571 F.2d 309 (5th Cir. 1978)).

[59] *Id.*

[60] *Id.* at 32.

current Superintendent of the NOPD.[61] Further, the City Defendants assert that Kirkpatrick has held her current position for less than two years, therefore she did not promulgate any policy of the NOPD at the time of Plaintiff's conviction in 1985.[62]

Third, the City Defendants contend that Plaintiff merely offers conclusory allegations that the City and NOPD "failed to conduct any in-service or advanced training for supervisors; failed to ensure that its supervisors had the training and resources to supervise investigations, including of murders; and failed to document and enforce disciplinary investigations."[63] Moreover, the City Defendants assert that Plaintiff pleads no specific facts that could plausibly establish the causation of his alleged constitutional deprivations.[64] Although Plaintiff cites reports published by the International Association of Chiefs of Police and the Louisiana National Guard that found a lack of training at the NOPD, the City Defendants point out that these reports were published in 1991 and 1994 respectively, thus could not have provided notice of a pattern of the alleged constitutional violations for Plaintiff's criminal conviction in 1985.[65] Therefore, the City Defendants claim the Plaintiff has not satisfied the elements necessary for his failure to train, supervise and discipline claims.[66] In sum, the City Defendants argue that because Plaintiff has failed to allege facts that satisfy any of the elements of a cognizable *Monell* claim, that count of the indictment should be dismissed.[67]

---

[61] *Id.*

[62] *Id.*

[63] *Id.* at 33–34.

[64] *Id.* at 34.

[65] *Id.*

[66] *Id.*

[67] *Id.*

With respect to the state law claims against the City, the City Defendants submit that Plaintiff seeks to hold the City vicariously liable for Dillmann's alleged wrongdoing.[68] The City Defendants do not dispute that Dillmann was acting within the course and scope of his employment when he participated in the Carnesi murder investigation and testified at trial.[69] However, the City Defendants, as described above, assert that Dillmann is not liable individually, thus there is no liability to vicariously transfer to his employer the NOPD.[70] Therefore, the City Defendants argue that the vicarious liability claim should be dismissed by the Court.[71] Thus, the City Defendants argue that they are entitled to summary judgment as to all claims against it.[72]

## B.    *Plaintiff's Arguments in Opposition to Motion*

### 1.    **Claims Against Dillmann**

Plaintiff contends that the state law claims against Dillmann based on Dillmann's fabrication of evidence, or in the alternative failure to intervene, and failure to comply with his *Brady* obligations should not be dismissed.[73] Regarding the fabrication of evidence claim, Plaintiff submits that the evidence plausibly demonstrates that during the photo lineup identification with Mrs. Carnesi, Dillmann shook his head, indicated the photo of Plaintiff, and said "that's him."[74] Further, Plaintiff alleges that "[t]he City Defendants' argument on this point boils down to what

---

[68] *Id.* at 35.

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73]  Rec. Doc. 90 at 7.

[74] *Id.* at 7–8.

Mrs. Carnesi's grand jury testimony *means* and the *inferences* a factfinder may draw from it."[75] Plaintiff asserts that such questions regarding the factual interpretation of the grand jury testimony is a matter for the jury to decide.[76] Additionally, Plaintiff contends that the City Defendants' assertion that if the photo lineup procedure was tainted a different detective may have been responsible is irrelevant, because "Dillmann would still be liable because the conduct occurred in his presence and he neither intervened nor disclosed it."[77]

Regarding Dillmann's alleged negligence for failing to disclose *Brady* evidence, Plaintiff asserts that in the complaint, he plausibly alleges that Dillmann withheld from the prosecution and the defense: "(1) the fact that he directed Mrs. Carnesi to identify [Plaintiff], (2) police reports discussing the string of robberies related to the Carnesi murder, and (3) information and facts illustrating inconsistencies between Mrs. Carnesi's description of the Perpetrator and [Plaintiff's] appearance."[78] Plaintiff maintains that a reasonable juror could conclude that Dillmann intentionally or recklessly withheld this information from the OPDA.[79]

Further, Plaintiff asserts that Dillmann's alleged actions: "(1) breached his duty of care, (2) caused Plaintiff's injuries stemming from his wrongful conviction, and (3) acted in an extreme and outrageous manner knowing that severe emotional distress would be certain or substantially certain

---

[75] *Id.* at 9.

[76] *Id.*

[77] *Id.* at 9–10.

[78] *Id.* at 11.

[79] *Id.* at 12.

to result from his conduct."[80] Hence, Plaintiff contends that the state law claims against Dillmann of negligence and/or gross negligence, and IIED should survive summary judgment.[81]

### 2.    Claims Against the City and Kirkpatrick

Plaintiff submits that he has raised valid *Monell* claims against the City and Kirkpatrick.[82] Plaintiff first contends that he has adequately identified the relevant City policymakers.[83] Plaintiff rebuts the City Defendants' assertion that Plaintiff "has not made clear who the policymaker was" at the NOPD by referring to the identification of Kirkpatrick and her "predecessors in office" in the complaint.[84] Moreover, Plaintiff offers the names of Kirkpatrick's predecessors to contend that there is not a genuine dispute about who these policymakers were.[85] Plaintiff contends that he is only required to allege sufficient facts to put the City Defendants on notice about who the final policymaker was at the NOPD, which he did.[86]

Second, Plaintiff maintains that the City and NOPD had unconstitutional official policies, customs, and practices.[87] In support, Plaintiff offers three theories to establish *Monell* liability:

> (1) that NOPD's formal policy on identification procedures was a proximate cause of the constitutional injury in this case; (2) that NOPD maintained an unconstitutional *custom* driven by a "pervasive culture of indifference to *Brady*" and the fabrication of evidence; and (3) that the NOPD Superintendents, having

---

[80] *Id.* at 13.

