## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RAYMOND FLANKS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 23-6897** |
| **THE CITY OF NEW ORLEANS et al.** | **SECTION: "G"(4)** |

## <u>ORDER AND REASONS</u>

This litigation arises from Plaintiff Raymond Flanks's ("Plaintiff") wrongful conviction for first-degree murder in 1985. Plaintiff names as Defendants the City of New Orleans; Jason Williams, in his official capacity as Orleans Parish District Attorney; and John Dillmann, in his individual capacity.[1] Plaintiff alleges the Orleans Parish District Attorney's Office ("OPDA") secured his wrongful conviction in violation of his constitutional rights by withholding material exculpatory evidence in violation of OPDA's obligations under *Brady v. Maryland*.[2]

Before the Court is Plaintiff's Motion to Exclude Expert Testimony of Dr. Tumulesh Solanky ("Solanky").[3] Solanky is a statistician retained by Defendant Jason Williams ("Williams") to conduct a scientific analysis of the alleged *Brady* violations reported by Plaintiff's expert Professor Laurie Levenson ("Levenson") and "to assess the reasonable conclusions that can be drawn regarding the frequency of such cases in Orleans Parish."[4] Plaintiff argues that Solanky's proposed testimony should be excluded because: (1) the ratio of *Brady* violations listed in

---

[1] *See* Rec. Doc. 27. The Court dismissed Plaintiff's claims against Anne Kirkpatrick and John/Jane Does #1-20.

[2] *Id.* at 4–5. *See Brady v. Maryland*, 373 U.S. 83 (1963).

[3] Rec. Doc. 94.

[4] Rec. Doc. 94-2 at 3.

Levenson's report to overall OPDA prosecution data is not an issue the jury will need to decide; (2) even if it were, a jury would not need expert opinion testimony to compare those numbers; (3) Solanky employs an unreliable methodology; (4) Solanky excludes certain cases, skewing the results; (5) Solanky has no data whatsoever to which he compares the numbers in New Orleans; and (6) his opinions are far outside the scope of his expertise as a statistician.[5] Williams opposes the motion.[6] Having considered the motion, the memoranda in support and opposition, the record, and the applicable law, the Court grants the motion in part and denies it in part. If the parties are unable to reach a stipulation on the average number of cases prosecuted and tried each year by OPDA, Solanky may testify to his use of the linear regression model to extrapolate this data. Solanky may not testify regarding any of the other opinions listed in his report.

## I. Background

On November 16, 2023, Plaintiff filed a Complaint against Defendants in this Court for alleged violations of his constitutional rights under 42 U.S.C. § 1983 and alleged violations of state law.[7] On June 4, 2024, Plaintiff filed an Amended Complaint.[8] This matter is set for trial on December 8, 2025. This case is related to Plaintiff's alleged wrongful conviction in May 1985 for the first-degree murder of Martin Carnesi.

In May 1985, a jury found Plaintiff guilty of first-degree murder in the death of Martin Carnesi, and Plaintiff was sentenced to life in prison.[9] Nearly 37 years later, on November 17,

---

[5] *Id.*

[6] Rec. Doc. 104.

[7] Rec. Doc. 1.

[8] Rec. Doc. 27.

[9] Rec. Doc. 27 at 12–13.

2022, Plaintiff's first-degree murder conviction was vacated.[10] At the November 17, 2022 exoneration hearing, the "OPDA stated that 'the State agrees that Mr. Flank's [sic] conviction was obtained in violation of *Brady v. Maryland*' because 'the State failed to disclose … materials [that] are favorable, and under circumstances of the State's case against Mr. Flank[s], material.'"[11]

Solanky is a statistician retained by Williams to conduct a scientific analysis of the alleged *Brady* violations reported by Plaintiff's expert Levenson and "to assess the reasonable conclusions that can be drawn regarding the frequency of such cases in Orleans Parish."[12] Solanky undertook two basic analyses. First, Solanky reviewed OPDA annual reports providing information about the numbers of cases screened, accepted, and tried over a period of 12 to 15 years.[13] Solanky found that the average number of cases accepted for prosecution by OPDA annually was approximately 7,084.[14] Extrapolating from the available data, Solanky found that between 1974 and 1985, there were approximately 522 trials and 5,175 guilty pleas on average each year.[15] Thus, the total average number of combined trials and guilty pleas per year was approximately 5,698.[16]

Second, Solanky compared the *Brady* violations documented in Levenson's report to the total conviction data. Solanky concluded:

1. Alleged *Brady* violations are exceptionally rare when compared to the number of trials, the number of trial convictions, and total number of trials and pleas. This holds true across all three examined time intervals: 1974–1985, 1974–2003, and the entire period cited by Professor Levenson (1967–2013). For all comparisons and all time periods, the rate of alleged *Brady* violations is less than one percent.

