# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RAYMOND FLANKS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 23-6897** |
| **THE CITY OF NEW ORLEANS et al.** | **SECTION: "G"(4)** |

## ORDER AND REASONS

This litigation arises from Plaintiff Raymond Flanks's ("Plaintiff") wrongful conviction for first-degree murder in 1985. Plaintiff names as Defendants the City of New Orleans; Jason Williams, in his official capacity as Orleans Parish District Attorney; and John Dillmann, in his individual capacity.[1] Plaintiff alleges the Orleans Parish District Attorney's Office ("OPDA") secured his wrongful conviction in violation of his constitutional rights by withholding material exculpatory evidence in violation of OPDA's obligations under *Brady v. Maryland*.[2]

Before the Court is Defendant Jason Williams's ("Williams") Motion to Exclude Expert Testimony of Laurie Levenson ("Levenson").[3] Levenson is a law professor who was retained by Plaintiff to testify about her evaluation of OPDA's *Brady* policies, practices, and customs. Williams contends that Levenson's testimony should be excluded because: (1) her opinions are full of legal conclusions; (2) her opinions are not supported by reliable principles and methods; (3) her opinions are not relevant to the legal elements of Plaintiff's claims; and (4) any probative value

---

[1] *See* Rec. Doc. 27. The Court dismissed Plaintiff's claims against Anne Kirkpatrick and John/Jane Does #1-20.

[2] *Id.* at 4–5. *See Brady v. Maryland*, 373 U.S. 83 (1963).

[3] Rec. Doc. 99.

is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.[4] Plaintiff opposes the motion.[5]

Having considered the motion, the memoranda in support and opposition, the record, and the applicable law, the Court grants the motion in part and denies it in part. The motion is granted to the extent it seeks to exclude: (1) evidence of *Brady* violations occurring in cases that were tried after Connick left office in 2003; (2) evidence that *Brady* violations occurred in the cases of George Lee and James Walker; (3) testimony to the ultimate issue of whether a *Brady* violation occurred in Plaintiff's criminal case; (4) opinion testimony that the *Brady* violations in Plaintiff's case were caused by OPDA's policies or practices; (5) opinion testimony comparing the number of *Brady* violations in Orleans Parish to other cities; (6) opinion testimony comparing this case to other Section 1983 cases; (7) opinion testimony that there was actual and constructive notice to OPDA that its operations were leading to repeated violations of defendants' *Brady* rights; and (8) opinion testimony that OPDA's conduct amounted to a municipal policy that resulted in dozens of *Brady* violations. The motion is denied in all other respects.

## I. Background

On November 16, 2023, Plaintiff filed a Complaint against Defendants in this Court for alleged violations of his constitutional rights under 42 U.S.C. § 1983 and alleged violations of state law.[6] On June 4, 2024, Plaintiff filed an Amended Complaint.[7] This matter is set for trial on

---

[4] Rec. Doc. 99-1 at 4–5.

[5] Rec. Doc. 105.

[6] Rec. Doc. 1.

[7] Rec. Doc. 27.

January 12, 2026. This case is related to Plaintiff's alleged wrongful conviction in May 1985 for the first-degree murder of Martin Carnesi.

In May 1985, a jury found Plaintiff guilty of first-degree murder in the death of Martin Carnesi, and Plaintiff was sentenced to life in prison.[8] Nearly 37 years later, on November 17, 2022, Plaintiff's first-degree murder conviction was vacated.[9] At the November 17, 2022 exoneration hearing, the "OPDA stated that 'the State agrees that Mr. Flank's [sic] conviction was obtained in violation of *Brady v. Maryland*' because 'the State failed to disclose … materials [that] are favorable, and under circumstances of the State's case against Mr. Flank[s], material.'"[10]

Plaintiff retained Laurie Levenson, a law professor, to testify about her evaluation of OPDA's *Brady* policy, practices, and customs.[11] Levenson gives the following opinions:

1. OPDA lacked proper policies and procedures to ensure its prosecutors' compliance with their legal obligations pursuant to *Brady*. The problems with OPDA's operations with respect to *Brady* were systemic and not limited to mistakes by individual prosecutors. Rather, the Office operated in a manner that predictably led to its lawyers' repeated failures to comply with their *Brady* obligations.

2. From at least the beginning of Orleans Parish District Attorney Harry Connick, Sr.'s tenure in 1974, OPDA, among other failings, did not: (1) institute and maintain procedures for obtaining grand jury transcripts to ensure that all favorable information was known by trial prosecutors and this information was provided to the defense; (2) issue, maintain, and use an accurate, current and adequately detailed written *Brady* policy; (3) properly train its prosecutors regarding their obligations under *Brady*; (4) properly monitor and supervise the discovery practices of its prosecutors, including a system to investigate and track *Brady* violations; (5) discipline prosecutors who did not comply with their *Brady* obligations; (6) implement proper procedures and practices to ensure that *Brady* information was obtained from police officers and provided to the defense; (7) institute or maintain procedures for proper handling, tracking, and disclosure of *Brady* information in cases handled by multiple prosecutors; (8) create an office culture that would

---

[8] Rec. Doc. 27 at 12–13.