[81] *Id.*

[82] *Id.* at 16.

[83] *Id.*

[84] *Id.* at 17.

[85] *Id.* The Kirkpatrick predecessors listed by Plaintiff include former NOPD Superintendents: Warren Woodfork, from in or around 1985 to in or around 1991; Henry M. Morris, from in or around 1980 to in or around 1985; James C. Parsons, from in or around 1978 to in or around 1980; and Clarence B. Giarrusso, from in or around 1970 to in or around 1978.

[86] *Id.* at 18.

[87] *Id.* at 19.

> knowledge of multiple instances in which NOPD employees suppressed material exculpatory evidence and presented false testimony, fostered *practices* constituting deliberate indifference toward *Brady* violations and the fabrication of evidence.[88]

Regarding the theory that NOPD had constitutionally deficient identification procedures, Plaintiff offers the expert report of William G. Brooks, a retired police chief with expertise on identification procedures.[89] Brooks opines that NOPD's photo array identification policy was improper, because it did not have a requirement that "[n]othing shall be said or done which might prompt a witness or victim to identify a particular person in the lineup."[90] Plaintiff also references Mr. Brooks's opinion that the lack of that requirement in the policy could be seen as intentionally permitting suggestive behavior during photo arrays.[91]

Regarding the second theory of *Monell* liability, Plaintiff alleges that NOPD had a "persistent, widespread practice" of withholding exculpatory evidence and knowingly presenting false evidence in violation of the Fifth and Fourteenth Amendments that was "so common and well settled as to constitute a custom that fairly represents municipal policy."[92] Relatedly, Plaintiff advances his third theory of *Monell* liability by alleging that the "NOPD Superintendents had constructive knowledge of repeated fabrication of evidence and *Brady* violations because such violations 'occurred for so long [and] so frequently that the course of conduct warrants the

---

[88] *Id.*

[89] *Id.*

[90] *Id.* at 19–20.

[91] *Id.* at 20.

[92] *Id.* (quoting *Marshall v. Webre*, No. 23-1319, 2023 U.S. Dist. LEXIS 162031, at *7 (E.D. La. Sept. 13, 2023)).

attribution to [the NOPD Superintendents] of knowledge that the objectionable conduct is the expected, accepted practice.'"[93]

In support of the latter two theories, Plaintiff cites expert witness Professor Levenson's report where she identified 57 cases in New Orleans over a period of 45 years in which a court found *Brady* violations, 22 of which occurred in the 18 years prior to Plaintiff's conviction.[94] Moreover, Plaintiff cites to Dillmann's testimony that allegedly establishes that NOPD did not train its employees regarding their *Brady* obligations, that secretaries prepared and provided documents to OPDA without oversight from detectives, that officers did not include all exculpatory evidence in their reports, and that officers regularly did not review or follow written NOPD policy.[95] Additionally, Plaintiff references a 1975 report on citizen complaints at NOPD by McManis Associates, Inc. that warned that NOPD "suffers from the absence of clearly defined and enforced ground rules of behavior," and observed that "police personnel feel free to behave as they wish in most instances."[96] Further, Plaintiff posits that because *Brady* and fabrication of evidence are acts of concealment or inaction there may be many more violations committed by the NOPD that have not come to light.[97] Plaintiff contends that this evidence taken together illustrates "persistent, widespread, customs that evince a 'pervasive culture of indifference to *Brady*.'"[98] Supported by the same evidence, Plaintiff avers he has alleged a plausible claim "that the need for training, supervision, and discipline was so obvious that failure to act was 'deliberate indifference'

---

[93] *Id.* (citing *Guillot v. Lopinto*, No. 20-1604, 2022 U.S. Dist. LEXIS 40383, at *17 (E.D. La. Mar. 8, 2022)).

[94] *Id.* at 21.

[95] *Id.*

[96] *Id.* at 22.

[97] *Id.*

[98] *Id.* (citing *Connick v. Thompson*, 563 U.S. 51, 73 (2011)).

on behalf of the relevant policymakers."[99] Accordingly, Plaintiff asserts that he has established that the City had unconstitutional official policies, customs, and practices requisite for *Monell* claims.[100]

Plaintiff contends that the final prong of the *Monell* claims is met, because the NOPD's customs and practices of permitting, encouraging, and failing to prevent *Brady* violations and the fabrication of evidence were the moving force behind Plaintiff's injuries.[101] Specifically, Plaintiff reiterates that said customs and practices of the NOPD violated Plaintiff's Fifth and Fourteenth Amendment due process rights.[102] Further, Plaintiff asserts that the City Defendants have cited no caselaw to support their argument that NOPD's practices and customs were not the moving force behind Plaintiff's alleged constitutional right violations.[103]

Finally, Plaintiff argues that the vicarious liability claim against the City should survive, because the City has allegedly conceded that Dillmann "was in the course and scope of his employment when he participated in the Carnesi murder investigation and testified at trial."[104] Further, Plaintiff asserts that the City Defendants' only argument against this claim is that there was no tortious conduct from Dillmann, thus there can be no vicarious transfer of Dillmann's non-

---

[99] *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

[100] *Id.* at 22–23.

[101] *Id.* at 23.