---

[10] *Id.* at 14.

[11] *Id.*

[12] Rec. Doc. 94-2 at 3.

[13] *Id.* at 2–5.

[14] *Id.* at 6.

[15] *Id.* at 11.

[16] *Id.*

2. The incidence of *Brady* violations allegedly found by courts before Raymond Flanks's conviction in 1985 is even rarer when compared to the number of trials, the number of trial convictions, and total number of trials and pleas over the time interval when those cases were tried (1967–1980). Specifically, these alleged *Brady* violations amount to approximately one out of 9,950 trials or pleas; approximately one out of 894 trials; and approximately one out of 647 trial convictions.

3. A significant percentage of years recorded zero alleged *Brady* violations, further emphasizing the infrequency of such cases. Notably, 31.9% of the years in the dataset—nearly one out of every three—had no alleged *Brady* violation cases.

4. The alleged *Brady* findings, as reported in Professor Levenson's expert report, are exceedingly rare and very infrequent. A review of the available data does not support the conclusion that *Brady* violations were caused by widespread, systematic factors at OPDA.[17]

On October 28, 2025, Plaintiff filed the instant Motion to Exclude Expert Testimony of Dr. Tumulesh Solanky.[18] On November 4, 2025, Williams filed an opposition to the motion.[19] On November 7, 2025, Plaintiff filed a reply brief in further support of the motion.[20]

## II. Parties' Arguments

### A.   *Plaintiff's Arguments in Support of the Motion*

Plaintiff moves the Court to exclude Solanky as a witness.[21] Plaintiff argues that Solanky's proposed testimony should be excluded because: (1) the ratio of *Brady* violations listed in Levenson's report to overall OPDA prosecution data is not an issue the jury will need to decide; (2) even if it were, a jury would not need expert opinion testimony to compare those numbers; (3) Solanky employs an unreliable methodology; (4) Solanky excludes certain cases, skewing the

---

[17] *Id.* at 17.

[18] Rec. Doc. 97.

[19] Rec. Doc. 104.

[20] Rec. Doc. 109.

[21] Rec. Doc. 97.

results; (5) Solanky has no data whatsoever to which he compares the numbers in New Orleans; and (6) his opinions are far outside the scope of his expertise as a statistician.[22]

First, Plaintiff argues that Solanky's opinions are not relevant because the ratio of *Brady* violations listed in Levenson's report to overall OPDA prosecution data is not an issue the jury will need to decide.[23] Plaintiff contends the only arguable relevance to Solanky's opinions pertains to whether former OPDA Harry Connick ("Connick") was deliberately indifferent to *Brady* violations.[24] Nevertheless, Plaintiff submits that Solanky's opinions are not relevant to that issue because they do not say anything meaningful about the extent of *Brady* violations under Connick.[25] Plaintiff submits that the fact there was a small proportion of documented *Brady* violations does not necessarily imply that *Brady* violations were not widespread—only that such violations are rarely searched for, discovered, litigated, adjudicated.[26]

Second, even if the proportions are relevant, Plaintiff submits a jury would not need expert opinion testimony to compare those numbers.[27] Plaintiff asserts a jury is readily capable of comparing the number of *Brady* violations Levenson was able to document in her report to overall OPDA prosecution data and draw its own conclusion.[28] Plaintiff contends that the jury does not

---

[22] *Id.*

[23] Rec. Doc. 94-1 at 8.

[24] *Id.* at 9.

[25] *Id.*

[26] *Id.*

[27] *Id.* at 11.