[9] *Id.* at 14.

[10] *Id.*

[11] Rec. Doc. 99-2 at 2.

encourage and ensure *Brady* compliance; (9) allow prosecutors to produce documents that were not required to be disclosed by law; (10) adopt safeguards to ensure that OPDA's prosecutors made proper disclosures, notwithstanding Mr. Connick's position that his prosecutors should withhold documents that were not required to be disclosed by law; and (11) ensure that its prosecutors and law enforcement understood that the *Brady* obligation to provide favorable evidence covers both exculpatory and impeachment information.

3. The absence of proper *Brady* policies and procedures at OPDA led to a continued pattern of *Brady* violations that was known or should have been known to OPDA; nevertheless, OPDA failed to properly acknowledge or respond to these *Brady* violations by instituting reforms of policies, procedures, or practices.[12]

On October 29, 2025, Williams filed the instant Motion to Exclude Expert Testimony of Laurie Levenson.[13] On November 4, 2025, Plaintiff filed an opposition to the motion.[14] On November 10, 2025, Williams filed a reply brief in further support of the motion.[15]

## II. Parties' Arguments

### A. *Williams's Arguments in Support of the Motion*

Williams move the Court to exclude Levenson as a witness.[16] First, Williams argues that Levenson has no expertise that would allow her to essentially testify as a fact witness about what OPDA's historical policies and practices were.[17] Williams contends that expert testimony is not necessary for the jury to decide what OPDA's policies and practices were, as there are numerous witnesses with first-hand knowledge of those policies and practices who are available to provide testimony.[18] Williams contends that Levenson's methodology is unreliable because: (1) she relies

---

[12] Rec. Doc. 99-2.

[13] Rec. Doc. 99.

[14] Rec. Doc. 105.

[15] Rec. Doc. 110.

[16] Rec. Doc. 99.

[17] Rec. Doc. 99-1 at 10.

[18] *Id.* at 12.

on policies that existed after Plaintiff's prosecution and (2) she relies on isolated statements to support her unfavorable opinions about OPDA's policies and practices while completely ignoring other testimony from the same witnesses that contradicts her opinions.[19] Assuming Levenson is allowed to testify about OPDA's policies and practices, Williams requests that the Court enter an order requiring that Plaintiff introduce evidence supporting his version of the facts before Levenson is allowed to offer opinions based on those assumed facts.[20]

Second, Williams argues that Levenson's opinions about OPDA's policies and practices are irrelevant.[21] Williams contends that Levenson's opinion that OPDA's policies were "inadequate" is irrelevant because the deliberate indifference standard does not involve any generally applicable standard of care.[22]

Third, Williams asserts that Levenson's opinions that *Brady* violations occurred in specific cases are improper for multiple reasons.[23] Williams argues that that the issue of whether a *Brady* violation occurred in any particular case is an ultimate legal conclusion based on an analysis of the required legal elements.[24] Additionally, Williams contends that Levenson's conclusions about *Brady* violations are not supported by a reliable methodology, as she does not explain how she determined that there was a *Brady* violation in any specific case.[25] Williams asserts that Levenson

---

[19] *Id.* at 12–18.

[20] *Id.* at 18.

[21] *Id.* at 19.

[22] *Id.* at 19–21.

[23] *Id.* at 22.

[24] *Id.* at 22–23.

[25] *Id.* at 24–27.

also misuses the term "*Brady* violation" by referring to any failure to disclose favorable information, without consideration of whether the evidence was material.[26]

Fourth, Williams contends that Levenson's conclusions about *Brady* violations are irrelevant, because she has not demonstrated that any of the alleged *Brady* violations in other cases were very similar to the alleged violations in Plaintiff's case.[27] Additionally, Williams points out that many of the cases identified occurred under a different district attorney or after Plaintiff's conviction.[28]

Fifth, Williams contends that Levenson's opinions about evidence that "should have" been disclosed in Plaintiff's case are improper legal conclusions.[29] According to Williams, whether the elements for a *Brady* violation are satisfied in Plaintiff's case is one of the key legal issues in dispute.[30]

Sixth, Williams relatedly argues that Levenson's opinion that the *Brady* violation in Plaintiff's case was caused by OPDA's policies or practices is an improper legal conclusion.[31] Williams asserts that Levenson's report does not include any analysis of what caused the alleged *Brady* violations.[32]

---

[26] *Id.* at 28.

[27] *Id.* at 29–30.

[28] *Id.* at 31.

[29] *Id.*

[30] *Id.*

[31] *Id.* at 32.

[32] *Id.* at 33.