[102] *Id.* (citing *Jauch v. Choctaw County*, 874 F.3d 425, 435–36 (5th Cir. 2017) (finding it "obvious" that "policy whereby certain arrestees were indefinitely detained" was the moving force behind "due process violation [of] indefinite detention"); *Arnold v. Alvarado*, No. 22-3332, 2024 U.S. Dist. LEXIS 67077, at *12–13 (E.D. La. Apr. 12, 2024) (finding allegations "clear" that failure to "enforce the policies that are meant to govern the use of force" led to the use of excessive force against plaintiff); *Durant v. Gretna City*, No. 19-147, 2020 U.S. Dist. LEXIS 8422, at *75–76 (E.D. La. Jan. 17, 2020) (arrest pursuant to unconstitutional ordinance established that unconstitutional ordinance itself "obvious[ly]" caused plaintiff's injury).

[103] *Id.*

[104] *Id.* at 24 (citing Rec. Doc. 74-1 at 35).

existent individual liability.[105] Plaintiff reasserts that, as explained above, Dillmann is liable for constitutional violations, through withholding exculpatory evidence and fabrication Mrs. Carnesi's identification of Plaintiff.[106] Therefore, Plaintiff contends that the vicarious liability claim has been adequately plead and evidenced, and should not be dismissed.[107]

## C.    *The City Defendants' Further Arguments in Support of the Motion*

### 1.    **Claims Against Dillmann**

First, the City Defendants assert that Plaintiff's fabrication of evidence claim against Dillmann "rests upon the unreasonable interpretation of a few sentences in the grand jury testimony by Mrs. Carnesi."[108] Regarding Plaintiff's *Brady* violation claims, the City Defendants assert that Plaintiff cannot prove that Dillmann concealed exculpatory evidence from both the prosecution and defense, or that the alleged concealment affected the outcome of Plaintiff's trial.[109]

### 2.    **Claims Against the City and Kirkpatrick**

The City Defendants also respond to Plaintiff's opposition to the dismissal of the *Monell* claims.[110] The City Defendants reassert that no underlying constitutional violation occurred, but if there was a constitutional violation NOPD policies were not the moving force behind the alleged suggestive lineup.[111] The City Defendants cite Dillmann's testimony where he explained that he

---

[105] *Id.*

[106] *Id.* at 24–25.

[107] *Id.*

[108] Rec. Doc. 101 at 1.

[109] *Id.* at 4.

[110] *Id.* at 8.

[111] *Id.*

was aware that both subtle and direct suggestion during a photo lineup was impermissible.[112] Further, while Plaintiff points to the NOPD policy for non-photo identification procedures in effect in 1983, the City Defendants contend that this policy is not relevant to the procedures for photo array identification procedures.[113]

Additionally, the City Defendants aver that Plaintiff has not proven a sufficient pattern or practice to establish that NOPD officers regularly used suggestive identification procedures to fabricate evidence.[114] Further, the City Defendants allege that Plaintiff improperly attempts to "pass [the] alleged *Brady* violations by OPDA as evidence of *Brady* violations by NOPD."[115] The City Defendants contend that Plaintiff solely bases this argument on Laurie Levenson's report, but the report only concerns *Brady* violation by the OPDA, rather than the NOPD.[116] Moreover, the City Defendants submit that even if Plaintiff could offer evidence of NOPD *Brady* violations occurring in the seven specified cases Plaintiff relies on, those cases occurred over a 46 year period.[117] Hence, the City Defendants argue that a mere seven cases involving potential *Brady* violations over 46 years, when thousands of murders were investigated by the NOPD is insufficient to conclude that there was a pattern or custom.[118]

---

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.* at 9.

[116] *Id.*

[117] *Id.* The City Defendants refer to criminal cases cited by Plaintiff in the complaint involving Bobbie Jean Johnson, Larry Hudson, Calvin Duncan, Roland Gibson, and Curtis Kyles.

[118] *Id.* at 9–10.

### III. Legal Standard

The City Defendants move for judgment on the pleadings under Rule 12(c) or for summary judgment under Rule 56. Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."[119] A motion under Rule 12(c) "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts."[120] The City Defendants rely on documents outside the pleadings which are not subject to judicial notice, such as testimonial evidence and numerous exhibits.[121] Hence, the Court will consider the full record, construe the City Defendants' motion as one for summary judgment, and evaluate the arguments contained therein under Rule 56.

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[122] The court must view the evidence in the light most favorable to the nonmovant.[123] Initially, the movant bears the burden of presenting the basis for the motion; that is, the absence of a genuine issue as to any material fact or facts.[124] The burden then shifts to the nonmovant to come forward with specific facts showing there is a genuine

---

[119] Fed. R. Civ. P. 12(c).

[120] *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co*., 313 F.3d 305, 312 (5th Cir. 2002) (quoting *Hebert Abstract Co. v. Touchstone Props., Ltd*., 914 F.2d 74, 76 (5th Cir. 1990)).

[121] Rec. Doc. 27.

[122] Fed. R. Civ. P. 56(a).

[123] *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

[124] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

dispute.[125] "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[126]

## IV. Analysis

The instant motion attempts to dismiss the claims which arise from the allegations that NOPD Detective Dillmann fabricated and/or concealed exculpatory evidence from the prosecution and defense in Plaintiff's criminal trial in violation of *Brady*. To begin with, all claims arising under the Louisiana Constitution have been dismissed except for the due process claims against the City. Because Plaintiff merely states a conclusory theory for the City's direct liability under the Louisiana Constitution's due process clause, the Court dismisses this claim on summary judgment.[127] For the same reasons, the Court dismisses the direct liability negligence claim against the City.[128] The Court proceeds to address the remaining claims against Dillmann, the City, and Kirkpatrick in turn.