[28] *Id.*

need to calculate the confidence interval numbers, especially considering they are so small that simple division provides a relatively precise estimate.[29]

Third, Plaintiff contends that Solanky employs an unreliable methodology.[30] Plaintiff argues that Solanky uses the wrong "numerator" by relying only on the *Brady* violations Levenson documents in her report, which Plaintiff asserts Solanky improperly assumes was the total number of *Brady* violations that occurred in Orleans Parish.[31] Additionally, Plaintiff argues that Solanky uses the wrong "denominator" by relying on the total number of prosecutions, rather than an appropriate subset of those data such as cases in which a criminal defendant took an appeal or initiated post-conviction proceedings.[32]

Fourth, Plaintiff asserts that Solanky excludes certain cases, skewing the results.[33] Plaintiff points out that a portion of the report removes *Brady* violations that occurred before his trial 1985 but were not documented until later.[34] Plaintiff asserts this is inconsistent with the Court's ruling on Williams's motion to dismiss.[35]

---

[29] *Id.* at 12.

[30] *Id.* at 13.

[31] *Id.* at 13–14.

[32] *Id.* at 14–15.

[33] *Id.* at 16.

[34] *Id.*

[35] *Id.* at 17.

Fifth, Plaintiff contends Solanky has no data whatsoever to which he compares the numbers in New Orleans.[36] Sixth, Plaintiff also argues that Solanky's opinions are far outside the scope of his expertise as a statistician, as he does not have any familiarity with *Brady* violations.[37]

## B.    *Williams's Arguments in Opposition to Motion*

Williams contends the purpose of Dr. Solanky's testimony is clear and straightforward—if Plaintiff can prove there were *Brady* violations in Orleans Parish, the jury must be allowed to consider those numbers in relation to the number of cases prosecuted.[38] Responding to Plaintiff's first argument that Solanky's opinions are irrelevant, Williams contends Solanky presents exactly the type of statistics and comparisons that the Fifth Circuit expects in municipal liability cases.[39] Relying on two *Monell* cases involving alleged patterns of excessive force incidents by police, Williams asserts "in both cases, the Fifth Circuit explained that these numbers should be considered in relation to numbers such as the size of the police department and the total number of arrests."[40]

Addressing Plaintiff's second argument that the jury could calculate the ratios without expert assistance, Williams contends that expert testimony is essential to explain the use of linear regression to extrapolate data for missing years, calculation of proportions for various figures in various date ranges, and calculation of confidence intervals.[41] Williams asserts that an expert will

---

[36] *Id.* at 17–20.

[37] *Id.*

[38] Rec. Doc. 104 at 3.

[39] *Id.* at 4.

[40] *Id.* at 4–5 (citing *Verastique v. City of Dallas*, 106 F.4th 427 (5th Cir. 2024); *Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009)).

[41] *Id.* at 6.

simplify these issues.[42] Williams argues that Plaintiff's complaints regarding Solanky's analysis being too precise do not provide a basis for exclusion.[43]

Responding to Plaintiff's third argument, Williams also contends that Solanky appropriately did not attempt to estimate numbers of speculative *Brady* violations.[44] Williams submits that Plaintiff cannot prove there were numerous unreported *Brady* violations, and even if he could, such proof would be meaningless absent evidence that Mr. Connick was aware of them.[45] Williams also asserts that Solanky properly compared the numbers of alleged *Brady* violations to various statistics: (1) total annual number of combined trials and guilty pleas; (2) total annual number of trials; and (3) total annual number of trial convictions.[46]

Next, Williams addresses Plaintiff's fourth argument that Solanky improperly failed to address *Brady* violations that occurred before his trial 1985 but were not documented until later.[47] Even if Plaintiff believes that *Brady* decisions rendered after his conviction are relevant, Williams submits it is certainly not irrelevant, or otherwise inappropriate, for OPDA to highlight the number of *Brady* decisions before Plaintiff's conviction and compare that number to total prosecution statistics.[48]

Responding to Plaintiff's fifth argument that Solanky should have compared the data to other jurisdictions, Williams suggests that such a comparison would be irrelevant and

---

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.* at 7.

[46] *Id.* at 8.

[47] *Id.*

[48] *Id.* at 9.

inappropriate.[49] Finally, addressing sixth argument that Solanky does not have any familiarity with *Brady* violations, Williams asserts that Solanky is not claiming to speak as a *Brady* expert.[50]

## C.  *Plaintiff's Arguments in Further Support of the Motion*

In reply, Plaintiff contends Solanky's opinions lack a valid point of comparison.[51] Plaintiff suggests that information about other jurisdictions would be necessary for the jury to determine whether *Brady* violations were rare, as Solanky's opinion suggests.[52] Plaintiff cites a Fifth Circuit case that criticized a plaintiff for failing to present evidence to show "the number of complaints filed against [the city's] officers is high relative to other metropolitan police departments."[53]

Plaintiff repeats his prior argument that Solanky's opinions are sweeping and are beyond his expertise.[54] Plaintiff asserts that Williams misapplies precedent to argue Solanky's testimony is essential.[55] Plaintiff contends that the cases Williams relied on are distinguishable, because use of force claims are very different from *Brady* claims.[56] Plaintiff then repeats his argument that Solanky uses the wrong denominator.[57]

Plaintiff suggests that Solanky cannot defend his conclusions as he did not provide even a ballpark estimate of the point at which the frequency of *Brady* violations become "not rare"

---

[49] *Id.* at 11.