Seventh, Williams contends that Levenson's opinions on the existence of undetected or unreported *Brady* violations are irrelevant and unreliable.[33] Williams argues that any *Brady* violations that were not found by courts or otherwise brought to the attention of Connick are irrelevant.[34] Additionally, Williams points out that beyond a vague suspicion that there must be additional, undetected violations, Levenson does not offer even a rough estimate of the number, type, or reasons for the speculative undetected *Brady* violations.[35]

Eighth, Williams argues that Levenson's opinions comparing the number of *Brady* violations in Atlanta, Memphis and St. Louis are irrelevant and unreliable.[36] Williams contends that the issue of whether OPDA had more *Brady* violations over some period of time than another city is irrelevant to OPDA's policies.[37] Additionally, Williams argues that Levenson's methodology of obtaining these comparators is unreliable because she found them through searches of Westlaw, news coverage, National Registry of Exonerations, and local Innocence Project websites.[38] Williams points out that Levenson does not explain how she chose the comparators or the number of cases prosecuted by each DA's office.[39]

Ninth, Williams contends Levenson's opinions on the correctness of OPDA's manual and OPDA's alleged "misunderstanding" of *Brady* are impermissible legal conclusions.[40] Tenth,

---

[33] *Id.*

[34] *Id.* at 34.

[35] *Id.*

[36] *Id.* at 35.

[37] *Id.*

[38] *Id.*

[39] *Id.* at 36.

[40] *Id.*

Williams asserts that Levenson's opinions comparing the facts of this case to other Section 1983 lawsuits are improper because they are legal conclusions.[41] Eleventh, Williams argues that Levenson's opinions on "notice" and OPDA's knowledge are impermissible opinions concerning state of mind and are unreliable.[42] Twelfth, Williams argues that Levenson's opinions on the existence of "municipal policy" are impermissible legal conclusions.[43]

### B.    Plaintiff's Arguments in Opposition to Motion

In opposition, Plaintiff contends that Levenson's testimony should be permitted because she is qualified, her opinions are reliable, and her testimony is relevant to issues central to this case.[44] Further, Plaintiff submits that Levenson does not offer legal conclusions regarding any ultimate issue.[45]

Responding to Williams's first argument that Levenson will testify as a fact witness, Plaintiff contends that Levenson will not offer fact witness testimony or her opinion about what happened in OPDA in the 1980s.[46] Instead, Plaintiff asserts Levenson relies on testimony from Connick, OPDA's discovery responses, the Rule 30(b)(6) testimony, and other fact witness testimony.[47] According to Plaintiff, Williams's extensive citation to testimony that it would use to

---

[41] *Id.* at 37.

[42] *Id.* at 38.

[43] *Id.* at 39.

[44] Rec. Doc. 105 at 6.

[45] *Id.*

[46] *Id.* at 7.

[47] *Id.*

impeach Levenson's conclusions evidences that such challenges are appropriate for cross-examination, not a *Daubert* motion.[48]

Next, Plaintiff asserts Levenson's opinions are reliable.[49] Addressing Williams's argument that Levenson has not sufficiently explained how she arrived at her conclusions regarding *Brady* violations in other cases, Plaintiff points out that Levenson explains that she reached these conclusions based on: (1) her review of the materials listed in Appendix A of her report; (2) her review of the underlying documentation and records of all of other *Brady* cases; and (3) her "professional expertise and experience in this area."[50] According to Plaintiff, Levenson's opinion that the actual number of *Brady* violations by the OPDA is likely much larger than the number that has been documented in court decisions is fully supported by reliable sources and the facts in the record.[51] Plaintiff also argues that Levenson's comparison of OPDA to other cities is reliable because it is supported by multiple types of evidence, including a report from the Fair Punishment Project, local Innocence Project websites and newspapers, the National Registry of Exonerations, and legal research conducted on Westlaw.[52] Plaintiff asserts these are common methods of research used by attorneys and courts.[53] Additionally, Plaintiff contends that Levenson's opinions are not unreliable merely because she credits some information, while disregarding other information.[54] Responding to Williams's requests that the Court enter an order requiring that Plaintiff introduce

---

[48] *Id.* at 8.

[49] *Id.* at 9–11.

[50] *Id.* at 11.

[51] *Id.* at 12.

[52] *Id.* at 13.

[53] *Id.*

[54] *Id.* at 14.

evidence supporting his version of the facts before Levenson is allowed to offer opinions based on those assumed facts, Plaintiff contends this request is based on a misinterpretation of a single district court opinion.[55]

Next, Plaintiff argues that Levenson's opinions are relevant to deliberate indifference.[56] Plaintiff suggests that experts are regularly permitted in Section 1983 cases in this Circuit to opine on how a law enforcement agency's policies and practices compare to best practices, and to offer opinions regarding deficiencies in an agency's supervision, discipline, and training of its employees.[57]

Finally, Plaintiff asserts that Levenson's opinions are not legal conclusions.[58] Levenson will testify that (1) in dozens of cases, courts have issued opinions holding that OPDA violated *Brady*; (2) in additional cases, OPDA has offered plea agreements to defendants alleging Brady violations; and (3) in more cases where a defendant alleged a *Brady* violation, courts resolved them on other grounds.[59] Plaintiff contends this testimony will aid the jury's understanding of the history of OPDA's non-compliance with *Brady*.[60] Because the testimony does not answer any ultimate question the jury must decide, Plaintiff contends it is not an impermissible legal conclusion.[61] Finally, Plaintiff submits that Levenson's testimony concerning OPDA's policies, practices, and customs is permissible because Levenson will not instruct the jury as to how it should assess

---

[55] *Id.* at 16.

[56] *Id.* at 17.

[57] *Id.* at 18.

[58] *Id.* at 19.

[59] *Id.* at 21.