### A.    *Whether the Claims Against Dillmann Should be Dismissed*

#### 1.    **Negligence or Gross Negligence**

Plaintiff alleges that Dillmann "failed to take due care, and instead [was] negligent and/or grossly negligent in suppressing and failing to timely disclose material exculpatory evidence to [Plaintiff] and in fabricating evidence against [Plaintiff]."[129] The City Defendants contend that Plaintiff has not alleged plausible facts to establish that: Mrs. Carnesi identified Dillmann as the

---

[125] *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

[126] *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (internal citation omitted).

[127] Rec Docs. 27, 90. Plaintiff does not discuss a factual theory or put for the any evidence of the City's direct liability under the Louisiana due process clause in either of the relevant filings.

[128] *Id.*

[129] Rec. Doc. 27 at 56.

detective who allegedly encouraged her to identify Plaintiff's photograph in the lineup; Dillmann ever testified inconsistently, let alone falsely; and Dillmann or anyone at the NOPD failed to turn over their reports to the State in violation of *Brady*.[130]

The determination of liability in a negligence case usually requires proof of five separate elements: (1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element).[131]

The City Defendants only dispute the breach and causation elements of the negligence claim.[132] The negligence claim against Dillmann is based primarily on Mrs. Carnesi's grand jury testimony. Mrs. Carnesi testified before the grand jury as follows:

> Q. OK. Do you remember about a week later, uh, the detectives came to your house and showed you some pictures?
>
> A. Yes.
>
> Q. Were you able to pick a picture out of those pictures that they showed you?
>
> A. Yes.
>
> Q. And the picture you picked, was that the individual who had shot your husband?
>
> A. He had five of them. As soon as I looked I took three and pushed them on the side. And I had one here and one here. And I looked at this one. And I told my daughter, I said, "Get me a flashlight. I want to make sure that it's him if it's here." So I looked at this one and I

---

[130] Rec. Doc. 74-1 at 20.

[131] *Detraz v. Lee*, 2005-1263 (La. 1/17/07), 950 So 2d 557, 562.

[132] Rec. Doc. 74-1 at 20–21.

put it down, and I took the one on this side and looked at it. And I kept looking and I recognized him. Then I told the detectives, I said, "I remember one thing about this man. He had a little white blotch on the side of his cheek, a little white mark, like discolored looking." And then the three detectives looked at one another, and he shook his head and said, "That's him." But I don't think they showed the side of his face with that mark, but I happened to remember it because I was looking him in his face twice, you see, and I remembered.

Q. Are you sure that the man you picked out in the pictures is the man that killed your husband?

A. Yes.[133]

Thus, because Dillmann was present and Mrs. Carnesi does not indicate what actions were specific to him, the Court finds that there is a genuine dispute of material facts as to whether Dillmann negligently fabricated evidence by shaking his head and saying "[t]hat's him" during the identification. Further, Plaintiff has pointed to evidence suggesting that OPDA may not have had NOPD reports relating to similar robberies; handwritten or daily reports; Mrs. Carnesi's comment about a "white blotch" on the perpetrator's face; and her description of the vehicle that sped off as "old" in Plaintiff's criminal case file. Thus, there are facts in dispute regarding whether Dillmann breached a duty owed to Plaintiff. Because this information was not considered by the jury at Plaintiff criminal trial there are also genuine disputes of material fact as to whether these alleged breaches caused Plaintiff's incarceration. Hence, the Court denies summary judgment as to the state law negligence and/or gross negligence claims against Dillmann.

### 2.     Intentional or Reckless Infliction of Emotional Distress

The City Defendants assert that the IIED claims should be dismissed because Plaintiff has "pleaded no facts which would allow the Court to draw any inference related to Dillmann's state

---

[133] Rec. Doc. 90-3 at 6–7.

of mind or intention at any point during the homicide investigation."[134] In a conclusory fashion, Plaintiff asserts that Dillmann desired to inflict severe emotional distress on [Plaintiff] or knew that severe emotional distress would be certain or substantially certain to result from [his] conduct."[135]

In order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.[136] Further, "the conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."[137]

Determining whether Dillmann's alleged conduct was "extreme and outrageous," or whether Plaintiff suffered "severe" emotional distress are plausible questions of fact. However, the Court agrees with the City Defendants that Plaintiff has not presented any evidence to establish that Dillmann "desired" to inflict the alleged emotional distress or knew that it would result. In fact, Plaintiff has not presented any evidence which could reasonably establish Dillmann's state of mind. Therefore, the Court grants summary judgment as to the intentional or reckless emotional distress claim.

---

[134] Rec. Doc. 74-1 at 21.

[135] Rec. Doc. 27 at 57.

[136] *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991).

[137] *King v. Phelps Dunbar, LLP*, 98-C-1805, (La. 2/7/24), 743 So. 2d 181, 186.

**B.** **_Whether the Vicarious Liability and Monell Claims Against the City and Kirkpatrick Should be Dismissed_**

### 1. State Law Claims

The Louisiana Supreme Court allows a plaintiff to recover for the negligence against a municipality under a theory of respondeat superior.[138] Under Louisiana law, an employer is liable for the torts an employee committed while acting within the course and scope of his employment.[139] Louisiana courts have generally determined vicarious liable by examining four factors: "(1) whether the tortious act was primarily employment rooted; (2) whether the [act] was reasonably incidental to the performance of the employee's duties; (3) whether the act occurred on the employer's premises and (4) whether it occurred during the hours of employment."[140] As a prerequisite the employee must have been found "liable in the first instance."[141]

The City Defendants do not dispute that the elements of vicarious liability are met, except to argue that Dillmann is not liable in the first place. As discussed above, Plaintiff has laid out plausible factual allegations and evidence in support of his claim of negligence against Dillmann. Further, all allegations against Dillmann stem from his actions performed in an investigatory capacity for NOPD. Therefore, there are genuine disputes of material fact as to whether the City is vicariously liable for Dillmann's actions. Thus, the Court denies summary judgment on Plaintiff's vicarious liability claims under Louisiana law.