[50] *Id.*

[51] Rec. Doc. 109 at 4.

[52] *Id.*

[53] *Id.* (quoting *Hinojosa v. Butler*, 547 F.3d 285, 296 (5th Cir. 2008)).

[54] *Id.* at 4–5.

[55] *Id.* at 5.

[56] *Id.*

[57] *Id.* at 6–7.

opposed to "rare."[58] Plaintiff asserts Williams takes inconsistent positions by claiming that the statistics are complex, while also arguing that it is "obvious" there is not a pattern.[59] Finally, Plaintiff asserts that Williams failed to adequately address Plaintiff's argument that the probative value of Solanky's testimony is substantially outweighed by a danger of confusing the issues and misleading the jury.[60]

### III. Legal Standard

The district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702.[61] Rule 702 states that a witness "qualified as an expert by knowledge, skill, experience, training, or education," may provide expert testimony when "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."[62] For the testimony to be admissible, Rule 702 establishes the following requirements:

(1) the testimony must be based upon sufficient facts or data,

(2) the testimony must be the product of reliable principles and methods, and

(3) the expert must reliably apply the principles and methods to the facts of the case.[63]

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court explained that Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific

---

[58] *Id.* at 7.

[59] *Id.* at 8–9.

[60] *Id.* at 10–11.

[61] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138–39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000).

[62] Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[63] Fed. R. Evid. 702.

testimony or evidence admitted is not only relevant, but reliable."[64] The court's gatekeeping function mostly involves a two-part inquiry.

First, the court must determine whether the expert testimony is reliable, which requires an assessment of whether the expert testimony's underlying reasoning or methodology is valid.[65] The court's inquiry into the reliability of expert testimony is flexible and fact-specific.[66] The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.[67] In analyzing reliability, *Daubert* instructs courts to consider (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) any evaluation of known rates of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) general acceptance within the scientific community.[68]

Second, the court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will assist the trier of fact in understanding the evidence.[69] The second inquiry primarily analyzes whether the expert testimony is relevant.[70]

---

[64] *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (clarifying that the court's gatekeeping function applies to all forms of expert testimony).

[65] *See Daubert*, 509 U.S. at 589. The party offering the testimony has the burden to establish reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994)).

[66] *Seatrax*, 200 F.3d at 372.

[67] *See Daubert*, 509 U.S. at 590.

[68] *Id.* at 592–94. In *Kumho Tire*, the Supreme Court emphasized that the test of reliability is "flexible" and that Daubert's list of specific factors does not necessarily nor exclusively apply to every expert in every case. *Kumho Tire*, 526 U.S. at 141. The overarching goal "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

[69] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

[70] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

Yet a court's role as a gatekeeper does not replace the traditional adversary system.[71] A "review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."[72] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[73] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left to the jury's consideration."[74]

Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue."[75] "The rule was enacted to change the old view that [] giving an opinion on an ultimate issue would 'usurp the function' or 'invade the province' of the jury."[76] The rule, however, "does not open the door to all opinions."[77] Witnesses may not "tell the jury what result to reach," nor may they "give legal conclusions."[78] The Fifth Circuit has explained that "the task of separating impermissible question which call for overbroad or legal responses from permissible questions is not a facile one," but one that requires courts to exclude questions or answers from experts that "would supply the jury with no information other than the expert's

---

[71] *See Daubert*, 509 U.S. at 596.

[72] Fed. R. Evid. 702 advisory committee's note, "2000 Amendments."

[73] *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

[74] *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore Cnty.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

[75] Fed. R. Evid. 704(a).

[76] *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983).

[77] *Id.*

[78] *Id.* (citing *United States v. Fogg*, 652 F.2d 551, 557 (5th Cir. 1981).