[60] *Id.*

[61] *Id.*

whether ODPA had a policy, practice, or custom of violating *Brady*.[62] Instead, Plaintiff contends Levenson merely intends to offer the jury a description of the case law underlying prosecutors' *Brady* obligations and compare that case law to OPDA's *Brady* policies, practices, and customs.[63]

### C.    *Williams's Arguments in Further Support of the Motion*

In the reply brief, Williams argues that Plaintiff has not demonstrated Levenson's opinions are based on reliable methodology and supported by the evidence in the record.[64] Although an expert can rely on one version of the facts and not the other, Williams contends that Levenson's opinions are problematic because she does not even acknowledge any disputes of fact.[65] Assuming the Court finds any of Levenson's testimony admissible, Williams submits that, at a minimum, Plaintiff should be required to introduce sufficient evidence at trial to support their version of the facts before Levenson is allowed to offer opinions based on those facts.[66]

Williams also argues that Levenson's opinions comparing the incidence of *Brady* violations in New Orleans to other jurisdictions is unreliable.[67] Williams submits that Levenson's opinions based on ethical rules and best practices are irrelevant.[68] Finally, Williams argues that Levenson's opinions about the inadequacy of OPDA's policies and her opinions about *Brady* violations in other cases are improper legal conclusions.[69]

---

[62] *Id.* at 23.

[63] *Id.* at 23–24.

[64] Rec. Doc. 110 at 2.

[65] *Id.* at 4.

[66] *Id.* at 6.

[67] *Id.*

[68] *Id.*

[69] *Id.* at 8.

### III. Legal Standard

The district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702.[70] Rule 702 states that a witness "qualified as an expert by knowledge, skill, experience, training, or education," may provide expert testimony when "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."[71] For the testimony to be admissible, Rule 702 establishes the following requirements:

(1) the testimony must be based upon sufficient facts or data,

(2) the testimony must be the product of reliable principles and methods, and

(3) the expert must reliably apply the principles and methods to the facts of the case.[72]

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court explained that Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."[73] The court's gatekeeping function mostly involves a two-part inquiry.

First, the court must determine whether the expert testimony is reliable, which requires an assessment of whether the expert testimony's underlying reasoning or methodology is valid.[74] The

---

[70] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138–39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000).

[71] Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[72] Fed. R. Evid. 702.

[73] *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (clarifying that the court's gatekeeping function applies to all forms of expert testimony).

[74] *See Daubert*, 509 U.S. at 589. The party offering the testimony has the burden to establish reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994)).

court's inquiry into the reliability of expert testimony is flexible and fact-specific.[75] The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.[76] In analyzing reliability, *Daubert* instructs courts to consider (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) any evaluation of known rates of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) general acceptance within the scientific community.[77]

Second, the court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will assist the trier of fact in understanding the evidence.[78] The second inquiry primarily analyzes whether the expert testimony is relevant.[79]

Yet a court's role as a gatekeeper does not replace the traditional adversary system.[80] A "review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."[81] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[82] "As a general rule, questions relating to the bases and sources

---

[75] *Seatrax*, 200 F.3d at 372.

[76] *See Daubert*, 509 U.S. at 590.

[77] *Id.* at 592–94. In *Kumho Tire*, the Supreme Court emphasized that the test of reliability is "flexible" and that Daubert's list of specific factors does not necessarily nor exclusively apply to every expert in every case. *Kumho Tire*, 526 U.S. at 141. The overarching goal "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

[78] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

[79] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

[80] *See Daubert*, 509 U.S. at 596.

[81] Fed. R. Evid. 702 advisory committee's note, "2000 Amendments."

[82] *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left to the jury's consideration."[83]

Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue."[84] "The rule was enacted to change the old view that [] giving an opinion on an ultimate issue would 'usurp the function' or 'invade the province' of the jury."[85] The rule, however, "does not open the door to all opinions."[86] Witnesses may not "tell the jury what result to reach," nor may they "give legal conclusions."[87] The Fifth Circuit has explained that "the task of separating impermissible question which call for overbroad or legal responses from permissible questions is not a facile one," but one that requires courts to exclude questions or answers from experts that "would supply the jury with no information other than the expert's view of how its verdict should read."[88]

## IV. Analysis

Williams moves the Court to exclude Levenson as a witness.[89] Williams raises twelve arguments in support of the motion. Each argument is addressed in turn.

---

[83] *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore Cnty.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

[84] Fed. R. Evid. 704(a).

[85] *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983).

[86] *Id.*

[87] *Id.* (citing *United States v. Fogg*, 652 F.2d 551, 557 (5th Cir. 1981)).

[88] *Id.*

[89] Rec. Doc. 99.