---

[138] _Mathieu v. Imperial Toy Corp._, 94-0952 (La. 11/30/94), 646 So. 2d 318, 320 (citing La. Civ. Code art. 2315).

[139] _See_ La. Civ. Code art. 2320.

[140] _Valenza v. Santos_, No. 16-1058, 2016 WL 7210347, at *3 (E.D. La. Dec. 13, 2016)

[141] _Chatman v. Plaquemines Par._, No. 23-1688, 2025 WL 270627 at *2 (E.D. La. Jan. 22, 2025).

## 2. *Monell* Claims

Turning to the *Monell* claims, Plaintiff asserts that NOPD's "unlawful policies, customs, and/or practices included" suppressing and failing to timely disclose exculpatory evidence and fabricating evidence.[142] The City Defendants contend that Plaintiff "cannot offer evidence which would support a claim that an official City policy was the moving force behind the deprivation of any of his rights."[143] Further, even assuming that a *Brady* violation by Dillmann occurred, the City Defendants argue that Plaintiff's *Monell* claims fail because Plaintiff cannot present competent evidence to show: (1) that NOPD adopted and implemented an unconstitutional policy concerning *Brady* disclosures; (2) that NOPD's relevant policymakers acted with deliberate indifference to the rights of criminal defendants; or (3) that NOPD's relevant policymakers conduct directly caused the alleged suppression of evidence in Plaintiff's criminal case.[144]

As an initial matter, the City Defendants contend that Plaintiff has not made clear who the policymaker was who would have promulgated the alleged policies.[145] However, the Fifth Circuit has held that "the specific identity of the policymaker is a legal question that need not be pled; the complaint need only allege facts that show an official policy, promulgated or ratified by the policymaker, under which the municipality is said to be liable."[146] Therefore, the Court finds that Plaintiff's identification of the City, the NOPD, and Kirkpatrick sufficient to allege that the

---

[142] Rec. Doc. 27 at 51–52.

[143] Rec. Doc. 74-1 at 44.

[144] *Id.* at 28–34. Because Plaintiff has not shown an official policy, pattern, or custom of constitutional violations by the NOPD, the Court does not reach the issue of whether a constitutional violation occurred.

[145] Rec. Doc. 74-1 at 32.

[146] *Groden v. City of Dallas*, 826 F.3d 280 (5th Cir. 2016).

superintendents of NOPD leading up to Plaintiff's conviction were the relevant policy makers ("Superintendent").

To succeed on a *Monell* claim, Plaintiff must present facts to establish the Superintendent had actual or constructive knowledge of an official policy, practice, or custom of similar constitutional violations. Plaintiff argues that he has put forth sufficient evidence to support *Monell* liability under three distinct theories:

> (1) that NOPD's formal policy on identification procedures was a proximate cause of the constitutional injury in this case; (2) that NOPD maintained an unconstitutional custom driven by a 'pervasive culture of indifference to Brady' and the fabrication of evidence; and (3) that the NOPD Superintendents, having knowledge of multiple instances in which NOPD employees suppressed material exculpatory evidence and presented false testimony, fostered practices constituting deliberate indifference toward Brady violations and the fabrication of evidence.[147]

Establishing an official policy, practice, or custom can be done in one of three ways. First, there may be a policy that is "officially adopted and promulgated" by the municipality or an official within the municipality with policymaking authority.[148] Second, there may be a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy."[149] A persistent, widespread practice may include allegations that a policymaker failed to act affirmatively, "if the need to take some action to control the agents of the local governmental entity 'is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r] … can reasonably be said to

---

[147] Rec. Doc. 90 at 19.

[148] *Burge v. Par. of St. Tammany (Burge II)*, 336 F.3d 363, 369 (5th Cir. 2003).

[149] *Id.*

have been deliberately indifferent to the need.'"[150] A policymaker with policy-making authority must have actual or constructive knowledge of the custom.[151] Third, "a single decision by a policy maker may, under certain circumstances, constitute a policy for which a municipality may be liable."[152] In this case, Plaintiff argues that there is evidence to support a *Monell* claim under the first and second options.[153]

### a. Official Policy

Plaintiff asserts that "NOPD's actual policy on identification procedures was constitutionally deficient."[154] Specifically, Plaintiff alleges that "NOPD's [in person] lineup policy dictated that '[n]othing shall be said or done which might prompt a witness or victim to identify a particular person in the lineup,' while its photo array policy omitted that requirement."[155] Further, Plaintiff's expert witness Chief Brooks, opined that this rule "is the most important of all the rules listed for lineup procedures[.]"[156] The City Defendants contend that Plaintiff has not alleged "the existence of any written unconstitutional policy nor does he allege that his rights were violated by the person in charge of policymaking."[157]

---

[150] *Burge v. Par. of St. Tammany (Burge I)*, 187 F.3d 452, 471 (5th Cir. 1999) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

[151] *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (internal citations omitted).