12

view of how its verdict should read."[79]

## IV. Analysis

Plaintiff argues that Solanky's proposed testimony should be excluded because the ratio of *Brady* violations listed in Levenson's report to overall OPDA prosecution data is not an issue the jury will need to decide.[80] Williams contends Solanky presents exactly the type of statistics and comparisons that the Fifth Circuit expects in municipal liability cases.[81]

Williams's argument is based primarily on the Fifth Circuit's recent decision in *Verastique*. There, the plaintiffs alleged that a Dallas police officer, Roger Rudloff, used excessive force while arresting them during widespread protests.[82] The plaintiffs sought to hold the City of Dallas liable under *Monell*, alleging that there were 19 prior complaints of misconduct by Rudloff over 23 years.[83] The Fifth Circuit affirmed the district court's dismissal of the claim on the pleadings, concluding that the other incidents were "not sufficiently similar, specific, or numerous."[84] The Fifth Circuit found that the allegations regarding the prior incidents were "devoid of critical factual enhancement," including facts that would have elucidated how and why the incidents occurred.[85] Even assuming these other incidents were "sufficiently specific and similar," the Fifth Circuit

---

[79] *Id.*

[80] Rec. Doc. 94-1 at 8–11.

[81] Rec. Doc. 104 at 4–5.

[82] *Verastique*, 106 F.4th at 431.

[83] *Id.* at 433.

[84] *Id.* at 434.

[85] *Id.* at 432 ("Plaintiffs, for example, cite five incidents allegedly involving a flashlight or nightstick. Some are listed incident-by-incident. But all still remain totally devoid of critical facts. What prompted the encounters? Did the individuals threaten Rudloff with physical harm? Were they attempting to resist arrest?").

found they were insufficient as a matter of law to "create a pattern capable of providing constructive notice" because the incidents occurred over a 23 year time-span:

> Given a constant number of incidents, a longer time span yields a lower rate of violations—militating against constructive notice. Nineteen allegations over the span of twenty-three years yields a mere annualized incident rate of 0.826. In other words: Plaintiffs—at most—show that, for over two decades, Rudloff, on average, received fewer than one accusation of misconduct per year.[86]

The Fifth Circuit further explained that the complaint failed to provide information "such as department size and number of arrests" that would "provide the context necessary to evaluate whether an alleged department-wide pattern is so obvious as to impart constructive notice."[87] The Fifth Circuit reasoned that "[g]iven a constant number of incidents, the percentage of conduct supporting a pattern of illegality shrinks as the size of the police department or the number of arrests increases."[88] "Given the department's size [3,200 officers], and absent any evidence of its total number of arrests during the same time period," the Fifth Circuit stated "only one conclusion can reasonably follow: Nineteen incidents over twenty-three years does not support any inference of a department-wide pattern of illegality."[89]

This Court thoroughly considered *Verastique* and other Fifth Circuit precedent in ruling on Williams's motion for summary judgment. The Court found that the Fifth Circuit cases suggest that the mere number of incidents must be viewed in context of the type and frequency of the disputed conduct. Plaintiff correctly points out that *Brady* claims are distinguishable from excessive force claims, because *Brady* claims necessarily involve concealed action (or inaction)

---

[86] *Id.* at 434.

[87] *Id.*

[88] *Id.*

[89] *Id.*

on the part of the State for which there may be no documentation at all. Given that *Brady* violations are less common than police uses of force, the Court concluded that *Verastique* did not compel the conclusion that there is insufficient evidence in this case to establish a *de facto* custom of *Brady* violations.

The Court found the comparison of cases where *Brady* violations are adjudicated following trial to cases that resolved in a guilty plea unpersuasive. Because generally "a guilty plea precludes the defendant from asserting a *Brady* violation,"[90] the Court found it was unlikely that any *Brady* violation would ever come to light in the cases OPDA resolved through guilty pleas. The Court agreed with Plaintiff that a more appropriate denominator would be the number of cases with an appeal or post-conviction proceeding. Solanky's report does not provide any data on that issue.

Nevertheless, this does not mean that the statistics provided by Solanky are irrelevant. It is ultimately Plaintiff's burden to "provide the context necessary to evaluate whether an alleged department-wide pattern is so obvious as to impart constructive notice."[91] Plaintiff intends to argue there was a sufficient number of *Brady* violations to put Connick on notice of a pattern, while Williams plans to argue there was not a sufficient pattern given the number of cases prosecuted by OPDA each year.