### A.      *Whether Levenson is Offering Fact Testimony*

First, Williams argues that Levenson has no expertise that would allow her to essentially testify as a fact witness about what OPDA's historical policies and practices were.[90] Williams is essentially challenging the facts on which Levenson relies to form her opinions about OPDA's policies and practices. Although "courts have afforded experts a wide latitude in picking and choosing the sources on which to base opinions," courts are nonetheless required "to examine the reliability of those sources."[91] The facts on which an expert relies must be of the sort that "experts in the particular field would reasonably rely" in forming an opinion on the subject.[92]

Levenson relies on testimony of Connick, testimony of other fact witnesses, and OPDA's discovery responses to form an opinion on whether OPDA's policies, practices, and procedures comported with its due process obligations. To the extent Williams believes that Levenson failed to consider other relevant evidence, this issue is best addressed through cross examination. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left to the jury's consideration."[93] The issue of whether Levenson relied upon adequate information goes to the weight to be assigned to her testimony, as it involves the bases and sources upon which she relied in reaching her conclusions in this case.

---

[90] Rec. Doc. 99-1 at 10.

[91] *Viterbo*, 826 F.2d at 422.

[92] Fed. R. Evid. 703.

[93] *14.38 Acres of Land*, 80 F.3d at 1077 (quoting *Viterbo*, 826 F.2d at 422).

**B.**    ***Whether Levenson's Opinions About OPDA's Policies and Practices are Irrelevant***

Second, Williams argues that Levenson's opinion that OPDA's policies were "inadequate" is irrelevant because the deliberate indifference standard does not involve any generally applicable standard of care.[94] To establish a failure to train claim, a plaintiff must show "(1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question."[95] "Deliberate indifference is 'more blameworthy than negligence' but less blameworthy than purposeful harm."[96] "The standard is 'stringent' and requires that the supervisory actor disregarded a known consequence of his action."[97] The issue of whether Connick acted with deliberate indifference is ultimately a fact question that will be decided by the jury. Levenson's opinions on whether OPDA's polices were "adequate" will assist the jury in making this determination.[98]

**C.**    ***Whether Levenson's Opinions About Brady Violations are Proper***

Third, Williams asserts that Levenson's opinions that *Brady* violations occurred in specific cases are improper legal conclusion and are not supported by a reliable methodology, as she does not explain how she determined that there was a *Brady* violation in any specific case.[99] Williams

---

[94] Rec. Doc. 99-1 at 19–21.

[95] *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010).

[96] *Id.* at 169 (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).

[97] *Id.* at 169–70 (citing *Southard v. Tex. Bd. of Crim. Justice*, 114 F.3d 539, 551 (5th Cir. 1997)).

[98] *See Jones v. Cannizzaro*, 514 F. Supp. 3d 853, 865 (E.D. La. 2021) ("Levenson's testimony will help the jury understand the adequacy of OPDA's *Brady* policy. She does not opine on whether the OPDA was deliberately indifferent or whether its policies were constitutional. Accordingly, she does not offer an opinion on a conclusion of law.").

[99] Rec. Doc. 99-1 at 22–27.

asserts that Levenson also misuses the term "*Brady* violation" by referring to any failure to disclose favorable information, without consideration of whether the evidence was material.[100]

Williams has not demonstrated that Levenson should be prevented from testifying regarding *Brady* violations found by other courts or claimed in other cases. Levenson's report offers a synthesis of the available caselaw that will assist the jury in its consideration of the history of findings and allegations of *Brady* violations by the OPDA. To prevail on his claim that OPDA had a *de facto* policy of violating *Brady*, Plaintiff will have the burden of proving a "persistent, widespread practice of city officials or employees" that is "so common and well settled as to constitute a custom that fairly represents municipal policy."[101] "A pattern also requires 'sufficiently numerous prior incidents' as opposed to 'isolated instances.'"[102] Levenson has reviewed the case law, and she provides concise lists of *Brady* violations that were adjudicated by courts (Exhibit 1), cases where she opines that OPDA's conduct amounted to admission of *Brady* claims (Exhibit 2), and cases where she opines that OPDA responded to a *Brady* claim with an admission that it withheld evidence favorable to the defense (Exhibit 3).

The cases listed in Exhibit 1 (*Brady* violations that were adjudicated by courts) are extremely relevant to Plaintiff's claim that OPDA had a pattern of violating *Brady.* Levenson's proposed testimony is not an impermissible legal conclusion. The legal conclusion was reached by those courts when they determined that a *Brady* violation occurred. Levenson is merely offering a summary of what those courts found. While the court opinions themselves would offer the most concise description of the facts of those cases, court opinions may be too complex for a lay person

---

[100] Rec. Doc. 99-1 at 28.

[101] *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001).

[102] *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) (quoting *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)).

to decipher, understand, synthesize, and appreciate its relevance to the facts of this case. Therefore, Williams has not shown that this testimony should be excluded. However, consistent with this Court's ruling on Williams's motion for summary judgment, Levenson may not offer evidence of *Brady* violations occurring in cases that were tried after Connick left office in 2003 as those cases are not relevant to show a pattern of withholding *Brady* material by Connick's office.[103] Additionally, as discussed in the Order and Reasons on Williams's motion for summary judgment, *Brady* violations were not adjudicated in the cases of George Lee and James Walker. Therefore, Levenson may not offer testimony on those two cases.