[152] *Id.* (quoting *Brown v. Bryan Cnty., OK*, 219 F.3d 450, 462 (5th Cir. 2000)).

[153] Plaintiff does not assert a theory of "single-incident liability," a path foreclosed in the *Brady* context by the Supreme Court's opinion in *Thompson*, 563 U.S. at 62–72.

[154] Rec. Doc. 90 at 19.

[155] *Id.* at 20 (citing Rec. Doc. 90-40 at 7).

[156] Rec. Doc. 90-40 at 7.

[157] Rec. Doc. 74-1 at 29.

Plaintiff has not identified an official adopted or promulgated policy of conducting improper identification procedures that could lead to fabricated evidence. At most, NOPD's policy was deficient by not including additional language to prevent misidentifications. "Liability for failure to promulgate policy . . . require[s] that the defendant acted with deliberate indifference."[158] "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights."[159] Plaintiff has not demonstrated that fabrication of evidence was a likely consequence of the NOPD failing to adopt a written policy stating nothing shall be said or done which might prompt a witness or victim to identify a particular person in the photo array. Plaintiff also has not presented any competent summary judgment evidence to show that the failure to adopt such a policy was deliberately indifferent.

Further, Plaintiff has merely offered threadbare evidence to support a *Monell* claim against the City and Kirkpatrick under the alleged fabrication of evidence through the persistent, widespread practice or custom, or failure to train prongs. Thus, the Court grants summary judgment on the *Monell* claims stemming from the alleged fabrication of evidence, against the City and Kirkpatrick in her official capacity as the superintendent of NOPD.

      **b.    Persistent, Widespread Practice or Custom**

Plaintiff also argues that NOPD had "a persistent, widespread practice' of withholding exculpatory evidence . . . that was 'so common and well settled as to constitute a custom that fairly

---

[158] *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011).

[159] *Id.*

represents municipal policy.'"[160] Plaintiff claims "that officers were so widely permitted to violate *Brady*, . . . and violated *Brady* so often and with such brazenness, that NOPD effectively adopted a policy of permitting and encouraging such violations."[161] In response, the City Defendants assert that most of the cases cited by Plaintiff deal with *Brady* allegations against the OPDA rather than the NOPD.[162] Further, the City Defendants argue that only 2 of the 38 cases cited by Plaintiff "*Norman Clark* and *Raymond Lockett*, involve findings of due process violations by an NOPD officer prior to [Plaintiff's] conviction in 1985."[163] Additionally, the City Defendants point out that both of those cases dealt with an NOPD officer encouraging an eyewitness to leave the State in advance of trial.[164] Lastly, the City Defendants offer that the other three cases relied on by Plaintiff that involve police misconduct were decided after Plaintiff's conviction, thus could not have provided notice or given rise to NOPD's deliberate indifference to that misconduct.[165]

To succeed on this claim, Plaintiff must demonstrate that there was a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy," and proving the Superintendent had actual or constructive knowledge of that custom.[166] Where an alleged custom or practice "is unconstitutional on its face, it necessarily follows that a policymaker was not only aware of the specific policy, but was also

---

[160] Rec. Doc. 90 at 20.

[161] *Id.*

[162] Rec. Doc. 74-1 at 30–31.

[163] *Id.* at 31.

[164] *Id.*

[165] *Id.*

[166] *Burge II*, 336 F.3d at 369.

aware that a constitutional violation will most likely occur."[167] However, where the alleged custom or practice "is facially innocuous, establishing the requisite official knowledge requires that a plaintiff establish that [the custom or practice] was 'promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result."[168] The alleged custom or practice at issue here—withholding exculpatory evidence—is unconstitutional on its face. Therefore, a finding of deliberate indifference is not required. Moreover, even if a finding of deliberate indifference is required, Plaintiff has not presented sufficient facts upon which a reasonable jury could find deliberate indifference.[169]

"A customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct."[170] A plaintiff must demonstrate "a pattern of abuses that transcends the error made in a single case."[171] Establishing a pattern "requires similarity and specificity; 'prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question."[172] "A pattern also requires 'sufficiently numerous prior incidents' as opposed to 'isolated instances.'"[173]

---

[167] *Id.* at 370 (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

[168] *Id.* (quoting *Piotrowski*, 237 F.3d at 579).

[169] *See Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003) ("To satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations. . . .'"). As discussed in great detail herein, there is not sufficient evidence upon which a reasonable juror could rely to find a pattern of similar violations by NOPD.

[170] *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 168 (5th Cir. 2010).

[171] *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850–51 (quoting *Piotrowski*, 237 F.3d at 582).

[172] *Id.* (citation and quotation marks omitted).

[173] *Id.* (citation and quotation marks omitted).

Plaintiff's expert, Laurie Levenson, has identified 47 cases in which a court found that OPDA's nondisclosure of material exculpatory evidence violated the defendant's constitutional rights, 22 of which occurred in the 18 years prior to Plaintiff's conviction. Six of the cases Levenson identifies were tried after Harry Connick left office in 2003. Therefore, in ruling on the motion for summary judgment regarding OPDA, the Court relied on 41 cases as relevant circumstantial evidence of the unconstitutional policy, practice, or custom in place at OPDA during Plaintiff's prosecution.

Levenson also identifies eight additional cases where she finds that OPDA's conduct amounted to an admission of *Brady* claims, three of which predate Plaintiff's conviction; seven additional cases involving credible *Brady* claims against OPDA that were resolved on other grounds, four of which predate Plaintiff's conviction; and 22 additional cases in which OPDA has subsequently admitted to a *Brady* violation, including three that predate Plaintiff's conviction. The Court did not rely on these cases in ruling on the motion for summary judgment regarding OPDA because Levenson's methodology is also the subject of a pending *Daubert* motion.