Solanky reviewed OPDA annual reports providing information about the numbers of cases screened, accepted, and tried over a period of 12 to 15 years.[92] Solanky used the linear regression

---

[90] *United States v. Conroy*, 567 F.3d 174, 178 (5th Cir. 2009). *See also Alvarez v. City of Brownsville*, 904 F.3d 382, 394 (5th Cir. 2018) ("[C]ase law from the Supreme Court, this circuit, and other circuits does not affirmatively establish that a constitutional violation occurs when *Brady* material is not shared during the plea bargaining process. The en banc court will not disturb this circuit's settled precedent and abstains from expanding the *Brady* right to the pretrial plea bargaining context for Alvarez.").

[91] *Verastique*, 106 F.4th at 434.

[92] Rec. Doc. 94-2 at 2–5.

model to extrapolate data for missing years. Extrapolating from the available data, Solanky found

that between 1974 and 1985, there were approximately 522 trials and 5,175 guilty pleas on average

each year.[93] Thus, the total average number of combined trials and guilty pleas per year was

approximately 5,698.[94] This information is relevant to Williams's defense strategy that the number

of *Brady* violations were not significant, when compared to the number of cases prosecuted and

tried each year. This statistical analysis is beyond the purview of an average juror. If the parties

are unable to reach a stipulation on the average number of cases prosecuted and tried each year by

OPDA, Solanky may testify to his use of the linear regression model to extrapolate this data.

The Court finds that the other opinions offered by Solanky must be excluded. Specifically,

Solanky opines:

1. Alleged *Brady* violations are exceptionally rare when compared to the number of trials, the number of trial convictions, and total number of trials and pleas. This holds true across all three examined time intervals: 1974–1985, 1974–2003, and the entire period cited by Professor Levenson (1967–2013). For all comparisons and all time periods, the rate of alleged *Brady* violations is less than one percent.
2. The incidence of *Brady* violations allegedly found by courts before Raymond Flanks's conviction in 1985 is even rarer when compared to the number of trials, the number of trial convictions, and total number of trials and pleas over the time interval when those cases were tried (1967–1980). Specifically, these alleged *Brady* violations amount to approximately one out of 9,950 trials or pleas; approximately one out of 894 trials; and approximately one out of 647 trial convictions.
3. A significant percentage of years recorded zero alleged *Brady* violations, further emphasizing the infrequency of such cases. Notably, 31.9% of the years in the dataset—nearly one out of every three—had no alleged *Brady* violation cases.
4. The alleged *Brady* findings, as reported in Professor Levenson's expert report, are exceedingly rare and very infrequent. A review of the available data does not support the conclusion that *Brady* violations were caused by widespread, systematic factors at OPDA.[95]

---

[93] *Id.* at 11.

[94] *Id.*

[95] Rec. Doc. 94-2 at 17.

As the Court noted in the Order denying Williams's motion for summary judgment, OPDA does not cite any caselaw to show this type of granular statistical analysis is required. The jury can easily compare the total number of cases tried each year with the number of *Brady* violations to determine whether the "alleged department-wide pattern is so obvious as to impart constructive notice."[96] The jury does not need an expert to tell them that the percentages are not large. Solanky's opinions that *Brady* violations were "exceptionally rare" or "exceedingly rare and very infrequent" are nothing more than argument. Allowing Solanky to testify to these issues would supplant the role of counsel in making argument at trial and the role of the jury in interpreting the evidence.[97] Solanky's assertions that *Brady* violations were "exceptionally rare" will not assist the jury in understanding the evidence or determining a fact in issue.[98] Therefore, this proposed testimony must be excluded.

---

[96] *Verastique*, 106 F.4th at 434.

[97] *See Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (quoting *In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1233 (5th Cir. 1986)) ("Stated more directly, the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument.").

[98] *See* Fed. R. Evid. 702(a).

## V. Conclusion

For the reasons stated above,

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Exclude Expert Testimony of Dr. Tumulesh Solanky[99] is **GRANTED IN PART AND DENIED IN PART**. If the parties are unable to reach a stipulation on the average number of cases prosecuted and tried each year by OPDA, Solanky may testify to his use of the linear regression model to extrapolate this data. Solanky may not testify regarding any of the other opinions listed in his report.

**NEW ORLEANS, LOUISIANA**, this 29th day of December, 2025.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[99] Rec. Doc. 94.