Exhibit 2 identifies eight cases where Levenson opines that OPDA's conduct amounted to an admission of *Brady* claims and seven additional cases where Levenson opines that the criminal defendants made credible *Brady* claims against OPDA that were resolved on other grounds. *Brady* violations were not adjudicated by the courts in those cases. Williams contends that Levenson's opinions are unreliable because she does not explain her methodology for how she determined there were "credible" *Brady* claims in these cases. The Court finds this argument unpersuasive. In a footnote for each case, Levenson lists the court records she reviewed to reach these conclusions. To the extent Williams disagrees with these conclusions, this issue is best left to cross-examination. The issue of whether Levenson relied upon adequate information goes to the weight to be assigned to her testimony, as it involves the bases and sources upon which she relied in reaching her conclusions. Levenson may not offer evidence on the cases that were tried after Connick left office in 2003 as those cases are not relevant to show a pattern of withholding *Brady* material by Connick's office.[104]

---

[103] John Duncan, Michael Anderson, Christopher Wells, Henry Bruer, Ronald Warner, and Robert Jones.

[104] Jamal Tucker, Jeremy Burse, and Julio Ruano.

Similarly, Exhibit 3 identifies 22 additional cases in which Levenson opines that OPDA has subsequently admitted to withholding favorable evidence. Levenson lists the court records she reviewed to reach these conclusions, such as joint post-conviction plea agreements and joint motions to vacate. To the extent Williams disagrees with these conclusions, this issue is best left to cross-examination. The issue of whether Levenson relied upon adequate information goes to the weight to be assigned to her testimony, as it involves the bases and sources upon which she relied in reaching her conclusions. Levenson may not offer evidence on the case that was tried after Connick left office in 2003 as those cases are not relevant to show a pattern of withholding *Brady* material by Connick's office.[105] To the extent that Williams claims Levenson misuses the term "*Brady* violation" by referring to any failure to disclose favorable information, without consideration of whether the evidence was material, this issue can be addressed on cross-examination.

### D.    *Whether Levenson's Conclusions About Brady Violations are Relevant*

Fourth, Williams contends that Levenson's conclusions about *Brady* violations are irrelevant, because she has not demonstrated that any of the alleged *Brady* violations in other cases were very similar to the alleged violations in Plaintiff's case.[106] The issue of whether the cases are sufficiently similar to put Connick on notice of a pattern is ultimately a fact question to be resolved by the jury. This issue is best addressed through cross-examination.

Additionally, Williams points out that many of the cases identified occurred under a different district attorney or after Plaintiff's conviction.[107] As discussed above, the Court excludes

---

[105] Kaleigh Smith.

[106] Rec. Doc. 99-1 at 29–30.

[107] *Id.* at 31.

evidence on the cases that were tried after Connick left office in 2003 as those cases are not relevant to show a pattern of withholding *Brady* material by Connick's office. The trials of Larry Hudson, Hayes Williams, Linroy Davis, and Roland Gibson pre-date the Connick administration. Because the *Brady* violations were found during the Connick administration, the Court finds the cases relevant to the issue of whether Connick had actual or constructive notice.

Williams also argues, to put Connick on notice of similar *Brady* violations, the convictions in other cases must have been overturned *before* Plaintiff's conviction, making many of the cases Plaintiff cites irrelevant to proving notice. The Court has addressed this issue several times in ruling on Williams's motions to dismiss and motion for summary judgment. The Fifth Circuit has recognized that "[a] pattern requires similarity, specificity, and sufficiently numerous *prior* incidents."[108] *Brady* violations that pre-date Plaintiff's conviction, and later came to light are relevant and probative to show the practices and customs at OPDA during the time period before and during Plaintiff's criminal proceedings. "The fact that similar *Brady* violations continued unabated in the years after the *Brady* violation in [Plaintiff's] case, under the same policymaker, enforcing the same *Brady* policy, constitutes powerful circumstantial evidence of the unconstitutional policy, practice, or custom in place at OPDA during [Plaintiff's] prosecution."[109] "[R]eversals occurring after a plaintiff's conviction are relevant in determining if there existed an unconstitutional custom in Connick's office and if he had actual or constructive notice of it."[110] Therefore, the Court once again rejects this argument.

---

[108] *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017), as revised (Mar. 31, 2017) (emphasis added). *See also Thompson*, 563 U.S. at 63 ("[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide 'notice to the cit[y] and the opportunity to conform to constitutional dictates.'").

[109] *Jones v. Cannizaro*, No. 18-503, 2021 U.S. Dist. LEXIS 13312, at *15 (E.D. La. Jan. 21, 2021).

[110] Rec. Doc. 44 at 25.

### E.    *Whether Levenson's Opinions About Evidence that Should Have Been Disclosed are Legal Conclusions*

Fifth, Williams contends that Levenson's opinions about evidence that "should have" been disclosed in Plaintiff's case are improper legal conclusions.[111] According to Williams, whether the elements for a *Brady* violation are satisfied in Plaintiff's case is one of the key legal issues in dispute.[112]

"[A]n expert may never render conclusions of law,"[113] as that "would constitute an invasion of 'the province of the court to determine the applicable law and to instruct the jury as to that law.'"[114] Allowing such expert testimony in a jury trial is both unhelpful and harmful because:

> the jury would be very susceptible to adopting the expert's conclusion rather making its own decision. There is a certain mystique about the word 'expert' and once the jury hears of the [expert]'s experience and expertise, it might think the witness even more reliable than the judge. If an expert witness were allowed to testify to legal questions, each party would find an expert who would state the law in the light most favorable to its position. Such differing opinions as to what the law is would only confuse the jury.[115]

The United States Fifth Circuit Court of Appeals has recognized that:

> [M]erely being a lawyer does not disqualify one as an expert witness. Lawyers may testify as to legal matters when those matters involve questions of fact. However, "it must be posited as an a priori assumption [that] there is one, but only one, legal answer for every cognizable dispute. There being only one applicable legal rule for

---

[111] Rec. Doc. 99-1 at 31.