Levenson states in the introduction of her report that her assessment is focused on the OPDA, without mention of the NOPD.[174] Levenson's report addresses multiple instances of OPDA not receiving relevant reports from NOPD, she also notes that "it was not NOPD's practice to supply the entire contents of the police file to prosecutors; their practice instead was to filter witness statements and evidence into a supplemental report, based on what the detective deemed to be pertinent."[175] She further states that there "was not one word in the Operations Manual for

---

[174] Rec. Doc. 90-4 at 2.

[175] *Id.* at 30.

NOPD regarding providing *Brady* materials to the prosecutors."[176] Plaintiff asserts that many of the cases cited by Levenson

> involve allegations of similar misconduct by NOPD, including cases where police handwritten notes with exculpatory evidence were withheld (Bobbie Jean Johnson, Larry Hudson), where police reports with prior inconsistent statements of witnesses were withheld (Calvin Duncan, Hayes Williams, Roland Gibson), and where a witness provided a description to the police that was misstated or simply not provided to the defense (Curtis Lee Kyles, John Floyd).[177]

However, Plaintiff has not provided evidence to support these allegations or demonstrated that the courts in those cases made findings that would support Plaintiff's reliance on them. Even assuming that every case Plaintiff has identified as supporting a pattern of NOPD's *de facto* policy is accurate, Plaintiff has only identified nine cases that involve alleged misconduct of NOPD.[178] As discussed above, a *de facto* policy must be a "persistent, widespread practice of city officials or employees" that is "so common and well settled as to constitute a custom that fairly represents municipal policy."[179] The reason for this, of course, is to ensure that "a municipality cannot be held liable *solely* because it employs a tortfeasor."[180] Requiring a persistent, widespread practice ensures that a municipality is not held liable unless the injury is caused by the execution of a custom made by those "whose edicts or acts may fairly be said to represent official policy."[181] Repeated conduct is necessary to "demonstrate[s] the governing body's knowledge and acceptance

---

[176] *Id.*

[177] Rec. Doc. 90 at 21.

[178] Norman Clark, Raymond Lockett, Bobbie Jean Johnson, Larry Hudson, Calvin Duncan, Hayes Williams, Roland Gibson, Curtis Lee Kyles, and John Floyd.

[179] *Piotrowski*, 237 F.3d at 579

[180] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978).

[181] *Id.* at 694.

of the disputed conduct."[182] Although similar, repetitive conduct is required in order to demonstrate the municipality's knowledge and acceptance of the conduct, the Fifth Circuit has often stated that it has "no rigid rule regarding numerosity to prove a widespread pattern of unconstitutional acts."[183]

In determining the numerosity of *Brady* violations to meet this *Monell* prong, the *Thompson* Court suggested 4 cases in a 10-year period would not be enough to support notice of similar constitutional violations.[184] The *Armstrong* Court implied 9 cases in a 24-year period would not be enough.[185] Plaintiff points to 9 cases in a 17-year period.[186] Thus, the numerosity that Plaintiff alleges is at best a marginal difference from the *Thompson* and *Armstrong* cases. Further, as discussed above that analysis is predicated on the Plaintiff having supported his reliance on those 9 cases, which he has not.

Again, on a motion for summary judgment the Court must view the evidence in the light most favorable to Plaintiff, as the non-moving party, and draw all reasonable inferences in his favor.[187] Even so construed, based on the lack of evidence discussed above, the Court finds that a reasonable jury could not find that the *Brady* violation resulted from a persistent, widespread

---

[182] *Zarnow*, 614 F.3d at 168.

[183] *Jackson v. Valdez*, 852 F. App'x 129, 135 (5th Cir. 2021).

[184] *Thompson*, 563 U.S. at 62.

[185] *Armstrong v. Ashley*, 60 F.4th 262, 278 (5th Cir. 2023).

[186] The earliest case considered is Larry Hudson (December 1967 trial). The latest case considered is Calvin Duncan (January 1985 trial).

[187] *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

practice of NOPD, much less that Superintendent had actual or constructive knowledge of that custom.

### c.    Failure to Train

Finally, Plaintiff contends that a reasonable juror could conclude that the Superintendent fostered practices constituting deliberate indifference toward *Brady* violations.[188] Plaintiff asserts that the evidence demonstrating that NOPD failed to train, supervise, and discipline its employees regarding their obligations under *Brady* and that these failures amounted to deliberate indifference to the known or obvious risk that criminal defendants' rights would be violated.[189]

"It is well-established that a municipality's failure to train its [] officers can give rise to § 1983 liability."[190] To establish a failure to train claim, a plaintiff must show "(1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question."[191] "Deliberate indifference is 'more blameworthy than negligence' but less blameworthy than purposeful harm."[192] "The standard is 'stringent' and requires that the supervisory actor disregarded a known consequence of his action."[193] "To satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations and that the

---

[188] Rec. Doc. 90 at 22.

[189] *Id.*

[190] *Westfall v. Luna*, 903 F.3d 534, 552 (5th Cir. 2018).

[191] *Zarnow*, 614 F.3d at 170.

[192] *Id.* at 169 (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).