[112] *Id.*

[113] *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009).

[114] *Willette v. Finn*, 778 F. Supp. 10, 11 (E.D. La. 1991) (quoting *United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988)); *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir. 1996); *Goodman*, 571 F.3d at 399.

[115] *Cefalu v. Edwards*, No. 12-1377, 2013 WL 5592947, at *1 (E.D. La. Oct. 10, 2013) (quoting *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997)); *see also Jarrow v. Cupit*, No. 99-3539, 2000 WL 1537989, at *2 (E.D. La. Oct. 17, 2000) ("[I]t is the Court's role, not that of one party's expert witness, to instruct the jury on the law of this case. The law 'requires only one spokesperson ... who of course is the judge." (quoting *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988))).

each dispute or issue, it requires only one spokesman of the law, who of course is the judge.[116]

In *Estate of Sowell v. U.S.,*[117] the Fifth Circuit upheld the trial court's exclusion of an attorney-expert who sought to testify regarding what a reasonable fiduciary would do. The Fifth Circuit reasoned that "[w]hether the Estate was 'acting reasonably' was, for all practical purposes, the only issue for the jury in this case to decide."[118]

The issue of whether a *Brady* violation occurred in Plaintiff's case is a disputed issue that must be resolved by the jury. Levenson may not merely "tell the jury what result to reach," *i.e.* she cannot opine that a *Brady* violation occurred.[119] To establish a *Brady* claim, Plaintiff must show: (1) the prosecutor suppressed evidence; (2) the evidence was favorable to his criminal defense; and (3) the evidence was material to guilt or punishment.[120] Levenson's opinion that evidence should have been disclosed in Plaintiff's case is a legal conclusion that invades the province of the Court to instruct the jury on the law and the province of the jury to decide the ultimate issue. Therefore, Levenson may not testify to the ultimate issue of whether a *Brady* violation occurred in Plaintiff's criminal case.

---

[116] *Askanase*, 130 F.3d at 672 (quoting *Specht*, 853 F.2d at 807).

[117] 198 F.3d 169 (5th Cir. 1999).

[118] *Id.* at 171.

[119] Fed. R. Evid. 704, advisory committee notes.

[120] *Miller v. Dretke*, 431 F.3d 241, 245 (5th Cir. 2005) (citing *Brady*, 373 U.S. at 87).

**F.**     ***Whether Levenson's Opinions About the Cause of the Brady Violations are Legal Conclusions***

Sixth, Williams relatedly argues that Levenson's opinion that the *Brady* violations in Plaintiff's case were caused by OPDA's policies or practices is an improper legal conclusion.[121] The Court agrees. Whether a *Brady* violation occurred and whether it was caused by the policies and practices of OPDA are the ultimate legal issues to be resolved by the jury, with instructions on the law provided by the Court. Levenson may not testify that the *Brady* violations in Plaintiff's case were caused by OPDA's policies or practices.

**G.**     ***Whether Levenson's Opinions About Undetected Brady Violations are Relevant and Reliable***

Seventh, Williams contends that Levenson's opinions on the existence of undetected or unreported *Brady* violations are irrelevant and unreliable.[122] Levenson opines that the "reported" *Brady* violations from Orleans Parish are "just the tip of the iceberg," and that "the actual number of violations is almost certainly substantially larger."[123] The Court disagrees with Williams's characterization of this proposed testimony. Levenson is offering relevant information about the post-conviction process and how *Brady* violations come to light. This information is not general knowledge for a lay person. Her opinion that the number of *Brady* violations at OPDA is likely much larger than the number that has been documented in court decisions is fully supported by reliable sources and the facts in the record. The fact that she does not purport to estimate the number of undocumented violations does not make her opinion less reliable.

---

[121] Rec. Doc. 99-1 at 32.

[122] *Id.* at 33.

[123] Rec. Doc. 99-2 at 33.

**H.**     *Whether Levenson's Opinions Comparing Brady Violations in Other Cities are Relevant and Reliable*

Eighth, Williams argues that Levenson's opinions comparing the number of *Brady* violations in Atlanta, Memphis and St. Louis are irrelevant and unreliable.[124] The Court agrees with Williams that Levenson did not employ a reliable methodology to calculated and compared the *Brady* violations in other cities to those committed by the OPDA. Levenson opines that the number of *Brady* violations by the OPDA "far eclipse those of comparable prosecutor's offices."[125] In reaching this opinion, Levenson determined the number of *Brady* violations in three cities by searching the Westlaw database, news coverage, and "the National Registry of Exonerations and local Innocence Projects websites."[126] Levenson does not appear to have taken into consideration the number of cases prosecuted in each city and the accuracy and completeness of the databases reviewed. Further, Levenson has not shown that such a method is commonly used or accepted in her field. Accordingly, the Court excludes testimony on the comparison to other cities.