[193] *Id.* at 169–70 (citing *Southard v. Tex. Bd. of Crim. Justice*, 114 F.3d 539, 551 (5th Cir. 1997)).

inadequacy of the training is 'obvious and obviously likely to result in a constitutional violation.'"[194]

In the complaint, Plaintiff cites a 1991 report, from the International Association of Chiefs of Police citing a "'stunning lack of training' at the NOPD and finding that the NOPD's training record was 'not nearly in compliance with professional expectations.' The report concluded that the NOPD's failure to keep training records 'leaves the department dangerously defenseless against failure-to-train based allegations and lawsuits.'"[195] Further, the report allegedly concluded that the NOPD is failing with respect to criminal investigations in almost every crime category.[196] Additionally, Plaintiff cites a 1994 report by the Louisiana National Guard which found that:

> [a] great deal has been written about the state of training within the NOPD. Year after year it does not seem to improve. It is clearly apparent that the city and department leaders do not understand, or simply choose to ignore, the importance of training for police officers and police civilians engaged in supporting police officers. . . . Unfortunately, even after three previous reports criticizing training within the NOPD, very little action has been taken to improve the situation.[197]

Plaintiff also relies on a 1973 report by McManis Associates, Inc. that found NOPD "suffers from the absence of clearly defined and enforced ground rules of behavior" and that "police personnel feel free to behave as they wish in most instances."[198] The McManis Associates report is the only one that predates the conduct at issue in this case. In sum, Plaintiff cites numerous articles and reports finding that NOPD's training procedures were generally inadequate. However, as

---

[194] *Cousin*, 325 F.3d at 637.

[195] Rec. Doc. 27 at 16.

[196] *Id.*

[197] *Id.* at 17.

[198] Rec. Doc. 90-41 at 6.

mentioned above when addressing the Plaintiff's persistent and widespread practice or custom theory for *Monell* liability, Plaintiff has not cited a sufficiently numerous amount of cases which would provide NOPD with notice of a trend of *Brady* violations. For the same reason, the Court finds that Plaintiff has not established NOPD's deliberate indifference to "a pattern of violations" which would provide NOPD with notice that the "inadequacy of the training" was "obviously likely to result in a constitutional violation."[199] Plaintiff cites: (1) evidence regarding alleged *Brady* violations by NOPD in the 1970s and 1980s;[200] (2) several instances of a failure to turn over exculpatory evidence by the NOPD;[201] and (3) one report that generally alleges that NOPD officers were poorly trained prior to Plaintiff's arrest and conviction. Nevertheless, this evidence when considered collectively, is not sufficient to meet Plaintiff's burden demonstrating a "pattern of violations" where courts have found NOPD officers committed *Brady* violations.[202] At most, Plaintiff has shown that NOPD's training procedures were generally deficient during the relevant time period. Because Plaintiff has not met his burden to establish *Monell* liability under the official policy; persistent, widespread practice or custom; or failure to train prongs, the Court need not address the secondary moving force portion of the *Monell* analysis. Hence, the Court grants summary judgment dismissing the *Monell* claims asserted against the City and Kirkpatrick.

---

[199] *Cousin*, 325 F.3d at 637.

[200] *See Floyd v. Vannoy*, No. 11-2819, 2017 WL 1837676 (E.D. La. May 8, 2017), *aff'd*, 887 F.3d 214 (5th Cir. 2018); *Kyles v. Whitley*, 514 U.S. 419 (1995); *State v. Knapper*, 579 So. 2d 956 (La. 1991); *State v. Seward*, 509 So. 2d 413 (La. 1987); *Clark v. Blackburn*, 632 F.2d 531, 535 (5th Cir. 1980); *Lockett v. Blackburn*, 571 F.2d 309 (5th Cir. 1978).

[201] Rec. Docs. 90-4, 90-8, 90-35, 90-42.

[202] *Zarnow*, 614 F.3d at 170.

## V. Conclusion

There are facts in dispute precluding summary judgment on the state law negligence claim against Dillmann. Further, there are facts in dispute precluding summary judgment on the City's vicarious liability for Dillmann's negligence. However, summary judgment is appropriate for all other remaining claims against the City Defendants including *Monell* claims brought against the City and Kirkpatrick in her official capacity. Plaintiff has not presented sufficient evidence to show that NOPD maintained an official policy in violation of *Brady*. Nor has Plaintiff presented sufficient evidence to establish a custom of withholding exculpatory witness testimony within NOPD. Finally, Plaintiff has not provided enough evidence for a reasonable juror to find NOPD failed to train, supervise, and discipline its employees regarding their obligations under *Brady* and that these failures amounted to deliberate indifference to the "known or obvious" risk that criminal defendants' rights would be violated.

Accordingly,

**IT IS HEREBY ORDERED** that the City Defendants' Motion to for Judgment on the Pleadings or Alternatively for Summary Judgment[203] is **GRANTED IN PART** and **DENIED IN PART.** The motion is granted to the extent that it seeks dismissal of the state law intentional or reckless infliction of emotional distress claim against Dillmann, the direct negligence and Louisiana due process claims against the City, and the *Monell* claims against the City and Kirkpatrick. The motion is denied to the extent it seeks dismissal of the negligence claim against Dillmann and the vicarious liability claim against the City.

**IT IS FURTHER ORDERED** that the state law intentional or reckless infliction of emotional distress claim is **DISMISSED.**

---

[203] Rec. Doc. 74.

**IT IS FURTHER ORDERED** that the direct negligence and Louisiana due process claims against the City are **DISMISSED.**

**IT IS FURTHER ORDERED** that the *Monell* claims against the City and Kirkpatrick in her official capacity as the Superintendent of NOPD are **DISMISSED.**

**NEW ORLEANS, LOUISIANA**, this <u>19th</u> day of December, 2025.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**