**E.**     *Whether Levenson's Opinions About the OPDA's Manual are Legal Conclusions*

Ninth, Williams contends Levenson's opinions on the correctness of OPDA's manual and OPDA's alleged "misunderstanding" of *Brady* are impermissible legal conclusions.[127] Levenson opines in her report that OPDA's policy manuals provided guidance on prosecutors' *Brady* obligations that were "inaccurate, inadequate and misleading."[128] The Court disagrees with Williams's characterization of this opinion. Levenson may testify to perceived shortcomings in

---

[124] Rec. Doc. 99-1 at 35.

[125] Rec. Doc. 99-2 at 34.

[126] *Id.*

[127] Rec. Doc. 99-1 at 36.

[128] Rec. Doc. 99-2 at 36.

OPDA policy. These opinions do not invade the province of the jury as Levenson does not opine on whether the OPDA was deliberately indifferent or whether its policies were constitutional. To the extent that Williams disagrees with those opinions, he can question her about it on cross-examination.

**J.    Whether Levenson's Opinions Comparing this Case to Other Section 1983 Lawsuits are Legal Conclusions**

Tenth, Williams asserts that Levenson's opinions comparing the facts of this case to other Section 1983 lawsuits are improper because they are legal conclusions.[129] Levenson's report includes a section discussing the rulings in *Connick v. Thompson*[130] and *Truvia v. Connick*[131] and explaining why she believes that Plaintiff is able to overcome the barriers to municipal liability discussed in those cases.[132] The Court agrees that such testimony is improper. Allowing Levenson to testify on these issues would usurp the role of the jury in determining whether Plaintiff has established municipal liability. Additionally, testimony about prior civil cases that were unsuccessful is of very limited probative value to this case, and any such value is substantially outweighed by a danger of confusing the issues or misleading the jury.

**K.    Whether Levenson's Opinions on Notice and Knowledge are Admissible**

Eleventh, Williams argues that Levenson's opinions on "notice" and OPDA's knowledge are impermissible opinions concerning state of mind and are unreliable.[133] To show deliberate indifference necessary to succeed on the failure to train claim, Plaintiff must present evidence "that

---

[129] Rec. Doc. 99-1 at 37.

[130] 563 U.S. 51 (2011).

[131] 577 F. App'x 317 (5th Cir. 2014).

[132] Rec. Doc. 99-2 at 42.

[133] Rec. Doc. 99-1 at 38.

a municipal actor disregarded a known or obvious consequence of his action."[134] Levenson opines that "there was more than enough actual and constructive notice to OPDA that its operations were leading to repeated violations of defendants' *Brady* rights."[135] Levenson also opines that Connick "demonstrate[d] a callous indifference to the rights of defendants."[136] Allowing Levenson to testify to these conclusions would usurp the role of the jury in determining whether Plaintiff has established municipal liability. Therefore, the Court excludes this proposed testimony.

### L.    *Whether Levenson's Opinions on Municipal Policy are Legal Conclusions*

Twelfth, Williams argues that Levenson's opinions on the existence of "municipal policy" are impermissible legal conclusions.[137] Levenson opines that "OPDA's conduct amounted to a municipal policy that resulted in dozens of *Brady* violations."[138] Allowing Levenson to testify to this conclusion would usurp the role of the jury in determining whether Plaintiff has established municipal liability. Therefore, the Court excludes this proposed testimony.

### V. Conclusion

For the reasons stated above,

**IT IS HEREBY ORDERED** that Defendant Jason Williams's Motion to Exclude Expert Testimony of Laurie Levenson[139] is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** to the extent it seeks to exclude: (1) evidence of *Brady* violations occurring in cases

---

[134] *Thompson*, 563 U.S. at 61.

[135] Rec. Doc. 99-2 at 42.

[136] *Id.* at 41.

[137] Rec. Doc. 99-1 at 39.

[138] Rec. Doc. 99-2 at 35.

[139] Rec. Doc. 99.

that were tried after Connick left office in 2003; (2) evidence that *Brady* violations occurred in the cases of George Lee and James Walker; (3) testimony to the ultimate issue of whether a *Brady* violation occurred in Plaintiff's criminal case; (4) opinion testimony that the *Brady* violations in Plaintiff's case were caused by OPDA's policies or practices; (5) opinion testimony comparing the number of *Brady* violations in Orleans Parish to other cities; (6) opinion testimony comparing this case to other Section 1983 cases; (7) opinion testimony that there was actual and constructive notice to OPDA that its operations were leading to repeated violations of defendants' *Brady* rights; and (8) opinion testimony that OPDA's conduct amounted to a municipal policy that resulted in dozens of *Brady* violations. The motion is **DENIED** in all other respects.

      **NEW ORLEANS, LOUISIANA**, this ___29th___ day of December, 2025.

                        **NANNETTE JOLIVETTE BROWN**
                        **UNITED STATES DISTRICT JUDGE**